**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

RIA R SQUARED, INC., Case No. 26-19251-CLC

Debtor. Chapter 11

_________________________________/

RIA R SQUARED, INC., Adv. No. 26-[ ][1]-CLC

Plaintiff.

vs.

SHINHAN SECURITIES CO., LTD.,

Defendant.

_________________________________/

## SHINHAN'S MOTION FOR REMAND

Shinhan Securities Co., Ltd. ("**Shinhan**"), by and through its undersigned counsel, respectfully moves this Court, pursuant to 28 U.S.C. §§ 1334(c)(1), 1334(c)(2), and 1452(b), for an order remanding the removed action captioned *Ria R Squared, Inc. v. Shinhan Securities Co., Ltd.*, Index No. 659538/2024 (N.Y. Sup. Ct.) (the "**State Court Action**") to the Supreme Court of the State of New York, County of New York, Commercial Division (the "**New York State Court**"), on the grounds that the United States Bankruptcy Court for the Southern District of Florida (this "**Court**") lacks subject-matter jurisdiction under 28 U.S.C. § 1334 or, in the

[1] As of the date of this Motion, the United States Bankruptcy Court for the Southern District of Florida, Miami Division has not yet opened an adversary proceeding for the State Court Action which was transferred from the United States District Court for the Southern District of New York to the United States District Court for the Southern District of Florida, Miami Division pursuant to Case No. 26-cv-6748. Ex. 48 [S.D.N.Y. Dkt. No. 12].

alternative, that mandatory abstention under 28 U.S.C. § 1334(c)(2) or permissive abstention and equitable remand under 28 U.S.C. §§ 1334(c)(1) and 1452(b) require remand. In support of this motion (the "**Motion**"), Shinhan states as follows.

## PRELIMINARY STATEMENT

1. This Court should return the State Court Action to the forum where it belongs. The New York State Court has presided over this simple New York law-governed contract, conversion, and fraud dispute for nearly two years. The New York State Court has developed substantial familiarity with its facts, having issued at least 17 orders addressing, among other things, discovery disputes, motions to dismiss, injunctive relief, and case management. Discovery is largely complete, with approximately 45,000 documents having been produced by the parties, depositions were scheduled, experts are ready to be disclosed, and a trial-readiness conference was set for October 2026. All of this screeched to a halt because RIA R Squared, Inc. ("**RIA**") filed this Chapter 11 Case to avoid pending adverse rulings in the New York State Court. Specifically, the Chapter 11 Case was filed after: (1) RIA's "secretive and stealth" transfer of Shinhan's collateral was revealed, (2) the Court granted partial injunctive relief, including the payment of past and future borrowing rate and coupon payments, (3) compelled discovery revealed that RIA made material misrepresentations to the Court and Shinhan; (4) RIA's counsel withdrew from further representing RIA; and (5) Shinhan filed a motion for sanctions which was pending ruling. In a clear attempt to find a more favorable forum, RIA removed the State Court Action to this Court on the theory that it is "related to" RIA's bankruptcy case within the meaning of 28 U.S.C. § 1334(b). This Court should not tolerate RIA's attempts at manipulation of jurisdiction here.

2. All three prongs of a remand analysis weigh in favor of sending the State Court Action back to New York State Court. *First*, this Court lacks subject-matter jurisdiction over the

removed action. The premise of RIA's asserted "related to" jurisdiction is that the outcome of the State Court Action could affect RIA's bankruptcy estate. But, at the center of the parties' dispute is the ownership and value of cash RIA was ordered to (and agreed) pay to Shinhan for borrowing rate and coupon payments,[2] and limited remaining securities (the "**Shinhan Securities**") which RIA admits serves as Shinhan's collateral under the Agreements. RIA has further revealed it (fraudulently) transferred the Shinhan Securities out of the Debtor's estate to non-Debtor, Ducenta 80-20 Fund, LP. RIA cannot manufacture bankruptcy jurisdiction over a dispute concerning assets it has disclaimed any ownership interest in.

3. *Second*, even if this Court concludes that subject matter jurisdiction exists over the State Court Action, mandatory abstention under 28 U.S.C. § 1334(c)(2) independently requires remand. Every element is satisfied: there is no independent basis for federal jurisdiction other than 28 U.S.C. § 1334(b); the State Court Action asserts New York law-governed contract, conversion, and fraud claims with no bankruptcy-related questions; it was commenced in state court nearly two years before the Chapter 11 Case was filed; and it can be timely adjudicated in the New York State Court, which has already brought the case to the threshold of trial.

4. *Third*, even if mandatory abstention did not independently compel remand, permissive abstention under 28 U.S.C. § 1334(c)(1) and equitable remand under 28 U.S.C. § 1452(b) favor the same result. The core of RIA's issues is a two-party contractual dispute between RIA and Shinhan, the holder of approximately 98% of RIA's disputed unsecured claims. The New York State Court's extensive investment in the case, the predominance of New York law issues,

---

[2] *See* Ex. 1 (Decision and Order on Mot. for OSC); Ex. 2 (June 17, 2026 Hr'g Tr.) at 38:10–23 (the court ordering the payment of outstanding coupon and borrowing rate payments to Shinhan "whether it's directly to [Shinhan] in U.S. bank account, whether it's in an escrow account with or without the Court" and further holding that "[s]uffice to say, that RIA will resume making those payments to Shinhan as it is legally bound to do. That fact is not in dispute.").

and the absence of any genuine bankruptcy issues and multi-creditor bankruptcy administration all counsel strongly in favor of returning this dispute to the forum RIA itself selected in December 2024 and litigated for nearly two years before deciding to switch venues to avoid adverse rulings. Moreover, the Chapter 11 Case was filed in bad faith—there is no operating business and no assets to reorganize; RIA does not exist without Shinhan.

5. At core, this is a two-party dispute that started two years ago in New York State Court and it should be finished there. This Court should not exercise jurisdiction over—much less retain—a two-party New York contract dispute that has no legitimate connection to the administration of RIA's estate.

## BACKGROUND[3]

### I. THE PARTIES AND THE SECURITIES LENDING AGREEMENTS

6. Shinhan is a securities brokerage and investment banking firm organized under the laws of the Republic of Korea and a wholly owned subsidiary of Shinhan Financial Group, one of South Korea's largest financial institutions.

7. RIA is a Delaware corporation that purports to be a financial services and asset management company. In its state-court pleadings, RIA repeatedly represented that its principal place of business is New York.[4] As recently as April 2026, RIA represented its principal place of business was Los Angeles.[5] Only for purposes of this bankruptcy has RIA now represented that its principal place of business is Florida.[6]

8. On January 25, 2019, Shinhan and RIA entered into the GMSLA and a

---

[3] References to filings in this adversary proceeding are cited as "Dkt. No. __." References to filings in the related Chapter 11 case, *In re RIA R Squared, Inc.*, Case No. 26-19251-CLC (Bankr. S.D. Fla. 2026) (the "**Main Case**"), are cited as "Main Case Dkt. No. __.".

[4] *See e.g.*, Ex. 3 (RIA New York State Court Complaint ("**Compl.**")) ¶ 14.

[5] *See* Ex. 4 (RIA Mot. to Dismiss Shinhan's Answer & Countercl.) at 16.

[6] *See* Main Case Dkt. No. 1 (Ch. 11 Petition) at 1; *see also* Dkt. No. 1 (Adv. Compl.) ¶ 23.

Supplemental Lending Agreement (the "**SLA**" and, together with the GMSLA, the "**Agreements**").[7] Under the Agreements, Shinhan lent securities to RIA between February and October 2019, of which approximately $228 million (in face value) remains outstanding.[8] In exchange, RIA was required to deposit custodial securities totaling at least 110% of the value of the lent securities into custodial accounts for Shinhan's exclusive benefit and maintain the 110% value on a daily basis.[9]

9. RIA was also required to make monthly borrowing rate and quarterly coupon payments for as long as the loans remained outstanding.[10] A failure to make such payments within five business days of the scheduled payment date triggered an automatic Event of Default under Section 13 of the SLA.[11]

10. An Act of Insolvency was also an immediate Early Termination Event triggering an Event of Default and all rights and remedies under the GMSLA and Section 13 of the SLA.[12]

11. RIA unequivocally represented in writing, at the time the Agreements were executed, that "in the event of RIA's bankruptcy, Shinhan Investment Corp. will take over ownership of the custodial account containing the collateral without any issues."[13]

12. The Agreements further provide that "neither Party may claim any sum by way of consequential loss or damage in the event of failure by the other Party to perform any of its

---

[7] Ex. 5 (the Agreements).

[8] *See* Ex. 6 (Shinhan New York State Court Answer & Counterclaims ("**Countercl.**")) ¶ 176; Ex. 7 (Trade Confirmations).

[9] *See* Ex. 5 (the Agreements) at SLA § 9; Ex. 7 (Trade Confirmations); Ex. 2 (June 17, 2026 Hr'g Tr.) at 28:21–25.

[10] Ex. 5 (the Agreements) at GMSLA § 8.3; *id*. at SLA § 7.

[11] *See id*. at SLA §§ 7, 13.

[12] *See id.* at SLA § 13.

[13] Ex. 8 (RIA-Shinhan Correspondence, dated Jan. 2019).

obligations under this Agreement."[14]

## II. RIA DEFAULTED AND THE STATE COURT ACTION WAS FILED

13. Prior to the New York litigation, Shinhan had ownership of the Shinhan Securities serving as its collateral. Under Sections 2.3, 4.2(c), and 14(c) of the GMSLA, RIA transferred full legal title and ownership to Shinhan.[15] Moreover, when RIA failed to make a timely borrowing rate payment in October 2024, Shinhan exercised its irrevocable power of attorney to take ownership of the custodial accounts including all custodial securities held therein, which as of October 2024 was comprised of liquid, marketable securities valued at approximately $224 million market value.[16] RIA obstructed those efforts.

14. On December 9, 2024, shortly after Shinhan exercised the power of attorney, RIA commenced the State Court Action.[17] It sued Shinhan for breach of contract, fraudulent inducement, breach of the covenant of good faith and fair dealing, and declaratory judgment, framing its own alleged breaches as arising from a purported oral side agreement it contends Shinhan failed to honor.[18] No such oral agreement exists, however. Nor does any such oral agreement constitute an Event of Default under the Agreements.[19]

15. Discovery commenced immediately, as the New York State Court had expressly ordered there would be "no stay of discovery pending motion practice, settlement proceedings, or alternative dispute resolution, unless specifically ordered by the Court."[20]

---

14 Ex. 5 (the Agreements) at GMSLA § 10.4.

15 Ex. 5 (the Agreements).

16 Ex. 6 (Countercl.) ¶¶ 184–192; Ex. 9 (Oct. 24, 2024 Collateral Report).

17 Ex. 3 (Compl.).

18 *See* Ex. 3 (Compl.) ¶¶ 75–112. The claims for declaratory judgment and breach of good faith and fair dealing were dismissed on July 31, 2025. Ex. 10 (Decision and Order on Mot. to Dismiss).

19 An Event of Default would have required a valid and binding securities lending agreement with specific terms, RIA to have provided collateral, and RIA to have provided written notice of Event of Default and termination of the loans. None occurred.

20 *See* Ex. 11 (March 13, 2025 Prelim. Conf. Order).

16. On September 2, 2025, Shinhan asserted counterclaims for breach of contract, conversion, and unjust enrichment based on RIA's continued withholding of the lent securities and its improper conversion of the Shinhan Securities.[21]

17. Pursuant to the Court-ordered deadline, the parties completed all document discovery by September 26, 2025, subject to limited discovery disputes.

18. In May 2025, notwithstanding its prior representations in its Complaint that it would continue all payments while the loans remained outstanding, RIA abruptly ceased providing daily BNP-verified reports on the value of Shinhan's collateral, stopped making monthly borrowing rate payments, and discontinued quarterly coupon payments.[22] As a result, Shinhan sent a letter to BNP, again exercising its irrevocable power of attorney over the custodial accounts, but RIA once again obstructed Shinhan's efforts by falsely alleging it had made all payments and directing BNP to disregard all instructions from Shinhan.[23]

19. Shinhan served renewed discovery requests seeking information regarding the status of the collateral, but RIA refused to produce any such information.[24] Shinhan therefore advised that it would seek the intervention of the New York State Court to protect its collateral and its rights, including through injunctive relief and a motion to compel.[25] In response, RIA represented that it wished to negotiate a settlement.

20. In October 2025, the parties engaged in settlement negotiations.[26] In January 2026, the parties executed a non-binding term sheet, and on January 21, 2026, the New York State Court

[21] *See* Ex. 6 (Countercl.).

[22] Ex. 6 (Countercl.) ¶¶ 194, 196; Ex. 12 (Correspondence with BNP) at 2, 11, 14.

[23] Ex. 6 (Countercl.) ¶ 195; Ex. 12 (Correspondence with BNP) at 10, 13.

[24] *See* Ex. 13 (Feb. 25, 2026 Status Conf. Tr.) at 5:7–18.

[25] *See* Ex. 13 (Feb. 25, 2026 Status Conf. Tr.) at 5:7–18.

[26] *See* Ex. 14 (Jan. 21, 2026 Stipulation and Order) at 1.

entered a stipulated order formally staying the action for 30 days, until February 20, 2026, to allow the parties to paper a final settlement.[27] The New York State Court granted the stay while expressly reserving Shinhan's right to seek injunctive relief with respect to the collateral and without prejudice to any motion to compel.[28] The New York State Court further directed that if a stipulation of discontinuance was not filed by March 27, 2026, the parties were to file any anticipated motions to compel and motions to dismiss by April 13, 2026, along with a joint proposed amended preliminary conference order.[29]

21. However, RIA did not negotiate in good faith—while the stay was in place, it continued to withhold collateral reports and the required payments and, as subsequent discovery would later confirm, began systematically selling, transferring, and otherwise depleting the Shinhan Securities, all while representing a settlement was forthcoming.[30] Although Shinhan had sent draft settlement agreements to RIA weeks before the February 25 status conference, RIA never returned a single comment on the draft agreements, never made a counterproposal, and never engaged substantively in the settlement process—despite repeatedly assuring Shinhan's counsel that a markup was forthcoming.[31]

22. At the February 25, 2026, status conference, RIA requested an additional 30 day extension to finalize the settlement—a court representation now known to be entirely false.[32] The New York State Court granted RIA's request for an additional thirty days to conclude the

---

27 *See id*. at 2.

28 *See* Ex. 13 (Feb. 25, 2026 Status Conference Tr.) at 10:13–17.

29 *See* Ex. 15 (Feb. 25, 2026 Court Notice).

30 *See infra* ¶ 28.

31 *See* Ex. 16 (May 12, 2026 Hr'g Tr.) at 15:11–16:12.

32 RIA provided not a single markup to the settlement agreements. It also had no ability or intent to settle, as confirmed by David Kang's (RIA's CEO) email to its auditor, Grant Thornton, roughly one week after seeking the extension, in which RIA's controller advised Grant Thornton that "[r]egarding the Shinhan lawsuit, there have been no developments since our last update. No settlement is imminent." *See* Ex. 17 (Feb.–Mar. 2026 GT Correspondence), Email from S. Shida to A. Klint (Mar. 3, 2026).

settlement agreements without prejudice to Shinhan's right to its collateral, on the condition that, absent a stipulation of discontinuance, the parties would have fifteen days to file their respective motions to compel and (as to RIA) a motion to dismiss Shinhan's counterclaims.[33]

## III. THE COURT GRANTED INJUNCTIONS AND MOTIONS TO COMPEL IN SHINHAN'S FAVOR

23. Having not reached a settlement, the stay terminated on March 27, 2026. On April 2, 2026, the Court held a pre-motion conference related to Shinhan's motion to compel information about its collateral and separate motion by order to show cause ("**OSC**") for a preliminary injunction for the turnover of the collateral based on Shinhan's concerns that RIA had transferred and/or depleted the collateral.[34] On April 9, 2026, following an off-the-record pre-motion conference, the New York State Court granted Shinhan leave to file its motion for an OSC and motion to compel.[35] The same day, the New York State Court entered an Amended Preliminary Conference Order setting updated discovery deadlines, including completion of all document productions by May 15, 2026, party depositions by July 15, 2026, expert disclosures by August 12, 2026, and a trial readiness conference for October 15, 2026.[36]

24. On April 13, 2026, Shinhan filed a motion to compel production of discovery related to its collateral.[37] On April 20, 2026, Shinhan filed its OSC.[38]

25. In opposition, RIA made blatant misrepresentations and omitted critical information from both Shinhan and the New York State Court concerning the location and value of the Shinhan Securities. Among other things, RIA asserted that Shinhan "ha[d] offered no

---

[33] *See* Ex. 13 (Feb. 25, 2026 Status Conference Tr.) at 10:3–8.

[34] Ex. 18 (Shinhan Ltr. Requesting Pre-Mot. Conference re OSC).

[35] Ex. 19 (Apr. 9, 2026 Court Notice).

[36] Ex. 20 (Am. Prelim. Conf. Order).

[37] *See* Ex. 21 (Shinhan Mem. ISO Mot. to Compel).

[38] *See* Ex. 22 (Shinhan Mem. ISO Mot. for OSC).

evidence that RIA has dissipated or depleted any collateral such that it would not be entirely recoverable at a later time," and that Shinhan's "claims of dissipation rest on speculation, not evidence" – all while knowing Shinhan's concerns were well founded.[39] RIA repeatedly assured the New York State Court that the Shinhan Securities were safe, remained at 110% value, and were being held exclusively for Shinhan's benefit.[40]

26. On May 12, 2026, the New York State Court held a hearing on both motions. It was during this hearing that the New York State Court and Shinhan first learned that RIA had transferred the Shinhan Securities out of the designated custodial accounts at BNP—a fact that no one other than RIA had known because RIA had not provided a single daily collateral report for over a year.[41] The Court specifically asked about the value of the collateral and RIA's counsel stated that, according to representations made by its client (which were not independently verified), the collateral had not been depleted from the $204 million last reported.[42]

27. The New York State Court granted Shinhan's motion to compel in its entirety, ordering production within two weeks of, among other things, daily valuation data for the Shinhan Securities from May 1, 2025, forward (the "**May 12 Order**").[43] The New York State Court also ordered additional briefing on Shinhan's motion for injunctive relief in light of RIA's previously undisclosed transfers and continued that motion. At the hearing, the New York State Court admonished RIA's "lack of transparency" and expressed "very serious concerns about what is

---

39 Ex. 23 (RIA Opp. to Shinhan Mot. for OSC) at 2, 13–14.

40 *See id.*

41 *See* Ex. 16 (May 12, 2026 Hr'g Tr.) at 16:6–23, 18:4–7, 29:4–11.

42 *See* Ex. 16 (May 12, 2026 Hr'g Tr.) at 26:5–29:16 (RIA's counsel representing that the collateral "ha[d] not [been] dissipated," based solely on what he had "been told by [his] client," and acknowledging he had "not seen . . . independent" verification of that representation).

43 *See* Ex. 24 (Decision and Order on Mot. to Compel).

going on behind the scenes."[44]

28. RIA failed to fully comply with the New York State Court's May 12 Order. By May 26, 2026, RIA did not produce daily collateral reports, account statements, or information sufficient to identify what had happened to the Shinhan Securities within the two-week deadline the Court had set.[45] Instead, RIA produced approximately 300 documents, which mainly consisted of daily collateral reports from before May 2025, which Shinhan already had. Because of these deficiencies, on May 28, 2026, Shinhan filed a letter requesting a pre-motion conference on a motion for sanctions, and the New York State Court agreed to hear the matter at a hearing scheduled for June 3, 2026.

29. On June 1, 2026, the parties submitted their additional briefing on Shinhan's motion for injunctive relief. In that additional briefing, RIA represented to the New York State Court—through sworn affirmations of its CEO, David Kang, and Timothy Torline of Ducenta Squared Asset Management—that the Shinhan Securities had a market value of $198,591,177 as of April 30, 2026.[46] While acknowledging they had been moved out of BNP and to a new custodian, RIA further represented that the Shinhan Securities had not been dissipated or transferred to third parties;[47] that they had not been commingled with any other party's assets;[48] and that "[t]he [Shinhan Securities] are all RIA's assets, held as collateral for Shinhan pursuant to the GMSLA and SLA."[49] RIA also represented that, if Shinhan ultimately prevailed at trial, it could recover the Shinhan Securities or their monetary value through a money judgment enforceable against RIA

---

44 *See* Ex. 16 (May 12, 2026 Hr'g Tr.) at 55:24–56:04.

45 Ex. 25 (Shinhan Mem. ISO Mot. for Sanctions) at 12–14.

46 Ex. 26 (RIA Supp. OSC Opp.) at 6; *see also* Ex. 27 (Aff. of T. Torline) ¶ 19; Ex. 28 (Aff. of D. Kang) ¶ 38.

47 *See* Ex. 26 (RIA Supp. OSC Opp.) at 2.

48 *See* Ex. 28 (Aff. of D. Kang) ¶¶ 42–43

49 Ex. 26 (RIA Supp. OSC Opp.) at 6 n.10; *see also* Ex. 28 (Aff. of D. Kang) ¶¶ 42–43.

as a solvent, U.S.-based counterparty.[50] RIA's counsel separately confirmed in writing to Shinhan's counsel "that there is no title, liens, or rights by any other party to the current collateral."[51]

30. On June 3, 2026, after the additional briefing was filed by both Shinhan and RIA, the New York State Court held a continued hearing on Shinhan's motion for injunctive relief and addressed the discovery issues related to the May 12 Order. At the outset of the hearing, the Court proposed that, rather than proceed directly to a ruling, the parties attempt to negotiate a stipulated resolution to the pending motion.[52] The Court made its own resources available to facilitate those negotiations, directing its court attorney to conference with the parties off the record to work toward a stipulation.[53] After the off-the-record session, the Court scheduled a remote follow-up conference with the court attorney for June 12, 2026, to report on the status of negotiations, and set a continued in-person preliminary injunction hearing for June 17, 2026.[54] RIA also agreed to continue to make rolling productions of documents responsive to the May 12 Order.

31. On June 18, 2026, based on the parties' inability to reach a final resolution on the various issues related to the injunction motion and the value and security of the Shinhan Securities, the New York State Court granted in part Shinhan's motion for injunctive relief.[55] In lieu of immediate turnover of the Shinhan Securities, and without knowledge that the value RIA attributed to the collateral was illusory and that RIA was insolvent, the New York State Court directed RIA to, among other things, (i) engage Houlihan Lokey to value the Shinhan Securities, (ii) provide

[50] Ex. 26 (RIA Supp. OSC Opp.) at 12.

[51] Ex. 28 (Aff. of D. Kang) ¶ 42; Ex. 29 (Counsel Email Correspondence, dated June 16, 2026).

[52] *See* Ex. 30 (June 3, 2026 Hr'g Tr.) at 2:14–3:11.

[53] *See id.* at 17:2–11.

[54] *See id.* at 17:12–18:6; *see also* Ex. 31 (June 3, 2026 Court Notice); Ex. 32 (June 12, 2026 Court Notice).

[55] *See* Ex. 1 (Decision and Order on Mot. for OSC).

daily collateral reporting, (iii) report any purchase or sale of Shinhan Securities within two calendar days, (iv) submit a joint letter to WSFS informing it of Shinhan's rights under the Agreements, (v) pay outstanding borrowing rate and coupon payments to Shinhan (either in a U.S. account or escrow account with or without the Court) and (vi) resume borrowing-rate and coupon payments to Shinhan moving forward (the "**June 18 Order**").[56] The New York State Court further directed the parties to submit a stipulation addressing the Houlihan Lokey engagement, the mechanics of RIA's payment obligations, and any other outstanding implementation issues, to be so-ordered by the Court by July 8, 2026.[57]

32. Also on June 17, the New York State Court granted Shinhan leave to file a motion for sanctions based on RIA's willful noncompliance with the May 12 Order and its pattern of misrepresentation.[58] RIA continued to refuse to produce bank account statements. RIA's counsel—Quinn Emanuel Urquhart & Sullivan LLP and Winston Taylor LLP—each filed motions to withdraw on June 30, 2026 (the "**Withdrawal Motions**"). Shinhan filed a motion for sanctions on July 1, 2026 (the "**Motion for Sanctions**"), seeking (i) adverse inferences with respect to RIA's maintenance of the collateral it held for Shinhan's benefit, (ii) preclusion of RIA from offering any evidence or argument based on information it failed to produce in accordance with the motion to compel, and (iii) an award of Shinhan's reasonable attorneys' fees and costs.[59] RIA's opposition was due on or before July 28, 2026.[60]

33. After the court deadline and the June 3, 2026 hearing, RIA produced highly concerning documents for the first time to Shinhan. Among other things, Shinhan learned that

---

[56] *See* Ex. 2 (June 17, 2026 Hr'g Tr.) at 36:9–38:25.

[57] *See id*. at 39:3–6.

[58] *See* Ex. 33 (Shinhan Ltr. re Mot. for Sanctions); Ex. 34 (June 17, 2026 Court Notice).

[59] *See* Ex. 25 (Shinhan Mem. ISO Mot. for Sanctions) at 1, 14–23.

[60] *See* N.Y. C.P.L.R. 2214(b).

RIA had no valuations or appraisals supporting its sworn representations that the Shinhan Securities totaled approximately $198 million.[61] In fact, RIA had sold the majority of the $204 million of liquid, marketable securities constituting the Shinhan Securities (all but approximately $58.7 million of securities) and replaced it with illiquid bespoke investments without any discernible value.[62] RIA also produced materials revealing that, as of December 31, 2023, its auditor, Grant Thornton, had confirmed that RIA could not return the lent securities or collateral, or satisfy a judgment against it, without liquidating.[63]

## IV. RIA FILED FOR BANKRUPTCY

34. As a consequence of the Withdrawal Motions, Shinhan was left with no counterparty with which to negotiate the Court-ordered stipulation concerning the Shinhan Securities that had been due on July 8, 2026, and the New York State Court adjourned that deadline *sine die*.[64]

35. On July 10, 2026, Shinhan wrote to the New York State Court advising of further concerning developments: RIA had still not provided all the documents the Court had directed in either the May 12 Order or the June 18 Order, and the daily reports generated by Ducenta revealed that RIA had withdrawn more than $1.2 million in cash from the WSFS account and BNP account between July 2 and July 8, 2026, in violation of the Court order and its representations to the Court.[65] On July 14, 2026, Shinhan filed a partial opposition to the Withdrawal Motions,

---

[61] Ex. 25 (Shinhan Mem. ISO Mot. for Sanctions) at 3, 10, 13–14.

[62] As Shinhan's counsel has represented to the Court, these "bespoke assets" are largely valueless litigation claims. One appears to be a note secured by a deed of trust on what may be Mr. Kang's personal residence. *See* Ex. 35 (Aug. 28, 2026 Hr'g Tr.) at 19:2–10 (describing the bespoke collateral as including "valueless litigation claims" and "apparently, a lien on what appears to be Mr. Kang's home, or a promissory note of what appears to be Mr. Kang's personal ledger").

[63] *See* Ex. 36 (Grant Thornton Audit Presentation); Ex. 37 (RIA-Grant Thornton Correspondence).

[64] *See* Ex. 38 (So-Ordered Ltr. Correspondence, dated July 7, 2026).

[65] *See* Ex. 39 (Shinhan Ltr. re Collateral at WSFS, dated July 10, 2026).

requesting that the New York State Court require RIA to retain replacement counsel within thirty days (absent which its claims should be dismissed), and impose interim protections over the collateral consistent with the June 18 Order.[66] In its opposition, Shinhan disclosed to the Court the withdrawal of $1.2 million of the Shinhan Securities since the Withdrawal Motions were filed in violation of the New York State Court's June 18 Order.[67]

36. RIA confirmed on July 10, 2026, that it would be "withdrawing its deposition notices" for the depositions scheduled for July 13–14, 2026; depositions that were ordered to be completed by July 15, 2026, despite RIA's requests for an extension of the deadline.[68]

37. On July 15, 2026—the deadline set to complete depositions, and while Shinhan's Motion for Sanctions remained pending—RIA filed the Chapter 11 petition commencing this case (the "**Chapter 11 Case**").[69] Two days later, the New York State Court conditionally granted the Withdrawal Motions, noting the "unusual posture and circumstances" of the case—including Quinn Emanuel's disclosure that RIA had directed Quinn Emanuel to withdraw on June 29, 2026.[70] The New York State Court warned RIA that if it did not retain replacement counsel by October 15, 2026, its claims would be "deemed abandoned and therefore dismissed" pursuant to CPLR § 3216, and reserved decision on any stay of the State Court Action pending notification of the bankruptcy filing.[71]

38. On July 22, 2026, the New York State Court stayed the State Court Action.[72]

---

[66] *See* Ex. 40 (Shinhan Partial Opp. to Withdrawal Mots.) at 1–5.

[67] *See id.* at 1, 3–4.

[68] *See* Ex. 41 (July 10, 2026 email from J. Bauchner); Ex. 20 (Am. Prelim. Conf. Order).

[69] *See* Main Case Dkt. No. 1.

[70] *See* Ex. 42 (July 17, 2026 Decision and Order on Withdrawal Mots.) at 2.

[71] *See id.*

[72] *See* Ex. 43 (July 22, 2026 Decision and Order on Mots.).

## V. SUMMARY OF STATE COURT PROCEEDING

39. The New York Court proceedings are significantly advanced. Over the course of the State Court Action, the New York State Court has issued at least 17 orders addressing, among other things, discovery disputes, motions to dismiss, injunctive relief, and case management; and between April 9, 2026 and July 17, 2026 the parties appeared in front of the New York State Court five times.[73]

## VI. RIA'S BANKRUPTCY SCHEDULES CONFIRM THIS IS A TWO-PARTY DISPUTE

40. RIA's own bankruptcy filings confirm that its Chapter 11 Case, in substance, is a vehicle for prosecuting RIA's disputed claims against Shinhan. RIA's Schedules of Assets and Liabilities list total assets of approximately $679.4 million and total liabilities of approximately $199.1 million.[74] Of that $679.4 million in assets, approximately $530 million—roughly 78%—consists of RIA's litigation claims against Shinhan in the State Court Action, claims RIA itself acknowledges are "disputed, contingent, and unliquidated."[75] The balance of assets with any known value represents either (i) accounts holding the borrowing rate and coupon rate payments, or (ii) assets that RIA's daily collateral report identify as Shinhan's collateral. Shinhan's disputed claim of $185 million constitutes approximately 97.7% of RIA's total nonpriority unsecured claims and 93% of all claims.[76] RIA's remaining creditors—principally American Express and JPMorgan Chase—hold combined claims of less than $30,000.[77] RIA lists only three employees, each an insider asserting a claim against the estate.[78]

---

73 *See* Docket, *Ria R Squared, Inc. v. Shinhan Sec. Co., Ltd.*, Index No. 659538/2024 (N.Y. Sup. Ct.).

74 Main Case Dkt. No. 1 at 8.

75 Main Case Dkt. No. 13 at 3–4.

76 Main Case Dkt. No. 1 at 7; Main Case Dkt. No. 6 at 13; Main Case Dkt. No. 13 at 3–4.

77 Main Case Dkt. No. 6 at 12–13.

78 Main Case Dkt. No. 6 at 14, 25.

41. Moreover, RIA's Schedules show that RIA has no conventional business operations requiring Chapter 11 protection: it has no third-party customers, no accounts receivable, no intellectual property, and no revenue sources independent of the disputed Shinhan Securities.[79] It is a shell holding what remains of Shinhan's assets.

42. On July 30, 2026, Shinhan moved to dismiss the Chapter 11 Case under 11 U.S.C. §§ 1112(b) and 305(a), or, in the alternative, for relief from the automatic stay, on the grounds that the case was filed in bad faith to obtain a tactical advantage in the State Court Action and lacks any legitimate reorganizational purpose.[80] RIA filed its opposition on August 7, 2026,[81] and Shinhan filed its reply on August 12, 2026.[82] That motion remains pending.

## VII. The Notice of Removal

43. On August 7, 2026, RIA filed a notice of removal (the "**Notice of Removal**")[83] of the State Court Action in the United States District Court for the Southern District of New York (the "**New York District Court**"), administered under Case No. 26-cv-6748.[84]

44. On August 11, 2026, RIA filed in the New York District Court the *Motion to Transfer Venue* (the "**Transfer Motion**") to this Court.[85]

45. On August 21, 2026, Shinhan filed the *Shinhan Securities Co., Ltd.'s Statement Pursuant to Federal Rule of Bankruptcy Procedure 9027(e)(3)* stating, among other things, its non-consent to the entry of final orders or judgment by the bankruptcy judge and reserving all

---

79 *See* Main Case Dkt. No. 6 (Schedules) at 2–7.
80 Main Case Dkt. No. 20.
81 Main Case Dkt. No. 41.
82 Main Case Dkt. No. 44.
83 References to filings in the New York District Court are cited as "S.D.N.Y. Dkt. No. _."
84 Ex. 44 (Notice of Removal) [S.D.N.Y. Dkt No. 1].
85 Ex. 45 [S.D.N.Y. Dkt. No. 3].

rights and remedies with respect to the Notice of Removal.[86]

46. On August 27, 2026, Shinhan took no position with respect to the Transfer Motion in *Defendant's Response to Plaintiff's Motion to Transfer Venue* and reserved any and all rights, claims, defenses, and arguments, including with respect to remand and subject-matter jurisdiction.[87]

47. On August 28, 2026, the New York District Court entered the *Order Granting Motion to Transfer Venue*, transferring the New York District Court proceeding to this Court.[88]

**ARGUMENT**

48. Courts in the Southern District of Florida generally apply a three-staged inquiry to a motion to remand a proceeding removed under 28 U.S.C. § 1452(a): (1) whether bankruptcy jurisdiction exists under 28 U.S.C. § 1334; (2) if jurisdiction exists, whether mandatory abstention requires remand under 28 U.S.C. § 1334(c)(2); and (3) if mandatory abstention does not apply, whether permissive abstention under 28 U.S.C. § 1334(c)(1) or equitable remand under 28 U.S.C. § 1452(b) nonetheless favors returning the action to state court. *See, e.g.*, *Benitez v. Jarrette Bay Invs. Corp. (In re Nassau Dev. of Vill. W. Corp.)*, 547 B.R. 857, 860–62 (Bankr. S.D. Fla. 2016); *Lennar Corp. v. Briarwood Capital LLC*, 430 B.R. 253, 261 (Bankr. S.D. Fla. 2010); *E.S. Bankest, LLC v. United Beverage Fla., LLC (In re United Container LLC)*, 284 B.R. 162, 168 (Bankr. S.D. Fla. 2002). The court performs a gatekeeper function: it must first determine whether jurisdiction exists, and then whether that jurisdiction must or should be exercised. *Lennar Corp.*, 430 B.R. at 261.

---

86 Ex. 46 [S.D.N.Y. Dkt. No. 10].

87 Ex. 47 [S.D.N.Y. Dkt. No. 11].

88 Ex. 48 [S.D.N.Y. Dkt. No. 12].

## I. SUBJECT-MATTER JURISDICTION DOES NOT EXIST OVER THE STATE COURT ACTION

49. A notice of removal does not confer automatic jurisdiction over the underlying action. Section 1452 permits removal only if the court "has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a); *E.S. Bankest*, 284 B.R. at 168. 28 U.S.C. § 1334(b) grants jurisdiction over civil proceedings "arising under title 11, or arising in or related to cases under title 11." *Id.* If neither "arising under" or "arising in" (aka "core") nor related-to (aka "non-core") jurisdiction exists, the removed action cannot remain in federal court and must be remanded on jurisdictional grounds. *See Mukamal v. Ofer*, No. 24-cv-22803, 2024 U.S. Dist. LEXIS 151517, at *5 (S.D. Fla. Aug. 23, 2024) ("once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue" (quoting *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999))).

50. RIA bears the burden of establishing, by a preponderance of the evidence, that 28 U.S.C. § 1334 jurisdiction exists. *See Hobbs v. Blue Cross Blue Shield of Ala.*, 276 F.3d 1236, 1242 (11th Cir. 2001) (the party seeking removal "ha[s] the burden of producing facts supporting the existence of federal subject matter jurisdiction by a preponderance of the evidence"); *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 752 (11th Cir. 2010) ("the party seeking to remove the case to federal court bears the burden of establishing federal jurisdiction"). Any doubt is resolved against removal. *See E.S. Bankest*, 284 B.R. at 168 ("The Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear." (citing B*urns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994))).

### A. Core Jurisdiction Does Not Exist Over the State Court Action

51. A proceeding is core if it arises under Title 11 or arises in a case under Title 11. *See* 28 U.S.C. §§ 1334(b), 157(b). The list of core proceedings includes, for example, obtaining credit,

confirming a plan, turnover of estate property, dischargeability of particular debts, validity of liens, and use of cash collateral. *Id.* § 157(b)(2).

52. The State Court Action—a state-court breach of contract, conversion, and fraud dispute governed by New York law—does not fit into any category listed in Section 157(b). It is plainly non-core: it does not raise any substantive provision of the Bankruptcy Code and does not arise in RIA's bankruptcy case. *See Wortley v. Bakst*, 844 F.3d 1313, 1319-20 (11th Cir. 2017) (state-law fraud and conspiracy claims are not core proceedings because they "are not created by the Bankruptcy Code and are not particular to federal bankruptcy law," collecting cases holding state-law fraud and tort claims non-core); *see also Cont'l Nat'l Bank of Miami v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1348-49 (11th Cir. 1999) (state-law contract dispute is non-core because it did not invoke a substantive bankruptcy-created right and "could clearly occur outside of bankruptcy").

53. RIA appears to not contest this notion. In its Notice of Removal, RIA frames the State Court Action as concerning a $750 million loan agreement and fraudulent inducement claim, and that "at least 'related-to'" jurisdiction exists.[89] It does not argue that "core" or "arising-in" jurisdiction exists.[90] Accordingly, this Court lacks "arising in" or "arising under" or "core" jurisdiction over the State Court Action.

**B. Related-to Jurisdiction Does Not Exist Over the State Court Action**

54. The test for "related to" jurisdiction is "whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy." *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir. 1990) (quoting *Pacor, Inc.*

---

[89] Ex. 44 (Notice of Removal) [S.D.N.Y. Dkt. No. 1] at ¶ 6.

[90] *Id.*

*v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)); *see also In re Nassau*, 547 B.R. at 860 ("An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankruptcy estate." (citing *Cmty. Bank of Homestead v. Boone (In re Boone)*, 52 F.3d 958, 960 (11th Cir. 1995))). But "[a] proceeding 'related to' a case under title 11 is the kind of proceeding with the most tenuous federal jurisdictional basis." *In re Nassau*, 547 B.R. at 860.

55. The broad interpretation of "related to" jurisdiction is not without limit: "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of" 28 U.S.C. § 1334(b), because "[j]udicial economy itself does not justify federal jurisdiction." *Pacor*, 743 F.2d at 994. Courts applying this test have found related-to jurisdiction lacking, and remanded, where—as here—the removed action would not conceivably affect the debtor's assets, liabilities, or the administration of the estate. *See In re Nassau*, 547 B.R. at 860-61 (remanding removed commercial foreclosure action for lack of related-to jurisdiction because "nothing in the [removed action] would impact the administration and handling of the Debtor's estate," notwithstanding the broad *Pacor/Lemco Gypsum* test); *Horizons A Far, LLC v. Buono (In re Soderstrom)*, No. 6:12-CV-1205-ORL-37, 2013 WL 24205, at *1, *2 n.1, *4 (M.D. Fla. Jan. 2, 2013) (affirming dismissal of state law fraud claims for lack of related-to jurisdiction where the claims did not "stem from the bankruptcy itself" and any effect on the estate was "attenuated and speculative").

56. RIA's Notice of Removal asserts that adjudicating the breach of contract and tort claims in the State Court Action "may materially affect creditor recoveries, plan formation, liquidity, and the administration of the estate."[91] RIA cannot simply assume its way into related-

[91] Ex. 44 (Notice of Removal) [S.D.N.Y. Dkt. No. 1] at ¶ 4.

to jurisdiction on that premise.[92]

57. The Shinhan Securities that make up the core of the parties' dispute are not estate property—meaning that their value cannot benefit or affect the estate in any way. As an initial matter, RIA transferred full legal title to the collateral to Shinhan under Sections 2.3, 4.2(c), and 14(c) of the GMSLA.[93] Shinhan further exercised an irrevocable power of attorney over the Shinhan Securities in October 2024—nearly one year ago. RIA's CEO swore to the New York State Court, under penalty of perjury, that the Shinhan Securities are "held as collateral for Shinhan pursuant to the GMSLA and SLA," and RIA's counsel confirmed in writing that there is "no title, liens, or rights by any other party to the current collateral."[94] RIA cannot now recast the same collateral as property of the estate simply because it has filed Chapter 11 and needs a jurisdictional hook to bring the State Court Action here.

58. RIA further admits to having (fraudulently) transferred the Shinhan Securities out of the Debtor's estate to non-Debtor, Ducenta 80-20 Fund, LP. RIA's CEO further confirmed that the Shinhan Securities constitute the only liquid assets available to RIA, testifying that of RIA's approximately $606 million in scheduled "all other assets," only "$50 to $60 million" is "flexible, liquid, or reasonably capable of being reduced to cash in the near term," and that those liquid assets

---

92 In its Notice of Removal, RIA cites to *Cuyahoga*, for the proposition that "related-to" jurisdiction is appropriate where the outcome could alter the estate's assets, liabilities, creditor distributions, and ability to reorganize. [Ex. 44 (Notice of Removal) ¶ 6]. *Cuyahoga* is an out-of-circuit case that does not even address removal. *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992). In *Cuyahoga*, the Second Circuit found that 28 U.S.C. § 1334(b) jurisdiction was proper because the underlying action being appealed involved approval of a settlement that "settled" §§ 502 and 506 allocation of claims between "a party asserting the status of constructive trustee and a first priority secured creditor." *Id.* at 114. Those issues made the action "core" and the court found supplemental jurisdiction over the ancillary environmental liability claims. *Id.* This case is clearly distinguishable, because the State Court Action has no core claims or issues. The State Court Action is a two-party contract, conversion, and fraud dispute over collateral that RIA has already conceded belongs to Shinhan; its resolution will determine the rights of RIA and Shinhan inter se under New York law, not resolve any bankruptcy-specific claims-allowance or asset-distribution question that would otherwise require this Court's involvement.

93 *See supra* ¶ 13.

94 *See supra* ¶ 29.

are the securities that were transferred to Ducenta 80-20 Fund, LP (i.e., the Shinhan Securities) with "the rest" being "contingent litigation claims."[95] Because the Shinhan Securities are at the center of the State Court Action, and are admittedly not property of the estate, related-to jurisdiction cannot rest on their value having an effect on the administration of the estate. Even if the Shinhan Securities are property of the estate (they are not), RIA acknowledges that the value thereunder inures to the exclusive benefit of Shinhan. Indeed, RIA has no assets of known value that are not expressly identified as Shinhan's collateral or money held in WSFS accounts and owed to Shinhan by Court order.

59. Related-to jurisdiction does not exist, and this Court should remand the State Court Action to the New York State Court on that basis alone.

## II. MANDATORY ABSTENTION UNDER 28 U.S.C. § 1334(C)(2) INDEPENDENTLY REQUIRES REMAND

60. Even if this Court were to find "related to" jurisdiction, it must abstain from hearing the State Court Action if (1) there is no independent basis for federal jurisdiction other than 28 U.S.C. § 1334(b); (2) the claims are related to a case under title 11 but do not arise under or arise in a case under title 11 (i.e., the proceeding is non-core); (3) the action was commenced in state court; and (4) the action can be timely adjudicated in state court. *See, e.g.*, *Lennar Corp.*, 430 B.R. at 262; *Carver v. Carver*, 954 F.2d 1573, 1579 n.10 (11th Cir. 1992); *E.S. Bankest*, 284 B.R. at 171. The party requesting abstention bears the burden of proving each element by a preponderance of the evidence. *Redstone Advance, Inc. v. Big Daddy Guns, Inc. (In re Big Daddy Guns, Inc.)*, 651 B.R. 817, 826 (Bankr. N.D. Fla. 2023). All four elements for mandatory abstention are satisfied here.

---

[95] *See* Ex. 49 (Transcript of Aug. 24, 2026 Meeting of Creditors) at 36:16–37:13.

### A. There Is No Independent Jurisdictional Basis Over the State Court Action

61. Shinhan disputes that jurisdiction is proper at all, but at most, jurisdiction here rests solely on 28 U.S.C. § 1334(b); there is no separate diversity or federal-question basis for the State Court Action to remain in federal court.

### B. Non-Core, Related-To Claims

62. RIA does not allege this is a core-proceeding, having represented in its Notice of Removal that the action is at least "related to" the Chapter 11 Case.[96] The claims do not arise under or arise in the bankruptcy case; they are not amongst the core proceedings listed in 28 U.S.C. § 157(b); and they raise no substantive Bankruptcy Code issues.

### C. Commenced in State Court

63. RIA commenced the State Court Action on December 9, 2024—well before RIA's July 15, 2026 petition date. The case had been ongoing for nearly two years as of the date of the filing and was poised for case-dispositive rulings.

### D. Timely Adjudication Favors the New York State Court

64. Timely adjudication is measured by whether continued state-court litigation would adversely affect administration of the bankruptcy case. *See E.S. Bankest*, 284 B.R. at 174-75. Relevant factors include:

> (1) backlog of the state court and federal court calendar; (2) status of the proceeding in state court prior to being removed (i.e., whether discovery had been commenced); (3) status of the bankruptcy case; (4) the complexity of the issues to be resolved; (5) whether the parties consent to the bankruptcy court entering judgment in the non-core case; (6) whether a jury demand has been made; and (7) whether the underlying bankruptcy case is a reorganization or liquidation case.

*Id.* at 175 (citing *Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764, 778-79 (B.A.P. 10th

[96] Ex. 44 (Notice of Removal) [S.D.N.Y. Dkt. No. 1] at ¶ 6 ("This Court has original but nonexclusive jurisdiction under 28 U.S.C. § 1334(b) because the action is at least 'related to' the Chapter 11 Case.").

Cir. 1997)).

65. Each of the seven factors confirms that the New York State Court, not this Court, can and should timely adjudicate the State Court Action.

66. *First*, the New York State Court has already invested substantially in this matter for nearly two years, issuing at least seventeen orders, holding five court hearings in the three months before the Chapter 11 Case was filed, and setting an operative scheduling order, which, until stayed by the Chapter 11 Case, included a trial-readiness conference in October 2026.

67. *Second*, the State Court Action was far advanced: the parties had produced over 45,000 documents, party depositions had been ordered completed by July 15, 2026, expert disclosures were due August 12, 2026, and a trial readiness conference was set for October 15, 2026.

68. *Third*, the Chapter 11 Case remains in its earliest stages—no plan has been filed, and the Motion to Dismiss remains pending. Nothing about the posture of the Chapter 11 Case requires this Court to retain the State Court Action.

69. *Fourth*, the State Court Action turns entirely on New York contract, conversion, and fraud law governing the GMSLA and SLA, issues the New York State Court has already analyzed at length. There is no bankruptcy-specific complexity that would counsel in favor of this Court's adjudication.

70. *Fifth*, Shinhan has expressly declined to consent to this Court entering final orders or judgment on these non-core claims.[97] Absent consent, this Court could, at most, submit proposed findings of fact and conclusions of law for *de novo* review by the district court, which requires an independent review of the record—and potentially hold its own trial—before any final,

[97] *See supra* ¶ 45.

appealable judgment could issue. *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(c). The New York State Court is not subject to this two-tiered process and can proceed directly to a final, appealable judgment, making it the faster and more efficient forum for the parties.

71. *Sixth*, under the New York Consolidated Laws, Civil Practice Law and Rules § 4102(a), the right to jury trial remains available and has not been waived because no note of issue has yet been filed. This Court cannot offer the parties a jury trial.

72. *Seventh*, RIA's Chapter 11 Case is nominally a reorganization, but RIA's own Schedules and Mr. Kang's sworn 341 testimony confirm that RIA has no legitimate business operations and no revenue independent of the Shinhan Securities. RIA consists overwhelmingly of contingent litigation claims against Shinhan—confirming that this is, in substance, a vehicle to relitigate the State Court Action.[98]

73. Every factor favors remanding this matter back to the New York State Court. At the time of removal, the State Court Action had been pending for approximately nineteen months; fact discovery was substantially complete; a sanctions motion was pending; party depositions had been ordered completed by July 15, 2026; expert disclosures were due August 12, 2026; and a trial readiness conference was set for October 15, 2026. This advanced posture confirms that the New York State Court can adjudicate the matter without delay, and that the New York State Court's continued oversight over the case would not prolong or hinder administration of RIA's estate. The State Court Action is at least as advanced as the state action remanded in *Lennar*, where mandatory abstention was required after the state action had been pending seventeen months, the state court had issued more than twenty orders, held at least ten substantive discovery hearings and multiple case-management conferences, set a three-week jury trial, and scheduled an evidentiary hearing

---

[98] RIA further has a pending litigation against DW Partners for the recovery of assets it alleges is Shinhan's collateral.

on a sanctions and default-judgment motion. *Lennar Corp.*, 430 B.R. at 258-66.

74. Because each mandatory abstention element is satisfied, this Court should hold that mandatory abstention independently requires remand of the State Court Action.

## III. PERMISSIVE ABSTENTION UNDER 28 U.S.C. § 1334(C)(1) AND EQUITABLE REMAND UNDER 28 U.S.C. § 1452(B) INDEPENDENTLY FAVOR RETURNING THIS ACTION TO STATE COURT

75. Under 28 U.S.C. § 1334(c)(1), this Court has broad discretion to abstain in the interest of justice, comity with state courts, or respect for state law. *DRO 15R LLC v. Marina Plaza, S.A. (In re DRO 15R LLC)*, 642 B.R. 341, 342 (Bankr. S.D. Fla. 2022). Under § 1452(b), this Court may remand on any equitable ground, a standard courts in this District treat as equally broad. *Hayim v. Goetz (In re SOL, LLC)*, 419 B.R. 498, 510 (Bankr. S.D. Fla. 2009) ("The criteria for either permissive abstention or [equitable] remand under 28 U.S.C. § 1452(b) are virtually identical."). The courts will rely on the factual record supporting each relevant factor. *See Fine Food Factory, Inc. v. Facilitrace LLC*, No. 0:24-cv-61191, 2024 U.S. Dist. LEXIS 198932 (S.D. Fla. Oct. 31, 2024).

76. Courts apply a fourteen-factor framework:

> (1) the effect, or lack of effect, on the efficient administration of the bankruptcy estate if discretionary abstention is exercised, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of related proceedings commenced in state court or other non-bankruptcy courts, (5) the jurisdictional basis, if any, other than § 1334, (6) the degree of relatedness or remoteness of the proceedings to the main bankruptcy case, (7) the substance rather than the form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the bankruptcy court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to jury trial, (12) the presence in the proceeding of non-debtor parties, (13) comity, and (14) the possibility of prejudice to other parties in the action.

*Lennar Corp.*, 430 B.R. at 267.

77. Every material factor favors remand here.[99]

78. *Forum shopping and the timing of the petition.* The timing of RIA's Chapter 11 filing independently supports remand. RIA has all but admitted the filing of this Chapter 11 Case was an act of forum shopping. On May 12, 2026, the New York State Court granted Shinhan's motion to compel and ordered further briefing on injunctive relief; on June 17, 2026, it granted leave for Shinhan to file the Sanctions Motion, which Shinhan filed on July 1; RIA's opposition to the Sanctions Motion, if any, was due July 28, 2026; the operative preliminary conference order required depositions to close July 15, 2026, expert disclosures by August 12, and set a trial readiness conference for October 15. RIA's counsel withdrew on June 30, 2026, RIA canceled scheduled depositions, and it filed for Chapter 11 on July 15, 2026, the very day depositions were to be completed. RIA failed to comply with the Court's order to pay the sums owed to Shinhan and which are currently held in the WSFS Escrow Account and Reserve Account totaling over $6.5 million and to make all payments moving forward.[100] After the Court's ruling on the OSC, Shinhan discovered RIA's blatant misrepresentations to the Court through RIA's delayed compelled discovery, and Shinhan further discovered RIA was insolvent and withdrew an additional $1.2 million in violation of the New York Court's order. These facts were raised to the Court for the first time in response to the Withdrawal Motions with a renewed request for an immediate turnover of collateral. RIA's first act in this bankruptcy was to file an adversary proceeding against Shinhan; an overt act of forum shopping. These circumstances support returning the action to the court whose orders and schedule the timing of the petition appears designed to avoid. *See Puritan Lace Mfg. Co. v. Perfect Home, L.L.C. (In re Perfect Home, L.L.C.)*,

---

[99] Of the fourteen factors identified above, factors 4, 5, 7, 9, and 14 are inapplicable here. As to factor 11, *see supra* ¶ 70 (no jury demand has been made in the State Court Action, and the right to do so remains available and unwaived).

[100] Main Case Dkt. No. 6 at 1.

231 B.R. 358, 362 (Bankr. N.D. Ala. 1999) (removal timed after an unfavorable state-court development is a hallmark of forum shopping).

79. *Bad faith.* RIA's Chapter 11 Case was independently filed in bad faith, which further supports abstention and equitable remand.[101] RIA clearly filed the Chapter 11 Case to stop the State Court Action from issuing adverse findings and to find a more favorable forum.[102] Courts are reluctant to reward such tactics: a debtor's manufacture of a bankruptcy hook to relitigate a two-party dispute in a friendlier forum is a hallmark of bad faith and forum shopping that weighs heavily in favor of abstention and equitable remand. *Cf. In re Outta Control Sportfishing, Inc.*, 642 B.R. 180, 185-86 (Bankr. S.D. Fla. 2022) (debtor filed Chapter 11 to escape a pending federal action and litigate a two-party dispute in a more favorable forum; courts are "loath to force" a creditor to litigate in the debtor's chosen forum instead of its own); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11th Cir. 1988) (petition filed on the eve of state-court proceedings to forestall a creditor's enforcement efforts evidences bad faith and forum shopping).

80. Since the filing of the Motion to Dismiss, additional evidence has come to light supporting that the Chapter 11 Case should be dismissed. For example, at the August 24, 2026 meeting of creditors held pursuant to 11 U.S.C. § 341, RIA's CEO, David Kang, testified under oath that RIA has had no lending counterparty other than Shinhan since approximately 2020.[103]

81. RIA also has no assets that are not owed to RIA. The WSFS accounts (totaling over $6.5 million) were ordered to be paid to Shinhan. And of RIA's approximately $679 million in scheduled assets, only $50 to $60 million consists of liquid assets—the rest being contingent

---

[101] *See Emergency Motion by Shinhan Securities Co., Ltd. to Dismiss or, Alternatively, for Relief from the Automatic Stay* [Main Case Dkt. No. 20] (the "**Motion to Dismiss**").

[102] Main Case Dkt. No. 44 ¶¶ 5–6.

[103] Ex. 49 (Transcript of Aug. 24, 2026 Meeting of Creditors) at 31:3–17.

litigation claims.[104] RIA's auditor confirmed that as of December 31, 2023, RIA could not continue as a going concern and uphold its contractual obligations to Shinhan.[105] Mr. Kang confirmed that RIA's financial condition had worsened every year since 2023.[106] The decision to file the Chapter 11 petition was made by the same three-person "executive committee" of insiders that controls all of RIA's business, investment, and litigation decisions,[107] and RIA first retained restructuring counsel at the end of May 2026—contemporaneously with Shinhan's motion for the turnover of the collateral and the revelation of RIA's collateral transfers and dissipation of $140 million of collateral value.[108]

82. *Comity with the New York State Court's docket management.* Comity strongly favors remand given the New York State Court's extensive investment in this litigation: it has presided over the case for approximately nineteen months, held multiple conferences, ruled on numerous motions, granted partial injunctive relief after extensive briefing, and was preparing resolution of a sanctions motion before removal intervened. *See Lennar Corp.*, 430 B.R. at 268 (comity favors discretionary remand "[g]iven all of the time and effort already expended by the State Court"); *Isa v. Johnson & Johnson*, No. 8:19-cv-1115-33JSS, 2019 U.S. Dist. LEXIS 115312, at *8 (M.D. Fla. July 11, 2019) ("comity counsels in favor of state-court resolution of state-law claims."). As in *Isa*, this is a case where Shinhan's claims are state law claims best decided by the court most familiar with the applicable law—here, New York contract, conversion, and fraud law that the New York State Court has applied to this dispute for nearly two years. *See id.*

---

[104] *Id.* at 37:2–17.

[105] *See* Ex. 36 (Grant Thornton Audit Presentation); Ex. 37 (RIA-Grant Thornton Correspondence).

[106] Ex. 49 (Transcript of Aug. 24, 2026 Meeting of Creditors) at 40:2–7.

[107] *Id.* at 34:10–16.

[108] *Id.* at 34:16.

83. *Predominance of state law.* The predominance of state law issues is one of the most compelling reasons for abstention. Every single issue in the State Court Action is governed by New York law turning on the interpretation of the GMSLA and SLA. No bankruptcy-specific expertise is required to resolve the breach of contract, conversion, and fraud claims brought in the State Court Action.

84. *Relatedness or remoteness to the bankruptcy case.* This factor is often the practical center of the analysis. *See Fine Food Factory*, 2024 U.S. Dist. LEXIS 198932, at *19-20 ("the primary inquiry is the degree of relatedness or remoteness of the proceedings to the main bankruptcy case" (internal quotation marks omitted)). The State Court Action is a breach of contract, conversion, and fraud dispute governed by New York law. That RIA's estate consists overwhelmingly of its litigation claims against Shinhan does not make the State Court Action itself a core bankruptcy matter; the New York State Court, not this Court, has presided over the substance of this dispute for nearly two years and has the strongest interest in resolving it, as there are no bankruptcy-related issues within the proceeding. RIA's attempts to forum shop at this late stage in the litigation should not be encouraged.

85. *Difficulty or unsettled nature of the applicable state law.* The State Court Action does not present any novel or unsettled question of New York law; to the contrary, it turns on the straightforward application of well-established New York contract principles—interpretation of the GMSLA and SLA, the effect of RIA's transfer of legal title to the Shinhan Securities, and garden-variety fraud and fraudulent-inducement standards—to a fully developed factual record that the New York State Court has already spent nearly two years developing. Because these are routine state-law issues rather than difficult or unsettled ones, there is no bankruptcy-specific reason for this Court to resolve them; the absence of any unsettled question further underscores

that the New York State Court can resolve the case efficiently and without need for guidance from this Court.

86. *Effect on efficient administration of the estate.* The core of the Chapter 11 Case is the two-party dispute between RIA and Shinhan—there are no material assets to administer outside RIA's contingent claims against Shinhan—which are unfounded and baseless. Outside this claim, RIA's only other asset is another litigation claim which is also part of the Shinhan's collateral package. RIA has no independent business operations outside of its business relationship with Shinhan. Therefore, administration of RIA's estate rises and falls entirely upon the adjudication of the parties' claims against one another and the New York Court is best suited to resolve this dispute.

87. *Feasibility of severing state-law claims.* The New York contract, conversion, and fraud claims are readily severable from the bankruptcy case; any judgment can be entered in state court, with enforcement, if needed, left to this Court.

88. *Presence of non-debtor parties; effectively a two-party dispute.* Shinhan's disputed claim of $185 million constitutes approximately 97.7% of RIA's total nonpriority unsecured claims and 93% of all claims, making this effectively a two-party dispute that the New York State Court—which has already invested nineteen months in the case—is best positioned to resolve. Because Shinhan's claim represents the overwhelming majority of RIA's disputed liabilities, and the underlying dispute can be fully adjudicated in the pending State Court Action, remand does not undermine any broader creditor-protection purpose of the bankruptcy case; there is no genuine multi-creditor administration at stake.

89. Taken together, these factors confirm that permissive abstention under 28 U.S.C. § 1334(c)(1) and equitable remand under 28 U.S.C. § 1452(b) independently support returning the

State Court Action to the New York State Court.

## CONCLUSION

90. For the reasons set forth above: (1) related-to jurisdiction does not exist under 28 U.S.C. § 1334, and, even if it were satisfied, (2) mandatory abstention under § 1334(c)(2) independently requires mandatory remand because every element—no independent jurisdictional basis, non-core status, commencement in state court, and timely adjudicability—is satisfied; and (3) even if it were not, permissive abstention under § 1334(c)(1) and equitable remand under § 1452(b) independently favor remand given the predominance of New York law, the comity owed to the New York State Court's extensive investment in this litigation, and the effect on efficient estate administration.

91. For the foregoing reasons, Shinhan respectfully requests that this Court enter an order (i) remanding the State Court Action, *Ria R Squared, Inc. v. Shinhan Securities Co., Ltd.*, Index No. 659538/2024, to the Supreme Court of the State of New York, County of New York, Commercial Division and (ii) granting such other and further relief as the Court deems just and proper.

## CERTIFICATE OF CONFERENCE WITH OPPOSING COUNSEL

92. Pursuant to this Court's Local Rule 9013-1, the undersigned counsel has attempted in good faith to confer with counsel to RIA in this case in an effort to seek a consensual resolution of the relief sought herein. As of the filing of this Motion, the parties had not yet been able to conduct that conference, and RIA's position on the relief sought is unknown.

[*Signature Page Follows*]

Respectfully submitted,

Dated: September 8, 2026
Miami, Florida

By: */s/ James N. Robinson*

**WHITE & CASE LLP**
James N. Robinson (FBN 608858)
Trudy Smith (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: 305-371-2700
Facsimile: 305-358-5744
Email: jrobinson@whitecase.com
trudy.smith@whitecase.com

-and-

Laura Garr (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
andrew.zatz@whitecase.com

*Counsel for Shinhan Securities Co., Ltd.*

**EXHIBIT 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 45

-----------------------------------------------------------------X

| | |
|---|---|
| RIA R Squared, Inc., | **INDEX NO.** 659538/2024 |
| Plaintiff, | **MOTION DATE** 04/20/2026 |
| - v - | |
| Shinhan Securities Co., Ltd., | **MOTION SEQ. NO.** 003 |
| Defendant. | **DECISION + ORDER ON MOTION** |

-----------------------------------------------------------------X

**HON. ANAR RATHOD PATEL:**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 125–135, 145, 156–227 were read on this motion for PRELIMINARY INJUNCTION.

Upon the foregoing documents, and pursuant to the reasons stated on the record following oral argument held on May 12, 2026, June 3, 2026, and June 17, 2026, it is hereby

**ORDERED** that Defendant's Shinhan Securities Co., Ltd. Motion for Preliminary Injunction (Motion 003) is GRANTED in part as set forth in the Court's oral decision on June 17, 2026; and it is further

**ORDERED** that the parties shall submit a stipulation for the Court to So Order on or before July 8, 2026; and it is further

**ORDERED** that movant shall file a obtain and file copies of the June 3, 2026, and June 17, 2026 transcripts within thirty (30) days of this Decision and Order.

The foregoing constitutes the Decision and Order of this Court.

**June 18, 2026**
**DATE**

**ANAR RATHOD PATEL, A.J.S.C.**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHECK ONE:** | [ ] | **CASE DISPOSED** | | [X] | **NON-FINAL DISPOSITION** | | |
| | [ ] | **GRANTED** | [ ] **DENIED** | [X] | **GRANTED IN PART** | [ ] | **OTHER** |
| **APPLICATION:** | [ ] | **SETTLE ORDER** | | [ ] | **SUBMIT ORDER** | | |
| **CHECK IF APPROPRIATE:** | [ ] | **INCLUDES TRANSFER/REASSIGN** | | [ ] | **FIDUCIARY APPOINTMENT** | [ ] | **REFERENCE** |

**EXHIBIT 2**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 45
-----------------------------------------X
RIA R. SQUARED, INC.,

Plaintiff,

INDEX NO: 659538/2024

-against-

SHINHAN SECURITIES CO., LTD.,

Defendants.
-----------------------------------------X

New York Supreme Courthouse
60 Centre Street
New York, New York 10007
JUNE 17, 2026

B E F O R E:

THE HONORABLE ANAR R. PATEL,
J U S T I C E

A P P E A R A N C E S:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorney for the Plaintiff
51 Madison Avenue, 22nd Floor
New York, New York 10010
BY: TOBY E. FUTTER, ESQ.
SASCHA N. RAND, ESQ.

WHITE & CASE
Attorney for the Defendant
1221 Avenue of the Americas
New York, New York 10020
BY: LAURA GARR, ESQ.
HANNELORE SKLAR, ESQ.

Karen Mangano, CSR
Senior Court Reporter

THE COURT: Good afternoon. We are here in RIA R. Squared Inc. versus Shinhan Securities Company Limited, Index 659538 of 2024.

Counsel, your appearances, please.

MR. RAND: Good afternoon, your Honor. Sascha Rand, Quinn Emanuel on behalf of RIA.

MR. FUTTER: Toby Futter also from Quinn Emanuel for plaintiff.

MS. GARR: Good afternoon. Laura Garr from White and Case on behalf of Shinhan Securities.

MS. SKLAR: Good afternoon. Hannelore Sklar from White and Case as well.

THE COURT: We are here for a continued preliminary injunction here. Before we return to the subject of that hearing, the parties have had two off the -- one off-the-record conference with Ms. Van Brunt since we were here last. I understand parties have been working very hard to try and resolve some of these issues, to think creatively to work with your clients, and I really appreciate all of that hard work. Ms. Van blunt let me know that as of the last conference, there was certainly progress being made, and I hope that -- well, I'm confident we'll continue in this sprit.

So with that, on the agenda today, first we can talk about the preliminary injunction where things stand,

what remains to be resolved, and then we can address the pre-motion conference letters that have come in as well.

So Mr. Rand, let me turn to you first, sir. From your perspective, where do we have a meeting of the minds and what is left to be resolved?

MR. RAND: Thank you, your Honor. I think the parties have worked very collaborately at this, and we thank the Court for the Court's involved in that in terms of facilitating the off-the-record discussions.

In regard to the four points, I think we are close. I think there are some issues that are unfortunately going to require the Court's input and adjudication in regard to the stipulation that the Court may want to consider concerning the Order to Show Cause application.

On the borrowing payments where things stand right now, and counsel for Shinhan can of course let me know if they believe I have gotten any of this wrong, but on the borrowing payments, RIA has agreed to provide the borrowing payments to Shinhan, to actually hold the borrowing payment amounts in an account subject to the agreement that they won't be removed from the United States.

And in regard to the coupon payments, RIA has indicated that it is comfortable and willing to put those into an escrow account held by the Court. The reason for that is concern as previously articulated that Shinhan

appears to be exiting the United States, and there is desire to insure that the collateral -- well, these amounts -- these payment amounts really remain under the Court's control at least with regard to the coupon in regard to the borrowing payments agreement to give those to Shinhan. And effectively, as an act of good faith in order to at least provide those to them, but at least have the Court take control of the coupon payments.

The second point is verification of collateral daily at WSFS. And there, I think the parties are generally in agreement that it should be facilitatable. We have not yet determined how the ask from Shinhan is having read access. I just don't know if that's possible.

THE COURT: Okay.

MR. RAND: And certainly, we have indicated that RIA is amenable to doing what WSFS would allow to allow daily -- I don't know if it's read access but a daily snapshot provided and to the extent that WSFS would that do, we're happy to help facilitate it. I think that's a practical issue, your Honor, of what is possible by the way of WSFS holding the collateral in the custodial account.

In regard to the valuation and composition of the collateral -- or actually, let me do this. I'm going to go to the fourth point, your Honor, which is provision to WSFS of correspondence that indicates the nature of the parties'

prior agreement and the power of attorney language that exists under the SLA.

We have provided a letter to White and Case that we would send to WSFS that effectively lays this out as we understand it to be and as we understood BNP understood it to be. We submitted that letter two days ago. We have been told that there will be edits on it. We are a waiting those edits.

Providing the edits don't -- and I don't mean pejoratively -- but overreach in a sense, we're happy to provide the letter. We're literally waiting for sign-off on that on the letter.

So let me go to the last issue which is the more complicated issue, your Honor, which is the composition of the -- valuation composition of the collateral.

We have not yet actually gotten confirmation from Shinhan that Houlihan Lockey which is the valuation firm that was identified in the -- off the record was acceptable. Nonetheless, they were engaged in communications over the weekend. They were engaged Monday morning off and running. They are currently working on valuing the various investments that are in the collateral pool.

They indicated late last night, and this is new information, and I will represent that, and I have not provided this information to -- what I am about to say is

new information. Not the prior information. I have not provided this information to counsel for Shinhan. I'm providing it right now because its been a moving target this morning.

They indicated late last night that given the speed at which I personally have indicated they need to move, they are uncomfortable and don't think they are the right people to be valuing the real estate assets. They have recommended that a commercial broker dealer of competence be engaged in order to move in the weeks' timeframes that I have indicated that I believe the Court and Shinhan would like this to move, and they've suggested CBRE or JLL, and they provided this morning persons on the west coast, so a little bit later than early morning our time, contacts for those, and my understanding is and my request has been that those contacts be made today and that commercial brokerage firm be engaged in regards to the real estate aspects of the assets that are sitting in the collateral pool.

I don't have more to advise the Court on that except that information, and I don't have firm dates, but my sense is on the real estate -- I can't speak to it yet, but we are talking weeks as in two weeks. I don't really know. I don't have firm dates, but I have made it very clear, this Court subject to something else perhaps changing is not going to allow the can to be kicked. Those were effectively

the words I've used, and I will make that representation to the Court and I understand both from Shinhan's point of view and the Court's point of view what needs to happen here.

THE COURT: Ms. Garr.

MS. GARR: Thank you, again, your Honor. And thank you to the Court for all of its time in to trying advance this. I do echo that there has been a lot of work being done behind the scenes and in corporation with the Court, and I appreciate it, again, to try to come to -- we took very seriously your Honor's recommendation that the parties come up with a stipulation as a way to resolve this, and we have been trying to come up with a compromise that reflects at minimum or as close as possible to replicate the status that existed when the litigation was commenced.

So from our perspective, that would mean payments being made directly to Shinhan which is what was being done at the time; that there be daily verification of the existence of the collateral in a collateral account that's held exclusively for Shinhan's benefit over which it has clear -- you know, there is clear legal title that there is -- it's confirmed that no one else has any stake or interest in this; and where the bank is aware as BNP was of our Power of Attorney and rights and the composition and nature of that reflected what existed up until April 30, 2025 when those reports stopped which was these are liquid

securities that were capable of being valued fair market value on a daily basis and is required under the contract.

Obviously, there are some things that are not available. So what we had, you know, proposed and -- on these points is that we do think those payments should still be made directly to Shinhan. We had as a compromise given their concerns gotten confirmation from Shinhan that they can open a U.S. account. We don't see any basis for the payments not to be made into a U.S. account. All of them. We don't see why there's is a distinction being drawn between the borrowing repayments and the coupon repayments, particularly where there is an account here in the United States.

Alternatively, as I have said from the outset too is we want to put everything in a court-controlled account including the lent securities. Then we were in favor of that as well and let this be held at the court level pending the outcome of this.

The issue of the daily verification, it was stated that, you know, Wilmington back on I believe may 12 when we first spoke here, that they were shortly around that time -- maybe right before -- that Wilmington was not able to provide the verification that BNP had. It was raised again this idea of like a view only access. As mentioned, we are just waiting to hear back from them that that's a

possibility. I don't again see why that wouldn't be, but we still have just not heard back on that point.

THE COURT: Okay.

MS. GARR: And then the -- one of the other things that we had said is that there has been trading; right. And the proposal from -- and what has since happened, apparently there was a trade of collateral is that the notice is able to be given according to their proposed terms two days after the trade. We would ask that any trading or substitution of collateral be done provided to Shinhan in advance or at least day of, not after the fact, and it be approved which is again consistent, you know, with what was contemplated under the GMSLA. And the other issue of the -- so there's two.

What was raised initially on May 12 was the idea of a fund administrative who can both verify the existence of a collateral and also do an independent appraisal of it. It was suggested that instead Houlihan Lockey be retained.

There needs to be some verification on a regular basis, and the -- we are as we mentioned just hearing today, we had proposed -- we understood it would be Houlihan Lockey, that they provide at least monthly appraisals because daily appraisals of this type of asset are not feasible. At, your know, RIA's expense, those be monthly appraisals pending transition to liquid securities. And our

understanding was that Houlihan Lockey was going to play a dual role which would be both to value the current securities but also provide which we're been asking for is -- and if not -- what was stated before is that there are some percentage of these illiquid securities that could be transitioned to liquid securities now.

We have not gotten any confirmation on what percent thank could be. We believe it should be 100 percent, but obviously are cognizant of the fact that we're told it's going to potentially take some time.

We would like a clear schedule of what that would be, and our understanding is that Houlihan Lockey was also going to serve that purpose which is not only value the existing assets, and I hesitate to call it "collateral," but the existing assets, but to also determine whether if there is a secondary market for this and when and how this could be transitioned to liquid securities of the nature and type that had existed for the past six years prior.

So you know, we -- in hearing this of, you know, having CBRE or someone else come in to appraise those real estate assets, again, having an independent appraiser I think is incredibly important. And so, obviously, I have not had an opportunity to speak to my client about this. But part of the concern here is not just an -- and it being again -- and I don't want to delve into anything else

because I do want to deal with just the stipulation, but we're at such a disadvantage and prejudice here because we don't understand the nature of these assets. And what we asked for, there was an affidavit presented to this Court that these illiquid assets valued $138 million. That's by far the vast majority of the value of what this collateral is supposed to be. And what is the underlying basis for that amount? It was noted to be some third-party appraisal. We have asked for that repeatedly.

We were provided both yesterday for the first time and today certain -- I'm going to say "appraisals." They are not appraisals. It's kind of a hodgepodge of materials.

The issue is that they are dated from years ago, and it is just a value of the real estate itself. We have no idea what RIA's actual interest is in that, what is -- so it doesn't -- whatever the underlying real estate might be valued at, there is not an indication of what -- how that reflects what the actual interest is; right. And so I worry we're going to get a valuation weeks from now from somebody like CBRE or somebody about the value of a property without a clear understanding of what the actual interest is. And then there's that second piece of it which is is this marketable at all.

From, again, the limited information that we just received yesterday, and we don't have information about the

collateral here, but the limited information that we just received yesterday, we are still trying to work our way through, it appears that many of these properties are in default. It appears many of these properties are subject to litigation and have been since 2022 so prior to them being put in as, you know, assets that are supposed to serve as collateral here.

So you know, we are trying very hard to come up with a solution by which we can come up with at least a timeline or schedule by which these are swapped out for liquid securities so that these can reflect what was the status quo at the start of this litigation, and we very much welcome this Court's assistance in reaching that objective. In some ways we are close. And in others, there is just still a lot of open questions that makes it hard for us to be able to move forward in some ways.

THE COURT: Okay. Yes.

MR. RAND: May I approach the podium. Thank you very much. Not that I'm going to go on a long thing. I just prefer the podium.

And I was remiss. I realized just as I sat down, and I was about to stand back up, but I didn't want to interrupt counsel for Shinhan. But yes, Houlihan was engaged with the dual role. The second role was to evaluate what could be sold without damaging the value of the

collateral. I think in part -- I'm speculating, but I think in part the communication I received last night from Houlihan was effectively considering that somebody else should value this to evaluate what could be sold without damaging it, and that's why the suggestion was to get a commercial broker. So just to be very clear, that is something we are undertaking. I think that timeframe -- I have demanded weeks, but I think it's next.

THE COURT: And do you have an engagement letter with Houlihan that sets forth the scope. And has that been provided?

MR. RAND: It's not. It's being added to as we speak, but I understand that providing that will be valuable, and we'll definitely do that, and we'll definitely consider doing that in connection with CBRE or JLL or whoever appropriately is engaged.

I will just point out these firms, I've learned -- I know from experience, but I have learned from this engagement treat internal valuations very different from external, and I'm trying -- we are trying hard not to let perfection be the enemy of the good on this, and I'm struggling with some of those issues, and I don't need to get into it with the Court, but it is -- we are trying to figure out how to get them in a way that could be shared with the Court, it could be shared with Shinhan. It will

have to be subject to a non-reliance letter. The engagement letter will make them -- they'll think that GCs will be involved, but we will move towards that goal, and I understand the need for that. So to be very clear, and I apologize for repeating myself, Houlihan and then this commercial broker have been engaged -- are being engaged to value the collateral currently and not just value the underlying property on the real estate side, value the interest in the property and any other issues that arise around as counsel for Shinhan mentioned some aspects.

And then separately, and I think probably a second step evaluate what could be sold without damaging the value of the collateral. Obviously, that would be wasteful, and we'll respond as quickly as we can. And I've made it clear.

I mean, I don't want to tread in. We're making progress. I don't want to tread into the PI standard, but I do have some comments and thoughts there because there was some argument interweaved.

THE COURT: Sure. I just want to pause here for just one moment. I just want to make sure that I've got a crisp understanding of the state of play which I think I do.

So with respect to the payments, it sounds like Shinhan's not fully on board with separating out the borrowing versus the coupon payments. Is that correct? Fair?

MS. GARR: That's correct, your Honor.

THE COURT: And the ask would be that everything goes to Shinhan directly both borrowing and coupon in a U.S. bank account, you would agree to.

MS. GARR: Yes, your Honor.

THE COURT: Okay. Can I ask though what's the practical implication of putting the coupon payments in an escrow account with the Court from your client's perspective?

MS. GARR: You mean, what would be the downside of doing that?

So, first, I'm not sure I -- and again, this was a proposal that was just made, so this is a brand new proposal --

THE COURT: Okay.

MS. GARR: -- but given -- again, I don't know why the distinction is being drawn, and I don't know that a court account -- if this were securities, the valuations are going to be what they are. It's not going to fluctuate, but this is cash. That's different; right. And so holding it in a court account is not as --

THE COURT: I got you. So really it's going to depend on the composition from your perspective.

MS. GARR: Yes.

THE COURT: Thank you. That's fine.

With respect to the daily verifications of collateral, we've just got to understand from Wells Fargo what they can actually provide.

Now, I can appreciate Ms. Garr wanting to kind of return to this litigation at the time the litigation was commenced standard, but one thing I think Ms. Van Brunt and I have come to appreciate having dug into this motion is it was a very manual process that was previously -- that was being undertaken, and I'm not not sure it's something we can really replicate here. I think everyone is going to make their best efforts. But notwithstanding any of that, I think we'll -- we just need the information whether or not we can get the read only access.

With respect to the draft letter to Wells Fargo, you're looking at that --

MS. GARR: Oh, I'm sorry. I forgot to raise that point. This is a big component here and a big current -- potentially resolvable, but the draft letter does not establish Shinhan as the BNP. It was a RIA/Shinhan Securities, you know, account.

The draft letter does not indicate that this is collateral being held exclusively for the benefit of Shinhan. It does not provide or indicate that there is a power of attorney that exists. It states that there is collateral that might be subject in the future of a court

order and that there is a litigation.

So I think -- I don't know what he -- what is indicated by overreaching, but at a minimum, we would want the bank to actually be apprised of our legal right to the collateral and confirmation on our end as well. You know, for this to actually serve as security interest, it needs to be clean title. There needs not to be other parties who for whom this collateral is, you know, serving as collateral as well; right. So it is important to us that the bank is actually made aware as BNP was of the actual power of attorney, right, and the fact this is presently serving as exclusive collateral.

So to the extent that is acceptable, then we'll do that, but the current letter as drafted does not establish that.

MR. RAND: Just two responses.

One, I'm at a disadvantage. I don't have the edits to the letter being proposed. And two, respectfully, I don't think that it's established what rights there are over this collateral.

I indicated at the last conference -- I started to make some argument to that effect. I think the Court understands the issue. I don't think the Court respectfully is in a position to even tell WSFS what the rights are.

THE COURT: Right. And that's -- I echo that same

concern which is I don't think we're there yet. And so frankly, I think at best, although, I don't know -- and sorry. I was saying Wells Fargo earlier. It's Wilmington Trust. My apologies.

One, I don't know that even the Court -- with the Court's assistance, we could all agree upon what Shinhan's rights are; okay. And I have some real concerns about blessing a letter that does that at this stage.

Frankly, at best, and I don't know how receptive Wilmington Trust will be to this, is attaching the letters as exhibits and providing, you know -- they are not going to like that. They are going to hate that; right. But I'm not comfortable getting into any interpretation of this structure.

MS. GARR: I'm sorry. Maybe I wasn't clear. But actually having the -- the contract speak for themselves what they are; right. And I think that that -- those are agreements that the bank had, and it was known at least-- I mean, the point, if this is to serve as collateral, it is supposed to be exclusively held for Shinhan's benefit. That is set forth in the contract.

Now, whether at the end of the day they can step in and take over, obviously, is going to be subject of whatever ruling from the Court. But the existence of -- and again, I don't want to delve too much into, but the minute it was

removed from BNP, it stopped serving as collateral for Shinhan. And right now it is a RIA Ducenta account that just has assets in it, illiquid assets. There is nothing that established this -- establishes this as Shinhan's collateral. And so, you know, we're in -- again, we're in land of stipulation where we are trying to make something work, but we do think at a minimum, the bank should be apprised of the existence of Shinhan and the contracts themselves that the SLA in particular that, you know, establishes what the custodial account is supposed to be and what the rights are. We certainly have no objection to making clear that it's subject to litigation and there's been --

THE COURT: That's where my head was going.

I think we've got to make it clear in any letter that this is all subject of this litigation; right. And certainly, I think we can work that in there.

MR. RAND: If I may, your Honor.

THE COURT: Yes, sir.

MR. RAND: I've had Mr. Futter provide me with a copy of our draft letter, and I just point out, in reference to the GMSLA, the SLA, independent litigation, my concern is what I believe is the Court's concern which is if we wrap WSFS into this, we are going to lose another collateral account -- custodial -- collateral account party like we

lost BNP due to the back and forth that they were dealing with, and that is a concern of mine. But you know, we'll be guided by the Court, of course.

THE COURT: Okay. Let's try not to let any of this backfire I think is the point.

Understood, sir.

Okay. And then finally, with respect to the valuation composition, what I'm hearing from Mr. Rand is that Houlihan and the second entity that they'll engage will be doing both an analysis of the valuation and how these are going to transition, if at all, to liquid securities, and I think -- I don't know that the engagement letters will be as specific as any of us want them to be. They are also written by our colleagues for these banks and entities, but at least, it can give you the comfort of the exact scope of the engagement for both of those.

MS. GARR: I appreciate that.

THE COURT: With that, go ahead, sir.

MR. RAND: And so, your Honor, look, I don't know where we are right now. In a sense, I feel like we are close potentially to a stipulation subject to some of the Court's guidance on some of the open issues, and I'm not going to delve into a full baked argument of the Order to Show Cause.

The Order to Show Cause is directed at avoiding

irreparable harm at the time it's brought. Now, it's not a vehicle to try to somehow turn the clock back and create new rights under the agreement that the Court would have to hear evidence to make a finding on, and I think at this point even an Order to Show Cause finding by the way of merits in regards to what the rights and remedies and set-off rights and so forth are. So I think there's just a false dichotomy being presented. I think the Court has in front of it an Order to Show Cause. Whatever there is now needs to be protected. I think we -- I'd like to think we've achieved that. We've done that. Certainly, the Court -- certainly the parties and certainly, RIA is aware the Court is laser focused. And the idea in light of the undertakings put forth in the affirmation that anyone is going to do anything with this collateral that is of meaningful materiality without advising Shinhan, advising the Court through whatever mechanisms would be extremely unlikely. It would make me personally very uncomfortable. So I can argue the merits of the Order to Show Cause and so far likelihood of success which I think the Court recognizes we would need a full record on. And we are going to talk about some of the evidentiary issues next I gather that are germane to that.

The irreparable harm, I think I've just addressed that point. And respectfully, look, I think the equities kind of benefit on this one right now, RIA is subject to

these protections and all these things that RIA is undertaking to do to give comfort because it shouldn't have to upset and unsettle its business right now while it as plaintiff is pursuing this action for harm it alleges was done to it as a result of actions taken years ago by Shinhan in regard for unfulfilled agreements that Shinhan has not abided by. But in any event, I apologies if I veered too far into argument.

Thank you very much your Honor.

THE COURT: Go ahead.

MS. GARR: Sorry, your Honor, and I will take the Court's cue on whether I am -- you think I should respond. I do have some thoughts on that that I would like to just briefly respond to.

This -- I just want to step back and recognize that this Order to Show Cause was filed in April at a time where we believed and were concerned that there was a risk of a transfer dissipation of collateral.

At that point in time, the response -- the opposition to that motion was we did not provide evidence of any dissipation or transfer of collateral. It was not before the Court. There was no evidence of it.

It wasn't until the hearing before this Court when it was made crystal clear that in fact the collateral was and had been at a time when we were seeking and we could

have sought this relief back in July of 2025, and we could have avoided so much of the damage that has now occurred. This was -- and maybe this is delving into the next preconference motion for sanctions. And you know, what the Court rightfully recognized at that time was these papers are now stale.

At that time even back in July of 2025, a year prior, they had stopped and prevented from proper discovery requests. They were maintaining those objections after that there was a stay lifted, and this Court granted our motion to compel with the specific direction that by May 26, they provide us with -- and this Court -- with evidence of what happened to the collateral from April 30 to present and the value of that collateral on a daily basis between that time.

We had supplemental briefing where we came back to this Court where we were supposed to have an update of what happened, and they had not produced any communications or documents. No bank account statements to this day. They have not produced any bank account statements of reflecting the value of this collateral, and we don't know what happened to all of the securities that existed as of April 30, 2025. All we know is right now there are two securities remaining valued at only $1.5 million sitting in Wilmington. Even if we were to accept that that were actually a custodial account, it is -- and the valuation

that they came to the Court with, saying it is -- we've met the value. And again, this is the standard of where there is a dissipation of collateral as exists here.

They have said to the Court the value is still there. In reality, there's not been anything supporting that. And as we hear now, we need appraisers actually going in to assess that. So we have established that there was collateral that was transferred. We have established that there was collateral that was depleted, and I recognize that we are not in it a position certainly where things stand to be able to bring us where we started, but that is the standard for a preliminary injunction. And there is case law supporting the relief we are seeing on that. And this isn't -- we have established the breaches that have occurred with nonpayment that are not in dispute, and I won't go through everything, but there is, you know -- all of the facts that establish the claims and the speaker being plaintiffs, they are -- there are claims against them as well.

There was a settlement discussion before there was a race to the courthouse. They are not just plaintiffs in this action. So I just -- you know, I want to respond in terms of what was there.

That being said, again, I recognize the Court rightfully given that it is a high burden for injunctive

relief that the Court is rightly trying to get the parties to come up with something to tied us over as this litigation advances, and I think what we proposed is doable while we try to work through the irreparable harm that has happened now with the deliberate depletion and transfer of this collateral.

THE COURT: So let me tell you what I'm thinking, and this is where -- as I indicated at the last appearance, we are going to address the motion today. It's going to be done. Okay.

What I have in my mind is a decision that's kind of a hybrid and cheats a little bit in light of everything we've accomplished which is granting the preliminary injunction to the extent of everything you were able to agree to and putting some framework around when the stipulation is actually entered into and to give defendant's counsel kind of a timing that you're rightfully looking for, particularly in light of when we started with this motion up until now.

And certainly, I wish there was a way to reconcile the fact that you had to file a motion to get here, but here we are, unfortunately, and that's not lost on the Court. So that's kind of what I'm thinking in terms of the position. I don't know that I need more argument or we need a, hearing but if you want to do that today, I'm happy to do whatever

you think you need to do to make your record complete.

And then what I would propose then is I know Ms. Van Brunt is fabulous. She's been so helpful to you all. She will happily meet with you all every week until the stip is done just to make sure we're moving forward, and she's very good at that.

Mr. Rand.

MR. RAND: And with the Court's indulgence because I appreciate the Court's comments. It sounds very sensible, and I want to move on. But just for the record, one point I have not yet made in either conference because I took the time to read the cases that were cited in the briefing in regard to the irreparable harm here, and I'll just point out the obvious which again, I suspect the Court totally appreciates.

These cases are cases that involve secured accounts. That's not the situation here that's been pointed out or even addressed today, so I just think they are inapplicable. I just wanted to state that for the record though in so far as the Court is considering entering some form of order.

THE COURT: Give us ten minutes. I just want to kind of go through our decision in light of what we discussed today because I do want you to leave with a clean transcript of how we resolved this and next steps. And then

we can come back and resolve some of the other ancillary issues.

Does that work for everybody? Why den we plan for three.

(Whereupon, at this time there was a recess taken.)

THE COURT: Counsel, we are back on the record in RIA v Shinhan Securities. I realized for some reason I keep saying "Shinahan." It's Shinhan. I will try and correct that.

MS. GARR: I didn't even notice.

THE COURT: Well, I was used to calling it SS and C. Okay.

So the Court is prepared to issue a decision and an order with respect to defendant Shinhan Securities' motion for preliminary injunction.

First, I'm going to start by setting forth relevant facts to this motion. Both parties agree that the securities held by RIA are Shinhan's collateral for lent securities. That's from the King Affirmation NYSCEF Document 181. All of the collateral that is currently held at Wilmington Savings Fund Society in a sub-account under a master account titled RIA R. Squared SEC custody. That's again from the King Affirmation at Paragraphs 33 through 35.

It is disputed whether the GMSLA and SLA are still active contracts between the parties; notwithstanding, Mr.

Kings's official termination email sent to Shinhan and BNP at NYSCEF Document number 100.

RIA's processes with regards to securities trading and account access are extremely manual. Almost all of the confirmations are done with the custodian through email instead of through the bank portal. I'm referring to the period in which the securities were held at BNP.

RIA manually put together spreadsheets and spreadsheet-like documents to send to both their customers and historically Shinhan.

Previous examples of daily collateral reports from RIA to Shinhan which were provided by Shinhan were self-created by RIA.

Based on current information before the Court, the collateral value according to RIA is approximately $198,591,177 as of April 30, 2026. That's from the Torline affirmation, NYSCEF document number 180 at Paragraph 38. The value of outstanding lent securities also to RIA is allegedly $185,517,963.75 as of April 30. That's from the Torline affirmation at Paragraph 20.

If the parties as they stated agreed to collateralize the lent securities with 110 percent of collateral in the custodial account, the collateral value should be $204,069,760 which is a deficiency of approximately 5.5 million. Again, I refer you to the King

Affirmation at Paragraph 5.

Let me now turn to the instant motion. Before the Court is a request for preliminary injunction brought by Order to Show Cause pursuant to CPLR 6301, 6311 and 6313 by defendant Shinhan against plaintiff RIA. The motion was brought on April 23rd of 2026. The Court incorporated the oral argument held on May 12th as well as oral argument held on June 3rd in addition to today June 17th.

The Court also notes that the parties engaged in two off-the-record conferences with court attorney Ms. Van Brunt, one during the hearing on June 3rd and a follow-up remote conference on June 12th.

In seeking a preliminary injunction, the movant must demonstrate by clear and convincing evidence a likelihood of success on the merits, irreparable injury absent the granting of the preliminary injunction and a balancing of the equities in the movant's favor.

Whether to grant preliminary injunction is committed to the sound discretion of the motion court. Issuing a preliminary injunction is a drastic remedy and as a result, the movant's burden of proof is high and must be shown by clear and convincing evidence.

The purpose of a preliminary injunction is to maintain the status quo until the merits of the action may be ultimately decided. Moreover, a mandatory preliminary

injunction requiring specific conduct by which the movant would receive some form of the ultimate relief sought as a final judgment is granted on in unusual situations where the granting of the relief is essential to maintain the status quo pending the trial of the action.

For the foregoing, I refer you to the Uber Technologies case from the First Department of 2022; Harris versus Patients, First Department of 2019; Delta versus Cohen, First Department of 2012; Bass versus WV Press Partner, First Department 2022; and Second On Second Cafe, First Department of 2009.

Shinhan requests that the Court enjoin RIA from obstructing Shinhan's right to exercise its power of attorney including its right to take immediate legal possession of custodial accounts and custodial securities at BNP pursuant to Section 13 of the SLA.

Further, it seeks to direct -- it seeks that the Court direct RIA to immediately cease and desist from any actions that interfere with Shinhan's exercise of the steps set forth in Section 13 to take legal possession of the custodial accounts and custodial securities at BNP. All parties acknowledge that the collateral is now held in an account at Wilmington Trust.

The parties have been actively litigating this action for approximately two and half years. The dispute

involve a series of securities lending transactions that were executed over the past seven years. The two contracts at issue are the global master securities lending agreement or the GMSLA and the SLA, the supplemental lending agreement. Both documents were executed contemporaneously on January 15 of 2019, and they control the overall lending relationship and each securities lending transaction between the parties. The agreements operate together as the governing documents with the SLA supplementing the GMSLA and with the SLA controlling in the event of a discrepancy between the two documents.

As relevant to this PI, RIA in its complaint alleges a breach of contract by Shinhan for failing to deliver 47 million of securities or treasury bonds that RIA returned early to Shinhan with the promise from Shinhan that it would re-lend the securities to RIA and provide fee relief on existing and future loans.

Shinhan disputes that it breached the agreement and instead, in its breach of contract counterclaim alleges that RIA is the actual breaching party and it has failed to return outstanding securities on a notice of termination and make required monthly borrowing rate payments, all constituting events of default and violations of the agreement.

On July 31 of 2025, the Court issued a decision and

order on Shinhan's motion to dismiss the complaint. Relevant here, the Court denied Shinhan's request to dismiss RIA's breach of contract claim with respect to the GMSLA and SLA.

BNP was the legacy collateral agent at the start of the relationship between the parties. RIA deposited the at-issue collateral to secure Shinhan in its role of securities lender to RIA based on the value of the lent securities transactions pursuant to the agreement.

The defendants argue that in the event of a payment default, Shinhan has the right to take legal possession of the custodial account and the collateral securities pursuant to Section 13 of the SLA and Section 4.2C of the GMSLA. However, the SLA contains a pre-condition stating that in an event of default, post-acknowledgment of such default by BNP, Shinhan Investment Co Limited shall solely have the right to proceed with the following steps to take legal possession of the custodial account and the collateral securities.

Turning first to the likelihood of success on the merits of its claims. This action has multiple complex disputes of material facts involving extensive negotiations by both RIA and Shinhan taking place by telephone, email and through counsel over the course of approximately seven years. Both parties claim that the other breached the

agreement. Both parties claim to have terminated the GMSLA and both parties claim the immediate right to the collateral security. These disputes are not new to the RIA/Shinhan relationship and caused significant disruption in their business dealings starting in August of 2024, if not earlier when RIA's counsel sent a demand letter to Shinhan demanding specific performance with respect to one of the numerous disputed transactions in this action.

The transaction disputed in October 2024 to re-lend 47 million in securities is pled by RIA as part of its breach of contract cause of action. RIA admits that it did transfer the collateral at issue in April or May of 2025 to Wells Fargo and WSFS. That's at King Affirmation Paragraph 33. Shinhan alleges that this puts RIA in default; and therefore, Shinhan can use its Power of Attorney provided in Section 13 of the SLA to instruct the custodian to turn over the collateral securities. The Court, therefore, need not determine whether the asset movant away from BNP constitutes a default at this juncture. Alleged defaults on the part of both parties are not new in this action but have been alleged in the original complaint and subsequent counterclaims.

In fact, defendants state in their supplemental memorandum of law that RIA's defaults are clear from the face of the agreements and ever expanding listing eight

separate events of default.

Although, Shinhan claims that RIA is limited in the types of securities that can be held on the custodial account on its behalf, the SLA specifies that the custodial securities shall include but not be limited to, for example, corporate bonds, commercial mortgage backed securities, residential mortgage backed securities, and it goes on from there. That's at the SLA Sections 8 and 12.

Therefore, on its face, it appears to the Court at this juncture that the SLA may allow for illiquid securities that do not have a daily mark; and therefore, can not be valued on a daily basis. Therefore, the Court is faced with competing claims of default, contract validity and current rights to collateral compounded by the informality of the lending and collateral arrangements between the parties.

Turning next to irreparable harm. When Shinhan filed the instant motion, it alleged that RIA was wrongly -- that RIA had wrongly retained approximately 228 million of Shinhan's securities for over six years. The six-year timeframe constitutes the amount of time that Shinhan claims RIA has been in default.

Shinhan claims the first payment event of default occurred in December of 2021 with the latest occurring in May of 2025. Defendants, however, did not assert their Power of Attorney with BNP until October of 2024.

At that time there were already multiple disputes between the parties including whether RIA could cease payments to set off losses from Shinhan's alleged failure to contractually complete certain securities transactions.

The record reflects multiple communications between and among both parties including inter alia, whether an event of default occurred, which party defaulted, whether the GMSLA is terminated; and if so, by which party and when this termination occurred.

Shinhan alleges that they had the right to exercise their Power of Attorney over the collateral accounts starting in May of 2025. Shinhan has credibly argued their concern regarding the movement and potential dissipation of collateral because of RIA's stealth and secretive asset movement that has been revealed during the course of litigating this motion. However, it remains to be seen exactly what the change in risk valuation is of those assets based upon a forthcoming valuation to be conducted by Houlihan Lockey and as agreed by the parties.

Turning next to the balance of equities. Granting the full relief that Shinhan currently seeks in its favor would award disputed securities or collateral to one party in this action to the detriment of the other.

Additionally, the award of collateral to Shinhan would require the court to provide the ultimate relief

Shinhan requests prior to adjudicating the causes of action alleged in the complaint and the counterclaims.

A mandatory preliminary injunction by which the movant would receive some form of the ultimate relief sought as a final judgment is granted only in unusual situations, where granting of the relief is essential to maintain the status quo pending trial. That's from Spectrum Stanford, First Department of 2018.

Accordingly as previewed, the Court grants the preliminary injunction in part to the extent of the following:

First, asset management continues consistent with the SLA. RIA commits to insure that Ducenta as RIA's secured registered investment advisor will continue to manage the collateral in the custodial account consistent with the investment parameters and the parties' SLA.

Second, with respect to daily reporting, the Court directs daily reporting at the collateral assets held at WSFS -- held in the WSFS custodial account on a going forward basis.

At a minimum, RIA should provide screen shots to determine the daily positions on the accounts to Shinhan. As the parties indicated, they will continue to work with WSFS to determine whether read only access can be provided to Shinhan. But as I said in the meantime, those daily

shown shots should be provided.

Third, with respect to the valuation of the underlying assets, as the parties have agreed on the engagement of Houlihan Lockey, Houlihan Lockey with again pursuant to the parties' stipulation and engagement of Houlihan Lockey conduct a valuation of the securities also an analysis to determine when and how these securities can be transitioned into a liquid form.

With respect to the real estate access, again to the extent the parties endeavored to engage a second independent appraiser, Court will not get into that for today's purposes but suffice to say that any valuation should include those real estate assets as well.

Fourth, with respect to trade transparency, RIA shall report any training activity, whether a purchase or sale of the collateral as necessary for ongoing collateral management and balancing within two calendar days of the trade.

Fifth, with respect to the joint letter to WSFS. The Court only directs that the parties provide a joint letter that demonstrates a collaborative effort to WSFS. I'm not going to dictate the substance of that letter for various reasons as we've discussed during oral argument. One, for example, being that we don't want to end up in a situation where we have to transfer the assets for another

time.

But third, the Court -- second, the Court has some reservations about making any findings or including language that might be later construed as findings concerned as the rights of the parties.

Accordingly, the Court directs that the parties meet and confer with respect to the language of that draft letter. The Court remains available to assist in helping to resolve any of that language.

Sixth is with respect to the payments. The Court directs only the extent of the following: That both the borrowing and coupon payments are directing to SSC, but I'm not going to dictate how those are deposited, whether it's directly to SSC in U.S. bank account, whether it's in an escrow account with or without the Court. Again, because I have some concerns at this juncture about making any decisions that might affect the ultimate merits of this case.

I also want to leave it to the parties to see if you can come up with a stipulation with respect to how you're going to direct those payments. Suffice to say, that RIA will resume making those payments to Shinhan as it is legally bound to do. That fact is not in dispute.

Again, the Court is available to assist with any resolution of how those payments are effectuated.

So with that, with respect to any outstanding items that should be the subject of a stipulation, I identified two. To the extent that there are others that the parties are working on, the Court directs that that stipulation is filed no later than July 8 which is three weeks from today for the Court to so order.

Between now and July 8, we are at your disposal on an as-needed basis. Reach out to us if we can help resolve anything. We'll make ourselves available to get us to the finish line.

Anything else with respect to the PI motion?

MR. RAND: I just had one question for clarification, your Honor. Thank you. And it's just understanding that it's something that the Court expects the parties to work out amongst themselves. If the parties conclude that a court escrow should be appropriate by agreement, I just wanted to inquire whether the Court is comfortable with that.

THE COURT: That's absolutely fine with us. Whatever works for you, you can agree upon.

MR. RAND: Thank you.

THE COURT: Anything else?

MS. GARR: No, your Honor.

THE COURT: Okay. So let's turn to the two motions.

First Ms. Garr, was your pre-motion letter concerning the deficiencies in complying with the Court's prior order to produce documentation concerning the collateral from April 2025 to the present. Notwithstanding your letter, anything you'd like to add to that?

MS. GARR: Thank you, your Honor. I won't repeat what's included in the letter. I will just provide an update since the letter was filed.

The -- and the requests, as your Honor knows, were made back in April of 2025 for this information about the collateral, information to reflect the value of the collateral and all documents and communications.

We had -- again, I note had that been pursued then and produced as it should have, we could have avoided a lot of expense and time that has come both Shinhan's expense and time and also this Court's and judicial resources wasted there.

We are now over a year later.

THE COURT: Over what?

MS. GARR: We are now over a year later from that request for this information. And your Honor back on May 12 directed -- granted our motion to compel and directed the parties to produce that information as of May 26.

That information, we have -- what they produced at that time is set forth in the letter. There is nothing for

an 11-month period. There were no bank account statements. They alerted for the first time in response that they had ceased doing the daily collateral reports so that there were none to be produced even though it was clearly relief being sought there.

And what has been produced is not -- doesn't establish at all where the collateral is, where its been. And we are now -- we received for the first time since the order from the Court from that first production on May 26th, 450 documents yesterday. We are trying to make our way through it. It does not appear to contain any bank account statements. We are still left -- what it does not include is a clear understanding of what happened to the collateral that existed as of April 30, 2025, where it went. There is no indication of when the current collateral -- the -- what happened to the collateral, what trades have happened, what the value was on a day-to-day basis throughout which, again, as your Honor recognized, is critical both for us to have been able to come back with a supplemental briefing and for relevant facts that were necessary for this Order to Show Cause.

Had we not filed the Order to Show Cause, we would not have even known that this collateral had been transferred, where it was located. And we are still despite this Court's order at a position where we have not been

provided any valuation or detail about the status of this that we can discern.

I also note and as raised to them in their production, the -- of the 450 documents, over 300 are attorneys eyes only, so we are unable to discuss with our clients in particular again these -- and I hesitate to call them appraisals, but the only information about this real estate, again, all designated attorneys only. We are unable to even discuss with our clients so that we can piece together what's happening. And we are facing at a time now where we have a deposition deadline of July 25.

We have repeatedly asked for an update on when we can expect the information. They had said back on May 26 that they intended to do rolling productions. Yesterday was the first time we received anything, an it is woefully deficient still.

Again, we respectfully request that we have the opportunity to seek legal fees in relation to this as well as adverse inference. I think they've indicated that the collateral reports ceased. And so to the extent there has not been any evidence that they could provide about the value of this collateral -- and what we also know about the value of the collateral is from what we have seen, there was no -- unless something is forthcoming, although we have requested this repeatedly at this point, there was certainly

no valuation done prior to substituting this collateral, and there was no valuation done prior to filing an affidavit with this court representing the value of the collateral that exists.

So with that, we respectfully request the ability to obtain whatever rolling production is still there by a date certain and also to file a motion for sanctions as well as adverse inference and other preclusive remedies thank you.

THE COURT: Any response?

MR. RAND: Your Honor, with the Court's permission, Mr. Futter is going to address this. Thank you very much.

THE COURT: Of course.

MR. FUTTER: Just in brief, a few statistics here. The Court entered an order on May 12 that the -- that RIA comply with the motion to compel.

Between May 12 and May 26, RIA undertook to review approximately 12,000 documents. We got that done very quickly. Less than two weeks. We next turned over 5,400 in excess of that. Those were produced on May 26.

I just want to clarify the record regarding what that production did contain. Your Honor, I refer you to -- I think a good reference would be Dockets 171 and 172.

What you have there are spreadsheets, so they are a bit hard to look at on a web browser, but what you've got

there from RIA pursuant to the Court's order are possession reconciliation spreadsheets, and we've heard that there was no disclosure as to what the value of the collateral was, where the collateral was. Your Honor, the answer is on the screen in front of you if you have managed to pull those up.

What those reports show on a month by month basis all the way back to 2020 out of an avoidance of doubt through 2024 is what is the collateral, which custodian is it held with, what is it value at the time. Sorry. On an annual basis from 2020 through 2024.

If you're looking at Docket 172, RIA recognizes that Shinhan's concern is what happened to the collateral as of the BNP termination, so we switched to monthly there.

The position reconciliation you have at 172 on a monthly basis, what is the collateral held in the custodial account at WSFS; who is the custodian, if it's not entirely WSFS because there was an transition and for a while, Wells Fargo was in there; what was the value of the collateral; what was the face value versus market value. All of that information is in there.

THE COURT: Unless I am misreading it, Counsel, this appears to start as of June 30 of 2025.

Is there information provided that goes back to April of 2025, sir?

MR. FUTTER: I believe it should be one of the

tabs. If you're looking for 2025 in the document at Docket 172.

THE COURT: I only see it starting in, again, as of June 30, 2025. Actually, hold on. Maybe. May 31 of 2025. I see.

MR. FUTTER: Yes. I think Page 1 is an as of end month May 2025. If you want to go prior to that, you have to go back to NYSCEF Docket 171.

THE COURT: That's helpful. Thank you. Okay.

MR. FUTTER: Your Honor, that's just the tip of the iceberg.

On top of that, we have provided -- we have turned over the bank accounts. If opposing counsel can't find them, we can provide them with Bates references. We've turned over screen shots from WSFS. We've turned over an email from WSFS concerning that they held the collateral. I can go on and on, your Honor, but we have made substantial efforts by May 26 to turn over everything that we had at the time.

Now, what we have also done is we did not have a full document collection from the client past that date. Quinn Emanuel are new counsel, but what it appears both sides did is take a discovery cutoff. They just stopped collecting documents.

Shinhan for its part has not turned over anything

or almost nothing past the end of 2024.

So Quinn Emanuel as new counsel undertook to collect an awful lot of these documents and then to review an awful lot of these documents. As of yesterday, and this is on top of the May 26th production, we've reviewed almost 5,400 documents. The bulk of those pursuant to the parties agreed search times are nonresponsive, but what we have turned over are 475 responsive documents.

Ms. Garr made a reference to AEO designations. If they let us know which documents they want to remove those designations from, we will consider those and get back to them.

We have advised -- again, this is clear between counsel as of this morning that our productions are rolling. We're trying to get stuff out the door as fast as we can; however, we've also advised so opposing counsel is aware of this that we expect to have everything wrapped up and produced by early next week. We put --

THE COURT: By when?

MR. FUTTER: By early next week. We have about 1,000 documents left in the hopper. We've got a team of four people working on this eight to ten hours a day. We should wrap up very soon.

THE COURT: That's really helpful. So certainly, I have not gone through these productions. I can only only go

by the parties' representations.

I appreciate that counsel is stepping in the shoes of your predecessor here and certainly can not make up for kind of history here; however, your client has certainly made some certain decisions in terms of discovery that's been provided to your predecessor counsel. And so, Ms. Garr, you have leave to file that motion. And again, there is a clear distinction between essentially taking punitive measures as to the client versus counsel.

Here, I know -- I think I have a good sense of what's going on here. So Ms. Garr, you do have leave to file that motion.

MS. GARR: Thank you.

THE COURT: The one question I have is -- well, two things. One, two weeks to file that motion. Okay.

Prior to filing that motion, I would direct that the parties engage in one meet and confer to go through what has been produced, if there's something that can be done to adjust the AEO designations, any cleanup so that whatever motion you file is based on current information and is not stale.

Is that reasonable?

MS. GARR: Absolutely, your Honor.

THE COURT: So you have leave to file that motion by July 1st, Ms. Garr, and that the parties should meet and

confer prior to the filing of that motion.

Let's next turn to Quinn Emanuel's letter. So Ms. Garr, forgive me. I have not yet had a chance to review your response letter, but I'm aware that it was filed. So I may need a little more color from you, but let me first turn it over to plaintiff's counsel on this letter.

MR. RAND: If acceptable to the Court, I want to touch -- if acceptable to the Court I'd like to it touch on the witnesses, and I'm going to ask Mr. Futter to address the PI PA productions if that's acceptable.

THE COURT: Okay.

MR. RAND: So your Honor, in regard to the letter that we filed, it has come to our attention as set forth in the letter that just as of early May -- I'm sorry. Mr. Futter, is it early -- early May for Mr. Kim?

I apologize.

MR. FUTTER: May 11.

MR. RAND: I want to get the date precise. May 11th. It was not until May 11 that there was any information that Mr. Kim, Mr. Sam Kim who is Mr. Kong's counterpart and clearly would play the main role for Shinhan in any adjudication of this matter, was no longer working with Shinhan. We have no idea what's happened to him. We have no idea what the -- and by the way, we served RFPs about all this as well. So it's not just us raising this

letter. We have no idea what's happened to him or what kind of cooperation rights may or may not have been secured to which the Court can take adverse inferences, if he's not going to be made available.

Effectively, the assertion appears to be let us put out a subpoena into the black hole for a Korean deposition of this individual in this case that we have been litigating as your Honor in your prior ruling made clear has been going on for years.

And we literally just learned of this. I was kind of astonished, frankly. Clearly, deposition of Mr. Kong and a deposition of Mr. Kim are critical or like trial testimony would be without deposition. Whatever.

We have to have those two people who came up with these agreements and discussed their course of performance here in the court for the Court to evaluate their credibility as the fact-finder.

In addition, and I have skimmed, although on my phone, and my eyesight is getting worse, so I think I got the gist. But based on the letter I read on my phone on the way down here that was delivered a little after 1:00 today, I don't believe that there's an indication as to similarly what's happened to Mr. Kim's boss who is H-Y-O Chan Lee. I think that's Hyo Chan Lee, if I'm pronouncing it right. He was the boss of Mr. Kim during the relevant period as I

understand it, and I'm at a loss too a little bit because I'm making certain -- not representations, but I'm providing the organizational structure to the Court based upon the documents we have of which many have redactions Mr. Futter will indicate. And so I can't quite be certain I'm right, but I believe that's true.

So again, Mr. Kim's boss appears as a former, and we have no idea what cooperation rights, if any, were secured, whether intentionally not secured, whether he was let go for some malfeasance in some way as set forth in the complaint of RIA originally.

Shinhan dealt with a criminal scandal in Korea in this matter that involved actually Mr. Lee's boss, Andy Lim whose in prison right now in Korea.

And in addition, the -- the individual who signed the agreements, the GMSLA and the SLA, that stamp is an indication of as we understand it -- that stamp belonged to Mr. H-Y-U-N-G, first name J-I-N Kim. He was the president and CFO of Shinhan who signed those agreements, and I understand he's a former. And again, I don't understand how that can not be cooperation secured by a former CEO of an entity such as Shinhan. That would come as on extraordinary surprise to me.

And look, I'm going to save it for briefing. I'll save it for argument another day, but obviously, if such

witnesses are not going to be available in this case, that's Shinhan's prerogative, I suppose, but we're going to ask the Court to take adverse inference obviously in connection with the adjudication of these agreements. There are arguments that are being asserted that are before the Court on a motion to dismiss about apparent verse actual authority issues. These are the witnesses.

THE COURT: With respect to each of those witnesses, so with respect to Mr. Kim, you've represented that you did not learn until May 2026 that he left in January of 2026; correct?

MR. RAND: Yes, your Honor.

MR. FUTTER: May 11.

MR. RAND: I'm sorry. May 11. My mistake.

THE COURT: What about each of these other individuals? When did you learn that they had left?

MR. RAND: I don't want to get into the slip stream between prior counsel and me. I didn't learn personally of of that until very recently.

The letter that I read in my iPhone, I don't -- didn't appear to address that issue about when that may have been communicated, so I don't want to get out over my skis.

THE COURT: In my mind what's critical for any of these individuals, and there are five in your letter, I want to know when they left and when you became aware of it. And

of course, I know Ms. Garr is going to tell me when it was disclosed to prior counsel.

Suffice to say, my position on these discovery disputes is going to be engagement of new counsel is not an opportunity to reopen discovery. Okay. So to the extent Ms. Garr points me to prior disclosures and discussions, that stands. We are not going to restart discovery and reopen and take a second bite now simply because we have new counsel. Okay?

MR. RAND: May I respond to that, your Honor.

THE COURT: Yes, sir.

MR. RAND: I understand and fully appreciate that, and that's why I'm being very cautious in what I know and how I know it and what Ms. Garr may represent to the court today. I don't have the benefit of a letter.

We do though have discovery outstanding that's newly served discovery that I think is appropriately in play.

As to the nature of the termination, cooperation rights and so forth, it tests the veracity of the representations, I think that is fair game. And I think that based upon that discovery, the Court -- we should be allowed to make argument to the Court. We are in the deposition period right now, and we should be able to make appropriate arguments to the Court about what inferences the

Court can take from appearance or nonappearance or cooperation or non-cooperation. But I recognize the line your Honor is drawing. And of course, I'll take it very much in mind in making arguments, but I believe these are all arguments that would be appropriate in the context right now because I wanted to take Mr. Kim's deposition very, very quickly, for instance.

THE COURT: Right. And the other thing that goes both ways, and this is applicable to Ms. Garr's anticipated motion as well is -- and I think I may have said this at an earlier conference, I'm going to insist that before you file this motion, that you engage in a meet and confer, that it is made in good faith because if we end up in a situation where -- and I'm going to say this on the record -- where your clients are insisting on filing motions that are not in the good faith and without merit, we're going to start awarding attorneys' fees. And please convey that to your respective clients. That has become abundantly clear to me in this case.

MR. RAND: Understood.

I will make one more observation, your Honor, which isn't quite in the letter, but I think it's the subject of the briefing if it's going to be allowed.

There's been an assertion by Shinhan that it should be sufficient to provide a designee, a 30(b)(6) as I think

about it under federal rules, and I apologize. I don't have the CPLR in my head at the moment. But in a any event -- and also, one individual former. Obviously 30(b)(6) is useful to bind Shinhan. It is not affirmative testimony. It can not be offered in this court at trial as affirmative testimony, so I don't understand -- I understand the purpose of providing us with discovery and perhaps some light admissions and certain organizational issues, but that's not a mechanism to provide evidence, A; and then B, on the individual former, partially because of the redactions, and Mr. Futter can address this, we're not certain what that person actually is a percipient witness of. And so I don't have any confidence that it covers the waterfront irrespective of that I need to be able to speak to Mr. Kim or understand why he is not coming subject to the issue your Honor raised.

THE COURT: Understood.

MR. RAND: Thank you very much, your Honor. I appreciate it.

THE COURT: Mr. Futter.

MR. FUTTER: Your Honor, this is, of course, just a request for leave, so I don't want to go any deeper than the Court needs at this stage.

THE COURT: Fair enough.

MR. FUTTER: Just to cut to the chase, your Honor,

we're struggling because we're attempting to determine as we prepare for deposition and trial who at Shinhan knew what and when. And what we keep running into are these redacted communications where we can't figure out who within Shinhan knows what which means we can't authenticate the documents. We can't assess whether there are further witnesses we should depose or call for trial. We can't ask the witnesses that are still employed -- half of them have left -- who they were speaking to about what because there's just this redacted blot on the documents and the evidence that we use.

Now, we understand that there is a blocking statute in Korea; however, we think the case law is quite clear including the Northern District of California where they decided that that blocking statute or any other blocking statute needs to be put aside if the evidence is responsive, and particularly as here, if the burden is low, the privacy interest is otherwise met.

So all we're asking is that redactions be lifted off of these emails, and it's just the email address and then maybe somebody's name and a signature block.

We have only had a very quick chance to look at the responsive letter filed today, but I didn't see anything there regarding the burden of having to pull these off. It's probably something that could be done on an automated basis very quickly.

I don't see in the response any dispute that this information is relevant. We have given the court a couple of examples where key testimony, if we were able to depose Mr. Kim, has been passed to somebody else in Shinhan, and we just can't see who.

No suggestion that isn't responsive information that we would in the ordinary course absolutely be allowed to find out about.

To the extent you want to jump in to the Korean law and its regime and the privacy interest in trying to balance, I think there's a pretty low degree of protection afforded to people's names and just email addresses. We are not talking about bank accounts or home addresses or social security numbers or whatever the equivalent is in Korea.

There's also no suggestion that the responsive letter that the existing protective order in this case can't protect this information completely adequately. We've heard today about how the parties are producing documents with AEO designations. If that's a measure that Shinhan wants to undertake as part of removing these redactions, look, we can work with that as well.

So your Honor, without laboring the point, we really do think we need this information. We don't think it's a burden to take the redactions off, and we think the interest of this Court and this case require that that be

done.

THE COURT: And Mr. Futter, I'm going to ask you similar questions that I asked your colleague which is when did you Quinn Emanuel become aware of these redactions.

MR. FUTTER: We were only engaged in May. We have been preparing for depositions solidly since then. So I would like to say, the true extent which requires us to look at every single document that's got these redactions, it's really the only last week or two that we've realized just how extensive these redactions are.

Just to jump to the waiver argument too, there's a suggestion -- and again, I've only had ten minutes to look at this. There's a suggestion that prior counsel waived or missed their chance to move on.

I think what's notable is that the communications that are cited there in the letter that the Shinhan had filed, they are all preproduction communications. So prior counsel did not yet have an opportunity to determine how extensive these redactions are, A, and just how important the redacted information is, B. That's only been something that's been possible -- possible to do since September, and I'm even talking about prior counsel here, and it's something that Quinn Emanuel has only done as far as trying to pick deponents, and B, get through depositions.

THE COURT: These productions were all completed in

September, sir?

MR. FUTTER: I think September 28 -- late September. And your Honor will note that the parties were, I believe, and you probably know this better than I do in settlement talks. So prior counsel weren't understandably doing a whole bunch of dep prep and doc review at that time.

THE COURT: Thank you. Ms. Garr.

MS. GARR: I'm going to move here just to spare my spine a little. Thank you, your Honor.

So I want to address there's two different points being raised here, and we did file a response and in accordance with the rule.

So this is -- again, there's two different pieces. The first is the Personal Information Protection Act. This was, and this has been a theme that has now run through. I understand there is new counsel.

I do want to note that to my understanding Winston is co-counsel on this still. They have not withdrawn. They remain counsel. They have been appearing at every hearing and is still counsel of record on this. But as your Honor noted, while we appropriate there is new counsel here, what has happened has been a flurry of activity of seeking to renegotiate or re-up a whole series of things that had been long discussed with and debated with prior counsel.

This is an issue of Korean law. This is not

redactions that we imposed other than directly in accordance with Korean law. The Korean law is extremely stringent and strict about this. This was something discussed at length between the parties on several meet and confers with prior counsel about what would be redacted, why. We actually had to extend -- if the Court recalls, we had to extend the deadline for the production specifically because it required obtaining consents from parties and required extensive redactions. This was known to RIA's counsel throughout. And even when the scope of the necessary redactions became known, the -- this is not a newly arisen issue.

This is on July 21, 2025, RIA's counsel then specifically proposed an extension to the deadline "so as to accommodate potential discovery disputes concerning South Korean data privacy law."

RIA never raised this dispute with the Court, and the obligation -- again, the production happened in September 26 of 2025. And at the February 25 court conference where the stay was lifted, at that time RIA said it expected to have some motions to compel. And your Honor set a timeline that said that the motions to compel that existed for discovery disputes had to be submitted by April 13 or they would be waived, and this is known to them at the time. It was not raised by them. And this is again the claim of prejudice for a party that has known about this

since July of 2025 and raised this specifically and took no action in now, does not warrant the relief being sought here. They had a deadline to do it and should have used that.

There is also the question of what was raised in their papers of why seeking for leave here is that they need these redactions done so that they can see what other additional parties they need to seek discovery from. That too is untimely.

The deadline for both serving discovery requests as well as production of document requests has long past. So again, the basis for this in seeking this now is without foundation here given the timing and the upcoming depositions. So again, we are in a position where we would have needed a court order to lift this; otherwise, we would be willingly violating Korean law. That was something that they could have sought, and they did not.

On the second point is the resignation of the employees. What they are seeking, and this again goes to your Honor's rule, they sought leave for this without, my understanding, any factual or legal basis for what they are requesting right now. They did not serve discovery requests seeking this.

First, the stay was lifted back in March. They took no steps to depose people or to ask about any deponents

or to identify deponents. They took no steps to seek those deponents knowing that they were in Korea, and that there would be a substantial delay in being able to obtain that.

It was not until May 11 when for the first he asked about a list of nine people and said before tomorrow's hearing with the Court, please tell us who they are and if they will be made available.

And at that time we said Mr. Kim is no longer there. That was the first time it was inquired about since the stay was lifted. We told him immediately that that was the case, that there were no steps taken prior to that is prejudice of their own making.

With respect to the other individuals, again, two of the -- all four of those individuals resigned back in 2020 and 2022 prior to this litigation commencing.

There is serious suggestion and implications in here that Shinhan separated these employees implying that we somehow took steps to remove individuals from being able to serve as witness. The fact that those -- two of the individuals that were inquired about was known to prior counsel. We told them when they inquired about them that they were no longer -- and that they had resigned back in 2020 and 2022. They knew about that. Prior counsel was well aware of that.

The other two individuals were not asked about

until now, and we told them immediately that they were no longer employed. The resignation occurred.

As to the basis of why they're bringing this, what they are seeking is they said, well, we need -- give us the corporation agreements that exist. We have already confirmed with them there are no cooperations that exist with any of these parties. And then to resolve this dispute before they filed the letter, we had offered to provide them with the designation letters. And in order to resolve the dispute, they did not respond to us in response to that.

So they filed this letter without -- in my opinion, they are being -- there is no -- what they are seeking is testimony essentially which they can easily obtain from the witnesses that are being made available.

There was also reference that was made by RIA's counsel to -- that Mr. Kim's boss is somehow not there. That's inaccurate. We told them back on May 11 that he is still current employee, and they've had that information.

So you know, again, I think we are dealing with new strategic decisions being made that don't reflect the long-standing agreements between the parties here.

THE COURT: Understood. Okay. And Ms. Garr, you bring up a good point, and this is something I should correct on the record. There is no predecessor counsel because Winston Strawn has not withdrawn. You are

absolutely right about that. And the statements I made previously, I want to make it clear that there has been no replacement here. And certainly, Winston Strawn has attended hearings along Quinn Emanuel.

I -- look, I think I made clear where I stand on this. To the extent these have been previously discussed with counsel for RIA, they have been waived, and we all came back here in April and we set forth the discovery schedule and I gave everybody dates for motion to compel.

So from my perspective, respectfully, the ship has sailed on these issues, and there is a bound case law in the First Department that specifically says new counsel doesn't mean you get to reopen discovery and test out new litigation strategies.

So with respect to this motion, again, I can never tell you you can't file the motion. I will instruct as I did with Ms. Garr's anticipated motion that you meet and confer prior to filing the motion. You have until July 1st.

To the extent though that I'm seeing in this motion that employees have left before litigation commenced that I have an affirmation from Ms. Garr or anyone on her team saying, Judge, we did this, we did this before September, we did this after September, you know, that's entirely going to be problematic. Okay.

Yes, sir.

MR. RAND: May I be very heard very briefly, your Honor?

THE COURT: Yes.

MR. RAND: I want to thank as always the Court for its guidance in helping to guide us on what the Court will be view as an efficacious application and what will not be helpful.

Having come into this case recently, there is a history here, and I look forward to understanding very clearly the factual record that your Honor is referring to. In fact, including what your Honor has said on the record, and I will consult with Winston and Strawn as well. And once we understand very clear that factual record and engage in the meet and confer you have directed us to, we'll bring the appropriate application, and I think I should just reserve rights to put that out in front of your Honor once I am there.

THE COURT: Understood. I appreciate that.

MR. RAND: Thank you very much.

THE COURT: Okay. Folks, anything else for today?

Okay. So I just want to make sure we are all clear on what's going to happen now.

We'll issue our short form order on the preliminary injunction hearing today. Whatever you need between now and July 8, please look out. Otherwise, look for a stipulation.

Parties to obtain a copy of today's transcript, file that on NYSCEF in 30 days.

With respect to the two motions that we discussed today, to the extent you decide to bring them, you have until July 1 to bring these motions.

I believe our next date in this action is a trial readiness conference in October. I know there's also a motion to dismiss that's I believe fully submitted now. Is that right?

MS. GARR: That's correct.

THE COURT: Give us chance to look at that. We have not yet. And if we think oral argument will be helpful, we'll reach out.

Thanks everyone. Have a good day.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

Karen Mangano

KAREN MANGANO, CSR
Senior Court Reporter

## $

**$138** [1] - 11:5
**$185,517,963.75** [1] - 28:19
**$198,591,177** [1] - 28:16
**$204,069,760** [1] - 28:24

## 1

**1** [2] - 45:6, 65:5
**1,000** [1] - 46:21
**1.5** [1] - 23:23
**100** [2] - 10:8, 28:2
**10007** [1] - 1:8
**10010** [1] - 1:15
**10020** [1] - 1:18
**11** [6] - 48:17, 48:19, 51:13, 51:14, 61:4, 62:17
**11-month** [1] - 41:1
**110** [1] - 28:22
**11th** [1] - 48:19
**12** [6] - 8:20, 9:15, 34:8, 40:21, 43:15, 43:17
**12,000** [1] - 43:18
**1221** [1] - 1:18
**12th** [2] - 29:7, 29:12
**13** [5] - 30:16, 30:20, 32:13, 33:16, 59:23
**15** [1] - 31:6
**17** [1] - 1:9
**171** [2] - 43:23, 45:8
**172** [4] - 43:23, 44:11, 44:14, 45:2
**17th** [1] - 29:8
**180** [1] - 28:17
**181** [1] - 27:20
**1:00** [1] - 49:21
**1st** [2] - 47:25, 63:18

## 2

**20** [1] - 28:20
**2009** [1] - 30:11
**2012** [1] - 30:9
**2018** [1] - 36:8
**2019** [2] - 30:8, 31:6
**2020** [4] - 44:7, 44:10, 61:15, 61:23
**2021** [1] - 34:23
**2022** [5] - 12:5, 30:7, 30:10, 61:15, 61:23
**2024** [7] - 2:3, 33:5, 33:9, 34:25, 44:8, 44:10, 46:1
**2025** [20] - 7:25, 23:1, 23:7, 23:22, 31:25, 33:12, 34:24, 35:12, 40:4, 40:10, 41:14, 44:22, 44:24, 45:1, 45:4, 45:7, 59:12, 59:18, 60:1
**2026** [5] - 1:9, 28:16, 29:6, 51:10, 51:11
**21** [1] - 59:12
**228** [1] - 34:18
**22nd** [1] - 1:14
**23rd** [1] - 29:6
**25** [2] - 42:11, 59:18
**26** [7] - 23:11, 40:23, 42:13, 43:17, 43:20, 45:18, 59:18
**26th** [2] - 41:9, 46:5
**28** [1] - 58:2

## 3

**30** [9] - 7:24, 23:13, 23:22, 28:16, 28:19, 41:14, 44:22, 45:4, 65:2
**30(b)(6** [2] - 53:25, 54:3
**300** [1] - 42:4
**31** [2] - 31:25, 45:4
**33** [2] - 27:23, 33:14
**35** [1] - 27:23
**38** [1] - 28:17
**3rd** [2] - 29:8, 29:11

## 4

**4.2C** [1] - 32:13
**45** [1] - 1:1
**450** [2] - 41:10, 42:4
**47** [2] - 31:14, 33:10
**475** [1] - 46:8

## 5

**5** [1] - 29:1
**5,400** [2] - 43:19, 46:6
**5.5** [1] - 28:25
**51** [1] - 1:14

## 6

**60** [1] - 1:8
**6301** [1] - 29:4
**6311** [1] - 29:4
**6313** [1] - 29:4
**659538** [1] - 2:3
**659538/2024** [1] - 1:4

## 8

**8** [4] - 34:8, 39:5, 39:7, 64:25

## A

**abided** [1] - 22:7
**ability** [1] - 43:5
**able** [11] - 8:22, 9:7, 12:16, 24:11, 25:14, 41:19, 52:24, 54:14, 56:3, 61:3, 61:18
**absent** [1] - 29:16
**absolutely** [4] - 39:19, 47:23, 56:7, 63:1
**abundantly** [1] - 53:18
**accept** [1] - 23:24
**acceptable** [5] - 5:18, 17:13, 48:7, 48:8, 48:10
**access** [7] - 4:13, 4:17, 8:24, 16:13, 28:4, 36:24, 37:9
**accommodate** [1] - 59:14
**accomplished** [1] - 25:13
**accordance** [2] - 58:12, 59:1
**according** [2] - 9:8, 28:15
**accordingly** [2] - 36:9, 38:6
**account** [35] - 3:20, 3:24, 4:21, 7:18, 8:8, 8:9, 8:12, 8:15, 15:4, 15:8, 15:18, 15:21, 16:20, 19:2, 19:10, 19:25, 23:18, 23:19, 23:25, 27:21, 27:22, 28:4, 28:23, 30:23, 32:12, 32:18, 34:4, 36:15, 36:19, 38:14, 38:15, 41:1, 41:11, 44:16
**accounts** [7] - 26:17, 30:15, 30:21, 35:11, 36:22, 45:13, 56:13
**ACCURATE** [1] - 65:15
**achieved** [1] - 21:10
**acknowledge** [1] - 30:22
**acknowledgment** [1] - 32:15
**Act** [1] - 58:14
**act** [1] - 4:6
**action** [13] - 22:4, 24:22, 29:24, 30:5, 30:25, 32:21, 33:8, 33:11, 33:21, 35:23, 36:1, 60:2, 65:6
**actions** [2] - 22:5, 30:19
**active** [1] - 27:25
**actively** [1] - 30:24
**activity** [2] - 37:15, 58:22
**actual** [6] - 11:15, 11:18, 11:21, 17:10, 31:20, 51:6
**add** [1] - 40:5
**added** [1] - 13:12
**addition** [3] - 29:8, 49:18, 50:15
**additional** [1] - 60:8
**additionally** [1] - 35:24
**address** [8] - 3:1, 25:9, 43:12, 48:9, 51:21, 54:11, 55:19, 58:10
**addressed** [2] - 21:23, 26:18
**addresses** [2] - 56:12, 56:13
**adequately** [1] - 56:17
**adjudicating** [1] - 36:1
**adjudication** [3] - 3:12, 48:22, 51:4
**adjust** [1] - 47:19
**administrative** [1] - 9:16
**admissions** [1] - 54:8
**admits** [1] - 33:11
**advance** [2] - 7:6, 9:10
**advances** [1] - 25:3
**adverse** [4] - 42:19, 43:8, 49:3, 51:3
**advise** [1] - 6:19
**advised** [2] - 46:13, 46:16
**advising** [2] - 21:16
**advisor** [1] - 36:14
**AEO** [3] - 46:9, 47:19, 56:18
**affect** [1] - 38:17
**affidavit** [2] - 11:4, 43:2
**Affirmation** [4] - 27:19, 27:23, 29:1, 33:13
**affirmation** [4] - 21:14, 28:17, 28:20, 63:21
**afforded** [1] - 56:12
**afternoon** [4] - 2:1, 2:5, 2:9, 2:11
**agenda** [1] - 2:24
**agent** [1] - 32:5
**ago** [3] - 5:6, 11:13, 22:5
**agree** [5] - 15:4, 18:6, 25:15, 27:17, 39:20
**agreed** [5] - 3:18, 28:21, 35:19, 37:3, 46:7
**agreement** [12] - 3:20, 4:5, 4:11, 5:1, 21:3, 31:3, 31:5, 31:18, 31:24, 32:9, 33:1, 39:17
**agreements** [10] - 18:18, 22:6, 31:8, 33:25, 49:15, 50:16, 50:19, 51:4, 62:5, 62:21
**ahead** [2] - 20:18, 22:10
**alerted** [1] - 41:2
**alia** [1] - 35:6
**alleged** [5] - 33:20, 33:21, 34:17, 35:3, 36:2
**allegedly** [1] - 28:19
**alleges** [5] - 22:4, 31:13, 31:19, 33:14, 35:10
**allow** [4] - 4:16, 6:25, 34:10
**allowed** [3] - 52:23, 53:23, 56:7
**almost** [3] - 28:4, 46:1, 46:5
**alternatively** [1] - 8:14
**amenable** [1] - 4:16
**Americas** [1] - 1:18
**amount** [2] - 11:8, 34:20
**amounts** [3] - 3:20, 4:2, 4:3
**analysis** [2] - 20:10, 37:7
**ANAR** [1] - 1:11
**ancillary** [1] - 27:1
**AND** [1] - 65:15
**Andy** [1] - 50:13
**annual** [1] - 44:10
**answer** [1] - 44:4
**anticipated** [2] - 53:9, 63:17
**apologies** [2] - 18:4, 22:7
**apologize** [3] - 14:5, 48:16, 54:1
**apparent** [1] - 51:6
**appear** [2] - 41:11, 51:21
**appearance** [2] - 25:8,

53:1
**appearances** [1] - 2:4
**appearing** [1] - 58:19
**applicable** [1] - 53:9
**application** [3] - 3:14, 64:6, 64:15
**appraisal** [2] - 9:17, 11:8
**appraisals** [6] - 9:22, 9:23, 9:25, 11:11, 11:12, 42:7
**appraise** [1] - 10:20
**appraiser** [2] - 10:21, 37:11
**appraisers** [1] - 24:6
**appreciate** [10] - 2:19, 7:9, 16:4, 16:7, 20:17, 26:9, 47:2, 52:12, 54:19, 64:18
**appreciates** [1] - 26:15
**apprised** [2] - 17:4, 19:8
**approach** [1] - 12:18
**appropriate** [5] - 39:16, 52:25, 53:5, 58:21, 64:15
**appropriately** [2] - 13:16, 52:17
**approved** [1] - 9:11
**April** [14] - 7:24, 22:16, 23:13, 23:22, 28:16, 28:19, 29:6, 33:12, 40:4, 40:10, 41:14, 44:24, 59:23, 63:8
**argue** [2] - 21:18, 32:10
**argued** [1] - 35:12
**argument** [12] - 14:18, 17:22, 20:23, 22:8, 25:24, 29:7, 37:23, 50:25, 52:23, 57:11, 65:12
**arguments** [4] - 51:4, 52:25, 53:4, 53:5
**arise** [1] - 14:9
**arisen** [1] - 59:11
**arrangements** [1] - 34:15
**articulated** [1] - 3:25
**as-needed** [1] - 39:8
**aside** [1] - 55:15
**aspects** [2] - 6:17, 14:10
**assert** [1] - 34:24
**asserted** [1] - 51:5
**assertion** [2] - 49:5, 53:24
**assess** [2] - 24:7, 55:6
**asset** [4] - 9:23, 33:18, 35:14, 36:12
**assets** [15] - 6:8, 6:17, 10:14, 10:15, 10:21, 11:3, 11:5, 12:6, 19:3, 35:17, 36:18, 37:3, 37:13, 37:25
**assist** [2] - 38:8, 38:24
**assistance** [2] - 12:13, 18:6
**astonished** [1] - 49:11
**at-issue** [1] - 32:7
**attaching** [1] - 18:10
**attempting** [1] - 55:1
**attended** [1] - 63:4
**attention** [1] - 48:13
**attorney** [5] - 5:1, 16:24, 17:11, 29:10, 30:14
**Attorney** [6] - 1:14, 1:17, 7:23, 33:16, 34:25, 35:11
**attorneys** [2] - 42:5, 42:8
**attorneys'** [1] - 53:17
**August** [1] - 33:5
**authenticate** [1] - 55:5
**authority** [1] - 51:6
**automated** [1] - 55:24
**available** [8] - 8:4, 38:8, 38:24, 39:9, 49:4, 51:1, 61:7, 62:14
**Avenue** [2] - 1:14, 1:18
**avoidance** [1] - 44:7
**avoided** [2] - 23:2, 40:14
**avoiding** [1] - 20:25
**award** [2] - 35:22, 35:24
**awarding** [1] - 53:17
**aware** [8] - 7:22, 17:10, 21:12, 46:16, 48:4, 51:25, 57:4, 61:24
**awful** [2] - 46:3, 46:4

## B

**backed** [2] - 34:6, 34:7
**backfire** [1] - 20:5
**baked** [1] - 20:23
**balance** [2] - 35:20, 56:11
**balancing** [2] - 29:17, 37:17
**bank** [14] - 7:22, 15:4, 17:4, 17:9, 18:18, 19:7, 23:18, 23:19, 28:6, 38:14, 41:1, 41:11, 45:13, 56:13
**banks** [1] - 20:14
**based** [7] - 28:14, 32:8, 35:18, 47:20, 49:20, 50:3, 52:22
**basis** [16] - 8:2, 8:8, 9:20, 11:7, 23:14, 34:12, 36:20, 39:8, 41:17, 44:6, 44:10, 44:15, 55:25, 60:12, 60:21, 62:3
**Bass** [1] - 30:9
**Bates** [1] - 45:14
**BE** [1] - 65:15
**became** [2] - 51:25, 59:10
**become** [2] - 53:18, 57:4
**behalf** [3] - 2:6, 2:10, 34:4
**behind** [1] - 7:8
**belonged** [1] - 50:17
**benefit** [5] - 7:19, 16:22, 18:20, 21:25, 52:15
**best** [3] - 16:11, 18:2, 18:9
**better** [1] - 58:4
**between** [17] - 8:11, 23:14, 27:25, 31:7, 31:11, 32:6, 34:15, 35:2, 35:5, 39:7, 43:17, 46:13, 47:8, 51:18, 59:4, 62:21, 64:24
**big** [2] - 16:17
**bind** [1] - 54:4
**bit** [4] - 6:13, 25:12, 43:25, 50:1
**bite** [1] - 52:8
**black** [1] - 49:6
**blessing** [1] - 18:8
**block** [1] - 55:20
**blocking** [3] - 55:11, 55:14
**blot** [1] - 55:10
**blunt** [1] - 2:20
**BNP** [16] - 5:5, 7:22, 8:23, 16:19, 17:10, 19:1, 20:1, 28:1, 28:7, 30:16, 30:21, 32:5, 32:16, 33:19, 34:25, 44:13
**board** [1] - 14:23
**bonds** [2] - 31:14, 34:6
**borrowing** [10] - 3:15, 3:18, 3:19, 4:5, 8:11, 14:24, 15:3, 31:22, 38:12
**boss** [5] - 49:23, 49:25, 50:7, 50:13, 62:16
**bound** [2] - 38:23, 63:11
**brand** [1] - 15:13
**breach** [4] - 31:13, 31:19, 32:3, 33:11
**breached** [2] - 31:18, 32:25
**breaches** [1] - 24:14
**breaching** [1] - 31:20
**brief** [1] - 43:14
**briefing** [5] - 23:15, 26:12, 41:19, 50:24, 53:23
**briefly** [2] - 22:14, 64:1
**bring** [5] - 24:11, 62:23, 64:14, 65:4, 65:5
**bringing** [1] - 62:3
**broker** [3] - 6:9, 13:6, 14:6
**brokerage** [1] - 6:16
**brought** [3] - 21:1, 29:3, 29:6
**browser** [1] - 43:25
**Brunt** [4] - 2:16, 16:6, 26:3, 29:11
**bulk** [1] - 46:6
**bunch** [1] - 58:6
**burden** [5] - 24:25, 29:21, 55:16, 55:23, 56:24
**business** [2] - 22:3, 33:5
**BY** [2] - 1:15, 1:19

## C

**Cafe** [1] - 30:10
**calendar** [1] - 37:17
**California** [1] - 55:13
**capable** [1] - 8:1
**Case** [3] - 2:10, 2:12, 5:3
**CASE** [1] - 1:17
**case** [12] - 24:12, 30:7, 38:18, 49:7, 51:1, 53:19, 55:12, 56:16, 56:25, 61:11, 63:11, 64:8
**cases** [3] - 26:12, 26:16
**cash** [1] - 15:20
**caused** [1] - 33:4
**causes** [1] - 36:1
**cautious** [1] - 52:13
**CBRE** [4] - 6:12, 10:20, 11:20, 13:15
**cease** [2] - 30:18, 35:2
**ceased** [2] - 41:3, 42:20
**Centre** [1] - 1:8
**CEO** [1] - 50:21
**certain** [8] - 11:11, 35:4, 43:7, 47:5, 50:2, 50:5, 54:8, 54:11
**certainly** [14] - 2:21, 4:15, 19:11, 19:17, 21:11, 21:12, 24:10, 25:20, 42:25, 46:24, 47:3, 47:4, 63:3
**CERTIFIED** [1] - 65:15
**CFO** [1] - 50:19
**Chan** [2] - 49:23, 49:24
**chance** [4] - 48:3, 55:21, 57:14, 65:11
**change** [1] - 35:17
**changing** [1] - 6:24
**chase** [1] - 54:25
**cheats** [1] - 25:12
**cited** [2] - 26:12, 57:16
**CIVIL** [1] - 1:1
**claim** [5] - 32:3, 32:25, 33:1, 33:2, 59:25
**claims** [7] - 24:17, 24:18, 32:21, 34:2, 34:13, 34:20, 34:22
**clarification** [1] - 39:13
**clarify** [1] - 43:21
**clean** [2] - 17:7, 26:24
**cleanup** [1] - 47:19
**clear** [25] - 6:23, 7:20, 10:11, 11:21, 13:6, 14:4, 14:14, 18:15, 19:12, 19:15, 22:24, 29:14, 29:22, 33:24, 41:13, 46:13, 47:8, 49:8, 53:18, 55:12, 63:2, 63:5, 64:13, 64:21
**clearly** [4] - 41:4, 48:21, 49:11, 64:10
**client** [4] - 10:23, 45:21, 47:4, 47:9
**client's** [1] - 15:8
**clients** [5] - 2:19, 42:6, 42:9, 53:15, 53:18
**clock** [1] - 21:2
**close** [4] - 3:10, 7:13, 12:14, 20:21
**co** [1] - 58:18
**Co** [1] - 32:16
**CO** [1] - 1:5

KM

**co-counsel** [1] - 58:18
**coast** [1] - 6:13
**cognizant** [1] - 10:9
**Cohen** [1] - 30:9
**collaborately** [1] - 3:7
**collaborative** [1] - 37:21
**collateral** [88] - 4:2, 4:9, 4:21, 4:23, 5:15, 5:22, 6:18, 7:18, 9:7, 9:10, 9:17, 10:14, 11:6, 12:1, 12:7, 13:1, 14:7, 14:13, 16:2, 16:22, 16:25, 17:5, 17:8, 17:12, 17:20, 18:19, 19:1, 19:5, 19:24, 19:25, 21:15, 22:18, 22:21, 22:24, 23:13, 23:14, 23:20, 24:3, 24:8, 24:9, 25:6, 27:18, 27:20, 28:11, 28:15, 28:23, 30:22, 32:5, 32:7, 32:12, 32:18, 33:2, 33:12, 33:17, 34:14, 34:15, 35:11, 35:14, 35:22, 35:24, 36:15, 36:18, 37:16, 40:4, 40:11, 40:12, 41:3, 41:7, 41:13, 41:15, 41:16, 41:23, 42:20, 42:22, 42:23, 43:1, 43:3, 44:3, 44:4, 44:8, 44:12, 44:15, 44:18, 45:16
**collateralize** [1] - 28:22
**colleague** [1] - 57:3
**colleagues** [1] - 20:14
**collect** [1] - 46:3
**collecting** [1] - 45:24
**collection** [1] - 45:21
**color** [1] - 48:5
**comfort** [2] - 20:15, 22:2
**comfortable** [3] - 3:23, 18:13, 39:18
**coming** [1] - 54:15
**commenced** [3] - 7:14, 16:6, 63:20
**commencing** [1] - 61:15
**comments** [2] - 14:17, 26:9
**commercial** [5] - 6:9, 6:16, 13:6, 14:6, 34:6
**commits** [1] - 36:13
**committed** [1] - 29:19
**communicated** [1] - 51:22
**communication** [1] - 13:2
**communications** [7] - 5:19, 23:17, 35:5, 40:12, 55:4, 57:15, 57:17
**Company** [1] - 2:2
**compel** [6] - 23:11, 40:22, 43:16, 59:20, 59:21, 63:9
**competence** [1] - 6:9
**competing** [1] - 34:13
**complaint** [5] - 31:12, 32:1, 33:21, 36:2, 50:11
**complete** [2] - 26:1, 35:4
**completed** [1] - 57:25
**completely** [1] - 56:17
**complex** [1] - 32:21
**complicated** [1] - 5:14
**comply** [1] - 43:16
**complying** [1] - 40:2
**component** [1] - 16:17
**composition** [6] - 4:22, 5:14, 5:15, 7:23, 15:23, 20:8
**compounded** [1] - 34:14
**compromise** [2] - 7:12, 8:6
**concern** [8] - 3:25, 10:24, 18:1, 19:22, 19:23, 20:2, 35:13, 44:12
**concerned** [2] - 22:17, 38:4
**concerning** [5] - 3:14, 40:2, 40:3, 45:16, 59:14
**concerns** [3] - 8:7, 18:7, 38:16
**conclude** [1] - 39:16
**condition** [1] - 32:14
**conduct** [2] - 30:1, 37:6
**conducted** [1] - 35:18
**confer** [6] - 38:7, 47:17, 48:1, 53:12, 63:18, 64:14
**conference** [9] - 2:16, 2:21, 3:2, 17:21, 26:11, 29:12, 53:11, 59:19, 65:7
**conferences** [1] - 29:10
**confers** [1] - 59:4
**confidence** [1] - 54:13
**confident** [1] - 2:22
**confirmation** [4] - 5:16, 8:7, 10:7, 17:5
**confirmations** [1] - 28:5
**confirmed** [2] - 7:21, 62:6
**connection** [2] - 13:15, 51:3
**consents** [1] - 59:8
**consider** [3] - 3:13, 13:15, 46:11
**considering** [2] - 13:3, 26:20
**consistent** [3] - 9:12, 36:12, 36:15
**constitutes** [2] - 33:19, 34:20
**constituting** [1] - 31:23
**construed** [1] - 38:4
**consult** [1] - 64:12
**contacts** [2] - 6:14, 6:16
**contain** [2] - 41:11, 43:22
**contains** [1] - 32:14
**contemplated** [1] - 9:12
**contemporaneously** [1] - 31:5
**context** [1] - 53:5
**continue** [3] - 2:22, 36:14, 36:23
**continued** [1] - 2:13
**continues** [1] - 36:12
**contract** [8] - 8:2, 18:16, 18:21, 31:13, 31:19, 32:3, 33:11, 34:13
**contracts** [3] - 19:8, 27:25, 31:2
**contractually** [1] - 35:4
**control** [3] - 4:4, 4:8, 31:6
**controlled** [1] - 8:15
**controlling** [1] - 31:10
**convey** [1] - 53:17
**convincing** [2] - 29:14, 29:22
**cooperation** [6] - 49:2, 50:8, 50:21, 52:19, 53:2
**cooperations** [1] - 62:6
**copy** [2] - 19:21, 65:1
**corporate** [1] - 34:6
**corporation** [2] - 7:8, 62:5
**correct** [6] - 14:24, 15:1, 27:8, 51:11, 62:24, 65:10
**correspondence** [1] - 4:25
**counsel** [41] - 2:4, 3:16, 6:2, 12:23, 14:10, 25:17, 27:6, 32:24, 33:6, 45:13, 45:22, 46:2, 46:14, 46:16, 47:2, 47:6, 47:9, 48:6, 51:18, 52:2, 52:4, 52:9, 57:13, 57:18, 57:22, 58:5, 58:16, 58:18, 58:19, 58:20, 58:21, 58:24, 59:5, 59:9, 59:12, 61:21, 61:23, 62:16, 62:24, 63:7, 63:12
**Counsel** [1] - 44:21
**counterclaim** [1] - 31:19
**counterclaims** [2] - 33:22, 36:2
**counterpart** [1] - 48:21
**COUNTY** [1] - 1:1
**couple** [1] - 56:2
**coupon** [8] - 3:22, 4:4, 4:8, 8:11, 14:24, 15:3, 15:7, 38:12
**course** [10] - 3:16, 20:3, 32:24, 35:15, 43:13, 49:15, 52:1, 53:3, 54:21, 56:7
**COURT** [54] - 1:1, 2:1, 2:13, 4:14, 7:4, 9:3, 12:17, 13:9, 14:19, 15:2, 15:6, 15:15, 15:22, 15:25, 17:25, 19:14, 19:19, 20:4, 20:18, 22:10, 25:7, 26:22, 27:6, 27:11, 39:19, 39:22, 39:24, 40:19, 43:10, 43:13, 44:21, 45:3, 45:9, 46:19, 46:24, 47:14, 47:24, 48:11, 51:8, 51:15, 51:23, 52:11, 53:8, 54:17, 54:20, 54:24, 57:2, 57:25, 58:7, 62:22, 64:3, 64:18, 64:20, 65:11
**Court** [87] - 1:24, 3:8, 3:13, 3:24, 4:7, 6:11, 6:19, 6:24, 7:2, 7:6, 7:8, 11:4, 13:23, 13:25, 15:8, 17:22, 17:23, 18:5, 18:24, 20:3, 21:3, 21:8, 21:11, 21:12, 21:16, 21:20, 22:22, 22:23, 23:5, 23:10, 23:12, 23:16, 24:1, 24:4, 24:24, 25:1, 25:22, 26:14, 26:20, 27:13, 28:14, 29:3, 29:6, 29:9, 30:12, 30:18, 31:25, 32:2, 33:18, 34:9, 34:12, 36:9, 36:17, 37:11, 37:20, 38:2, 38:6, 38:8, 38:10, 38:15, 38:24, 39:4, 39:6, 39:14, 39:17, 41:9, 43:15, 48:7, 48:8, 49:3, 49:16, 50:3, 51:3, 51:5, 52:22, 52:23, 52:25, 53:1, 54:23, 56:25, 59:6, 59:16, 61:6, 64:4, 64:5, 65:20
**court** [16] - 8:15, 8:17, 15:18, 15:21, 16:25, 29:10, 29:19, 35:25, 39:16, 43:3, 49:16, 52:14, 54:5, 56:2, 59:18, 60:15
**Court's** [16] - 3:8, 3:12, 4:3, 7:3, 12:13, 18:6, 19:23, 20:22, 22:12, 26:8, 26:9, 40:2, 40:16, 41:25, 43:11, 44:1
**court-controlled** [1] - 8:15
**courthouse** [1] - 24:21
**Courthouse** [1] - 1:7
**covers** [1] - 54:13
**CPLR** [2] - 29:4, 54:2
**create** [1] - 21:2
**created** [1] - 28:13
**creatively** [1] - 2:18
**credibility** [1] - 49:17
**credibly** [1] - 35:12
**criminal** [1] - 50:12
**crisp** [1] - 14:21
**critical** [3] - 41:18, 49:12, 51:23
**crystal** [1] - 22:24
**CSR** [2] - 1:23, 65:20
**cue** [1] - 22:12
**current** [8] - 10:2, 16:17, 17:14, 28:14, 34:13, 41:15, 47:20, 62:18
**custodial** [16] - 4:21, 19:10, 19:25, 23:25, 28:23, 30:15, 30:21,

KM

32:12, 32:18, 34:3, 34:4, 36:15, 36:19, 44:15
**custodian** [4] - 28:5, 33:17, 44:8, 44:16
**custody** [1] - 27:22
**customers** [1] - 28:9
**cut** [1] - 54:25
**cutoff** [1] - 45:23

**D**

**daily** [17] - 4:10, 4:16, 4:17, 7:17, 8:2, 8:19, 9:23, 16:1, 23:14, 28:11, 34:11, 34:12, 36:17, 36:18, 36:22, 36:25, 41:3
**damage** [1] - 23:2
**damaging** [3] - 12:25, 13:5, 14:12
**data** [1] - 59:15
**date** [4] - 43:7, 45:21, 48:18, 65:6
**dated** [1] - 11:13
**dates** [3] - 6:20, 6:23, 63:9
**day-to-day** [1] - 41:17
**days** [4] - 5:6, 9:8, 37:17, 65:2
**deadline** [5] - 42:11, 59:7, 59:13, 60:3, 60:10
**deal** [1] - 11:1
**dealer** [1] - 6:9
**dealing** [2] - 20:1, 62:19
**dealings** [1] - 33:5
**dealt** [1] - 50:12
**debated** [1] - 58:24
**December** [1] - 34:23
**decide** [1] - 65:4
**decided** [2] - 29:25, 55:14
**decision** [4] - 25:11, 26:23, 27:13, 31:25
**decisions** [3] - 38:17, 47:5, 62:20
**deeper** [1] - 54:22
**default** [12] - 12:4, 31:23, 32:11, 32:15, 33:15, 33:19, 34:1, 34:13, 34:21, 34:22, 35:7
**defaulted** [1] - 35:7
**defaults** [2] - 33:20, 33:24
**defendant** [2] - 27:14, 29:5
**Defendant** [1] - 1:17
**defendant's** [1] - 25:16
**defendants** [3] - 32:10, 33:23, 34:24
**Defendants** [1] - 1:6
**deficiencies** [1] - 40:2
**deficiency** [1] - 28:24
**deficient** [1] - 42:16
**definitely** [2] - 13:14
**degree** [1] - 56:11
**delay** [1] - 61:3
**deliberate** [1] - 25:5
**deliver** [1] - 31:14
**delivered** [1] - 49:21
**Delta** [1] - 30:8
**delve** [3] - 10:25, 18:25, 20:23
**delving** [1] - 23:3
**demand** [1] - 33:6
**demanded** [1] - 13:8
**demanding** [1] - 33:6
**demonstrate** [1] - 29:14
**demonstrates** [1] - 37:21
**den** [1] - 27:3
**denied** [1] - 32:2
**dep** [1] - 58:6
**Department** [7] - 30:7, 30:8, 30:9, 30:10, 30:11, 36:8, 63:12
**depleted** [1] - 24:9
**depletion** [1] - 25:5
**deponents** [4] - 57:24, 60:25, 61:1, 61:2
**depose** [3] - 55:7, 56:3, 60:25
**deposited** [2] - 32:6, 38:13
**deposition** [8] - 42:11, 49:6, 49:11, 49:12, 49:13, 52:24, 53:6, 55:2
**depositions** [3] - 57:6, 57:24, 60:14
**designated** [1] - 42:8
**designation** [1] - 62:9
**designations** [4] - 46:9, 46:11, 47:19, 56:19
**designee** [1] - 53:25
**desire** [1] - 4:1
**desist** [1] - 30:18
**despite** [1] - 41:24
**detail** [1] - 42:1
**determine** [7] - 10:15, 33:18, 36:22, 36:24, 37:7, 55:1, 57:18
**determined** [1] - 4:12
**detriment** [1] - 35:23
**dichotomy** [1] - 21:7
**dictate** [2] - 37:22, 38:13
**different** [4] - 13:19, 15:20, 58:10, 58:13
**direct** [4] - 30:17, 30:18, 38:21, 47:16
**directed** [4] - 20:25, 40:22, 64:14
**directing** [1] - 38:12
**direction** [1] - 23:11
**directly** [5] - 7:16, 8:6, 15:3, 38:14, 59:1
**directs** [5] - 36:18, 37:20, 38:6, 38:11, 39:4
**disadvantage** [2] - 11:2, 17:17
**discern** [1] - 42:2
**disclosed** [1] - 52:2
**disclosure** [1] - 44:3
**disclosures** [1] - 52:6
**discovery** [17] - 23:8, 45:23, 47:5, 52:3, 52:5, 52:7, 52:16, 52:17, 52:22, 54:7, 59:14, 59:22, 60:8, 60:10, 60:22, 63:8, 63:13
**discrepancy** [1] - 31:10
**discretion** [1] - 29:19
**discuss** [2] - 42:5, 42:9
**discussed** [7] - 26:24, 37:23, 49:15, 58:24, 59:3, 63:6, 65:3
**discussion** [1] - 24:20
**discussions** [2] - 3:9, 52:6
**dismiss** [4] - 32:1, 32:2, 51:6, 65:8
**disposal** [1] - 39:7
**dispute** [7] - 24:15, 30:25, 38:23, 56:1, 59:16, 62:7, 62:10
**disputed** [4] - 27:24, 33:8, 33:9, 35:22
**disputes** [7] - 31:18, 32:22, 33:3, 35:1, 52:4, 59:14, 59:22
**disruption** [1] - 33:4
**dissipation** [4] - 22:18, 22:21, 24:3, 35:13
**distinction** [3] - 8:10, 15:17, 47:8
**District** [1] - 55:13
**doable** [1] - 25:3
**doc** [1] - 58:6
**Docket** [3] - 44:11, 45:1, 45:8
**Dockets** [1] - 43:23
**Document** [2] - 27:20, 28:2
**document** [5] - 28:17, 45:1, 45:21, 57:8, 60:11
**documentation** [1] - 40:3
**documents** [20] - 23:18, 28:9, 31:5, 31:9, 31:11, 40:12, 41:10, 42:4, 43:18, 45:24, 46:3, 46:4, 46:6, 46:8, 46:10, 46:21, 50:4, 55:5, 55:10, 56:18
**done** [17] - 7:8, 7:16, 9:10, 21:11, 22:5, 25:10, 26:5, 28:5, 43:1, 43:2, 43:18, 45:20, 47:18, 55:24, 57:1, 57:23, 60:7
**door** [1] - 46:15
**doubt** [1] - 44:7
**down** [2] - 12:21, 49:21
**downside** [1] - 15:10
**draft** [5] - 16:14, 16:18, 16:21, 19:21, 38:7
**drafted** [1] - 17:14
**drastic** [1] - 29:20
**drawing** [1] - 53:3
**drawn** [2] - 8:10, 15:17
**dual** [2] - 10:2, 12:24
**Ducenta** [2] - 19:2, 36:13
**due** [1] - 20:1
**dug** [1] - 16:7
**during** [4] - 29:11, 35:15, 37:23, 49:25

**E**

**early** [7] - 6:14, 31:15, 46:18, 46:20, 48:14, 48:15
**easily** [1] - 62:13
**echo** [2] - 7:7, 17:25
**edits** [4] - 5:7, 5:8, 5:9, 17:17
**effect** [1] - 17:22
**effectively** [5] - 4:6, 5:4, 6:25, 13:3, 49:5
**effectuated** [1] - 38:25
**efficacious** [1] - 64:6
**effort** [1] - 37:21
**efforts** [2] - 16:11, 45:18
**eight** [2] - 33:25, 46:22
**either** [1] - 26:11
**email** [6] - 28:1, 28:5, 32:23, 45:16, 55:19, 56:12
**emails** [1] - 55:19
**Emanuel** [7] - 2:6, 2:7, 45:22, 46:2, 57:4, 57:23, 63:4
**EMANUEL** [1] - 1:13
**Emanuel's** [1] - 48:2
**employed** [2] - 55:8, 62:2
**employee** [1] - 62:18
**employees** [3] - 60:19, 61:17, 63:20
**end** [6] - 17:5, 18:22, 37:24, 45:6, 46:1, 53:13
**endeavored** [1] - 37:10
**enemy** [1] - 13:21
**engage** [5] - 20:9, 37:10, 47:17, 53:12, 64:13
**engaged** [10] - 5:19, 5:20, 6:9, 6:17, 12:24, 13:16, 14:6, 29:9, 57:5
**engagement** [8] - 13:9, 13:19, 14:1, 20:12, 20:16, 37:4, 37:5, 52:4
**enjoin** [1] - 30:12
**entered** [2] - 25:16, 43:15
**entering** [1] - 26:20
**entirely** [2] - 44:16, 63:23
**entities** [1] - 20:14
**entity** [2] - 20:9, 50:22
**equities** [3] - 21:24, 29:17, 35:20
**equivalent** [1] - 56:14
**escrow** [4] - 3:24, 15:8, 38:15, 39:16
**ESQ** [4] - 1:15, 1:16, 1:19, 1:19
**essential** [2] - 30:4, 36:6
**essentially** [2] - 47:8, 62:13
**establish** [4] - 16:19, 17:14, 24:17, 41:7
**established** [5] - 17:19, 19:4, 24:7,

KM

24:8, 24:14
**establishes** [2] - 19:4, 19:10
**estate** [10] - 6:8, 6:17, 6:21, 10:21, 11:14, 11:16, 14:8, 37:9, 37:13, 42:8
**evaluate** [4] - 12:24, 13:4, 14:12, 49:16
**event** [7] - 22:7, 31:10, 32:10, 32:15, 34:22, 35:7, 54:2
**events** [2] - 31:23, 34:1
**evidence** [10] - 21:4, 22:20, 22:22, 23:12, 29:14, 29:22, 42:21, 54:9, 55:10, 55:15
**evidentiary** [1] - 21:22
**exact** [1] - 20:15
**exactly** [1] - 35:17
**example** [2] - 34:5, 37:24
**examples** [2] - 28:11, 56:3
**except** [1] - 6:20
**excess** [1] - 43:20
**exclusive** [1] - 17:12
**exclusively** [3] - 7:19, 16:22, 18:20
**executed** [2] - 31:2, 31:5
**exercise** [3] - 30:13, 30:19, 35:10
**exhibits** [1] - 18:11
**exist** [2] - 62:5, 62:6
**existed** [6] - 7:14, 7:24, 10:18, 23:21, 41:14, 59:22
**existence** [4] - 7:18, 9:16, 18:24, 19:8
**existing** [4] - 10:14, 10:15, 31:17, 56:16
**exists** [4] - 5:2, 16:24, 24:3, 43:4
**exiting** [1] - 4:1
**expanding** [1] - 33:25
**expect** [2] - 42:13, 46:17
**expected** [1] - 59:20
**expects** [1] - 39:14
**expense** [3] - 9:24, 40:15
**experience** [1] - 13:18
**extend** [2] - 59:6
**extension** [1] - 59:13
**extensive** [4] - 32:22, 57:10, 57:19, 59:8
**extent** [14] - 4:18, 17:13, 25:14, 36:10, 37:10, 38:11, 39:3, 42:20, 52:5, 56:9, 57:7, 63:6, 63:19, 65:4
**external** [1] - 13:20
**extraordinary** [1] - 50:22
**extremely** [3] - 21:17, 28:4, 59:2
**eyes** [1] - 42:5
**eyesight** [1] - 49:19

**F**

**fabulous** [1] - 26:3
**face** [3] - 33:25, 34:9, 44:19
**faced** [1] - 34:12
**facilitatable** [1] - 4:11
**facilitate** [1] - 4:19
**facilitating** [1] - 3:9
**facing** [1] - 42:10
**fact** [10] - 9:11, 10:9, 17:11, 22:24, 25:21, 33:23, 38:23, 49:17, 61:19, 64:11
**fact-finder** [1] - 49:17
**facts** [4] - 24:17, 27:17, 32:22, 41:20
**factual** [3] - 60:21, 64:10, 64:13
**failed** [1] - 31:20
**failing** [1] - 31:13
**failure** [1] - 35:3
**fair** [4] - 8:1, 14:25, 52:21, 54:24
**faith** [3] - 4:6, 53:13, 53:16
**false** [1] - 21:7
**far** [5] - 11:6, 21:19, 22:8, 26:20, 57:23
**Fargo** [5] - 16:2, 16:14, 18:3, 33:13, 44:18
**fast** [1] - 46:15
**favor** [3] - 8:16, 29:17, 35:21
**feasible** [1] - 9:24
**February** [1] - 59:18
**federal** [1] - 54:1
**fee** [1] - 31:16
**fees** [2] - 42:18, 53:17
**few** [1] - 43:14
**fifth** [1] - 37:19
**figure** [2] - 13:24, 55:4
**file** [11] - 25:21, 43:7, 47:7, 47:12, 47:15, 47:20, 47:24, 53:11, 58:11, 63:16, 65:1
**filed** [11] - 22:16, 34:17, 39:5, 40:8, 41:22, 48:4, 48:13, 55:22, 57:17, 62:8, 62:11
**filing** [5] - 43:2, 47:16, 48:1, 53:15, 63:18
**final** [2] - 30:3, 36:5
**finally** [1] - 20:7
**finder** [1] - 49:17
**findings** [2] - 38:3, 38:4
**fine** [2] - 15:25, 39:19
**finish** [1] - 39:10
**firm** [4] - 5:17, 6:16, 6:20, 6:23
**firms** [1] - 13:17
**first** [20] - 2:24, 3:3, 8:21, 11:10, 15:12, 27:16, 32:20, 34:22, 36:12, 40:1, 41:2, 41:8, 41:9, 42:15, 48:5, 50:18, 58:14, 60:24, 61:4, 61:9
**First** [7] - 30:7, 30:8, 30:9, 30:10, 30:11, 36:8, 63:12
**five** [1] - 51:24
**Floor** [1] - 1:14
**fluctuate** [1] - 15:19
**flurry** [1] - 58:22
**focused** [1] - 21:13
**folks** [1] - 64:20
**follow** [1] - 29:11
**follow-up** [1] - 29:11
**following** [3] - 32:17, 36:11, 38:11
**foregoing** [1] - 30:6
**forgive** [1] - 48:3
**forgot** [1] - 16:16
**form** [5] - 26:21, 30:2, 36:4, 37:8, 64:23
**former** [5] - 50:7, 50:20, 50:21, 54:3, 54:10
**forth** [12] - 13:10, 18:21, 20:1, 21:7, 21:14, 27:16, 30:20, 40:25, 48:13, 50:10, 52:20, 63:8
**forthcoming** [2] - 35:18, 42:24
**forward** [4] - 12:16, 26:5, 36:20, 64:9
**foundation** [1] - 60:13
**four** [3] - 3:10, 46:22, 61:14
**fourth** [2] - 4:24, 37:14
**framework** [1] - 25:15
**frankly** [3] - 18:2, 18:9, 49:11
**front** [3] - 21:8, 44:5, 64:16
**full** [4] - 20:23, 21:21, 35:21, 45:21
**fully** [3] - 14:23, 52:12, 65:8
**fund** [1] - 9:16
**Fund** [1] - 27:21
**FUTTER** [13] - 1:15, 2:7, 43:14, 44:25, 45:6, 45:10, 46:20, 48:17, 51:13, 54:21, 54:25, 57:5, 58:2
**Futter** [9] - 2:7, 19:20, 43:12, 48:9, 48:15, 50:4, 54:11, 54:20, 57:2
**future** [2] - 16:25, 31:17

**G**

**game** [1] - 52:21
**Garr** [15] - 2:9, 7:4, 16:4, 40:1, 46:9, 47:7, 47:11, 47:25, 48:3, 52:1, 52:6, 52:14, 58:7, 62:22, 63:21
**GARR** [21] - 1:19, 2:9, 7:5, 9:4, 15:1, 15:5, 15:10, 15:16, 15:24, 16:16, 18:15, 20:17, 22:11, 27:10, 39:23, 40:6, 40:20, 47:13, 47:23, 58:8, 65:10
**Garr's** [2] - 53:9, 63:17
**gather** [1] - 21:22
**GCs** [1] - 14:2
**generally** [1] - 4:10
**germane** [1] - 21:22
**gist** [1] - 49:20
**given** [7] - 6:5, 8:6, 9:8, 15:16, 24:25, 56:2, 60:13
**global** [1] - 31:3
**GMSLA** [10] - 9:13, 19:22, 27:24, 31:4, 31:9, 32:3, 32:13, 33:1, 35:8, 50:16
**goal** [1] - 14:3
**governing** [1] - 31:9
**grant** [1] - 29:18
**granted** [4] - 23:10, 30:3, 36:5, 40:22
**granting** [5] - 25:13, 29:16, 30:4, 35:20, 36:6
**grants** [1] - 36:9
**guidance** [2] - 20:22, 64:5
**guide** [1] - 64:5
**guided** [1] - 20:3

**H**

**half** [2] - 30:25, 55:8
**HANNELORE** [1] - 1:19
**Hannelore** [1] - 2:11
**happily** [1] - 26:4
**happy** [3] - 4:19, 5:10, 25:25
**hard** [6] - 2:17, 2:20, 12:8, 12:15, 13:20, 43:25
**harm** [6] - 21:1, 21:23, 22:4, 25:4, 26:13, 34:16
**Harris** [1] - 30:7
**hate** [1] - 18:12
**head** [2] - 19:14, 54:2
**hear** [3] - 8:25, 21:3, 24:6
**heard** [4] - 9:2, 44:2, 56:17, 64:1
**hearing** [10] - 2:15, 9:20, 10:19, 20:8, 22:23, 25:24, 29:11, 58:19, 61:6, 64:24
**hearings** [1] - 63:4
**held** [17] - 3:24, 7:19, 8:17, 16:22, 18:20, 27:18, 27:20, 28:7, 29:7, 30:22, 34:3, 36:18, 36:19, 44:9, 44:15, 45:16
**help** [2] - 4:19, 39:8
**helpful** [5] - 26:3, 45:9, 46:24, 64:7, 65:13
**helping** [2] - 38:8, 64:5
**hesitate** [2] - 10:14, 42:6
**high** [2] - 24:25, 29:21
**historically** [1] - 28:10
**history** [2] - 47:4, 64:9
**hodgepodge** [1] - 11:12
**hold** [2] - 3:19, 45:4
**holding** [2] - 4:21, 15:20
**hole** [1] - 49:6
**home** [1] - 56:13
**Honor** [43] - 2:5, 3:6, 4:20, 4:24, 5:14, 7:5, 15:1, 15:5, 19:18, 20:19, 22:9, 22:11, 39:13, 39:23, 40:6,

KM

40:9, 40:21, 41:18, 43:11, 43:22, 44:4, 45:10, 45:17, 47:23, 48:12, 49:8, 51:12, 52:10, 53:3, 53:21, 54:16, 54:18, 54:21, 54:25, 56:22, 58:3, 58:9, 58:20, 59:20, 64:2, 64:10, 64:11, 64:16
**Honor's** [2] - 7:10, 60:20
**HONORABLE** [1] - 1:11
**hope** [1] - 2:22
**hopper** [1] - 46:21
**Houlihan** [14] - 5:17, 9:18, 9:21, 10:1, 10:12, 12:23, 13:3, 13:10, 14:5, 20:9, 35:19, 37:4, 37:6
**hours** [1] - 46:22
**hybrid** [1] - 25:12
**HYO** [1] - 49:23
**Hyo** [1] - 49:24
**HYUNG** [1] - 50:18

**I**

**iceberg** [1] - 45:11
**idea** [8] - 8:24, 9:15, 11:15, 21:13, 48:23, 48:24, 49:1, 50:8
**identified** [2] - 5:18, 39:2
**identify** [1] - 61:1
**illiquid** [4] - 10:5, 11:5, 19:3, 34:10
**immediate** [2] - 30:14, 33:2
**immediately** [3] - 30:18, 61:10, 62:1
**implication** [1] - 15:7
**implications** [1] - 61:16
**implying** [1] - 61:17
**important** [3] - 10:22, 17:9, 57:19
**imposed** [1] - 59:1
**inaccurate** [1] - 62:17
**inapplicable** [1] - 26:19
**Inc** [1] - 2:2
**INC** [1] - 1:2
**include** [3] - 34:5, 37:13, 41:12
**included** [1] - 40:7
**including** [7] - 8:16, 30:14, 35:2, 35:6, 38:3, 55:13, 64:11
**incorporated** [1] - 29:6
**incredibly** [1] - 10:22
**independent** [4] - 9:17, 10:21, 19:22, 37:11
**Index** [1] - 2:3
**INDEX** [1] - 1:4
**indicate** [3] - 16:21, 16:23, 50:5
**indicated** [11] - 3:23, 4:15, 5:23, 6:5, 6:6, 6:10, 17:3, 17:21, 25:8, 36:23, 42:19
**indicates** [1] - 4:25
**indication** [4] - 11:17, 41:15, 49:22, 50:17
**individual** [4] - 49:7, 50:15, 54:3, 54:10
**individuals** [7] - 51:16, 51:24, 61:13, 61:14, 61:18, 61:20, 61:25
**indulgence** [1] - 26:8
**inference** [3] - 42:19, 43:8, 51:3
**inferences** [2] - 49:3, 52:25
**informality** [1] - 34:14
**information** [28] - 5:24, 5:25, 6:1, 6:2, 6:20, 11:24, 11:25, 12:1, 16:12, 28:14, 40:10, 40:11, 40:21, 40:23, 40:24, 42:7, 42:13, 44:20, 44:23, 47:20, 48:20, 56:2, 56:6, 56:17, 56:23, 57:20, 62:18
**Information** [1] - 58:14
**injunction** [15] - 2:14, 2:25, 24:12, 25:14, 27:15, 29:3, 29:13, 29:16, 29:18, 29:20, 29:23, 30:1, 36:3, 36:10, 64:24
**injunctive** [1] - 24:25
**injury** [1] - 29:15
**input** [1] - 3:12
**inquire** [1] - 39:17
**inquired** [3] - 61:9, 61:20, 61:21
**insist** [1] - 53:11
**insisting** [1] - 53:15
**instance** [1] - 53:7
**instant** [2] - 29:2, 34:17
**instead** [3] - 9:18, 28:6, 31:19
**instruct** [2] - 33:16, 63:16
**insure** [2] - 4:2, 36:13
**intended** [1] - 42:14
**intentionally** [1] - 50:9
**inter** [1] - 35:6
**interest** [9] - 7:22, 11:15, 11:18, 11:21, 14:9, 17:6, 55:17, 56:10, 56:25
**interfere** [1] - 30:19
**internal** [1] - 13:19
**interpretation** [1] - 18:13
**interrupt** [1] - 12:23
**interweaved** [1] - 14:18
**Investment** [1] - 32:16
**investment** [2] - 36:14, 36:16
**investments** [1] - 5:22
**involve** [2] - 26:16, 31:1
**involved** [3] - 3:8, 14:3, 50:13
**involving** [1] - 32:22
**iPhone** [1] - 51:20
**irreparable** [6] - 21:1, 21:23, 25:4, 26:13, 29:15, 34:16
**irrespective** [1] - 54:14
**issue** [16] - 4:20, 5:13, 5:14, 8:19, 9:13, 11:13, 17:23, 27:13, 31:3, 32:7, 33:12, 51:21, 54:15, 58:25, 59:11, 64:23
**issued** [1] - 31:25
**issues** [10] - 2:18, 3:11, 13:22, 14:9, 20:22, 21:22, 27:2, 51:7, 54:8, 63:11
**issuing** [1] - 29:20
**items** [1] - 39:1
**itself** [1] - 11:14

**J**

**January** [2] - 31:6, 51:11
**JIN** [1] - 50:18
**JLL** [2] - 6:12, 13:15
**joint** [2] - 37:19, 37:20
**Judge** [1] - 63:22
**judgment** [2] - 30:3, 36:5
**judicial** [1] - 40:16
**July** [12] - 23:1, 23:7, 31:25, 39:5, 39:7, 42:11, 47:25, 59:12, 60:1, 63:18, 64:25, 65:5
**jump** [2] - 56:9, 57:11
**juncture** [3] - 33:19, 34:10, 38:16
**JUNE** [1] - 1:9
**June** [6] - 29:8, 29:11, 29:12, 44:22, 45:4

**K**

**Karen** [1] - 1:23
**KAREN** [1] - 65:20
**keep** [2] - 27:7, 55:3
**key** [1] - 56:3
**kicked** [1] - 6:25
**Kim** [10] - 48:15, 48:20, 49:12, 49:25, 50:18, 51:9, 54:14, 56:4, 61:8
**Kim's** [4] - 49:23, 50:7, 53:6, 62:16
**kind** [10] - 11:12, 16:4, 21:25, 25:11, 25:17, 25:23, 26:23, 47:4, 49:1, 49:10
**King** [4] - 27:19, 27:23, 28:25, 33:13
**kings's** [1] - 28:1
**knowing** [1] - 61:2
**known** [7] - 18:18, 41:23, 59:9, 59:11, 59:23, 59:25, 61:20
**knows** [2] - 40:9, 55:5
**Kong** [1] - 49:11
**Kong's** [1] - 48:20
**Korea** [5] - 50:12, 50:14, 55:12, 56:14, 61:2
**Korean** [7] - 49:6, 56:9, 58:25, 59:2, 59:15, 60:16

**L**

**laboring** [1] - 56:22
**land** [1] - 19:6
**language** [4] - 5:1, 38:3, 38:7, 38:9
**laser** [1] - 21:12
**last** [9] - 2:17, 2:21, 5:13, 5:23, 6:5, 13:2, 17:21, 25:8, 57:9
**late** [3] - 5:23, 6:5, 58:2
**latest** [1] - 34:23
**Laura** [1] - 2:9
**LAURA** [1] - 1:19
**law** [10] - 24:13, 33:24, 55:12, 56:9, 58:25, 59:2, 59:15, 60:16, 63:11
**lays** [1] - 5:4
**learn** [3] - 51:10, 51:16, 51:18
**learned** [3] - 13:17, 13:18, 49:10
**least** [8] - 4:4, 4:6, 4:7, 9:11, 9:22, 12:9, 18:18, 20:15
**leave** [8] - 26:24, 38:19, 47:7, 47:11, 47:24, 54:22, 60:6, 60:20
**Lee** [2] - 49:23, 49:24
**Lee's** [1] - 50:13
**left** [8] - 3:5, 41:12, 46:21, 51:10, 51:16, 51:25, 55:8, 63:20
**legacy** [1] - 32:5
**legal** [8] - 7:20, 17:4, 30:14, 30:20, 32:11, 32:17, 42:18, 60:21
**legally** [1] - 38:23
**lend** [2] - 31:16, 33:9
**lender** [1] - 32:8
**lending** [6] - 31:1, 31:3, 31:4, 31:6, 31:7, 34:15
**length** [1] - 59:3
**lent** [5] - 8:16, 27:18, 28:18, 28:22, 32:8
**less** [1] - 43:19
**letter** [41] - 5:3, 5:6, 5:11, 5:12, 13:9, 14:1, 14:2, 16:14, 16:18, 16:21, 17:14, 17:18, 18:8, 19:15, 19:21, 33:6, 37:19, 37:21, 37:22, 38:8, 40:1, 40:5, 40:7, 40:8, 40:25, 48:2, 48:4, 48:6, 48:12, 48:14, 49:1, 49:20, 51:20, 51:24, 52:15, 53:22, 55:22, 56:16, 57:16, 62:8, 62:11
**letters** [4] - 3:2, 18:10, 20:12, 62:9
**level** [1] - 8:17
**lift** [1] - 60:15
**lifted** [5] - 23:10, 55:18, 59:19, 60:24, 61:10
**light** [5] - 21:13, 25:12, 25:18, 26:23, 54:7
**likelihood** [3] - 21:19, 29:15, 32:20

KM

**Lim** [1] - 50:13
**limited** [4] - 11:24, 12:1, 34:2, 34:5
**Limited** [2] - 2:2, 32:16
**line** [2] - 39:10, 53:2
**liquid** [7] - 7:25, 9:25, 10:6, 10:17, 12:11, 20:11, 37:8
**list** [1] - 61:5
**listing** [1] - 33:25
**literally** [2] - 5:11, 49:10
**litigating** [3] - 30:24, 35:16, 49:7
**litigation** [13] - 7:14, 12:5, 12:12, 16:5, 17:1, 19:12, 19:16, 19:22, 25:2, 61:15, 63:13, 63:20
**LLP** [1] - 1:13
**loans** [1] - 31:17
**located** [1] - 41:24
**Lockey** [9] - 5:17, 9:18, 9:22, 10:1, 10:12, 35:19, 37:4, 37:6
**long-standing** [1] - 62:21
**look** [13] - 20:19, 21:24, 43:25, 50:24, 55:21, 56:20, 57:7, 57:12, 63:5, 64:9, 64:25, 65:11
**looking** [4] - 16:15, 25:17, 44:11, 45:1
**lose** [1] - 19:24
**loss** [1] - 50:1
**losses** [1] - 35:3
**lost** [2] - 20:1, 25:22
**low** [2] - 55:16, 56:11
**LTD** [1] - 1:5

## M

**Madison** [1] - 1:14
**main** [1] - 48:21
**maintain** [3] - 29:24, 30:4, 36:6
**maintaining** [1] - 23:9
**majority** [1] - 11:6
**malfeasance** [1] - 50:10
**manage** [1] - 36:15
**managed** [1] - 44:5
**management** [2] - 36:12, 37:17
**mandatory** [2] - 29:25, 36:3
**Mangano** [1] - 1:23
**MANGANO** [1] - 65:20
**manual** [2] - 16:8, 28:4
**manually** [1] - 28:8
**March** [1] - 60:24
**mark** [1] - 34:11
**market** [3] - 8:1, 10:16, 44:19
**marketable** [1] - 11:23
**master** [2] - 27:22, 31:3
**material** [1] - 32:22
**materiality** [1] - 21:15
**materials** [1] - 11:12
**matter** [2] - 48:22, 50:13
**mean** [6] - 5:9, 7:15, 14:15, 15:10, 18:19, 63:13
**meaningful** [1] - 21:15
**means** [1] - 55:5
**meantime** [1] - 36:25
**measure** [1] - 56:19
**measures** [1] - 47:9
**mechanism** [1] - 54:9
**mechanisms** [1] - 21:17
**meet** [8] - 26:4, 38:7, 47:17, 47:25, 53:12, 59:4, 63:17, 64:14
**meeting** [1] - 3:4
**memorandum** [1] - 33:24
**mentioned** [3] - 8:24, 9:20, 14:10
**merit** [1] - 53:16
**merits** [6] - 21:5, 21:19, 29:15, 29:24, 32:21, 38:17
**met** [2] - 24:1, 55:17
**might** [4] - 11:16, 16:25, 38:4, 38:17
**million** [6] - 11:5, 23:23, 28:25, 31:14, 33:10, 34:18
**mind** [3] - 25:11, 51:23, 53:4
**minds** [1] - 3:4
**mine** [1] - 20:2
**minimum** [4] - 7:13, 17:3, 19:7, 36:21
**minute** [1] - 18:25
**MINUTES** [1] - 65:16
**minutes** [2] - 26:22, 57:12
**misreading** [1] - 44:21
**missed** [1] - 57:14
**mistake** [1] - 51:14
**moment** [2] - 14:20, 54:2
**Monday** [1] - 5:20
**month** [3] - 44:6, 45:7
**monthly** [5] - 9:22, 9:24, 31:22, 44:13, 44:15
**moreover** [1] - 29:25
**morning** [5] - 5:20, 6:4, 6:13, 6:14, 46:14
**mortgage** [2] - 34:6, 34:7
**motion** [38] - 3:2, 16:7, 22:20, 23:4, 23:10, 25:9, 25:18, 25:21, 27:14, 27:17, 29:2, 29:5, 29:19, 32:1, 34:17, 35:16, 39:11, 40:1, 40:22, 43:7, 43:16, 47:7, 47:12, 47:15, 47:16, 47:20, 47:24, 48:1, 51:6, 53:10, 53:12, 63:9, 63:15, 63:16, 63:17, 63:18, 63:19, 65:8
**motions** [6] - 39:25, 53:15, 59:20, 59:21, 65:3, 65:5
**movant** [4] - 29:13, 30:1, 33:19, 36:4
**movant's** [2] - 29:17, 29:21
**move** [8] - 6:6, 6:10, 6:12, 12:16, 14:3, 26:10, 57:14, 58:8
**movement** [2] - 35:13, 35:15
**moving** [2] - 6:3, 26:5
**MR** [38] - 2:5, 2:7, 3:6, 4:15, 12:18, 13:12, 17:16, 19:18, 19:20, 20:19, 26:8, 39:12, 39:21, 43:11, 43:14, 44:25, 45:6, 45:10, 46:20, 48:7, 48:12, 48:17, 48:18, 51:12, 51:13, 51:14, 51:17, 52:10, 52:12, 53:20, 54:18, 54:21, 54:25, 57:5, 58:2, 64:1, 64:4, 64:19
**MS** [21] - 2:9, 2:11, 7:5, 9:4, 15:1, 15:5, 15:10, 15:16, 15:24, 16:16, 18:15, 20:17, 22:11, 27:10, 39:23, 40:6, 40:20, 47:13, 47:23, 58:8, 65:10
**multiple** [3] - 32:21, 35:1, 35:5
**must** [2] - 29:14, 29:21

## N

**name** [2] - 50:18, 55:20
**names** [1] - 56:12
**nature** [5] - 4:25, 7:24, 10:17, 11:3, 52:19
**necessary** [3] - 37:16, 41:20, 59:10
**need** [17] - 6:6, 13:22, 14:4, 16:12, 21:20, 24:6, 25:24, 26:1, 33:18, 48:5, 54:14, 56:23, 60:6, 60:8, 62:4, 64:24
**needed** [2] - 39:8, 60:15
**needs** [7] - 7:3, 9:19, 17:6, 17:7, 21:9, 54:23, 55:15
**negotiations** [1] - 32:22
**never** [2] - 59:16, 63:15
**NEW** [2] - 1:1, 1:1
**new** [15] - 5:23, 6:1, 15:13, 21:2, 33:3, 33:20, 45:22, 46:2, 52:4, 52:8, 58:16, 58:21, 62:19, 63:12, 63:13
**New** [7] - 1:7, 1:8, 1:15, 1:18
**newly** [2] - 52:17, 59:11
**next** [11] - 13:8, 21:22, 23:3, 26:25, 34:16, 35:20, 43:19, 46:18, 46:20, 48:2, 65:6
**night** [3] - 5:23, 6:5, 13:2
**nine** [1] - 61:5
**NO** [1] - 1:4
**non** [2] - 14:1, 53:2
**non-cooperation** [1] - 53:2
**non-reliance** [1] - 14:1
**nonappearance** [1] - 53:1
**none** [1] - 41:4
**nonetheless** [1] - 5:19
**nonpayment** [1] - 24:15
**nonresponsive** [1] - 46:7
**Northern** [1] - 55:13
**notable** [1] - 57:15
**note** [4] - 40:13, 42:3, 58:3, 58:17
**noted** [2] - 11:8, 58:21
**notes** [1] - 29:9
**nothing** [3] - 19:3, 40:25, 46:1
**notice** [3] - 9:7, 27:10, 31:21
**notwithstanding** [3] - 16:11, 27:25, 40:4
**number** [2] - 28:2, 28:17
**numbers** [1] - 56:14
**numerous** [1] - 33:7
**NYSCEF** [5] - 27:19, 28:2, 28:17, 45:8, 65:2

## O

**objection** [1] - 19:11
**objections** [1] - 23:9
**objective** [1] - 12:13
**obligation** [1] - 59:17
**observation** [1] - 53:21
**obstructing** [1] - 30:13
**obtain** [4] - 43:6, 61:3, 62:13, 65:1
**obtaining** [1] - 59:8
**obvious** [1] - 26:14
**obviously** [8] - 8:3, 10:9, 10:22, 14:13, 18:23, 50:25, 51:3, 54:3
**occurred** [6] - 23:2, 24:14, 34:23, 35:7, 35:9, 62:2
**occurring** [1] - 34:23
**October** [3] - 33:9, 34:25, 65:7
**OF** [5] - 1:1, 1:1, 65:15, 65:16
**off-the-record** [3] - 2:16, 3:9, 29:10
**offered** [2] - 54:5, 62:8
**official** [1] - 28:1
**once** [2] - 64:13, 64:16
**one** [20] - 2:15, 7:21, 9:4, 14:20, 16:6, 17:17, 18:5, 21:25, 26:10, 29:11, 33:7, 35:22, 37:24, 39:12, 44:25, 47:14, 47:15, 47:17, 53:21, 54:3
**ongoing** [1] - 37:16
**open** [3] - 8:8, 12:15, 20:22
**operate** [1] - 31:8

**opinion** [1] - 62:11
**opportunity** [4] - 10:23, 42:18, 52:5, 57:18
**opposing** [2] - 45:13, 46:16
**opposition** [1] - 22:20
**oral** [4] - 29:7, 37:23, 65:12
**Order** [10] - 3:14, 20:23, 20:25, 21:5, 21:9, 21:19, 22:16, 29:4, 41:20, 41:22
**order** [16] - 4:6, 6:10, 17:1, 26:21, 27:14, 32:1, 39:6, 40:3, 41:9, 41:25, 43:15, 44:1, 56:16, 60:15, 62:9, 64:23
**ordinary** [1] - 56:7
**organizational** [2] - 50:3, 54:8
**ORIGINAL** [1] - 65:16
**original** [1] - 33:21
**originally** [1] - 50:11
**otherwise** [3] - 55:17, 60:15, 64:25
**ourselves** [1] - 39:9
**outcome** [1] - 8:18
**outset** [1] - 8:14
**outstanding** [4] - 28:18, 31:21, 39:1, 52:16
**overall** [1] - 31:6
**overreach** [1] - 5:10
**overreaching** [1] - 17:3
**own** [1] - 61:12

**P**

**PA** [1] - 48:10
**Page** [1] - 45:6
**papers** [2] - 23:5, 60:6
**Paragraph** [4] - 28:17, 28:20, 29:1, 33:14
**Paragraphs** [1] - 27:23
**parameters** [1] - 36:16
**part** [8] - 10:24, 13:1, 13:2, 33:10, 33:20, 36:10, 45:25, 56:20
**PART** [1] - 1:1
**partially** [1] - 54:10
**particular** [2] - 19:9, 42:6
**particularly** [3] - 8:12, 25:18, 55:16
**parties** [46] - 2:15, 2:17, 3:7, 4:10, 7:10, 17:7, 21:12, 25:1, 27:17, 27:25, 28:21, 29:9, 30:22, 30:24, 31:8, 32:6, 32:25, 33:1, 33:2, 33:20, 34:15, 35:2, 35:6, 35:19, 36:23, 37:3, 37:10, 37:20, 38:5, 38:6, 38:19, 39:3, 39:15, 40:23, 46:6, 47:17, 47:25, 56:18, 58:3, 59:4, 59:8, 60:8, 62:7, 62:21, 65:1
**parties'** [4] - 4:25, 36:16, 37:5, 47:1
**Partner** [1] - 30:10
**party** [7] - 11:8, 19:25, 31:20, 35:7, 35:8, 35:22, 59:25
**passed** [1] - 56:4
**past** [5] - 10:18, 31:2, 45:21, 46:1, 60:11
**PATEL** [1] - 1:11
**Patients** [1] - 30:8
**pause** [1] - 14:19
**payment** [4] - 3:19, 4:3, 32:10, 34:22
**payments** [19] - 3:15, 3:18, 3:19, 3:22, 4:5, 4:8, 7:15, 8:5, 8:9, 14:22, 14:24, 15:7, 31:22, 35:3, 38:10, 38:12, 38:21, 38:22, 38:25
**pejoratively** [1] - 5:10
**pending** [4] - 8:17, 9:25, 30:5, 36:7
**people** [5] - 6:7, 46:22, 49:14, 60:25, 61:5
**people's** [1] - 56:12
**percent** [3] - 10:7, 10:8, 28:22
**percentage** [1] - 10:5
**percipient** [1] - 54:12
**perfection** [1] - 13:21
**performance** [2] - 33:7, 49:15
**perhaps** [2] - 6:24, 54:7
**period** [4] - 28:7, 41:1, 49:25, 52:24
**permission** [1] - 43:11
**person** [1] - 54:12
**Personal** [1] - 58:14
**personally** [3] - 6:6, 21:18, 51:18
**persons** [1] - 6:13
**perspective** [5] - 3:4, 7:15, 15:9, 15:23, 63:10
**phone** [2] - 49:19, 49:20
**PI** [4] - 14:16, 31:12, 39:11, 48:10
**pick** [1] - 57:24
**piece** [2] - 11:22, 42:9
**pieces** [1] - 58:13
**place** [1] - 32:23
**plaintiff** [3] - 2:8, 22:4, 29:5
**Plaintiff** [2] - 1:3, 1:14
**plaintiff's** [1] - 48:6
**plaintiffs** [2] - 24:18, 24:21
**plan** [1] - 27:3
**play** [4] - 10:1, 14:21, 48:21, 52:18
**pled** [1] - 33:10
**podium** [2] - 12:18, 12:20
**point** [19] - 4:9, 4:24, 7:2, 7:3, 9:2, 13:17, 16:17, 18:19, 19:21, 20:5, 21:4, 21:24, 22:19, 26:10, 26:13, 42:25, 56:22, 60:18, 62:23
**pointed** [1] - 26:17
**points** [4] - 3:10, 8:5, 52:6, 58:10
**pool** [2] - 5:22, 6:18
**portal** [1] - 28:6
**position** [7] - 17:24, 24:10, 25:23, 41:25, 44:14, 52:3, 60:14
**positions** [1] - 36:22
**possession** [5] - 30:15, 30:20, 32:11, 32:18, 44:1
**possibility** [1] - 9:1
**possible** [5] - 4:13, 4:20, 7:13, 57:21
**post** [1] - 32:15
**post-acknowledgment** [1] - 32:15
**potential** [2] - 35:13, 59:14
**potentially** [3] - 10:10, 16:18, 20:21
**power** [4] - 5:1, 16:24, 17:10, 30:13
**Power** [4] - 7:23, 33:15, 34:25, 35:11
**practical** [2] - 4:19, 15:7
**pre** [3] - 3:2, 32:14, 40:1
**pre-condition** [1] - 32:14
**pre-motion** [2] - 3:2, 40:1
**precise** [1] - 48:18
**preclusive** [1] - 43:8
**preconference** [1] - 23:4
**predecessor** [3] - 47:3, 47:6, 62:24
**prefer** [1] - 12:20
**prejudice** [3] - 11:2, 59:25, 61:12
**preliminary** [15] - 2:13, 2:25, 24:12, 25:13, 27:15, 29:3, 29:13, 29:16, 29:18, 29:20, 29:23, 29:25, 36:3, 36:10, 64:23
**prep** [1] - 58:6
**prepare** [1] - 55:2
**prepared** [1] - 27:13
**preparing** [1] - 57:6
**preproduction** [1] - 57:17
**prerogative** [1] - 51:2
**present** [2] - 23:13, 40:4
**presented** [2] - 11:4, 21:8
**presently** [1] - 17:11
**president** [1] - 50:18
**Press** [1] - 30:9
**pretty** [1] - 56:11
**prevented** [1] - 23:8
**previewed** [1] - 36:9
**previous** [1] - 28:11
**previously** [4] - 3:25, 16:8, 63:2, 63:6
**prison** [1] - 50:14
**privacy** [3] - 55:16, 56:10, 59:15
**problematic** [1] - 63:24
**proceed** [1] - 32:17
**PROCEEDING** [1] - 65:16
**process** [1] - 16:8
**processes** [1] - 28:3
**produce** [2] - 40:3, 40:23
**produced** [9] - 23:17, 23:19, 40:14, 40:24, 41:4, 41:6, 43:20, 46:18, 47:18
**producing** [1] - 56:18
**production** [8] - 41:9, 42:4, 43:6, 43:22, 46:5, 59:7, 59:17, 60:11
**productions** [5] - 42:14, 46:14, 46:25, 48:10, 57:25
**progress** [2] - 2:21, 14:16
**promise** [1] - 31:15
**pronouncing** [1] - 49:24
**proof** [1] - 29:21
**proper** [1] - 23:8
**properties** [2] - 12:3, 12:4
**property** [3] - 11:20, 14:8, 14:9
**proposal** [3] - 9:6, 15:13, 15:14
**propose** [1] - 26:2
**proposed** [6] - 8:4, 9:8, 9:21, 17:18, 25:3, 59:13
**protect** [1] - 56:17
**protected** [1] - 21:10
**Protection** [1] - 58:14
**protection** [1] - 56:11
**protections** [1] - 22:1
**protective** [1] - 56:16
**provide** [21] - 3:18, 4:7, 5:11, 8:23, 9:22, 10:3, 16:3, 16:23, 19:20, 22:20, 23:12, 31:16, 35:25, 36:21, 37:20, 40:7, 42:21, 45:14, 53:25, 54:9, 62:8
**provided** [16] - 4:18, 5:3, 5:25, 6:2, 6:12, 9:10, 11:10, 13:11, 28:12, 33:16, 36:24, 37:1, 42:1, 44:23, 45:12, 47:6
**providing** [6] - 5:9, 6:3, 13:13, 18:11, 50:2, 54:7
**provision** [1] - 4:24
**pull** [2] - 44:5, 55:23
**punitive** [1] - 47:8
**purchase** [1] - 37:15
**purpose** [3] - 10:13, 29:23, 54:6
**purposes** [1] - 37:12
**pursuant** [7] - 29:4, 30:16, 32:9, 32:12, 37:5, 44:1, 46:6
**pursued** [1] - 40:13
**pursuing** [1] - 22:4
**put** [9] - 3:23, 8:15, 12:6, 21:13, 28:8, 46:18, 49:5, 55:15, 64:16
**puts** [1] - 33:14

KM

**putting** [2] - 15:7, 25:15

## Q

**questions** [2] - 12:15, 57:3
**quick** [1] - 55:21
**quickly** [4] - 14:14, 43:19, 53:7, 55:25
**QUINN** [1] - 1:13
**Quinn** [8] - 2:6, 2:7, 45:22, 46:2, 48:2, 57:4, 57:23, 63:4
**quite** [3] - 50:5, 53:22, 55:12
**quo** [4] - 12:12, 29:24, 30:5, 36:7

## R

**race** [1] - 24:21
**raise** [1] - 16:16
**raised** [9] - 8:23, 9:15, 42:3, 54:16, 58:11, 59:16, 59:24, 60:1, 60:5
**raising** [1] - 48:25
**Rand** [4] - 2:6, 3:3, 20:8, 26:7
**RAND** [27] - 1:16, 2:5, 3:6, 4:15, 12:18, 13:12, 17:16, 19:18, 19:20, 20:19, 26:8, 39:12, 39:21, 43:11, 48:7, 48:12, 48:18, 51:12, 51:14, 51:17, 52:10, 52:12, 53:20, 54:18, 64:1, 64:4, 64:19
**rate** [1] - 31:22
**re** [3] - 31:16, 33:9, 58:23
**re-lend** [2] - 31:16, 33:9
**re-up** [1] - 58:23
**reach** [2] - 39:8, 65:13
**reaching** [1] - 12:13
**read** [7] - 4:12, 4:17, 16:13, 26:12, 36:24, 49:20, 51:20
**readiness** [1] - 65:7
**real** [11] - 6:8, 6:17, 6:21, 10:20, 11:14, 11:16, 14:8, 18:7, 37:9, 37:13, 42:7
**reality** [1] - 24:5
**realized** [3] - 12:21, 27:7, 57:9
**really** [8] - 2:19, 4:3, 6:22, 15:22, 16:10, 46:24, 56:23, 57:9
**reason** [2] - 3:24, 27:7
**reasonable** [1] - 47:22
**reasons** [1] - 37:23
**receive** [2] - 30:2, 36:4
**received** [5] - 11:25, 12:2, 13:2, 41:8, 42:15
**recently** [2] - 51:19, 64:8
**receptive** [1] - 18:9
**recess** [1] - 27:5
**recognize** [4] - 22:15, 24:9, 24:24, 53:2
**recognized** [2] - 23:5, 41:18
**recognizes** [2] - 21:20, 44:11
**recommendation** [1] - 7:10
**recommended** [1] - 6:8
**reconcile** [1] - 25:20
**reconciliation** [2] - 44:2, 44:14
**record** [17] - 2:16, 3:9, 5:18, 21:21, 26:1, 26:10, 26:19, 27:6, 29:10, 35:5, 43:21, 53:14, 58:20, 62:24, 64:10, 64:11, 64:13
**redacted** [4] - 55:3, 55:10, 57:20, 59:5
**redactions** [13] - 50:4, 54:10, 55:18, 56:20, 56:24, 57:4, 57:8, 57:10, 57:19, 59:1, 59:9, 59:10, 60:7
**refer** [3] - 28:25, 30:6, 43:22
**reference** [4] - 19:21, 43:23, 46:9, 62:15
**references** [1] - 45:14
**referring** [2] - 28:6, 64:10
**reflect** [3] - 12:11, 40:11, 62:20
**reflected** [1] - 7:24
**reflecting** [1] - 23:19
**reflects** [3] - 7:12, 11:18, 35:5
**regard** [9] - 3:10, 3:12, 3:22, 4:4, 4:22, 22:6, 26:13, 48:12
**regarding** [3] - 35:13, 43:21, 55:23
**regards** [3] - 6:17, 21:6, 28:3
**regime** [1] - 56:10
**registered** [1] - 36:14
**regular** [1] - 9:19
**relation** [1] - 42:18
**relationship** [3] - 31:7, 32:6, 33:4
**relevant** [6] - 27:16, 31:12, 32:2, 41:20, 49:25, 56:2
**reliance** [1] - 14:1
**relief** [12] - 23:1, 24:13, 25:1, 30:2, 30:4, 31:17, 35:21, 35:25, 36:4, 36:6, 41:4, 60:2
**remain** [2] - 4:3, 58:19
**remaining** [1] - 23:23
**remains** [3] - 3:1, 35:16, 38:8
**remedies** [2] - 21:6, 43:8
**remedy** [1] - 29:20
**remiss** [1] - 12:21
**remote** [1] - 29:12
**remove** [2] - 46:10, 61:18
**removed** [2] - 3:21, 19:1
**removing** [1] - 56:20
**renegotiate** [1] - 58:23
**reopen** [3] - 52:5, 52:8, 63:13
**repayments** [2] - 8:11
**repeat** [1] - 40:6
**repeatedly** [3] - 11:9, 42:12, 42:25
**repeating** [1] - 14:5
**replacement** [1] - 63:3
**replicate** [2] - 7:13, 16:10
**report** [1] - 37:15
**Reporter** [2] - 1:24, 65:20
**reporting** [2] - 36:17, 36:18
**reports** [5] - 7:25, 28:11, 41:3, 42:20, 44:6
**represent** [2] - 5:24, 52:14
**representation** [1] - 7:1
**representations** [3] - 47:1, 50:2, 52:21
**represented** [1] - 51:9
**representing** [1] - 43:3
**request** [7] - 6:15, 29:3, 32:2, 40:21, 42:17, 43:5, 54:22
**requested** [1] - 42:25
**requesting** [1] - 60:22
**requests** [7] - 23:9, 30:12, 36:1, 40:9, 60:10, 60:11, 60:22
**require** [3] - 3:12, 35:25, 56:25
**required** [4] - 8:2, 31:22, 59:7, 59:8
**requires** [1] - 57:7
**requiring** [1] - 30:1
**reservations** [1] - 38:3
**reserve** [1] - 64:16
**residential** [1] - 34:7
**resignation** [2] - 60:18, 62:2
**resigned** [2] - 61:14, 61:22
**resolution** [1] - 38:25
**resolvable** [1] - 16:18
**resolve** [7] - 2:18, 7:11, 27:1, 38:9, 39:8, 62:7, 62:9
**resolved** [3] - 3:1, 3:5, 26:25
**resources** [1] - 40:16
**respect** [22] - 14:22, 16:1, 16:14, 20:7, 27:14, 32:3, 33:7, 36:17, 37:2, 37:9, 37:14, 37:19, 38:7, 38:10, 38:20, 39:1, 39:11, 51:8, 51:9, 61:13, 63:15, 65:3
**respectfully** [6] - 17:18, 17:23, 21:24, 42:17, 43:5, 63:10
**respective** [1] - 53:18
**respond** [6] - 14:14, 22:12, 22:14, 24:22, 52:10, 62:10
**response** [7] - 22:19, 41:2, 43:10, 48:4, 56:1, 58:11, 62:10
**responses** [1] - 17:16
**responsive** [5] - 46:8, 55:15, 55:22, 56:6, 56:15
**restart** [1] - 52:7
**result** [2] - 22:5, 29:21
**resume** [1] - 38:22
**retained** [2] - 9:18, 34:18
**return** [3] - 2:14, 16:5, 31:21
**returned** [1] - 31:15
**revealed** [1] - 35:15
**review** [4] - 43:17, 46:3, 48:3, 58:6
**reviewed** [1] - 46:5
**RFPs** [1] - 48:24
**RIA** [48] - 1:2, 2:1, 2:6, 3:18, 3:22, 4:15, 19:2, 21:12, 21:25, 22:1, 27:7, 27:18, 27:22, 28:8, 28:12, 28:13, 28:15, 28:18, 29:5, 30:12, 30:18, 31:12, 31:14, 31:16, 31:20, 32:6, 32:8, 32:23, 33:10, 33:11, 33:14, 34:2, 34:17, 34:18, 34:21, 35:2, 36:13, 36:21, 37:14, 38:22, 43:15, 43:17, 44:1, 44:11, 50:11, 59:16, 59:19, 63:7
**RIA's** [11] - 9:24, 11:15, 28:3, 32:3, 33:6, 33:24, 35:14, 36:13, 59:9, 59:12, 62:15
**RIA/Shinhan** [2] - 16:19, 33:3
**rightfully** [3] - 23:5, 24:25, 25:17
**rightly** [1] - 25:1
**rights** [14] - 7:23, 17:19, 17:24, 18:7, 19:11, 21:3, 21:6, 34:14, 38:5, 49:2, 50:8, 52:20, 64:16
**risk** [2] - 22:17, 35:17
**role** [5] - 10:2, 12:24, 32:7, 48:21
**rolling** [3] - 42:14, 43:6, 46:14
**rule** [2] - 58:12, 60:20
**rules** [1] - 54:1
**ruling** [2] - 18:24, 49:8
**run** [1] - 58:15
**running** [2] - 5:20, 55:3

## S

**sailed** [1] - 63:11
**sale** [1] - 37:16
**Sam** [1] - 48:20
**sanctions** [2] - 23:4, 43:7
**SASCHA** [1] - 1:16
**Sascha** [1] - 2:5
**sat** [1] - 12:21
**save** [2] - 50:24, 50:25
**Savings** [1] - 27:21
**scandal** [1] - 50:12
**scenes** [1] - 7:8
**schedule** [3] - 10:11, 12:10, 63:8
**scope** [3] - 13:10,

20:15, 59:10
**screen** [3] - 36:21, 44:5, 45:15
**search** [1] - 46:7
**SEC** [1] - 27:22
**second** [10] - 4:9, 11:22, 12:24, 14:11, 20:9, 36:17, 37:10, 38:2, 52:8, 60:18
**Second** [2] - 30:10
**secondary** [1] - 10:16
**secretive** [1] - 35:14
**Section** [5] - 30:16, 30:20, 32:13, 33:16
**Sections** [1] - 34:8
**secure** [1] - 32:7
**secured** [6] - 26:16, 36:14, 49:2, 50:9, 50:21
**Securities** [4] - 2:2, 2:10, 16:20, 27:7
**SECURITIES** [1] - 1:5
**securities** [42] - 8:1, 8:16, 9:25, 10:3, 10:5, 10:6, 10:17, 12:11, 15:18, 20:11, 23:21, 23:23, 27:18, 27:19, 28:3, 28:7, 28:18, 28:22, 30:15, 30:21, 31:1, 31:3, 31:7, 31:14, 31:16, 31:21, 32:8, 32:9, 32:12, 32:19, 33:10, 33:17, 34:3, 34:5, 34:6, 34:7, 34:10, 34:19, 35:4, 35:22, 37:6, 37:7
**Securities'** [1] - 27:14
**security** [3] - 17:6, 33:3, 56:14
**see** [10] - 8:8, 8:10, 9:1, 38:19, 45:3, 45:5, 55:22, 56:1, 56:5, 60:7
**seeing** [2] - 24:13, 63:19
**seek** [3] - 42:18, 60:8, 61:1
**seeking** [9] - 22:25, 29:13, 58:22, 60:6, 60:12, 60:19, 60:23, 62:4, 62:12
**seeks** [3] - 30:17, 35:21
**self** [1] - 28:13
**self-created** [1] - 28:13
**send** [2] - 5:4, 28:9
**Senior** [2] - 1:24, 65:20
**sense** [4] - 5:10, 6:21, 20:20, 47:10
**sensible** [1] - 26:9
**sent** [2] - 28:1, 33:6
**separate** [1] - 34:1
**separated** [1] - 61:17
**separately** [1] - 14:11
**separating** [1] - 14:23
**September** [7] - 57:21, 58:1, 58:2, 58:3, 59:18, 63:22, 63:23
**series** [2] - 31:1, 58:23
**serious** [1] - 61:16
**seriously** [1] - 7:10
**serve** [6] - 10:13, 12:6, 17:6, 18:19, 60:22, 61:19
**served** [2] - 48:24, 52:17
**serving** [4] - 17:8, 17:11, 19:1, 60:10
**set** [9] - 18:21, 21:6, 30:20, 35:3, 40:25, 48:13, 50:10, 59:21, 63:8
**set-off** [1] - 21:6
**sets** [1] - 13:10
**setting** [1] - 27:16
**settlement** [2] - 24:20, 58:5
**seven** [2] - 31:2, 32:24
**several** [1] - 59:4
**shall** [3] - 32:16, 34:5, 37:15
**shared** [2] - 13:24, 13:25
**Shinahan** [1] - 27:8
**SHINHAN** [1] - 1:5
**Shinhan** [71] - 2:2, 2:10, 3:16, 3:19, 3:25, 4:5, 4:12, 5:17, 6:2, 6:11, 7:16, 8:6, 8:7, 9:10, 12:23, 13:25, 14:10, 15:3, 16:19, 16:23, 19:2, 19:8, 21:16, 22:5, 22:6, 27:7, 27:8, 27:14, 28:1, 28:10, 28:12, 29:5, 30:12, 31:13, 31:15, 31:18, 32:7, 32:11, 32:16, 32:23, 33:6, 33:14, 33:15, 34:2, 34:16, 34:20, 34:22, 35:10, 35:12, 35:21, 35:24, 36:1, 36:22, 36:25, 38:22, 45:25, 48:21, 48:23, 50:12, 50:19, 50:22, 53:24, 54:4, 55:2, 55:4, 56:4, 56:19, 57:16, 61:17
**Shinhan's** [16] - 7:2, 7:19, 14:23, 18:6, 18:20, 19:4, 27:18, 30:13, 30:19, 32:1, 32:2, 34:19, 35:3, 40:15, 44:12, 51:2
**ship** [1] - 63:10
**shoes** [1] - 47:2
**short** [1] - 64:23
**shortly** [1] - 8:21
**shots** [3] - 36:21, 37:1, 45:15
**show** [1] - 44:6
**Show** [10] - 3:14, 20:24, 20:25, 21:5, 21:9, 21:19, 22:16, 29:4, 41:20, 41:22
**shown** [2] - 29:22, 37:1
**side** [1] - 14:8
**sides** [1] - 45:23
**sign** [1] - 5:11
**sign-off** [1] - 5:11
**signature** [1] - 55:20
**signed** [2] - 50:15, 50:19
**significant** [1] - 33:4
**similar** [1] - 57:3
**similarly** [1] - 49:22
**simply** [1] - 52:8
**single** [1] - 57:8
**sitting** [2] - 6:18, 23:23
**situation** [3] - 26:17, 37:25, 53:13
**situations** [2] - 30:3, 36:5
**six** [3] - 10:18, 34:19
**six-year** [1] - 34:19
**sixth** [1] - 38:10
**skimmed** [1] - 49:18
**skis** [1] - 51:22
**SKLAR** [2] - 1:19, 2:11
**Sklar** [1] - 2:11
**SLA** [18] - 5:2, 19:9, 19:22, 27:24, 30:16, 31:4, 31:9, 31:10, 32:4, 32:13, 32:14, 33:16, 34:4, 34:8, 34:10, 36:13, 36:16, 50:16
**slip** [1] - 51:17
**snapshot** [1] - 4:17
**social** [1] - 56:13
**Society** [1] - 27:21
**sold** [3] - 12:25, 13:4, 14:12
**solely** [1] - 32:16
**solidly** [1] - 57:6
**solution** [1] - 12:9
**someone** [1] - 10:20
**soon** [1] - 46:23
**sorry** [7] - 16:16, 18:3, 18:15, 22:11, 44:9, 48:14, 51:14
**sought** [7] - 23:1, 30:2, 36:4, 41:5, 60:2, 60:17, 60:20
**sound** [1] - 29:19
**sounds** [2] - 14:22, 26:9
**South** [1] - 59:14
**spare** [1] - 58:8
**speaker** [1] - 24:17
**speaking** [1] - 55:9
**specific** [4] - 20:13, 23:11, 30:1, 33:7
**specifically** [4] - 59:7, 59:13, 60:1, 63:12
**specifies** [1] - 34:4
**Spectrum** [1] - 36:7
**speculating** [1] - 13:1
**speed** [1] - 6:5
**spine** [1] - 58:9
**spreadsheet** [1] - 28:9
**spreadsheet-like** [1] - 28:9
**spreadsheets** [3] - 28:8, 43:24, 44:2
**sprit** [1] - 2:23
**SQUARED** [1] - 1:2
**Squared** [2] - 2:2, 27:22
**SS** [1] - 27:11
**SSC** [2] - 38:12, 38:14
**stage** [2] - 18:8, 54:23
**stake** [1] - 7:21
**stale** [2] - 23:6, 47:21
**stamp** [2] - 50:16, 50:17
**stand** [5] - 2:25, 3:15, 12:22, 24:10, 63:5
**standard** [4] - 14:16, 16:6, 24:2, 24:12
**standing** [1] - 62:21
**stands** [1] - 52:7
**Stanford** [1] - 36:7
**start** [5] - 12:12, 27:16, 32:5, 44:22, 53:16
**started** [3] - 17:21, 24:11, 25:18
**starting** [3] - 33:5, 35:12, 45:3
**state** [3] - 14:21, 26:19, 33:23
**STATE** [1] - 1:1
**statements** [5] - 23:18, 23:19, 41:1, 41:12, 63:1
**States** [3] - 3:21, 4:1, 8:13
**states** [1] - 16:24
**stating** [1] - 32:14
**statistics** [1] - 43:14
**status** [6] - 7:13, 12:12, 29:24, 30:4, 36:7, 42:1
**statute** [3] - 55:11, 55:14, 55:15
**stay** [4] - 23:10, 59:19, 60:24, 61:10
**stealth** [1] - 35:14
**step** [3] - 14:12, 18:22, 22:15
**stepping** [1] - 47:2
**steps** [7] - 26:25, 30:19, 32:17, 60:25, 61:1, 61:11, 61:18
**still** [14] - 8:5, 9:2, 12:2, 12:15, 24:4, 27:24, 41:12, 41:24, 42:16, 43:6, 55:8, 58:18, 58:20, 62:18
**stip** [1] - 26:4
**stipulation** [11] - 3:13, 7:11, 11:1, 19:6, 20:21, 25:16, 37:5, 38:20, 39:2, 39:4, 64:25
**stopped** [4] - 7:25, 19:1, 23:8, 45:23
**strategic** [1] - 62:20
**strategies** [1] - 63:14
**Strawn** [3] - 62:25, 63:3, 64:12
**stream** [1] - 51:17
**Street** [1] - 1:8
**strict** [1] - 59:3
**stringent** [1] - 59:2
**structure** [2] - 18:14, 50:3
**struggling** [2] - 13:22, 55:1
**stuff** [1] - 46:15
**sub** [1] - 27:21
**sub-account** [1] - 27:21
**subject** [14] - 2:14, 3:20, 6:24, 12:4, 14:1, 16:25, 18:23, 19:12, 19:16, 20:21, 21:25, 39:2, 53:22, 54:15
**submitted** [3] - 5:6, 59:22, 65:8
**subpoena** [1] - 49:6
**subsequent** [1] -

33:22
**substance** [1] - 37:22
**substantial** [2] - 45:17, 61:3
**substituting** [1] - 43:1
**substitution** [1] - 9:9
**success** [3] - 21:20, 29:15, 32:20
**suffice** [3] - 37:12, 38:21, 52:3
**sufficient** [1] - 53:25
**suggested** [2] - 6:12, 9:18
**suggestion** [6] - 13:5, 56:6, 56:15, 57:12, 57:13, 61:16
**SULLIVAN** [1] - 1:13
**supplemental** [4] - 23:15, 31:4, 33:23, 41:19
**supplementing** [1] - 31:9
**supporting** [2] - 24:5, 24:13
**suppose** [1] - 51:2
**supposed** [5] - 11:7, 12:6, 18:20, 19:10, 23:16
**SUPREME** [1] - 1:1
**Supreme** [1] - 1:7
**surprise** [1] - 50:23
**suspect** [1] - 26:14
**swapped** [1] - 12:10
**switched** [1] - 44:13

T

**tabs** [1] - 45:1
**TAKEN** [1] - 65:16
**talks** [1] - 58:5
**target** [1] - 6:3
**team** [2] - 46:21, 63:21
**Technologies** [1] - 30:7
**telephone** [1] - 32:23
**ten** [3] - 26:22, 46:22, 57:12
**TERM** [1] - 1:1
**terminated** [2] - 33:1, 35:8
**termination** [5] - 28:1, 31:21, 35:9, 44:13, 52:19
**terms** [5] - 3:8, 9:8, 24:23, 25:23, 47:5
**test** [1] - 63:13
**testimony** [5] - 49:12, 54:4, 54:6, 56:3, 62:13
**tests** [1] - 52:20
**THE** [56] - 1:1, 1:11, 2:1, 2:13, 4:14, 7:4, 9:3, 12:17, 13:9, 14:19, 15:2, 15:6, 15:15, 15:22, 15:25, 17:25, 19:14, 19:19, 20:4, 20:18, 22:10, 25:7, 26:22, 27:6, 27:11, 39:19, 39:22, 39:24, 40:19, 43:10, 43:13, 44:21, 45:3, 45:9, 46:19, 46:24, 47:14, 47:24, 48:11, 51:8, 51:15, 51:23, 52:11, 53:8, 54:17, 54:20, 54:24, 57:2, 57:25, 58:7, 62:22, 64:3, 64:18, 64:20, 65:11, 65:15
**theme** [1] - 58:15
**themselves** [3] - 18:16, 19:9, 39:15
**therefore** [5] - 33:15, 33:18, 34:9, 34:11, 34:12
**they've** [3] - 6:12, 42:19, 62:18
**thinking** [2] - 25:7, 25:23
**third** [3] - 11:8, 37:2, 38:2
**third-party** [1] - 11:8
**THIS** [1] - 65:16
**thoughts** [2] - 14:17, 22:13
**three** [2] - 27:4, 39:5
**throughout** [2] - 41:17, 59:9
**tied** [1] - 25:2
**timeframe** [2] - 13:7, 34:20
**timeframes** [1] - 6:10
**timeline** [2] - 12:10, 59:21
**timing** [2] - 25:17, 60:13
**tip** [1] - 45:10
**title** [2] - 7:20, 17:7
**titled** [1] - 27:22
**TO** [1] - 65:15
**TOBY** [1] - 1:15
**Toby** [1] - 2:7
**today** [17] - 2:24, 6:16, 9:20, 11:11, 25:9, 25:25, 26:18, 26:24, 29:8, 39:5, 49:21, 52:15, 55:22, 56:18, 64:20, 64:24, 65:4
**today's** [2] - 37:12, 65:1
**together** [3] - 28:8, 31:8, 42:10
**tomorrow's** [1] - 61:5
**took** [6] - 7:9, 26:11, 60:1, 60:25, 61:1, 61:18
**top** [2] - 45:12, 46:5
**Torline** [2] - 28:16, 28:20
**totally** [1] - 26:14
**touch** [2] - 48:8
**towards** [1] - 14:3
**trade** [4] - 9:7, 9:9, 37:14, 37:18
**trades** [1] - 41:16
**trading** [3] - 9:5, 9:9, 28:3
**training** [1] - 37:15
**transaction** [2] - 31:7, 33:9
**transactions** [4] - 31:1, 32:9, 33:8, 35:4
**TRANSCRIPT** [1] - 65:15
**transcript** [2] - 26:25, 65:1
**transfer** [5] - 22:18, 22:21, 25:5, 33:12, 37:25
**transferred** [2] - 24:8, 41:24
**transition** [3] - 9:25, 20:11, 44:17
**transitioned** [3] - 10:6, 10:17, 37:8
**transparency** [1] - 37:14
**tread** [2] - 14:15, 14:16
**treasury** [1] - 31:14
**treat** [1] - 13:19
**trial** [7] - 30:5, 36:7, 49:12, 54:5, 55:2, 55:7, 65:6
**true** [2] - 50:6, 57:7
**TRUE** [1] - 65:15
**Trust** [3] - 18:4, 18:10, 30:23
**try** [6] - 2:18, 7:9, 20:4, 21:2, 25:4, 27:8
**trying** [13] - 7:6, 7:12, 12:2, 12:8, 13:20, 13:23, 19:6, 25:1, 41:10, 46:15, 56:10, 57:23
**turn** [8] - 3:3, 21:2, 29:2, 33:17, 39:24, 45:18, 48:2, 48:5
**turned** [6] - 43:19, 45:12, 45:15, 45:25, 46:8
**turning** [3] - 32:20, 34:16, 35:20
**two** [26] - 2:15, 5:6, 6:22, 9:8, 9:14, 17:16, 17:18, 23:22, 29:10, 30:25, 31:2, 31:11, 37:17, 39:3, 39:24, 43:19, 47:14, 47:15, 49:14, 57:9, 58:10, 58:13, 61:13, 61:19, 61:25, 65:3
**type** [2] - 9:23, 10:17
**types** [1] - 34:3

U

**U.S** [4] - 8:8, 8:9, 15:3, 38:14
**Uber** [1] - 30:6
**ultimate** [4] - 30:2, 35:25, 36:4, 38:17
**ultimately** [1] - 29:25
**unable** [2] - 42:5, 42:8
**uncomfortable** [2] - 6:7, 21:18
**under** [7] - 4:3, 5:2, 8:2, 9:13, 21:3, 27:21, 54:1
**underlying** [4] - 11:7, 11:16, 14:8, 37:3
**understandably** [1] - 58:5
**understood** [8] - 5:5, 9:21, 20:6, 53:20, 54:17, 62:22, 64:18
**undertake** [1] - 56:20
**undertaken** [1] - 16:9
**undertaking** [2] - 13:7, 22:2
**undertakings** [1] - 21:13
**undertook** [2] - 43:17, 46:2
**unfortunately** [2] - 3:11, 25:22
**unfulfilled** [1] - 22:6
**United** [3] - 3:21, 4:1, 8:12
**unless** [2] - 42:24, 44:21
**unlikely** [1] - 21:17
**unsettle** [1] - 22:3
**untimely** [1] - 60:9
**unusual** [2] - 30:3, 36:5
**up** [19] - 7:11, 7:12, 7:24, 12:8, 12:9, 12:22, 25:2, 25:18, 29:11, 37:24, 38:20, 44:5, 46:17, 46:23, 47:3, 49:14, 53:13, 58:23, 62:23
**upcoming** [1] - 60:13
**update** [3] - 23:16, 40:8, 42:12
**upset** [1] - 22:3
**URQUHART** [1] - 1:13
**useful** [1] - 54:4

V

**validity** [1] - 34:13
**valuable** [1] - 13:14
**valuation** [15] - 4:22, 5:15, 5:17, 11:19, 20:8, 20:10, 23:25, 35:17, 35:18, 37:2, 37:6, 37:12, 42:1, 43:1, 43:2
**valuations** [2] - 13:19, 15:18
**value** [30] - 8:2, 10:2, 10:13, 11:6, 11:14, 11:20, 12:25, 13:4, 14:7, 14:8, 14:12, 23:14, 23:20, 24:2, 24:4, 28:15, 28:18, 28:23, 32:8, 40:11, 41:17, 42:22, 42:23, 43:3, 44:3, 44:9, 44:18, 44:19
**valued** [5] - 8:1, 11:5, 11:17, 23:23, 34:12
**valuing** [2] - 5:21, 6:8
**Van** [3] - 2:16, 16:6, 29:10
**van** [2] - 2:20, 26:3
**various** [2] - 5:21, 37:23
**vast** [1] - 11:6
**veered** [1] - 22:7
**vehicle** [1] - 21:2
**veracity** [1] - 52:20
**verification** [5] - 4:9, 7:17, 8:19, 8:23, 9:19
**verifications** [1] - 16:1
**verify** [1] - 9:16
**verse** [1] - 51:6
**versus** [7] - 2:2, 14:24, 30:8, 30:9, 44:19, 47:9
**view** [4] - 7:2, 7:3, 8:24, 64:6
**violating** [1] - 60:16
**violations** [1] - 31:23

## W

**waiting** [3] - 5:7, 5:11, 8:25
**waived** [3] - 57:13, 59:23, 63:7
**waiver** [1] - 57:11
**wants** [1] - 56:19
**warrant** [1] - 60:2
**wasted** [1] - 40:16
**wasteful** [1] - 14:13
**waterfront** [1] - 54:13
**ways** [3] - 12:14, 12:16, 53:9
**web** [1] - 43:25
**week** [4] - 26:4, 46:18, 46:20, 57:9
**weekend** [1] - 5:20
**weeks** [7] - 6:22, 11:19, 13:8, 39:5, 43:19, 47:15
**weeks'** [1] - 6:10
**welcome** [1] - 12:13
**Wells** [5] - 16:2, 16:14, 18:3, 33:13, 44:17
**west** [1] - 6:13
**WHITE** [1] - 1:17
**White** [3] - 2:9, 2:12, 5:3
**whole** [2] - 58:6, 58:23
**willing** [1] - 3:23
**willingly** [1] - 60:16
**Wilmington** [7] - 8:20, 8:22, 18:3, 18:10, 23:24, 27:21, 30:23
**Winston** [4] - 58:17, 62:25, 63:3, 64:12
**wish** [1] - 25:20
**withdrawn** [2] - 58:18, 62:25
**witness** [2] - 54:12, 61:19
**witnesses** [7] - 48:9, 51:1, 51:7, 51:9, 55:6, 55:7, 62:14
**woefully** [1] - 42:15
**words** [1] - 7:1
**works** [1] - 39:20
**worry** [1] - 11:18
**worse** [1] - 49:19
**wrap** [2] - 19:23, 46:23
**wrapped** [1] - 46:17
**written** [1] - 20:14
**wrongly** [2] - 34:17, 34:18
**WSFS** [18] - 4:10, 4:16, 4:18, 4:20, 4:24, 5:4, 17:24, 19:24, 33:13, 36:19, 36:24, 37:19, 37:21, 44:16, 44:17, 45:15, 45:16
**WV** [1] - 30:9

## Y

**year** [4] - 23:7, 34:19, 40:18, 40:20
**years** [8] - 10:18, 11:13, 22:5, 30:25, 31:2, 32:25, 34:19, 49:9
**yesterday** [6] - 11:10, 11:25, 12:2, 41:10, 42:14, 46:4
**YORK** [2] - 1:1, 1:1
**York** [7] - 1:7, 1:8, 1:15, 1:18

KM

**EXHIBIT 3**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------x

RIA R SQUARED, INC.,

Plaintiff,

v.

SHINHAN SECURITIES CO., LTD.,

Defendant.

-----------------------------------x

Index No.

Date Purchased: December 9, 2024

**SUMMONS**

To the above-named Defendant:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Venue is proper under New York Civil Practice Law and Rules §§ 501 and 503 because Plaintiff is a domestic corporation authorized to transact business in New York and maintains its principal place of business in New York County, and because the claims set forth in the complaint are subject to the parties' valid choice-of-forum agreement.

Dated: December 9, 2024

Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ George E. Mastoris*
George E. Mastoris
Matthew Olsen
200 Park Avenue
New York, NY 10166
T. (212) 294-6700
F. (212) 294-4700
GMastoris@winston.com
MOlsen@winston.com

*Counsel for RIA R Squared, Inc.*

TO: Shinhan Securities Co., Ltd., c/o
Shinhan Investment America, Inc.
1325 Avenue of the Americas
Ste. 2002A
New York, New York 10019

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

RIA R SQUARED, INC.,

Plaintiff,

v.

SHINHAN SECURITIES CO., LTD.,

Defendant.

Index No.

**COMPLAINT**

Plaintiff RIA R Squared, Inc. ("RIA" or "Plaintiff"), by its attorneys Winston & Strawn LLP, for its complaint against Shinhan Securities Co., Ltd. ("SSC" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This matter concerns SSC's fraudulent inducement of RIA to enter into a $147 million securities-lending agreement and SSC's knowing and intentional breach of its obligations under that agreement.

2. On January 25, 2019, RIA and SSC entered into a Global Master Securities Lending Agreement ("GMSLA") and an accompanying agreement titled the Supplemental Lending Agreement for Securities Lending ("SLA"). Together, the GMSLA and SLA set forth terms and conditions governing the parties' anticipated entry into separate but related loan contracts, pursuant to which SSC would lend U.S. securities to RIA for terms of no less than one year in exchange for collateral and a predetermined fee. Upon termination of each loan, RIA would return the securities, and SSC would return the collateral.

3. SSC made its first such loan to RIA in 2019, extending approximately $250 million worth of securities to RIA. But in early 2020, SSC found itself facing a significant increase in margin requirements associated with market volatility caused by the onset of the COVID-19 pandemic (and its own decision to engage in high-risk investments). This risked substantial losses. Desperate to avoid such an outcome and separately embroiled in a costly financial scandal, SSC began asking counterparties that had managed their finances more prudently—such as RIA—to prematurely terminate their loan agreements and return loaned securities to SSC.

4. In February 2020, as part of these efforts, Sam Sang Hyuk Kim, a senior executive with SSC, contacted David Kang, CEO of RIA, and informed Mr. Kang that SSC wanted RIA to return to it $94 million in loaned securities at least a year before RIA would have had any obligation to do so. Mr. Kim and Mr. Kang knew each other from Mr. Kim's time at Mirae Asset Global Investments Co., Ltd., an investment management company with which RIA had previously engaged in securities lending transactions.

5. Despite Mr. Kim's framing of the early termination as a "special request," the relative positions of the parties made it a directive, pure and simple. Indeed, Mr. Kim said the quiet part out loud, telling Mr. Kang that unless RIA complied with his request, SSC would discontinue its business with RIA and, using its influence as a member of South Korea's "Big Five" (one of the nation's five largest business conglomerates), blacklist RIA from the South Korean financial market. As a young company reliant on Korean investors, RIA was in no position to refuse, and SSC knew it.

6. Accordingly, on or about April 2020, RIA and SSC entered into a Securities Delivery Agreement ("SDA"), pursuant to which RIA agreed to deliver to SSC $47 million of securities by April 28, 2020. In exchange, SSC promised to (1) re-lend the $47 million of securities

and lend an additional $100 million of securities to RIA by May 2020; (2) suspend RIA's spread payments—the difference between the amount paid to the issuer of a security and the price paid by the investor for that security—to SSC for six months; and (3) lower the rate of future spread payments.

7. When discussing the terms of the SDA, SSC and Mr. Kim acknowledged the substantial financial and reputational burden that SSC's "special request" would impose on RIA. SSC and Mr. Kim thus assured RIA and Mr. Kang multiple times that SSC could satisfy its new obligations by the end of May 2020.

8. But SSC had no intention of doing so. To the contrary, its assurances and promises were misrepresentations meant to induce RIA to help it fix SSC's balance sheet issues as quickly as possible, notwithstanding the harm that it would cause RIA. Put differently, SSC knew it would not fulfill its promises to RIA at the time it entered into the SDA, but made those promises anyway.

9. RIA fulfilled its obligations under the SDA by delivering the $47 million of securities to SSC on or about April 28, 2020. This transaction was memorialized in an email wire confirmation from RIA to SSC.

10. SSC failed to fulfill its obligations under the SDA by never re-lending *any* of the $47 million of securities and not lending *any* of the additional $100 million of securities.

11. In the months that followed, SSC repeatedly admitted to breaching the SDA and acknowledged the losses RIA had suffered as a result of its breach in both email correspondence and a "Statement of Facts" signed by both parties on March 11, 2022. While admitting breach, SSC repeatedly agreed to negotiate in good faith towards an agreement that would make RIA whole.

12. Needless to say, no good-faith negotiation took place. SSC has yet to make the promised securities loans available to RIA or to compensate RIA for its losses. Instead, it has repeatedly kicked the can down the road in an effort to evade responsibility for its actions, alternating between extending promises of future business and threatening RIA with retribution by blacklisting it from conducting business with one of South Korea's "Big Five" business conglomerates. In recent months, SSC has ratcheted up its pressure campaign. For instance, it recently caused RIA's custodian bank (which was indicted in South Korea the very same day SSC's counsel sent RIA a threatening letter) to terminate its profitable, decade-long relationship with RIA.

13. Enough is enough. SSC's breach has caused RIA to suffer hundreds of millions of dollars in damages, comprising not just the loan itself but also the financial and reputational harm resulting from SSC's failure to perform under the SDA. That figure includes, but is not limited to, hundreds of millions of dollars in damages from balance sheet losses; lost opportunity costs from the lost yields on the promised securities; trading liquidity losses; unrealized market value resulting from SSC's failure to deliver the promised securities; Commercial Real Estate ("CRE") Fund losses; and lost business opportunities with third parties.

## THE PARTIES

14. Plaintiff RIA is a corporation organized under Delaware law, with its principal place of business located at 575 Lexington Avenue, New York, New York 10022. RIA is a financial services and asset management company, providing financial planning, portfolio management, and investment advisory services.

15. Upon information and belief, SSC is a corporation organized under the laws of the Republic of South Korea. SSC's principal place of business is located at Shinhan Investment

Tower, 70, Yeoui-daero, Yeongduengpo-gu, Seoul, 07325, South Korea. SSC is a wholly owned subsidiary of Shinhan Financial Group.

16. The parties to the GMSLA are listed as RIA and "Shinhan Investment Corp" or "SIC." According to Shinhan Financial Group's Form 20-F filing with the U.S. Securities and Exchange Commission for Fiscal Year 2022, Shinhan Investment Corp. was renamed Shinhan Securities Co., Ltd., effective October 2022, after the parties entered the GMSLA.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action under New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302. SSC is subject to personal jurisdiction in New York because its business offices, domiciles, or residences are in New York; it transacted business in New York giving rise to RIA's action; it owns, uses, or possesses real property in New York; and it caused injuries in New York. Additionally, SSC consented to this Court's exercise of personal jurisdiction under the choice-of-forum provision in the SLA.

18. Venue is proper under CPLR §§ 501 and 503 because RIA is a domestic corporation authorized to transact business in New York and maintains its principal place of business in New York County, and because the claims set forth herein are subject to the SLA's valid choice-of-forum provision, which governs disputes arising out of, or in connection with, the GMSLA.

## FACTUAL ALLEGATIONS

### Background on the Securities Lending Market

19. This case concerns the business of securities lending, a long-established practice and a bedrock component of global capital markets. Approximately $3 trillion of securities were on loan worldwide as of September 2023, with more than $10 billion in revenue estimated to be generated by securities lenders annually.

20. Despite the ubiquitous practice of securities lending, it remains somewhat obscure to many outside the world of institutional finance and capital markets. Some context is helpful.

21. Imagine that Investor A holds a highly sought-after security—for example, GameStop. Investor A makes money off the stock as it appreciates and from any dividends it pays, but otherwise, Investor A's GameStop stock sits idly in Investor A's portfolio. At the same time, Investor A's GameStop stock is a scarce resource that other investors, such as Investor B, also want to acquire in order to pursue their own investment strategies. This is where securities lending comes into play.

22. In a securities-lending contract, the "lender"—Investor A—temporarily transfers stock (in this example, the GameStop stock) to a "borrower"—Investor B—in exchange for collateral and a fee. Investor B is ultimately obligated to return the borrowed securities (or securities equivalent in value), at which point Investor A must return the collateral. The date on which the securities and collateral must be returned may be agreed upon ahead of time, based on the lender's demand, or determined based on some other agreement between the parties.

23. Investor A benefits from this arrangement because lending the GameStop stock to Investor B in exchange for the borrowing fee provides Investor A with a supplemental source of revenue.

24. Investor B benefits from this arrangement because it can use the borrowed GameStop stock to pursue its own investment goals, including by "short selling." Short selling is the practice of selling a security the seller doesn't own with the expectation that its value will fall before the requisite time of repurchase, allowing the borrower to pocket the difference in value between the money received from the sale and the cost of repurchasing the shares at a lower price.

25. Securities lending is integral to the broader health of capital markets. By dramatically increasing the circulation of securities that would otherwise be passively held by an investor, securities lending provides increased liquidity (the increased availability of liquid assets in a market), the absence of which can be devastating to market participants and markets alike. When securities are illiquid, the cost of obtaining them can rise to prohibitive levels, which in turn has a cascading (and highly detrimental) impact on companies with investment strategies predicated on continuing access to these securities.

26. Securities lending is not limited to stock transactions, or even equity securities more generally. Fixed-income securities, such as corporate or government bonds, are also commonly transacted via securities-lending agreements. Such was the case here: RIA and SSC transacted in fixed-income securities.

27. Fixed-income securities transactions, which are identical to the lending of equity securities, enable the borrower to engage in a number of additional investment strategies. These include repurchase transactions (short-term agreements wherein the security is sold and later repurchased at a predetermined price); hedging activity (borrowing securities to offset against a risk posed by an investment strategy); and securities arbitrage (buying and selling a security in different markets to profit off the price difference).

28. Each of these investment strategies typically involves the borrower transferring the lent security to a third party. It is paramount that parties to a securities-lending contract avoid a default triggered by any party's failure to deliver requested securities, because a default has a cascading effect that interferes not only with the investment strategies of the borrower, but also with those of various downstream entities whose own investment strategies rely on access to the securities in question.

29. Given the substantial risk posed by an event of default, borrowers must be able to depend on their lender honoring its contractual obligations. Even a single failed delivery exposes a borrower to a host of serious financial and reputational consequences. First, the borrower is likely to see its own investment strategy fail; for example, if a borrower intends to use the contemplated securities as a hedge against investment risk, it would now face full exposure to that risk. The borrower also faces increased costs of borrowing in the future, as the market will view it as a riskier counterparty. Finally, the borrower faces irreparable reputational harm: Its counterparties themselves depend on the borrower to transfer securities in a timely manner and are unlikely to transact with a borrower that is foreclosed from doing so.

30. All this is to say that participants in the securities-lending market, such as RIA and SSC, must be able to rely on one another to meet their mutual obligations and investment goals. As discussed further below, SSC has repeatedly failed to meet that baseline standard.

**<u>The GMLSA and SLA</u>**

31. The securities-lending relationship between SSC and RIA began on January 25, 2019, when the parties entered into the GMSLA and contemporaneously entered into the SLA. The GMSLA describes the overarching terms of the parties' securities-lending arrangement: SSC would from time to time lend to RIA securities and financial instruments in exchange for collateral and RIA's agreement to transfer securities or assets equivalent to those it had borrowed back to SSC, typically on a fixed date. The SLA, for its part, acted as a supplement to the GMSLA—the SLA, for example, contained the governing forum selection clause for the SLA—and contained additional terms applicable to specific loans. Among other things, RIA was explicitly permitted to use the securities it borrowed from SSC in repurchase (or "repo") transactions; indeed, that was the impetus for the parties' entry into the GMSLA and SLA.

32. The purpose of the GMSLA was memorialized in the contract:

> Lender will lend Securities to Borrower, and Borrower will borrow Securities from Lender in accordance with the terms and conditions of this Agreement. The terms of each Loan shall be agreed prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties.

GMSLA ¶ 3.

33. Accordingly, after the parties reached agreement as to the terms of a Loan, SSC was obligated to "procure the Delivery of Securities to Borrower or deliver such Securities in accordance with this Agreement and the terms of the relevant Loan." *Id.* ¶ 4.

34. Among other things, the SLA detailed the initial term of all Loans issued under the GMSLA—12 months—as well as the process SSC was required to undertake before terminating a Loan—providing RIA with notice of SSC's intent to terminate within the 30-day window preceding the conclusion of the Loan's term. If SSC failed to do so, the Loan term would be automatically extended for an additional 12 months.

**The Securities Delivery Agreement**

35. All proceeded smoothly for the first year of the parties' securities-lending arrangement: RIA would request that certain securities be lent, SSC would agree to do so, and a Loan would be executed. That changed in early 2020, when SSC was roiled by two crises.

36. The first of these was specific to SSC. Unbeknown to the broader market, South Korean prosecutors had recently commenced an investigation into SSC's role in a wide-ranging episode of financial fraud that came to be known as the Lime Asset Management Scandal. The investigation, which ultimately resulted in multiple indictments and hundreds of millions of dollars in fines, concerned Lime Asset Management's embezzlement of client funds and its brokers'

involvement—including SSC's—in procuring client funds for fraudulent investments. SSC was required to repay hundreds of millions to investors and subjected to fines and sanctions, and ultimately admitted to RIA that it was endeavoring to restrict its business with its counterparties during the investigation to offset its inevitable financial impact.

37. The second crisis was universal. In February 2020, South Korea was struck by the COVID-19 crisis, which crippled financial markets both in the country and worldwide. The value of the South Korean won tumbled, foreign investment withdrew in unprecedented volumes, and capital market activity within South Korea ground to a standstill.

38. The risk that a protracted COVID-19 crisis posed to all capital market investors was severe; for SSC, an institution simultaneously facing a government investigation into financial fraud, it verged on the existential.

39. To protect itself, SSC decided that it would try to offload its expected financial losses onto its counterparties. One of those counterparties was RIA.

40. In February 2020, David Kang, RIA's CEO, was contacted by Sam Sang Hyuk Kim, the General Manager of SSC's Prime Broker Services Department. During a phone call, Mr. Kim served RIA with an ultimatum: RIA would either acquiesce to SSC's demands—the early termination and return of $94 million in Loans to which RIA was entitled—or be blacklisted from doing business with SSC.

41. Mr. Kang, understandably, had no interest in simply acceding to Mr. Kim's extortionate demands, and decided to push back. He informed Mr. Kim that terminating the Loans would severely damage RIA's bottom line and reputation. After all, RIA was also facing substantial financial headwinds as a result of the COVID-19 pandemic, and the securities underlying the Loans were being used in a number of transactions with downstream counterparties.

Their return to SSC would not only result in the termination of these transactions—leading to costly termination penalties and the loss of goodwill at a time of market stress—but would negate the investment strategies RIA had executed.

42. Unaccustomed to being refused, Mr. Kim upped the ante. He warned Mr. Kang that if RIA ignored SSC's directive, Mr. Kim would ensure that Mr. Kang was permanently banned from traveling to his homeland of South Korea, where much of his family still resided. Coming from a senior executive at one of the country's most powerful institutions, this was hardly an idle threat. But Mr. Kang—facing the potential destruction of the business he had built from scratch if he simply agreed to Mr. Kim's demands—held firm, and the parties remained at an impasse.

43. A month passed, and the tenor of the parties' communications softened. But SSC's financial problems remained. Consequently, on April 6, 2020, Mr. Kim again called Mr. Kang and reiterated SSC's demand that RIA acquiesce to the early termination of $94 million in Loans.

44. RIA faced a Catch-22. On one hand, unwinding the transactions necessary to deliver the early return of these Loans would come at significant financial and reputational cost; on the other, its future business with SSC—and potentially other South Korean financial entities—was at risk. Ultimately, RIA chose what it believed to be the best path forward: it would agree to voluntarily terminate a portion of the Loans, but would only do so in exchange for a promise of future lent securities.

45. On the same day of their April 6, 2020 call, Mr. Kang wrote to Mr. Kim and informed him that RIA would make "best commercial efforts in fulfilling your request." Mr. Kang was also clear that SCC's directive was "causing a lot of harm to all our Broker Dealer and Repo counterparty relationships on Wall Street."

46. On April 7, 2020, Mr. Kang offered an agreement to amicably resolve the parties' dispute and remedy the fact that SSC's actions had put RIA's "US credibility [] at risk." In exchange for RIA's early termination and return of the Loan, Mr. Kang asked that SSC extend the "bond maturities" (the Loan term) for other lent securities "so that [RIA] can make up for the upfront losses over a longer duration," and that it accommodate certain adjustments to spread payments (the difference between the interest rate paid by SSC and that it received from RIA on lent securities), also in an attempt to offset RIA's losses.

47. Later that day, Mr. Kim wrote back to express SSC's willingness to reach an agreement. Although SSC did not agree to RIA's proposed terms—SSC sought different alterations to RIA's spread payments, and offered only a six-month extension to bond maturities—Mr. Kim noted that SSC was willing to "support RIA" and expected to "ramp up [assets under management]" by the "3rd week of May 2020," as an assurance that it would have the financial capabilities to meet its side of the bargain being negotiated. Mr. Kim concluded on what seemed an earnest note: "I sincerely apologize on this but please help us so that we can continue this great relationship built over the past years."

48. RIA rose to the occasion. After a series of discussions, Mr. Kang and Mr. Kim reached agreement—the SDA. RIA would deliver $47 million of securities to SSC, and in exchange, SSC agreed to provide a new Loan under the GMSLA, under which SSC would return the $47 million (whether in the securities initially lent or in U.S. Treasury bonds) and extend an additional $100 million of securities for RIA to borrow by May 30, 2020. SSC also agreed to suspend RIA's spread payments for six months and to provide a discount on the future spread payments once they became due again.

49. Throughout these negotiations, Mr. Kim repeatedly assured RIA that SSC had the ability to fulfill its obligation to extend RIA $147 million of securities by the end of May 2020. RIA relied on these representations in entering into the SDA.

50. With the SDA in place, RIA began to fulfill its side of the bargain. Having already contacted its downstream counterparties upon SSC's initial termination demand, RIA quickly terminated or amended the agreements to which the securities at issue were subject. Although it incurred significant losses in doing so, RIA managed to recoup the $47 million in SSC-lent securities within a few weeks of the parties' agreement.

51. On April 28, 2020, RIA wired $47 million of securities to SSC, thus fully satisfying its obligations under the SDA. RIA's performance was memorialized in an email exchange between the parties.

**<u>SSC's Breach and Continued Failure to Cure</u>**

52. RIA had satisfied its side of the agreement, but SSC had not. Facing the prospect of substantial injury caused by SSC's continued breach, RIA repeatedly sought assurance that SSC would abide by the terms of the SDA and the parties' other agreements.

53. To give just one example, on May 7, 2020, Mr. Kang wrote to Mr. Kim concerning the "need to address a few immediate action points" between the parties, which included confirming the "[s]tatus of replacement of the $47 MM notional lend assets." Mr. Kang described the "heavy losses" RIA had incurred and explained that they were "impacting [RIA's] overall P&L beyond reasonable levels." Mr. Kim responded that same evening, promising that "yes[,] SIC does have capacity to continue the GMSLA deal. SIC is also looking forward for the great relationship and we are working on the points . . . let[']s overcome this crisis."

54. But despite Mr. Kim's show of solidarity, SSC had no intention of meeting its part of the bargain. May 30 came and went, and SSC failed to transfer the $147 million of securities RIA was owed. In doing so, SSC breached the SDA, the SLA, and the GMSLA, which, under Paragraph 4, requires the delivery of securities made pursuant to a loan agreement between the parties on the mutually agreed date of transfer.

55. Despite SSC's default—and its clear bad-faith efforts to induce RIA to enter an agreement SSC had no intention of fulfilling—RIA sought to resolve the issue amicably. That desire initially appeared mutual. SSC repeatedly acknowledged its obligation to transfer the $147 million of securities, repeatedly promising to satisfy "any and all past statements and representations" concerning its obligations to RIA and blaming its nonperformance on the impact of the "Lime [asset] management" scandal on SSC's finances. SSC likewise acknowledged that RIA had "performed above and beyond to assist SIC with any request made by SIC's internal reporting and financial need" during SSC's internal crisis, and praised RIA for its "exemplary" "track record and performance of all obligations to SIC."

56. But its words were empty, and SSC's conduct from that point onward told a different story—one of deception and malfeasance. Over the next eighteen months, SSC repeatedly contradicted its past assurances, delayed the date by which it claimed its business would be back to normal, and—most problematic of all—even attempted to terminate the Loans and the GMSLA itself despite its own admission that it had not yet satisfied its obligations under the SDA. Given the ongoing impact of the COVID-19 pandemic on capital markets and its desire to maintain the parties' relationship, RIA gave SSC (and Mr. Kang gave Mr. Kim) the benefit of the doubt. Naturally, however, its concerns lingered and grew with each passing month.

**The Statement of Facts and SSC's Continuing Defaults**

57. RIA continued to press SSC to fulfill its obligations under the SDA and other agreements for over a year and half, to no avail. The final straw came on January 18, 2022, when SSC (yet again) attempted to improperly terminate the GMSLA, despite the existence of both unmatured loans (for which notice of termination could not be properly given for another six months) and its outstanding obligations to RIA. After all, and as a matter of basic logic, if the GMSLA (and its terms dictating the rights and obligations of both borrower and lender) no longer remained in effect, the transfer of securities contemplated by the SDA could not be fulfilled.

58. Accordingly, on February 15, 2022, RIA's counsel provided written notice to SSC of its failure to fulfill the parties' agreements. The letter spelled out how SSC had failed to meet its obligations and repeatedly breached the parties' agreements by its ongoing failures and by attempting to improperly terminate the GMSLA. It demanded that SSC immediately cure these deficiencies.

59. SSC quickly sought a détente. On March 11, 2022, after discussions with RIA, the parties executed a new agreement, memorialized in the Statement of Facts. Specifically, the Statement of Facts described the agreement between SSC and RIA, pursuant to which they:

> agree[d] that they will maintain the status quo and work in good faith to resolve their differences based on the facts stated above and the economic impact on RIA (including opportunity costs, loss of business relationships, additional liability burdens, and increased business costs) until the earlier of such time as both Parties agree to a resolution or both Parties agree that the market is no longer impacted by Covid and has returned to normalcy. The Parties agree[d] that if the Parties mutually agree[d] that the market is no longer impacted by Covid and has returned to normalcy and no resolution has been made, the status of the Parties shall revert to the status in effect on the date of this Statement of Facts.

60. With this agreement by SSC to "maintain the status quo"—put simply, maintain the operative nature of the parties' contracts and obligations to one another—RIA felt assured that

it would ultimately receive the securities it was owed. Either the parties would "agree to a resolution" resolving their dispute over SSC's failure to lend the securities promised, or the parties would agree that the market dislocations caused by COVID-19 had drawn to a close and would revert to the status quo as of March 11, 2022—with SSC in default and facing an imminent lawsuit from RIA.

61. The Statement of Facts also memorialized the events leading up to the execution of the SDA and the SDA itself, described SSC's improper efforts to terminate the GMSLA, and documented SSC's continuing failure to extend the requisite $147 million of securities for RIA to borrow.

62. As time progressed and the parties' securities lending relationship continued, SSC repeatedly affirmed its unfulfilled commitments under the GMSLA, the SLA, the SDA, and the Statement of Facts. Below are a few representative examples.

63. In July 2022, SSC informed RIA that it would be issuing a transaction termination notice, despite having no intention of concluding the parties' relationship. The reason for this was clearly spelled out by Mr. Kim: Due to SSC's hazardous financial condition, his department had "to show we are doing something to reduce this transactions [sic], even half of this existing balance. I know this is not going to work on RIA side, but it need to do kept [sic] the rest of balance." Mr. Kang responded that he "hope[d] you understand that RIA has its obligations. As long as you are comfortable with this, then we will progress. Furthermore, per the terms of the Supplemental Agreement as well as GMSLA, there will be additional terms that will need to be processed, including but not limited to SIC default under the GMSLA."

64. In December 2022, Mr. Kim sent Mr. Kang the following email, unequivocally acknowledging SSCs' defaults and its refusal to cure:

> We are asking for a favor to see what steps we can take to partially or fully wind-up our current GMSLA transaction.
>
> Per our discussion, SIC understands and acknowledges the hardships that RR faced due to assisting SIC with our USD capital need in 2020. As we would have liked to fulfil[l] our transactional agreement and obligation of returning the $50MM notional and ramping up an additional $100MM notional, but due to the current market environment and internal situation at SIC we have shut down the PBS Department and our management is urgently requesting any outstanding transactions be called back.
>
> ***We acknowledge that due to SIC's failure to perform, RR has been negatively impacted on many economic levels. And unfortunately, our management would not allow us to fulfil our obligations per transaction.***

65. In October 2023, after yet another round of negotiations ostensibly aimed at "resolv[ing] SIC's default and current status quo agreement," SSC offered to extend an additional $750 million of securities to RIA for borrowing (the "$750M Loan Agreement"). By entering into such a transaction, the parties reasoned that RIA could engage in repo transactions utilizing those securities and more quickly offset the damages it had suffered because of SSC's failure to lend it the $147 million it had promised more than three years prior.

66. Upon reaching agreement, RIA had its counsel prepare a draft "Securities Loan Confirmation" document spelling out the terms of the $750M Loan Agreement (which was to be made in three tranches over the course of 2024 and 2025). Mr. Kang sent the document to Mr. Kim, who immediately signed on behalf of SSC and returned the signed copy to RIA. Nevertheless—and unsurprisingly given the parties' history—SSC never loaned those securities to RIA.

**<u>SSC Reneges on Its Obligations for a Final Time</u>**

67. By August 2024, nearly four and a half years had passed since SSC first promised to deliver the $147 million of securities, the failure of which had cost RIA dearly in both financial

and reputational terms. And despite SSC's continued insistence that it would eventually live up to the parties' deal and otherwise comply with its obligations under the parties' contracts, its actions have spoken louder than its words. On August 28, 2024, RIA issued a demand letter for immediate transfer of the owed securities and remediation for its losses; it also offered SSC the opportunity to engage in settlement negotiations before litigation was brought.

68. SSC's response, issued through new legal counsel, defied credulity. Despite its numerous admissions to the contrary, SSC now asserted that it had never breached its agreements with RIA; that it lacked any outstanding obligations to RIA; and that despite RIA's injury, SSC was fully entitled to walk away from the parties' longstanding securities-lending relationship scot-free. Incredibly, in what appears to have been a transparent attempt to gain back some leverage in a negotiation, SSC even asserted that RIA had somehow breached the GMSLA by not acquiescing to its latest (improper) notice of termination.

69. There were, of course, a number of problems with this. As an initial matter, although SSC's alleged "termination" was supposed to have occurred sometime in July and to have become effective in August, SSC said nothing at all about it until October 25, 2024. Second, and more importantly, SSC was explicitly barred from terminating the GMSLA by the agreement reflected in the parties' Statement of Facts. As SSC was well aware, the GMSLA, which detailed terms and responsibilities integral to the effectuation of a securities-lending transaction between the parties, needed to remain in effect until SSC cured its defaults under it and the SDA. Without the GMSLA, SSC had no way to transfer to RIA the $147 million of securities it still owed. It is for this exact reason that the parties had agreed to "maintain the status quo" until an agreement that their dispute had been resolved.

70. In a further sign of its desperation, SSC also contended that RIA had defaulted on the GMSLA (which it claimed to have previously terminated) by failing to make certain post-termination coupon and borrowing payments on the SSC securities that RIA currently holds (the "Current Loan"). This was a red herring. First, RIA had prepaid a substantial portion of these fees earlier in the year. Second, the amount of those payments was dependent upon an agreed-upon borrowing rate, which RIA and SSC typically discussed in the days and weeks leading up to the annual renewal of the Loan in question (on August 24 of each calendar year). In furtherance of its attempt to terminate the GMSLA and the Current Loan, SSC had refused to engage in those discussions with RIA, thus making calculation of the borrowing and coupon payments for the post-August 24, 2024 time period an impossibility.

71. Nevertheless, in a show of good faith and in an attempt not to prejudice SSC in any way, RIA has in fact made all of the borrowing and coupon payments in question using the rate from 2023–24, and will continue to do so as long as the Current Loan remains outstanding (or until SSC engages in discussions as to what the 2024–25 rate should be).

72. Although RIA's decision to make those payments was a sincere effort to stave off this litigation, it ultimately proved futile. Rather than agree to withdraw its baseless notice of default, SSC, purportedly invoking the SLA, contacted RIA's custodial bank, BNP Paribas ("BNP"), and demanded that it turn over RIA's entire collateral account in light of RIA's asserted breach. BNP, of course, could do no such thing: The mere fact that SSC claimed that a default existed did not make it so. Moreover, SSC was well aware that the securities in that custodial account were the subject of various repurchase transactions entered into by RIA; had BNP complied with SSC's request, the impact on RIA's business and reputation would have been catastrophic.

73. That said, RIA was still severely damaged by SSC's outreach to BNP. Apparently unwilling to get caught up in a dispute between the two parties, BNP placed a hold on RIA's ability to access the securities in its account, thus leading RIA to default on at least one transaction and forgo potential business opportunities. Worse, BNP also served RIA—a counterparty with which it had a relationship going back more than a decade—with a 90-day notice of termination. It is unclear if BNP's indictment in South Korea, which was announced on the exact same day as SSC's letter was sent to RIA, had anything to do with its decision (or, for that matter, with this dispute). The timing is noteworthy, at the very least.

74. In light of SSC's fraud, breaches of contract, and bad-faith acts, RIA has no choice but to bring the instant lawsuit and seek relief in this Court under the following causes of action.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT (GMSLA, SLA, and SDA)

75. RIA repeats and realleges the allegations contained in paragraphs 1 through 74 above as if fully set forth herein.

76. SSC engaged in a series of contracts—the GMSLA, SLA, and SDA—with RIA whose totality represented a relationship wherein SSC would lend securities to RIA in exchange for a fee and collateral.

77. SSC knew that when RIA possessed the lent securities, RIA would engage in various business transactions with those securities seeking to profit off those transactions.

78. Under Paragraph 4 of the GMSLA, SSC was obliged to procure the delivery of securities to RIA in line with the GMSLA and terms of the individual Loan agreement.

79. On or about April 28, 2020, RIA and SSC entered into the SDA, under which RIA would deliver $47 million of securities in exchange for SSC's agreement to (1) return the

$47 million of securities or $47 million of U.S. Treasury bonds by May 2020, and (2) extend $100 million of additional securities for borrowing to Plaintiff.

80. At all times, RIA performed its obligations under the GMSLA, SLA, and SDA by re-lending $47 million of securities on April 28, 2020.

81. SSC breached its obligations under the GMSLA, SLA, and SDA by failing to deliver to RIA the sum of $47 million of securities or U.S. Treasury bonds and by its failure to extend $100 million of additional securities to RIA.

82. As a result of SSC's breach, RIA has suffered hundreds of millions of dollars in damages, in an amount to be determined at trial.

83. RIA has taken all reasonable steps to resolve this dispute and mitigate damages, but SSC has refused to negotiate in good faith with RIA to address its breach.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT ($750M Loan Agreement)**

84. RIA repeats and realleges the allegations contained in paragraphs 1 through 83 above as if fully set forth herein.

85. At some point prior to November 13, 2023, in order to compensate RIA for its losses under the SDA and in exchange for satisfaction of its outstanding obligations under that agreement, SSC, through its agent Mr. Kim, agreed to loan to RIA $750 million worth of additional securities, to be transferred in three tranches worth $100 million, $250 million, and $400 million, respectively.

86. Such agreement was binding under Section 3 of the GMSLA, which specifies that trade confirmations can be entered into via oral agreement.

87. On November 13, 2023, Mr. Kim, again acting on behalf of RIA, signed a draft "Securities Loan Confirmation" evidencing that prior oral agreement had been entered into with RIA, and sent it to Mr. Kang, who countersigned it.

88. SSC breached its obligations under the $750M Loan Agreement by failing to deliver to RIA any of the three tranches of securities promised.

89. As a result of SSC's breach, RIA has suffered hundreds of millions of dollars in damages, in an amount to be determined at trial.

90. RIA has taken all reasonable steps to resolve this dispute and mitigate damages, but SSC has refused to negotiate in good faith with RIA to address its breach.

**THIRD CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT (SDA)**

91. RIA repeats and realleges the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

92. To induce RIA to enter into the SDA with SSC, Defendant SSC, through its agent Mr. Kim, made certain oral and written misrepresentations to RIA regarding SSC's financial capacity and SSC's intention to meet its obligations under the SDA.

93. On April 7, 2020, Mr. Kim misrepresented to RIA in an email that SSC could pay RIA the securities owed under the SDA due to SSC's ramp-up of the Assets Under Management in May 2020.

94. These representations (which Mr. Kim repeated to Mr. Kang on May 7, 2020) were materially false and misleading because SSC had no intention of fulfilling its contractual obligations. In fact, SSC knew and understood that its financial state would not improve due to a financial fraud scandal that would have a material impact on SSC's business.

95. SSC and Mr. Kim intended to induce RIA to hand over tens of millions of dollars of securities to SSC knowing that SSC would never fulfill its end of the bargain.

96. RIA repeatedly reminded SSC and Mr. Kim that SSC's request was made at a time when the markets were suffering a profound dislocation due to the pandemic and that RIA would suffer significant costs and hardship in case the securities were not delivered when SSC and Mr. Kim promised they would be delivered.

97. SSC was aware that RIA's fulfillment of its request would cause RIA to incur significant costs, and that SSC's failure to perform under the SDA would cause RIA further losses.

98. Despite RIA's repeated stated concerns, Mr. Kim gave false assurances to RIA and promised that SSC would return the securities to RIA by May 2020.

99. RIA relied to its detriment on SSC's misrepresentations by entering into the SDA and delivering to SSC $47 million of securities.

100. As a direct and proximate result of relying on SSC's and Mr. Kim's misrepresentations, RIA suffered significant losses. These include, but are not limited to, millions of dollars of U.S. dollar balance sheet losses from the undelivered $47 million of securities and accompanying interest for the nearly four years since the breach occurred; millions of dollars of lost opportunity costs from the lost yields on the securities; millions of dollars in trading liquidity losses; millions of dollars in market value losses resulting from the breach; hundreds of millions of dollars in CRE Fund losses; and RIA's lost business relationship losses with third parties, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (GMSLA, SLA, and SDA)**

101. RIA repeats and realleges the allegations contained in paragraphs 1 through 101 above as if fully set forth herein.

102. Implicit in the GMSLA, SLA, and SDA were a covenant of good faith and fair dealing, which included a pledge that neither party would do anything that would frustrate, destroy, or injure the right of the other party to receive the benefits under the agreement.

103. SSC repeatedly misrepresented the status of its business, its expected Assets Under Management ramp-up, and SSC's ability to return the securities by May 2020, when it never had any intention of repaying RIA.

104. RIA entered into the SDA relying on SSC's and Mr. Kim's misrepresentations that SCC would return the securities by May 2020 and that SSC had the capability to meet its obligations.

105. RIA performed its obligations under the SDA by delivering $47 million of securities to SSC by April 28, 2020.

106. SSC has not re-lent RIA the $47 million of securities or extended the promised $100 million of securities, despite its assurances that it would.

107. On or about January 18, 2022, SSC sent a notice to RIA purporting to terminate the parties' business relationship without having met its contractual obligations of paying RIA the securities RIA is owed. None of the parties' agreements allowed for early termination of the relationship.

108. SSC's effort to terminate the relationship without returning to RIA the $147 million of securities was a breach of the covenant of good faith and fair dealing and intended to frustrate or delay SSC's obligations to RIA.

109. As a result of SSC's breach, RIA has sustained hundreds of millions of dollars in damages, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## DECLARATORY JUDGMENT (GMSLA and SLA)

110. RIA repeats and realleges the allegations contained in paragraphs 1 through 110 above as if fully set forth herein.

111. As a result of the foregoing conduct by SSC in contravention of its various agreements with RIA and the likelihood that SSC's misconduct will continue, an actual and justiciable controversy exists between RIA and SSC regarding whether SSC can early terminate the GMSLA that establishes the trading relationship between the parties.

112. As to the GMSLA and SLA, which together set forth terms and conditions governing the parties' entry into separate but related loan contracts, Plaintiff is entitled to an order declaring:

a. the GMSLA and SLA govern the dispute between RIA and SSC regarding any securities trading;

b. SSC improperly terminated the GMSLA on January 18, 2022;

c. the GMSLA remains in full force and effect, notwithstanding SSC's purported termination of it on January 18, 2022 or any subsequent terminations; and

d. RIA did not default on its obligations to SSC with respect to borrowing or coupon payments.

## PRAYER FOR RELIEF

**WHEREFORE**, RIA demands judgment against Defendant as follows:

(a) On the first cause of action for breach of the GMSLA, SLA, and SDA:
1. judgment against Defendant SSC in an amount to be determined at trial;
2. an award of reasonable attorneys' fees and expenses in favor of RIA in an amount to be determined at trial; and
3. the costs and disbursements incurred by RIA, and for any other relief that may be just and proper.

(b) On the second cause of action for breach of the $750M Loan Agreement:
1. judgment against Defendant SSC in an amount to be determined at trial;
2. an award of reasonable attorneys' fees and expenses in favor of RIA in an amount to be determined at trial; and
3. the costs and disbursements incurred by RIA, and for any other relief that may be just and proper.

(c) On the third cause of action for fraudulent inducement:
1. judgment against Defendant SSC in an amount to be determined at trial;
2. an award of reasonable attorneys' fees and expenses in favor of RIA in an amount to be determined at trial; and
3. the costs and disbursements incurred by RIA, and for any other relief that may be just and proper.

(d) On the fourth cause of action, for breach of the covenant of good faith and fair dealing:
1. judgment against Defendant SSC in an amount to be determined at trial;
2. an award of reasonable attorneys' fees and expenses in favor of RIA in an amount to be determined at trial; and
3. the costs and disbursements incurred by RIA, and for any other relief that may be just and proper.

(e) On the fifth cause of action, for declaratory judgment:
1. a declaratory judgment setting forth Plaintiff RIA's and Defendant SSC's respective continuing rights and obligations under the GMSLA;
2. an award of reasonable attorneys' fees and expenses in favor of RIA in an amount to be determined at trial; and
3. the costs and disbursements incurred by RIA, and for any other relief that may be just and proper.

Dated: December 9, 2024

Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ George E. Mastoris*
George E. Mastoris
Matthew Olsen
200 Park Avenue
New York, NY 10166
T. (212) 294-6700
F. (212) 294-4700
GMastoris@winston.com
MOlsen@winston.com

*Counsel for RIA R Squared, Inc.*

**EXHIBIT 4**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| RIA R SQUARED, INC., *Plaintiff*, v. SHINHAN SECURITIES CO., LTD., *Defendant*. | Index No. 659538/2024 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS IN PART DEFENDANT'S ANSWERS & COUNTERCLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ... 1

I. Three of SSC's Four Counterclaims Must Be Dismissed as a Matter of Law ... 3

A. SSC's implied covenant of good faith and fair dealing counterclaim easily fails as duplicative of its contract breach claim. ... 3

B. SSC's conversion counterclaim likewise fails as duplicative of its contract breach claim. ... 4

C. SSC's unjust enrichment claim fails as a matter of law. ... 5

1. SSC's unjust enrichment claim is barred by the parties' agreements. ... 5

2. SSC's unjust enrichment claim must be dismissed as duplicative of its contract breach claim. ... 7

3. At any rate, SSC fails to plead the essential elements of unjust enrichment. ... 7

II. Three of SSC's Affirmative Defenses Must be Dismissed as a Matter of Law ... 8

A. The Fourth Affirmative Defense ("Lack of Authority") is legally insufficient and should be dismissed. ... 8

1. SSC fails to adequately allege any facts supporting its assertion that Mr. Kim lacked apparent authority. ... 10

2. The uncontroverted record—including SSC's own allegations and discovery responses—establishes Mr. Kim's apparent authority. ... 11

B. The Seventeenth Affirmative Defense ("Undue Influence") is facially insufficient and should be dismissed. ... 16

C. The Eighteenth Affirmative Defense ("Fraud, Fraudulent Inducement, and Misrepresentation") should be dismissed as to the SDA. ... 17

CONCLUSION ... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*,
206 A.D.2d 166 (1st Dep't 1994) ....................10

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*,
70 A.D.3d 423 (1st Dep't 2010) ....................2

*Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*,
78 A.D.3d 746 (2d Dep't 2010) ....................10

*Brook v. Peconic Bay Med. Ctr.*,
152 A.D.3d 436 (1st Dep't 2017) ....................3

*Cece & Co. v. U.S. Bank Nat'l Ass'n*,
153 A.D.3d 275 (1st Dep't 2017) ....................3, 4

*Cloudfund LLC v. Broughton Constr. Co.*,
2023 N.Y. Misc. LEXIS 23043 (N.Y. Sup. Ct. Dec. 4, 2023)....................15

*Dragons 516 Ltd. v. GDC 138 E 50 LLC*,
201 A.D.3d 463 (1st Dep't 2022) ....................6

*Fesseha v. TD Waterhouse Inv. Servs.*,
305 A.D.2d 268 (1st Dep't 2003) ....................3

*GE Oil & Gas, Inc. v. Turbine Generation Servs., L.L.C.*,
2017 N.Y. Misc. LEXIS 501 (Sup. Ct. N.Y. Cnty. Feb. 10, 2017) ....................17

*Globalx, Inc. v. Hogwarts Cap., LLC*,
226 A.D.3d 535 (1st Dep't 2024) ....................6

*Goel v. Ramachandran*,
111 A.D.3d 783 (2d Dep't 2013)....................7

*Hallock v. State*,
64 N.Y.2d 224 (1984) ....................10, 13, 14

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*,
241 F. Supp. 2d 246 (S.D.N.Y. 2002)....................11

*High Tides, LLC v. DeMichele*,
88 A.D.3d 954 (2d Dep't 2011) ....................17

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
12 N.Y.3d 132 (2009) .....5

*Johnson v. Nationwide Gen. Ins. Co.*,
971 F. Supp. 725 (N.D.N.Y. 1997), *aff'd sub nom. Johnson v. Nationwide Ins. Co.*, 162 F.3d 1148 (2d Cir. 1998) .....14

*Kivort Steel, Inc. v. Liberty Leather Corp.*,
110 A.D.2d 950 (3d Dep't 1985) .....10

*Kopel v. Bandwidth Tech. Corp.*,
56 A.D.3d 320 (1st Dep't 2008) .....3, 4

*Korangy Publ'g v. Miceli*,
No. 110327/08, 2009 WL 586131 (N.Y. Sup. Ct. 2009) .....4

*Legal Recovery Assocs. LLC v. Brenes Law Grp., P.C.*,
2023 WL 2253138 (S.D.N.Y. Feb. 13, 2023) .....15

*Lozowsky v. Planet Automall, Inc.*,
2009 WL 1910726 (E.D.N.Y. June 29, 2009) .....16

*LPD N.Y., LLC v. Adidas Am., Inc.*,
2022 WL 4451727 (E.D.N.Y. Sep. 24, 2022) .....11

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (N.Y. 2011) .....7

*Massey Knakal Realty of Brooklyn, LLC v. Nevins Realty Corp.*,
2013 WL 3970717 (Sup. Ct., N.Y. Cnty. Aug. 2, 2013) .....12

*Matzan v. Eastman Kodak Co.*,
134 A.D.2d 863 (4th Dep't 1987) .....4

*Modern Art Servs., LLC v. Fin. Guar. Ins. Co.*,
161 A.D.3d 618 (1st Dep't 2018) .....5

*Norcast S.ar.l. v. Castle Harlan, Inc.*,
48 N.Y.S.3d 95 (1st Dep't 2017) .....7

*Ogbolu v. Trs. of Columbia Univ. in City of New York*,
2022 WL 280934 (S.D.N.Y. Jan. 31, 2022), *aff'd*, 2023 WL 2579044 (2d Cir. Mar. 21, 2023) .....15

*Regency Oaks Corp. v. Norman-Spencer McKernan, Inc.*,
129 A.D.3d 1454 (4th Dep't 2015) .....12

*RKA Film Fin., LLC v. Kavanaugh*,
171 A.D.3d 678 (1st Dep't 2019) ....................17

*Robbins v. Growney*,
229 A.D.2d 356 (1996) ....................10

*Santander Bank, N.A. v. Rubin Trading Corp.*,
68 Misc. 3d 1013 (N.Y. Sup. Ct. 2020) ....................5

*Sebastian Holdings, Inc. v. Deutsche Bank, AG*,
108 A.D.3d 433 (1st Dep't 2013) ....................3, 4, 6

*Shapsis v. Kogan*,
No. 38418/07, 2011 WL 61727 (N.Y. Sup. Ct. 2011) ....................3

*Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*,
76 A.D.3d 556 (2d Dep't 2010) ....................10

**Other Authorities**

Choi Jae-hee, *Shinhan CEOs get slap on wrist over Lime scandal*, THE KOREA HERALD (Apr. 23, 2021) ....................9

Kim Na-young, *Ex-executive of investment company sentenced to 8 yrs in prison over fund scam*, YONHAP NEWS AGENCY (Sept. 25, 2020) ....................2

N.Y. C.P.L.R. 3013 ....................9, 10

N.Y. C.P.L.R. 3211(a)(1) ....................17

N.Y. C.P.L.R. 3211(a)(7) ....................17

N.Y. C.P.L.R. 3211(b) ....................15

Shin Ha-Nee, *Shinhan Securities CEO offers 'sincere apology' for $95 million ETF scandal*, KOREA JOONGANG DAILY (Oct. 16, 2025) ....................9

## INTRODUCTION

On July 31, 2025, this Court found that Plaintiff RIA R Squared, Inc. ("RIA") had successfully stated claims for breach of contract and fraud against Defendant Shinhan Securities Co., Ltd. ("SSC"). In particular, RIA had alleged facts demonstrating that SSC—through the Deputy Senior Manager and later Head of its Prime Brokerage Services ("PBS") Department, Sam Sang Hyuk Kim[1]—fraudulently induced RIA into returning some $47 million of securities on a short-term basis in exchange for the promise of future loans worth $147 million, and then added injury to injury by never following through on that promise. After RIA threatened to sue, SSC attempted to appease it by signing yet another loan agreement—this time for $750 million ("750M Loan Agreement")—and then once again failed to deliver. As a result of SSC's misconduct, RIA saw its profits take a nosedive and its reputation among its counterparties—the lifeblood of its business—suffer dramatically.

In a thinly veiled attempt to divert this Court's attention from its misconduct, SSC now asserts four counterclaims—none of which have anything to do with the core dispute described above—and a grab bag of twenty-four boilerplate affirmative defenses. Later in this case, the evidence will show that all of SSC's assertions are unsupported and unsupportable. At this stage, however, the issues are narrower: RIA moves to dismiss three counterclaims which are not only irrelevant, but also duplicative of SSC's first counterclaim, along with three affirmative defenses which are directly contradicted or otherwise unsupported by SSC's own pleadings. Among these is the risible (and, frankly, bewildering) assertion that Mr. Kim—who was RIA's primary point of

[1] Notwithstanding SSC's denial of the same, Sam Sang Hyuk Kim held himself out as the General Manager of SSC's Prime Broker Services Department during the relevant period (e.g., by presenting RIA with an SSC-branded business card). *See* Compl. ¶ 40. As discussed further herein, regardless of his *actual* title, Mr. Kim spoke on behalf of SSC, bound it to multiple transactions with RIA, and executed the relevant agreements, rendering SSC's "apparent authority" defense baseless.

contact at SSC for five years and who unilaterally negotiated the terms of the Securities Delivery Agreement ("SDA") and the $750M Loan Agreement directly with RIA's CEO—somehow lacked authority to reach any agreement on SSC's behalf. SSC should not be permitted to escape liability by throwing Mr. Kim under the proverbial bus. This is particularly true given that one of the individuals they claim *did* have authority to enter into these agreements—Il-woo Lim—not only had stepped down because of scandal from his role at SSC *before the SDA was ever discussed* but was actually *in prison* during the time period SSC now asserts he was making decisions for the Company.[2] *See* Ex. 1.[3] Moreover, to the extent there is any merit to its disparaging (and condescending) comments about Mr. Kim's "limited" comprehension and failure to understand the numerous documents he signed on SSC's behalf, that would be even more damning, as it suggests a shocking lack of control and oversight for so sophisticated and prominent a financial institution.

First, RIA seeks dismissal of three of SSC's four counterclaims—breach of the implied covenant of good faith and fair dealing (Counterclaim II), conversion (Counterclaim III), and unjust enrichment (Counterclaim IV)—for failure to state a claim because ***all*** are duplicative of and wholly subsumed by SSC's breach of contract claim, as they arise from the same nucleus of facts and seek the same relief. New York law is unequivocal: where an express contract governs the subject matter of a dispute, parties may not repackage claims arising under that contract as tort or quasi-contractual claims. SSC's counterclaims are precisely the type of duplicative and impermissible claims that New York courts routinely dismiss at the pleading stage.

---

[2] *See* Kim Na-young, *Ex-executive of investment company sentenced to 8 yrs in prison over fund scam*, YONHAP NEWS AGENCY (Sept. 25, 2020).

[3] All exhibit citations used within this memorandum refer to those exhibits attached to the Affirmation of George Mastoris in Support of Plaintiff's Motion to Dismiss in Part Defendant's Answer & Counterclaims.

Second, RIA seeks dismissal of SSC's lack of authority defense (Affirmative Defense IV) and undue influence defense (Affirmative Defense XVII) as facially deficient and unsupported by the facts. Similarly, SSC's fraud, fraudulent inducement, and misrepresentation defense (Affirmative Defense XVIII) lacks particularity and fails to allege any direct, nonspeculative pecuniary loss, as required under New York law.

## I. Three of SSC's Four Counterclaims Must Be Dismissed as a Matter of Law

### A. SSC's implied covenant of good faith and fair dealing counterclaim easily fails as duplicative of its contract breach claim.

SSC's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of its breach of contract claim. Courts routinely dismiss such claims where, as here, they arise from the same operative facts and seek the same damages as a party's breach of contract claim. *See, e.g.*, *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (1st Dep't 2010); *Sebastian Holdings, Inc. v. Deutsche Bank, AG*, 108 A.D.3d 433, 434 (1st Dep't 2013); *Brook v. Peconic Bay Med. Ctr.*, 152 A.D.3d 436, 438 (1st Dep't 2017).

There is no dispute that the factual allegations underlying SSC's implied covenant claim mirror those supporting its breach of contract claim. In support of each, SSC raises RIA's alleged failure to comply with SSC's purported notices of termination, its alleged failure to return securities, and its purported interference with SSC's contractual rights and remedies. *Compare, e.g.*, SSC's Answer & Countercls. (Dkt. 73) ¶¶ 202–17 (basing contract breach claims on allegations that RIA obstructed SSC's right to take legal possession of collateral and failed to provide daily collateral reports), *with id.* ¶¶ 220–33 (basing implied covenant claim on the same allegations). Indeed, SSC does not allege ***any*** conduct that is independent of the contract or that falls outside the scope of the parties' express agreements. And for both claims, SSC seeks the same relief—i.e., the return of securities and monetary damages for the alleged deprivation of

contractual benefits. *See id.* ¶¶ 217, 234, 256 (seeking compensatory and punitive damages, restitution/disgorgement, pre- and post-judgment interest, and attorneys' fees and costs for both contract breach and covenant of good faith and fair dealings claims). SSC's wholly duplicative claim must be dismissed.

**B. SSC's conversion counterclaim likewise fails as duplicative of its contract breach claim.**

SSC's conversion counterclaim is also duplicative. "A cause of action for conversion cannot be predicated on a mere breach of contract." *Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268, 269 (1st Dep't 2003); *Kopel v. Bandwidth Tech. Corp.*, 56 A.D.3d 320, 320 (1st Dep't 2008) (similar); *Cece & Co. v. U.S. Bank Nat'l Ass'n*, 153 A.D.3d 275, 282 (1st Dep't 2017) (similar). Courts carefully maintain the boundary between contract and tort, dismissing tort claims that are, at their core, contractual disputes. *See, e.g.*, *Shapsis v. Kogan*, No. 38418/07, 2011 WL 61727 at *9 (N.Y. Sup. Ct. 2011) ("Where there are no independent facts alleged that constitute a separate taking which could give rise to tort liability, apart from an alleged breach of contract, a cause of action for conversion must be dismissed."); *Korangy Publ'g v. Miceli*, No. 110327/08, 2009 WL 586131, at *5 (N.Y. Sup. Ct. 2009) ("The Appellate Division, First Department, routinely upholds dismissals of conversion claims that merely seek damages for breach of contract.").

Here, SSC's conversion allegations are entirely contractual: RIA's "unauthorized" possession is defined solely by reference to the parties' contracts and based exclusively on RIA's alleged failure to return securities and collateral after the expiration or termination of the parties' agreements. *See, e.g.*, SSC's Answer & Countercls. ¶¶ 237–42 (basing conversion claim on RIA's alleged failure "to return more than $220 million in recalled securities after the loan terms expire[d]"). SSC raises no allegations of independent wrongdoing, fraud, or other tortious conduct, and it alleges no duty independent of the parties' contracts. *See generally id.* Its asserted right to

possession and the premise of "unauthorized" retention are defined by the Global Master Securities Lending Agreement ("GMSLA") and Securities Lending Agreement ("SLA") and loan confirmations themselves. *Compare, e.g.*, *id.* ¶¶ 183–91, 200–02 (basing contract breach claims on allegations that RIA breached the GMSLA, the SLA, and the terms of the individual loans by retaining SSC's securities), *with id.* ¶¶ 236–41 (basing its right to possession of the securities RIA allegedly converted on the same allegations). Because SSC's purported conversion claim is identical to its breach of contract claim, it is not cognizable in tort and must be dismissed. *See Cece & Co.*, 153 A.D.3d at 282 (conversion claim dismissed as duplicative of contract claim); *Sebastian Holdings*, 108 A.D.3d at 433 (same); *Kopel*, 56 A.D.3d at 320 ("The conversion claim also fails because such a cause of action cannot be predicated on a mere breach of contract, and no independent facts are alleged giving rise to tort liability[.]"); *see also Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 863 (4th Dep't 1987) ("A breach of contract does not give rise to a tort action in the absence of additional allegations of wrongdoing").

**C. SSC's unjust enrichment claim fails as a matter of law.**

**1. SSC's unjust enrichment claim is barred by the parties' agreements.**

The law is clear that unjust enrichment is a quasi-contractual remedy, available ***only*** in the absence of an enforceable contract. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (explaining that unjust enrichment claims are "imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned" and "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded"). Here, where no less than four different contracts govern the relationship between the parties, including the alleged grounds for SSC's counterclaim, that is undeniably not the case.

SSC does not allege, nor could it, that there is any bona fide dispute as to the existence, validity, or scope of the GMSLA and the SLA, or that the contracts do not cover the subject matter of the dispute. *See* SSC's Answer & Countercls. ¶ 2 (admitting that RIA and SSC entered into the GMSLA and the SLA on January 25, 2019); *see also Santander Bank, N.A. v. Rubin Trading Corp.*, 68 Misc. 3d 1013, 1022 (N.Y. Sup. Ct. 2020) ("A plaintiff may state alternative causes of action for breach of contract and unjust enrichment which are predicated on the same facts only where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue.") (citing *Modern Art Servs., LLC v. Fin. Guar. Ins. Co.,* 161 A.D.3d 618, 620 (1st Dep't 2018)). Further, as this Court previously held, RIA's Complaint successfully pled the existence of the SDA. Decision & Order (Dkt. 71) at 7–8. The parties' relationship, rights, obligations, and remedies are defined by these agreements. Where, as here, the parties' relationship and the subject matter of the dispute are governed by the parties' bargained-for agreements, an unjust enrichment claim is not simply superfluous—it is legally impermissible. Permitting SSC to proceed with this claim would undermine the parties' carefully negotiated agreements and the certainty that contracts are intended to provide, an outcome which New York law does not permit. *See Dragons 516 Ltd. v. GDC 138 E 50 LLC*, 201 A.D.3d 463, 464 (1st Dep't 2022) (parties may not circumvent contracts by asserting quasi-contractual claims covering the same subject matter); *Sebastian Holdings*, 108 A.D.3d at 433 (same).

SSC's claim fails for the additional reason that the SDA and the March 11, 2022 Statement of Facts ***required*** the parties to "***maintain the status quo.***" Compl. (Dkt. 1) ¶¶ 59–60 (emphasis added). Under such an arrangement, RIA was expressly under no obligation to return securities until its defaults were cured. *Id.* ¶¶ 11–12, 55–62. RIA's retention of the securities was thus expressly authorized by the parties' agreements.

### 2. SSC's unjust enrichment claim must be dismissed as duplicative of its contract breach claim.

SSC's unjust enrichment claim is based on the same facts as its contract claim: RIA's retention of securities and collateral after the alleged expiration or termination of the lending agreements. *Compare, e.g.*, SSC's Answer & Countercls. ¶¶ 202–06 (basing contract breach claims on allegations that RIA breached the agreements by failing to return all outstanding securities to SSC), *with id.* ¶¶ 247–56 (basing unjust enrichment claim on the same allegations). Where, as here, a plaintiff's unjust enrichment counterclaim is based on the same underlying allegations as its contract claim, it is duplicative and must be dismissed. *See Globalx, Inc. v. Hogwarts Cap., LLC*, 226 A.D.3d 535, 536 (1st Dep't 2024) ("To the extent these [breach of contract and fraud] claims succeed, the unjust enrichment claim is duplicative, and to the extent those claims are defective, the unjust enrichment claim cannot remedy them.") (internal quotations and marks omitted); *Dragons 516*, 201 A.D.3d at 464 (unjust enrichment claim duplicative and insufficient where "[complaint did] not sufficiently allege that [defendants] were unjustly enriched or received the funds from plaintiff such that any aspect of the loan transaction did not fall within the loan agreement").

### 3. At any rate, SSC fails to plead the essential elements of unjust enrichment.

Even if SSC's unjust enrichment claim were not barred as duplicative, SSC has still failed to plead its essential elements. In particular, SSC must allege: (1) that RIA was enriched, (2) at SSC's expense, and (3) that it is against equity and good conscience to permit RIA to retain what is sought to be recovered. *See Norcast S.ar.l. v. Castle Harlan, Inc.*, 48 N.Y.S.3d 95, 97 (1st Dep't 2017). Conclusory allegations that the defendant was "enriched at [the claimant's] expense" and that "it is against equity and good conscience to permit [the respondent] to retain the [outstanding securities]" are insufficient. *See Goel v. Ramachandran*, 111 A.D.3d 783, 791–92 (2d Dep't 2013)

(noting further that bare legal conclusions do not suffice; a complaint must instead allege particularized facts showing that the enrichment was unjust as between the parties); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) ("Without sufficient facts, conclusory allegations that fail to establish that a defendant was unjustly enriched at the expense of a plaintiff warrant dismissal.").

Here, SSC's allegations are entirely conclusory and speculative. SSC does not allege any facts showing that RIA's retention of any securities is "unjust" in light of the parties' contractual rights and obligations. On the contrary, as detailed in RIA's Complaint, SSC was in material breach of its own obligations under the parties' agreements, including failing to deliver $147 million in securities, attempting to terminate the agreements while in default, and refusing to cure its breaches despite repeated demands. Compl. ¶¶ 6–12, 49–54, 55–62, 68–69, 81–82. SSC's claim that it is "against equity and good conscience" for RIA to retain the securities (SSC's Answer and Countercls. ¶ 249) ignores the fact that SSC's own misconduct gave rise to this situation in the first instance. RIA's actions were taken in reliance on SSC's repeated promises to cure and in the context of ongoing negotiations, as memorialized in the Statement of Facts and other communications. Compl. ¶¶ 11–12, 55–62. Under these circumstances, there is nothing "unjust" about RIA's conduct.

## II. Three of SSC's Affirmative Defenses Must Be Dismissed as a Matter of Law

### A. The Fourth Affirmative Defense ("Lack of Authority") is legally insufficient and should be dismissed.[4]

SSC's Fourth Affirmative Defense asserts that RIA's claims are barred "because Mr. Kim did not have authority, actual or apparent, to execute or enter into any agreement on behalf of

[4] As noted in RIA's letter to the Court, SSC's Answer and Counterclaims are replete with "other pleading deficiencies." Dkt. 88 at 2. Among those deficiencies is SSC's wholly unsupported "lack of authority" argument. While RIA did not expressly address this issue in its brief letter to the

Shinhan, including at the time of the purported SDA and the alleged $750M Loan Agreement." SSC's Answer & Countercls. ¶ 107.

As an initial matter, SSC's attempt to interpose such a defense is incredibly confusing. As discussed below, Mr. Kim, the Deputy Senior Manager of SSC's PBS Department, was RIA's primary point of contact with SSC at all relevant times; not only did he oversee numerous trades between the parties, but he was also Mr. Kang's primary interlocutor in all substantive discussions, including negotiations over the SDA, the Statement of Facts, and the $750M Loan Agreement (which he executed). And Mr. Kim is no rogue employee; not only is he still with SSC, but he was promoted to Department Head just a couple of years ago. Moreover, and as discussed below, the individual that SSC asserts *did* have the requisite authority—Il-woo Lim—was forced to resign in disgrace because of the Lime Asset Management scandal, months before the SDA was even discussed for the first time.[5] *See* Ex. 1. SSC is well aware of that timing, yet it includes that misleading allegation in the factual recitation accompanying its Answer and Counterclaims anyway (much like it denied that Mr. Kim had signed the $750M Loan Agreement in its Opposition to the Motion to Dismiss).

What, then, is going on? Why rely on misleading allegations to make claims that are easily proven false? And why fight so hard to discredit your own employee? Although the picture hasn't yet come completely into focus, it appears likely that SSC—which has been stung by repeated public scandals in recent years, including the Lime Asset Management affair, which forced the resignation of numerous SSC executives, and the ETF scandal (which involved unauthorized

---

Court, it respectfully seeks leave to move to dismiss this affirmative defense now. Recent developments provide good cause to do so. Specifically, since RIA filed its letter on October 2, 2025, it has since discovered—upon review of materials produced by SSC on September 26, 2025 (attached as Exhibits 2–4, 6–10 )—grounds to move to dismiss, discussed herein.

[5] *See supra* note 2.

futures trading and a coverup from Korean regulators, and which came to light just this month)—is preemptively attempting to pin on Mr. Kim the fallout from its fraudulent conduct here.[6]

All that said, at this stage of the proceedings, the "why" is less important than the "what" of SSC's responsibility for its own misconduct, which is clear from the pleadings and relevant documents. Contrary to its apparent belief, SSC's assertions that Mr. Kim had a "limited" understanding of English and did not grasp the significance of documents he repeatedly signed do not insulate it from liability. Mr. Kim was designated as SSC's liaison to an American company and was in fact promoted to Department Head after agreeing to the SDA and executing the Statement of Facts. These facts (if true) would suggest a lack of controls at SSC which supports not only RIA's claims in this matter, but likely a finding of regulatory misconduct as well. And its Fourth Affirmative Defense, which attempts to sidestep such responsibility, is fatally deficient for two independent reasons.

### 1. SSC fails to adequately allege any facts supporting its assertion that Mr. Kim lacked apparent authority.

Under CPLR 3013, a party must plead "statements sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved." Here, SSC's "defense"—which merely states that "Mr. Kim did not have authority, actual or apparent, to execute or enter into any agreement on behalf of Shinhan" (SSC's Answer & Countercls. ¶ 107)—is wholly conclusory and thus insufficient to meet this basic pleading standard. Indeed, SSC ***never*** defines what Mr. Kim had the authority to do at SSC; its

[6] *See, e.g.*, Choi Jae-hee, *Shinhan CEOs get slap on wrist over Lime scandal*, THE KOREA HERALD (Apr. 23, 2021); Shin Ha-Nee, *Shinhan Securities CEO offers 'sincere apology' for $95 million ETF scandal*, KOREA JOONGANG DAILY (Oct. 16, 2025); *see also* Ex. 1. That hypothesis finds further support in the fact that SSC still hasn't disclosed this suit to its regulators (or investors), despite the suit's obvious materiality; perhaps it believes it can avoid the same sorts of far-reaching consequences it suffered last time if it successfully scapegoats one of its own executives.

pleadings are devoid of *any* factual allegations whatsoever regarding the scope of Mr. Kim's authority, the nature of his position, or any other information suggesting that RIA was or should have been aware of any limitations on Mr. Kim's authority at any relevant point in time. *See Kivort Steel, Inc. v. Liberty Leather Corp.*, 110 A.D.2d 950, 952 (3d Dep't 1985) ("[T]he facts in support [of an affirmative defense] must be pleaded in the answer."). SSC's defense therefore fails as a matter of law. *See Robbins v. Growney*, 229 A.D.2d 356, 358 (1996) ("[B]are legal conclusions are insufficient to raise an affirmative defense"); *Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*, 78 A.D.3d 746, 748 (2d Dep't 2010) ("The motion is granted if the plaintiff can demonstrate that the 'defenses are without merit as a matter of law because they either do not apply under the factual circumstances of [the] case, or fail to state a defense.'") (quoting *Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*, 76 A.D.3d 556, 557–58 (2d Dep't 2010)).

**2. The uncontroverted record—including SSC's own allegations and discovery responses—establishes Mr. Kim's apparent authority.**

To the extent that SSC has alleged relevant facts going to the question of Mr. Kim's authority with sufficient particularity to meet the strictures of CPLR 3013 (it has not), SSC still wouldn't get to where it needs to go. It is black letter law in New York that apparent authority arises wherever the principal's conduct "clothes" the agent with the ability to act on the principal's behalf. *See Hallock v. State*, 64 N.Y.2d 224, 231 (1984). The doctrine of apparent authority is unconcerned with the agent's actual authority, but rather focuses on the reasonable perception of the third party (RIA) based on the principal's (SSC's) own words, conduct, and course of dealing. *See id.* The principal is bound where it has placed its agent (Mr. Kim) in such a position that a third party would be justified in believing the agent has authority to act. *Id.* at 231–32; *accord Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 168 (1st Dep't 1994) (where an agreement was signed by a sufficiently senior agent of the corporation, the agent was construed as

having "at least apparent authority to bind the corporation"). This is so even if no agent with "actual" authority to bind SSC interacted directly with RIA. *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 261 (S.D.N.Y. 2002) (holding that representations "need not be made through actual contact between the principal and third party"); *LPD N.Y., LLC v. Adidas Am., Inc.*, 2022 WL 4451727, at *10 (E.D.N.Y. Sep. 24, 2022) (denying summary judgment on apparent authority notwithstanding defendants' lack of direct communications with plaintiff). And it is exactly the case here.

SSC's own allegations and admissions fatally undermine the assertion that Mr. Kim did not have (at the very least) apparent authority to enter into the SDA and the $750M Loan Agreement. Mr. Kim agreed to the SDA in April/May 2020 and to the $750M Loan Agreement in October/November 2023. At each of those times (and at every point in between), Mr. Kim was held out to RIA as having authority to enter into those agreements—and his statements, as well as the surrounding facts and circumstances, easily justified RIA's belief that Mr. Kim was so authorized. SSC's newfound "discovery" that Mr. Kim did not have such authority thus appears to be entirely litigation-driven; worse, "Andy" Il-woo Lim, the individual it identifies as having had such authority "in 2020" (*see* SSC's Answer & Countercls. ¶ 159), stepped down from SSC in disgrace in January 2020 as a result of his role in the Lime Asset Management scandal and went to prison shortly thereafter.[7] *See* Ex. 1. That, of course, was four months before discussions over the SDA began—and almost four *years* before Mr. Kim affixed his signature, and SSC's official seal, to the $750M Loan Agreement.[8]

[7] *See supra* note 2.
[8] As with SSC's previous insistence that Mr. Kim had never executed the $750M Loan Agreement [Dkt. 67], the inclusion of this misleading assertion in its Answer and Counterclaims also suggests that SSC is not being entirely candid with its U.S. counsel.

The record is clear that in and around the time that Mr. Kim executed the SDA in 2020, the parties exchanged numerous emails demonstrating that Mr. Kim was SSC's principal negotiator of the parties' agreements. *See, e.g.*, Ex. 2 (Mr. Kim representing that "SIC does have capacity to continue the GMSLA deal"); Ex. 3 (Mr. Kim confirming that "SIC agrees to suspend spread payments to receive[.]"). Mr. Kim repeatedly processed trade confirmations made pursuant to the parties' GMSLA on behalf of SSC. *See, e.g.*, Ex. 4 (Mr. Kim requesting an exchange of bonds); Exs. 5–6 (Mr. Kim soliciting RIA's confirmation of roll trades); Dkt. Nos. 41, 42, 75, 76, 77, 78 (further undisputed evidence that Mr. Kim served as RIA's primary point of contact during the relevant period). That Mr. Kim liaised with RIA as its official point of contact at SSC weighs further in favor of an apparent authority finding. *See Regency Oaks Corp. v. Norman-Spencer McKernan, Inc.*, 129 A.D.3d 1454, 1456 (4th Dep't 2015) (finding that where an employee with specialized knowledge had been specifically assigned to assist plaintiff, that employee was imbued with apparent authority). Indeed, it beggars belief that Mr. Kim would have been able to engage in all these activities—which often involved tangible financial transactions, including the loaning of actual securities to RIA—without authority and without the knowledge of anyone else from SSC, as SSC now appears to claim.

Before and around the time that Mr. Kim executed the $750M Loan Agreement in 2023, Mr. Kim's responsibilities and authority only appeared to grow. By SSC's own admission, Mr. Kim had, by January 2022, been promoted to the role of "Head of the PBS Department" (SSC's Answer & Countercls. ¶ 172)—clearly cloaking him with the appearance of authority to transact on SSC's behalf. *See Massey Knakal Realty of Brooklyn, LLC v. Nevins Realty Corp.*, 2013 WL 3970717, at *4 (Sup. Ct. N.Y. Cnty. Aug. 2, 2013) (dismissing affirmative defense of lack of authority where defendant's appointment of agent as "'Managing Director' . . . cloaked [him] with the appearance

of authority to conduct [the disputed] transactions on its behalf"). And as SSC repeatedly acknowledges, Mr. Kim was not only the principal point of contact for RIA at that point, but also the individual who negotiated, signed, and transmitted the Statement of Facts and the $750M Loan Agreement to RIA as part of the parties' ongoing business relationship. *See, e.g.*, SSC's Answer & Countercls. ¶¶ 11 (admitting Mr. Kim signed the Statement of Facts), 66 (admitting Mr. Kim signed the Securities Loan Confirmation). The record lends further support to these admissions of apparent authority. For instance, in March 2022, Mr. Kim represented to Mr. Kang that the Statement of Facts would "have to be approved," and then he personally signed it, implicitly holding out his authority to do so. *See* Ex. 7. In May 2023, he represented SSC in discussions with RIA personnel regarding the parties' relationship and dealings under the GMSLA. *See* Ex. 8. In June 2023, Mr. Kim assured RIA personnel that he would follow up to discuss matters related to SSC's plans to remedy its default status. *See* Ex. 9. And in November 2023, Mr. Kim solicited a countersignature from RIA on the $750M Loan Agreement on behalf of SSC. *See* Ex. 10.

By stark contrast to the above, SSC pleads no contemporaneous disclosure to RIA of any limitation on Mr. Kim's authority before or during the transactions at issue. *See generally* SSC's Answer & Countercls. It relies instead on a conclusory allegation that Mr. Kang "was aware" of purported limits. *Id.* ¶ 172. That allegation does nothing to defeat the apparent authority set in place by SSC's own conduct and course of dealing, any more than it negates RIA's reasonable reliance on the same. As *Hallock* makes clear, it is incumbent ***on the principal*** to disclose any restrictions on its agent's authority; absent such disclosure, the counterparty's reliance on the agent's apparent authority is reasonable and binding. 64 N.Y.2d at 232 ("In the circumstances, it necessarily fell to [the principal or agent] to reveal any restrictions on the attorney's authority to settle, and absent such disclosure defendants' reliance on the appearance of authority was entirely

reasonable.”). SSC does not dispute that it accepted the benefits arising out of Mr. Kim’s execution of the agreements he entered. In so accepting (in tandem with its failure to disclose any limitations to Mr. Kim’s authority), SSC blessed Mr. Kim with at least constructive authority to act on its behalf. *See Johnson v. Nationwide Gen. Ins. Co.*, 971 F. Supp. 725, 735 (N.D.N.Y. 1997) (given defendant’s “omissions and failures to take reasonable actions to destroy [agent’s] apparent authority,” defendant was construed as having granted “permission to the agent to perform acts and conduct negotiations”), *aff’d sub nom. Johnson v. Nationwide Ins. Co.*, 162 F.3d 1148 (2d Cir. 1998). It cannot now, years after accepting those benefits, disclaim the authority of the individual instrumental in procuring them.

RIA’s reliance on Mr. Kim’s authority was not only reasonable, but compelled by the circumstances. SSC’s own conduct—designating Mr. Kim as the lead negotiator, permitting him to sign and transmit binding agreements, and promoting him to a senior position—would lead any reasonable counterparty to believe that Mr. Kim had full authority to act on SSC’s behalf. RIA did so to its detriment: relying on Mr. Kim’s apparent authority, RIA unwound downstream transactions and delivered $47 million in securities under the SDA, incurring substantial financial and reputational costs, and later continued to forbear and “maintain the status quo” based on documents that Mr. Kim negotiated and signed on SSC’s behalf, including the Statement of Facts and the $750M Loan Agreement. *See generally* Compl.

Accordingly, SSC’s belated assertion that Mr. Kim lacked actual authority is wholly irrelevant as a legal matter. Even if true—and, as discussed in Section II.A.1, SSC has failed to plead any facts in support of that assertion—SSC may not now disavow the apparent authority with which its own actions imbued Mr. Kim now that it is convenient for it to do so. This is particularly true given RIA’s assertions that it relied to its detriment on Mr. Kim’s apparent

authority. *See Hallock*, 64 N.Y.2d at 231–33. Accordingly, SSC's affirmative defense for lack of authority should be dismissed.

**B. The Seventeenth Affirmative Defense ("Undue Influence") is facially insufficient and should be dismissed.**

SSC's Seventeenth Affirmative Defense states, in its entirety: "Plaintiff's claims are barred in whole or in part because of undue influence exerted by Plaintiff." SSC's Answer & Countercls. ¶ 120. That bare assertion contains no factual allegations and is insufficient as a matter of law under CPLR 3211(b). SSC merely recites that RIA exerted "undue influence," without describing the nature of the alleged influence, the circumstances under which it was exerted, or how RIA could possibly have unduly influenced SSC's conduct. Such a "wholly conclusory" allegation of undue influence, "lacking any concrete factual support," fails to meet the requisite plausibility standard. *Legal Recovery Assocs. LLC v. Brenes Law Grp., P.C.*, 2023 WL 2253138, at *2 (S.D.N.Y. Feb. 13, 2023) (striking defendant's "undue influence defense [as] wholly conclusory [and] lacking any concrete factual support"); *see Cloudfund LLC v. Broughton Constr. Co.*, 2023 N.Y. Misc. LEXIS 23043, at *10 (N.Y. Sup. Ct. Dec. 4, 2023) (striking defense given absence of particularized allegations).

SSC's own pleadings describe an arm's length commercial dispute—not coercion. Indeed, SSC's own allegations set forth voluntary business decisions and negotiations conducted at arm's length. *See* SSC's Answer & Countercls. ¶¶ 161–66, 177–81. There are no allegations of coercion, domination, overborne will, or any other circumstance suggesting a relational power dynamic leveraged by RIA to unduly coerce SSC into striking the agreements it did. Nor would any such allegations be remotely plausible, given that SSC is the wholly owned subsidiary of South Korea's second largest bank, and RIA is a much smaller asset manager based in Los Angeles. *Cf. Ogbolu v. Trs. of Columbia Univ. in City of New York*, 2022 WL 280934, at *3 (S.D.N.Y. Jan. 31, 2022)

(applying New York law and dismissing undue influence count given absence of allegations of "relationship of control" or any conduct beyond "mere pressure"), *aff'd*, 2023 WL 2579044 (2d Cir. Mar. 21, 2023); *Lozowsky v. Planet Automall, Inc.*, 2009 WL 1910726, at *5 (E.D.N.Y. June 29, 2009) (dismissing claim of undue influence as "unavailing" where plaintiff failed to meet the "heavy" burden of "prov[ing] that it contracted under circumstances indicating that a relationship of control existed and that the stronger of the two parties had exerted influence over the other to destroy the weaker party's free will and substitute for it the will of the [other].") (internal quotation marks and citations omitted). Indeed, as RIA's Complaint alleges, it was SSC that attempted to forcefully prevent RIA from pursuing its legal rights by threatening to have its founder and CEO permanently banned from traveling to South Korea, where much of his family resides. Compl. ¶¶ 5, 42. To date, Mr. Kang still has not dared set foot in his home country. It thus comes with particular ill grace (and no shortage of projection) for SSC to turn around and levy an accusation of "undue influence" *at RIA*.

### C. The Eighteenth Affirmative Defense ("Fraud, Fraudulent Inducement, and Misrepresentation") should be dismissed as to the SDA.

SSC seeks to invalidate "any claims related to" the SDA, contending that it was "the product of fraudulent inducement by Plaintiff." SSC's Answer & Countercls. ¶ 121. But SSC points to no contemporaneous misrepresentation at or before April 2020 that procured assent to the SDA, and the only factual predicates discussed in pleading its fraudulent inducement defense took place ***after*** the SDA was entered into. SSC pleads that in March 2022, RIA induced Mr. Kim to sign the "Statement of Facts" containing allegedly false assertions about a supposed 2020 SDA by assuring him the document was nonbinding and was merely to restore trust so RIA would return outstanding securities. *Id.* ¶¶ 121, 169–73, 179–81.

There is no dispute that the alleged SDA *preceded* the Statement of Facts, *see* *id.* ¶¶ 121, 178; accordingly, fraudulent acts that RIA allegedly *later* undertook could not have induced SSC into entering the SDA. As a matter of basic logic, the latter communications cannot render the already-executed SDA voidable for fraud. *See GE Oil & Gas, Inc. v. Turbine Generation Servs., L.L.C.*, 2017 N.Y. Misc. LEXIS 501 (Sup. Ct. N.Y. Cnty. Feb. 10, 2017) (fraud post-dating a contract's execution cannot have induced the contract's execution); *RKA Film Fin., LLC v. Kavanaugh*, 171 A.D.3d 678, 679 (1st Dep't 2019) (same); *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 958 (2d Dep't 2011) (same). Nor can post-execution correspondence transform predictions or negotiation positions into actionable misstatements of present fact as to the SDA. Because the only alleged misrepresentations tied to the fraud defense occurred well after the SDA's execution, and because SSC fails to plead any relevant facts that took place prior to the execution of the SDA, SSC's Eighteenth Affirmative Defense lacks the required temporal nexus to the contract, rendering it a nullity.

Accordingly, the Court must dismiss SSC's fraudulent inducement affirmative defense as to the SDA.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss SSC's Second through Fourth Counterclaims and the Fourth, Seventeenth, and Eighteenth Affirmative Defenses, with prejudice, pursuant to CPLR 3211(a)(1) and (7), as well as 3211(b), together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 13, 2026

By: */s/ George E. Mastoris*

George E. Mastoris
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
gmastoris@winston.com

*Counsel for Plaintiff RIA R Squared, Inc.*

**CERTIFICATE OF COMPLIANCE**

It is hereby certified pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

Plaintiff's Memorandum of Law in Support of its Motion to Dismiss in Part Defendant's Answers & Counterclaims was prepared in the processing system Microsoft Word, with Times New Roman typeface, 12-point font. Relying on the word count of the word-processing system, the total number of words in this document—inclusive of point headings and footnotes, and exclusive of caption page, table of contents, table of authorities, signature block, certificate of compliance, or any authorized addenda—is 6,072.

Dated: New York, New York
April 13, 2026

By: */s/ George E. Mastoris*

**EXHIBIT 5**

VERSION: October 2018

ISLA
INTERNATIONAL SECURITIES LENDING ASSOCIATION

# GLOBAL MASTER SECURITIES LENDING AGREEMENT

**CONTENTS**

**CLAUSE** **PAGE**

1. APPLICABILITY ..... 3
2. INTERPRETATION ..... 3
3. LOANS OF SECURITIES ..... 9
4. DELIVERY ..... 9
5. COLLATERAL ..... 10
6. DISTRIBUTIONS AND CORPORATE ACTIONS ..... 13
7. RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL ..... 15
8. DELIVERY OF EQUIVALENT SECURITIES ..... 16
9. FAILURE TO DELIVER ..... 17
10. EVENTS OF DEFAULT ..... 18
11. CONSEQUENCES OF AN EVENT OF DEFAULT ..... 19
12. TAXES ..... 23
13. LENDER'S WARRANTIES ..... 25
14. BORROWER'S WARRANTIES ..... 25
15. INTEREST ON OUTSTANDING PAYMENTS ..... 25
16. TERMINATION OF THIS AGREEMENT ..... 26
17. SINGLE AGREEMENT ..... 26
18. SEVERANCE ..... 26
19. SPECIFIC PERFORMANCE ..... 26
20. NOTICES ..... 26
21. ASSIGNMENT ..... 27
22. NON-WAIVER ..... 27
23. GOVERNING LAW AND JURISDICTION ..... 27
24. TIME ..... 28
25. RECORDING ..... 28
26. WAIVER OF IMMUNITY ..... 28
27. MISCELLANEOUS ..... 28

SCHEDULE ..... 31
AGENCY ANNEX ..... 34
ADDENDUM FOR POOLED PRINCIPAL AGENCY LOANS ..... 37

**AGREEMENT**

**BETWEEN:**

Shinhan Investment Corp, LTD (***Party A***) a company incorporated under the laws of the Republic of Korea acting through one or more Designated Offices; and

RIA R SQUARED, INC (***Party B***) a company incorporated under the laws of Delaware, USA acting through one or more Designated Offices.

**1. APPLICABILITY**

1.1 From time to time the Parties acting through one or more Designated Offices may enter into transactions in which one party (***Lender***) will transfer to the other (***Borrower***) securities and financial instruments (***Securities***) against the transfer of Collateral (as defined in paragraph 2) with a simultaneous agreement by Borrower to transfer to Lender Securities equivalent to such Securities on a fixed date or on demand against the transfer to Borrower by Lender of assets equivalent to such Collateral.

1.2 Each such transaction shall be referred to in this Agreement as a ***Loan*** and shall be governed by the terms of this Agreement, including the supplemental terms and conditions contained in the Schedule and any Addenda or Annexes attached hereto, unless otherwise agreed in writing. In the event of any inconsistency between the provisions of an Addendum or Annex and this Agreement, the provisions of such Addendum or Annex shall prevail unless the Parties otherwise agree.

1.3 Either Party may perform its obligations under this Agreement either directly or through a Nominee.

**2. INTERPRETATION**

2.1 In this Agreement:

***Act of Insolvency*** means in relation to either Party:

(a) its making a general assignment for the benefit of, or entering into a reorganization, arrangement, or composition with creditors; or

(b) its stating in writing that it is unable to pay its debts as they become due; or

(c) its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

(d) the presentation or filing of a petition in respect of it (other than by the other Party to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such Party (or any analogous proceeding) or seeking any reorganization, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition not having been stayed or dismissed within 30 days of its filing (except in the case of a petition for winding-up or any

analogous proceeding in respect of which no such 30 day period shall apply); or

(e) the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such Party over all or any material part of such Party's property; or

(f) the convening of any meeting of its creditors for the purpose of considering a voluntary arrangement as referred to in Section 3 of the Insolvency Act 1986 (or any analogous proceeding);

***Agency Annex*** means the Annex to this Agreement published by the International Securities Lending Association and providing for Lender to act as agent for a third party in respect of one or more Loans;

***Alternative Collateral*** means Collateral having a Market Value equal to the Collateral delivered pursuant to paragraph 5 and provided by way of substitution in accordance with the provisions of paragraph 5.3;

***Applicable Law*** means the laws, rules and regulations (including double taxation conventions) of any relevant jurisdiction, including published practice of any government or other taxing authority in connection with such laws, rules and regulations;

***Automatic Early Termination*** has the meaning given in paragraph 10.1(d);

***Base Currency*** means the currency indicated in paragraph 2 of the Schedule;

***Business Day*** means:

(a) in relation to Delivery in respect of any Loan, a day other than a Saturday or a Sunday on which banks and securities markets are open for business generally in the place(s) where the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral are to be delivered;

(b) in relation to any payments under this Agreement, a day other than a Saturday or a Sunday on which banks are open for business generally in the principal financial centre of the country of which the currency in which the payment is denominated is the official currency and, if different, in the place where any account designated by the Parties for the making or receipt of the payment is situated (or, in the case of a payment in euro, a day on which TARGET operates);

(c) in relation to a notice or other communication served under this Agreement, any day other than a Saturday or a Sunday on which banks are open for business generally in the place designated for delivery in accordance with paragraph 3 of the Schedule; and

(d) in any other case, a day other than a Saturday or a Sunday on which banks are open for business generally in each place stated in paragraph 6 of the Schedule;

***Buy-In*** means any arrangement under which, in the event of a seller or transferor failing to deliver securities to the buyer or transferee, the buyer or transferee of such

securities is entitled under the terms of such arrangement to buy or otherwise acquire securities equivalent to such securities and to recover the cost of so doing from the seller or transferor;

***Cash Collateral*** means Collateral taking the form of a transfer of currency;

***Close of Business*** means the time at which the relevant banks, securities settlement systems or depositaries close in the business centre in which payment is to be made or Securities or Collateral is to be delivered;

***Collateral*** means such securities or financial instruments or transfers of currency as are referred to in the table set out under paragraph 1 of the Schedule as being acceptable or any combination thereof as agreed between the Parties in relation to any particular Loan and which are delivered by Borrower to Lender in accordance with this Agreement and shall include Alternative Collateral;

***Defaulting Party*** has the meaning given in paragraph 10;

***Delivery*** in relation to any Securities or Collateral or Equivalent Securities or Equivalent Collateral comprising Securities means:

(a) in the case of Securities held by a Nominee or within a clearing or settlement system, the crediting of such Securities to an account of the Borrower or Lender, as the case may be, or as it shall direct, or,

(b) in the case of Securities otherwise held, the delivery to Borrower or Lender, as the case may be, or as the transferee shall direct of the relevant instruments of transfer, or

(c) by such other means as may be agreed,

and ***deliver*** shall be construed accordingly;

***Designated Office*** means the branch or office of a Party which is specified as such in paragraph 6 of the Schedule or such other branch or office as may be agreed to in writing by the Parties;

***Equivalent*** or ***equivalent to*** in relation to any Loaned Securities or Collateral (whether Cash Collateral or Non-Cash Collateral) provided under this Agreement means Securities or other property, of an identical type, nominal value, description and amount to particular Loaned Securities or Collateral (as the case may be) so provided. If and to the extent that such Loaned Securities or Collateral (as the case may be) consists of Securities that are partly paid or have been converted, subdivided, consolidated, made the subject of a takeover, rights of pre-emption, rights to receive securities or a certificate which may at a future date be exchanged for Securities, the expression shall include such Securities or other assets to which Lender or Borrower (as the case may be) is entitled following the occurrence of the relevant event, and, if appropriate, the giving of the relevant notice in accordance with paragraph 6.7 and provided that Lender or Borrower (as the case may be) has paid to the other Party all and any sums due in respect thereof. In the event that such Loaned Securities or Collateral (as the case may be) have been redeemed, are partly paid, are the subject of a capitalization issue or are subject to an event similar to any of the foregoing events described in this paragraph, the expression shall have the following meanings:

(a) in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(b) in the case of a call on partly-paid Securities, Securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, provided that Lender shall have paid Borrower, in respect of Loaned Securities, and Borrower shall have paid to Lender, in respect of Collateral, an amount of money equal to the sum due in respect of the call;

(c) in the case of a capitalization issue, Securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, together with the securities allotted by way of bonus thereon;

(d) in the case of any event similar to any of the foregoing events described in this paragraph, Securities equivalent to the Loaned Securities or the relevant Collateral, as the case may be, together with or replaced by a sum of money or Securities or other property equivalent to that received in respect of such Loaned Securities or Collateral, as the case may be, resulting from such event;

***Income*** means any interest, dividends or other distributions of any kind whatsoever with respect to any Securities or Collateral;

***Income Record Date***, with respect to any Securities or Collateral, means the date by reference to which holders of such Securities or Collateral are identified as being entitled to payment of Income;

***Letter of Credit*** means an irrevocable, non-negotiable letter of credit in a form, and from a bank, acceptable to Lender;

***Loaned Securities*** means Securities which are the subject of an outstanding Loan;

***Margin*** has the meaning specified in paragraph 1 of the Schedule with reference to the table set out therein;

***Market Value*** means:

(a) in relation to the valuation of Securities, Equivalent Securities, Collateral or Equivalent Collateral (other than Cash Collateral or a Letter of Credit):

(i) such price as is equal to the market quotation for the mid price of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral as derived from a reputable pricing information service reasonably chosen in good faith by Lender; or

(ii) if unavailable the market value thereof as derived from the mid price or rate bid by a reputable dealer for the relevant instrument reasonably chosen in good faith by Lender,

in each case at Close of Business on the previous Business Day, or as specified in the Schedule, unless agreed otherwise or, at the option of either Party where in its reasonable opinion there has been an exceptional movement in the price of the asset in question since such time, the latest available price, plus (in each case):

(iii) the aggregate amount of Income which has accrued but not yet been paid in respect of the Securities, Equivalent Securities, Collateral or Equivalent Collateral concerned to the extent not included in such price,

provided that the price of Securities, Equivalent Securities, Collateral or Equivalent Collateral that are suspended or that cannot legally be transferred or that are transferred or required to be transferred to a government, trustee or third party (whether by reason of nationalization, expropriation or otherwise) shall for all purposes be a commercially reasonable price agreed between the Parties, or absent agreement, be a price provided by a third party dealer agreed between the Parties, or if the Parties do not agree a third party dealer then a price based on quotations provided by the Reference Dealers. If more than three quotations are provided, the Market Value will be the arithmetic mean of the prices, without regard to the quotations having the highest and lowest prices. If three quotations are provided, the Market Value will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest or lowest price, then one of such quotations shall be disregarded. If fewer than three quotations are provided, the Market Value of the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral shall be determined by the Party making the determination of Market Value acting reasonably;

(b) in relation to a Letter of Credit the face or stated amount of such Letter of Credit; and

(c) in relation to Cash Collateral the amount of the currency concerned;

***Nominee*** means a nominee or agent appointed by either Party to accept delivery of, hold or deliver Securities, Equivalent Securities, Collateral and/or Equivalent Collateral or to receive or make payments on its behalf;

***Non-Cash Collateral*** means Collateral other than Cash Collateral;

***Non-Defaulting Party*** has the meaning given in paragraph 10;

***Notification Time*** means the time specified in paragraph 1.5 of the Schedule;

***Parties*** means Lender and Borrower and ***Party*** shall be construed accordingly;

***Posted Collateral*** has the meaning given in paragraph 5.4;

***Reference Dealers*** means, in relation to any Securities, Equivalent Securities, Collateral or Equivalent Collateral, four leading dealers in the relevant securities selected by the Party making the determination of Market Value in good faith;

***Required Collateral Value*** has the meaning given in paragraph 5.4;

***Sales Tax*** means value added tax and any other Tax of a similar nature (including, without limitation, any sales tax of any relevant jurisdiction);

***Settlement Date*** means the date upon which Securities are due to be transferred to Borrower in accordance with this Agreement;

***Stamp Tax*** means any stamp, transfer, registration, documentation or similar Tax; and

***Tax*** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) imposed by any government or other taxing authority in respect of any transaction effected pursuant to or contemplated by, or any payment under or in respect of, this Agreement.

2.2 **Headings**

All headings appear for convenience only and shall not affect the interpretation of this Agreement.

2.3 **Market terminology**

Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to deliver Equivalent Securities or Equivalent Collateral as the case may be.

2.4 **Currency conversions**

Subject to paragraph 11, for the purposes of determining any prices, sums or values (including Market Value and Required Collateral Value) prices, sums or values stated in currencies other than the Base Currency shall be converted into the Base Currency at the latest available spot rate of exchange quoted by a bank selected by Lender (or if an Event of Default has occurred in relation to Lender, by Borrower) in the London inter-bank market for the purchase of the Base Currency with the currency concerned on the day on which the calculation is to be made or, if that day is not a Business Day, the spot rate of exchange quoted at Close of Business on the immediately preceding Business Day on which such a quotation was available.

2.5 The Parties confirm that introduction of and/or substitution (in place of an existing currency) of a new currency as the lawful currency of a country shall not have the effect of altering, or discharging, or excusing performance under, any term of the Agreement or any Loan thereunder, nor give a Party the right unilaterally to alter or terminate the Agreement or any Loan thereunder. Securities will for the purposes of this Agreement be regarded as equivalent to other securities notwithstanding that as a result of such introduction and/or substitution those securities have been redenominated into the new currency or the nominal value of the securities has changed in connection with such redenomination.

2.6 **Modifications etc. to legislation**

Any reference in this Agreement to an act, regulation or other legislation shall include a reference to any statutory modification or re-enactment thereof for the time being in force.

## 3. LOANS OF SECURITIES

Lender will lend Securities to Borrower, and Borrower will borrow Securities from Lender in accordance with the terms and conditions of this Agreement. The terms of each Loan shall be agreed prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties. Unless otherwise agreed, any confirmation produced by a Party shall not supersede or prevail over the prior oral, written or electronic communication (as the case may be).

## 4. DELIVERY

### 4.1 Delivery of Securities on commencement of Loan

Lender shall procure the Delivery of Securities to Borrower or deliver such Securities in accordance with this Agreement and the terms of the relevant Loan.

### 4.2 Requirements to effect Delivery

The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(a) any Securities borrowed pursuant to paragraph 3;

(b) any Equivalent Securities delivered pursuant to paragraph 8;

(c) any Collateral delivered pursuant to paragraph 5;

(d) any Equivalent Collateral delivered pursuant to paragraphs 5 or 8;

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, on delivery of the same in accordance with this Agreement with full title guarantee, free from all liens, charges and encumbrances. In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a computer-based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or deliver any of the assets so acquired but, in so far as any Securities are borrowed by or any Collateral is delivered to such Party, such Party shall be obliged, subject to the terms of this Agreement, to deliver Equivalent Securities or Equivalent Collateral as appropriate.

### 4.3 Deliveries to be simultaneous unless otherwise agreed

Where under the terms of this Agreement a Party is not obliged to make a Delivery unless simultaneously a Delivery is made to it, subject to and without prejudice to its rights under paragraph 8.6, such Party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities, Collateral and cash transfers, waive its right under this Agreement in respect of simultaneous delivery and/or payment provided that no such waiver (whether by course of conduct or otherwise) in respect of one transaction shall bind it in respect of any other transaction.

4.4 **Deliveries of Income**

In respect of Income being paid in relation to any Loaned Securities or Collateral, Borrower (in the case of Income being paid in respect of Loaned Securities) and Lender (in the case of Income being paid in respect of Collateral) shall provide to the other Party, as the case may be, any endorsements or assignments as shall be customary and appropriate to effect, in accordance with paragraph 6, the payment or delivery of money or property in respect of such Income to Lender, irrespective of whether Borrower received such endorsements or assignments in respect of any Loaned Securities, or to Borrower, irrespective of whether Lender received such endorsements or assignments in respect of any Collateral.

**5. COLLATERAL**

5.1 **Delivery of Collateral on commencement of Loan**

Subject to the other provisions of this paragraph 5, Borrower undertakes to deliver to or deposit with Lender (or in accordance with Lender's instructions) Collateral simultaneously with Delivery of the Securities to which the Loan relates and in any event no later than Close of Business on the Settlement Date.

5.2 **Deliveries through securities settlement systems generating automatic payments**

Unless otherwise agreed between the Parties, where any Securities, Equivalent Securities, Collateral or Equivalent Collateral (in the form of securities) are transferred through a book entry transfer or settlement system which automatically generates a payment or delivery, or obligation to pay or deliver, against the transfer of such securities, then:

(a) such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the extent that it is applied to discharge an obligation of the transferee to effect payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a transfer of Collateral or delivery of Equivalent Collateral, as the case may be, made by the transferee until such time as the Collateral or Equivalent Collateral is substituted with other Collateral or Equivalent Collateral if an obligation to deliver other Collateral or deliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral; and

(b) the Party receiving such substituted Collateral or Equivalent Collateral, or if no obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral, the Party receiving the deemed transfer of Collateral or Delivery of Equivalent Collateral, as the case may be, shall cause to be made to the other Party for value the same day either, where such transfer is a payment, an irrevocable payment in the amount of such transfer or, where such transfer is a Delivery, an irrevocable Delivery of securities (or other property, as the case may be) equivalent to such property.

5.3 **Substitutions of Collateral**

Borrower may from time to time call for the repayment of Cash Collateral or the Delivery of Collateral equivalent to any Collateral delivered to Lender prior to the date on which the same would otherwise have been repayable or deliverable provided that at or prior to the time of such repayment or Delivery Borrower shall have delivered Alternative Collateral acceptable to Lender and Borrower is in compliance with paragraph 5.4 or paragraph 5.5, as applicable.

5.4 **Marking to Market of Collateral during the currency of a Loan on aggregated basis**

Unless paragraph 1.3 of the Schedule indicates that paragraph 5.5 shall apply in lieu of this paragraph 5.4, or unless otherwise agreed between the Parties:

(a) the aggregate Market Value of the Collateral delivered to or deposited with Lender (excluding any Equivalent Collateral repaid or delivered under paragraphs 5.4(b) or 5.5(b) (as the case may be)) (***Posted Collateral***) in respect of all Loans outstanding under this Agreement shall equal the aggregate of the Market Value of Securities equivalent to the Loaned Securities and the applicable Margin (the ***Required Collateral Value***) in respect of such Loans;

(b) if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement together with: (i) all amounts due and payable by the Lender under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral exceeds the aggregate of the Required Collateral Values in respect of such Loans together with: (i) all amounts due and payable by the Borrower under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any securities equivalent to Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Lender shall (on demand) repay and/or deliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess;

(c) if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement together with: (i) all amounts due and payable by the Lender under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral falls below the aggregate of Required Collateral Values in respect of all such Loans together with: (i) all amounts due and payable by the Borrower under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency;

(d) where a Party acts as both Lender and Borrower under this Agreement, the provisions of paragraphs 5.4(b) and 5.4(c) shall apply separately (and without duplication) in respect of Loans entered into by that Party as Lender and Loans entered into by that Party as Borrower.

5.5 **Marking to Market of Collateral during the currency of a Loan on a Loan by Loan basis**

If paragraph 1.3 of the Schedule indicates this paragraph 5.5 shall apply in lieu of paragraph 5.4, the Posted Collateral in respect of any Loan shall bear from day to day and at any time the same proportion to the Market Value of Securities equivalent to the Loaned Securities as the Posted Collateral bore at the commencement of such Loan. Accordingly:

(a) the Market Value of the Posted Collateral to be delivered or deposited while the Loan continues shall be equal to the Required Collateral Value;

(b) if at any time on any Business Day the Market Value of the Posted Collateral in respect of any Loan together with: (i) all amounts due and payable by the Lender in respect of that Loan but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral exceeds the Required Collateral Value in respect of such Loan together with: (i) all amounts due and payable by the Borrower in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Lender shall (on demand) repay and/or deliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess; and

(c) if at any time on any Business Day the Market Value of the Posted Collateral together with: (i) all amounts due and payable by the Lender in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral falls below the Required Collateral Value together with: (i) all amounts due and payable by the Borrower in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.6 **Requirements to deliver excess Collateral**

Where paragraph 5.4 applies, unless paragraph 1.4 of the Schedule indicates that this paragraph 5.6 does not apply, if a Party (the ***first Party***) would, but for this paragraph 5.6, be required under paragraph 5.4 to provide further Collateral or deliver Equivalent Collateral in circumstances where the other Party (the ***second Party***) would, but for this paragraph 5.6, also be required to or provide Collateral or deliver Equivalent Collateral under paragraph 5.4, then the Market Value of the Collateral or Equivalent Collateral deliverable by the first Party (***X***) shall be set off against the Market Value of the Collateral or Equivalent Collateral deliverable by the second

Party (*Y*) and the only obligation of the Parties under paragraph 5.4 shall be, where X exceeds Y, an obligation of the first Party, or where Y exceeds X, an obligation of the second Party to repay and/or (as the case may be) deliver Equivalent Collateral or to deliver further Collateral having a Market Value equal to the difference between X and Y.

5.7 Where Equivalent Collateral is repaid or delivered (as the case may be) or further Collateral is provided by a Party under paragraph 5.6, the Parties shall agree to which Loan or Loans such repayment, delivery or further provision is to be attributed and failing agreement it shall be attributed, as determined by the Party making such repayment, delivery or further provision to the earliest outstanding Loan and, in the case of a repayment or delivery up to the point at which the Market Value of Collateral in respect of such Loan equals the Required Collateral Value in respect of such Loan, and then to the next earliest outstanding Loan up to the similar point and so on.

5.8 **Timing of repayments of excess Collateral or deliveries of further Collateral**

Where any Equivalent Collateral falls to be repaid or delivered (as the case may be) or further Collateral is to be provided under this paragraph 5, unless otherwise provided or agreed between the Parties, if the relevant demand is received by the Notification Time specified in paragraph 1.5 of the Schedule, then the delivery shall be made not later than the Close of Business on the same Business Day; if a demand is received after the Notification Time, then the relevant delivery shall be made not later than the Close of Business on the next Business Day after the date such demand is received.

5.9 **Substitutions and extensions of Letters of Credit**

Where Collateral is a Letter of Credit, Lender may by notice to Borrower require that Borrower, on the third Business Day following the date of delivery of such notice (or by such other time as the Parties may agree), substitute Collateral consisting of cash or other Collateral acceptable to Lender for the Letter of Credit. Prior to the expiration of any Letter of Credit supporting Borrower's obligations hereunder, Borrower shall, no later than 10.30 a.m. UK time on the second Business Day prior to the date such Letter of Credit expires (or by such other time as the Parties may agree), obtain an extension of the expiration of such Letter of Credit or replace such Letter of Credit by providing Lender with a substitute Letter of Credit in an amount at least equal to the amount of the Letter of Credit for which it is substituted.

## 6. DISTRIBUTIONS AND CORPORATE ACTIONS

6.1 In this paragraph 6, references to an amount of Income ***received*** by any Party in respect of any Loaned Securities or Non-Cash Collateral shall be to an amount received from the issuer after any applicable withholding or deduction for or on account of Tax.

6.2 **Manufactured payments in respect of Loaned Securities**

Where the term of a Loan extends over an Income Record Date in respect of any Loaned Securities, Borrower shall, on the date such Income is paid by the issuer, or on such other date as the Parties may from time to time agree, pay or deliver to Lender such sum of money or property as is agreed between the Parties or, failing

such agreement, a sum of money or property equivalent to (and in the same currency as) the type and amount of such Income that would be received by Lender in respect of such Loaned Securities assuming such Securities were not loaned to Borrower and were retained by Lender on the Income Record Date.

6.3 **Manufactured payments in respect of Non-Cash Collateral**

Where Non-Cash Collateral is delivered by Borrower to Lender and an Income Record Date in respect of such Non-Cash Collateral occurs before Equivalent Collateral is delivered by Lender to Borrower, Lender shall on the date such Income is paid, or on such other date as the Parties may from time to time agree, pay or deliver to Borrower a sum of money or property as is agreed between the Parties or, failing such agreement, a sum of money or property equivalent to (and in the same currency as) the type and amount of such Income that would be received by Lender in respect of such Non-Cash Collateral assuming Lender:

(a) retained the Non-Cash Collateral on the Income Record Date; and

(b) is not entitled to any credit, benefit or other relief in respect of Tax under any Applicable Law.

6.4 **Indemnity for failure to redeliver Equivalent Non-Cash Collateral**

Unless paragraph 1.6 of the Schedule indicates that this paragraph does not apply, where:

(a) prior to any Income Record Date in relation to Non-Cash Collateral, Borrower has in accordance with paragraph 5.3 called for the Delivery of Equivalent Non-Cash Collateral;

(b) Borrower has given notice of such call to Lender so as to be effective, at the latest, five hours before the Close of Business on the last Business Day on which Lender would customarily be required to initiate settlement of the Non-Cash Collateral to enable settlement to take place on the Business Day immediately preceding the relevant Income Record Date;

(c) Borrower has provided reasonable details to Lender of the Non-Cash Collateral, the relevant Income Record Date and the proposed Alternative Collateral;

(d) Lender, acting reasonably, has determined that such Alternative Collateral is acceptable to it and Borrower shall have delivered or delivers such Alternative Collateral to Lender; and

(e) Lender has failed to make reasonable efforts to transfer Equivalent Non-Cash Collateral to Borrower prior to such Income Record Date,

Lender shall indemnify Borrower in respect of any cost, loss or damage (excluding any indirect or consequential loss or damage or any amount otherwise compensated by Lender, including pursuant to paragraphs 6.3 and/or 9.3) suffered by Borrower that it would not have suffered had the relevant Equivalent Non-Cash Collateral been transferred to Borrower prior to such Income Record Date.

6.5 **Income in the form of Securities**

Where Income, in the form of securities, is paid in relation to any Loaned Securities or Collateral, such securities shall be added to such Loaned Securities or Collateral (and shall constitute Loaned Securities or Collateral, as the case may be, and be part of the relevant Loan) and will not be delivered to Lender, in the case of Loaned Securities, or to Borrower, in the case of Collateral, until the end of the relevant Loan, provided that the Lender or Borrower (as the case may be) fulfils its obligations under paragraph 5.4 or 5.5 (as applicable) with respect to the additional Loaned Securities or Collateral, as the case may be.

6.6 **Exercise of voting rights**

Where any voting rights fall to be exercised in relation to any Loaned Securities or Collateral, neither Borrower, in the case of Equivalent Securities, nor Lender, in the case of Equivalent Collateral, shall have any obligation to arrange for voting rights of that kind to be exercised in accordance with the instructions of the other Party in relation to the Securities borrowed by it or transferred to it by way of Collateral, as the case may be, unless otherwise agreed between the Parties.

6.7 **Corporate actions**

Where, in respect of any Loaned Securities or any Collateral, any rights relating to conversion, sub-division, consolidation, pre-emption, rights arising under a takeover offer, rights to receive securities or a certificate which may at a future date be exchanged for securities or other rights, including those requiring election by the holder for the time being of such Securities or Collateral, become exercisable prior to the delivery of Equivalent Securities or Equivalent Collateral, then Lender or Borrower, as the case may be, may, within a reasonable time before the latest time for the exercise of the right or option give written notice to the other Party that on delivery of Equivalent Securities or Equivalent Collateral, as the case may be, it wishes to receive Equivalent Securities or Equivalent Collateral in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice.

**7. RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL**

7.1 **Rates in respect of Loaned Securities**

In respect of each Loan, Borrower shall pay to Lender, in the manner prescribed in sub-paragraph 7.3, sums calculated by applying such rate as shall be agreed between the Parties from time to time to the daily Market Value of the Loaned Securities.

7.2 **Rates in respect of Cash Collateral**

Where Cash Collateral is deposited with Lender in respect of any Loan, Lender shall pay to Borrower, in the manner prescribed in paragraph 7.3, sums calculated by applying such rates as shall be agreed between the Parties from time to time to the amount of such Cash Collateral. Any such payment due to Borrower may be set-off against any payment due to Lender pursuant to paragraph 7.1.

7.3 **Payment of rates**

In respect of each Loan, the payments referred to in paragraph 7.1 and 7.2 shall accrue daily in respect of the period commencing on and inclusive of the Settlement Date and terminating on and exclusive of the Business Day upon which Equivalent Securities are delivered or Cash Collateral is repaid. Unless otherwise agreed, the sums so accruing in respect of each calendar month shall be paid in arrears by the relevant Party not later than the Business Day which is the tenth Business Day after the last Business Day of the calendar month to which such payments relate or such other date as the Parties shall from time to time agree.

## 8. DELIVERY OF EQUIVALENT SECURITIES

### 8.1 Lender's right to terminate a Loan

Subject to paragraph 11 and the terms of the relevant Loan, Lender shall be entitled to terminate a Loan and to call for the delivery of all or any Equivalent Securities at any time by giving notice on any Business Day of not less than the standard settlement time for such Equivalent Securities on the exchange or in the clearing organization through which the Loaned Securities were originally delivered. Borrower shall deliver such Equivalent Securities not later than the expiry of such notice in accordance with Lender's instructions.

### 8.2 Borrower's right to terminate a Loan

Subject to the terms of the relevant Loan, Borrower shall be entitled at any time to terminate a Loan and to deliver all and any Equivalent Securities due and outstanding to Lender in accordance with Lender's instructions and Lender shall accept such delivery.

### 8.3 Delivery of Equivalent Securities on termination of a Loan

Borrower shall procure the Delivery of Equivalent Securities to Lender or deliver Equivalent Securities in accordance with this Agreement and the terms of the relevant Loan on termination of the Loan. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (howsoever expressed) to an obligation to deliver or account for or act in relation to Loaned Securities shall accordingly be construed as a reference to an obligation to deliver or account for or act in relation to Equivalent Securities.

### 8.4 Delivery of Equivalent Collateral on termination of a Loan

On the date and time that Equivalent Securities are required to be delivered by Borrower on the termination of a Loan, Lender shall simultaneously (subject to paragraph 5.4 if applicable) repay to Borrower any Cash Collateral or, as the case may be, deliver Collateral equivalent to the Collateral provided by Borrower pursuant to paragraph 5 in respect of such Loan. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (however expressed) to an obligation to deliver or account for or act in relation to Collateral shall accordingly be construed as a reference to an obligation to deliver or account for or act in relation to Equivalent Collateral.

### 8.5 Delivery of Letters of Credit

Where a Letter of Credit is provided by way of Collateral, the obligation to deliver Equivalent Collateral is satisfied by Lender delivering for cancellation the Letter of Credit so provided, or where the Letter of Credit is provided in respect of more than one Loan, by Lender consenting to a reduction in the value of the Letter of Credit.

**8.6 Delivery obligations to be reciprocal**

Neither Party shall be obliged to make delivery (or make a payment as the case may be) to the other unless it is satisfied that the other Party will make such delivery (or make an appropriate payment as the case may be) to it. If it is not so satisfied (whether because an Event of Default has occurred in respect of the other Party or otherwise) it shall notify the other Party and unless that other Party has made arrangements which are sufficient to assure full delivery (or the appropriate payment as the case may be) to the notifying Party, the notifying Party shall (provided it is itself in a position, and willing, to perform its own obligations) be entitled to withhold delivery (or payment, as the case may be) to the other Party until such arrangements to assure full delivery (or the appropriate payment as the case may be) are made.

## 9. FAILURE TO DELIVER

**9.1 Borrower's failure to deliver Equivalent Securities**

If Borrower fails to deliver Equivalent Securities in accordance with paragraph 8.3 Lender may:

(a) elect to continue the Loan (which, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable); or

(b) at any time while such failure continues, by written notice to Borrower declare that that Loan (but only that Loan) shall be terminated immediately in accordance with paragraph 11.2 as if (i) an Event of Default had occurred in relation to the Borrower, (ii) references to the Termination Date were to the date on which notice was given under this sub-paragraph, and (iii) the Loan were the only Loan outstanding. For the avoidance of doubt, any such failure shall not constitute an Event of Default (including under paragraph 10.1(i)) unless the Parties otherwise agree.

**9.2 Lender's failure to deliver Equivalent Collateral**

If Lender fails to deliver Equivalent Collateral comprising Non-Cash Collateral in accordance with paragraph 8.4 or 8.5, Borrower may:

(a) elect to continue the Loan (which, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable); or

(b) at any time while such failure continues, by written notice to Lender declare that that Loan (but only that Loan) shall be terminated immediately in accordance with paragraph 11.2 as if (i) an Event of Default had occurred in relation to the Lender, (ii) references to the Termination Date were to the date on which notice was given under this sub-paragraph, and (iii) the Loan were the only Loan outstanding. For the avoidance of doubt, any such failure shall

not constitute an Event of Default (including under paragraph 10.1(i)) unless the Parties otherwise agree.

9.3 **Failure by either Party to deliver**

Where a Party (the ***Transferor***) fails to deliver Equivalent Securities or Equivalent Collateral by the time required under this Agreement or within such other period as may be agreed between the Transferor and the other Party (the ***Transferee***) and the Transferee:

(a) incurs interest, overdraft or similar costs and expenses; or

(b) incurs costs and expenses as a direct result of a Buy-in exercised against it by a third party,

then the Transferor agrees to pay within one Business Day of a demand from the Transferee and hold harmless the Transferee with respect to all reasonable costs and expenses listed in sub-paragraphs (a) and (b) above properly incurred which arise directly from such failure other than (i) such costs and expenses which arise from the negligence or willful default of the Transferee and (ii) any indirect or consequential losses.

## 10. EVENTS OF DEFAULT

10.1 Each of the following events occurring and continuing in relation to either Party (the ***Defaulting Party***, the other Party being the ***Non-Defaulting Party***) shall be an Event of Default but only (subject to sub-paragraph 10.1(d)) where the Non-Defaulting Party serves written notice on the Defaulting Party:

(a) Borrower or Lender failing to pay or repay Cash Collateral or to deliver Collateral on commencement of the Loan under paragraph 5.1 or to deliver further Collateral under paragraph 5.4 or 5.5;

(b) Lender or Borrower failing to comply with its obligations under paragraph 6.2 or 6.3 upon the due date and not remedying such failure within three Business Days after the Non-Defaulting Party serves written notice requiring it to remedy such failure;

(c) Lender or Borrower failing to pay any sum due under paragraph 9.1(b), 9.2(b) or 9.3 upon the due date;

(d) an Act of Insolvency occurring with respect to Lender or Borrower, provided that, where the Parties have specified in paragraph 5 of the Schedule that Automatic Early Termination shall apply, an Act of Insolvency which is the presentation of a petition for winding up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party shall not require the Non-Defaulting Party to serve written notice on the Defaulting Party (***Automatic Early Termination***);

(e) any warranty made by Lender or Borrower in paragraph 13 or paragraphs 14(a) to 14(d) being incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated;

(f) Lender or Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations under this Agreement and/or in respect of any Loan where such failure to perform would with the service of notice or lapse of time constitute an Event of Default;

(g) all or any material part of the assets of Lender or Borrower being transferred or ordered to be transferred to a trustee (or a person exercising similar functions) by a regulatory authority pursuant to any legislation;

(h) Lender (if applicable) or Borrower being declared in default or being suspended or expelled from membership of or participation in, any securities exchange or suspended or prohibited from dealing in securities by any regulatory authority, in each case on the grounds that it has failed to meet any requirements relating to financial resources or credit rating; or

(i) Lender or Borrower failing to perform any other of its obligations under this Agreement and not remedying such failure within 30 days after the Non-Defaulting Party serves written notice requiring it to remedy such failure.

10.2 Each Party shall notify the other (in writing) if an Event of Default or an event which, with the passage of time and/or upon the serving of a written notice as referred to above, would be an Event of Default, occurs in relation to it.

10.3 The provisions of this Agreement constitute a complete statement of the remedies available to each Party in respect of any Event of Default.

10.4 Subject to paragraphs 9 and 11, neither Party may claim any sum by way of consequential loss or damage in the event of failure by the other Party to perform any of its obligations under this Agreement.

## 11. CONSEQUENCES OF AN EVENT OF DEFAULT

11.1 If an Event of Default occurs in relation to either Party then paragraphs 11.2 to 11.7 below shall apply.

11.2 The Parties' delivery and payment obligations (and any other obligations they have under this Agreement) shall be accelerated so as to require performance thereof at the time such Event of Default occurs (the date of which shall be the ***Termination Date***) so that performance of such delivery and payment obligations shall be effected only in accordance with the following provisions.

(a) The Default Market Value of the Equivalent Securities and Equivalent Non-Cash Collateral to be delivered and the amount of any Cash Collateral (including sums accrued) to be repaid and any other cash (including interest accrued) to be paid by each Party shall be established by the Non-Defaulting Party in accordance with paragraph 11.4 and deemed as at the Termination Date.

(b) On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each Party to the other under this Agreement (on the basis that each Party's claim against the other in respect of delivery of Equivalent Securities or Equivalent Non-Cash Collateral equal to

the Default Market Value thereof) and the sums due from one Party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the Party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be payable on the next following Business Day after such account has been taken and such sums have been set off in accordance with this paragraph. For the purposes of this calculation, any sum not denominated in the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at such dates and times determined by the Non-Defaulting Party acting reasonably.

(c) If the balance under sub-paragraph (b) above is payable by the Non-Defaulting Party and the Non-Defaulting Party had delivered to the Defaulting Party a Letter of Credit, the Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently deliver for cancellation the Letter of Credit so provided.

(d) If the balance under sub-paragraph (b) above is payable by the Defaulting Party and the Defaulting Party had delivered to the Non-Defaulting Party a Letter of Credit, the Non-Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently deliver for cancellation the Letter of Credit so provided.

(e) In all other circumstances, where a Letter of Credit has been provided to a Party, such Party shall deliver for cancellation the Letter of Credit so provided.

11.3 For the purposes of this Agreement, the ***Default Market Value*** of any Equivalent Collateral in the form of a Letter of Credit shall be zero and of any Equivalent Securities or any other Equivalent Non-Cash Collateral shall be determined in accordance with paragraphs 11.4 to 11.6 below, and for this purpose:

(a) the ***Appropriate Market*** means, in relation to securities of any description, the market which is the most appropriate market for securities of that description, as determined by the Non-Defaulting Party;

(b) the ***Default Valuation Time*** means, in relation to an Event of Default, the close of business in the Appropriate Market on the fifth dealing day after the day on which that Event of Default occurs or, where that Event of Default is the occurrence of an Act of Insolvency in respect of which under paragraph 10.1(d) no notice is required from the Non-Defaulting Party in order for such event to constitute an Event of Default, the close of business on the fifth dealing day after the day on which the Non-Defaulting Party first became aware of the occurrence of such Event of Default;

(c) ***Deliverable Securities*** means Equivalent Securities or Equivalent Non-Cash Collateral to be delivered by the Defaulting Party;

(d) ***Net Value*** means at any time, in relation to any Deliverable Securities or Receivable Securities, the amount which, in the reasonable opinion of the Non-Defaulting Party, represents their fair market value, having regard to such pricing sources and methods (which may include, without limitation, available prices for securities with similar maturities, terms and credit characteristics as the relevant Equivalent Securities or Equivalent Collateral)

plus, in the case of Deliverable Securities, all Transaction Costs incurred or reasonably anticipated in connection with the purchase or sale of such securities;

(e) ***Receivable Securities*** means Equivalent Securities or Equivalent Non-Cash Collateral to be delivered to the Defaulting Party; and

(f) ***Transaction Costs*** in relation to any transaction contemplated in paragraph 11.4 or 11.5 means the reasonable costs, commissions (including internal commissions), fees and expenses (including any mark-up or mark-down or premium paid for guaranteed delivery) incurred or reasonably anticipated in connection with the purchase of Deliverable Securities or sale of Receivable Securities, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction.

11.4 If between the Termination Date and the Default Valuation Time:

(a) the Non-Defaulting Party has sold, in the case of Receivable Securities, or purchased, in the case of Deliverable Securities, securities which form part of the same issue and are of an identical type and description as those Equivalent Securities or that Equivalent Collateral, (and regardless as to whether or not such sales or purchases have settled) the Non-Defaulting Party may elect to treat as the Default Market Value:

(i) in the case of Receivable Securities, the net proceeds of such sale after deducting all Transaction Costs; provided that, where the securities sold are not identical in amount to the Equivalent Securities or Equivalent Collateral, the Non-Defaulting Party may, acting in good faith, either (A) elect to treat such net proceeds of sale divided by the amount of securities sold and multiplied by the amount of the Equivalent Securities or Equivalent Collateral as the Default Market Value or (B) elect to treat such net proceeds of sale of the Equivalent Securities or Equivalent Collateral actually sold as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Collateral, and, in the case of (B), the Default Market Value of the balance of the Equivalent Securities or Equivalent Collateral shall be determined separately in accordance with the provisions of this paragraph 11.4; or

(ii) in the case of Deliverable Securities, the aggregate cost of such purchase, including all Transaction Costs; provided that, where the securities purchased are not identical in amount to the Equivalent Securities or Equivalent Collateral, the Non-Defaulting Party may, acting in good faith, either (A) elect to treat such aggregate cost divided by the amount of securities purchased and multiplied by the amount of the Equivalent Securities or Equivalent Collateral as the Default Market Value or (B) elect to treat the aggregate cost of purchasing the Equivalent Securities or Equivalent Collateral actually purchased as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Collateral, and, in the case of (B), the Default Market Value of the balance of the Equivalent Securities

or Equivalent Collateral shall be determined separately in accordance with the provisions of this paragraph 11.4;

(b) the Non-Defaulting Party has received, in the case of Deliverable Securities, offer quotations or, in the case of Receivable Securities, bid quotations in respect of securities of the relevant description from two or more market makers or regular dealers in the Appropriate Market in a commercially reasonable size (as determined by the Non-Defaulting Party) the Non-Defaulting Party may elect to treat as the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral:

(i) the price quoted (or where more than one price is so quoted, the arithmetic mean of the prices so quoted) by each of them for, in the case of Deliverable Securities, the sale by the relevant market marker or dealer of such securities or, in the case of Receivable Securities, the purchase by the relevant market maker or dealer of such securities, provided that such price or prices quoted may be adjusted in a commercially reasonable manner by the Non-Defaulting Party to reflect accrued but unpaid coupons not reflected in the price or prices quoted in respect of such Securities;

(ii) after deducting, in the case of Receivable Securities or adding in the case of Deliverable Securities the Transaction Costs which would be incurred or reasonably anticipated in connection with such transaction.

11.5 If, acting in good faith, either (A) the Non-Defaulting Party has endeavored but been unable to sell or purchase securities in accordance with paragraph 11.4(a) above or to obtain quotations in accordance with paragraph 11.4(b) above (or both) or (B) the Non-Defaulting Party has determined that it would not be commercially reasonable to sell or purchase securities at the prices bid or offered or to obtain such quotations, or that it would not be commercially reasonable to use any quotations which it has obtained under paragraph 11.4(b) above the Non-Defaulting Party may determine the Net Value of the relevant Equivalent Securities or Equivalent Collateral (which shall be specified) and the Non-Defaulting Party may elect to treat such Net Value as the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral.

11.6 To the extent that the Non-Defaulting Party has not determined the Default Market Value in accordance with paragraph 11.4, the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral shall be an amount equal to their Net Value at the Default Valuation Time; provided that, if at the Default Valuation Time the Non-Defaulting Party reasonably determines that, owing to circumstances affecting the market in the Equivalent Securities or Equivalent Collateral in question, it is not reasonably practicable for the Non-Defaulting Party to determine a Net Value of such Equivalent Securities or Equivalent Collateral which is commercially reasonable (by reason of lack of tradable prices or otherwise), the Default Market Value of such Equivalent Securities or Equivalent Collateral shall be an amount equal to their Net Value as determined by the Non-Defaulting Party as soon as reasonably practicable after the Default Valuation Time.

**Other costs, expenses and interest payable in consequence of an Event of Default**

11.7 The Defaulting Party shall be liable to the Non-Defaulting Party for the amount of all reasonable legal and other professional expenses incurred by the Non-Defaulting Party in connection with or as a consequence of an Event of Default, together with interest thereon at such rate as is agreed by the Parties and specified in paragraph 10 of the Schedule or, failing such agreement, the overnight London Inter Bank Offered Rate as quoted on a reputable financial information service (***LIBOR***) as at 11.00 a.m., London time, on the date on which it is to be determined or, in the case of an expense attributable to a particular transaction and, where the Parties have previously agreed a rate of interest for the transaction, that rate of interest if it is greater than LIBOR. Interest will accrue daily on a compound basis.

**Set-off**

11.8 Any amount payable to one Party (the ***Payee***) by the other Party (the ***Payer***) under paragraph 11.2(b) may, at the option of the Non-Defaulting Party, be reduced by its set-off against any amount payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement between the Payee and the Payer or instrument or undertaking issued or executed by one Party to, or in favour of, the other Party. If an obligation is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and set off in respect of the estimate, subject to accounting to the other Party when the obligation is ascertained. Nothing in this paragraph shall be effective to create a charge or other security interest. This paragraph shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

## 12. TAXES

**Withholding, gross-up and provision of information**

12.1 All payments under this Agreement shall be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any Applicable Law.

12.2 Except as otherwise agreed, if the paying Party is so required to deduct or withhold, then that Party (***Payer***) shall:

(a) promptly notify the other Party (***Recipient***) of such requirement;

(b) pay or otherwise account for the full amount required to be deducted or withheld to the relevant authority;

(c) upon written demand of Recipient, forward to Recipient documentation reasonably acceptable to Recipient, evidencing such payment to such authorities; and

(d) other than in respect of any payment made by Lender to Borrower under paragraph 6.3, pay to Recipient, in addition to the payment to which Recipient is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the amount actually received by Recipient (after

taking account of such withholding or deduction) will equal the amount Recipient would have received had no such deduction or withholding been required; provided Payer will not be required to pay any additional amount to Recipient under this sub-paragraph (d) to the extent it would not be required to be paid but for the failure by Recipient to comply with or perform any obligation under paragraph 12.3.

12.3 Each Party agrees that it will upon written demand of the other Party deliver to such other Party (or to any government or other taxing authority as such other Party directs), any form or document and provide such other cooperation or assistance as may (in either case) reasonably be required in order to allow such other Party to make a payment under this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document, or the provision of such cooperation or assistance, would not materially prejudice the legal or commercial position of the Party in receipt of such demand). Any such form or document shall be accurate and completed in a manner reasonably satisfactory to such other Party and shall be executed and delivered with any reasonably required certification by such date as is agreed between the Parties or, failing such agreement, as soon as reasonably practicable.

**Stamp Tax**

12.4 Unless otherwise agreed, Borrower hereby undertakes promptly to pay and account for any Stamp Tax chargeable in connection with any transaction effected pursuant to or contemplated by this Agreement (other than any Stamp Tax that would not be chargeable but for Lender's failure to comply with its obligations under this Agreement).

12.5 Borrower shall indemnify and keep indemnified Lender against any liability arising as a result of Borrower's failure to comply with its obligations under paragraph 12.4.

**Sales Tax**

12.6 All sums payable by one Party to another under this Agreement are exclusive of any Sales Tax chargeable on any supply to which such sums relate and an amount equal to such Sales Tax shall in each case be paid by the Party making such payment on receipt of an appropriate Sales Tax invoice.

**Retrospective changes in law**

12.7 Unless otherwise agreed, amounts payable by one Party to another under this Agreement shall be determined by reference to Applicable Law as at the date of the relevant payment and no adjustment shall be made to amounts paid under this Agreement as a result of:

(a) any retrospective change in Applicable Law which is announced or enacted after the date of the relevant payment; or

(b) any decision of a court of competent jurisdiction which is made after the date of the relevant payment (other than where such decision results from an action taken with respect to this Agreement or amounts paid or payable under this Agreement).

## 13. LENDER'S WARRANTIES

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Lender:

(a) it is duly authorized and empowered to perform its duties and obligations under this Agreement;

(b) it is not restricted under the terms of its constitution or in any other manner from lending Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c) it is absolutely entitled to pass full legal and beneficial ownership of all Securities provided by it hereunder to Borrower free from all liens, charges and encumbrances; and

(d) it is acting as principal in respect of this Agreement, other than in respect of an Agency Loan.

## 14. BORROWER'S WARRANTIES

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Borrower:

(a) it has all necessary licenses and approvals, and is duly authorized and empowered, to perform its duties and obligations under this Agreement and will do nothing prejudicial to the continuation of such authorization, licenses or approvals;

(b) it is not restricted under the terms of its constitution or in any other manner from borrowing Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c) it is absolutely entitled to pass full legal and beneficial ownership of all Collateral provided by it hereunder to Lender free from all liens, charges and encumbrances;

(d) it is acting as principal in respect of this Agreement; and

(e) it is not entering into a Loan for the primary purpose of obtaining or exercising voting rights in respect of the Loaned Securities.

## 15. INTEREST ON OUTSTANDING PAYMENTS

In the event of either Party failing to remit sums in accordance with this Agreement such Party hereby undertakes to pay to the other Party upon demand interest (before as well as after judgment) on the net balance due and outstanding, for the period commencing on and inclusive of the original due date for payment to (but excluding) the date of actual payment, in the same currency as the principal sum and at the rate referred to in paragraph 11.7. Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed. No interest shall be

payable under this paragraph in respect of any day on which one Party endeavors to make a payment to the other Party but the other Party is unable to receive it.

## 16. TERMINATION OF THIS AGREEMENT

Each Party shall have the right to terminate this Agreement by giving not less than 15 Business Days' notice in writing to the other Party (which notice shall specify the date of termination) subject to an obligation to ensure that all Loans which have been entered into but not discharged at the time such notice is given are duly discharged in accordance with this Agreement.

## 17. SINGLE AGREEMENT

Each Party acknowledges that, and has entered into this Agreement and will enter into each Loan in consideration of and in reliance upon the fact that, all Loans constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each Party agrees:

(a) to perform all of its obligations in respect of each Loan, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Loans, subject always to the other provisions of the Agreement; and

(b) that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan.

## 18. SEVERANCE

If any provision of this Agreement is declared by any judicial or other competent authority to be void or otherwise unenforceable, that provision shall be severed from the Agreement and the remaining provisions of this Agreement shall remain in full force and effect. The Agreement shall, however, thereafter be amended by the Parties in such reasonable manner so as to achieve as far as possible, without illegality, the intention of the Parties with respect to that severed provision.

## 19. SPECIFIC PERFORMANCE

Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver Securities, Equivalent Securities, Collateral or Equivalent Collateral but without prejudice to any other rights it may have.

## 20. NOTICES

20.1 Any notice or other communication in respect of this Agreement may be given in any manner set forth below to the address or number or in accordance with the electronic messaging system details set out in paragraph 5 of the Schedule and will be deemed effective as indicated:

(a) if in writing and delivered in person or by courier, on the date it is delivered;

(b) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(c) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(d) if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or the receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the Close of Business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

20.2 Either Party may by notice to the other change the address or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 21. ASSIGNMENT

21.1 Subject to paragraph 21.2, neither Party may charge, assign or otherwise deal with all or any of its rights or obligations hereunder without the prior consent of the other Party.

21.2 Paragraph 21.1 shall not preclude a party from charging, assigning or otherwise dealing with all or any part of its interest in any sum payable to it under paragraph 11.2(b) or 11.7.

## 22. NON-WAIVER

No failure or delay by either Party (whether by course of conduct or otherwise) to exercise any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege as herein provided.

## 23. GOVERNING LAW AND JURISDICTION

23.1 This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed by, and shall be construed in accordance with, English law.

23.2 The courts of England have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes or any non-contractual obligation which may arise out of or in connection with this Agreement (respectively, ***Proceedings*** and ***Disputes***) and, for these purposes, each Party irrevocably submits to the jurisdiction of the courts of England.

23.3 Each Party irrevocably waives any objection which it might at any time have to the courts of England being nominated as the forum to hear and decide any Proceedings and to settle any Disputes and agrees not to claim that the courts of England are not a convenient or appropriate forum.

23.4 Each Party hereby respectively appoints the person identified in paragraph 7 of the Schedule pertaining to the relevant Party as its agent to receive on its behalf service of process in the courts of England. If such an agent ceases to be an agent of a Party, the relevant Party shall promptly appoint, and notify the other Party of the identity of its new agent in England.

## 24. TIME

Time shall be of the essence of the Agreement.

## 25. RECORDING

The Parties agree that each may record all telephone conversations between them.

## 26. WAIVER OF IMMUNITY

Each Party hereby waives all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any action or proceeding in the courts of England or of any other country or jurisdiction relating in any way to this Agreement and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

## 27. MISCELLANEOUS

27.1 This Agreement constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

27.2 The Party (the ***Relevant Party***) who has prepared the text of this Agreement for execution (as indicated in paragraph 9 of the Schedule) warrants and undertakes to the other Party that such text conforms exactly to the text of the standard form Global Master Securities Lending Agreement (2009 version) posted by the International Securities Lending Association on its website except as notified by the Relevant Party to the other Party in writing prior to the execution of this Agreement.

27.3 Unless otherwise provided for in this Agreement, no amendment in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the Parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

27.4 The Parties agree that where paragraph 11 of the Schedule indicates that this paragraph 27.4 applies, this Agreement shall apply to all loans which are outstanding as at the date of this Agreement and which are subject to the securities lending agreement or agreements specified in paragraph 11 of the Schedule, and such Loans shall be treated as if they had been entered into under this Agreement, and the terms of such loans are amended accordingly with effect from the date of this Agreement.

27.5 The Parties agree that where paragraph 12 of the Schedule indicates that this paragraph 27.5 applies, each may use the services of a third party vendor to automate the processing of Loans under this Agreement and that any data relating to such Loans received from the other Party may be disclosed to such third party vendors.

27.6 The obligations of the Parties under this Agreement will survive the termination of any Loan.

27.7 The warranties contained in paragraphs 13, 14 and 27.2 and in the Agency Annex will survive termination of this Agreement for so long as any obligations of either of the Parties pursuant to this Agreement remain outstanding.

27.8 Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

27.9 This Agreement (and each amendment in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

27.10 A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any terms of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

EXECUTED by the PARTIES

SIGNED by

duly authorized for and
on behalf of

Shinhan Investment Tower, 70, Yeoui-daero, Yeongdeungpo-gu, Seoul, 07325, Korea
SHINHAN INVESTMENT CORP.
President & CEO KIM Hyung Jin

**SHINHAN INVESTMENT CORP, LTD**

SIGNED by *Mr. K. David Kang*

duly authorised for and
on behalf of

*President & Managing Partner*
**Ria R Squared, INC**

## SCHEDULE

### 1. COLLATERAL

1.1 The securities, financial instruments and deposits of currency set out in the table below with a cross marked next to them are acceptable forms of Collateral under this Agreement.

1.2 Unless otherwise agreed between the Parties, the Market Value of the Collateral delivered pursuant to paragraph 5 by Borrower to Lender under the terms and conditions of this Agreement shall on each Annual Roll Day represent not less than the Market Value of the Loaned Securities together with the percentage contained in the row of the table below corresponding to the particular form of Collateral, referred to in this Agreement as the ***Margin***.

| Security/Financial Instrument/ Deposit of Currency | Mark "X" if acceptable form of Collateral | Margin (%) |
|---|---|---|
| RIA R SQUARED – SHINHAN Custodial Account | X | N/A |

1.3 Basis of Margin Maintenance:

Paragraph 5.4 (aggregation) shall apply

1.4 Paragraph 5.6 (netting of obligations to deliver Collateral and redeliver Equivalent Collateral) shall apply

1.5 For the purposes of Paragraph 5.8, Notification Time means by 3pm New York

1.6 Paragraph 6.4 (indemnity for failure to redeliver Equivalent Non-Cash Collateral) shall apply.

**2. BASE CURRENCY**

The Base Currency applicable to this Agreement is US Dollars provided that if that currency ceases to be freely convertible the Base Currency shall be US Dollars.

**3. PLACES OF BUSINESS**

US and Seoul.

(See definition of Business Day.)

**4. MARKET VALUE**

(See definition of Market Value.)

**5. EVENTS OF DEFAULT**

Automatic Early Termination shall not apply in respect of Party A

Automatic Early Termination shall apply in respect of Party B

**6. DESIGNATED OFFICE AND ADDRESS FOR NOTICES**

(a) **Designated office of Party A**:

Front office and trading:

Address: Shinhan Investment Tower, 70, Yeoui-daero, Yeongdeungpo-gu, Seoul, 07325 Korea

Attention: HyoChan, Lee
(Head of PBS)
Facsimile No: +82 2 780 4182
Telephone No: +82 2 3772 3647
Email: estrading@Shinhan.com

Operations:

Address: Shinhan Investment Tower, 70, Yeoui-daero, Yeongdeungpo-gu, Seoul, 07325 Korea

Attention: OPER/SEC/ATP/SSE/EQY
Facsimile No: +82 2 780 4182
Telephone No: +82 2 3772 2753
Email: estrading@Shinhan.com

(b) **Designated office of Party B**:

Address for notices or communications to Party B:

Address: 575 Lexington Ave, 4th Floor New York NY

10022

Attention: Ria R Squared, INC – Nirav Patel

Facsimile No:

Telephone No: +1-212-652-9668

Electronic Messaging System Details: nirav.patel@rsquaredia.com

7. (a) **Agent of Party A for Service of Process**

Name: Shinhan Investment America INC.

Address: 1325 AVENUE OF THE AMERICAS STE. 2002A, NEW YORK, NY, 10019, UNITED STATES

(b) **Agent of Party B for Service of Process**

Name: **BNP PARIBAS Securities Services**

Address: 787 SEVENTH AVE., 9TH FLOOR NEW YORK, NY 10019

8. **AGENCY**

– Party A [may][will always]* act as agent ■

– Party B may act as agent ■

– The Addendum for Pooled Principal Transactions may apply to Party A ☐

– The Addendum for Pooled Principal Transactions may apply to Party B ☐

9. **PARTY PREPARING THIS AGREEMENT**

Party A ■

Party B ■

10. **DEFAULT INTEREST**

Rate of default interest: FED OPEN

11. **EXISTING LOANS**

Paragraph 27.4 applies*

12. AUTOMATION

Paragraph 27.5 applies

**IN WITNESS WHEREOF** the parties have executed this Agreement on the respective dates specified below with effect from [25th January 2019]

| | |
|---|---|
| SHINHAN INVESTMENT CORP. LTD | Ria R Squared, INC |
| By: | By: |
| Name: Shinhan Investment Tower, 70, Yeoui-daero, | Name: Mr. David Kang |
| Title: Yeongdeungpo-gu, Seoul, 07325 Korea | Title: President & Managing Partner |
| Date: SHINHAN INVESTMENT CORP. President & CEO KIM Hyung Jin | Date: 1/25/2019 |

# AGENCY ANNEX

## TRANSACTIONS ENTERED INTO AS AGENT

1.1 **Power for Lender to enter into Loans as agent**

Subject to the following provisions of this paragraph, Lender may enter into Loans as agent (in such capacity, the ***Agent***) for a third person (a ***Principal***), whether as custodian or investment manager or otherwise (a Loan so entered into being referred to in this paragraph as an ***Agency Loan***).

If the Lender has indicated in paragraph 8 of the Schedule that it may act as Agent, it must identify each Loan in respect of which it acts as Agent as an Agency Loan at the time it is entered into. If the Lender has indicated in paragraph 8 of the Schedule that it will always act as Agent, it need not identify each Loan as an Agency Loan.

1.2 **Pooled Principal transactions**

The Lender may enter into an Agency Loan on behalf of more than [one] Principal and accordingly the addendum hereto for pooled principal transactions shall apply.*

1.3 **Conditions for Agency Loan**

A Lender may enter into an Agency Loan if, but only if:

(a) it provides to Borrower, prior to effecting any Agency Loan, such information in its possession necessary to complete all required fields in the format generally used in the industry, or as otherwise agreed by Agent and Borrower (***Agreed Format***), and will use its best efforts to provide to Borrower any optional information that may be requested by the Borrower for the purpose of identifying such Principal (all such information being the ***Principal Information***). Agent represents and warrants that the Principal Information is true and accurate to the best of its knowledge and has been provided to it by Principal;

(b) it enters into that Loan on behalf of a single Principal whose identity is disclosed to Borrower (whether by name or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) either at the time when it enters into the Loan or before the Close of Business on the next Business Day after the date on which Loaned Securities are transferred to the Borrower in the Agreed Format or as otherwise agreed between the Parties; and

(c) it has at the time when the Loan is entered into actual authority to enter into the Loan and to perform on behalf of that Principal all of that Principal's obligations under the agreement referred to in paragraph 1.5(b) below.

Agent agrees that it will not effect any Loan with Borrower on behalf of any Principal unless Borrower has notified Agent of Borrower's approval of such Principal, and has not notified Agent that it has withdrawn such approval (such Principal, an ***Approved Principal***), with both such notifications in the Agreed Format.

Borrower acknowledges that Agent shall not have any obligation to provide it with confidential information regarding the financial status of its Principals; Agent agrees, however, that it will assist Borrower in obtaining from Agent's Principals such information regarding the financial status of such Principals as Borrower may reasonably request.

1.4 **Notification by Agent of certain events affecting any Principal**

Agent undertakes that, if it enters as agent into an Agency Loan, forthwith upon becoming aware:

(a) of any event which constitutes an Act of Insolvency with respect to the relevant Principal; or

(b) of any breach of any of the warranties given in paragraph 1.6 below or of any event or circumstance which results in any such warranty being untrue if repeated by reference to the then current facts,

it will inform Borrower of that fact and will, if so required by Borrower, furnish it with such additional information as it may reasonably request to the extent that such information is readily obtainable by Agent.

1.5 **Status of Agency Loan**

(a) Each Agency Loan shall be a transaction between the relevant Principal and Borrower and no person other than the relevant Principal and Borrower shall be a party to or have any rights or obligations under an Agency Loan. Without limiting the foregoing, Agent shall not be liable as principal for the performance of an Agency Loan, but this is without prejudice to any liability of Agent under any other provision of this Annex; and

(b) all the provisions of the Agreement shall apply separately as between Borrower and each Principal for whom the Agent has entered into an Agency Loan or Agency Loans as if each such Principal were a party to a separate agreement with Borrower in all respects identical with this Agreement other than this Annex and as if the Principal were Lender in respect of that agreement; provided that

(i) if there occurs in relation to the Agent an Event of Default or an event which would constitute an Event of Default if Borrower served written notice under any sub-clause of paragraph 10 of the Agreement, Borrower shall be entitled by giving written notice to the Principal (which notice shall be validly given if given in accordance with paragraph 20 of the Agreement) to declare that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal. If Borrower gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given; and

(ii) if the Principal is neither incorporated in nor has established a place of business in Great Britain, the Principal shall for the purposes of the agreement referred to in paragraph 1.5(b) above be deemed to have appointed as its agent to receive on its behalf service of process in the courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in Great Britain, the person appointed by the Agent for the

purposes of this Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other Party.

If Lender has indicated in paragraph 8 of the Schedule that it may enter into Loans as agent, the foregoing provisions of this paragraph do not affect the operation of the Agreement as between Borrower and Lender in respect of any Loans into which Lender may enter on its own account as principal.

1.6 **Warranty of authority by Lender acting as Agent**

Agent warrants to Borrower that it will, on every occasion on which it enters or purports to enter into a Loan as an Agency Loan, have been duly authorized to enter into that Loan and perform the obligations arising under such Loan on behalf of the Principal in respect of that Loan and to perform on behalf of the Principal all the obligations of that person under the agreement referred to in paragraph 1.5(b) above.

## ADDENDUM FOR POOLED PRINCIPAL AGENCY LOANS

### 1. SCOPE

This addendum applies where the Agent wishes to enter into an Agency Loan on behalf of more than one Principal. The Agency Annex shall apply to such a Loan subject to the modifications and additional terms and conditions contained in paragraph 2 to 7 below.

### 2. INTERPRETATION

2.1 In this addendum:

(a) ***Collateral Transfer*** has the meaning given in paragraph 5.1 below;

(b) if at any time on any Business Day the aggregate Market Value of Posted Collateral in respect of all Agency Loans outstanding with a Principal under the Agreement exceeds the aggregate of the Required Collateral Value in respect of such Agency Loans, Borrower has a ***Net Loan Exposure*** to that Principal equal to that excess; if at any time on any Business Day the aggregate Market Value of Posted Collateral in respect of all Agency Loans outstanding under the Agreement with a Principal falls below the aggregate of the Required Collateral Value in respect of such Agency Loans, that Principal has a ***Net Loan Exposure*** to Borrower for such Agency Loans equal to that deficiency;

(c) ***Pooled Principal*** has the meaning given in paragraph 6(a) below; and

(d) ***Pooled Loan*** has the meaning given in paragraph 6(a) below.

### 3. MODIFICATIONS TO THE AGENCY ANNEX

3.1 Paragraph 1.3(b) of the Agency Annex is deleted and replaced by the following:

"it enters into that Loan on behalf of one or more Principals and at or before the time when it enters into the Loan it discloses to Borrower the identity and the jurisdiction of incorporation, organization or establishment of each such Principal (and such disclosure may be made either directly or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal);".

3.2 Paragraph 1.3(c) of the Agency Annex is deleted and replaced by the following:

"it has at the time when the Loan is entered into actual authority to enter into the Loan on behalf of each Principal and to perform on behalf of each Principal all of that Principal's obligations under the Agreement".

### 4. ALLOCATION OF AGENCY LOANS

4.1 The Agent undertakes that if, at the time of entering into an Agency Loan, the Agent has not allocated the Loan to a Principal, it will allocate the Loan before the Settlement Date for that Agency Loan either to a single Principal or to several Principals, each of whom shall be responsible for only that part of the Agency Loan which has been allocated to it. Promptly following such allocation, the Agent shall notify Borrower of the Principal or Principals (whether by name or reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) to which that Loan or part of that Loan has been allocated.

4.2 Upon allocation of a Loan in accordance with paragraph 4.1 above or otherwise, with effect from the date on which the Loan was entered into:

(a) where the allocation is to a single Principal, the Loan shall be deemed to have been entered into between Borrower and that Principal; and

(b) where the allocation is to two or more Principals, a separate Loan shall be deemed to have been entered into between Borrower and each such Principal with respect to the appropriate proportion of the Loan.

4.3 If the Agent shall fail to perform its obligations under paragraph 4.2 above then for the purposes of assessing any damage suffered by Borrower (but for no other purpose) it shall be assumed that, if the Loan concerned (to the extent not allocated) had been allocated in accordance with that paragraph, all the terms of the Loan would have been duly performed.

## 5. ALLOCATION OF COLLATERAL

5.1 Unless the Agent expressly allocates (a) a deposit or delivery of Posted Collateral or (b) a repayment of Cash Collateral or a redelivery of Equivalent Collateral (each a ***Collateral Transfer***) before such time, the Agent shall, at the time of making or receiving that Collateral Transfer, be deemed to have allocated any Collateral Transfer in accordance with paragraph 6.3 below.

5.2 (a) If the Agent has made a Collateral Transfer on behalf of more than one Pooled Principal, that Collateral Transfer shall be allocated in proportion to Borrower's Net Loan Exposure in respect of each Pooled Principal at the Agent's close of business on the Business Day before the Collateral Transfer is made; and

(b) if the Agent has received a Collateral Transfer on behalf of more than one Pooled Principal, that Collateral Transfer shall be allocated in proportion to each Pooled Principal's Net Loan Exposure in respect of Borrower at the Agent's close of business on the Business Day before the Collateral Transfer is made.

(c) Sub-paragraphs (a) and (b) shall not apply in respect of any Collateral Transfer which is effected or deemed to have been effected under paragraph 6.3 below.

## 6. POOLED PRINCIPALS: REBALANCING OF MARGIN

6.1 Where the Agent acts on behalf of more than one Principal, the Parties may agree that, as regards all (but not some only) outstanding Agency Loans with those Principals, or with such of those Principals as they may agree (***Pooled Principals***, such Agency Loans being ***Pooled Loans***), any Collateral Transfers are to be made on an aggregate net basis.

6.2 Paragraphs 6.3 to 6.5 below shall have effect for the purpose of ensuring that Posted Collateral is, so far as is practicable, transferred and held uniformly, as between the respective Pooled Principals, in respect of all Pooled Loans for the time being outstanding under the Agreement.

6.3 At or as soon as practicable after the Agent's close of business on each Business Day on which Pooled Loans are outstanding (or at such other times as the Parties may from time to time agree) there shall be effected such Collateral Transfers as shall ensure that immediately thereafter:

(a) in respect of all Pooled Principals which have a Net Loan Exposure to Borrower, the amount of Collateral then deliverable or Cash Collateral then payable by Borrower to each such Pooled Principal is equal to such proportion of the aggregate amount of Collateral then deliverable or Cash Collateral then payable, to all such Pooled Principals as corresponds to the proportion which the Net Loan Exposure of the relevant Pooled Principal bears to the aggregate of the Net Loan Exposures of all Pooled Principals to Borrower; and

(b) in respect of all Pooled Principals to which Borrower has a Net Loan Exposure, the aggregate amount of Equivalent Collateral then deliverable or repayable by each such Pooled Principal to Borrower is equal to such proportion of the aggregate amount of Equivalent Collateral then deliverable or repayable by all such Pooled Principals as corresponds to the proportion which the Net Loan Exposure of Borrower to the relevant Pooled Principal bears to the aggregate of the Net Loan Exposures of Borrower to all Pooled Principals.

6.4 Collateral Transfers effected under paragraph 6.3 shall be effected (and if not so effected shall be deemed to have been so effected) by appropriations made by the Agent and shall be reflected by entries in accounting and other records maintained by the Agent. Accordingly, it shall not be necessary for payments of cash or deliveries of Securities to be made through any settlement system for the purpose of such Collateral Transfers. Without limiting the generality of the foregoing, the Agent is hereby authorized and instructed by Borrower to do all such things on behalf of Borrower as may be necessary or expedient to effect and record the receipt on behalf of Borrower of cash and Securities from, and the delivery on behalf of Borrower of cash and Securities to, Pooled Principals in the course or for the purposes of any Collateral Transfer effected under that paragraph.

6.5 Promptly following the Collateral Transfers effected under paragraph 6.3 above, and as at the Agent's close of business on any Business Day, the Agent shall prepare a statement showing in respect of each Pooled Principal the amount of cash Collateral which has been paid, and the amount of non-cash Collateral of each description which have been transferred, by or to that Pooled Principal immediately after those Collateral Transfers. If Borrower so requests, the Agent shall deliver to Borrower a copy of the statement so prepared in a format and to a timetable generally used in the market.

## 7. WARRANTIES

7.1 The Agent warrants to Borrower that:

(a) all notifications provided to Borrower under paragraph 4.1 above and all statements provided to the other party under paragraph 6.5 above shall be complete and accurate in all material respects;

(b) at the time of allocating an Agency Loan in accordance with paragraph 4.1 above, each Principal or Principals to whom the Agent has allocated that Agency Loan or any part of that Agency Loan is duly authorized to enter into the Agency Loans contemplated by this Agreement and to perform its obligations thereunder; and

(c) at the time of allocating an Agency Loan in accordance with paragraph 4.1 above, no Event of Default or event which would constitute an Event of Default with the service of a Default Notice or other written notice under paragraph 14 of the Agreement has occurred in relation to any Principal or Principals to whom the Agent has allocated that Agency Loan or any part of that Agency Loan.

## SUPPLEMENTAL LENDING AGREEMENT FOR SECURITIES LENDING

### 1. SCOPE

This supplement supersedes the agreement for the purpose of Securities Lending. The Agreement shall be governed by English Law. All disputes arising out of, or in connection with the Agreement shall be governed by and construed in accordance with the laws of the United States of America in the New York State Courts.

### 2. The Lender

For the purpose of this agreement, the lender shall be Party A (the ***lending party***), Unless specified otherwise

### 3. The Borrower

For the purpose of this agreement, the borrower shall be Party B (the ***borrowing party***), Unless specified otherwise

### 4. Securities

Party A agrees to lend Party B securities per **Schedule B** of this agreement. (***securities***).

### 5. Term

The ***term*** of the loan shall be **12 months (365 days)** from the date of delivery of the ***securities***.

The lending party shall have a right to replace the ***lent securities*** with ***new securities,*** whose market value is greater than or equal to that of the ***lent securities***. If such right is exercised, the ***lending party*** shall deliver the ***new securities,*** the ***borrowing party*** shall then return the original ***securities*** within 5 business days after the ***new securities*** are received, and the term of the loan shall extend for an additional period of **12 months (365 days)** without additional notice or documentation.

To terminate the lending agreement, the ***lending party*** shall give notice during the ***notice period*** to the borrowing party. If no notice is sent by the ***lending party*** within the ***notice period***, the term of the loan shall extend for a period of **12 months (365 days)** without additional notice or documentation.

### 6. Notice Period

The ***notice period*** shall be the 30th day prior to the final business day of the ***term*** of the loan.

**7. Borrowing Rate**

The ***borrowing party*** shall pay the ***lending party*** the yield of the ***security*** plus an annual rate as designated in **Schedule B** as basis points per annum (***bps***) to be paid on a monthly basis. The payments shall commence on the 25th (or the next business day) of the second month after the securities are received by Party B. The final month's payment shall accrue as 2 months. The yield of the ***security*** shall be set as the closing yield at 3pm EST on the date the ***security*** is delivered to the ***borrowing party.***

**8. Collateral**

The ***collateral*** for this loan agreement shall be ***the custodial securities*** held in the ***custodial account*** with the agent. No delivery of collateral shall take place between the parties.

**9. Market Value Ratio**

The ***market value ratio***, the numerator of which is the market value of collateral assets and the denominator of which is the market value of lent assets, shall not be lower than the OC Ratio.

**10. Custodial Account**

The ***custodial account*** shall be held at the designated agent. No other counterparty's collateral, besides Shinhan Investment Co. Ltd, shall be placed into the ***custodial account***.

**11. Repo**

Party A agrees that Party B may engage in REPO and Reverse REPO.

**12. Custodial Securities**

The ***custodial securities*** shall include but not be limited to: Corporate bonds, Commercial Mortgage Backed Securities, Residential Mortgage Backed Securities, Single Family Rental Securities, Asset Backed Securities, Securities issued from the shelves of Fannie Mae, Freddie Mac, and Ginnie Mae, Loans. Hedges shall be held in the ***custodial account*** from time to time. Hedges shall include but not limited to: T Bills, Treasury Notes, Euro$ Futures, Treasury Options, Swaptions, Swap Spreads, Caps, Floors, Tips, Strips, Credit Default Swaps, Total Return Swaps, Credit Linked Notes, CDX, iTraxx, LevX, LCDX, iBoxx.

**13. Event of Default**

An ***event of default*** shall occur upon a nonpayment of the ***borrowing rate*** from the ***borrowing party*** to the ***lending party*** within 5 business days of the scheduled payment date.

In an ***event of default***, post acknowledgement of such default by BNP, Shinhan Investment Co, LTD shall solely have the right to proceed with the following steps to take legal possession of the ***custodial account*** and the ***custodial securities***:

1. BNP will draft paperwork for new custodial agreement documents for Shinhan Investment Corp.

2. Shinhan Investment Corp shall review the custody agreement documents and complete all AML/KYC paperwork per BNP.

3. Once signed paperwork is delivered to BNP, BNP compliance and business review occurs.

4. Once approved, ownership transfer of the collateral shall be immediate.

Power of Attorney. Party B, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints Party A as the attorney of the Party B on its behalf and in the name of the Party B or the Party A (as the attorney may decide) to do all acts, and execute all documents which the Party B could itself execute, in relation to any of the ***custodial securities***, including (but without limitation):

(i) to execute any Transfer, bill of sale or other assurance in respect of the ***custodial securities***;

(ii) to exercise all the rights and powers of Party B in respect of the ***custodial securities***;

(iii) to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the ***custodial securities***;

(iv) to endorse any checks or other instruments or orders in connection with any of the ***custodial securities***; and

(v) to make any claims or to take any action or to institute any proceedings which Party A considers to be necessary or advisable to protect or enforce the security interest created hereunder.

**IN WITNESS WHEREOF** the parties have executed this Agreement on the respective dates specified below with effect from [25th January 2019].

| SHINHAN INVESTMENT CORP, LTD | Ria R Squared, INC |
|---|---|
| By: ........................ | By: [signature] |
| Name: | Name: M.K. David Kang |
| Title: Shinhan Investment Tower, 70, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea SHINHAN INVESTMENT CORP. | Title: President & Managing Partner |
| Date: President & CEO KIM Hyung Jin [seal] | Date: 1/25/2019 |

**SCHEDULE B**

| | *Security* | | | ***term(yrs)*** | ***bps*** | *security final maturity* | initial value | date of lend |
|---|---|---|---|---|---|---|---|---|
| | ***security*** | ***security coupon*** | ***security CUSIP/ISIN*** | | | | | |
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |

RIA R SQUARED

# Board Resolution of Ria R Squared INC Approving the execution of the GMSLA with Shinhan Investment Corp, Ltd by Ria R Squared INC in the Republic of Korea DULY PASSED ON January 25, 2019

---

APPROVAL OF THE EXECUTION OF THE GMSLA WITH Shinhan Investment Corp, Ltd BY Myung-Kyu David Kang of Ria R Squared, INC in the Republic of Korea

WHEREAS, the GMSLA with Shinhan Investment Corp, Ltd and Ria R Squared INC has been recommended for adoption by the Chief Operating Officer, Nirav Patel, be it therefore

RESOLVED, the GMSLA with Shinhan Investment Corp, Ltd and Ria R Squared INC is hereby approved.

RESOLVED, that the officers of this corporation are, and each acting alone is, hereby authorized to do and perform any and such acts, including execution of any and all documents and certificates, as such officers shall deem necessary or advisable, to carry out the purposes and intent of the foregoing resolution.

RESOLVED FURTHER, that any actions taken by such officers prior to the date of the foregoing resolutions adopted hereby that are within the authority conferred thereby ratified, confirmed and approved as the acts and deeds of this corporation.

It is hereby certified by the undersigned that the foregoing resolution was duly passed by the Board of Directors of the above-named Company on the 25th day of January, 2019, in accordance with the Memorandum or By-Laws and Articles of Incorporation of the Company and the laws and by-laws governing the Company and is in full force and effect.

Myung-Kyu David Kang
President, Managing Partner

Michael Leung
Chief Risk Officer, Managing Partner

Adrian Wu
Chief Investment Officer, Managing Partner

Nirav Patel
Chief Operating Officer, Managing Partner

**EXHIBIT 6**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

RIA R SQUARED, INC.,

*Plaintiff,*

v.

SHINHAN SECURITIES CO., LTD.,

*Defendant.*

Index No. 659538/2024

**DEFENDANT SHINHAN SECURITIES COMPANY, LTD.'S**
**ANSWER AND COUNTERCLAIM**

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Sylvia Precht
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
sylvia.precht@whitecase.com

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

Defendant Shinhan Securities Co., Ltd. ("Defendant" or "Shinhan"), through its undersigned counsel, hereby submits this answer and counterclaim in response to the Complaint (the "Complaint") of Plaintiff RIA R Squared, Inc. ("Plaintiff" or "RIA"). Defendant denies any and all allegations of the Complaint that are not specifically addressed herein.

## ANSWER

Defendant responds below to the separately numbered paragraphs and prayer for relief contained in the Complaint. No response is required to the various headings, subheadings and footnotes throughout the Complaint. Plaintiff's Fourth Cause of Action for breach of covenant of good faith and fair dealing and Fifth Cause of Action for declaratory judgment were dismissed by this Court's Decision and Order on Motion to Dismiss dated July 31, 2025, and accordingly, no response is provided herein to those claims. NYSCEF Dkt. No. 71.

To the extent that responses are required to such headings, subheadings and footnotes, they are denied. To the extent that any allegation is not specifically admitted, it is denied. Defendant reserves the right to challenge the relevance and admissibility of all sources and documents referred to or purportedly quoted from in the Complaint. Defendant further reserves the right to supplement or amend this Answer as may be necessary.

## IN RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "NATURE OF THE ACTION" WITHIN THE COMPLAINT

1. Paragraph 1 of the Complaint consists of Plaintiff's characterization of its claims and no response is required. To the extent a response is required, Defendant denies the allegations contained in paragraph 1 of the Complaint.

2. Paragraph 2 of the Complaint consists of Plaintiff's interpretation of the GMSLA and SLA, to which no response is required. To the extent a response is required, Defendant admits that on January 25, 2019, RIA and Shinhan entered into the Global Master Securities Lending

Agreement ("GMSLA") and an accompanying agreement titled the Supplemental Lending Agreement for Securities Lending ("SLA"). Defendant respectfully refers the Court to the GMSLA and SLA for the true and complete contents thereof. Defendant denies any paraphrasing, summarizing or characterization of the GMLSA and SLA and any factual inferences or legal conclusions made by Plaintiff based on them.

3. Defendant admits that: (a) Shinhan made its first loan to RIA under the GMSLA and SLA in 2019; and (b) there was market volatility caused by COVID-19. Defendant denies the remaining allegations contained in paragraph 3 of the Complaint.

4. Defendant denies that RIA was not obligated to return the $94 million in loaned securities for another year. Defendant further denies that Sam Sang Hyuk Kim ("Mr. Kim") was a "senior executive with SSC" in February 2020 (or at any other time) to the extent that implies he had authority to enter into agreements on behalf of Shinhan in 2020, which he did not. Defendant admits that Mr. Kim previously was employed at Mirae Asset Securities and that during his time there, Mr. Kim became acquainted with alleged affiliates of RIA, Han Kyung Bae ("Mr. Bae") and Marcus Shin ("Mr. Shin"). Defendant denies the remaining allegations contained in paragraph 4 of the Complaint.

5. Defendant admits it requested that RIA return of a portion of its loans. Defendant denies the remaining allegations in paragraph 5 including to the extent they purport to quote or describe correspondence between Plaintiff and Defendant and do not accurately represent the correspondence's full content and context.

6. Defendant denies the allegations contained in paragraph 6 of the Complaint.

7. Defendant denies the allegations in paragraph 7 of the Complaint.

8. Defendant denies the allegations contained in paragraph 8 of the Complaint.

9. Paragraph 9 of the Complaint contains legal conclusions to which no response is required. Defendant admits that RIA delivered $47 million in securities to Shinhan on April 16, 2020. Defendant denies the remaining allegations contained in paragraph 9 of the Complaint.

10. Paragraph 10 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in paragraph 10 of the Complaint.

11. Defendant admits that Mr. Kim and David Kang ("Mr. Kang") signed a "Statement of Facts" on March 11, 2022 and negotiated in good faith for a resolution to the dispute with Plaintiff. Defendant denies the remaining allegations contained in paragraph 11 of the Complaint.

12. Defendant denies the allegations contained in paragraph 12 of the Complaint.

13. Paragraph 13 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in paragraph 13 of the Complaint.

**IN RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "THE PARTIES" WITHIN THE COMPLAINT**

14. Defendant lacks sufficient knowledge to admit or deny the allegations of paragraph 14 of the Complaint.

15. Defendant admits in part and denies in part the allegations contained in paragraph 15 of the Complaint. Defendant's principal place of business is now located at 96 Uisadang-Daero, Yeongdeungpo-Gu, Seoul, 07321, Republic of Korea.

16. Defendant admits the allegations contained in paragraph 16 of the Complaint.

**IN RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "JURISDICTION AND VENUE" WITHIN THE COMPLAINT**

17. Paragraph 17 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant admits that Defendant consented to this

Court's personal jurisdiction. Defendant denies all remaining allegations in paragraph 17 of the Complaint.

18. Paragraph 18 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant admits that paragraph 18 purports to describe the basis for the proper venue.

**IN RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "FACTUAL ALLEGATIONS" WITHIN THE COMPLAINT**

19. Defendant admits that this case concerns securities lending. The remainder of paragraph 19 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

20. Paragraph 20 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

21. Paragraph 21 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

22. Paragraph 22 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

23. Paragraph 23 of the Complaint consists of Plaintiff's interpretation of lending

securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

24. Paragraph 24 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

25. Paragraph 25 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

26. Paragraph 26 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

27. Paragraph 27 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

28. Paragraph 28 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

29. Paragraph 29 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

30. Defendant denies it has failed to meet a baseline standard. The remainder of Paragraph 30 of the Complaint consists of Plaintiff's interpretation of lending securities generally, to which no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations.

31. Paragraph 31 of the Complaint consists of Plaintiff's interpretation of the GMSLA and SLA, to which no response is required. To the extent a response is required, Defendant admits that securities-lending relationship between Defendant and RIA began on January 25, 2019 when the parties entered into the GMSLA and SLA. Defendant denies the remaining allegations contained in paragraph 31 of the Complaint.

32. Paragraph 32 of the Complaint consists of Plaintiff's interpretation of "the purpose of the GMSLA," to which no response is required. To the extent a response is required, Defendant admits that paragraph 32 of the Complaint contains a partial quotation of the GMSLA but denies the partial quotation states the "purpose of the GMSLA." Defendant respectfully refers the Court to the GMSLA for the true and complete contents thereof.

33. Paragraph 33 of the Complaint consists of Plaintiff's interpretation of the GMSLA, to which no response is required. To the extent a response is required, Defendant admits that paragraph 33 of the Complaint contains a partial quotation of the GMSLA. Defendant denies the remaining allegations in paragraph 33. Defendant respectfully refers the Court to the GMSLA for the true and complete contents thereof. Defendant denies any paraphrasing, summarizing or

characterization of the GMSLA and any factual inferences or legal conclusions made by Plaintiff based on it.

34. Paragraph 34 of the Complaint consists of Plaintiff's interpretation of the SLA, to which no response is required. To the extent a response is required, Defendant admits that the SLA contained terms. Defendant denies the remaining allegations in paragraph 34. Defendant respectfully refers the Court to the SLA for the true and complete contents thereof. Defendant denies any paraphrasing, summarizing or characterization of the SLA and any factual inferences or legal conclusions made by Plaintiff based on it.

35. Defendant admits that the securities-lending arrangement proceeded smoothly for the first year, to the extent it means that Shinhan performed all of its lending obligations under the Agreements. Defendant denies the remaining allegations in paragraph 35 of the Complaint.

36. Defendant admits that South Korean prosecutors conducted an investigation involving Lime Asset Management. Defendant denies the remaining allegations contained in paragraph 36 of the Complaint.

37. Defendant admits South Korea was impacted by Covid-19. Defendant denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 37 of the Complaint.

38. Defendant denies that Shinhan verged on the existential. Defendant denies knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 38 of the Complaint.

39. Defendant denies the allegations in paragraph 39 of the Complaint.

40. Defendant admits that David Kang was RIA's CEO. Defendant denies the remaining allegations in paragraph 40 of the Complaint.

41. Defendant denies that Mr. Kim made extortionate demands. Defendant denies knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 41 of the Complaint.

42. Defendant denies the allegations in paragraph 42 of the Complaint.

43. Defendant denies the allegations in paragraph 43 of the Complaint.

44. Defendant admits that RIA voluntarily agreed to terminate a portion of the loans. Defendant denies that the termination of a portion of the loans was in exchange for a promise of future lent securities. Defendant denies knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 44 of the Complaint.

45. To the extent the allegations in paragraph 45 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the allegations in paragraph 45, including to the extent they do not accurately represent the correspondence's full content and context.

46. To the extent the allegations in paragraph 46 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the allegations in paragraph 46, including to the extent they do not accurately represent the correspondence's full content and context.

47. Defendant admits that Shinhan never agreed to RIA's proposed terms. To the extent the allegations in paragraph 47 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the remaining allegations in paragraph 47,

including to the extent they do not accurately represent the correspondence's full content and context.

48. Defendant denies the allegations in paragraph 48 of the Complaint.

49. Defendant denies the allegations in paragraph 49 of the Complaint.

50. Paragraph 50 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies RIA fulfilled its side of the bargain or that the SDA was "in place." Defendant denies knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 50 of the Complaint.

51. Defendant admits that: (a) RIA delivered $47 million in securities to Shinhan on April 16, 2020; and (b) the delivery of $47 million in securities was documented in email correspondence between the parties. Defendant denies the remaining allegations in paragraph 51 of the Complaint.

52. Paragraph 52 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 52 of the Complaint.

53. To the extent the allegations in paragraph 53 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the allegations in paragraph 53, including to the extent they do not accurately represent the correspondence's full content and context.

54. Paragraph 54 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 54

of the Complaint.

55. Paragraph 55 of the Complaint contains legal conclusions to which no response is required. To the extent the allegations in paragraph 55 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the allegations in paragraph 55, including to the extent they do not accurately represent the correspondence's full content and context.

56. Defendant admits that Defendant sent Plaintiff notices of termination on at least six different occasions: July 5, 2020; July 21, 2021; January 18, 2022; July 15, 2022; July 13, 2023; and July 19, 2024. Defendant denies the remaining allegations in paragraph 56 of the Complaint.

57. Paragraph 57 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant admits that Defendant sent Plaintiff notices of termination on January 18, 2022. Defendant denies the remaining allegations in paragraph 57 of the Complaint.

58. To the extent the allegations in paragraph 58 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant admits that RIA's counsel provided notice of an alleged failure to fulfill the parties' agreements. Defendant denies the remaining allegations in paragraph 58, including to the extent they do not accurately represent the correspondence's full content and context.

59. Paragraph 59 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant admits that: (a) Mr. Kim and Mr. Kang signed a "Statement of Facts" on March 11, 2022; and (b) paragraph 59 of the Complaint contains

a partial quotation of the Statement of Facts. Defendant denies that the Statement of Facts was an agreement. Defendant respectfully refers the Court to the Statement of Facts for the true and complete contents thereof. Defendant denies any paraphrasing, summarizing or characterization of the Statement of Facts and any factual inferences or legal conclusions made by Plaintiff based on it.

60. Paragraph 60 of the Complaint consists of Plaintiff's interpretation of the Statement of Facts, to which no response is required. To the extent a response is required, Defendant admits that paragraph 60 of the Complaint contains a partial quotation of the Statement of Facts. Defendant denies the remaining allegations in paragraph 60. Defendant respectfully refers the Court to the Statement of Facts for the true and complete contents thereof. Defendant denies any paraphrasing, summarizing or characterization of the Statement of Facts and any factual inferences or legal conclusions made by Plaintiff based on it.

61. Paragraph 61 of the Complaint consists of Plaintiff's interpretation of the Statement of Facts to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 61.

62. Defendant denies the allegations in paragraph 62 of the Complaint.

63. To the extent the allegations in paragraph 63 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant denies the allegations in paragraph 63, including to the extent they do not accurately represent the correspondence's full content and context. Defendant asserts that the relevant correspondence itself is the best source of its full content and context.

64. Defendant denies that Defendant unequivocally acknowledged alleged defaults and refusal to cure. To the extent the remaining allegations in paragraph 64 purport to quote or describe

correspondence between Plaintiff and Defendant, Defendant denies the allegations in paragraph 64, including to the extent they do not accurately represent the correspondence's full content and context. Defendant asserts that the relevant correspondence itself is the best source of its full content and context.

65. Defendant denies the allegations in paragraph 65 of the Complaint.

66. Defendant admits that: (a) Mr. Kim signed an incomplete "Securities Loan Confirmation" document that had missing key terms and was titled "Discussion Draft" that Mr. Kang sent him; and (b) it never loaned those securities because RIA did not countersign or return the document. Defendant denies the remaining allegations in paragraph 66 of the Complaint.

67. Defendant admits that RIA issued a demand letter dated August 27, 2024. Defendant denies the remaining allegations in paragraph 67 of the Complaint.

68. To the extent the allegations in paragraph 68 of the Complaint purport to describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant admits that: (a) Defendant served a notice of termination on Plaintiff on July 19, 2024; (b) Defendant responded to Plaintiff's August 27, 2024 demand letter on September 6, 2024; and (c) Defendant responded to a separate September 18, 2024 letter from Plaintiff on October 25, 2024. Defendant denies the remaining allegations in paragraph 68, including to the extent they do not accurately represent the correspondence's full content and context.

69. Paragraph 69 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in paragraph 69 of the Complaint.

70. Defendant admits that Defendant has contended that Plaintiff defaulted on the

GMSLA and SLA by failing to make coupon and borrowing payments on the securities. Defendant denies the remaining allegations in paragraph 70 of the Complaint.

71. Defendant denies the allegations in paragraph 71 of the Complaint, including Plaintiff's allegation that it has and will continue to make coupon and borrowing payments on the securities using the 2023-2024 rates as long as Current Loans are outstanding. Plaintiff has failed to make the monthly borrowing rate payments for May 2025, June 2025, and July 2025.

72. Defendant admits that on October 25, 2024, Defendant's counsel notified BNP about Plaintiff's event of default under the GMLA and SLA. Defendant denies the remaining allegations contained in paragraph 72 of the Complaint.

73. Defendant denies knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 73 of the Complaint.

74. Paragraph 74 of the Complaint contains legal conclusions and consists of Plaintiff's characterization of its claims and no response is required. To the extent a response is required, Defendant denies the allegations contained in paragraph 74 of the Complaint.

**IN RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "FIRST CAUSE OF ACTION" WITHIN THE COMPLAINT**

75. Defendant repeats and incorporates by reference its responses to the allegations contained in all other paragraphs of the Complaint with the same legal force and effect as if fully set forth herein.

76. Defendant admits that Defendant engaged in the GMSLA and SLA with Plaintiff. Defendant denies the existence of the SDA.

77. Defendant admits the allegations in paragraph 77 of the Complaint.

78. Paragraph 78 of the Complaint consists of Plaintiff's interpretation of the GMSLA and SLA, to which no response is required. Defendant respectfully refers the Court to the GMSLA

for its complete and accurate contents. Defendant denies any paraphrasing, summarizing or characterization of the GMSLA and any factual inferences or legal conclusions made by Plaintiff based on it.

79. Defendant denies the allegations in paragraph 79 of the Complaint.

80. Defendant denies the allegations in paragraph 80 of the Complaint.

81. Paragraph 81 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 81 of the Complaint.

82. Paragraph 82 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 82 of the Complaint.

83. Defendant denies the allegations in paragraph 83 of the Complaint.

**RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "SECOND CAUSE OF ACTION" WITHIN THE COMPLAINT**

84. Defendant repeats and incorporates by reference its responses to the allegations contained in all other paragraphs of the Complaint with the same legal force and effect as if fully set forth herein.

85. Defendant denies the allegations in paragraph 85 of the Complaint.

86. Paragraph 86 of the Complaint consists of Plaintiff's interpretation of the GMSLA and SLA, to which no response is required. Defendant respectfully refers the Court to the GMSLA for its complete and accurate contents. Defendant denies any paraphrasing, summarizing or characterization of the GMSLA and any factual inferences or legal conclusions made by Plaintiff based on it. Defendant further denies that the Statute of Frauds does not apply to the GMSLA.

87. Defendant admits that on or around November 13, 2023 Mr. Kim signed a

discussion draft of a "Securities Loan Confirmation" that was missing key missing terms, which was never finalized or countersigned and returned by RIA, and under which the parties never performed. Defendant denies the remaining allegations in paragraph 87 of the Complaint.

88. Paragraph 88 of the Complaint contains legal conclusions about Defendant breaching its obligations, to which no response is required. To the extent a response is required, Defendant admits that it did not lend securities to Plaintiff pursuant to the "$750M Loan Agreement" because the parties never entered into the agreement. Defendant denies the remaining allegations in paragraph 88 of the Complaint.

89. Defendant denies the allegations in paragraph 89 of the Complaint.

90. Defendant denies the allegations in paragraph 90 of the Complaint.

**RESPONSE TO THE ALLEGATIONS CONTAINED IN THE SECTION TITLED "THIRD CAUSE OF ACTION" WITHIN THE COMPLAINT**

91. Defendant repeats and incorporates by reference its responses to the allegations contained in all other paragraphs of the Complaint with the same legal force and effect as if fully set forth herein.

92. Defendant denies the allegations in paragraph 92 of the Complaint.

93. To the extent the allegations in paragraph 93 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the allegations in paragraph 93, including to the extent they do not accurately represent the correspondence's full content and context.

94. To the extent the allegations in paragraph 94 purport to quote or describe correspondence between Plaintiff and Defendant, Defendant asserts that the relevant correspondence itself is the best source of its full content and context. Defendant denies the

allegations in paragraph 94, including to the extent they do not accurately represent the correspondence's full content and context.

95. Defendant denies the allegations in paragraph 95 of the Complaint.

96. Defendant admits that in the spring of 2020, the pandemic had a negative effect on the markets. Defendant denies the remaining allegations in paragraph 96 of the Complaint.

97. Defendant denies the allegations in paragraph 97 of the Complaint.

98. Defendant denies the allegations in paragraph 98 of the Complaint.

99. Defendant denies the allegations in paragraph 99 of the Complaint.

100. Defendant denies the allegations in paragraph 100 of the Complaint.

**AS TO FOURTH AND FIFTH CAUSES OF ACTIONS**

101. Defendant repeats and incorporates by reference its responses to the allegations contained in all other paragraphs of the Complaint with the same legal force and effect as if fully set forth herein.

102. Given that the Court has dismissed the Fourth and Fifth Causes of Action by order of the Court dated July 31, 2025, no response to the allegations contained in paragraphs 101-112 is required. To the extent a response is required, Defendant denies each and every allegation in paragraphs 101-112 of the Complaint.

**AFFIRMATIVE DEFENSES**

103. Defendant further asserts the following defenses and affirmative defenses to each cause of action alleged by Plaintiff, the applicability of which will be determined through the course of discovery. By alleging the defenses set forth below, Defendant does not hereby agree or admit that it has the burden of proof, persuasion, or production with respect to any elements of any defense, or that Plaintiff has properly asserted any cause of action against Defendant. Defendant reserves the right to assert additional affirmative defenses based on facts that are revealed during

discovery or other investigation. Defendant intends to rely upon such other and further defenses as may become available or apparent during pretrial or trial proceedings in this action and hereby reserves its rights to amend this Answer and assert all such defenses, counterclaims and setoffs.

**<u>First Affirmative Defense (Waiver/Laches)</u>**

104. Plaintiff's claims for relief are barred in whole or in part by the doctrines of ratification, waiver, release, acquiescence, laches or estoppel.

**<u>Second Affirmative Defense (Unclean Hands)</u>**

105. Plaintiff's claims for relief are barred in whole or in part by the doctrine of unclean hands and other equitable defenses. Plaintiff has engaged in conduct that is inequitable, including but not limited to conversion of Defendant's securities and obstruction of Defendant's legal rights to its collateral, and, as a result, should not be allowed to obtain the relief it seeks. Plaintiff's actions have contributed to any alleged harm it claims to have suffered.

**<u>Third Affirmative Defense (No Legal Obligation Owed or Breached)</u>**

106. The claims asserted in the Complaint are barred, in whole or in part, because Defendant did not owe or breach any legal obligation to Plaintiff. There was no SDA or $750M Loan Agreement executed by the Parties.

**<u>Fourth Affirmative Defense (Lack of Authority)</u>**

107. Plaintiff's claims for relief are barred in whole or in part because Mr. Kim did not have authority, actual or apparent, to execute or enter into any agreement on behalf of Shinhan, including at the time of the purported SDA and the alleged $750M Loan Agreement. Any actions taken by Mr. Kim without proper authority are not binding on Defendant and cannot form the basis of Plaintiff's claims.

**<u>Fifth Affirmative Defense (No Contract Formation)</u>**

108. Plaintiff's claims for relief are barred in whole or in part because the "SDA" and

"Securities Loan Confirmation" (the alleged $750M Loan Agreement) were not valid contracts, including but not limited to the fact they lack essential elements necessary for a valid contract.

**Sixth Affirmative Defense (Lack of Consideration)**

109. Plaintiff's claims for relief are barred in whole or in part because there was lack of consideration for the "SDA" and "Securities Loan Confirmation."

**Seventh Affirmative Defense (Estoppel)**

110. Plaintiff is estopped from alleging the claims due to its own conduct and representations. Plaintiff's own actions and statements have led Defendant to reasonably rely on them to its detriment, and Plaintiff cannot now assert claims inconsistent with those actions and statements.

**Eighth Affirmative Defense (Excuse from Performance)**

111. Plaintiff's claims for relief are barred in whole or in part because Defendant's performance was excused, and Defendant would have performed its obligations under the contracts but for Plaintiff's interference with Defendant's ability to perform, to the extent that Defendant is found in breach of the contract.

**Ninth Affirmative Defense (Prior Material Breach)**

112. Plaintiff's claims are barred because it committed the first material breach of the Parties' agreements. Plaintiff's failure to perform its contractual obligations excuses any subsequent non-performance by Defendant.

**Tenth Affirmative Defense (Failure to Perform Condition Precedent)**

113. Plaintiff's claims are barred because it failed to perform a condition precedent required before Defendant's performance, thereby excusing any subsequent nonperformance by Defendant.

**Eleventh Affirmative Defense (Bad Faith)**

114. Plaintiff's claims are barred in whole or in part by the doctrine of bad faith. Plaintiff acted in bad faith in its dealings with Defendant, and such behavior precludes Plaintiff from seeking equitable relief.

**Twelfth Affirmative Defense (No Intent to Defraud)**

115. Plaintiff's claims are barred in whole or in part because Defendant had no intent to fraudulently induce Plaintiff into any agreement. Defendant acted in good faith and with no intention of deceiving Plaintiff.

**Thirteenth Affirmative Defense (No Damages)**

116. Plaintiff's claims are barred in whole or in part because Plaintiff did not suffer any damages from Defendant's actions, including but not limited to the fact that any purported damages were incurred from actions taken voluntarily by Plaintiff.

**Fourteenth Affirmative Defense (Speculative Damages)**

117. Plaintiff's claims are barred in whole or in part because the Complaint alleges a purely speculative injury.

**Fifteenth Affirmative Defense (Setoff)**

118. Plaintiff's claims for relief are barred in whole or part by Defendant's right to set off any damages that Plaintiff owes to Defendant. This includes any amounts that Plaintiff may owe to Defendant under related transactions or agreements, thereby reducing or eliminating the amount recoverable by Plaintiff.

**Sixteenth Affirmative Defense (Statute of Frauds)**

119. Plaintiff's claims are barred in whole or in part because of the Statute of Frauds. The alleged agreements do not satisfy the Statute of Frauds requirements and are therefore unenforceable.

**Seventeenth Affirmative Defense (Undue Influence)**

120. Plaintiff's claims are barred in whole or in part because of undue influence exerted by Plaintiff.

**Eighteenth Affirmative Defense (Fraud, Fraudulent Inducement, and Misrepresentation)**

121. To the extent the Court finds that either the SDA or the $750M Loan Agreement constitute valid and binding agreements among the Parties (which it should not), any claims related to such agreements are barred because they were the product of fraudulent inducement by Plaintiff. Specifically, and as detailed more below, Plaintiff induced Mr. Kim to sign a "letter" titled "Statement of Facts" containing false statements about a purported agreement from two years prior by assuring Mr. Kim it was not a contract but simply a way to restore trust to the business relationship so that Plaintiff would return the outstanding securities it owed. Mr. Kim relied on those assurances. Among other misrepresentations, Plaintiff also falsely claimed that if Mr. Kim showed an agreement to lend future securities, Plaintiff would return the outstanding securities owed. Mr. Kim relied on the representations from RIA and signed the "Discussion Draft" of the $750M Loan Agreement, understanding that it would result in the return of the outstanding securities.

**Nineteenth Affirmative Defense (Failure to State a Claim)**

122. Plaintiff's Complaint, and each remaining cause of action therein, fails to set forth facts sufficient to state a claim upon which relief may be granted against Defendant.

**Twentieth Affirmative Defense (Injuries Traceable to Third Parties)**

123. Plaintiff's injuries and/or damages and/or expenses, if any, were the direct and proximate result of acts, omissions, negligence, fault and/or breach of persons and/or parties over whom Defendant had neither control nor responsibility.

**Twenty-First Affirmative Defense (Statute of Limitations)**

124. To the extent Plaintiff relies on actions that occurred outside of the statute of limitations, those claims are barred.

**Twenty-Second Affirmative Defense (Lack of Proximate Cause)**

125. Plaintiff's claims are barred as an intervening cause or the conduct of another was the proximate cause of any alleged harm to the Plaintiff.

**Twenty-Third Affirmative Defense (Failure to Mitigate Damages)**

126. Plaintiff has failed to mitigate its alleged damages, if any.

**Twenty-Fourth Affirmative Defense (CPLR § 3018)**

127. Defendant preserves all affirmative defenses outlined in CPLR § 3018, including, arbitration and award, collateral estoppel, culpable conduct claimed in diminution of damages as set forth in article fourteen-A, discharge in bankruptcy, facts showing illegality either by statute or common law, fraud, infancy or other disability of the party defending, payment, release, res judicata, statute of frauds, or statute of limitation.

## COUNTERCLAIM

Defendant Shinhan Securities Co., Ltd. ("Counter-Plaintiff" or "Shinhan"), through its undersigned counsel, brings this counterclaim against RIA R Squared, Inc. ("Counter-Defendant" or "RIA"), and alleges as follows:

## THE PARTIES

128. Counter-Defendant RIA is a corporation organized under Delaware law, with its principal place of business located at 575 Lexington Avenue, New York, New York 10022. RIA is a financial services and asset management company, providing financial planning, portfolio management, and investment advisory services.

129. Counter-Plaintiff Shinhan is a corporation organized under the laws of the Republic of Korea, and has its principal place of business in Seoul, Republic of Korea. Shinhan was renamed Shinhan Securities Co., Ltd. effective October 2022; prior to October 2022, Shinhan was named Shinhan Investment Corp.

## JURISDICTION AND VENUE

130. This Court has jurisdiction over Shinhan's counterclaim against RIA under New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302. RIA is subject to personal jurisdiction in New York because it regularly transacts business in New York, its business offices, domiciles, or residences are in New York, it transacted business in New York giving rise to Shinhan's claims, and it owns, uses, or possesses real property in New York.

131. Venue is proper under CPLR § 503 because Counter-Defendant is a domestic corporation authorized to transact business in New York and maintains its principal place of business in New York.

## FACTUAL ALLEGATIONS

### I. The Securities Lending Agreements

132. Shinhan is a securities brokerage and investment banking company. Shinhan's business includes securities trading, wealth management, and investment banking services, as well as merger and acquisition, investment trust, and corporate financing services. Stability and profitability are Shinhan's top concerns, seeking to maximize shareholder value while fulfilling its social responsibilities as a corporate citizen.

133. As part of Shinhan's business, Shinhan operates a Prime Broker Service ("PBS") Department, by which Shinhan offers prime brokerage services, primarily to global investment banks and domestic private equity funds, which includes securities lending and borrowing, cash and stock loan services, deposit payment, and settlement, among other tailored solutions for its borrowers. With respect to securities lending, Shinhan's PBS Department acts as an intermediary (broker) from the standpoint of both borrower and ultimate lender. Shinhan borrows securities that it relends to borrowers in exchange for, among other things, borrowing fees and coupon payments. Shinhan, as borrower, has obligations to the ultimate lender, including, among other things, coupon payments.

134. In December of 2018, Han Kyung Bae ("Mr. Bae") and Marcus Shin ("Mr. Shin"), on behalf of RIA, approached Sam Sang Hyuk Kim ("Mr. Kim"), an employee of Shinhan, about a securities-lending arrangement between Shinhan and RIA, by which Shinhan would from time to time lend to RIA securities and financial instruments in exchange for collateral and RIA's agreement to transfer securities or assets equivalent to those it had borrowed back to Shinhan. Mr. Kim was acquainted with Mr. Bae and Mr. Shin and their work on behalf of RIA at Mr. Kim's previous employer, Mirae Asset Securities. As of December 2018, Mr. Kim was a deputy senior manager of the PBS Department at Shinhan. Mr. Bae and Mr. Shin were (now known to be)

consultants of RIA. As such, neither Mr. Kim, nor Mr. Bae or Mr. Shin had authority to bind Shinhan or RIA to any contract.

135. Between December 17, 2018 and January 25, 2019, Shinhan and RIA negotiated the terms of the Global Master Securities Lending Agreement (the "GMSLA") and accompanying Securities Lending (the "SLA," and together with the GMSLA, the "Agreements"). Throughout these negotiations, Mr. Bae and Mr. Shin were Shinhan's point of contact for RIA.

136. On January 25, 2019, RIA and Shinhan entered into a securities lending arrangement pursuant to the GMSLA and SLA, attached hereto as Exhibit 1. The SLA acted as a supplement to the GMSLA, superseding the provisions in the GMSLA to the extent there is a conflict. SLA § 1.

137. Shinhan's President and CEO, Hyung Jin Kim—not Mr. Kim, executed the GMSLA and SLA on behalf of Shinhan. RIA's President and Managing Partner, David Kang, executed the agreement on behalf of RIA. At the time the Parties executed the GMSLA and SLA, Mr. Kang knew or should have known that Mr. Kim had no authority to execute a contract on behalf of Shinhan. Indeed, Mr. Kang met with the PBS Department Head and the Division Head, Hyo Chan Lee and Il-woo Lim, in Seoul.

138. During the first year of Shinhan's securities-lending arrangement with RIA, both parties performed according to their obligations under the Agreements. Pursuant to the GMSLA, and between February 19, 2019 until October 8, 2019, Shinhan extended seventeen individual loans to RIA totaling approximately $294 million worth of securities. In October 2019, RIA returned three individual loans totaling $50 million in securities to Shinhan for an outstanding total of approximately $244 million in securities as of October 11, 2019.

139. The Parties' agreed-to practice to effectuate any individual loan under the

Agreements was consistent for each of the seventeen loans: RIA made a request for a loan and Shinhan then sent RIA a proposed pre-trade confirmation email that identified the terms necessary for a binding securities loan transaction, including the trade date, settlement date, and termination date, aggregate notional amount of the securities, spread amount, collateral ("Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities"), rollover ("Initial 6 months with confirmed automatic 6 Months roll"), and trade details, including the International Securities Identification Number or "ISIN." RIA, in return, would confirm the terms and provide a letter identifying the securities to serve as collateral for the loan. SLA §§ 8, 10, 12.

140. For each of the individual loans Shinhan made between February and October 2019, the trade date was always the same date as the settlement date, and the termination date of the loan was always six months from the settlement date.

141. The terms of each loan would be recorded within Shinhan's internal electronic platform used to track, approve, and process transactions. Approval from the PBS Department Head was required before Shinhan's Payment Operations Team could process the individual loan transaction. Once the PBS Department Head approved the transaction and it was processed by the Payment Operations Team, Shinhan would then deliver the securities to RIA in accordance with the Agreements and the terms of the individual loan.

142. As required under the Agreements, and for as long as the loan remained outstanding, RIA was required to comply with the terms of the Agreements, including by making monthly borrowing rate payments for each loan that remained outstanding and periodic coupon payments. GMSLA § 6.2; SLA § 7; *see also* GMSLA § 27.6 ("The obligations of the Parties under this Agreement will survive the termination of any Loan.").

143. Under § 7 of the SLA, the borrowing rate payments must be paid "on a monthly

basis" starting "on the 25th (or the next business day) of the second month" after Plaintiff received the securities. SLA § 7. Failure to make the monthly borrowing rate payment within five business days of the payment date is an automatic Event of Default under the Agreements triggering Shinhan's irrevocable right to "take legal possession of the ***custodial account*** and the ***custodial securities***" held at BNP Paribas ("BNP"). SLA § 13 (emphasis in original).

144. RIA is also required to pay coupon payments to Shinhan to be passed onto the issuer. GMLA § 6.2. Non-payment of the coupon payments is an Event of Default. GMSLA § 10.1.

145. The Agreements and terms of the individual loans require RIA to maintain a certain margin for the market value of the collateral in the custodial account on "any Business Day." GMSLA § 5, Schedule § 1.2; SLA § 9; *see also e.g.*, Exhibit 2 (February 19, 2019 Trade Confirmation); Exhibit 3 (February 27, 2019 Trade Confirmation); Exhibit 4 (April 15, 2019 Trade Confirmation); Exhibit 5 (October 8, 2019 Trade Confirmation). To ensure that the appropriate collateral margin is maintained "on any Business Day," RIA sent Shinhan daily reports detailing the collateral and value of the collateral held in the custodial accounts at BNP, which were then verified by BNP. *See e.g.*, Exhibit 8 (Collateral Report dated October 11, 2019); Exhibit 9 (Collateral Report dated April 30, 2025).

146. Under § 8.1 of the GMSLA, Shinhan had a right to terminate and recall the securities of any particular loan "at any time." Under § 8.2 of the GMSLA, RIA also had a right to terminate and deliver all securities due and outstanding on any particular loan "at any time" and Shinhan was required to accept such delivery.

147. In addition, under § 16 of the GMSLA, either party could terminate the GMSLA (thereby recalling all outstanding securities) by giving "15 Business Days' notice in writing."

148. Under the terms of the SLA, to "terminate the lending agreement," Shinhan had to give notice during the "notice period," which was "the 30th day prior to the final business day of the term of the loan." SLA §§ 5, 6.

149. RIA's failure to return the securities upon a request for recall of any loan or termination of the Agreements is an Event of Default, entitling Shinhan to damages, costs, and attorneys fees, among other damages. GMSLA §§ 10, 11.

## II. Shinhan's Recall Request

150. In early April 2020, when hit by the COVID-19 pandemic and resulting financial crisis, it became necessary to take steps to recall the securities Shinhan had lent to RIA. Inquiries were initially made with Mr. Bae and Mr. Shin, and Mr. Kim eventually contacted David Kang to request that RIA return of $94 million in equivalent securities—a portion of the approximately $244 million in securities that Shinhan had loaned to RIA in 2019. The recall of the $94 million in securities was never contingent on an agreement by Shinhan to relend any amount of securities to RIA at any future time.

151. Seeking to terminate loans prior to the term is very commonplace in the securities lending market and, given the very liquid nature of the securities, the return of equivalent securities should not have caused any or only *de minimus* harm to RIA.

152. Mr. Kang, on behalf of RIA, responded that RIA would make "best commercial efforts in fulfilling" Shinhan's request. Although Mr. Kang alleged that the return of securities would cause hardship to RIA, neither Mr. Kang nor anyone else from RIA ever made any demand for consideration in exchange for Shinhan's recall of a portion of the loaned securities.

153. A few days later, on April 7, 2020, Mr. Kang asked Shinhan for accommodations to "make up for the upfront losses" as RIA worked to "facilitate majority or all of the approximate $94 MM in corp bonds back to" Shinhan. No one from Shinhan agreed to any accommodations

in exchange for the return of the securities. Nor did the parties enter into any lending agreement (formal or informal) related to the return of the securities.

154. On April 16, 2020, and without any agreement for relending, RIA voluntarily returned $47 million of the $94 million in securities that Shinhan had recalled. The $47 million in equivalent securities were received by Shinhan on April 17, 2020. The securities returned—institutional and corporate bonds from Stanford and Harvard Universities and Procter & Gamble—were readily available in the market and liquid.

155. On or around April 27, 2020, Mr. Kang stated that RIA made its "best commercial efforts" to return the full $94 million requested, but confirmed it would not be returning the remaining amount (an additional $47 million) of equivalent securities.

156. RIA's failure to return to Shinhan the full amount of the securities Shinhan recalled resulted in financial harm to Shinhan. Nonetheless, Shinhan recognized the unprecedented times the Parties were facing as they navigated the challenges of the COVID-19 pandemic and Shinhan wanted to work cooperatively with RIA as a business partner. Shinhan had hoped that the Parties could continue the lending relationship if RIA returned the full amount of securities demanded and financial conditions improved. However, at no point did Shinhan agree to amend the terms of the Agreements or enter into a new lending agreement with RIA. Unfortunately, RIA never returned the remaining $47 million in securities requested and global financial conditions were not quick to improve.

157. Weeks after returning the securities without condition, Mr. Kang contacted Mr. Kim and stated RIA exercised its best efforts to return the full $94 million requested. Mr. Kang then asked—for the first time and only after returning the $47 million in securities—if Shinhan might forgive its inability to pay the borrowing rate payment for April 2020. In addition, and for

the first time, Mr. Kang asked Mr. Kim if Shinhan could do RIA "a favor" and "cover the $47 MM . . . that was returned."

158. Shinhan did not agree to re-lend the $47 million in securities nor did it guarantee any future lending in any amount. To the contrary, Mr. Kim expressly told Mr. Kang that absent the return of all securities, he did not believe Shinhan would be able to re-lend securities or increase RIA's assets under management in future. Mr. Kim did, however, relay the request for accommodations and Shinhan forgave the April 2020 nonpayment. As detailed below, Shinhan agreed to certain other accommodations as a favor to RIA in 2020 in reliance on RIA assuring Shinhan that it was winding up the Agreements.

159. Importantly, and as known to Mr. Kang, Mr. Kim was only a deputy senior manager and had no authority in 2020 to bind Shinhan to any contract—oral or written. Though he was a point of contact for communications, Mr. Kim did not and could not enter into the Agreements, approve the loans, or otherwise expand the scope of Shinhan's lending made under the Agreements. The authority to bind Shinhan to such a contract rested with the Division Head, Il-woo Lim, who could grant approval to PBS Department Head, Hyo Chan Lee.

## III. RIA's Breaches of the Agreements

### A. After Shinhan Terminated the Agreements, RIA Refused to Return the Securities to Shinhan

160. In mid-2020, with the continued uncertainty of the pandemic, Shinhan made the decision to discontinue new PBS transactions and discontinue existing transactions beyond contract maturities, in an effort to temporarily improve Shinhan's own collateral position. Accordingly, Shinhan sought to terminate the Agreements, thereby recalling all outstanding securities. Shinhan sent RIA a notification on July 5, 2020 stating that it would not extend the maturity of the remaining loans with the intention of liquidating all PBS transactions, in

accordance with §§ 8.1 and 16 of the GMSLA and §§ 5 and 6 of the SLA.

161. Though the Agreements between the parties contemplated at most a year term, with a right to terminate, RIA expressed clear disappointment in the relationship ending. RIA began seeking more and more accommodations on its remaining payments in anticipation of what should have been the return of all securities at the end of 2020.

162. In an effort to maintain good business relations with RIA, Shinhan discounted and suspended certain of RIA's payments in 2020, and made other accommodations, such as adjusting bond maturity dates, in recognition of the market challenges COVID-19 posed and on the assumption that RIA was unwinding the GMSLA portfolio. All such accommodations were never made pursuant to any contractual obligation, were made without waiver to Shinhan's rights, and were based on continued assurances that RIA was returning securities at the end of 2020 in accordance with the July notice of termination. For example, RIA missed borrowing rate payments in April, August and September 2020 and asked for forgiveness of the defaults since it was winding up the lending arrangement.

163. In July 2020, after the termination notice, RIA also asked Shinhan to sign a memorandum RIA drafted, which stated RIA had 0% default on the lent securities and an exemplary track record in its performance under the GMSLA. Shinhan agreed based on RIA's assurance that it was unwinding the GMSLA portfolio and would return all outstanding securities.

164. Unfortunately, despite RIA's repeated assurances it was winding up the lending arrangement, RIA never returned the outstanding securities. Shinhan subsequently sent RIA additional notices of termination on at least five separate occasions: July 21, 2021; January 18, 2022; July 15, 2022; July 13, 2023; and July 19, 2024.

165. Each time, and in breach of the Agreements, RIA refused to return the securities as

required.

166. For example, in July 2021, Shinhan notified RIA of its intent to end the securities-lending relationship and terminate all transactions, and called for the return of the outstanding securities, which then totaled over $200 million in value. On July 22, 2021, RIA agreed that it "makes sense to wind up the relationship" with Shinhan under the Agreements. However, a month later, on August 30, 2021, RIA claimed that the July 2021 notice was not provided during the notice period specified in § 6 of the GMSLA. According to RIA, "no official notice was provided during the Notice Period," and therefore "[t]he GMSLA agreement holds up for the next 12 months"—*i.e.*, the contract extended until August 2022. RIA did not return any of the outstanding securities it had borrowed from Shinhan.

167. Shinhan continued to demand RIA return the outstanding securities and wind up the Parties' securities lending relationship, hoping to do so without resorting to litigation. In February 2022, however, RIA engaged external legal counsel, which sent a threatening letter to Shinhan. As is now apparent, but unknown at the time, RIA began sending legally self-serving communications to Mr. Kim and threatening Shinhan with litigation for purported breaches, seemingly to justify evading its obligations under the Agreements and to demand terms to which it was not entitled under the Agreements. This was a stark contrast to the continuous representations Mr. Kang made to Mr. Kim orally, where Mr. Kang assured Mr. Kim that RIA wished to resolve the relationship amicably.

168. From Shinhan's initial recall of the securities in April 2020, Mr. Kang and Mr. Kim had communicated both by email and over the phone. Mr. Kang was bilingual in both English and Korean, but Mr. Kim's English was far more limited. Through phone conversations, often in Korean, Mr. Kang explained to Mr. Kim that he was under increasing pressure from his partners

at RIA following the voluntary return of the $47 million in lent securities, and that Mr. Kang risked being sued by his own partners if the remainder of the outstanding securities were returned to Shinhan. Accordingly, and despite RIA's continued breaches of the Agreements due to—among other things—its failure to return the outstanding securities, Mr. Kim in good faith attempted to reach a resolution without formally declaring an Event of Default under the Agreements or pursuing litigation against RIA.

169. In March 2022, Mr. Kang sent Mr. Kim a "letter," with the heading and file name of "Statement of Facts," in which RIA listed a series of self-serving statements regarding, among other things, RIA's return of $47 million in securities from two years prior. Mr. Kang indicated that his voting rights had been restricted at RIA and told Mr. Kim that if he signed the letter, it would strengthen Mr. Kang's position at RIA. Mr. Kang indicated RIA was requesting it as a condition to the termination of the agreements and return of all securities, to rebuild trust between the parties, and to avoid litigation over the disputes. Mr. Kang assured Mr. Kim that if he signed the letter, Mr. Kang would use his authority at RIA to ensure that the outstanding securities were returned without further issue and explained that the signed letter was needed so that Mr. Kang could demonstrate his own credibility to RIA's partners.

170. Upon receiving the Statement of Facts, Mr. Kim asked Mr. Kang what effect signing "the letter" would have. Mr. Kang assured Mr. Kim that the letter was not intended to be a contract or agreement of any kind. Rather, in communications with Mr. Kim, including an email from March 14, 2022, Mr. Kang said executing "the letter" would just be to restore trust among the parties from an "overall business perspective."

171. Based on RIA's representations, and the informal nature of the letter, Mr. Kim understood there was no legal effect to signing the letter. So, even though Mr. Kim knew that

RIA's assertions about April 2020 were inaccurate, he signed the letter to appease Mr. Kang with the expectation that RIA would then wind up the trading relationship, return the outstanding securities to Shinhan, and Shinhan could avoid having to commence litigation.

172. Notably, as of January 24, 2022 (until December 31, 2023), Mr. Kim had been promoted to Head of the PBS Department. Even in this new role, Mr. Kim lacked authority to bind Shinhan to any contract without the approval of the Division Head. Mr. Kang was apparently well-aware of this fact, as Mr. Kang acknowledged when he sent the Statement of Facts to Mr. Kim that Mr. Kim may not have authority to sign on behalf of Shinhan.

173. Because it was only a letter, Mr. Kim did not seek or obtain any approval within Shinhan to sign the Statement of Facts.

174. Because RIA failed to return the securities, Shinhan served RIA with another notice of termination in accordance with the terms of the Agreements in July 2022. In response, RIA manufactured, without any basis under the Agreements or law, a purported "default" by Shinhan due to the "request of [Shinhan's] COVID hardship" which RIA claimed Shinhan "must first remedy" before RIA could "process [the transactions termination] accordingly." RIA again did not return any of the outstanding securities it had borrowed from Shinhan. In other words, RIA engaged in a self-help remedy that, if undertaken by borrowers without consequence, would upend the entire securities lending market.

175. In April 2023, RIA stated that it was continuing to "work" on a "partial or full windup of the GMSLA portfolios." Nonetheless, RIA claimed that it still could not return securities to Shinhan upon termination of the Agreements, as "the global markets continue to disrupt our ability to navigate" and pushing to wind up with RIA's "US counterparties would not be wise" and "could cause huge losses which will make the relationship between [Shinhan] and

RiaR bad." As the securities at issue were (and are) very liquid and the lending arrangement per the SLA and trade confirmations only contemplated a one time renewal, RIA's claims were entirely baseless.

176. Notwithstanding the multiple valid notices of termination pursuant to the Agreements that Shinhan sent to RIA in January 2022, July 2022, July 2023, and July 2024, to date, RIA still wrongly retains approximately $228 million[1] in securities that Shinhan first lent to RIA in 2019.

**B. Shinhan Tried to Resolve the Dispute without Litigation**

177. While in hindsight, the attempts were futile, Shinhan's main priority was to conclude the trading relationship smoothly, obtain the outstanding securities back from RIA, and avoid the time and expense of litigation. It therefore did not bring an action against RIA despite all of the continuing and accumulating breaches.

178. By the end of 2023, as a prerequisite for resuming transactions with new PBS counterparties and reactivating trading in the first quarter of 2024, Shinhan needed RIA to return the securities. Based on his belief that he had a good relationship with Mr. Kang, Mr. Kim believed Mr. Kang when he said RIA would return the securities in full if Shinhan would consider future lending. Therefore, in or around September 2023, Mr. Kim began having discussions with Mr. Kang about RIA returning all securities in exchange for Shinhan lending additional securities in the future. Mr. Kim, however, never mentioned any specific amounts or provided any guarantee

[1] Securities have both a market value and a face value. The market value of securities refers to the current price at which they can be bought or sold in the open market, while face value is the original cost of the security as stated by the issuer. The securities Shinhan lent RIA in 2019 had a face value of $244 million. Although that $244 million was reduced by RIA's return of $47 million in securities in April 2020, the market value of the remaining securities that RIA still wrongfully retains have exceeded their face value through swaps and changes of securities, thereby increasing the face value to $228 million.

of lending, and the precise terms of such potential future lending were never discussed on the calls. Then, on or around October 18, 2023, Mr. Kang sent Mr. Kim a "Discussion Draft" of an agreement that RIA's counsel had prepared wherein Shinhan would loan RIA $750 million worth of additional securities to be transferred in three tranches "over the course of 2024 and 2025." Mr. Kang indicated that the draft was for discussion only. The draft did not contain key terms necessary for a binding loan agreement or reflect any prior discussions of the Parties.

179. Based on Mr. Kang's express representations that RIA would return all securities if Shinhan demonstrated it would be open to future lending, Mr. Kim signed and returned the "Discussion Draft" at Mr. Kang's insistence, as a gesture of good faith to facilitate the return of all securities, even though the document was still missing key terms and subject to further discussion between the parties.

180. Immediately after receiving the signed Discussion Draft, Mr. Kang indicated that RIA would have additional edits and changes. *See* Exhibit 6 (November 14, 2023 Email from Kang to Kim); Exhibit 7 (November 30, 2023 Email from Kang to Kim). Soon thereafter, however, Mr. Kang advised Mr. Kim that RIA no longer wanted to enter into the agreement, seemingly because it would rather continue to wrongly retain the more than $220 million in securities that it was required to return.

181. That the Discussion Draft was never intended by either party to be a binding contract is reflected by the fact that: (1) RIA intended to further amend the terms, (2) RIA never countersigned and returned a copy of the Discussion Draft, or any other version of the $750M Loan Agreement, to Shinhan; (3) Mr. Kim never had Shinhan's legal team review the Discussion Draft or obtained approval from the Division Head, as would be required; (4) there was never any performance by Shinhan or demand for performance by RIA; and (5) there was never any notice

of default when the first tranches would have been due before March 2024.

182. RIA nonetheless made a false claim of breach of contract in this Court and then on May 9, 2025, issued its first ever notice of default—over a year and half after the first payment would have been due had the Parties actually entered into the agreement.

**C. RIA Failed to Make Required Payments and Has Obstructed Shinhan's Contractual Right to Take Legal Possession of the Collateral**

183. Because Shinhan—on multiple occasions—validly terminated the Agreements pursuant to § 8.1 of the GMSLA and §§ 5 and 6 of the SLA, RIA is required to return the securities in full, among other damages. GMSLA § 8.3; *see also id.* §§ 9.1, 11.2.

184. In addition, for as long as RIA holds the securities, RIA is obligated to make monthly borrowing and coupon payments for the outstanding loans. GMSLA § 6.2; SLA §7. On multiple occasions, RIA has failed to make timely payments, or neglected to make certain borrowing rate payments altogether in violation of the Agreements.

185. Specifically, RIA failed to make timely coupon payments in August 2022, June 2024, November 2024, and August 2025.

186. RIA also failed to make timely borrowing rate payments (*i.e.* within five business days of the scheduled payment date) in the following months: December 2021, June 2022, November 2022, August 2024, September 2024, October 2024, January 2025, and February 2025.

187. RIA failed to make any borrowing rate payments in September 2021 and October 2021, and has stopped making borrowing rate payments altogether since May 2025.

188. Each of these late or missed payments triggered an automatic Event of Default under Section 13 of the SLA. SLA § 7, 13.

189. Shinhan never forgave, excused, or waived any of these late or missed payments.

190. Following any single nonpayment of a borrowing rate payment within five business

days of the scheduled payment date, Shinhan has a self-executing irrevocable power of attorney over the collateral in the BNP accounts. SLA §§ 7, 13.

191. After RIA had, among other things, failed to make any borrowing payments for August and September 2024, Shinhan wrote to RIA and BNP on October 25, 2024 to provide formal notice of RIA's defaults and to exercise its right to take legal possession of the custodial accounts consistent with § 13 of the SLA.

192. In response, Plaintiff contacted BNP saying the GMSLA was no longer valid, contradicting its later filings with this Court, and ultimately blocked Shinhan's rights and power of attorney under the SLA. BNP replied to Shinhan on November 1, 2024, stating that BNP was "not authorized to accept [Shinhan's] instructions" and that BNP had "been advised by our client, RIA R Squared Inc., that the Power of Attorney attached to [Shinhan's] letter is no longer valid."

193. On December 9, 2024, RIA commenced the above-captioned action in this Court. In its Complaint, RIA alleged it "has in fact made all of the borrowing and coupon payments in question using the rate from 2023–24, and will continue to do so as long as the Current Loan remains outstanding (or until SSC engaged in discussions as to what the 2024–25 rate should be)." Compl. ¶ 71.

194. Notwithstanding this representation to the Court, RIA failed to make its quarterly coupon payment in August 2025 and has not made any borrowing rate payments since May 2025—making only a partial payment in May and no payments at all in June, July, or August 2025.

195. Shinhan again wrote to BNP on June 5, July 3, and August 6, 2025 to provide formal notice of RIA's latest defaults and to exercise its right to take legal possession of the custodial accounts. In response, RIA falsely advised BNP that its payments were current and blocked Shinhan's rights and exercise of its power of attorney under the SLA. BNP has again

taken the position that it "is not authorized to accept [Shinhan's] instructions without direction from RIA R Squared Inc."

196. Troublingly, as of May 1, 2025, RIA has also ceased providing Shinhan daily collateral reports detailing the amount and type of securities held in the custodial accounts at BNP, eliminating any visibility Shinhan had into the status of the collateral backing the loans for the outstanding securities. Shinhan cannot verify whether RIA continues to maintain the proper margin for the market value of the collateral in the custodial accounts, as required under the Agreements, or if RIA is depleting or converting Shinhan's collateral. When served with requests for the production of the collateral reports, RIA objected. Among other things, RIA further refused to admit or deny whether the collateral in the custodial accounts is the same as it was as of the last collateral report received on April 30, 2025, whether RIA is maintaining the proper margin for the market value of the collateral, and whether RIA has transferred, swapped, decreased the amount of, or subjected to repurchase transactions any of the collateral in the custodial accounts.

## FIRST COUNTERCLAIM
## (BREACH OF CONTRACT)

197. Shinhan repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

198. The Parties entered into the GMSLA and SLA on January 25, 2019. Together, the Agreements constitute a firm and binding contract that contains all essential terms for the Parties' securities-lending relationship.

199. Shinhan performed all of its obligations under the Agreements by lending nearly $300 million worth of securities to RIA pursuant to seventeen individual loans between February and October 2019.

200. The lending arrangement, as set forth in the Agreements and the trade confirmations

for each individual loan, was intended to be a six-month or one-year term. Shinhan had the right to terminate the lending arrangement with RIA under § 16 of the GMSLA and § 5 of the SLA. Shinhan further had a right to terminate any particular loan and call for the delivery of all or any equivalent securities "at any time" under § 8.1 of the GMSLA.

201. Shinhan validly terminated the loans under the Agreements in accordance with §§ 16 and 8.1 of the GMSLA and § 5 of the SLA on July 5, 2020.

202. RIA breached the Agreements by failing to, among other things, return all outstanding securities to Shinhan in accordance with the notice of termination in violation of, among others, §§ 8.3, 9.1 11.2, 16 of the GMSLA. In doing so, RIA further breached its obligations to perform "in accordance with the terms and conditions" of the Agreements. *See* GMSLA § 3.

203. Without waiver of its rights with respect to the valid termination in 2020, Shinhan subsequently issued five additional notices of termination on July 21, 2021; January 18, 2022; July 15, 2022; July 13, 2023; and July 19, 2024.

204. RIA continued to breach the Agreements by failing to honor the notices of termination and by failing to return all securities.

205. RIA's breach of the Agreements, including its failure to return all outstanding securities totaling over $220 million, has resulted in substantial financial harm to Shinhan in an amount to be determined at trial.

206. Moreover, the maturity dates of the securities as to the original lenders will occur in November and December 2025, meaning that Shinhan has an obligation to return the equivalent value of securities it lent to RIA to the original lenders by that time. Without RIA returning equivalent securities to Shinhan, Shinhan will be forced to either borrow or purchase the same

securities in the market in order to provide them to the original lenders, or otherwise default on its obligations to the original lenders.

207. Under § 7 of the SLA, RIA is obligated to make monthly borrowing rate payments on all outstanding securities within five business days of the payment date. RIA's obligation is owed so long as it retains any securities and survives termination of the Agreements.

208. Failure to make timely monthly borrowing rate payments is an Event of Default under § 13 of the SLA and § 10.1 of the GMSLA.

209. In its Complaint, RIA assured this Court it would make all monthly borrowing and coupon payments for so long as long as the loan remains outstanding. *See* Compl. ¶ 71.

210. RIA repeatedly breached the Agreements by failing to make timely monthly borrowing rate payments on several occasions, including but not limited to the following months: September 2021, October 2021, December 2021, June 2022, November 2022, August 2024, September 2024, October 2024, January 2025, February 2025, May 2025, June 2025, and July 2025.

211. RIA's failure to make the monthly borrowing rate payments has resulted in substantial financial and reputational harm to Shinhan in an amount to be determined at trial.

212. Each individual failure to make timely borrowing rate payment constitutes an Event of Default under § 13 of the SLA entitled Shinhan to, among other damages, legal possession of all custodial securities held at BNP.

213. RIA breached § 13 of the SLA by failing to comply with the Parties' contracted obligations in the Event of Default, which would allow Shinhan to take legal possession of all custodial accounts at BNP.

214. RIA has further breached its obligations under the Agreements by failing to comply

with § 5.4 of the GMSLA and § 9 of the SLA.

215. To the extent RIA has failed to maintain the required margin for the market value of the collateral in the custodial accounts or improperly transferred custodial securities from the custodial accounts, RIA has breached § 5.4 of the GMSLA and § 9 of the SLA.

216. RIA has breached the Agreements by failing to make timely coupon payments in accordance with § 6.2 of the GMSLA. Specifically, in August 2022, June 2024, November 2024, and August 2025, RIA failed to make timely coupon payments.

217. Collectively, RIA's breaches of the Agreement have resulted in significant damages. The failure to make borrowing rate payments and coupon payments has led to financial losses due to the missed income streams. The absence of collateral reports has compromised the ability to monitor and manage the collateral, increasing financial risk. The refusal to allow Shinhan to take legal possession of the collateral and RIA's wrongful retention of approximately $228 million worth of securities for over five years have not only deprived the rightful party of their assets but also caused substantial opportunity costs and potential investment losses. Collectively, these breaches have inflicted severe economic harm, undermined trust, and necessitated legal intervention to rectify the situation and recover the unjustly retained securities. Accordingly, Shinhan is entitled to damages in an amount that will be determined at trial.

**SECOND COUNTERCLAIM**
**(BREACH OF IMPLIED COVENANT)**

218. Shinhan repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

219. A covenant of good faith and fair dealing is implied in all contracts under New York law. The covenant of good faith and fair dealing prevents a party from destroying or injuring the right of another party to receive the fruits of the contract. This implied covenant is breached

when a party acts in a manner that deprives the other party of the benefits of the contract.

220. RIA has engaged in numerous acts to withhold from Shinhan the benefits of the Agreements, thereby breaching the covenant of good faith and fair dealing implied in the GMSLA and SLA.

221. First, under § 13 of the SLA, "[i]n an event of default," such as RIA's "nonpayment of the borrowing rate" payments "within 5 business days of the scheduled payment date," Shinhan "shall solely have the right to . . . take legal possession of the ***custodial account*** and the ***custodial securities***" by following the enumerated steps in the SLA. SLA § 13 (emphasis original).

222. Shinhan's right to take legal possession of the collateral in the custodial accounts at BNP following an Event of Default by RIA is a benefit of the Agreements.

223. After Shinhan first tried to exercise its rights to take legal possession of the custodial accounts in October 2024, RIA informed BNP that the GMSLA and Shinhan's Power of Attorney was "no longer valid," thereby blocking Shinhan's rights and power of attorney under the SLA.

224. After Shinhan provided BNP notice in June, July, and August 2025 regarding RIA's further events of default by failing to make borrowing payments, RIA once again blocked Shinhan's rights and power of attorney under the SLA by refusing to "authorize[]" BNP "to accept [Shinhan's] instructions" regarding the custodial accounts.

225. By interfering with Shinhan's rights and ultimately preventing its power of attorney over the custodial accounts following RIA's defaults, RIA sought to withhold the benefits of the Agreements from Shinhan.

226. Second, the Agreements and terms of the individual loans required RIA to maintain a certain margin for the market value of the collateral in the custodial accounts at BNP on each

Business Day. In compliance with the GMSLA, RIA provided daily reports detailing the collateral held in the custodial accounts which were verified by BNP. On May 1, 2025, RIA suddenly stopped providing such daily collateral reports to Shinhan. RIA also refused to respond to any discovery requests by Shinhan regarding the status of the collateral in the custodial accounts and has not confirmed it is not dissipating Shinhan's collateral.

227. By withholding information from Shinhan regarding the status of the collateral in the custodian accounts, RIA is depriving Shinhan of a critical benefit under the Agreements—namely, the assurance of adequate collateral on each day the loans are outstanding.

228. Third, the lending arrangement was contemplated to be only a one year term. The Agreements give Shinhan the right to recall particular loans and to terminate the Agreements in their entirety. Shinhan exercised those rights when it issued the various notices of termination to RIA in 2021, 2022, 2023, and 2024.

229. RIA acted in bad faith by refusing to acknowledge valid notices of termination and making increasing demands for accommodations and terms. RIA further violated its obligation by seeking to impose terms not included in the Agreements in exchange for recognizing Shinhan's bargained for rights, such as conditioning return of the securities on additional securities lending.

230. In addition, RIA also responded on multiple occasions by threatening Shinhan with litigation for exercising its rights under the Agreements to terminate loans and the GMSLA and SLA.

231. RIA also made false promises that it would finally return the outstanding amount of recalled securities in exchange for Mr. Kim agreeing to sign the Statement of Facts and the "Discussion Draft" of the $750M Loan Agreement.

232. By refusing to comply with Shinhan's valid notices of termination, threatening

Shinhan for properly recalling individual loans and terminating the Agreements, and making false promises to return the outstanding securities, RIA sought to withhold the benefits of the Agreements from Shinhan.

233. Through these numerous acts of interference and efforts to withhold from Shinhan the benefits of the Agreements, RIA has breached the covenant of good faith and fair dealing implied in the Agreements.

234. RIA's breach of the covenant of good faith and fair dealing implied in the Agreements has damaged Shinhan in an amount to be determined at trial.

**THIRD COUNTERCLAIM**
**(CONVERSION)**

235. Shinhan repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

236. The Agreements, and each individual loan thereunder, terminated by the term of the loan and pursuant to six separate valid notices of termination Shinhan sent to RIA.

237. By continuing to retain and refusing to return more than $220 million in recalled securities after the loan terms expired and Shinhan issued the notices of termination, presently valued at $228 million, RIA converted assets that belong to Shinhan or over which Shinhan had an immediate superior right of possession. In addition, by repeatedly obstructing Shinhan's exercise its rights to take legal possession of the BNP custodial accounts following RIA's events of default, RIA also has converted assets (the collateral) that belong to Shinhan or over which Shinhan had an immediate right of legal possession.

238. As detailed above, the term of the particular loans has long since expired. Moreover, these securities were properly recalled by Shinhan under GMSLA §§ 8.1, 16 and SLA §§ 5, 6 when Shinhan issued multiple notices of termination in 2021, 2022, 2023, and 2024.

239. As further detailed above, RIA knew the loans had matured and Shinhan had issued notices of termination and recalled the outstanding securities, and nonetheless RIA has willfully and without lawful justification refused for years to return the securities.

240. To date, RIA has not returned any of the outstanding securities, currently valued at approximately $228 million. RIA had no right to withhold these securities upon termination, and has thus exercised unauthorized dominion and control over Shinhan's assets in derogation of Shinhan's rights.

241. In addition, RIA has taken affirmative steps to obstruct Shinhan's right to exercise its contractual and legal entitlement to take legal possession of the custodial securities being held in the custodial accounts at BNP following RIA's defaults. RIA has blocked Shinhan from taking possession of its collateral by making false claims to BNP that the SLA provision authorizing Shinhan to take legal possession upon default was no longer valid, or falsely claiming that RIA had made all borrowing rate payments. In doing so, RIA exercised unauthorized dominion and control over the collateral in derogation of Shinhan's irrevocable right to possession and control of the collateral.

242. RIA's conduct is not the result of mistake or negligence, but a deliberate, knowing, and malicious scheme to deprive Shinhan of its property for RIA's own gain, in conscious disregard of Shinhan's rights.

243. RIA's conversion is aggravated by fraudulent intent, gross indifference, and wanton dishonesty. Defendant has knowingly exploited custodial and collateral structures to perpetuate its wrongful retention of Shinhan's property, thereby engaging in conduct that transcends a mere private dispute and evidences such moral turpitude and bad faith as to warrant punitive damages under New York law.

244. Moreover, if self-help of the kind undertaken by RIA were permitted to stand, it would undermine the integrity of the securities lending market—a multibillion-dollar industry that depends on the prompt return of borrowed securities and the enforceability of collateral arrangements. RIA's conduct therefore poses a risk of harm not only to Shinhan, but to the functioning and stability of the broader marketplace.

245. As a direct and proximate result of such conversion, Shinhan has suffered and will continue to suffer damage for which RIA is liable. RIA is therefore liable for having converted these securities, and Shinhan is entitled to the return all such securities, legal possession of the custodial accounts, and an award of damages in an amount to be determined at trial.

246. Shinhan is further entitled to an award of punitive damages, in an amount sufficient to punish RIA's egregious misconduct and to deter RIA and others from engaging in similar conduct that threatens market stability.

**FOURTH COUNTERCLAIM**
**(UNJUST ENRICHMENT)**

247. Shinhan repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

248. By virtue of the facts set forth above, RIA has been enriched at Shinhan's expense.

249. It is against equity and good conscience to permit RIA to retain the outstanding securities initially lent by Shinhan in 2019, pursuant to the Agreements.

250. As detailed above, these securities were properly recalled by Shinhan under GMSLA §§ 8.1, 16 and SLA §§ 5, 6 when Shinhan issued multiple notices of termination in 2020, 2021, 2022, 2023, and 2024.

251. Moreover, under the terms of the individual loans, as set out in the trade confirmations, and the SLA, the loans terminated after a single rollover. There was never more

than a single automatic renewal.

252. Despite multiple notices of termination and the express term limit for the loans, RIA has not returned any of the outstanding securities that Shinhan lent in 2019 and recalled, and which are currently valued at approximately $228 million.

253. By continuing to retain and refusing to return the outstanding securities currently valued at approximately $228 million, RIA has been unjustly enriched at Shinhan's expense, as RIA has been able to pursue its own investment strategies and goals with continued use of the lent securities during this multi-year period.

254. By blocking Shinhan's right to take over legal possession of the collateral, which had an original face value of approximately $243 million and a market value of approximately $204 million as of April 30, 2025, RIA has further enriched itself at the expense of Shinhan.

255. As a result thereof, Shinhan has been damaged in an amount to be determined at trial.

256. Shinhan is entitled to restitution and/or disgorgement of all benefits unjustly obtained by RIA, including but not limited to the value of the securities wrongly retained, the value of the collateral, as well as any profits derived therefrom.

**WHEREFORE,** Defendant respectfully demands judgment as follows:

i. Dismissing the Complaint in its entirety with prejudice;

ii. Denying any and all relief requested by Plaintiff;

iii. Awarding Shinhan compensatory damages in an amount to be determined at trial for Plaintiff's breaches of the GMSLA and SLA, and of the implied covenants therein;

iv. On the third counterclaim, as consequence of RIA's conversion of the recalled securities and unauthorized dominion and control over Shinhan's assets in derogation of Shinhan's rights, directing RIA to return all outstanding securities, together with all proceeds and distributions derived therefrom to Shinhan immediately; awarding Shinhan compensatory damages in an amount to be determined at trial, but not less than the fair market value of the securities wrongfully converted plus consequential damages arising from RIA's misconduct; and awarding Shinhan punitive damages in an amount sufficient to punish RIA for its willful, malicious, and fraudulent conduct, and to deter RIA from engaging in similar misconduct that undermines the integrity of the securities lending market;

v. On the fourth counterclaim, an order requiring RIA to return the securities wrongly retained, to cease blocking Shinhan's right to take over the collateral, and to allow Shinhan to take legal possession of the collateral, or alternatively, an order requiring RIA to pay Shinhan the fair market value of the securities wrongly retained and the value of the collateral; an order requiring RIA to disgorge any profits or benefits derived from the wrongful retention of the securities and the blocking of Shinhan's right to the collateral; and an award of damages in an amount to be determined at trial;

vi. Awarding Shinhan pre-judgment and post-judgment interest at the maximum rate permitted by law;

vii. Awarding Shinhan reasonable attorneys' fees and costs, as authorized under § 11.7 of the GMSLA; and

viii. Awarding Shinhan such other and further relief as this Court deems just and proper.

Respectfully submitted,

New York, New York
September 2, 2025

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Sylvia Precht
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
sylvia.precht@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**EXHIBIT 7**

Message

**From:** David Kang [david.kang@rsquaredia.com]
**Sent:** 2/11/2019 6:09:55 PM
**To:** 김상혁 [shkim@shinhan.com]
**CC:** Michael Leung [michael.leung@rsquaredia.com]; PIPA Redaction [PIPA Redaction@rsquared.co.kr]
**Subject:** Re: [ShinHan PBS] Pre-trade confirmation

Mr. Kim,

Thank you for the pre-trade confirmation. Please accept this email as confirmation from RIA per mutual trade terms stated in your email. I will relay to my NY team to put together the Block Letter as well as the bond list. I should be able to get back to within a day or two.

Thank you,

Best,

D. Kang
President and CEO.
RIA R Squared Inc.

On Mon, Feb 11, 2019 at 12:51 AM 김상혁 <shkim@shinhan.com> wrote:

Please find the below pre-trade confirmation.

**Pre-Trade Confirmation**

| | |
|---|---|
| Trade Date | 20-FEB-19 (Korea Standard Time) |
| Settlement Date | 20-FEB-19 (Korea Standard Time) |
| Termination Date | 19-AUG-20 (Korea Standard Time) |
| Trade Notional | US Treasury USD 100,000,000<br>Municipal Bonds USD 50,000,000 |
| Price/Spread | US Treasury: 170bps<br>Municipal Bonds: 120bps |

| | |
|---|---|
| **Collateral** | **All Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities (Block)** |
| Rollover | Initial 6 Months with confirmed automatic 6 Months Roll |

Trade Details

| ISIN | CCY | Amount |
|---|---|---|
| US912810RQ31 | T 2.5 02/15/46 | 60,000,000 |
| US912810RT79 | T 2.25 08/15/46 | 40,000,000 |
| US85440KAA25 | STNFRD 3.647 05/01/48 | 25,000,000 |
| US91514AGU34 | UNIHGR 3.354 08/15/47 | 25,000,000 |
| | | 150,000,000 |

Thank you for your support, and we look forward to the trade

Sam Sang Hyuk, Kim

T +82.2.3772.2753
M +82.10.5871.0202

PBS Department
SHINHAN Investment Corp.

--
***David Kang***
*Partner and President*

***Ria R Squared Inc.***

575 Lexington Ave. 4th Floor
New York, NY 10022

*Office: 212-652-9668*
*Cell: 213-364-2848*
*david.kang@rsquaredia.com*

Message

**From:** David Kang [david.kang@rsquaredia.com]
**Sent:** 2/18/2019 2:00:12 PM
**To:** 김상혁 [shkim@shinhan.com]
**CC:** Michael Leung [michael.leung@rsquaredia.com]
**Subject:** Re: [ShinHan PBS] Trade confirmation_2019-02-18
**Attachments:** Shinhan Investment SSI (2019) (4).pdf

Mr. Kim,

Confirmed on the trade. I will work with RIA US operations to provide the following:
1. Block Letter with securities.
2. Authorized signature by RIA for Block Letter
3. Upon receipt by SIC, please sign as witness to the Block Letter and send with bond transfer

My US partner has been cc'd in the email along with SSI to be delivered to BNP Custodial.

Thank you,

D. Kang
President and CEO
RIA R Squared Inc.

On Sun, Feb 17, 2019 at 8:51 PM 김상혁 <shkim@shinhan.com> wrote:

Please find the below Trade confirmation.

**Trade Confirmation**

| | |
|---|---|
| Trade Date | 19-FEB-19 (Korea Standard Time) |
| Settlement Date | 19-FEB-19 (Korea Standard Time) |
| Termination Date | 19-AUG-20 (Korea Standard Time) |
| Trade Notional | Municipal Bonds USD 50,000,000 |
| Price/Spread | Municipal Bonds: 120bps |

| | |
|---|---|
| **Collateral** | **All Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities (Block)** |
| Rollover | Initial 6 Months with confirmed automatic 6 Months Roll |

Trade Details

| ISIN | CCY | Amount |
|---|---|---|
| US85440KAA25 | STNFRD 3.647 05/01/48 | 25,000,000 |
| US91514AGU34 | UNIHGR 3.354 08/15/47 | 25,000,000 |
| | **total** | 50,000,000 |

Thank you for your trade

Shinhan Inv Euro Clear A/C #43322

Sam Sang Hyuk, Kim

T +82.2.3772.2753
M +82.10.5871.0202

PBS Department
SHINHAN Investment Corp.

SHINHAN Investment Corp.

--
***David Kang***
*President and CEO*

*Partner*

***Ria R Squared Inc.***
575 Lexington Ave. 4th Floor
New York, NY 10022

*Office: 212-652-9668*
*Cell: 213-364-2848*
*david.kang@rsquaredia.com*

Message

**From:** david.kang@rsquaredia.com [david.kang@rsquaredia.com]
**Sent:** 2/26/2019 3:16:54 PM
**To:** '김상혁' [shkim@shinhan.com]
**CC:** PIPA Redaction@rsquared.co.kr; michael.leung@rsquaredia.com
**Subject:** RE: [ShinHan PBS] Trade confirmation_2019-02-27
**Attachments:** RIA R SQUARED - SHINHAN Letter to Block the Sale of Assets 02252019 dk1.pdf

Sam,

Please see the attached Block Letter with GNMA Securities. With the current GNMAs and this addition.
MV is ~152.5mm
152.5mm/136.8mm ~111.476%

In addition too, we will be adding a little cushion to the overall portfolio... within the next day or so...
Please see the attached Block Letter.

Thanks..

D. Kang
President and CEO

**From:** 김상혁 <shkim@shinhan.com>
**Sent:** Monday, February 25, 2019 8:31 PM
**To:** David Kang <david.kang@rsquaredia.com>
**Subject:** [ShinHan PBS] Trade confirmation_2019-02-27

Please find the below Trade confirmation.

**Trade Confirmation**

| | |
|---|---|
| Trade Date | 27-FEB-2019 (Korea Standard Time) |
| Settlement Date | 27-FEB-2019 (Korea Standard Time) |
| Termination Date | 26-AUG-2019 (Korea Standard Time) |
| Trade Notional | US Treasury 100,000,000 |

Price/Spread US Treasury 170bps

**Collateral** **All Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities (Block)**

Rollover Initial 6 Months with confirmed automatic 6 Months Roll

Trade Details

| ISIN | CCY | Amount |
|---|---|---|
| US912810RQ31 | T 2.5 02/15/46 | 30,000,000 |
| US912810RS96 | T 2.5 05/15/46 | 40,000,000 |
| US912810RT79 | T 2.25 08/15/46 | 30,000,000 |

Thank you for your trade

**Settlement Detail**

Trade date : 27-FEB-2019

Settlement Date : 27-FEB-2019

Shinhan Inv Euro Clear A/C #43322

Ria R Squared Euro Clear A/c #45668

Sam Sang Hyuk, Kim

T +82.2.3772.2753
M +82.10.5871.0202

PBS Department
SHINHAN Investment Corp.

Message

**From:** David Kang [david.kang@rsquaredia.com]
**Sent:** 4/12/2019 5:02:32 AM
**To:** 김상혁 [shkim@shinhan.com]
**CC:** Marcus Shin [marcus.shin@rsquared.co.kr]; 배한경 [hankyung.bae@rsquared.co.kr]; Michael Leung [michael.leung@rsquaredia.com]
**Subject:** Re: [ShinHan PBS] Trade confirmation_2019-04-15

Sam,

Confirmed receipt. Will have my team in NYC prepare the Block Letter for your review.

Thank you,

D. Kang

On Thu, Apr 11, 2019 at 9:58 PM 김상혁 <shkim@shinhan.com> wrote:

Please find the below Trade confirmation.

**Trade Confirmation**

| | |
|---|---|
| Trade Date | 15-April-2019 (Korea Standard Time) |
| Settlement Date | 15-April-2019 (Korea Standard Time) |
| Termination Date | 14-October-2019 (Korea Standard Time) |
| Trade Notional | US Treasury 50,000,000 |
| Price/Spread | US Treasury 170bps |
| **Collateral** | **All Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities (Block)** |
| Rollover | Initial 6 Months with confirmed automatic 6 Months Roll |

Trade Details

| ISIN | CCY | Amount |
|---|---|---|
| US912810RK60 | T 2.5 02/15/45 | 30,000,000 |
| US912810RS96 | T 2.5 05/15/46 | 10,000,000 |
| US912810RT79 | T 2.5 05/15/46 | 10,000,000 |

**Settlement Detail**

Trade date : 15-April-2019

Settlement Date : 15-April-2019

Shinhan Inv Euro Clear A/C #43322

Ria R Squared Euro Clear A/c #45668

**Thank you.**

**Sam Sang Hyuk, Kim**

T +82.2.3772.2753

M +82.10.5871.0202

PBS Department

SHINHAN Investment Corp.

--
***David Kang***
*President and CEO*
*Partner*

***Ria R Squared Inc.***

575 Lexington Ave. 4th Floor
New York, NY 10022

*Office: 212-652-9668*
*Cell: 213-364-2848*
*david.kang@rsquaredia.com*

Message

**From:** David Kang [david.kang@rsquaredia.com]
**Sent:** 10/8/2019 11:11:26 AM
**To:** 김상혁 [shkim@shinhan.com]
**CC:** Michael Leung [michael.leung@rsquaredia.com]
**Subject:** Re: [ShinhanInvestment] Trade Confirmation 2019-10-08 (Amendment)
**Attachments:** RIA R SQUARED - SHINHAN Letter to Block the Sale of Assets 10082019.pdf

Sam,

Revised trade confirmation well received. Please see attached block letter. After settlement of the bonds, we will send you revised payment schedule.

Thank you,

D. Kang

On Mon, Oct 7, 2019 at 6:12 PM 김상혁 <shkim@shinhan.com> wrote:

Dear RIA,

We would like to swap out the US Treasuries with the below listed Bonds.

Please send the US Treasuries to the Euroclear Account "**Shinhan Inv Euro Clear A/C #43322**"

**Trade Confirmation**

| | |
|---|---|
| Trade Date | 8-OCT-2019 (Korea Standard Time) |
| Settlement Date | 8-OCT-2019 (Korea Standard Time) |
| Termination Date | 7-APR-2020 (Korea Standard Time) |
| Returning US Treasuries | US912810RK60 – USD 30,000,000<br>US912810RS96 – USD 10,000,000<br>US912810RT79 – USD 10,000,000 |

New Trade Details

| ISIN | CCY | Amount | Spread Fee |
|---|---|---|---|
| HARVARD 3.15 07/15/46 | US740816AM58 | 16,000,000 | 120 bps |
| HARVARD 6.5 01/15/39 | USU7410EAC94 | 5,000,000 | 120 bps |

| | | | |
|---|---|---|---|
| PG 3.5 10/25/47 | US742718FB02 | 20,000,000 | 110 bps |
| STNFRD 3.647 05/01/48 | US85440KAA25 | 6,000,000 | 120 bps |
| TVA 3.5 12/15/42 | US880591EP31 | 10,000,000 | 120 bps |
| TVA 5.25 09/15/39 | US880591EH15 | 13,000,000 | 120 bps |
| UNIHGR 3.354 08/15/47 | US91514AGU34 | 4,000,000 | 120 bps |
| WMT 4.05 06/29/48 Corp | US931142EC31 | 10,000,000 | 110 bps |
| WMT 4.75 10/02/43 Corp | US931142DK65 | 10,000,000 | 110 bps |

Total Amount USD 94,000,000

**Collateral** **All Ginnie Mae Minimum 110% and above of MTM value of Loaned Securities (Block)**

Rollover Initial 6 Months with confirmed automatic 6 Months Roll

Thank you for your trade

Sam Sang Hyuk, Kim

T +82.2.3772.2753
M +82.10.5871.0202

PBS Department
SHINHAN Investment Corp.

--
***David Kang***
*President and CEO*
*Partner*

***Ria R Squared Inc.***
575 Lexington Ave. 4th Floor
New York, NY 10022

*Office: 212-652-9668*
*Cell: 213-364-2848*
*david.kang@rsquaredia.com*

**EXHIBIT 8**

Message

**From**: PIPA Redaction @rsquared.co.kr [PIPA Redaction @rsquared.co.kr]
**Sent**: 1/29/2019 2:50:33 PM
**To**: shkim@shinhan.com
**CC**: PIPA Redaction @rsquared.co.kr
**Subject**: RE: [ShinHan] GMSLA Progress and Requests

**Attachments**: Bond List for Approval 20190128.xlsx

Dear Deputy General Manager,

I hope you had a pleasant lunch.

Please find below the updates we have received from our headquarters.

**1. The account opening at BNPP is expected to be completed around Thursday, US time (Friday, Korea time).**

**2. We have attached the list of Ginnie Mae securities that we can pledge as collateral ("Securities List for Approval 20190128"). We would highly appreciate it if you could select your preferred securities. Alternatively, if all the attached securities are acceptable to you, please let us know that all of them are acceptable.**

**3. Since we need to prepare the market value of the securities in advance to meet the collateral ratio requirements, we would appreciate it if you could provide us with the expected OC Ratio (Overcollateralization Ratio) and Deal Size.**

Deputy General Manager, I apologize for the repeated requests, but we would be deeply grateful if you could make every effort to ensure the deal is closed by Friday, February 1, Korea time.

Kindly review the above details and let us have your response.

Thank you!

[redacted] Sincerely,

PIPA Redaction
Associate Director
Machine Learning Finance

SQUARED ML
R Squared ML Company
20F, Gwanghwamun Bldg., 149, Sejong-daero, Jongno-gu,
Seoul, Korea 03186
Office: PIPA Redaction
Cell: PIPA Redaction
Email: PIPA Redaction @rsquared.co.kr / www.rsquared.co.kr

*This e-mail message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this e-mail/telefax information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents.*

---

**From:** PIPA Redaction @rsquared.co.kr <PIPA Redaction @rsquared.co.kr>
**Sent:** Monday, January 21, 2019 4:12 PM
**To:** shkim@shinhan.com
**Cc:** PIPA Redaction @rsquared.co.kr
**Subject:** [ShinHan] GMSLA Progress and Requests

Dear Deputy General Manager,

Please find below our responses to the inquiries requested by the Risk Team for your review.

**1. PEF Investment Leverage Ratio**
For MBS investments financed by repoed funds, our internal leverage ratio is approximately 50% (+/-).

**2. Method for Recovering Funds for Ginnie Mae and Other** Guaranteed Securities
First, the methods and procedures for recovering funds for Ginnie Mae securities are not a matter of concern.

Since its establishment in 1968, Ginnie Mae has never once failed to pay Principal & Interest (P&I) to investors. You can verify this via the Ginnie Mae website link provided below.
*Reference Link:* *https://www.ginniemae.gov/newsroom/GinnieInBrief/pages/Post.aspx?PostID=13*

Even if a mortgage borrower within a Ginnie Mae securities loan pool goes bankrupt, the lender/issuer of the Ginnie Mae securities is obligated to independently pay the principal or interest for the defaulted portion. If the lender/issuer fails to pay the principal and interest on the issued Ginnie Mae securities, Ginnie Mae will step in pursuant to MBS Guide Chapter 23: CONDITIONS FOR DEFAULT - GINNIE MAE REMEDIES *(Reference: https://www.ginniemae.gov/issuers/program_guidelines/Pages/mbsguidelib.aspx)* ) to ensure that investors unconditionally receive their principal and interest. In other words, even if a loan pool within a specific Ginnie Mae securities goes bankrupt, the Ginnie Mae securities themselves do not go bankrupt, and investors will continuously receive their

principal and interest. For supporting data regarding this, please refer to the attached 'Ginnie Mae Pass Through Process' and 'Ginnie Mae Guide Chapter_23.'

Therefore, in accordance with this 'Full Faith and Credit' of these U.S. government agencies, as mentioned above, Ginnie Mae has never once missed a single principal and interest payment to investors for 50 years.

**3. Procedures in the Event of PEF (Ria R Squared) Bankruptcy**

The procedures in the event of RIA's bankruptcy will be executed in accordance with Section 13 [Event of Default] within the Supplemental Lending Agreement, which has been reviewed by the Shinhan Investment Corp. Legal Team. Since a POA is also included, in the event of RIA's bankruptcy, Shinhan Investment Corp. will take over the ownership of the custodial account containing the collateral without any issues.

**Supplemental Lending Agreement – 13. Event of Default**

In an ***event of default***, post acknowledgement of such default by BNP, Shinhan Investment Co, LTD shall solely have the right to proceed with the following steps to take legal possession of the ***custodial account*** and the ***custodial securities***:

1. BNP will draft paperwork for new custodial agreement documents for Shinhan Investment Corp.
2. Shinhan Investment Corp shall review the custody agreement documents and complete all AML/KYC paperwork per BNP.
3. Once signed paperwork is delivered to BNP, BNP compliance and business review occurs.
4. Once approved, ownership transfer of the collateral shall be immediate.

**Power of Attorney.**

Party B, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints Party A as the attorney of the Party B on its behalf and in the name of the Party B or the Party A (as the attorney may decide) to do all acts, and execute all documents which the Party B could itself execute, in relation to any of the ***custodial securities***, including (but without limitation):

(i) to execute any Transfer, bill of sale or other assurance in respect of the ***custodial securities***;

(ii) to exercise all the rights and powers of Party B in respect of the ***custodial securities***;

(iii) to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the ***custodial securities***;

(iv) to endorse any checks or other instruments or orders in connection with any of the ***custodial securities***; and

(v) to make any claims or to take any action or to institute any proceedings which Party A considers to be necessary or advisable to protect or enforce the security interest created hereunder.

Please feel free to contact us at any time if you have any further questions.

Thank you.

[redacted] Sincerely,

PIPA Redaction
Associate Director
Machine Learning Finance

SQUARED ML
R Squared ML Company
20F, Gwanghwamun Bldg., 149, Sejong-daero, Jongno-gu,
Seoul, Korea 03186
Office: PIPA Redaction
Cell: PIPA Redaction
Email: PIPA Redaction@rsquared.co.kr / www.rsquared.co.kr

*This e-mail message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this e-mail/telefax information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents.*

From: Kim Sang-hyuk <shkim@shinhan.com>
**Sent:** Monday, January 21, 2019 9:08 AM
**To:** PIPA Redaction@rsquared.co.kr
**Subject:** [ShinHan] GMSLA Progress and Requests

Dear Director,
I hope you had a great weekend.

We have held a second meeting with the Risk Management Department. Please find below the additional requests made by the Risk Team.

**1. PEF Investment Leverage Ratio**

e.g.) Internal leverage ratio of 100%, 200%, etc., when investing in
MBS (Mortgage-Backed Securities) using repoed funds

**2. Method for Recovering Funds for Guaranteed Securities, such as Ginnie Mae**

e.g.) Method for recovering funds, payment procedures

**3. Procedures in the Event of PEF (Ria R Squared) Bankruptcy**

There are the above requirements and various requested materials from the Risk Management Department, and I think I can prepare the rest myself.

The future procedures consist of holding a Risk Working-level Meeting (deal approval for the transaction) after replying to the Risk Team's requirements (expected to take about a week).

Thank you as always.

Sam Sang Hyuk, Kim

T +82.2.3772.2753
M +82.10.5871.0202

PBS Department
SHINHAN Investment Corp.

--- Original Message ---
**From :** PIPA Redaction @rsquared.co.kr
**To :** shkim@shinhan.com
**Cc :** PIPA Redaction @rsquared.co.kr
**Date:** Wednesday, January 9, 2019, 1:43:50 PM
**Subject :** FW: FW: [ShinHan] Gmsla Feedback

Dear Deputy General Manager,

We have put together and are sending our responses to the Shinhan Investment Corp. Legal Team's comments as follows.

Supplemental Lending Agreement

13. We have partially revised and supplemented the POA section under the Event of Default clause.

Power of Attorney. Party B, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints Party A as the attorney of the Party B on its behalf and in the name of the Party B or the Party A (as the attorney may decide) to do all acts, and execute all documents which the Party B could itself execute, in relation to any of the custodial securities collateral ("Posted Collateral"), including (but without limitation):

(i) to execute any Transfer, bill of sale or other assurance in respect of the Posted Collateral custodial securities;

(ii) to exercise all the rights and powers of Party B in respect of the Posted Collateral custodial securities;

(iii) to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the Posted Collateral custodial securities;

(iv) to endorse any checks or other instruments or orders in connection with any of the Posted Collateral custodial securities; and

(v) to make any claims or to take any action or to institute any proceedings which Party A considers to be necessary or advisable to protect or enforce the security interest created hereunder.

--> "Revised "Posted Collateral" to "Custodial Securities"

Regarding the Tripartite Security Agreement between BNP, the Company, and RIA

Custodians in the U.S. do not enter into any tri-party agreements, as their role is limited to safely holding assets in custody. The reason is that since the 2008 financial crisis,
numerous custodians in the U.S. have been sued due to tri-party agreements. During a previous deal with Shinhan Bank, we received a response from BNPP stating that BNPP do not enter into a Tri-party Agreement, and the relevant email has been attached ('Follow up with BNP per Multi or Tri-party agreements.pdf').If you check this email, you will see that when we visited BNPP New York for due diligence with the Shinhan Bank team, we also received a response from BNPP that they do not enter into a Tri-party Agreement.

Accordingly, BNPP has proposed the following method regarding this deal.

BNPP has agreed to provide confirmation
once we submit the attached 'RIA R SQUARED-SHINHAN Letter to Block the Sale of Pledged Assets' form to BNPP after both parties have mutually agreed to and signed it. Upon BNPP's confirmation of this Letter,
the specified collateral securities will be pledged until maturity.

The procedures are as follows:

* Before we send the Pre-Trade Confirmation, RIA will send the collateral securities list in advance, and Shinhan Investment Corp. will cherry-pick the desired collateral securities up to the OC Ratio.

* When Shinhan Investment Corp. sends the Pre-Trade Confirmation, they will also specify the pre-cherry-picked collateral securities list within the Pre-Trade Confirmation and send it to RIA.
* After confirming the Pre-Trade Confirmation sent by Shinhan Investment Corp., RIA will draft and sign the 'Letter to Block the Sale of Pledged Assets' and send the form to Shinhan Investment Corp..
* On the Trade Date, upon sending the securities, Shinhan Investment Corp. will simultaneously send the fully executed 'Letter to Block the Sale of Pledged Assets' to RIA.
* While concurrently depositing the collateral securities specified in the 'Letter to Block the Sale of Pledged Assets' into the RIA-SHINHAN custodial account, RIA will send the fully executed 'Letter to Block the Sale of Pledged Assets' to BNPP for their confirmation.

In this regard, we kindly request the Legal Team and Risk Team to review this matter.

Please feel free to contact us if you have any questions.

Thank you.

[redacted] Sincerely,

PIPA Redaction
Associate Director
Machine Learning Finance

R Squared ML Company
20F, Gwanghwamun Bldg., 149, Sejong-daero, Jongno-gu,

Seoul, Korea 03186
Office: PIPA Redaction

Cell: PIPA Redaction
Email: <mailto:PIPA Redaction@rsquared.co.kr> PIPA Redaction@rsquared.co.kr /
<http://www.rsquared.co.kr/> www.rsquared.co.kr

This e-mail message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this e-mail/telefax information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents.

From: Kim Sang-hyuk <shkim@shinhan.com <mailto:shkim@shinhan.com>>
Sent: Tuesday, January 8, 2019 10:33 AM
To: PIPA Redaction @rsquared.co.kr <mailto: PIPA Redaction @rsquared.co.kr>
Subject: Re: FW: [ShinHan] Gmsla Feedback

Hello,

We have received the following response from our legal counsel.

Could you please review this?

13. BNP appears in the Event of Default clause; however, since BNP is not a contracting party to this Agreement, it does not have binding force.

As we do not actually take physical possession of the collateral but rather establish a pledge over the RIA account opened with BNP, please execute a separate tri-party collateral pledge agreement among BNP (as the custodian), our company, and RIA in this regard.

In addition, please add the following details.

Power of Attorney. Party B, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints Party A as the attorney of the Party B on its behalf and in the name of the Party B or the Party A (as the attorney may decide) to do all acts, and execute all documents which the Party B could itself execute, in relation to any of the collateral ("Posted Collateral"), including (but without limitation):

(i) to execute any Transfer, bill of sale or other assurance in respect of the Posted Collateral;

(ii) to exercise all the rights and powers of Party B in respect of the Posted Collateral;

(iii) to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the Posted Collateral;

(iv) to endorse any checks or other instruments or orders in connection with any of the Posted Collateral; and

(v) to make any claims or to take any action or to institute any proceedings which Party A considers to be necessary or advisable to protect or enforce the security interest created hereunder.

Sam Sang Hyuk, Kim

T +82.2.3772.2753

M +82.10.5871.0202

PBS Department

SHINHAN Investment Corp.

--- Original Message ---
From : PIPA Redaction @rsquared.co.kr <mailto: PIPA Redaction @rsquared.co.kr>
To : shkim@shinhan.com <mailto:shkim@shinhan.com>
Cc : PIPA Redaction "< PIPA Redaction @rsquared.co.kr
<mailto: PIPA Redaction @rsquared.co.kr> >
Date: Saturday, January 5, 2019, 7:29:06 AM
Subject : FW: [ShinHan] Gmsla Feedback

Dear Deputy General Manager,

We are sending the attached revised version reflecting all the feedback from the Legal Team, and the amendments are as follows.

GMSLA amendments

Schedule 1.3 – Aggregation Shall Apply

Schedule 1.4 – Netting Shall Apply

Schedule 1.6 – Indemnity Shall Apply

Schedule 7. (a) Agent of Party A for Service of Process

Name: Shinhan Investment America INC.

Address: 1325 AVENUE OF THE AMERICAS STE. 2002A, NEW YORK, NY, 10019, UNITED STATES

* Please verify the name and address of the New York local entity.

Amendments to the Supplemental Lending Agreement

2. The Lender

For the purpose of this agreement, the lender shall be Party A (the lending party), Unless specified otherwise

* Inserted 'Unless specified otherwise'

3. The Borrower

For the purpose of this agreement, the borrower shall be Party B (the borrowing party), Unless specified otherwise

* Inserted 'Unless specified otherwise'

5. Term

To terminate the lending agreement, the lending party shall give notice during the notice period to the borrowing party. If no notice is sent by the
lending party within the notice period, the term of the loan shall extend for a period of 12 months (365 days) without additional notice or documentation.

* Revised the existing 'received' to 'sent'
* Revised the existing 'borrowing party' to 'lending party'

9. Addition of Market Value Ratio Clause

The market value ratio, the numerator of which is the market value of collateral assets and the denominator of which is the market value of lent assets, shall not be lower than the OC Ratio.

* This clause requires that the Market Value of the collateral assets within the Custodial Account must at all times maintain a level equal to or greater than the OC Ratio (to be finalized and specified in the Deal Confirmation later) relative to the Market Value of the assets lent by Shinhan Investment Corp..

10. Custodial Account

The custodial account shall be held at the designated agent. No other counterparty's collateral, besides Shinhan Investment Co. Ltd, shall be placed into the custodial account.

* A section has been added stating that collateral assets of institutions other than Shinhan Investment Corp. are not to be deposited into the relevant Custodial Account; this provision effectively establishes that Shinhan Investment Corp. holds the sole status as the exclusive secured creditor.

Deletion of Clause 12.2

An event of default shall occur upon a failure to deliver the security within 90 business days upon the borrowing party receiving notice from the lending party within the notice period

* We have deleted this entire section.

13. Event of Default

Upon default, the lending party shall take legal possession of the custodial account and the custodial collateral.

* Revised this section to the following clause:

In an event of default, post acknowledgement of such default by BNP, Shinhan Investment Co, LTD shall solely have the right to proceed with the following steps to take legal possession of the custodial account and the custodial collateral:

1. BNP will draft paperwork for new custodial agreement documents for Shinhan Investment Corp.

2. Shinhan Investment Corp shall review the custody agreement documents and complete all AML/KYC paperwork per BNP.

3. Once signed paperwork is delivered to BNP, BNP compliance and business review occurs.

4. Once approved, ownership transfer of the collateral shall be immediate.

* In the event of RIA's bankruptcy, Shinhan Investment Corp. shall have the exclusive right to take over the ownership of the Custodial Account and Custodial Collateral, and will directly initiate the specified bankruptcy procedures with BNP.

We kindly request the Legal Team to review the attached revised version and look forward to your reply.

Please feel free to contact us if you have any questions.

Thank you.

[redacted] Sincerely,

PIPA Redaction
Associate Director
Machine Learning Finance

R Squared ML Company
20F, Gwanghwamun Bldg., 149, Sejong-daero, Jongno-gu,

Seoul, Korea 03186
Office: PIPA Redaction

Cell: PIPA Redaction
Email: <mailto:PIPA Redaction@rsquared.co.kr> PIPA Redaction@rsquared.co.kr
<mailto:PIPA Redaction@rsquared.co.kr> /
<http://www.rsquared.co.kr/> www.rsquared.co.kr

This e-mail message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this e-mail/telefax information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents.

From: Kim Sang-hyuk <shkim@shinhan.com
<mailto:shkim@shinhan.com%20%3cmailto:shkim@shinhan.com>
<mailto:shkim@shinhan.com> >
Sent: Friday, January 4, 2019 5:28 PM
To: PIPA Redaction@rsquared.co.kr <mailto:PIPA Redaction@rsquared.co.kr>
<mailto:PIPA Redaction@rsquared.co.kr>
Subject: [ShinHan] Gmsla Feedback

General Manager, please review the following details.

1. Schedule

1.3 Aggregation Apply

1.4 Netting Shall Apply

1.6 Indemnity Shall Apply

1.7 (a) New York local entity

2. Supplemental lending Agreement

1. Article 2 and Article 3

1. The Lender

For the purpose of this agreement, the lender shall be Party A (the lending party), Unless specified othewise

2. The Borrower

For the purpose of this agreement, the borrower shall be Party B (the borrowing party), Unless specified othewise

Since we need to leave open the possibility for departments other than our own to act as a borrowing party, please check whether it can be revised as stated above.

2. The agreement currently stipulates that the term will be automatically extended for an additional 12 months unless a termination notice is given to RIA on the 30th day prior to the expiration of the loaned securities;
please review whether this can be conversely revised so that the additional extension occurs only if our company does not issue a separate termination notice by that 30th-day deadline.

3. Although it stipulates that all securities within the Custodial Account are to serve as collateral, substantive protective mechanisms appear insufficient in scenarios such as when there are no assets inside the account, or when the asset value within the Custodial Account falls short of the value of the loaned securities, relative to the securities lent by us.
Therefore, further safeguards must be supplemented.

Please verify whether we can include explicit language and procedures that not only require assets exceeding the value of the securities lent by us to be maintained in the Custodial Account at all times,
but also recognize our status as the first-priority secured creditor.

4. EOD

RIA can hold the borrowed securities for up to an additional 90 business days after expiration without any penalty.

Even if a termination notice is sent on December 1, they are not required to return them on December 31, but only by mid-to-late April, which is 90 business days thereafter; thus, this should practically be viewed as a term loan of 16 months or longer, rather than a 12-month unit term.

Whether Clause 12.2 can be deleted

Sam Sang Hyuk, Kim

T +82.2.3772.2753

M +82.10.5871.0202

PBS Department

SHINHAN Investment Corp.

**EXHIBIT 9**

신한금융투자
SHINHAN INVESTMENT CORP.

## COLLATERAL ASSET REPORT

**PORTFOLIO**

SIC - Ria R Squared

**LENT ASSETS**

| CUSIP | BOND NAME | ORIGINAL FACE | CURRENT FACE | MARKET VALUE | % Change |
|---|---|---|---|---|---|
| 85440KAA2 | STNFRD 3.647 05/01/48 | 25,000,000 | 25,000,000 | 20,794,272 | 0.88% |
| 91514AGU3 | UNIHGR 3.35 08/15/47 | 25,000,000 | 25,000,000 | 19,388,038 | 0.01% |
| 91514AGU3 | UNIHGR 3.35 08/15/47 | 4,000,000 | 4,000,000 | 3,102,086 | 0.01% |
| 594918CC6 | MSFT 2.525 06/01/50 | 10,000,000 | 10,000,000 | 6,564,349 | 0.83% |
| 9128282R0 | T 2 1/4 08/15/27 | 50,000,000 | 50,000,000 | 47,881,963 | 0.08% |
| 91282CCS8 | T 1 1/4 08/15/31 | 64,000,000 | 64,000,000 | 53,357,174 | 0.24% |
| 912810RS9 | T 2 1/2 05/15/46 | 50,000,000 | 50,000,000 | 36,257,303 | 0.75% |
| | | | | | |
| Total | | 228,000,000 | 228,000,000 | 187,345,184 | 0.36% |

**COLLATERAL ASSETS**

| CUSIP | BOND NAME | ORIGINAL FACE | CURRENT FACE | MARKET VALUE | % Change |
|---|---|---|---|---|---|
| 38381TRK3 | GNR 2019-44 FM | 19,257,547 | 5,398,587 | 5,308,683 | 0.00% |
| 38381TR98 | GNR 2019-43 FB | 40,000,000 | 8,317,144 | 8,139,920 | 0.00% |
| 38381TW27 | GNR 2019-43 CF | 50,000,000 | 11,970,265 | 11,769,995 | 0.00% |
| 38381TF83 | GNR 2019-42 FG | 35,025,597 | 10,135,899 | 9,992,617 | 0.00% |
| 38379WFQ0 | GNR 2016-49 MF | 40,000,000 | 3,737,643 | 3,698,767 | 0.00% |
| 38377DBW5 | GNR 2010-106 FH | 55,700,000 | 4,727,457 | 4,677,146 | 0.00% |
| 3137FJKN8 | FHR 4844 F | 19,000,000 | 3,072,820 | 3,006,745 | 0.00% |
| 30313LAG7 | FREMF 2019-KF69 B | 3,000,000 | 659,007 | 615,760 | 0.00% |
| 30307QAC3 | FREMF 2018-KF56 B | 4,000,000 | 983,929 | 934,732 | 0.00% |
| 30308HAG3 | FREMF 2019-KF60 B | 3,615,500 | 817,163 | 800,820 | 0.00% |
| 38380PFV1 | GNR 2020-54 FA | 11,000,000 | 8,900,329 | 8,357,656 | 0.00% |
| 38380PFV1 | GNR 2020-54 FA | 35,932,686 | 29,073,883 | 27,301,184 | 0.00% |
| 38383XXQ2 | GNR 2023-53 EF | 1,975,891 | 1,755,774 | 1,752,399 | 0.00% |
| 38384APW7 | GNR 2023-65 PF | 30,000,000 | 26,405,605 | 26,292,242 | 0.00% |
| 3137HBVU5 | FHR 5389 FB | 15,000,000 | 13,056,756 | 13,178,373 | 0.00% |
| 3137HBVV3 | FHR 5389 FC | 10,000,000 | 8,704,504 | 8,807,054 | 0.00% |
| 38384KDM0 | GNR 2024-19 JF | 15,000,000 | 11,484,853 | 11,516,010 | 0.00% |
| 3137HDPB0 | FHR 5433 CF | 20,000,000 | 19,379,672 | 19,554,471 | 0.00% |
| 3137HFB46 | FHR 5446 FB | 20,000,000 | 19,500,376 | 19,740,997 | 0.00% |
| 001210AC7 | AGL 2022-19A B1 | 5,000,000 | 5,000,000 | 5,016,550 | 0.00% |
| 26254CAN1 | DRSLF 2022-106A A1R | 15,000,000 | 15,000,000 | 15,045,150 | 0.17% |
| 55952AAA7 | MAGNE 2023-37A A | 7,000,000 | 7,000,000 | 7,031,500 | 0.01% |
| 07134FAC4 | BATLN 2024-25A B | 4,600,000 | 4,600,000 | 4,646,000 | 0.00% |
| 67109KBN3 | OZLM 2014-9A BR3 | 2,000,000 | 2,000,000 | 2,018,220 | -0.01% |
| 3137HFSC0 | FHR 5460 FN | 5,000,000 | 4,977,937 | 4,991,565 | 0.00% |
| | | | | | |
| | | | | | |
| Total | | 467,107,221 | 226,659,602 | 224,194,556 | 0.01% |

**COLLATERAL HEDGES**

| CUSIP | BOND NAME | ORIGINAL FACE | CURRENT FACE | MARKET VALUE | % Change |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| Total | | 0 | 0 | 0 | 0.00% |

**Date: October-24-2024**

**EXHIBIT 10**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 45

-------------------------------------------------------------X

| | | | |
|---|---|---|---|
| RIA R SQUARED, INC. | | **INDEX NO.** | 659538/2024 |
| | Plaintiff, | **MOTION DATE** | 04/08/2025 |
| - v - | | | |
| SHINHAN SECURITIES CO., LTD., | | **MOTION SEQ. NO.** | 002 |
| | Defendant. | **DECISION + ORDER ON MOTION** | |

-------------------------------------------------------------X

**HON. ANAR RATHOD PATEL:**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 38–55, 60–65 were read on this motion to DISMISS.

Plaintiff RIA R Squared, Inc. ("Plaintiff" or "RIA") is an asset manager organized under Delaware law, with its principal place of business in New York, New York. NYSCEF Doc. No. 1 ("Compl.") at ¶ 14. Defendant Shinhan Securities Co., Ltd. ("Defendant" or "SSC"), is a financial services company organized under the laws of the Republic of South Korea, with its principal place of business in Seoul, South Korea, and is a wholly owned subsidiary of SSC Financial Group. *Id.* at ¶ 15.

## Relevant Factual[1] and Procedural History

*Global Master Securities Lending Agreement (GMSLA) and Supplemental Lending Agreement (SLA)*

On January 25, 2019, RIA and SSC entered into a Global Master Securities Lending Agreement ("GMSLA") and a Supplemental Lending Agreement for Securities Lending ("SLA") (together, the "Agreements"). *Id.* at ¶¶ 2, 31; NYSCEF Doc. No. 14 ("GMSLA" and "SLA" or "Agreements"). The SLA supplemented the GMSLA and superseded the GMSLA where provisions conflicted. Compl. at ¶ 30–32; NYSCEF Doc. No. 55 ("Def. Mem. of Law") at ¶ 7. Pursuant to the GMSLA, "the terms of each Loan shall be agreed [upon] prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties." Compl. at ¶ 32; GMSLA at § 3.

[1] The facts are taken from the Complaint and are accepted as true for the purpose of this Motion to Dismiss.

Pursuant to the Agreements, SSC began lending securities to RIA in exchange for collateral, and a fee. Compl. at ¶ 32. Upon the termination of each loan, RIA would return the securities to SSC, and SSC would return the collateral. *Id.* During 2019, RIA claims SSC loaned them $250 million in securities through a series of individual loans. *Id.* However, in 2020, SSC allegedly faced reduced liquidity on their balance sheet which Plaintiff attributes to both COVID-19, and an as-yet undisclosed regulatory investigation involving business dealings of SSC. *Id.* at ¶¶ 3, 35–40. Endeavoring to increase their liquidity, SSC contacted RIA and allegedly requested a recall of previously lent securities to meet their counterparty margin demands. *Id.*

Plaintiff alleges Sam San Hyuk Kim, a senior executive at SSC, contacted David Kang, CEO of RIA, in February 2020 to negotiate an early return of $94 million in loaned securities. *Id.* at ¶¶ 4–5, 40. Although RIA claims it was under no contractual obligation for an early return of the securities, Kim allegedly framed the transaction as a "special request" which would negatively impact their business relationship if RIA refused. *Id.* at ¶ 5. RIA also alleges that SSC threatened to use their substantial influence to discourage other South Korean financial entities from engaging in future business with RIA. *Id.*

SSC admits it requested the return of $94 million in securities from RIA out of a total of outstanding $250 million in loans between the parties. NYSCEF Doc. No. 55 (Def. Mem. of Law) at ¶ 15. However, SSC states that although it had the contractual right to recall "any particular loan at any time under Section 8 of the GMSLA" it chose to frame the discussion as a "request." NYSCEF Doc. No. 55 (Def. Mem. of Law); GMSLA at § 8.1.

*The Securities Delivery Agreement (SDA)*

After lengthy negotiations, RIA alleges it entered into a "Securities Delivery Agreement" ("SDA") between SSC and RIA. *Id.* at ¶¶ 6, 43–44, 51, 79. Pursuant to the SDA, RIA agreed to the early return of $47 million of borrowed securities to SSC on April 28, 2020. *Id.* As consideration, SSC agreed to: (1) re-lend the original $47 million in securities, and extend an additional $100 million in securities to RIA by May 30, 2020; (2) suspend RIA's spread payments to SSC on current loans for six months; and (3) discount spread payments on future loans. *Id.* at ¶¶ 6, 48–49. Kang alleges he originally expressed to SSC his concerns about their future financial ability to perform under the agreed upon SDA terms. *Id.* at ¶¶ 7, 47. Kang claims SSC provided assurance that they could satisfy all future obligations under the SDA because they expected an increase in assets under management in May 2020. *Id.*

RIA alleges that SSC knew it would be financially unable to fulfill the SDA obligations throughout the negotiation process and misrepresented their capacity to perform. *Id.* at ¶¶ 8, 10. RIA specifically alleges that during the relevant period, SSC knew they were under investigation by South Korean Authorities regarding their role in a financial fraud commonly known as the "Lime Asset Management Scandal." *Id.* at ¶ 36. Ultimately, regulators required SSC to repay "hundreds of millions" to investors and imposed "hundreds of millions of dollars" in fines and sanctions. *Id.* Despite previous assurances to RIA that their business would grow, SSC "ultimately admitted" it was "endeavoring to restrict its business" during the investigation "to offset its inevitable financial impact." *Id.*

RIA alleges it delivered $47 million dollars of securities to SSC on April 28, 2020, but SSC failed to re-lend either the original $47 million, or the additional $100 million in securities by May 30, 2020, pursuant to the SDA. *Id.* at ¶¶ 9–10. In subsequent telephone conversations and e-mail correspondence, SSC allegedly admitted to breaching the SDA, acknowledged RIA's financial loss due to the breach, and agreed to negotiate a resolution. *Id.* at ¶ 11. Kim allegedly acknowledged SSC's obligation pursuant to the SDA coupled with various assurances, including an e-mail, stating that SSC has "capacity to continue the GMSLA deal" and they are "looking forward for the great relationship and we are working on the points . . . lets [*sic*] overcome this crisis." *Id.* at ¶¶ 52–53. Kim wrote that SSC will satisfy "any and all past statements and representations", and acknowledged that RIA "performed above and beyond to assist SSC with any request made by SSC's internal reporting and financial need", and thanked RIA for an "exemplary track record and performance of all obligations." *Id.* at ¶ 55.

Defendant SSC disputes the existence of either a written or verbal SDA, and provides the GMSLA, e-mails and letters between the parties, and termination notices as documentary evidence to substantiate that the decision to return the securities to SSC was a non-contractual and voluntary business decision by RIA. Def. Mem. of Law at ¶ 2; NYSCEF Doc. Nos. 14–28 (Def. Exs. 1–15).

*The "Statement of Facts"*

RIA claims the relationship and trust between the parties continued to deteriorate over time. Compl. at ¶¶ 55–57. SSC would not fulfill any of its obligations under the SDA. *Id.* Additionally, RIA claims that SSC improperly attempted to terminate the GMSLA and recall outstanding unmatured loans. *Id.* at ¶ 57. On February 15, 2022, counsel for RIA provided written notice to SSC detailing breaches of contract with respect to the Agreements, and the SDA. *Id.* at ¶ 58. The notice documented improper attempts by SSC to terminate the GMSLA. *Id.* RIA claims that on March 11, 2022, the parties entered into an agreement (the "Statement of Facts" or "SOF") whereby they agreed to maintain the "status quo" of their business relationship and informally work towards a resolution of the alleged breaches of contract, until either (1) the parties resolved the dispute; or (2) the parties agree the market is no longer impacted by COVID and has "returned to normalcy." *Id.* at ¶¶ 11, 59–61. Pursuant to the SOF, RIA alleges that SSC promised they would not terminate the GMSLA until there was a resolution of the disputes. Compl. at ¶ 69. RIA claims this SOF provided them "assurance it would ultimately receive the securities it was owed" because it "described SSC's improper efforts to terminate the GMSLA" and "documented SSC's continuing failure to lend the previously promised $147 million of securities to RIA." *Id.* at ¶¶ 60–61.

However, in December 2022, Kim requested another favor from RIA *via* e-mail. *Id.* at ¶ 64. RIA alleges that SSC wanted to "partially or fully wind-up our current GMSLA transaction" because SSC was closing their Prime Brokerage Department "due to market conditions." *Id.* RIA claims SSC admitted the breach by stating in an e-mail that it "would have liked to fulfil[l] our transactional agreement and obligation of returning the $50MM notional and ramping up an additional $100MM notional" and they "acknowledge that due to SSC's failure to perform, RR has been negatively impacted on many economic levels. And unfortunately, our management would not allow us to fulfil[l] our obligations per transaction." *Id.*

SSC claims the SOF was not a contract, nor was it intended to memorialize the alleged SDA, or any prior agreement or contract between the parties. NYSCEF Doc. No. 66 (Def. Reply) at ¶ 15.

*The Draft Agreement*

Despite the anticipated closure of SSC's Prime Brokerage business, RIA alleges that the parties continued to negotiate future securities lending. *Id.* at ¶ 65. "[S]ometime prior to November 13, 2023", SSC offered to lend $750 million of repo-eligible securities in three separate tranches "during 2024 and 2025" worth "$100 million, $250 million, and $400 million, respectively" to offset damages that RIA suffered from the prior contractual breaches. *Id.* at ¶¶ 65–66, 85. "[U]pon reaching agreement", counsel for RIA prepared a "draft 'Securities Loan Confirmation' document spelling out the terms of the $750M Loan Agreement" (the "Draft Agreement). *Id.* at ¶ 66. RIA alleges that "Mr. Kang sent the document to Mr. Kim, who immediately signed on behalf of SSC and returned the signed copy to RIA." *Id.* Originally, SSC denied that it either executed the "draft agreement" or agreed to any of its terms. Def. Mem. of Law at ¶ 25.

SSC denies custody of "any record of ever executing this agreement or agreeing to any of the terms." *Id.* SSC submits an unsigned copy of the at-issue document titled "CONFIRMATION OF SECURITIES LOAN TRANSACTION ("SECURITIES LOAN CONFIRMATION")" containing a header on each page titled "W&S Discussion Draft: 18 October 2023". NYSCEF Doc. No. 21 ("Draft Agreement"). Subsequent to SSC's Motion to Dismiss being marked fully submitted to the Court, its counsel filed a letter on June 9, 2025 to correct certain facts in its Memorandum of Law. NYSCEF Doc. No. 67 ("SSC's Letter"). After additional discovery and communications with their client, counsel advised that SSC did, in fact, execute the Draft Agreement and returned it *via* e-mail to RIA. *Id.* The Draft Agreement signed by Sam San Hyuk Kim on behalf of SSC and the e-mail are attached to Defendant's Letter. *Id.* at 6–11. However, SSC claims that RIA never returned a countersigned version. *Id.* at 2. RIA added context to SSC's failure to locate the e-mail after performing a "reasonable search." NYSCEF Doc. No. 70 ("Plaintiff's Sur-reply"). Although SSC's Letter disclosed its current possession of the signed Discussion Draft, it failed to disclose that it was not discovered through additional searches by SSC, but that RIA provided it to SSC on May 23, 2025 in advance of SSC's Reply Mem. of Law filed on May 27, 2025. NYSCEF Doc. No. 70 at 5–6; NYSCEF Doc. No. 69 at 1 ("Plaintiff's Letter to the Court).

*The Relationship Between the Parties Continues to Deteriorate*

On August 28, 2024, counsel for RIA issued a demand letter to SSC seeking either specific performance for the re-lending of the $47 million in securities, the lending of the additionall promised $100 million in securities, and remediation for RIA's losses due to the breach of the SDA, or a negotiated settlement. *Id.* at ¶ 67. In response, SSC asserted that (1) it had not breached any contracts, (2) it lacked any outstanding obligations to RIA, and (3) RIA was in breach of the GMSLA for failing to pay fees on outstanding loans. *Id.* at ¶ 68, 70. In a show of good faith, RIA claims it paid the disputed fees, but SSC nevertheless declared an event of default, and contacted RIA's custodial bank, BNP Paribas ("BNP"), to assert rights under the SLA demanding BNP turn

over RIA's collateral to SSC. *Id.* at ¶¶ 12–13, 70–73. RIA alleges that BNP "froze" all securities in the collateral account, and ultimately terminated their role as RIA's custodian due to SSC's improper demands and false communications to BNP regarding the alleged default. *Id.* SSC argues that RIA's non-payment of fees due on existing loans created an automatic event of default. Def. Mem. of Law at ¶¶ 11–13, 26. Therefore, SSC claims it had the right, pursuant to the SLA at §§ 7 and 13, to direct BNP, as collateral agent, to "take legal possession of the **custodial account** and the **custodial securities**" pursuant to a self-executing irrevocable power of attorney SSC held over the accounts. *Id.*; GMSLA and SLA (emphasis in original); NYSCEF Doc. No. 19 ("BNP Default Letter"). SSC contends that RIA falsely told BNP that the GMSLA was no longer valid and therefore, SSC had no contractual authority to take possession or control of the collateral securities. *Id.* at ¶ 26. Due to the factual dispute, RIA claims BNP placed a hold on its access to the account, causing RIA to default on an unrelated transaction. Compl. at ¶ 72–73. BNP eventually terminated its role as securities collateral custodian and provided RIA with 90-days to find another custodial provider. *Id.*

*Procedural Posture*

Plaintiff RIA commenced this action on December 9, 2024 by filing a Summons and Complaint (NYSCEF Doc. No. 1) alleging five counts against Defendant SSC: (1) breach of the GMSLA, SLA, and SDA contracts; (2) breach of an agreement to lend RIA $750 million in securities; (3) fraudulent inducement by making misrepresentations to RIA regarding the financial condition of SSC that caused RIA to enter into the SDA; (4) breach of the implied covenant of good faith and fair dealing under the GMSLA, SLA, and SDA; and (5) declaratory judgment ordering that (i) the GMSLA and SLA govern; (ii) SSC improperly terminated the GMSLA, and therefore, it remains in full force and effect; and (iii) RIA did not default on borrowing or coupon fee payments due to SSC for outstanding loans pursuant to the GMSLA and SLA. *Id.* at ¶¶ 75–112. SSC filed the present Motion to Dismiss (Mot. Seq. 002) all five counts in the Complaint (NYSCEF Doc. No. 38) on April 8, 2025. RIA filed a Memorandum of Law in Opposition on April 28, 2025. (NYSCEF Doc. No. 65). SSC filed a Reply Memorandum of Law on May 27, 2025. (NYSCEF Doc. No. 66). The Court granted RIA's request to file a Sur-reply (NYSCEF Doc. No. 69), which RIA filed on June 17, 2025. (NYSCEF Doc. No. 70).

## Legal Analysis

"A party may move for judgment dismissing one or more causes of action asserted against him on the ground that a defense is founded upon documentary evidence." CPLR § 3211(a)(1). Documentary evidence, "such as an unambiguous contract," must "conclusively establish[] a defense to the asserted claims as a matter of law." *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 571 (2005) (internal citations omitted). A motion to dismiss under CPLR § 3211(a)(1) "may be appropriately granted only where the documentary evidence utterly refutes [the] plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2D 314, 326 (2002) (internal citations omitted). At the motion to dismiss stage of litigation, defendant must show the evidence "resolves all factual issues as a matter of law and conclusively disposes of the plaintiff's claim." *Hohwald v. Farm Fam. Cas. Ins. Co.*, 155 A.D.3d 1009, 1010 (2d Dept. 2017).

On a motion to dismiss brought pursuant to CPLR § 3211(a)(7), "pleadings are to be afforded a liberal construction, allegations are taken as true, the plaintiff is afforded every possible inference, and a determination is made only as to whether the facts as alleged fit within any cognizable legal theory." *CSC Holdings, LLC v. Samsung Elecs. Am., Inc.*, 146 N.Y.S.3d 17, 18 (2021) (internal citations omitted). Nevertheless, "[d]ismissal of the complaint is warranted if the [movant] fails to assert facts in support of an element of the claim, or if the factual allegations and inferences drawn from them do not allow for an enforceable right of recovery." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1162 (N.Y. 2017) (internal citations omitted). Allegations consisting of "bare legal conclusions" or factual claims that are "inherently or flatly contradicted by documentary evidence are not entitled" to the presumption that the facts plead are presumed to be true. *Stuart Lipsky, P.C. v. Price*, 215 A.D. 102, 103 (1st Dept. 1995). Courts will grant a motion to dismiss where the plaintiff states a cognizable cause of action but fails to assert a material fact necessary to meet an element of the claim. *See, e.g., Arnon Ltd v. Beierwaltes*, 3 N.Y.S.3d 31, 33 (1st Dept. 2015).

***A. Count I - Plaintiff Successfully Pleads Breach of Contract as to the SDA, GMSLA, and SLA***

To state a claim for breach of contract, a plaintiff must allege "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Second Source Funding, LLC v. Yellowstone Cap.*, 144 A.D.3d 445, 445–46 (1st Dept. 2016). To plead the existence of a contract, a party must "establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dept. 2009).

A breach of the SDA would simultaneously breach the GMSLA and SLA contracts governing all individual security lending transactions between RIA and SSC. Therefore, the Court first conducts an analysis of SSC's breach of contract claim under the SDA.

*Breach of the SDA*

*(i) The Complaint Successfully Pleads the SDA was a Contract*

SSC argues that RIA's breach of contract claim fails because the SDA was a non-contractual request by SSC to return $94 million in borrowed securities that RIA partially fulfilled by returning $47 million in borrowed securities to SSC. Def. Mem. of Law at ¶ 2. SSC claims RIA, in return, made a non-contractual request for a return favor and asked SSC to re-lend the $47 million in securities, plus an additional $100 million in securities at an undefined period in the future. *Id.* It is undisputed that numerous discussions and negotiations regarding the securities lending relationship generally, and the $47 million transaction specifically, took place between February 2020 and August 2024, when RIA issued a demand letter to SSC due to the SDA breach. Def. Mem. of Law at ¶ 25; Compl. at ¶ 67. SSC characterizes the numerous e-mail and telephonic exchanges between the parties during this period as "negotiations" about future business transactions, which lacked the specificity of an offer or an intent by SSC to be bound. Def. Mem. of Law at ¶ 2.

SSC provides three e-mail threads written at various times both before and after RIA's return of the $47 million in securities to bolster its argument that there was no contract between the parties. The e-mails, however, do not provide any conclusive or unambiguous statements or evidence supporting SSC's position, but simply contain facts that are undisputed. Def. Mem. of Law at ¶¶ 39–42. Pl. Mem. of Law in Opp'n at 8. The e-mails confirm SSC's ask was a "special request", that SSC characterized the request as a "favor", and that the original request was for early termination of $94 million in securities. NYSCEF Doc. 43–45. Both parties contend negotiations involving the SDA took place over the course of years (generally, between April 2020—when RIA returned the $47 million in securities—and August 2024 when RIA issued the demand letter). Compl. ¶¶ 53–67. The e-mail threads, however, lack the full context of the approximately four-and-a-half years of dialogue between RIA and SSC that occurred *via* both e-mail and phone calls. Compl. at ¶ 11; Def. Mem. of Law at ¶ 2.

Additionally, Defendant's exhibits fail to meet the burden under § 3211(a)(1) that documentary evidence must resolve all factual matters as a matter of law. NYSCEF Doc. Nos. 40–54. When, as here, a defendant selectively submits a handful of ambiguous documents meant to raise factual issues, the case should survive the motion to dismiss. *Calpo-Rivera v. Siroka,* 144 A.D.3d 568, 568 (1st Dept. 2016) (invoices and e-mails in a breach of contract case must be conclusive and will not provide a basis for a motion to dismiss pursuant to CPLR § 3211(a)(1) if additional discovery may reveal relevant facts).

SSC further argues the SDA lacks necessary material terms such as a termination date, spread amount, and collateral type. Def. Mem. of Law at ¶ 37; *see Mangold Mate, LLC v. Metabook, Inc.*, LEXIS 2553 at *5 (N.Y. Cnt'y Sup. Ct. Aug. 9, 2024) (a complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory). However, even if there was a question as to the specificity or materiality of an omitted term or provision, it is one of fact which cannot be resolved on a motion to dismiss. *S.E.C. v. Rorech*, 673 F. Supp. 2d 217, 224 (S.D.N.Y. 2009) (whether terms are material in a credit default swap are questions of fact). Although SSC argues the SDA does not contain certain contractual provisions that could be considered "material terms" such as, *inter alia,* identification of collateral and loan spread, RIA alleges that, pursuant to the GMSLA, the parties had broad latitude to contractually enter securities lending and borrowing transactions taking "such form and on such basis as shall be agreed between the Parties." GMSLA at § 3; Def. Mem. of Law at ¶ 37; Pl. Mem. of Law in Opp'n at 14.

Due to the informality of prior negotiations and transactions, this Court must conduct a fact-intensive determination of what terms are "material" to a contract between the parties, and the moment when each negotiation ripened into an actual contract. Therefore, the Court cannot determine, as a matter of law that the return of the $47 million of securities was a favor, as argued by SSC, and not an enforceable contract.

Taking all allegations as true, RIA successfully pleads the SDA was an oral contract made pursuant to the GMSLA and SLA. Compl. at ¶¶ 6, 48–49, 60–61. The Complaint pleads (1) an offer characterized as a "special request"; (2) an acceptance of the offer as demonstrated by RIA's return of $47 million in securities; (3) consideration consisting of specific notional amounts of securities that SSC promised to lend in the future, and advantageous terms for RIA with respect to future fees on outstanding loans; (4) mutual assent of the parties that occurred through e-mails and

telephonic discussions; and (5) an intent to be bound that is evidenced by communications of the parties and RIA's early return of securities. *Id.* RIA further pleads that, although not required, the SDA oral terms were later codified in writing within the SOF. *Id.*

*The Complaint Successfully Pleads Breach of the SDA*

SSC argues the breach of contract claim fails, because the negotiations surrounding the purported SDA amounted only to an agreement to agree and, as a matter of law, promises which are made to "work something out" are "indefinite and insufficient to support [a] conclusion that there was a meeting of the minds." *Ernst Steel Corp. v. Horn Const. Div.*, 104 A.D.2d 55 (4th Dept. 1984). However, the Complaint offers greater specificity than a general promises between the parties including specific future notional amounts, a deadline date, current fee waivers, and future fee reductions. Compl. at ¶ 6, 48–49. The historic lack of contractual formality between the parties is consistent with the alleged discussions which led to the formation of a contract.

Nothing in the e-mails provided by SSC "utterly refutes" any aspect of the SDA itself, or its breach as required by *Goshen*. Instead, the e-mails provided by SSC strengthen RIA's breach of contract claim—*e.g.*, RIA refers to the "special circumstance" request and complains about the breach by telling SSC the transaction was based on "extreme market circumstance of SIC's[2] immediate needs", and points out that "even major big banks, regardless of the market conditions perform based on contract." NYSCEF Doc. No. 44; *see also* Compl. at ¶¶ 6, 48–49. RIA also alleges Kim sent an e-mail to RIA in December 2022 apologizing for not fulfilling their obligation to return "the $50MM notional and ramping up an additional $100MM notional" due to the market environment and acknowledging that RIA has been negatively impacted. Compl. at ¶ 64; Pl. Mem. of Law in Opp'n at 11–12. Further, in the same e-mail, SSC acknowledges their failure to perform and claimed management "would not allow us to fulfil [*sic*] our obligations per transaction." *Id.* The Complaint successfully alleges (1) the existence of a detailed contractual agreement, (2) RIA's performance; (3) SSC's breach by not "fulfil[ling their] obligations"; and (4) damages to RIA. *Id.*

*Breach of the GMSLA and SLA*

It is also undisputed that the GMSLA and SLA are the governing contracts that control each lending transaction between the parties. Given the Court's finding that RIA successfully pleads a breach of the SDA contract, it logically follows that SSC simultaneously breached the GMSLA and SLA which contained provisions impacting the terms of the $47 million transaction, and the promise by SSC to re-lend securities and provide fee relief on existing and future loans.

E-mails provided by SSC between Kang and King discussing the return of securities militates RIA's position that the GMSLA and SLA were breached. On April 28, 2020, Kang advises "Sam [King] and Jung" that "as per the GMSLA contract 'Supplemental Lending Agreement for Securities Lending', paragraph 5. [] [L]ending party (SIC) must give prior notice of 30 days in order to terminate the GMSLA trade. As we both know, SIC did not provide a request to return the 94MM within the requested timeline." NYSCEF Doc. No. 44 (Def. Ex. 5). Defendant also submits documentary evidence consisting of transaction termination notices

---

[2] Shinhan Investment Corp ("SIC") was renamed Shinhan Securities Co. Ltd. ("SSC"), effective October 2022. Compl. at ¶16.

arguing that RIA breached the GMSLA and SLA by failing to return securities in a timely fashion. NYSCEF Doc. Nos. 22–27 (Def. Exs. 9–14); Pl. Mem. of Law in Opp'n at 21. However, whether RIA breached the Agreements is irrelevant at this stage in the litigation.

The Court finds that RIA has adequately plead (1) the existence of the GMSLA, SLA, and SDA contracts; (2) RIA's performance by returning the $47 million in securities; (3) a breach of those contracts when SSC failed to adhere to the obligations in the SDA; and (4) reputational and financial damages to RIA due to the breach.

Therefore, the Court DENIES Defendant's Motion to Dismiss Count I of the Complaint pursuant to CPLR §§ 3211(a)(1) and (a)(7).

### *B. Count II - Plaintiff Successfully Pleads Breach of Contract as to the $750 Million Securities Loan*

New York statute of frauds mandates that all contracts which cannot be performed within a year must be in written form ("SOF"). N.Y. Gen. Obl. Law § 5–701. RIA does not dispute that the alleged $750 million securities lending agreement with SSC required three tranches of lending to occur at different times during 2004 and 2005. Compl. at ¶¶ 65–66. SSC originally argued that the breach of contract claim with respect to the alleged $750 million securities loan should be dismissed pursuant to the SOF because, according to RIA, SSC "signed and immediately returned the draft agreement (Compl. ¶ 66), yet Defendant has no record of ever executing this agreement or agreeing to any of the terms." Def. Reply at ¶¶ 3, 25, 17. Although SSC now claims to have the draft agreement signed by Kang, SSC continues to claim they have no record of any fully executed agreement between the parties and that the Complaint does not allege the existence of one. Def. Mem. of Law at ¶ 49.

The party seeking to enforce a contract holds the "burden of proving the existence, terms, and validity of a contract." *Paz v. Singer Co.*, 151 A.D.2d 234, 235 (1989). Although RIA fails to allege the existence of a fully executed contract for the $750 million loan in the Complaint, RIA does rely on provisions in the GMSLA, which allow for a binding verbal agreement between the parties. Pl. Mem. of Law in Opp'n at 20. In their opposition brief, RIA argues that SSC watermarked the loan agreement, meaning "the Statute of Frauds does not apply." *Id.* RIA does not reference any statute, case law, or document that would exempt this transaction from the Statute of Frauds. SSC argues that because the allegation of a watermark is first mentioned in the Plaintiff's Memorandum of Law in Opposition, this Court cannot consider it as a factual allegation without an affidavit accompanying the Memorandum of Law. *See Start Elevator, LLC v. Macombs Place, LLC*, 2018 WL 4000423, at *2 (Bronx Cnty. Aug. 21, 2018) (where Plaintiff provides affidavits in opposition to a motion to dismiss, the court may consider additional facts contained therein to remedy any defects in the complaint).

Setting aside Plaintiff's Memorandum of Law in Opposition, the Court determines on the remaining record that RIA has adequately plead (1) the existence of the $750 million securities lending contract given the latitude for verbal agreements discussed *supra*; (2) performance by RIA because it stood ready to engage in the transaction and fulfill its obligations under the contract; (3) a breach of the contract because SSC never made the three-tranche loan; and (4) financial damages

resulting from the breach. Additionally, the inability of SSC to locate a key document later provided by RIA militates further discovery.

Therefore, the Court DENIES Defendant's Motion to Dismiss Count II of the Complaint pursuant to CPLR §§ 3211(a)(1) and 3211(a)(7).

### *C. Count III - Plaintiff Successfully Pleads Fraudulent Inducement in the SDA Contract*

To state a claim of fraudulent inducement, a plaintiff must "assert (1) the misrepresentation of a material fact, which was (2) known by the defendant to be false, (3) intend to be relied on when made, and that (4) there was justifiable reliance and (5) resulting injury." *Braddock v. Braddock*, 60 A.D.3d 84, 86 (1st Dept. 2009). "Opinions of value or future expectations [may] not form a basis for fraudulent misrepresentation." *Canelle v. Russian Tea Room Realty LLC.*, WL 287750, at *5 (S.D.N.Y. Feb. 27, 2022). Parties do not make "actionable representations of fact when predicting a future event with no knowledge of whether or not the event may occur." *Cimen v. HQ Cap. Real Estate L.P.*, 277A.D. 3d 587, 587 (1st Dept. 2024) (internal citation omitted).

SSC argues that—without more—an expression of expectation of a future business event is not sufficient to support a claim of fraudulent misrepresentation. Def. Mem. of Law at ¶ 55. However, RIA successfully pleads the first two prongs of *Braddock* by alleging that it had concerns about SSC's future financial ability to satisfy the obligations in the SDA. Compl. at ¶ 47, 49. RIA alleges that SSC made false assurances of financial capacity to re-lend securities to RIA by materially misrepresenting that they "expected" to increase their assets under management by May 2020. *Id.* Simultaneously, SSC is alleged to have knowingly reduced its exposure to counterparties because of the Lime Asset Management Scandal. Compl. at ¶¶ 36, 47. Countering SSC's argument that any alleged statements were only an expression of expectation, RIA pleads more than simple expectation trends, aspirational statements, or projections made by SSC. Compl. at ¶¶ 36, 94. The Complaint alleges that SSC knew their financial capacity would not increase, but actually decrease, and SSC was actively reducing business during the negotiations with RIA. *Id.* RIA's claim that that SSC knew it was under investigation and "ultimately admitted" it was restricting business and not ramping up assets establishes an inference that misrepresentation of a material fact occurred. RIA satisfies the third and fourth prongs of *Braddock* because it would not have entered the SDA absent the assurance provided to them by RIA upon which it justifiably relied. Compl. at ¶ 49. The final prong of *Braddock* is also satisfied because RIA sustained financial and reputational damage by breaking trades with other counterparties to facilitate the early return of $47 million of securities to SSC. Compl. at ¶ 50.

Therefore, the Court DENIES Defendant's Motion to Dismiss Count III of the Complaint pursuant to CPLR § 3211(a)(7).

Based on the foregoing, the Court need not address the arguments Defendant makes under CPLR § 3211(a)(1), as the Court found *supra* that the SDA is an enforceable contract.

### *D. Count IV - Plaintiff Fails to Plead Breach of Implied Covenant of Good Faith and Fair Dealing in the GMSLA, SLA, and SDA Contracts*

A claim for breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract and should be dismissed when "both claims arise from the same facts and seek identical damages." *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (1st Dept. 2010). Implicit in every contract is "a promise of good faith and fair dealing that is breached when a party acts in a manner that ... would deprive the other party of receiving the benefits under their agreement." *Sorenson v. Bridge Capital Corp.,* 52 A.D.3d 265, 267 (1st Dept 2008). This implied covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educational Testing Serv*., 87 N.Y.2d 384, 389 (1995). To the extent the claim "merely restates [a] breach of contract claim[,]" it shall be dismissed. *Brook v. Peconic Bay Med. Ctr*., 152 AD3d 436, 438 (1st Dept 2017).

SSC claims the action for breach of the implied covenant of good faith and fair dealing should be dismissed because it is duplicative of Counts I and II for breach of contract, arise from the same facts, and seek the same damages. Def. Mem of Law at ¶ 59. RIA argues SSC violated its reasonable expectations under the GMSLA, SLA, and SDA by sending a notice to RIA on or about January 18, 2022, terminating the GMSLA. Pl. Mem. of Law in Opp'n at 22. Without a valid GMSLA and SLA, the $147 million securities lending transaction SSC agreed to under the SDA could not occur. Compl. ¶¶ 57,107; Pl. Mem. of Law in Opp'n at 23. Actions by a plaintiff to frustrate the ability of a defendant to recover under a contract under certain circumstances can violate the implied covenant of good faith and fair dealing. *See AEA Middle Mkt. Debt Funding, LLC v. Marblegate Asset Mgmt. LLC*, 214 A.D.3d 111, 134 (2023) (plaintiff adequately pleads a breach of covenant of good faith and fair dealing because the complaint alleges defendant frustrated the ability to recover under a credit agreement). However, here, the claim under Count IV arise from the same facts, the same circumstances, and request the same relief which, pursuant to *Brook*, merely restates the breach of contract claims in Counts I and II.

Therefore, the Court GRANTS Defendant's Motion to Dismiss Count IV of the Complaint pursuant to CPLR § 3211(a)(7).

### *E. Count V - Plaintiff Fails to Plead the Requirements for a Declaratory Judgment*

The Court's discretion in awarding declaratory relief is inappropriate if an adequate remedy is available, or when hypothetical issues are presented. *See James v. Alderton Dock Yards,* 256 N.Y.298, 305 (1931) (a declaratory judgment is discretionary and dependent upon facts and circumstances rendering it useful and necessary); *Jem Caterers of Woodbury, Ltd. v. Woodbury Jewish Ctr.*, 2012 WL 1557281 at *9 (denying declaratory judgment when there is not a justiciable or actual controversy and when other remedies, such as breach of contract, are available).

Here, RIA requests an order declaring (i) the GMSLA and SLA govern the dispute between RIA and SSC regarding any securities trading; (ii) SSC improperly terminated the GMSLA on January 18, 2022; (iii) the GMSLA remains in full force and effect, notwithstanding SSC's purported termination of it on January 18, 2022, or any subsequent terminations; and (iv) RIA did not default on its obligations to SSC with respect to borrowing or coupon payments. Compl. at ¶¶ 111–112. These declaratory judgment applications are duplicative of the relief sought in Counts I

and II for breach of contract. RIA's remedy is in contract law and not declaratory relief as sought here. Additionally, RIA's request for an order determining that the GMSLA and SLA govern any securities trading between the parties is not only over-broad, but operates as an advisory opinion because it looks to this Court to rule on an abstract issue of a "trade" that is not grounded in fact, as opposed to the specific and detailed trading transactions appropriately plead in the Complaint. *United Water New Rochelle, Inc. v. City of New York,* 275 A.D.2d 464, 466 (2d Dept. 2000).

Accordingly, the Court GRANTS Defendant's Motion to Dismiss Count IV of the Complaint pursuant to CPLR § 3211(a)(7).

The Court has considered the remaining contentions of the parties and finds them to be unavailing. Upon the foregoing, it is hereby:

**ORDERED** that the Motion to Dismiss the Complaint (Mot. Seq. 002) by Defendant Shinhan Securities Co., LTD. is GRANTED in part, and DENIED in part, as set forth herein; and it is further

**ORDERED** that the Defendant's Motion to Dismiss Counts I (Breach of GLSMA, SLA, and SDA contracts), II (Breach of $750 million loan contract), and III (fraudulent inducement regarding the financial condition of SSC) is DENIED; and it is further

**ORDERED** that the Defendant's Motion to Dismiss Counts IV (breach of the implied covenant of good faith and fair dealing), and V (request for a declaratory judgment) is GRANTED; and it is further

**ORDERED** that Defendant submit an answer within twenty (20) days after service of this Decision and Order with notice of entry.

The foregoing constitutes the Decision and Order of the Court.

**July 31, 2025**
**DATE**

A.R.Patel
**ANAR RATHOD PATEL, A.J.S.C.**

| | | | | |
|---|---|---|---|---|
| **CHECK ONE:** | [ ] **CASE DISPOSED** | | [X] **NON-FINAL DISPOSITION** | |
| | [ ] **GRANTED** | [ ] **DENIED** | [X] **GRANTED IN PART** | [ ] **OTHER** |
| **APPLICATION:** | [ ] **SETTLE ORDER** | | [ ] **SUBMIT ORDER** | |
| **CHECK IF APPROPRIATE:** | [ ] **INCLUDES TRANSFER/REASSIGN** | | [ ] **FIDUCIARY APPOINTMENT** | [ ] **REFERENCE** |

**EXHIBIT 11**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

RIA R Squared, Inc.

Plaintiff(s)

-against-

Shinhan Securities Co., Ltd.

Defendant(s).

---------------------------------------------------------------X

**Preliminary Conference Order**
**Part 45**

Index No. 659538/2024

RJI Filing Date January 31, 2025

Track:
- ☐ Expedited
- ☑ Standard
- ☐ Complex

**RATHOD PATEL, J.**

Counsel and/or parties having appeared before this Court on March 13, 2025 at a preliminary conference on this matter:

**Appearances** (Attorney Name, Firm Name, Phone, and Email Address)

| Counsel for Plaintiff(s): | Counsel for Defendant(s): |
|---|---|
| George Mastoris | Laura Garr |
| Winston & Strawn LLP | White & Case LLP |
| 212-294-6700 | 212-819-8849 |
| gmastoris@winston.com | laura.garr@whitecase.com |
| | |

The Court having conducted a Preliminary Conference in the above-entitled action, it is hereby ORDERED as follows, pursuant to the Rules of the Commercial Division and this Court's Practices and Procedures:

1. **Confidentiality Agreement and Order**

   a. The parties are directed to Commercial Division Rule 11-g and Appendix B thereto for the form Stipulation and Order for the Production and Exchange of Confidential Information. If the parties propose to deviate from the form Stipulation, the parties shall file (1) a copy of the parties' proposed confidentiality order; (2) a redline of the parties' proposed order to the form Stipulation; and (3) a letter to the Court articulating the reasons for such deviations.

*Revised as of 1/24/25*

2. **Document Production and Interrogatories**

   a. Demands for Discovery and Interrogatories shall be served on or before: April 11, 2025.

   b. Responses to Demands for Discovery with objections and Interrogatories shall be served on or before: May 1, 2025.

   c. The parties shall produce all documents on a rolling basis and shall complete all document productions, including the production of privilege logs, on or before: August 1, 2025.

   d. Pursuant to Commercial Division Rule 11-a (a) and (b), the parties are advised that the interrogatories shall be limited both in terms of the topics to be covered and the number of interrogatories permitted (*i.e.*, 25 including subparts). Pursuant to Commercial Division Rule 11-a (d), the Court hereby orders that there shall be no additional interrogatories permitted concerning the claims and contentions of the parties.

3. **Exchange of Electronically Stored Information (ESI)**

   a. The parties shall execute a stipulation reflecting their agreement as to exchanging ESI by April 11, 2025, or if there is no agreement or only partial agreement the parties shall notify the Court.

4. **Deposition of Oral Questions**

   a. All party depositions shall be completed by: October 31, 2025.

   b. Non-party depositions shall be completed by: November 14, 2025.

5. **Expert Discovery**

   a. Parties shall serve expert disclosure on or before: December 5, 2025.

   b. Expert Discovery shall be completed on or before: February 6, 2026.

6. **Impleader** shall be completed on or before: June 20, 2025.

7. All discovery shall be completed by February 9, 2026, and any discovery not then completed may be considered waived, precluded, or otherwise as appropriate pursuant to Commercial Division Rule 13(a) and CPLR 3126. The failure to provide a document, or to otherwise provide discovery, may result in preclusion at trial.

8. **Trial Readiness Conference and Note of Issue**

   a. A Trial Readiness Conference will be held on February 10, 2026 at 9:30 a.m. in person in Courtroom 428. On this date, a Trial Readiness Order (TRO) will be issued directing that Plaintiff serve and file a Note of Issue and within ten (10) days of the date of the TRO.

   b. The Note of Issue/ Certificate of Readiness shall be filed on or before: February 19, 2026.

9. **Discovery Disputes**

   a. Counsel shall comply with this Court's Practices and Procedures and Commercial Division Rule 14. If counsel, after good faith consultation, cannot resolve a discovery dispute, counsel shall promptly notify the Court *via* letter filed on NYSCEF to schedule a virtual conference, otherwise the issue(s) will be waived. No motion relating to discovery shall be made without the permission of the Court. Neither the existence of any discovery dispute nor the making of any discovery motion shall result in, or justify, any change or adjustment in the dates set forth herein.

10. **Motions**

    a. Pre-motion conferences are required before making any application to the Court.

    b. Any dispositive motions shall be served within forty-five (45) days of the filing of the Note of Issue, unless otherwise directed by the Court.

11. The dates set forth herein of the discovery deadline, Trial Readiness Conference, and filing of the Note of Issue may not be adjourned except with the prior approval of the Court. *See* Sections 7 and 8.

12. There is no stay of discovery pending motion practice, settlement proceedings, or alternative dispute resolution, unless specifically ordered by the Court.

13. Additional Directives

______________________________________________
______________________________________________
______________________________________________

Dated: March 13, 2025
New York, New York

**So Ordered.**

A. R. Patel

**Hon. Anar Rathod Patel, A.J.S.C.**

**OPTIONAL STIPULATION**

In order to streamline the discovery process, and to prioritize good faith cooperation over motion practice, the parties hereby stipulate that the prevailing party in any discovery related motion may, subject to the Court's discretion, recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in litigating the motion.

Counsel for Plaintiff(s): ____________________________________

Counsel for Defendant(s): ____________________________________

**EXHIBIT 12**

WHITE & CASE

October 25, 2024

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

**VIA EMAIL**

BNP Paribas
787 Seventh Ave., 9th Floor
New York, NY 10019
Attn.: Di Zhu and Stephanie Storti
di.zhu@us.bnpparibas.com
stephanie.storti@us.bnpparibas.com

RE: Notice of Event of Default by Ria R. Squared Inc. and Request for Transfer of Legal Ownership of the Custodial Account and Custodial Securities – Account Nos. 180036500002 and 180036500002001

Dear Di Zhu and Stephanie Storti:

Notice is hereby given that Ria R. Squared Inc. ("Ria") has, among other breaches, violated Section 7 of the Supplemental Lending Agreement for Securities Lending dated as of January 25, 2019, between Shinhan Securities Co., Ltd. ("Shinhan") and Ria (the "GMSLA") triggering an event of default under Section 13 of the GMSLA.

Section 7 of the GMSLA requires Ria, as the borrowing party, to pay to Shinhan, as the lending party, on a monthly basis "the yield of the ***security*** plus an annual rate." Since August 2024, Ria has not made any of the mandatory borrowing rate payments totaling at least USD 148,181.83 (the "Specific Default"). Section 13 of the GMSLA provides that "[a]n event of default shall occur upon a nonpayment of the ***borrowing rate*** from the ***borrowing party*** to the ***lending party*** within 5 business days of the scheduled payment date." A copy of the GMSLA is attached hereto as **Attachment A**.

This letter constitutes formal notice that the Specific Default is an event of default under the GMSLA. Shinhan reserves all rights with respect to the amount of damages related to the Specific Default and any additional events of default that has or may have occurred under the GMSLA.

Pursuant to Section 13 of the GMSLA, Shinhan has been irrevocably appointed as the attorney of Ria and hereby exercises its power of attorney to request, execute, or otherwise seek the **immediate transfer, on Ria's behalf, of all the custodial securities** held in account numbers 180036500002 and 180036500002001 at BNP Paribas (together, the "Accounts") as of the date hereof into the account (the "Shinhan Account") identified in the settlement instructions attached hereto as **Attachment B**. In addition, pursuant to Section 13 of the GMSLA, Shinhan seeks the immediate transfer of legal ownership of the custodial securities in the Accounts from Ria to Shinhan and of legal possession of the custodial securities and the Accounts from Ria to Shinhan.

WHITE & CASE

In furtherance of these requests and pursuant to Shinhan's power of attorney, BNP is hereby instructed to comply with each of the requests stated in this letter and to proceed with drafting the paperwork for new custodial agreement documents for Shinhan, as required under Section 13 of the GMSLA. Due to the ongoing nature of the event of default, Shinhan also requests, instructs, or otherwise seeks (1) your acknowledgment of Ria's event of default be sent to the undersigned counsel, (2) the transfer of the custodial securities into the Shinhan Account, and (3) drafts of the new custodial agreement documents to be sent to the undersigned counsel, each within **five business days** of the date of this letter.

Neither this letter nor any failure or purported delay by Shinhan in exercising any right, power, privilege, or remedy in respect of the GMSLA or applicable law shall constitute a waiver or forbearance of any such right, power, privilege, or remedy.

Please contact me at the number below with any questions.

Best regards,

**Laura J. Garr**

**T** +212-819-8849
**E** lgarr@whitecase.com

Attachment

cc: David Kang, Ria R Squared, Inc., david.kang@rsquaredia.com,
575 Lexington Ave., 4th Floor,
New York, NY 10022
Attn. Ria R. Squared, Inc. — Nirav Patel
niray.patel@rsquaredia.com

Sam Sang Hyuk, Kim, Shinhan Securities Co., Ltd., shkim@shinhan.com,
myjung@shinhan.com
Shinhan Investment Tower 70,
Yeoui-daero, Yeongduengpo-gu,
Seoul, 07325, Republic of Korea

BNP Paribas, BP2S_ACCOUNT_MANAGEMENT_US@BNPPARIBAS.COM
dl.hfsmony_ria_r2@us.bnpparibas.com,

WHITE & CASE

**Attachment A**

**GMSLA**

## SUPPLEMENTAL LENDING AGREEMENT FOR SECURITIES LENDING

### 1. SCOPE

This supplement supersedes the agreement for the purpose of Securities Lending. The Agreement shall be governed by English Law. All disputes arising out of, or in connection with the Agreement shall be governed by and construed in accordance with the laws of the United States of America in the New York State Courts.

### 2. The Lender

For the purpose of this agreement, the lender shall be Party A (the ***lending party***), Unless specified otherwise

### 3. The Borrower

For the purpose of this agreement, the borrower shall be Party B (the ***borrowing party***), Unless specified otherwise

### 4. Securities

Party A agrees to lend Party B securities per **Schedule B** of this agreement. (***securities***).

### 5. Term

The ***term*** of the loan shall be **12 months (365 days)** from the date of delivery of the ***securities***.

The lending party shall have a right to replace the ***lent securities*** with ***new securities,*** whose market value is greater than or equal to that of the ***lent securities***. If such right is exercised, the ***lending party*** shall deliver the ***new securities,*** the ***borrowing party*** shall then return the original ***securities*** within 5 business days after the ***new securities*** are received, and the term of the loan shall extend for an additional period of **12 months (365 days)** without additional notice or documentation.

To terminate the lending agreement, the ***lending party*** shall give notice during the ***notice period*** to the borrowing party. If no notice is sent by the ***lending party*** within the ***notice period***, the term of the loan shall extend for a period of **12 months (365 days)** without additional notice or documentation.

### 6. Notice Period

The ***notice period*** shall be the 30th day prior to the final business day of the ***term*** of the loan.

**7. Borrowing Rate**

The ***borrowing party*** shall pay the ***lending party*** the yield of the ***security*** plus an annual rate as designated in **Schedule B** as basis points per annum (***bps***) to be paid on a monthly basis. The payments shall commence on the 25th (or the next business day) of the second month after the securities are received by Party B. The final month's payment shall accrue as 2 months. The yield of the ***security*** shall be set as the closing yield at 3pm EST on the date the ***security*** is delivered to the ***borrowing party.***

**8. Collateral**

The ***collateral*** for this loan agreement shall be ***the custodial securities*** held in the ***custodial account*** with the agent. No delivery of collateral shall take place between the parties.

**9. Market Value Ratio**

The ***market value ratio***, the numerator of which is the market value of collateral assets and the denominator of which is the market value of lent assets, shall not be lower than the OC Ratio.

**10. Custodial Account**

The ***custodial account*** shall be held at the designated agent. No other counterparty's collateral, besides Shinhan Investment Co. Ltd, shall be placed into the ***custodial account***.

**11. Repo**

Party A agrees that Party B may engage in REPO and Reverse REPO.

**12. Custodial Securities**

The ***custodial securities*** shall include but not be limited to: Corporate bonds, Commercial Mortgage Backed Securities, Residential Mortgage Backed Securities, Single Family Rental Securities, Asset Backed Securities, Securities issued from the shelves of Fannie Mae, Freddie Mac, and Ginnie Mae, Loans. Hedges shall be held in the ***custodial account*** from time to time. Hedges shall include but not limited to: T Bills, Treasury Notes, Euro$ Futures, Treasury Options, Swaptions, Swap Spreads, Caps, Floors, Tips, Strips, Credit Default Swaps, Total Return Swaps, Credit Linked Notes, CDX, iTraxx, LevX, LCDX, iBoxx.

**13. Event of Default**

An ***event of default*** shall occur upon a nonpayment of the ***borrowing rate*** from the ***borrowing party*** to the ***lending party*** within 5 business days of the scheduled payment date.

In an ***event of default***, post acknowledgement of such default by BNP, Shinhan Investment Co, LTD shall solely have the right to proceed with the following steps to take legal possession of the ***custodial account*** and the ***custodial securities***:

1. BNP will draft paperwork for new custodial agreement documents for Shinhan Investment Corp.

2. Shinhan Investment Corp shall review the custody agreement documents and complete all AML/KYC paperwork per BNP.

3. Once signed paperwork is delivered to BNP, BNP compliance and business review occurs.

4. Once approved, ownership transfer of the collateral shall be immediate.

Power of Attorney. Party B, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints Party A as the attorney of the Party B on its behalf and in the name of the Party B or the Party A (as the attorney may decide) to do all acts, and execute all documents which the Party B could itself execute, in relation to any of the ***custodial securities***, including (but without limitation):

(i) to execute any Transfer, bill of sale or other assurance in respect of the ***custodial securities***;

(ii) to exercise all the rights and powers of Party B in respect of the ***custodial securities***;

(iii) to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the ***custodial securities***;

(iv) to endorse any checks or other instruments or orders in connection with any of the ***custodial securities***; and

(v) to make any claims or to take any action or to institute any proceedings which Party A considers to be necessary or advisable to protect or enforce the security interest created hereunder.

**IN WITNESS WHEREOF** the parties have executed this Agreement on the respective dates specified below with effect from [25th January 2019].

| **SHINHAN INVESTMENT CORP, LTD** | **Ria R Squared, INC** |
|---|---|
| By: ........ | By: [signature] |
| Name: | Name: M.K. David Kang |
| Title: SHINHAN INVESTMENT CORP. | Title: President & Managing Partner |
| Date: President & CEO KIM Hyung Jin | Date: 1/25/2019 |

WHITE & CASE

# Attachment B

## Settlement Instructions

Shinhan Securities

TP Tower, 96, Uisadang-daero, Yeongdeungpo-gu, Seoul, 07321 Korea

*SETTLEMENT INSTRUCTION for* ***Shinhan Securities Co.,Ltd****. is as follows:*

- CASH Wire Transfer A/C
  Beneficiary:
  Shinhan Bank Korea Swift Code: SHBKKRSE
  Address: 25-12 Yeouido-Dong, Yeoungdeungpo-Gu, Seoul, Korea
  Branch: Yeouidojungang Middle Market Banking Center
  A/C Name: Shinhan Securities Co.,Ltd.
  A/C Number: 180-000-285461
  Correspondent Bank (USD): JP Morgan Chase NY. (Swift Code: CHASUS33)
  Shinhan Bank A/C No.: 001-1-544541
- Euroclear A/C No.: # 97151 (SHINHAN SECURITIES
- Clearstream A/C No : #19681
- FedWire 1 (for US Treasury trade only) : ABA 021000089
  Citibank NYC/CUST/233073
- FedWire 2 (settlement in FED via JP Morgan Chase Bank) : ABA 021000021 - DTC 902
  JPMorgan Chase/EURCLR/G23019 EURO43322
- DTC : CITIUS33 DTC:0908 Citibank NYC/ Sub-Custodian AC: 233073
  Citibank Agent ID: 27603 Institutional ID: 64113

Please do not hesitate to contact us if you have any inquiries.

Best Regards,

Settlement Dept 1**. E-mail : settle3@shinhan.com**

Shinhan Securities Co.,Ltd.

**EXHIBIT 13**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : CIVIL TERM : PART 45
---------------------------------------X
RIA R. SQUARED, INC.,

Plaintiff,

Index No. 659538/2024

**PROCEEDINGS**

-against-

SHINHAN SECURITIES CO., LTD,

Defendant.

---------------------------------------X

60 Centre Street
New York, NY 10007
February 25, 2026

B E F O R E:

HONORABLE ANAR RATHOD PATEL, J.S.C.

A P P E A R A N C E S:

WINSTON & STRAWN LLP
Attorneys for Plaintiff
300 N. LaSalle Drive, Suite 4400
Chicago, IL 60654
By: GEORGE E. MASTORIS, ESQ.
Also present:
SAMANTHA OSAKI, ESQ.

WHITE & CASE LLP
Attorneys for Defendant
1221 Avenue of the Americas
New York, NY 10020
By: LAURA J. GARR, ESQ.
Also present:
ZOE MITROFANIS, ESQ.

Alecia Hines, RPR
Senior Court Reporter

THE COURT: Good morning, everyone.

we're here in Ria R. Squared Inc. versus Shinhan Securities Company limited, index number 659538 of 2024.

Counsel, your appearances, please?

MR. MASTORIS: Good morning, your Honor. George Mastoris and Samantha Osaki from Winston & Strawn on behalf of plaintiff.

THE COURT: Good morning.

MS. GARR: Good morning, your Honor. Laura Garr from White & Case. I'm here with Zoe Mitrofanis on behalf of Shinhan Securities.

THE COURT: So the good news is, I have in my notes from last time that everybody seems to work so well together, and I can tell from the body language and the smiles, that that continues to be the case, so we're starting off right.

So we had set today as a date to appear if we didn't have a stip filed.

What's going on? Mr. Mastoris, you want to kick us up off?

MR. MASTORIS: Sure thing. Do you want me to stand, your Honor?

THE COURT: Yes, please. Thank you.

MR. MASTORIS: So the good news is that we held a couple of days of intense negotiations back in, I believe it

was, October of last year. And after several rounds and exchanges of the term sheet, were able to come to an agreement on the settlement in principle. We have, obviously, informed in the Court of that, and have engaged in the process of reducing that agreement to writing.

My colleagues at White & Case were kind enough to offer to do the first drafts. We received those a couple of weeks ago. We've been -- I've been in a trial, actually. My client has been traveling. But we intend to look at those drafts, to review them as quickly as possible, and get them back to their side.

So I think we're on pace. The problem, of course, from our perspective, is we don't have a signed agreement right now which I would very much prefer, I think everyone at this table would very much prefer.

So from our perspective, I think where we are is, you know, we ask the Court's indulgence for an extra period of time, say, 30 days, or whatever the Court sees fit, to try to get this thing done. There are some thorny issues involved. There are some underlying documents which have to be revised.

And, again, I think, you know, there's been a yeoman-like effort on the part of the White & Case lawyers and Shinhan get that done, but we're just not there yet.

THE COURT: Okay.

Ms. Garr, would you agree with that?

MS. GARR: Thank you, very much, your Honor.

I do want to say that we continue to work cooperatively to try to advance this, and I agree that the parties have reached a settlement in principle and are working, or have reduced it to writing. We are waiting, as mentioned by Mr. -- by Ria's counsel that we are working to receive comments back on that.

We do want to proceed in good faith to advance the settlement, and do think additional time is necessary for that.

That being said, we do have concerns about whether or not Ria is proceeding in good faith in the settlement discussions; and would, perhaps, recommend maybe more court oversight into this settlement process; perhaps, engaging in an ADR mediation to insure that these next 30 days, we're not back before your Honor in 30 days time without there being an advancement.

Without going into the details -- and this is, again, not a reflexion of Winston & Strawn, which has been, I think, working to advance the ball -- but we do have concerns about whether or not we will have a resolution in 30 days. And an advance of this settlement, there be -- as your Honor may recall, the securities that were lent years ago which were -- which remain in Ria's possession despite

determination, despite that have happened and the borrowing rate payments that we were assured would be continued to be paid in the interim have stopped since May.

When exercising our right to take possession of the collateral, we've been blocked. All daily collateral reports stopped as of May 2025, as well. We have no insight into the collateral now, whether we have concerns that there's a risk of dissipation of that collateral.
And there was discussion about whether or not -- whether we'd be seeking -- we also served discovery which was objected to on any additional in sight into the collateral.

Obviously, the settlement obviated the need for Court intervention on that, but we did raise that we would be seeking the intervention of this Court to protect our collateral and our rights.

We do have concerns that if we keep granting additional days without there being Court oversight, we're prejudicing our client's rights in seeking relief.

I would add, again, I do hope that that doesn't come to pass and we reach resolution. We are, just by way of update of the things before the settlement, there was -- you know, the document production was completed by this September 26 deadline. But there are motions to compel that will likely -- to the extent, you know, we have to resume this, just so your Honor is aware of where things stand, I

think there are discovery disputes that we would need to pick up on. And I can only speak on our side.

Hopefully, again, after -- this doesn't come to pass. But just so your Honor is aware of kind-of procedurally where things are.

And there is granting of leave for a motion -- the motion for relief for a motion to dismiss was granted. So we would pick up -- you know, we would need to pick up there, and there is no briefing schedule set on that front.

THE COURT: Okay.

MS. GARR: We, obviously, hopefully don't need to do it, but I'm sure we could work cooperatively on a new briefing schedule, should that be necessary.

THE COURT: Okay.

MR. MASTORIS: Your Honor, may I respond briefly?

THE COURT: Sure, go ahead, sir.

MR. MASTORIS: Thank you.

So, there's a couple of things that Ms. Garr mentioned which I think are worth picking up on. I'll start with the last one. You know, discovery in this case kind-of froze in place once the parties looked like they were going to reach agreement here. And, in fact, we were able to agree on a term sheet. So, yes, document production was completed in September. I expect that we will have some motions to compel. I expect we will have a number of depositions we'll

want to settle which involve Korean nationals, so we'll have to work that out hopefully cooperatively and figure that out over the next coming months. But I'm hopeful, as Ms. Garr is, that we won't get to that position.

I can assure you that everything I've seen and heard from my client suggests that we are moving forward in good faith to try to get a deal done. They've expended a large amount of effort here. They retained a different law firm in connection with the corporate side of matters. For their litigation shop, they use a different firm for corporate matters, and I know that that lawyer appeared at our settlement conference and, you know, has been cooperative in his correspondence. So I believe that everyone wishes to move forward at this point and wants to, you know --

As for the concerns, look, you can probably tell by reading the papers, there is a gap of trust, I think, between the parties, themselves, on both sides. I think there was a lot mistrust on our side as to whether what sort of documents we would get back, and whether Ms. Garr's client was also to be trusted here given some of the history between the parties and some of the overarching stories and news reports and everything that have percolated, at least, on my client's side. So that is shared.

I'm not really, at this point, able to take a position on whether the client would want to move forward with some

sort of court supervision, but I believe that is obviously a decision for the Court to make.

And, you know, in terms of what we've received so far, like I said, we've had it for a couple of weeks. I believe that the papers, you know, took a while to draft, and I understand that, but I do know that my client was wondering why things had taken quite as long as they did to come to our side.

So I understand Ms. Garr's concerns, and I appreciate her airing them. I think our client also has some concerns. So in all honesty, the sooner we can get to resolution from our perspective, I think the better.

THE COURT: So the parties agreed to a settlement in principle in October of '25, correct?

MR. MASTORIS: May have been later, November or December?

MS. GARR: It was actually not until January when the parties agreed a non-binding term sheet.

THE COURT: Got it. So the mediation settlement discussions were October of '25; agreement in principle in January, we have stayed the case based on that representation.

And, Ms. Garr, when did you send across draft documents to plaintiff's counsel?

MS. GARR: The agreements were sent, I believe, two

weeks ago.

THE COURT: Okay. So there's kind-of one or two ways we can approach this; one, is the more punitive way which is 30 days, and if not, the stay is lifted and we get back to filing our motions to compel and whatnot; or two, the Court can be more involved, but in order for me to be involved, I have to be read into what the settlement issues are and what those thorny issues are; or, we can refer it to a third party using the Court's commercial ADR part. That can, depending on the parties' by en, and the mediator which is randomly signed that could advance the process within 30 days or not, right? It's kind-of a crap shoot.

So I'm of the view that I think option number one makes more sense here which is, I'll give 30 days, and at those 30 days, if we don't have a stipulation of discontinuance filed, you'll each have leave to file respective motions to compel within 15 days; and motion to dismiss -- and it was defendant's counterclaims that was previously granted within 15 days, and we can just move forward that way. I would hate for us to go down that path, but I think that's a clear indication to your clients that I'm not the judge that kind-of grants stays one after the other which is not going to be surprising to you all.

What do you think?

MS. GARR: I defer to your Honor.

THE COURT:

MR. MASTORIS: Likewise.

THE COURT: Okay. So let's do this, we'll grant you an additional 30 days to file that stipulation of discontinuance. If we don't have it in 30 days, you'll have 15 days to file your respective motions to compel, for plaintiff to file their motion to dismiss defendant's counterclaims.

And I will also ask within 15 days for an amended preliminary conference order to get this back on track in terms of deposition dates and expert dates. And we'll move down that path.

MS. GARR: May I ask your Honor that the additional 30 days not be without prejudice to our client's right with respect to any injunctive relief we'd seek with respect to the collateral?

THE COURT: Absolutely.

MS. GARR: Thank you, your Honor.

THE COURT: Anything further?

MR. MASTORIS: Your honor, just one clarifying question, the 15 days to, I guess, submit a preliminary conference schedule, that would be after the stay is lifted if we end up there, right, not 15 days from today?

THE COURT: Yes. Yes. So think of it as 30 days, and then 45 days for your motions and amended PC order.

Sound good?

MS. GARR: Yes.

THE COURT: And, certainly, you should feel free to provide today's transcript to your clients so that they know that I'm not going to grant another stay.

Anything else for today?

MR. MASTORIS: No.

MS. GARR: That's all, your Honor. Thank you very much for your time, especially on a snowy day.

THE COURT: Thanks for checking in the snow for this. I appreciate it.

Last but not least, if you'd obtain a today's transcript, file it on NYSCEF in 30 days. Thank you.

Have a good day.

MR. MASTORIS: Thank you, very much, your Honor.

MS. GARR: Thank you, your Honor.

************************************************************

Certified to be a true and accurate transcript of the stenographic minutes taken within.

________________________
Alecia Hines, RPR
Senior Court Reporter

**EXHIBIT 14**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.<br><br>*Plaintiff*,<br><br>vs.<br><br>SHINHAN SECURITIES CO., LTD.,<br><br>*Defendant*. | Index No.: 659538/2024<br><br>Commercial Division Part 45<br><br>Hon. Anar R. Patel, A.J.S.C.<br><br>**STIPULATON AND ~~[PROPOSED]~~ ORDER FOR STAY** |

WHEREAS, Plaintiff Ria R Squared, Inc. ("RIA") commenced the above-captioned action against Defendant Shinhan Securities Co., Ltd. ("Shinhan," and together, the "Parties") on December 9, 2024;

WHEREAS, pursuant to this Court's March 13, 2025 Preliminary Conference Order, the close of discovery is currently scheduled for February 9, 2026, and a Trial Readiness Conference is scheduled for February 10, 2026;

WHEREAS, on September 2, 2025, Shinhan filed its Answer to Plaintiff's Complaint and Counterclaims against RIA;

WHEREAS, on October 3, 2025, this Court granted RIA's October 2, 2025 request seeking leave to file a Motion to Dismiss Defendant's Counterclaims and Affirmative Defenses;

WHEREAS, in October 2025, the Parties met in person for purposes of settlement negotiations and have since continued to engage in good faith settlement negotiations;

WHEREAS, the Parties have now reached an agreement in principle regarding resolution of their respective claims and require additional time to reduce the settlement terms to writing;

WHEREAS, the agreement in principle, and the additional time needed to prepare and finalize the necessary settlement documentation and related agreements, requires the Parties to seek a temporary stay of this action as well as adjournment of all other due dates and deadlines in the litigation;

WHEREAS, the Parties wish to conserve Party and judicial resources while the Parties work towards executing the definitive documents which would resolve this litigation in full;

WHEREAS, the Parties agree that a stay of all proceedings, including but not limited to discovery, motion practice, including as to RIA's anticipated partial motion to dismiss Shinhan's Counterclaims and Affirmative Defenses, and all deadlines, is warranted under these circumstances and constitutes good cause, so the Parties stipulate and agree as follows, all subject to this Court's approval:

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for the respective Parties herein, that the above-captioned action is hereby stayed pursuant to NY CPLR § 2201 for a period of ~~45~~ 30 days from the date of this Order, until February 20, 2026, and that the case deadlines are adjourned to dates to be set by future order in the event a final settlement is not consummated. Parties are to file a Stipulation of Discontinuance by February 20, 2026 or appear on February 25, 2026 at 10:00 a.m. in Courtroom 428 at 60 Centre Street.

Dated: January 21, 2026
New York, NY

By: /s/ *Laura Garr*
Laura Garr
Hannelore Sklar
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
laura.garr@whitecase.com
hannelore.sklar@whitecase.com

*Counsel for Defendant Shinhan Securities Co., Ltd.*

By: */s/ George E. Mastoris*
George E. Mastoris
Samantha Osaki
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
gmastoris@winston.com
molsen@winston.com

*Counsel for Plaintiff RIA R Squared*

SO ORDERED.

Dated: January 21, 2026
New York, New York

A. R. Patel

Hon. Anar R. Patel, A.J.S.C.

**EXHIBIT 15**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE PATEL, ANAR R.**

| | |
|---|---|
| **RIA R Squared, Inc.**<br><br>**- v. -**<br><br>**Shinhan Securities Co., Ltd.** | **Index #** **659538/2024** |

## COURT NOTICE

Filing on Behalf of - HON. ANAR RATHOD PATEL

Pursuant to the Courts directives at todays held Status Conference, the parties are directed as follows:

- The parties shall file a stipulation of discontinuance on or before March 27, 2026;
- In the event that a stipulation of discontinuance is not filed by the above date, the parties shall file their anticipated motions to compel, and Plaintiff shall file its anticipated motion to dismiss, on or before April 13, 2026, otherwise they will have waived their right to file said motions;
- Additionally, in the event that a stipulation of discontinuance is not filed by the above date, the parties shall file a joint proposed amended preliminary conference order on or before April 13, 2026;
- File a copy of todays transcript on NYSCEF within 30 days of todays date.

This order is without prejudice to Defendants right to seek injunctive relief.

DATED 02/25/2026 FILED By Lisa Morisi

**EXHIBIT 16**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - CIVIL TERM - 45
---------------------------------------------X

RIA R. SQUARED, INC.

Plaintiff,

-against-

SHINHAN SECURITIES CO., LTD.,

Defendant.
---------------------------------------------X
Index # 659538/2024

INPERSON PROCEEDINGS
60 Centre Street
New York, New York 10007

May 12, 2026

B E F O R E:

HONORABLE ANAR RATHOD PATEL,
Supreme Court Justice.

A P P E A R A N C E S:

WINSTON & STRAWN, LLP
200 Park Avenue
New York, New York 10166
BY: GEORGE MASTORIS, ESQ.
Attorney for Plaintiff

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
BY: TOBY E. FUTTER, ESQ.
JONATHAN SEBASTIAN BECKER, ESQ.
Attorneys for Plaintiff

(Continue next page.)

**A P P E A R A N C E S: (Continued)**

**WHITE & CASE, LLP**
**1221 Avenue of the Americas**
**New York, New York 10020**
**BY: LAURA GARR, ESQ.**
**HANNELORE SKLAR, ESQ.**
**HELIN AKCAM, ESQ.**
**Attorneys for Defendant**

**DEBORAH A. ROTHROCK, RPR**
**Official Court Reporter**

THE COURT: Good afternoon everyone.

We're here in RIA R Squared, Inc. versus Shinhan Securities Co., Ltd. Index 659538 of 2024.

Counsel, your appearances please.

MS. GARR: Good afternoon, your Honor. Laura Garr from White & Case, counsel for the Defendant and Counter Claimant Shinhan Securities Co., Ltd.

MR. MASTORIS: Good afternoon. George Mastoris, Winston & Strawn on behalf of the Plaintiff. And with me today are two new appearances; Toby Futter and his colleague John Sebastian Becker from Quinn Emanuel.

THE COURT: Okay, folks, we're here today --

MS. GARR: Your Honor, if I may, also with me is Hannelore Sklar and Helin Akcam.

THE COURT: Good afternoon.

We're here today on the Defendant's Order to Show Cause and the Motion to Compel as well, also by the Defendants, okay.

So, folks, in terms of how we will proceed today; about how much time does each side need for oral argument? Let's do both motions at the same time, they overlap on subject matter.

How long do you need, Ms. Garr?

MS. GARR: Your Honor, apologies, because we were unaware the motion to compel was on for today's calendar.

THE COURT: All right.

MS. GARR: But I would expect that I would need 20 to 30 minutes on the Order to Show Cause, if that is okay?

THE COURT: Okay.

MR. MASTORIS: Your Honor, I think we're proposed to split the argument between us. I think Mr. Futter will address the likelihood of success on the merits, if that is all right with your Honor, and I'm going to address the balance of the Defendant's motion.

For my part, it is going to depend, in large part, on what we hear from the Defendants. I doubt I will need to speak for more than five to 10 minutes, though, for my part at least.

MR. FUTTER: Accordingly, your Honor, probably about five minutes, it is a fairly straightforward argument.

THE COURT: Okay, terrific. Thank you.

It is now 3:00. To budget our time, I'm going to ask you to keep it to no more than 20 minutes both for your argument and any reply; with that, Ms. Garr, go ahead.

If you would use the lectern, it is just easier for us to hear you with the mic up there. Thank you.

MS. GARR: Thank you so much, your Honor.

We're here before you seeking injunctive relief to remedy RIA's recent and now admitted, conversion of Shinhan's collateral. This is not merely a risk of

**dissipation or a transfer, which is all that is legally required for the relief we seek.**

**RIA threatened in an April 7th, 2026 letter, to engage in more Self-Help to Shinhan Securities. And now admits, although vaguely worded in its opposition, that it took Shinhan's collateral, hundreds of millions worth of securities for which Shinhan holds legal title, and moved them out of the Custodial Account at BNP where they are required to be held for Shinhan's benefit.**

**Based on Page 1 of the Opposition, the collateral is over 20 million less than it should be. The conversion of the collateral is on top of and completely separate from the 228 million in securities that RIA has been wrongly retaining for the past six years without any contractual or legal basis to do so.**

**As of yesterday, RIA's counsel does not know when the transfer of Shinhan's collateral occurred, has not disclosed where the funds are, and has not independently verified the value of the collateral. And we know from repeated experiences now, RIA's representations cannot be trusted.**

**What is clear, is that RIA took Shinhan Securities after RIA had stopped making borrowing rate payments, and Shinhan had the contractual right to take possession of the securities perfecting its rights as a secured creditor; it**

also did it while it was misrepresenting to Shinhan and this Court that it would settle the case.

This is precisely the situation when injunctive relief is not only appropriate, it is necessary.

The facts are nearly identical to the case law we cite, including Aminity Loans versus Sterling, where the First Department upheld the injunction requiring the borrower to deposit funds in the lender's bank account. And also AQ Asset Management, which was also upheld by the First Department;

And because this is a case where lender's security interest is being threatened, it provides a separate independent basis to grant the injunction.

Again, the facts here are nearly identical in respect to Goldman Sachs Bank versus Schreiber, a 2022 Commercial Division case, and Empire Medi Holding.

The law in New York is clear, where a secured creditor's collateral is at issue, like here, an injunction is appropriate, even where monetary damages may ultimately be available.

THE COURT: Ms. Garr, in the past, and I recall earlier in connection with the prior motion in the Complaint, there was representation that, at that time, both parties were perhaps reaching out to BNP. And BNP at one point represented that, you guys need to go find another

custody in 90 days, obviously, that did not happen.

So, to the extent that the parties are contacting BNP to withdraw or release funds, what has BNP's response been?

MS. GARR: I can only speak on our end --

THE COURT: Sure.

MS. GARR: Because we have requested, they have not shared their communications with BNP.

THE COURT: Right.

MS. GARR: That is a subject to the Motion to Compel.

THE COURT: Yes.

MS. GARR: From our end, at the time of each default, the boring rate payments, back in October of 2025, when we first reached out, at that time, RIA, and that was prior to Winston's representation, if I recall, reached out to BNP in response, and said, ignore there instructions, the Agreements are no longer in effect, and there's been no default.

Once Mr. Mastoris joined, he reached out and rightly, at that time, understood you can't have it both ways. They cannot both claim that the Agreements are in effect, which if your Honor recalls, they sought a declaration to that effect.

THE COURT: Uh-huh.

MS. GARR: And not make the borrowing rate payments. And so he asked for a waiver, which was not granted. And at that point in time they resumed making the boring rate payments, and then filed the Complaint with the Court. We were in discussions of settlement at that time.

They ended up doing a race to the courthouse and filed first. But at that time they resumed making the borrowing rate payments and represented to the Court, in Paragraph 71 of the Complaint, that they would continue make borrowing rate and coupon rate payments during the course of the pendency. That happened all throughout until May of 2025. And when it stopped, that is when we, again, reached out to the bank. At that time, the response from RIA was, we are current on all payments. We have not defaulted.

We have been making all the borrowing rate payments and BNP responded --basically threw its hands up and said, I cannot act without direction from RIA.

THE COURT: Uh-huh.

MS. GARR: At each default, again, we've reached out for each borrowing rate payment and each response from BNP, I cannot act without RIA's instruction. And I understand from their point of view, if they are being told that the payments are being made and there is no defaults, they don't want to get sued, right, they are not inclined to turn over the securities. It is based on a

**misrepresentation that the payments were being made, it is not true. And certainly, no party then, at that point in time should have been able to assess absent a Court Order. There was never any out reach from BNP or from RIA that the funds were being transferred.**

**Your Honor did appropriately note that, back at the time of the Complaint, there was some reference to the 90 days. Then the collateral daily report showed the accounts were still there and that continued. There was no indication ever from RIA even at the time of the default.**

**The reason the collateral reports, we were told stopped, it was becoming too burdensome. Never an indication that there was a transfer of funds or that BNP stopped.**

**THE COURT: Thank you.**

**MS. GARR: The law in New York is clear, where a secured creditor's collaterals are at issue, like here, an injunction is appropriate, even where monetary damages may ultimately be available. This is an exception to the general rule, as is the separate rule that injunctive relief is appropriate and necessary where there is a conversion of identifiable assets as like here.**

**RIA is currently profiting from not just the over 200 million in lent securities that it won't return, that is the subject of the action before the Court, but now**

Shinhan's collateral as well, that is over 400 million in securities.

The injunction would place the parties in the position that they are contractually ment to be in at the time of the alleged default, essentially, a net zero, while damages are ultimately decided by this Court.

If there was no lawsuit, this is exactly the situation the parties would be in. And under 112 of the GMSLA, there would be netting out of the collateral and the lent securities. An injunction allows for the status quo.

Absent an injunction, it would be an astounding unprecedented windfall for RIA, rewarding it for truly shocking misconduct that deprived Shinhan of its secured creditor's status.

RIA barely engages on the case law in its opposition. It simply ignores the law related to collateral, or enforcement of contractual rights. It misstates the well settled law on conversion that permits the relief we seek.

RIA only makes four arguments in opposition. And because we didn't get a chance to submit a reply, I would like to briefly address each and explain why non were valid or sufficient to deny this motion.

First, RIA argues we have not established the likelihood of success on the merits. This argument fails

**when there's no dispute that RIA failed to make borrowing rate payments, which is an unqualified event of default under Section 13 of the GMSLA or the SLA.**

**There's also no dispute that RIA failed to return securities upon termination, which is a separate clear event of default under Section 101(c) of the GMSLA. These constitute defaults on the face of the Agreement.**

**RIA's claim against Shinhan, by contract, requires this Court to make highly disputed findings of fact in RIA's favor, that even accepted as true, are insufficient under the Agreements to establish an event of default or right to set off. They say numerous times in the Opposition that Shinhan admits to being a defaulting party. This is entirely false.**

**A defaulting party is a term of art under the contract. Even if Shinhan had agreed in 2020 to lend a 147 million, which it did not ultimately lend, which we dispute, it does not constitute an event of default under the GMSLA. Under the contract there can be no lender default for failing to lend securities, unless RIA had provided collateral, which it never did. That is under Section 43 of the GMSLA. That would have been 162 million in securities, for 147.**

**There's no provision they can cite to under the GMSLA, that establishes a lender default on these facts.**

**Even if it could be an event of default, under the GMSLA, there's no default and Shinhan cannot be deemed a defaulting party, unless RIA provided written notice of it in 2020, and then terminated the Agreements, which it never did;**

**To the contrary, it refused to allow termination to occur. Because termination meets the immediate return of all securities. If you recall, and as I mentioned before, RIA sought declaratory judgment in the Complaint, that the Agreements were still in full force and effect, and that the terminations were invalid.**

**The only party who gave repeated written notices of default in accordance with the GMSLA is Shinhan. That makes RIA the defaulting party per the Agreements.**

**RIA never sought to terminate, until last month, with that April 7, 2026 letter, six years after the alleged defaults in 2020. And that was after it held onto the securities and refused to terminate, and after it received default notices for failing to make borrowing rate payments. RIA's entire opposition rests on a new argument made long after commencing this litigation, that it can stop making borrowing rate payments in May of 2025 because of set off rates. But that is expressly prohibited under the expressed language of Section 10 and 118 of the GMSLA.**

**The Agreements are clear, RIA cannot set off prior to a written notice of termination and it is prohibited from**

setting off it had breached.

Even if set off were allowed, there is no basis to any of the damages it seeks under the contract, all of which are consequential damages that are expressly prohibited from recovery under Section 104 of the GMSLA.

Put simply, RIA's breach is clear and undisputed and we have established a likelihood of success.

The success of RIA's claims depend entirely on this Court rewriting the terms of the agreement.

RIA's second argument is that Shinhan's failure to seek injunctive relief until now, undermines our claim of irreparable harm.

I am personally outraged that they made this argument. First, it is completely irrelevant, given RIA's egregious conduct in recent weeks. It is also very important this Court understands the factual history here. Because the delay was the direct result of RIA's deliberate and repeated deception to not only Shinhan, but seemingly its own counsel, which perfectly demonstrates why the order must be granted.

RIA failed to make the borrowing rate payment on May 25, 2025, within five days of that date. Shinhan immediately issued the letter to BNP. RIA's counsel then repeatedly alleged that there was some confusion, because RIA had in fact made the payments. He wrote this to be BNP

in June, claiming that RIA had made the payments, so that BNP should disregard Shinhan. And he wrote it and said it to me on numerous occasions throughout June and July. There was delay because I believed him. And I had my client checking repeatedly that there had not been some error. I don't believe he was being deceitful, I assume inaccurate information came from his client.

In July, after RIA had defaulted in both May and June, RIA's counsel wrote a letter with two relevant points.

First, he said quote: "RIA is confused by your suggestion that it is not current on its borrowing and spread payments. RIA believes it is current on those payments. To the extent Shinhan believes differently, we would appreciate you providing evidence of same."

I have copies of the letter, I would be happy to share it with the Court if you would allow me to approach.

Second, regarding the daily collateral reports. He said those stopped because it was quite burdensome. RIA does want to move forward on a cooperative basis to resolve the issue and that RIA proposed a meeting with business principles to try to resolve the issues.

It was not until August when the coupon payment was not made for the first time, and RIA objected to producing any documents or answering any RFPs about the status of the collateral that we said we had serious concerns and we would

**be filing this Order to Show Cause. The settlement meeting in LA then followed.**

**Shinhan engaged in those settlement negotiation in good faith and filed a stay with this Court in January of 2026, after the parties finally reached an Agreement that would have obviated the relief being sought here. But, again, RIA was not being honest with Shinhan or seemingly its counsel.**

**As your Honor, hopefully, recalls, at the time of our February 25th status conference with the Court, Shinhan had already sent draft agreements to RIA on the terms the parties agreed to weeks prior. RIA's counsel, before your Honor, stated, that RIA simply needed more time to reply and asked for 30 more days to get it done.**

**Again, I don't think RIA's counsel was trying to mislead anyone, I believe he was trusting what his client said. But at that time I expressed that I had serious concerns about whether RIA was engaged in good faith, or this was all an attempted to prejudice Shinhan's rights to the relief we now seek.**

**I specifically flag that the borrowing rate payments had stopped, that the collateral reports had stopped and we had concerns that there would be dissipation or a transfer of the collateral. I asked for court oversight at that time.**

**At the end of the conference, after your Honor granted the 30 days, I expressly asked your Honor to confirm it be without prejudice to Shinhan's rights, with respect to any injunctive relief we seek on the collateral. Your Honor replied, "absolutely."**

**As I feared, after asking this Court for an additional 30 days, RIA did not send an single comment back to the Agreements, not one.**

**Shinhan followed up repeatedly and RIA's counsel assured us RIA was serious about settlement and a markup was coming, even after the stay was lifted and we agreed to proceed in parallel.**

**Instead, RIA without counsel copied, sends the AI letter to BNP and Shinhan, instructing BNP, and any other successor custodian to disregard any and all directions from Shinhan. Based on RIA's professed right to engage in self-help with Shinhan's collateral and a demand for $2.5 billion from Shinhan.**

**RIA has also doubled down on its baseless objections to discovery. And now, in its opposition, makes clear, that what really happened here is exactly what we feared. It transferred our collateral out of the Custodial Account at BNP to some unknown location, and we have no visibility into the status of our own securities.**

**I don't say this lightly but RIA cannot be trusted.**

There is no representation that its counsel, or new counsel can make, that Shinhan or this Court can rely on.

Absent the relief we seek Shinhan's status as a secured creditor will be lost. This is precisely the circumstances warranting injunctive relief.

Third, RIA argues the relieve should not be granted because Shinhan has not been provided evidence of dissipation of collateral. That is not the standard and they cite no authority for it.

Injunction is appropriate, where it appears that a party threatens, or is about to do an act in violation of the rights, that comes from Immigrant; this argument fails for two additional reasons.

The lack of evidence is because RIA is not only withholding it, its fighting us in a motion to compel from providing it. And the pre-motion, at the pre-motion conference for this Order to Show Cause, the Court encouraged RIA to voluntarily produce evidence of the collateral at BNP to confirm the value and it refused. And notable absent from the opposition is any sworn statement or bank accounting on the status of collateral.

As confirmed with counsel yesterday, there's been no verification independently from counsel about the value of the collateral or where it is.

More importantly, the opposition now tells us

information that they deliberately withheld. The funds have been transferred out of the company's account, we have no idea how much remains.

So, the dissipation and transfer that we feared, when we brought this motion, is not just a risk, it is real and they have now admitted it, albeit not directly in their opposition.

And so even under their fabricated and heightened legal standard, an immediate injunction is needed; and if it is true that the securities have been transferred out of the custody account, which they confirmed yesterday is true, we will, obviously, need a different order from this Court, which leads me to RIA's final argument, that Shinhan is asking to move the funds to Korea, that is completely false.

Shinhan is asking to take legal possession of the collateral, as is contractual required. Shinhan has no objection to keeping the securities in the U.S. during the pendency of this litigation. Shinhan can submit a new proposed order to reflect this, if there's any concern on that front.

I'm happy to answer any other questions, but I would like to leave the balance of my time for responding.

THE COURT: Nothing further, thanks Ms. Garr.

Please proceed, counsel.

MR. FUTTER: Good afternoon, your Honor.

There's a fare amount of rhetoric and testimony in what you just heard. Some of the testimony was not from any evidentiary source, but instead from counsel.

Nonetheless I want to address some of the accusations made at the outset, they may be covered again by my colleague, even though I'm just addressing likelihood of success on the merits.

This idea that there's been this secret pilfering and transfer of the collateral away from BNP Paribas, your Honor yourself noted in the Motion to Dismiss order, which was citing the Complaint, which was even older, that BNP had given a 90 days notice, said I'm done with both of you, you need to get collateral out. This is not some secret, it is not new, it was recorded in the Complaint and it was also referenced by your Honor in the Motion to Dismiss.

The idea that there's any secret shifting of assets here, it is belied by the record.

There was a reference, I believe, too, from counsel, to the value of the collateral being less than the value of the securities. I believe that is a misunderstanding of the opening page of our opposition motion. We have a reference there to $185 million figure. I think opposing counsel is confused as to that being the value of the collateral that has been housed. What that was intended to be, apologies if it is not clear, is a reference

**to the current market value of the securities that were loaned;**

**The point is merely, the securities that were loaned against which collateral needs to be held, they are worth less now on a mark-to-market base.**

**For Shinhan to say the collateral needs to be higher because the securities are worth more, all we were trying to do is with the $185 million figure in the opening brief, is say the securities are worth less, the collateral doesn't need to be as high anymore.**

**THE COURT: Uh-huh.**

**MR. FUTTER: Turning to the likelihood of success on the merits. I'm admittedly new to this case. I think the argument is fairly straightforward.**

**Shinhan is saying that there was a default by RIA. What was the default? It was the failure to make timely payments that were required to be made in exchange for being loaned the securities. That is the default. That is contractual breach upon which they purport to be able to exercise the Power of Attorney.**

**So the issue in this case, in terms of whether there has been a breach by RIA, that entitled Shinhan to do what its trying to do here, all comes down to, did those coupon payments need to be made, or not. The reason that's not in issue, that your court should decide in favor of**

**Defendants right now, is because Shinhan has lost a Motion to Dismiss where RIA plausibly alleged that it had the right to set off those payments. RIA is not in breach of an agreement, required to make coupon payments, if it is entitled to set off those payments. And I think your Honor, at the Motion to Dismiss, has clearly found that RIA has credibly alleged that it was entitled to that set off.**

**Now, opposing counsel said it is highly disputed, it is highly contested that they have that set off right. The short response to that your Honor is, you can't resolve that at this stage. What you you can resolve at this stage is that RIA has credibly pledged that it had such set off, RIA has, therefore, credibly pledged it was not the breaching party, it was not in breach for failing to make those coupon payments. Shinhan in fact was in breach, that is why RIA was entitled to exercise its set off rights.**

**I believe opposing counsel also said that it is highly disputed that Shinhan was in breach. Your Honor, you've already dealt with this at the Motion to Dismiss stage. You found the allegations of breach RIA were credible. If you wanted to go to the evidentiary record, and look at whether Shinhan has a credible claim that it was not in breach, I refer you to the statement to facts.**

**Again, I'm new to the case, but that document just jumped out at me. It is signed by Shinhan, it admits a**

**breach. It admits there was an agreement to lend additional securities, and that that agreement was not followed through on. It is clear as day.**

**I'll note too, there was no reference from opposing counsel to the injunctive standard that they are actually required to meet here. We do think that in significant parts, the relief they're seeking is a mandatory injunction, not just a prohibitive one. Clearly long establish president. That is a much higher burden. It is an extraordinary remedy, really only for the most dire of cases.**

**As for the breaches that we have alleged credibly that are shown in the evidentiary record, they are multitude.**

**There's a breach and failure to deliver 147 million of securities, that is under the SLA. That was the one that is admitted very clearly, black and white, plain as day in the statement of facts. We have also credibly allege, as your Honor has found that there was a breach of another agreement, the SLC, I'll call it, or the 750 million agreement, if you want to call it that; which also, we believe, given the extensive powers of set off in that SLC 750 million agreement constitute a credible right to set off here.**

**And, again, if RIA has a right to set off, it is**

**not in breach for failing to make the coupon payments.**

**Just a final point, your Honor, I don't know if my colleague will cover this again. I feel like maybe it falls under the likelihood of success on the merits point.**

**I want to note that the harm that Shinhan is alleging here, in terms of not being able to access, again, its collateral, that harm is on the well pled allegations that this Court has already sustained, more outweighed by the damages that RIA believes its entitled to.**

**Now, I accept that we are going to need through fact discovery and trial to prove up the Agreements, the SLC and SLA; but provided we can do so, the damages that we have credibly allege, with respect to those agreements, far outweigh any collateral amount that is in dispute. I feel that is relevant to likelihood of success point as well.**

**If no questions, your Honor, I'll turnover to my colleague.**

**THE COURT: Thank you, counsel.**

**MR. MASTORIS: Good afternoon, your Honor.**

**So, I'll try not to tread old ground, and I will try to stick to the facts that the harm complained of here is not the type that is really subject to injunctive relief and certainly not the sort of mandatory injunctive relief and far reaching injunctive relief in which the Defendant appears to be seeking.**

So, first at all, at bottom, what is really happening here is that Shinhan is effectively asking for a 100 percent advance on the amount --actually perhaps more than that, maybe 110 advance -- on the amount of damages it is seeking through this litigation. It is seeking to get that money, that collateral, now, without any guaranties as to what is going to happen to that.

I appreciate Ms. Garr telling us that the funds will stay here. But the facts that we know, sitting where we sit today, is that Shinhan Securities has been shutting down its operations all over the world, except in the Korea, announced publicly its intention to shut its doors in the United States. So, coming into this, we certainly had no guaranty; have no knowledge or understanding, that the money that would be awarded at this early stage of the case to Shinhan Securities would stay in a place where we might be able to recover it.

I think that, in itself, militates strongly in favor of keeping those funds here in the United States where they're available for a final judgment.

THE COURT: Uh-huh.

MR. MASTORIS: Now, in terms of what we're talking about, we're real talking about money damages.

It is Black Letter Law in New York, that money damages, in and of themselves, cannot be the subject of the

**Preliminary Injunction, of this sort of injunctive relief, ahead of a final judgment.**

**Shinhan has shown, at this point, no perfected interest in that money. All they have is an interpretation of the GMSLA, which they say is right, and which we dispute. Why do we dispute it?**

**We dispute it because we are not the original defaulting party. The original defaulting party signed, sealed and delivered to RIA, by their agent, who negotiated these contracts and negotiated the arrangement with RIA, says we defaulted. We have that in writing and signed from 2022;**

**So based on that, we have a wide canopy of rights available to us under GMSLA, including setting those things off. Instead, we agreed not to do that at the time in the hopes that the parties would be able to come to some sort of arrangement.**

**At this point, to declare a termination over and over again, as they have done, to reach out to the Custodial Agent and demand the immediate return, return of the securities, as they have done. For them to come in this courtroom, halfway through the litigation where they are seeking that the return of that collateral or the securities as their ultimate relief and demand that it happen now, sort of skips a whole bunch of steps; which is let's figure out**

who exactly is right, in terms of their interpretation of this contract, and who owes what to whom. We are just not there yet in this litigation.

So, I think, respectfully, we're jumping the gun a little bit to be having this conversation today.

THE COURT: Has RIA transferred any of the collateral or securities from BNP?

MR. MASTORIS: So, they have not dissipated any of the assets. As I understand it, BNP, I think to your Honor's point and the point my colleague made earlier, and this is something that I have recently come to understand, BNP had, in fact, terminated. I believe the funds remained with BNP for sometime after the 90 days. But, at some point, I believe, that BNP insisted that RIA move those funds. They were not dissipated, as I understand it, and, again, I don't have all details on this, I apologize, they were moved to a different accounts, a different Custodial Account at a different bank.

THE COURT: Which bank?

MR. MASTORIS: I believe it is Wilmington Savings.

MR. FUTTER: Could I very briefly address that?

THE COURT: Yes.

MR. FUTTER: Your Honor, the Complaint alleges, and the Motion to Dismiss recognizes, that BNP Paribas, after repeat letters from Shinhan, said this is enough, I can't be

your custodian anymore, I'm terminating, you need to transfer. Now, that patent of interference with the custodian by Shinhan--

THE COURT: I just want to know where is the money?

MR. FUTTER: Your Honor, we are prepared to disclose who the new custodian is, but my client would respectfully beg --

THE COURT: No. Where is the money now?

MR. FUTTER: It is out in a Custodian Account, with a custodian, that our client would like to provide to the Court, for exchange of an undertaking that no further correspondence from the Defendants to the custodian --

THE COURT: No. I need to know where these funds are, that is why we are here? Why are we hiding the ball?

MR. FUTTER: We have offered to resume, in Footnote 1 of our brief we have been clear about this, RIA will resume reporting. They are prepared to resume reporting--

THE COURT: You are not answering my very clear question.

MR. FUTTER: Yes.

THE COURT: Where are the funds? When were they transferred?

MR. FUTTER: I don't know they were transferred. They are currently being held with Wilmington, which is a well recognized custodian.

**THE COURT: They are at Wilmington now?**

**MR. FUTTER: That is my understanding.**

**THE COURT: Thank you.**

**MR. MASTORIS: So, I think what my colleague was addressing is the fact that RIA, as it's alleged, and has made clear repeatedly, in embarking on this letter writing campaign with BNP severely damaged RIA's representation on Wall Street and has made it difficult for RIA to continue lending or engaging in the same sort of transactions across the same range as it had been doing before.**

**I think what Mr. Futter was, respectfully, asking the Court, was for an undertaking. Obviously, we are here, here in public at the moment, but perhaps for Shinhan to refrain from engaging in a similar letter writing campaign.**

**We can talk about that as part of what this ultimate outcome looks like and order looks like, but I think there's grave concerns about the reputational harm that has been done from the letters, from the termination, from the relationship with RIA by BNP, which is, Wall Street, in some ways, is a small world.**

**THE COURT: Could you tell me when the funds were transferred?**

**MR. MASTORIS: So that is a question that I don't know exactly. I know that it was well after the 90-day termination period ended.**

**THE COURT: Okay.**

**MR. MASTORIS: I don't --I apologize for this, your Honor, I don't have the exact date.**

**THE COURT: So, the funds were transferred to a different custodian, where they are held now?**

**MR. MASTORIS: Correct.**

**THE COURT: You represented there have been no dissipation of those funds, correct?**

**MR. MASTORIS: I am representing that, in terms of what I have been told by my client, I want to be very clear about that.**

**THE COURT: Fair enough.**

**MR. MASTORIS: So I have not seen sort of independent -- I do suspect, that as part of what we talk about today, there might be some information like that, that would be required.**

**THE COURT: When you say that your client is willing to resume providing those daily collateral reports, those would be coming from the new custodian, correct?**

**MR. MASTORIS: That is correct, your Honor.**

**THE COURT: But what I would also like is, I want to see the missing reports. Because I need to know what was in the accounts at BNP, while it was at BNP, when it was transferred. I would like to see collateral reports from the new custodian since they have been there; fair enough?**

**MR. MASTORIS: I understand. I understand your Honor's words on that.**

**I guess, from my perspective, if the account is --from our client's perspective, if the account does have the sufficient collateral today and correct amount, I'm not sure, in terms of purposes avoiding any harm, why it would necessarily be relevant to see what --where the money has been all this time. But I take your Honor's point and directive.**

**THE COURT: Well, it is highly relevant, right. We are here and Ms. Garr is right, she has repeatedly reserved her right to seek this relief since day one. I was the one that said, not right now, you know, let's try settlement, let's keep going, okay. And she has been very cautious, as to where she is targeting her accusations. And I appreciate we've got clients and attorneys, and you only know what you know; but, from my perspective, they are entitled to where the money was, where it has traveled along the way, where it is now; fair?**

**MR. MASTORIS: Fair enough, your Honor.**

**THE COURT: Okay. With that, I cut you off, we took a detour. Please continue.**

**MR. MASTORIS: No, I think it is all right.**

**I think I know where we may be headed here. I don't want to belabor the points at all.**

**THE COURT: Okay.**

**MR. MASTORIS: Obviously, we have offered, in Footnote 1, to make that information available.**

**I think your Honor has just directed us to make that information available. And so we shall make that information available. That, of course, is a far cry from actually turning over all of these securities and all of the collateral to Shinhan today and, essentially, entitling them, or giving them the relief they're seeking ultimately in that the action. That would be a manifest in justice, perpetrated against RIA, who was the one who brought the lawsuit because of multiple, admitted, defaults, by Shinhan.**

**I believe that Mr. Futter addressed the likelihood of success on the merits, so I don't want to get into that again.**

**In particular, the very very broad set off rights that are included in the SLC. I do believe that Shinhan's counsel included a letter that I had sent, I believe, it was on June 13th, or July 13th, of 2025, in which we apprised Shinhan --RIA apprised Shinhan, look, we have this tremendously broad set off right under the SLC which allows us, even at this point in time, to set off damages that we think we will win in a litigation. We didn't do that at that time, we have not done that yet. Although the April 7th letter that Mr. Kang sent, does announce that he's**

got the right to do that if he would have like.

THE COURT: Yep.

MR. MASTORIS: So that is a remedy that we believe he would be entitled to exercise today. And that is something that, ultimately, if we choose to do it, and we're not right, right, we're not correct under the agreement, then we would have to pay back those monetary damages at the statutory rate of interest. Ultimately, if that is a risk that RIA is willing to take, they are allowed to take that risk, based on the language of the contract, which they've pled, and your Honor found, at least stated a claim that it was a valid contract, right, with those provisions as part of it.

THE COURT: Okay. Going back to BNP, I'm going to have the same question for the current custodian.

So the securities, as I understand it, would have been in Shinhan's name, correct, when they were at BNP?

MR. MASTORIS: The securities --the title transfer --when you're talking about a stock loan, title transfers.

THE COURT: Yes.

MR. MASTORIS: So the title --we acquired title in those securities in borrowing them so that we can then engage in RECO and reverse RECO transactions.

THE COURT: Got it.

So title was transferred. Is there anything now

**--I think I know the answer based on what you just said --was there anything in BNP's contract that would have required Shinhan's authorization to transfer any of those funds? I'm guessing, no, if they have been moved.**

**MR. MASTORIS: So, I don't think there's anything explicit in the GMSLA, which says you need prior authorization. I think that is the best answer I can give right now.**

**THE COURT: Uh-huh.**

**MR. MASTORIS: To be perfectly honest, I think I would have to go back and look at the GMSLA provisions again.**

**THE COURT: Sure.**

**MR. MASTORIS: Clearly, at the time, BNP was the custodian. Once they terminated the money was transferred to a different Custodial Account.**

**(Pausing.)**

**MR. MASTORIS: Sure, okay.**

**MR. FUTTER: The security loan agreement, your Honor, which was signed by Shinhan, expressly acknowledged that RIA would have the right to engage in RECO and reverse RECO transactions. So Shinhan did consent to dealing with securities.**

**MR. MASTORIS: Sorry, I thought you were asking a different question. I thought I said the whole point of**

**this arrangement was to allow for RECO and reverse RECO transactions. I thought you were addressing a different question which was the Custodial Agent.**

**THE COURT: Essentially what I am looking for, is some comfort that the money will not move from the current custodian. I think I have answered my own question. If it already moved from BNP, likely it could continue to travel around; is that fair to say?**

**MR. MASTORIS: I would like to go back and take a look at the provisions. My understanding is that the protections being afforded to Shinhan here are the equivalent to collateral that exists in a custodian account. I'm not sure if it really matters if it is at BNP, or bank X, or Y, at the end of the day, so long as they have that.**

**THE COURT: Got it. That is really helpful.**

**Anything else?**

**MR. MASTORIS: No. Like I said, on the balance of the equities, I'm not sure that we need to go into the case law. I think you could understand where we're coming from, which is that we have severe and significant concerns about the fact that --I mean, really, the reverse of what Shinhan is complaining about here would come to be, which is that these funds would be transferred to a bank account in Korea. Already we have seen, we allege as part of our complaint, that Mr. Kang and RIA have subject to blackballing by**

**Shinhan executives amongst other Korean companies. We could only imagine that might extend to the Courts as well. As your Honor knows, once money travels away from the United States, as between accounts in the United States, it becomes a lot harder and costly to find and that would affect the irreparable harm on RIA, as opposed to Shinhan.**

**So, I think, ultimately, given all of that, we see no reason why there should be any transfer of monies, any transfer of funds, at this point in time.**

**We do think that RIA continues to have the right to set off the amounts --that is the J.P. Morgan case that we cite and others, pursuant to contractual rights. And if it wants to bear the risk, then it is going to have to pay that back in spades, it can bear that risk.**

**And there is a clearly adequate remedy at law, which is damages, money damages, plus statutory interest. And I think that is all that we are really talking about in this litigation. And that is all that Shinhan will be entitlement to, at the end of the day, if by some chance they prevail. I think that, in itself sort of puts paid to the idea there should be injunctive relief granted. Certainly at this stage, when we're right in the middle of litigation over precisely these issues.**

**Thank you.**

**MR. MASTORIS: Thank you.**

**THE COURT: Ms. Garr.**

**MS. GARR: Thank you, your Honor.**

**There was a lot said there. I want to respond to a few of the points.**

**First of all, the clarification on the value of collateral, the 185 million, does not help at all.**

**A market value with lent security are, is something we're aware of. The open question is what the value of the collateral is. And nobody is able to say that and certainly it has not provided, it raises more questions about what the value of the collateral is. More importantly, as made very clear, there's been no independent verification of it.**

**The second point that was raised was that the Motion to Dismiss somehow approved this idea of a contractual set off right. There has been a finding, at least to survive a Motion to Dismiss stage. That was never raised in the Complaint, never a claim or cause of action;**

**As Mr. Mastoris acknowledged, that didn't come until September of 2025 during the pendency after there had been a default.**

**THE COURT: Right.**

**MS. GARR: That is not a claim, that has not been decided by this Court. And if it had, we would have, in fact, the closest that came to it was the declaratory judgment that the Agreements were in effect and terminations**

were invalid and that was dismissed. That was the claims dismissed by the Court. That is inaccurate.

THE COURT: Uh-huh.

MS. GARR: Third, they've again muddied the well settled law here.

The reason why just providing collateral reports now, and I think if we might combine the motion to compel at this point, as well --

THE COURT: Yes.

MS. GARR: --it is not just enough, as your Honor recognized, to say what is the value of what a has happened now?

What was, I think misrepresented, or misunderstood, is that the title, while the title transferred with respect to the lent securities, for purposes of RECO, the title transferred to Shinhan with respect to the collateral. That is legally titled in Shinhan's name, not RIA's. It was supposed to be held in a Custodial Account for Shinhan's benefit.

THE COURT: Say that again. That is different from what I heard.

MS. GARR: That is different from what they represented.

THE COURT: Go ahead.

MS. GARR: Under the GMSLA. If you look at

**section --**

**THE COURT: Give me one second to find it.**

**(Pausing.)**

**THE COURT: Okay.**

**MS. GARR: 42 of the GMSLA. The requirements to effect delivery.**

**First of all, you'll see that the deliveries have to be simultaneous, reason again there's actually been no breach at all, unless there's been a transfer of collateral.**

**But there needs to be the securities borrowed. Pursuant to Paragraph 3, that is the loan of securities, right, or any collateral delivered pursuant to Paragraph 5.**

**That is the delivery of collateral upon commencement of the loan that is Section 5.1. That shall pass from one party to the other. And then it is full title guarantee, free from all liens, charges and encumbrances. The collateral is the legally title --it has been in all of our papers and not disputed until today -- the legal title to collateral is Shinhan's, which is why this is conversion.**

**What Section 13 of the SLA provides, is that they can take possession of the collateral upon the first instance of any instance of a missed borrowing rate payments.**

**The reason why giving us information about the collateral is insufficient, is because the legal possession**

**perfects the security interest.**

**We are talking about a security interest here. This is collateral. This is an exception to the rule.**

**This is why just saying, in addition to RIA not being a party that we would trust withholding this collateral, that is our possession, this is why the two exceptions to the general rule that monetary damages are insufficient here.**

**One, this is our legal property that they have now transferred and are taking full dominion and control over. That is conversion. It is identifiable proceeds and exception to the general law.**

**The second independent is because this is to serve as our security interest. This is the legal possession that Section 13 of the SLA, the reason why --and this was, if you see the SLA itself, which is the Agreement that the parties amended, added that supersedes the GMSLA, it is very short. This is very limited in what these parties specifically agreed to.**

**And it is that in event of default -- first, it is going to be held in a custody account for the benefit of Shinhan. An event of default is any failure to make a single borrowing rate payments within five days. At that point in time, we have right to proceed to take legal possession, possession of the Custodial Account and**

**Custodial Securities.**

**It is also not just that we can take it and then transfer anywhere we want, put it anywhere we want. We also have the right to make any claims, or take any action, or institute any proceedings which Shinhan considers to be necessary advisable to protect or enforce its security interest created hereunder.**

**This is like the case law that we have cited in our papers, this is an instance, where if it is not in our legal possession, we are no longer a secured creditor. This is what the security is designed. That is why it is an exception to the general rule.**

**When collateral is at state, with RIA engaging in this way, we are not secured, we do not have secured status if it is not in our possession.**

**That is why --that is the distinction. That is why monetary damages are insufficient, because we lose our secured creditor status.**

**So, again, this risk or fear of this somehow --right now, this was meant to be a custodial arrangement, we had a contractual right to take possession. They have not told us --again, taking their representations, but they are withholding all communications with BNP. We don't know what was said or why.**

**What it looks like from the Footnote in their**

opposition, if I am reading it correctly --and, again, none of this was directly stated, none of it -- that--

First of all, also for the timing, I just want to address too --the daily collateral reports resumed through April. It was May 1st when they stopped. Meaning, we know that at least through April of 2025, those funds were held at BNP. We were never told that the collateral reports stopped because they were no longer held at BNP, but certainly we know at least until that time.

What is notable in their Footnote 5 of their Opposition. Said, if any one -- the party that destabilized the custodial arrangement was Shinhan, as Shinhan repeated demands to BNP. I want to stop for a moment because it was repeatedly called a letter writing campaign. This is an exercise of contractual rights under Section 13 of the SLA. This was not a letter writing campaign. It was the notice of event of default with the expressed language contemplated in the failure of the borrowing rate payments. Which RIA had complete control over. If they did not want that to happen, they could have been making the borrowing rate payments but they did not.

It says -- Shinhan --the last sentence Shinhan's own extra judicial conduct the disruption-- sorry that is not right.

It says, directly impaired RIA's custodial access

**and downstream relationships.**

**This suggests, to me, that what happened, was that BNP -- again, we don't know, absent discovery here, that they are withholding, but suggests to me that BNP said what they should have said, which is, I'm not transferring this to you, and I'm not transferring to them, you cannot take this, right. Because --and because he was no longer able to take and was seeking to take funds out, that suggests to me that he was trying to gain access to the account.**

**Now, again, I have to read between the lines because we don't know, which is why, for the motion to compel, I need to understand what is happening here;**

**But this is our legal property, it is something we should have possession of. And, as we have made clear, we are happy for any order from this Court. Shinhan is not looking to transfer to Korea. Would absolutely keep it. We can keep it at the same bank, or a bank agreed upon. It just cannot remain in RIA's possession.**

**It destroys our collateral and secured rights. This is also not --this will be the last point, although there's many more I would like to address. One of the last points, this is the ultimate relief we're seeking in this case. That is absolutely false. That is absolutely false.**

**The return of the lent securities, they are still holding onto the securities. There is no contractual right**

**under the GMSLA or SLA to do that. If there's been an event of default, you need to terminate. Off set needs to happen between the collateral and the lent securities.**

**What they have done, is engage if their own Self-Help from the outside of this, which we are certainly seeking now because it is not per the terms of this. We are seeking far more than just the return of those lent securities. This is entirely separate. This is an additional $200 million that they have now taken that was legally titled in our name and transferred it without our knowledge into an account that we have no control over and not a Custodial Account for our benefit, which is what has been required.**

**This is netting out. This is conversion. We are seeking punitive damages. This is far beyond a return of the securities here.**

**So, again, this is the status quo. If you look at 112(b) of this GMSLA, what is supposed to happen in the event of default and termination, this is why they never terminated. They never terminated specifically. Because if you terminate, you must return the securities.**

**And so the 112(b) requires this net set off. It shows this is the status quo. We have the securities, they have the lent securities, there's a balance that gets returned. That is what is supposed to happen upon an event**

of default. There's no consequential damages.

The relief we're seeking far exceeds just the return of the lent securities.

Thank you.

MR. MASTORIS: May I address a couple of points, your Honor.

THE COURT: Briefly.

MR. MASTORIS: Thank you.

So, first, I want to start with the purpose of collateral.

Very simply put, it is to protect a lending parties' interest in having lent out certain securities. To say there's $400 million at stake here is not, I think, accurate.

What is happening is, RIA borrowed whatever the amount is, $185 mark-to-market value, $228 million value worth of securities.

And they put up an equivalent amount of collateral to protect Shinhan's interest. That collateral, as far as we know, continues to sit in a Custodial Account. It continues to not have been dissipated and Shinhan --RIA, rather, is willing, as we have put forth to provide these reports again, and to provide Shinhan with an understanding of where its collateral is.

If you look at each of the cases cited in their

briefs, each and every one of them, none of them say --first of all, all of them have to do with the dissipation of assets. It is not moving it from one escrow account to another, or one Custodial Account to another. It is actually dissipating those assets is what is at stake. I think almost every case is cited in Shinhan's brief in support of its Order to Show Cause.

In all of the cases there was evidence of dissipation happening. In none of those cases was the relief that the was imposed, even where there was a likelihood of success on the merits. The return of that collateral, or those securities, or that escrow amount to the party, which had been a victim of default, right. That is not what happened there.

What happened was, no, we want to keep that collateral in the Custodial Account where it belongs, right. So that is, in fact, the only relief they should be seeking, period.

The other distinction between those cases and ourselves is that RIA here was not the original defaulting party. In each and every one of the case, there was only one default. It was by the party, which was, in fact, seeking to dissipate the assets, dissipate whatever in that the escrow accounts.

Here, there was a preexisting default, admitted to

and signed by Shinhan's representative. And so that, in turn, triggered a chain of potential remedies and rights that RIA had, both under the GMSLA, starting back in 2019, or '18, whenever it was executed. And there are rights, by the way, under 112, 118 to take exactly the sort of action they have taken here today. Also, later, when the SLC was signed. And the SLC, again, stated a claim it is a valid contract that might be wrong at the end of the day, right now that is where we are. That provides supremely broad set off rights, which provide an independent justification for the ability to set that money off.

So, I do think that what we're talking about what the collateral means here, A, we want to be very clear that if Shinhan is allowed to take that collateral and possess it itself, that really is the relief.

At the end of the day they're saying, we want our securities back, right. That is the breach that they have alleged. But they get either securities or the equivalent collateral. Never in a million years they get both.

If the collateral is transferred to them now, they are getting the ultimate relief they are seeking. It might be in a slightly different form or securities, but it is the exact same monetary amount. That is the ultimate relief and ultimately these are highly liquid securities which can easily be disposed of on the open market and liquidated, so

**we are talking about money damages again, which brings me back to where I started earlier.**

**I think Ms. Garr also talked a little bit about the letters to BNP. I understand their position is that we had a right to send these letters and to notice these defaults. Even to do that while litigation was ongoing and after BNP told us that they were not going to comply with our orders, I get all of that.**

**My colleague did express a concern and my client expressed a very serious concern about what will be done with this information, particularly, in the light of some of the allegations in the Complaint about their reputational harm done to RIA on Wall Street.**

**So, I'm not sure what your Honor is thinking, in terms of relief here. But, to the extent that we will be providing these reports and will be providing this transparency, this information, we would like a representation that, as long as that information is being transferred, we're not going to be receiving, or the bank, I guess, more accurately, will not be receiving similar letters and similar outreaches from Shinhan's counsel saying, these guys are in breach of a whole bunch of stuff. That is how --that is what we are here in this litigation to resolve. And by them doing that, they are putting themselves on the hook for reputational harm. And I would**

hate to see us come back to court on another Preliminary Injunction motion to stop that from occurring.

THE COURT: Counsel, do you have a -- from your perspective, is the GMSLA still in effect or is it terminated?

MR. MASTORIS: So, I think that it was certainly in effect up until April 7th. There was a letter that was sent at that point by Mr. Kang, right, which purports to terminate it.

THE COURT: Right.

MR. MASTORIS: I think, as of that date, it is certainly possible that it was terminated. But I think that something -- I think that is something that could be discussed, I guess. Uhm, because I don't know --if we are going to be keeping the collateral in that account and providing the transparency, I'm not sure we need to go that route. I do think that we could certainly do that. I think that is ultimately a client question in terms of whether he wishes to terminate, exercise those set off rights and then take, basically, his chances, in terms of damages, that are awarded or not awarded here, as the case may be.

THE COURT: Thank you counsel.

MS. GARR: May I add two points.

THE COURT: You got it.

MS. GARR: I appreciate it, I will keep it quick.

**THE COURT: No worries.**

**MS. GARR: I think your Honor just hit on a very important point.**

**I want to just -- the affect -- you cannot have it both ways, I think that has been the issue here.**

**The set off rights, first of all, are not entitled to a defaulting party, which you cannot seek to terminate without written notice. Under the GMSLA it is a requirement. There's no defaulting party until there has been written notice. Written notice did not come until April 7, 2026, which is after there had already been the borrowing rate missed payments. There could not be at that point the right to set off. You're not entitled to set off under the agreement.**

**But also, the point that your Honor, I think was alluding to, which is the appropriate point here, is that, if the Agreements are in effect, you're required to make the borrowing rate payments. There has been over 7 million, I believe, at this stage of lost borrowing rate payments that have not been made, if not more. If he's terminating --and that is the position he's taken and elected to take, it is, specifically, so that he can exercise off set, which requires the immediate return.**

**Again, this is why the status quo is what it is at returning collateral. You cannot have it where keep the**

**custodial-- he's trying to benefit from the double amount and to keep profiting off of that, which is not intended when there's been a termination in an event of default.**

**The last thing I want to address very quickly is the $750 million loan agreement.**

**This was an unlikely claim that, I believe, is now bordering on frivolous. We are prepared to seek partial summary judgment on this.**

**The discovery has borne out, at this point, exactly what we stated from the outset. This was a draft discussion, draft that was missing all key terms, that representative from Shinhan that didn't have authority to sign it, signed it, based on Mr. Kang's representations that it would be a showing of good faith, he returned it. And even if you were to take that as, okay, this is now an offer, the immediate response was, we are going to meet from RIA --the discovery is borne out but we are going to need to have more revisions and changes to this.**

**That is not an acceptance. And then there was no -- this is also a several year tranche agreement. There can be no statute of frauds --there would be a statute of frauds violation if we are relying on an oral agreement. And there is no meeting of the minds where, obviously, all terms were not met and there is no agreement and said there was going to be further changes.**

**Not only that, there was no performance. They can not rely on performance. It was never performed and never sought to be performed. The first time this was raised didn't come until litigation in bringing the claim, and then subsequent letters saying this. They keep representing to this court --and, again, the standard here is likelihood of success. It does not needed to be proving, but likelihood of success is all that is needed to be established here, we have established clear on the face breaches. Their claims, again, rely on, at this point, an Agreement that is -- that is not only unlikely to succeed, but we believe should be dismissed right away.**

**Also, the last point is the case law that they referenced is actually nearly identical to the issues here. This is transfer of account to an account. There's been orders where it has been transferred to an account in the lenders name to resolve the issue, to remedy the conversion.**

**And, also, it is not true, that in all instances there is no instances where there's allegation of default going the other way.**

**In fact, there's case law, numerous case law that indicates that there could be a triable issue of fact at the same time that there is an injunctive relief granted.**

**THE COURT: Thank you.**

**It is 4:06. Let's take a short break and then we**

**will issue a decision. Let's plan to be back at 4:30.**

**MR. MASTORIS: Fine, your Honor.**

**One quick question. Maybe not now, but later, we would like to address the partial judgment. I think we are getting little bit ahead of ourselves.**

**THE COURT: Understood.**

**MR. MASTORIS: We would ask one or two minutes.**

**THE COURT: Understood. Understood.**

**Thank you.**

**(Recess taken.)**

**(Continued next page.)**

**THE COURT: We are back on the record with respect to Motion 003 and 004.**

**Let me start at the outset by noting that, based on what the Court learned at the oral argument today, the briefing is, unfortunately, stale now, because there's all this new information that the Court was not aware of prior to today's argument, and certain information that the Defendants were not aware of prior to coming into the room today;**

**So, with that backdrop, let me add a second observation, which is, I am aware that, based on counsel's conference with Ms. Van Brunt, previously, prior to bringing this motion, that the Court highly recommended, that the parties exchange those daily collateral reports; because had that been done, we would actually have highly relevant information for the Court to be able to resolve the Preliminary Injunction that is before us.**

**And, second, it would have completely obviated the need for the Defendants to bring the Motion to Compel.**

**So where I'm going with this is, I am putting everybody on notice, on the record, that if we continue to have to file motions, that are made because of a lack of cooperation, of a desire to protract litigation for clients to not be forthcoming with their counsel, the Court will direct that attorneys' fees are paid in connection with**

**those motions. There was no need for a motion to compel to have been filed and consume judicial resources.**

**Second, and as you'll see, the Court is in no position to make a ruling on Preliminary Injunction hearing today, because there's all this information that resides solely in those daily collateral reports.**

**So with that, here is what we are going to do:**

**With respect to the Motion to Compel, I note that Plaintiff's opposition blatantly conflates contractual rights with discovery applications. These are highly relevant documents. Doesn't matter what is in the contract. What matters is what is relevant for purposes of discovery. Those collateral reports were relevant, that was made clear based on Ms. Van Brunt's conference with the parties;**

**Accordingly, the Court directs that that motion is granted in its entirety. Plaintiffs shall produce the daily collateral reports from May of 2025 to the present and will continue to produce those on a regular basis.**

**With respect to May 1st, 2025, through the present, those will be produced to the Defendant within two weeks from today's date.**

**I have no interest in hearing about the burden of having to do that, it should have already been done.**

**Now, with that then, that would put us at May 26th for the production of those collateral reports.**

By June 1st, at 5:00 p.m., the parties shall file simultaneous briefs, not to exceed 4200 words. That will supplement your briefing on Defendants' Order to Show Cause, and will specifically address the follows:

Whether the GMSLA has been terminated. That issue in question bears directly upon the Court's adjudication, the pending Order to Show Cause;

Second, the value of the collateral on a daily basis versus the securities;

And third, the specific relief you are seeking in light of the production of the collateral reports and, again, the new information that's been presented.

The Court will therefore, reserve on the Order to Show Cause. We'll come back here on June 3rd at 2:00 p.m., for further oral argument on the Order to Show Cause based on those briefs and that new information, okay.

Finally, as is our practice, the parties should obtain a copy of today's transcript, file it on NYSCEF within 30 days.

I'm also directing to you provide today's transcript to your respective clients and file an affirmation of service it's been served upon your clients within five days of that service.

What is very concerning to me is that the Court has been operating on a lack of transparency and, therefore,

counsel has been operating on a lack of transparency. I am not questioning counsel's ethics and adherence to ethical obligations. But I do have some very serious concerns about what is going on behind the scenes, okay.

I am not going to direct that the Defendant not engage with the new custodian, they have every right to, under the GMSLA, unless someone tells me it has been terminated and that the collateral should go back to them.

Anything else for today?

MR. FUTTER: I don't want to wait until June 3rd to raise a scheduling issue because time is marching on.

We have currently under the schedule a July 15th date to complete depositions. Some notices for depositions were served in September of last year, three that went out.

The important one, from Plaintiff's point of view is from Mr. Sam Kim. We heard a reference today of how the Defendant's are ready on move on partial summary judgment whether SLC is even a valid contract including, apparently because Mr. Kim lacked authority. We found out yesterday, despite serving deposition notice in September last year, he's no longer employed by Shinhan. They can't produce him for deposition because he left months ago. We found that out yesterday. If he's in Korea and if they can't produce him, we are going to need Hague, or maybe cooperation. I don't know if we can get that done by July 15th, chances are

**we absolutely cannot, Hague is much slower than that.**

**I just wanted to flag that for your Honor, we might need an extension because we need to confer on that and several other deposition issues.**

**MR. MASTORIS: That was the point that I wanted to rise to make earlier with respect to the SLC. Because the allegations in the Complaint, it was an oral agreement, it was later memorialized, that agreement was between Mr. Kim and Mr. Kang. So I think his deposition is absolutely critical and necessary before any sort of summary judgment motions to be contemplated, if this Court is even willing to relax their normal rules and allow that to happen prior to the end of discovery, which I see no reason why that would happen here, in any event.**

**MS. GARR: On that, first of all, the deposition notices that were served back in September, were noticed for November. It was at a time when the parties were settling. We said at the time it was premature, they withdrew that, obviously, the depositions did not go forward. Those were not in effect and, obviously, then the parties stayed and discovery stopped. So there are no notices for deposition that had been noticed, that are valid currently.**

**There was not any request or a discussion about depositions. Although your Honor issued over a month ago now. The scheduling order, it was not until yesterday**

afternoon that counsel asked to discuss the schedule. And said, at that time, we're going to need an extension because we need to go through the Hague. I said, I don't even know who you're seeking to notice, and I don't know, it wasn't until late yesterday evening that he sent a list of eight or nine people, and saying we wanted potentially to seek, could you see if they are there, let me know by today's hearing at 3:00 p.m. whether or not you're willing to go forward with this.

This idea somehow we had -- the minute they raised this, I mentioned Mr. Kim, in January of 2026, was no lower at the company it was during the thing. The suggestion that somehow I was not forthcoming, when the first time it was brought up was yesterday afternoon and I told them right away at that time. When they could have noticed or take any steps before that, a month before, is just not entirely accurate.

Also, I would note that -- just a separate question that I had that doesn't have to do with scheduling;

You had mentioned that the motion to compel, which is more than just for the daily collateral, that is being granted in its entirety regarding communications as well regarding with the bank as well.

THE COURT: Yes, we'll issue a short form order today so that you have it at hand.

MS. GARR: Thank you.

THE COURT: I'm not going to grant A single adjournment on discovery, period, not going to happen. I made that very clear in the Amended PC Order where I said no adjournments will be grant absent good cause shown. Everybody should have been doing what they were supposed to do, as soon as the stay was lifted in this case.

We have been available and involved with counsel from the inception of this case, so, no.

MR. FUTTER: Your Honor, the good cause is that we didn't know they would not be able to produce him until yesterday, they can't.

THE COURT: Right. Did you renew your subpoena after the stay was lifted?

MR. FUTTER: We indicated we wanted to depose him. We didn't reissue a deposition notice. We thought we would want to schedule this person's deposition. And for them to tell us suddenly he was fired or quit, we did not learn about it, to repeat, until yesterday.

THE COURT: Okay. With respect to the partial summary judgment motion, I'm not going to address that today. We are not there yet, okay.

We'll see everybody June 3rd at 2:00 p.m.

We'll issue a court notice today so that you know exactly what our expectation is. I know everybody was

**taking notes, don't worry if you didn't get it.**

**Have a good day.**

*** * * ***

**It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.**



**DEBORAH ANN ROTHROCK, RPR**
**Official Court Reporter**

## $

**$185** [3] - 19:22, 20:8, 44:16
**$200** [1] - 43:9
**$228** [1] - 44:16
**$400** [1] - 44:13
**$750** [1] - 50:5

## '

**'18** [1] - 46:4

## 0

**003** [1] - 53:2
**004** [1] - 53:2

## 1

**1** [3] - 5:10, 27:16, 31:3
**10** [2] - 4:12, 12:23
**100** [1] - 24:3
**10007** [1] - 1:9
**10010** [1] - 1:21
**10020** [1] - 2:3
**101(c** [1] - 11:6
**10166** [1] - 1:17
**104** [1] - 13:5
**110** [1] - 24:4
**112** [2] - 10:8, 46:5
**112(b** [2] - 43:18, 43:22
**118** [2] - 12:23, 46:5
**12** [1] - 1:10
**1221** [1] - 2:3
**13** [4] - 11:3, 38:20, 39:15, 41:15
**13th** [2] - 31:19
**147** [3] - 11:16, 11:23, 22:15
**15th** [2] - 56:12, 56:25
**162** [1] - 11:22
**185** [1] - 36:6
**1st** [3] - 41:5, 54:19, 55:1

## 2

**2.5** [1] - 16:18
**20** [3] - 4:2, 4:18, 5:11
**200** [2] - 1:17, 9:24
**2019** [1] - 46:3
**2020** [3] - 11:16, 12:3, 12:16
**2022** [2] - 6:15, 25:12
**2024** [1] - 3:3
**2025** [9] - 7:14, 8:12, 12:21, 13:22, 31:19, 36:19, 41:6, 54:17, 54:19
**2026** [6] - 1:10, 5:3, 12:15, 15:5, 49:11, 58:11
**228** [1] - 5:13
**22nd** [1] - 1:20
**25** [1] - 13:22
**25th** [1] - 15:10
**26th** [1] - 54:24
**2:00** [2] - 55:14, 59:23

## 3

**3** [1] - 38:11
**30** [5] - 4:3, 15:14, 16:2, 16:7, 55:19
**3:00** [2] - 4:17, 58:8
**3rd** [3] - 55:14, 56:10, 59:23

## 4

**400** [1] - 10:1
**42** [1] - 38:5
**4200** [1] - 55:2
**43** [1] - 11:21
**45** [1] - 1:1
**4:06** [1] - 51:25
**4:30** [1] - 52:1

## 5

**5** [2] - 38:12, 41:10
**5.1** [1] - 38:14
**51** [1] - 1:20
**5:00** [1] - 55:1

## 6

**60** [1] - 1:9
**659538** [1] - 3:3
**659538/2024** [1] - 1:8

## 7

**7** [3] - 12:15, 49:11, 49:18
**71** [1] - 8:9
**750** [2] - 22:20, 22:23
**7th** [3] - 5:3, 31:25, 48:7

## 9

**90** [4] - 7:1, 9:7, 19:12, 26:13
**90-day** [1] - 28:24

## A

**ability** [1] - 46:11
**able** [9] - 9:3, 20:19, 23:6, 24:17, 25:16, 36:9, 42:7, 53:16, 59:11
**absent** [6] - 9:3, 10:11, 17:3, 17:20, 42:3, 59:5
**absolutely** [6] - 16:5, 42:16, 42:23, 57:1, 57:9
**accept** [1] - 23:10
**acceptance** [1] - 50:19
**accepted** [1] - 11:10
**access** [3] - 23:6, 41:25, 42:9
**accordance** [1] - 12:12
**accordingly** [1] - 54:15
**Accordingly** [1] - 4:14
**account** [15] - 6:8, 18:2, 18:11, 30:3, 30:4, 34:12, 34:23, 39:21, 42:9, 43:11, 45:3, 48:15, 51:15, 51:16
**Account** [11] - 5:8, 16:23, 26:18, 27:9, 33:16, 37:18, 39:25, 43:12, 44:20, 45:4, 45:16
**accounting** [1] - 17:21
**accounts** [5] - 9:8, 26:17, 29:23, 35:4, 45:24
**accurate** [3] - 44:14, 58:17, 60:5
**accurately** [1] - 47:20
**accusations** [2] - 19:5, 30:15
**acknowledged** [2] - 33:20, 36:18
**acquired** [1] - 32:21
**act** [3] - 8:17, 8:21, 17:11
**action** [5] - 9:25, 31:10, 36:17, 40:4, 46:5
**add** [2] - 48:23, 53:10
**added** [1] - 39:17
**addition** [1] - 39:4
**additional** [4] - 16:7, 17:13, 22:1, 43:9
**address** [12] - 4:7, 4:8, 10:22, 19:4, 26:21, 41:4, 42:21, 44:5, 50:4, 52:4, 55:4, 59:21
**addressed** [1] - 31:13
**addressing** [3] - 19:6, 28:5, 34:2
**adequate** [1] - 35:15
**adherence** [1] - 56:2
**adjournment** [1] - 59:3
**adjournments** [1] - 59:5
**adjudication** [1] - 55:6
**admits** [4] - 5:5, 11:13, 21:25, 22:1
**admitted** [5] - 4:24, 18:6, 22:17, 31:12, 45:25
**admittedly** [1] - 20:13
**advance** [2] - 24:3, 24:4
**advisable** [1] - 40:6
**affect** [2] - 35:5, 49:4
**affirmation** [1] - 55:22
**afforded** [1] - 34:11
**afternoon** [8] - 3:1, 3:5, 3:8, 3:15, 18:25, 23:19, 58:1, 58:14
**agent** [1] - 25:9
**Agent** [2] - 25:20, 34:3
**ago** [2] - 56:22, 57:24
**agreed** [6] - 11:16, 15:12, 16:11, 25:15, 39:19, 42:17
**agreement** [16] - 13:9, 21:4, 22:1, 22:2, 22:20, 22:21, 22:23, 32:6, 33:19, 49:14, 50:5, 50:20, 50:22, 50:24, 57:7, 57:8
**Agreement** [4] - 11:7, 15:5, 39:16, 51:10
**Agreements** [11] - 7:18, 7:22, 11:11, 12:4, 12:9, 12:13, 12:24, 16:8, 23:11, 36:25, 49:17
**agreements** [2] - 15:11, 23:13
**ahead** [4] - 4:19, 25:2, 37:24, 52:5
**AI** [1] - 16:13
**AKCAM** [1] - 2:5
**Akcam** [1] - 3:14
**albeit** [1] - 18:6
**allegation** [1] - 51:19
**allegations** [4] - 21:20, 23:7, 47:12, 57:7
**allege** [3] - 22:18, 23:13, 34:24
**alleged** [8] - 10:5, 12:15, 13:24, 21:2, 21:7, 22:12, 28:5, 46:18
**alleges** [1] - 26:23
**alleging** [1] - 23:6
**allow** [4] - 12:5, 14:16, 34:1, 57:12
**allowed** [3] - 13:2, 32:9, 46:14
**allows** [2] - 10:10, 31:21
**alluding** [1] - 49:16
**almost** [1] - 45:6
**Amended** [1] - 59:4
**amended** [1] - 39:17
**Americas** [1] - 2:3
**Aminity** [1] - 6:6
**amount** [10] - 19:1, 23:14, 24:3, 24:4, 30:5, 44:16, 44:18, 45:12, 46:23, 50:1
**amounts** [1] - 35:11
**ANAR** [1] - 1:13
**ANN** [1] - 60:8
**announce** [1] - 31:25
**announced** [1] - 24:12
**answer** [3] - 18:21, 33:1, 33:7
**answered** [1] - 34:6
**answering** [2] - 14:24, 27:18
**apologies** [2] - 3:24, 19:25
**apologize** [2] - 26:16, 29:2
**appearances** [2] - 3:4, 3:10
**applications** [1] - 54:10
**appreciate** [4] - 14:14, 24:8, 30:15, 48:25
**apprised** [2] - 31:19, 31:20
**approach** [1] - 14:16
**appropriate** [6] - 6:4, 6:19, 9:18, 9:21, 17:10, 49:16
**appropriately** [1] - 9:6
**approved** [1] - 36:14
**April** [7] - 5:3, 12:15, 31:25, 41:5, 41:6, 48:7, 49:11
**AQ** [1] - 6:9
**argues** [2] - 10:24, 17:6
**argument** [14] - 3:20, 4:6, 4:15, 4:19, 10:25, 12:19, 13:10, 13:14, 17:12, 18:13, 20:14, 53:4, 53:7,

55:15
**arguments** [1] - 10:20
**arrangement** [5] - 25:10, 25:17, 34:1, 40:20, 41:12
**art** [1] - 11:15
**assess** [1] - 9:3
**Asset** [1] - 6:9
**assets** [6] - 9:22, 19:16, 26:9, 45:3, 45:5, 45:23
**assume** [1] - 14:6
**assured** [1] - 16:10
**astounding** [1] - 10:11
**attempted** [1] - 15:19
**Attorney** [2] - 1:18, 20:20
**attorneys** [2] - 1:22, 30:16
**Attorneys** [1] - 2:5
**attorneys'** [1] - 53:25
**August** [1] - 14:22
**authority** [3] - 17:9, 50:12, 56:19
**authorization** [2] - 33:3, 33:7
**available** [8] - 6:20, 9:19, 24:20, 25:14, 31:3, 31:5, 31:6, 59:8
**Avenue** [3] - 1:17, 1:20, 2:3
**avoiding** [1] - 30:6
**awarded** [3] - 24:15, 48:21
**aware** [4] - 36:8, 53:6, 53:8, 53:11

## B

**backdrop** [1] - 53:10
**balance** [4] - 4:9, 18:22, 34:17, 43:24
**ball** [1] - 27:14
**bank** [11] - 6:8, 8:13, 17:21, 26:18, 26:19, 34:13, 34:23, 42:17, 47:19, 58:23
**Bank** [1] - 6:15
**barely** [1] - 10:15
**base** [1] - 20:5
**based** [11] - 5:10, 8:25, 16:16, 25:13, 32:10, 33:1, 50:13, 53:3, 53:11, 54:14, 55:15
**baseless** [1] - 16:19
**basis** [6] - 5:15, 6:13, 13:2, 14:19, 54:18, 55:9
**bear** [2] - 35:13, 35:14
**bears** [1] - 55:6
**BECKER** [1] - 1:22
**Becker** [1] - 3:11
**becomes** [1] - 35:4
**becoming** [1] - 9:12
**beg** [1] - 27:7
**behalf** [1] - 3:9
**behind** [1] - 56:4
**belabor** [1] - 30:25
**belied** [1] - 19:17
**believes** [3] - 14:12, 14:13, 23:9
**belongs** [1] - 45:16
**benefit** [5] - 5:9, 37:19, 39:21, 43:12, 50:1
**best** [1] - 33:7
**between** [6] - 4:6, 35:4, 42:10, 43:3, 45:19, 57:8
**beyond** [1] - 43:15
**billion** [1] - 16:18
**bit** [3] - 26:5, 47:3, 52:5
**black** [1] - 22:17
**Black** [1] - 24:24
**blackballing** [1] - 34:25
**blatantly** [1] - 54:9
**BNP** [42] - 5:8, 6:24, 7:3, 7:8, 7:17, 8:16, 8:21, 9:4, 9:13, 13:23, 13:25, 14:2, 16:14, 16:23, 17:19, 19:9, 19:11, 26:7, 26:9, 26:12, 26:13, 26:14, 26:24, 28:7, 28:19, 29:23, 32:14, 32:17, 33:14, 34:7, 34:13, 40:23, 41:7, 41:8, 41:13, 42:3, 42:4, 47:4, 47:6
**BNP's** [2] - 7:3, 33:2
**bordering** [1] - 50:7
**boring** [2] - 7:14, 8:4
**borne** [2] - 50:9, 50:17
**borrowed** [2] - 38:10, 44:15
**borrower** [1] - 6:8
**borrowing** [20] - 5:23, 8:1, 8:8, 8:10, 8:15, 8:20, 11:1, 12:18, 12:21, 13:21, 14:11, 15:21, 32:22, 38:22, 39:23, 41:18, 41:20, 49:12, 49:18, 49:19
**bottom** [1] - 24:1
**breach** [16] - 13:6, 20:19, 20:22, 21:3, 21:14, 21:15, 21:18, 21:20, 21:23, 22:1, 22:15, 22:19, 23:1, 38:9, 46:17, 47:22
**breached** [1] - 13:1
**breaches** [2] - 22:12, 51:9
**breaching** [1] - 21:14
**break** [1] - 51:25
**brief** [3] - 20:9, 27:16, 45:6
**briefing** [2] - 53:5, 55:3
**briefly** [3] - 10:22, 26:21, 44:7
**briefs** [3] - 45:1, 55:2, 55:16
**bring** [1] - 53:19
**bringing** [2] - 51:4, 53:12
**brings** [1] - 47:1
**broad** [3] - 31:16, 31:21, 46:9
**brought** [3] - 18:5, 31:11, 58:14
**Brunt** [1] - 53:12
**Brunt's** [1] - 54:14
**budget** [1] - 4:17
**bunch** [2] - 25:25, 47:22
**burden** [2] - 22:9, 54:22
**burdensome** [2] - 9:12, 14:18
**business** [1] - 14:20
**BY** [3] - 1:18, 1:21, 2:4

## C

**calendar** [1] - 3:25
**campaign** [4] - 28:7, 28:14, 41:14, 41:16
**cannot** [14] - 5:20, 7:22, 8:17, 8:21, 12:2, 12:24, 16:25, 24:25, 42:6, 42:18, 49:4, 49:7, 49:25, 57:1
**canopy** [1] - 25:13
**case** [21] - 6:2, 6:5, 6:11, 6:16, 10:15, 20:13, 20:21, 21:24, 24:15, 34:18, 35:11, 40:8, 42:23, 45:6, 45:21, 48:21, 51:13, 51:21, 59:7, 59:9
**CASE** [1] - 2:2
**Case** [1] - 3:6
**cases** [5] - 22:11, 44:25, 45:8, 45:9, 45:19
**cautious** [1] - 30:14
**Centre** [1] - 1:9
**certain** [2] - 44:12, 53:7
**certainly** [10] - 9:2, 23:23, 24:13, 35:22, 36:9, 41:9, 43:5, 48:6, 48:12, 48:17
**certified** [1] - 60:4
**chain** [1] - 46:2
**chance** [2] - 10:21, 35:19
**chances** [2] - 48:20, 56:25
**changes** [2] - 50:18, 50:25
**charges** [1] - 38:16
**checking** [1] - 14:5
**choose** [1] - 32:5
**circumstances** [1] - 17:5
**cite** [4] - 6:6, 11:24, 17:9, 35:12
**cited** [3] - 40:8, 44:25, 45:6
**citing** [1] - 19:11
**CIVIL** [1] - 1:1
**claim** [10] - 7:22, 11:8, 13:11, 21:22, 32:11, 36:17, 36:22, 46:7, 50:6, 51:4
**Claimant** [1] - 3:7
**claiming** [1] - 14:1
**claims** [4] - 13:8, 37:1, 40:4, 51:9
**clarification** [1] - 36:5
**clear** [19] - 5:22, 6:17, 9:16, 11:5, 12:24, 13:6, 16:21, 19:25, 22:3, 27:16, 27:18, 28:6, 29:10, 36:12, 42:14, 46:13, 51:9, 54:13, 59:4
**clearly** [5] - 21:6, 22:8, 22:17, 33:14, 35:15
**client** [9] - 14:4, 14:7, 15:16, 27:6, 27:10, 29:10, 29:17, 47:9, 48:18
**client's** [1] - 30:4
**clients** [4] - 30:16, 53:23, 55:21, 55:22
**closest** [1] - 36:24
**CO** [1] - 1:6
**Co** [2] - 3:3, 3:7
**collateral** [82] - 4:25, 5:6, 5:10, 5:12, 5:17, 5:19, 6:18, 9:8, 9:11, 10:1, 10:9, 10:17, 11:21, 14:17, 14:25, 15:22, 15:24, 16:4, 16:17, 16:22, 17:8, 17:19, 17:21, 17:24, 18:16, 19:9, 19:13, 19:19, 19:24, 20:4, 20:6, 20:9, 23:7, 23:14, 24:6, 25:23, 26:7, 29:18, 29:24, 30:5, 31:8, 34:12, 36:6, 36:9, 36:11, 37:6, 37:16, 38:9, 38:12, 38:13, 38:17, 38:19, 38:21, 38:25, 39:3, 39:6, 40:13, 41:4, 41:7, 42:19, 43:3, 44:10, 44:18, 44:19, 44:24, 45:12, 45:16, 46:13, 46:14, 46:19, 46:20, 48:15, 49:25, 53:14, 54:6, 54:13, 54:17, 54:25, 55:8, 55:11, 56:8, 58:21
**collaterals** [1] - 9:17
**colleague** [7] - 3:10, 19:6, 23:3, 23:17, 26:10, 28:4, 47:9
**combine** [1] - 37:7
**comfort** [1] - 34:5
**coming** [5] - 16:11, 24:13, 29:19, 34:19, 53:8
**commencement** [1] - 38:14
**commencing** [1] - 12:20
**comment** [1] - 16:7
**Commercial** [1] - 6:16
**communications** [3] - 7:8, 40:23, 58:22
**companies** [1] - 35:1
**company** [1] - 58:12
**company's** [1] - 18:2
**Compel** [4] - 3:17, 7:11, 53:19, 54:8
**compel** [6] - 3:25, 17:15, 37:7, 42:12, 54:1, 58:20
**complained** [1] - 23:21
**complaining** [1] - 34:22
**Complaint** [11] - 6:23, 8:4, 8:9, 9:7, 12:8, 19:11, 19:14, 26:23, 36:17, 47:12, 57:7
**complaint** [1] - 34:24
**complete** [2] - 41:19, 56:13

**completely** [4] - 5:12, 13:14, 18:14, 53:18
**comply** [1] - 47:7
**concern** [3] - 18:19, 47:9, 47:10
**concerning** [1] - 55:24
**concerns** [6] - 14:25, 15:18, 15:23, 28:17, 34:20, 56:3
**conduct** [2] - 13:15, 41:23
**confer** [1] - 57:3
**conference** [5] - 15:10, 16:1, 17:17, 53:12, 54:14
**confirm** [2] - 16:2, 17:19
**confirmed** [2] - 17:22, 18:11
**conflates** [1] - 54:9
**confused** [2] - 14:10, 19:23
**confusion** [1] - 13:24
**connection** [2] - 6:22, 53:25
**consent** [1] - 33:22
**consequential** [2] - 13:4, 44:1
**considers** [1] - 40:5
**constitute** [3] - 11:7, 11:18, 22:23
**consume** [1] - 54:2
**contacting** [1] - 7:2
**contemplated** [2] - 41:17, 57:11
**contested** [1] - 21:9
**Continue** [1] - 1:24
**continue** [6] - 8:9, 28:8, 30:22, 34:7, 53:21, 54:18
**continued** [1] - 9:9
**Continued** [2] - 2:1, 52:11
**continues** [3] - 35:10, 44:20, 44:21
**contract** [11] - 11:8, 11:16, 11:19, 13:3, 26:2, 32:10, 32:12, 33:2, 46:8, 54:11, 56:18
**contracts** [1] - 25:10
**contractual** [11] - 5:14, 5:24, 10:17, 18:16, 20:19, 35:12, 36:15, 40:21, 41:15, 42:25, 54:9
**contractually** [1] - 10:4
**contrary** [1] - 12:5
**control** [3] - 39:10, 41:19, 43:11
**conversation** [1] - 26:5
**conversion** [8] - 4:24, 5:11, 9:21, 10:18, 38:19, 39:11, 43:14, 51:17
**cooperation** [2] - 53:23, 56:24
**cooperative** [1] - 14:19
**copied** [1] - 16:13
**copies** [1] - 14:15
**copy** [1] - 55:18
**correct** [7] - 29:6, 29:8, 29:19, 29:20, 30:5, 32:6, 32:17
**correctly** [1] - 41:1
**correspondence** [1] - 27:12
**costly** [1] - 35:5
**counsel** [31] - 3:4, 3:6, 5:16, 13:19, 13:23, 14:9, 15:8, 15:12, 15:15, 16:9, 16:13, 17:1, 17:22, 17:23, 18:24, 19:3, 19:19, 19:23, 21:8, 21:17, 22:5, 23:18, 31:18, 47:21, 48:3, 48:22, 53:24, 56:1, 58:1, 59:8
**counsel's** [2] - 53:11, 56:2
**Counter** [1] - 3:6
**COUNTY** [1] - 1:1
**couple** [1] - 44:5
**coupon** [6] - 8:10, 14:22, 20:24, 21:4, 21:15, 23:1
**course** [2] - 8:10, 31:6
**court** [5] - 15:24, 20:25, 48:1, 51:6, 59:24
**COURT** [68] - 1:1, 3:1, 3:12, 3:15, 4:1, 4:4, 4:16, 6:21, 7:6, 7:9, 7:12, 7:25, 8:18, 9:15, 18:23, 20:11, 23:18, 24:21, 26:6, 26:19, 26:22, 27:4, 27:8, 27:13, 27:18, 27:21, 28:1, 28:3, 28:21, 29:1, 29:4, 29:7, 29:12, 29:17, 29:21, 30:10, 30:21, 31:1, 32:2, 32:14, 32:20, 32:24, 33:9, 33:13, 34:4, 34:15, 36:1, 36:21, 37:3, 37:9, 37:20, 37:24, 38:2, 38:4, 44:7, 48:3, 48:10, 48:22, 48:24, 49:1, 51:24, 52:6, 52:8, 53:1, 58:24, 59:2, 59:13, 59:20
**Court** [35] - 1:13, 2:21, 6:2, 8:5, 8:8, 9:3, 9:25, 10:6, 11:9, 13:9, 13:16, 14:16, 15:4, 15:10, 16:6, 17:2, 17:17, 18:12, 23:8, 27:11, 28:12, 36:23, 37:2, 42:15, 53:4, 53:6, 53:13, 53:16, 53:24, 54:3, 54:15, 55:13, 55:24, 57:11, 60:9
**Court's** [1] - 55:6
**courthouse** [1] - 8:6
**courtroom** [1] - 25:22
**Courts** [1] - 35:2
**cover** [1] - 23:3
**covered** [1] - 19:5
**created** [1] - 40:7
**credible** [3] - 21:21, 21:22, 22:23
**credibly** [6] - 21:7, 21:12, 21:13, 22:12, 22:18, 23:13
**creditor** [4] - 5:25, 17:4, 40:10, 40:18
**creditor's** [3] - 6:18, 9:17, 10:14
**critical** [1] - 57:10
**cry** [1] - 31:6
**current** [6] - 8:14, 14:11, 14:12, 20:1, 32:15, 34:5
**custodial** [4] - 40:20, 41:12, 41:25, 50:1
**Custodial** [13] - 5:8, 16:22, 25:19, 26:17, 33:16, 34:3, 37:18, 39:25, 40:1, 43:12, 44:20, 45:4, 45:16
**Custodian** [1] - 27:9
**custodian** [15] - 16:15, 27:1, 27:3, 27:6, 27:10, 27:12, 27:25, 29:5, 29:19, 29:25, 32:15, 33:15, 34:6, 34:12, 56:6
**custody** [3] - 7:1, 18:11, 39:21
**cut** [1] - 30:21

## D

**daily** [9] - 9:8, 14:17, 29:18, 41:4, 53:14, 54:6, 54:16, 55:8, 58:21
**damaged** [1] - 28:7
**damages** [20] - 6:19, 9:18, 10:6, 13:3, 13:4, 23:9, 23:12, 24:4, 24:23, 24:25, 31:22, 32:7, 35:16, 39:7, 40:17, 43:15, 44:1, 47:1, 48:20
**date** [5] - 13:22, 29:3, 48:11, 54:21, 56:13
**days** [11] - 7:1, 9:8, 13:22, 15:14, 16:2, 16:7, 19:12, 26:13, 39:23, 55:19, 55:23
**dealing** [1] - 33:22
**dealt** [1] - 21:19
**DEBORAH** [2] - 2:21, 60:8
**deceitful** [1] - 14:6
**deception** [1] - 13:18
**decide** [1] - 20:25
**decided** [2] - 10:6, 36:23
**decision** [1] - 52:1
**declaration** [1] - 7:24
**declaratory** [2] - 12:8, 36:24
**declare** [1] - 25:18
**deemed** [1] - 12:2
**default** [30] - 7:14, 7:19, 8:19, 9:10, 10:5, 11:2, 11:6, 11:11, 11:18, 11:19, 11:25, 12:1, 12:2, 12:12, 12:18, 20:15, 20:16, 20:18, 36:20, 39:20, 39:22, 41:17, 43:2, 43:19, 44:1, 45:13, 45:22, 45:25, 50:3, 51:19
**defaulted** [3] - 8:14, 14:8, 25:11
**defaulting** [9] - 11:13, 11:15, 12:2, 12:13, 25:8, 45:20, 49:7, 49:9
**defaults** [5] - 8:23, 11:7, 12:16, 31:12, 47:5
**Defendant** [6] - 1:7, 2:5, 3:6, 23:24, 54:20, 56:5
**Defendant's** [3] - 3:16, 4:9, 56:17
**Defendants** [6] - 3:18, 4:11, 21:1, 27:12, 53:8, 53:19
**Defendants'** [1] - 55:3
**delay** [2] - 13:17, 14:4
**deliberate** [1] - 13:17
**deliberately** [1] - 18:1
**deliver** [1] - 22:15
**delivered** [2] - 25:9, 38:12
**deliveries** [1] - 38:7
**delivery** [2] - 38:6, 38:13
**demand** [3] - 16:17, 25:20, 25:24
**demands** [1] - 41:13
**demonstrates** [1] - 13:19
**deny** [1] - 10:23
**Department** [2] - 6:7, 6:10
**depose** [1] - 59:15
**deposit** [1] - 6:8
**deposition** [8] - 56:20, 56:22, 57:4, 57:9, 57:15, 57:21, 59:16, 59:17
**depositions** [4] - 56:13, 57:19, 57:24
**deprived** [1] - 10:13
**designed** [1] - 40:11
**desire** [1] - 53:23
**despite** [1] - 56:20
**destabilized** [1] - 41:11
**destroys** [1] - 42:19
**details** [1] - 26:16
**detour** [1] - 30:22
**different** [11] - 18:12, 26:17, 26:18, 29:5, 33:16, 33:25, 34:2, 37:20, 37:22, 46:22
**differently** [1] - 14:13
**difficult** [1] - 28:8
**dire** [1] - 22:10
**direct** [3] - 13:17, 53:25, 56:5
**directed** [1] - 31:4
**directing** [1] - 55:20
**direction** [1] - 8:17
**directions** [1] - 16:15
**directive** [1] - 30:9
**directly** [4] - 18:6, 41:2, 41:25, 55:6
**directs** [1] - 54:15
**disclose** [1] - 27:6
**disclosed** [1] - 5:18
**discovery** [10] - 16:20, 23:11, 42:3, 50:9,

50:17, 54:10, 54:12, 57:13, 57:21, 59:3
**discuss** [1] - 58:1
**discussed** [1] - 48:14
**discussion** [2] - 50:11, 57:23
**discussions** [1] - 8:5
**Dismiss** [8] - 19:10, 19:15, 21:2, 21:6, 21:19, 26:24, 36:14, 36:16
**dismissed** [3] - 37:1, 37:2, 51:12
**disposed** [1] - 46:25
**dispute** [7] - 11:1, 11:4, 11:17, 23:14, 25:5, 25:6, 25:7
**disputed** [4] - 11:9, 21:8, 21:18, 38:18
**disregard** [2] - 14:2, 16:15
**disruption** [1] - 41:23
**dissipate** [2] - 45:23
**dissipated** [3] - 26:8, 26:15, 44:21
**dissipating** [1] - 45:5
**dissipation** [7] - 5:1, 15:23, 17:8, 18:4, 29:8, 45:2, 45:9
**distinction** [2] - 40:16, 45:19
**Division** [1] - 6:16
**document** [1] - 21:24
**documents** [2] - 14:24, 54:11
**dominion** [1] - 39:10
**done** [12] - 15:14, 19:12, 25:19, 25:21, 28:18, 31:24, 43:4, 47:10, 47:13, 53:15, 54:23, 56:25
**doors** [1] - 24:12
**double** [1] - 50:1
**doubled** [1] - 16:19
**doubt** [1] - 4:11
**down** [3] - 16:19, 20:23, 24:11
**downstream** [1] - 42:1
**draft** [3] - 15:11, 50:10, 50:11
**during** [4] - 8:10, 18:17, 36:19, 58:12

## E

**early** [1] - 24:15
**easier** [1] - 4:20
**easily** [1] - 46:25
**effect** [10] - 7:18, 7:23, 7:24, 12:9, 36:25, 38:6, 48:4, 48:7, 49:17, 57:20
**effectively** [1] - 24:2
**egregious** [1] - 13:15
**eight** [1] - 58:5
**either** [1] - 46:18
**elected** [1] - 49:21
**EMANUEL** [1] - 1:20
**Emanuel** [1] - 3:11
**embarking** [1] - 28:6
**Empire** [1] - 6:16
**employed** [1] - 56:21
**encouraged** [1] - 17:18
**encumbrances** [1] - 38:16
**end** [8] - 7:5, 7:13, 16:1, 34:14, 35:19, 46:8, 46:16, 57:13
**ended** [2] - 8:6, 28:25
**enforce** [1] - 40:6
**enforcement** [1] - 10:17
**engage** [6] - 5:4, 16:16, 32:23, 33:21, 43:4, 56:6
**engaged** [2] - 15:3, 15:18
**engages** [1] - 10:15
**engaging** [3] - 28:9, 28:14, 40:13
**entire** [1] - 12:19
**entirely** [4] - 11:14, 13:8, 43:8, 58:16
**entirety** [2] - 54:16, 58:22
**entitled** [9] - 20:22, 21:5, 21:7, 21:16, 23:9, 30:17, 32:4, 49:6, 49:13
**entitlement** [1] - 35:19
**entitling** [1] - 31:8
**equities** [1] - 34:18
**equivalent** [3] - 34:12, 44:18, 46:18
**error** [1] - 14:5
**escrow** [3] - 45:3, 45:12, 45:24
**ESQ** [6] - 1:18, 1:21, 1:22, 2:4, 2:4, 2:5
**essentially** [3] - 10:5, 31:8, 34:4
**establish** [2] - 11:11, 22:8
**established** [4] - 10:24, 13:7, 51:8, 51:9
**establishes** [1] - 11:25
**ethical** [1] - 56:2
**ethics** [1] - 56:2
**evening** [1] - 58:5
**event** [13] - 11:2, 11:5, 11:11, 11:18, 12:1, 39:20, 39:22, 41:17, 43:1, 43:19, 43:25, 50:3, 57:14
**evidence** [5] - 14:14, 17:7, 17:14, 17:18, 45:8
**evidentiary** [3] - 19:3, 21:21, 22:13
**exact** [2] - 29:3, 46:23
**exactly** [7] - 10:7, 16:21, 26:1, 28:24, 46:5, 50:9, 59:25
**exceed** [1] - 55:2
**exceeds** [1] - 44:2
**except** [1] - 24:11
**exception** [4] - 9:19, 39:3, 39:12, 40:12
**exceptions** [1] - 39:7
**exchange** [3] - 20:17, 27:11, 53:14
**executed** [1] - 46:4
**executives** [1] - 35:1
**exercise** [6] - 20:20, 21:16, 32:4, 41:15, 48:19, 49:22
**exists** [1] - 34:12
**expect** [1] - 4:2
**expectation** [1] - 59:25
**experiences** [1] - 5:20
**explain** [1] - 10:22
**explicit** [1] - 33:6
**express** [1] - 47:9
**expressed** [4] - 12:22, 15:17, 41:17, 47:10
**expressly** [4] - 12:22, 13:4, 16:2, 33:20
**extend** [1] - 35:2
**extension** [2] - 57:3, 58:2
**extensive** [1] - 22:22
**extent** [3] - 7:2, 14:13, 47:15
**extra** [1] - 41:23
**extraordinary** [1] - 22:10

## F

**fabricated** [1] - 18:8
**face** [2] - 11:7, 51:9
**fact** [12] - 11:9, 13:25, 21:15, 23:11, 26:12, 28:5, 34:21, 36:24, 45:17, 45:22, 51:21, 51:22
**facts** [7] - 6:5, 6:14, 11:25, 21:23, 22:18, 23:21, 24:9
**factual** [1] - 13:16
**failed** [3] - 11:1, 11:4, 13:21
**failing** [4] - 11:20, 12:18, 21:14, 23:1
**fails** [2] - 10:25, 17:12
**failure** [5] - 13:10, 20:16, 22:15, 39:22, 41:18
**fair** [5] - 29:12, 29:25, 30:19, 30:20, 34:8
**fairly** [2] - 4:15, 20:14
**faith** [3] - 15:4, 15:18, 50:14
**falls** [1] - 23:3
**false** [4] - 11:14, 18:14, 42:23
**far** [7] - 23:13, 23:24, 31:6, 43:7, 43:15, 44:2, 44:19
**fare** [1] - 19:1
**favor** [3] - 11:10, 20:25, 24:19
**fear** [1] - 40:19
**feared** [3] - 16:6, 16:22, 18:4
**February** [1] - 15:10
**fees** [1] - 53:25
**few** [1] - 36:4
**fighting** [1] - 17:15
**figure** [3] - 19:22, 20:8, 25:25
**file** [4] - 53:22, 55:1, 55:18, 55:21
**filed** [4] - 8:4, 8:7, 15:4, 54:2
**filing** [1] - 15:1
**final** [4] - 18:13, 23:2, 24:20, 25:2
**finally** [2] - 15:5, 55:17
**findings** [1] - 11:9
**fine** [1] - 52:2
**fired** [1] - 59:18
**First** [2] - 6:7, 6:9
**first** [18] - 7:15, 8:7, 10:24, 13:14, 14:10, 14:23, 24:1, 36:5, 38:7, 38:21, 39:20, 41:3, 44:9, 45:1, 49:6, 51:3, 57:15, 58:13
**five** [5] - 4:12, 4:15, 13:22, 39:23, 55:23
**flag** [2] - 15:21, 57:2
**Floor** [1] - 1:20
**folks** [2] - 3:12, 3:19
**followed** [3] - 15:2, 16:9, 22:2
**follows** [1] - 55:4
**Footnote** [4] - 27:15, 31:3, 40:25, 41:10
**force** [1] - 12:9
**foregoing** [1] - 60:4
**form** [2] - 46:22, 58:24
**forth** [1] - 44:22
**forthcoming** [2] - 53:24, 58:13
**forward** [3] - 14:19, 57:19, 58:8
**four** [1] - 10:20
**frauds** [2] - 50:21, 50:22
**free** [1] - 38:16
**frivolous** [1] - 50:7
**front** [1] - 18:20
**full** [3] - 12:9, 38:15, 39:10
**funds** [21] - 5:18, 6:8, 7:3, 9:5, 9:13, 18:1, 18:14, 24:8, 24:19, 26:12, 26:15, 27:13, 27:21, 28:21, 29:4, 29:8, 33:4, 34:23, 35:9, 41:6, 42:8
**Futter** [4] - 3:10, 4:6, 28:11, 31:13
**FUTTER** [16] - 1:21, 4:14, 18:25, 20:12, 26:21, 26:23, 27:5, 27:9, 27:15, 27:20, 27:23, 28:2, 33:19, 56:10, 59:10, 59:15

## G

**gain** [1] - 42:9
**GARR** [25] - 2:4, 3:5, 3:13, 3:24, 4:2, 4:22, 7:5, 7:7, 7:10, 7:13, 8:1, 8:19, 9:16, 36:2, 36:22, 37:4, 37:10, 37:22, 37:25, 38:5, 48:23, 48:25, 49:2, 57:15, 59:1
**Garr** [9] - 3:5, 3:23, 4:19, 6:21, 18:23, 24:8, 30:11, 36:1, 47:3
**general** [4] - 9:20, 39:7, 39:12, 40:12
**GEORGE** [1] - 1:18
**George** [1] - 3:8
**given** [4] - 13:14, 19:12, 22:22, 35:7
**GMSLA** [24] - 10:9, 11:3, 11:6, 11:18, 11:22, 11:25, 12:1,

12:12, 12:23, 13:5, 25:5, 25:14, 33:6, 33:11, 37:25, 38:5, 39:17, 43:1, 43:18, 46:3, 48:4, 49:8, 55:5, 56:7
**Goldman** [1] - 6:15
**grant** [3] - 6:13, 59:2, 59:5
**granted** [8] - 8:3, 13:20, 16:2, 17:6, 35:21, 51:23, 54:16, 58:22
**grave** [1] - 28:17
**ground** [1] - 23:20
**guarantee** [1] - 38:16
**guaranties** [1] - 24:6
**guaranty** [1] - 24:14
**guess** [3] - 30:3, 47:20, 48:14
**guessing** [1] - 33:4
**gun** [1] - 26:4
**guys** [2] - 6:25, 47:22

**H**

**Hague** [3] - 56:24, 57:1, 58:3
**halfway** [1] - 25:22
**hand** [1] - 58:25
**hands** [1] - 8:16
**HANNELORE** [1] - 2:4
**Hannelore** [1] - 3:14
**happy** [3] - 14:15, 18:21, 42:15
**harder** [1] - 35:5
**harm** [9] - 13:12, 23:5, 23:7, 23:21, 28:17, 30:6, 35:6, 47:13, 47:25
**hate** [1] - 48:1
**headed** [1] - 30:24
**hear** [2] - 4:11, 4:21
**heard** [3] - 19:2, 37:21, 56:16
**hearing** [3] - 54:4, 54:22, 58:7
**heightened** [1] - 18:8
**held** [9] - 5:9, 12:16, 20:4, 27:24, 29:5, 37:18, 39:21, 41:6, 41:8
**HELIN** [1] - 2:5
**Helin** [1] - 3:14
**Help** [2] - 5:4, 43:5
**help** [2] - 16:17, 36:6
**helpful** [1] - 34:15
**hereby** [1] - 60:4
**hereunder** [1] - 40:7
**hiding** [1] - 27:14
**high** [1] - 20:10
**higher** [2] - 20:7, 22:9
**highly** [9] - 11:9, 21:8, 21:9, 21:18, 30:10, 46:24, 53:13, 53:15, 54:10
**history** [1] - 13:16
**hit** [1] - 49:2
**Holding** [1] - 6:16
**holding** [1] - 42:25
**holds** [1] - 5:7
**honest** [2] - 15:7, 33:10
**Honor** [43] - 3:5, 3:13, 3:24, 4:5, 4:8, 4:14, 4:22, 7:23, 9:6, 15:9, 15:13, 16:1, 16:2, 16:4, 18:25, 19:10, 19:15, 21:5, 21:10, 21:18, 22:19, 23:2, 23:16, 23:19, 26:23, 27:5, 29:3, 29:20, 30:20, 31:4, 32:11, 33:20, 35:3, 36:2, 37:10, 44:6, 47:14, 49:2, 49:15, 52:2, 57:2, 57:24, 59:10
**Honor's** [3] - 26:10, 30:2, 30:8
**HONORABLE** [1] - 1:13
**hook** [1] - 47:25
**hopefully** [1] - 15:9
**hopes** [1] - 25:16
**housed** [1] - 19:24
**hundreds** [1] - 5:6

**I**

**idea** [6] - 18:3, 19:8, 19:16, 35:21, 36:14, 58:10
**identical** [3] - 6:5, 6:14, 51:14
**identifiable** [2] - 9:22, 39:11
**ignore** [1] - 7:17
**ignores** [1] - 10:16
**imagine** [1] - 35:2
**immediate** [5] - 12:6, 18:9, 25:20, 49:23, 50:16
**immediately** [1] - 13:23
**Immigrant** [1] - 17:12
**impaired** [1] - 41:25
**important** [3] - 13:16, 49:3, 56:15
**importantly** [2] - 17:25, 36:11
**imposed** [1] - 45:10
**inaccurate** [2] - 14:6, 37:2
**INC** [1] - 1:3
**Inc** [1] - 3:2
**inception** [1] - 59:9
**inclined** [1] - 8:24
**included** [2] - 31:17, 31:18
**including** [3] - 6:6, 25:14, 56:18
**independent** [5] - 6:13, 29:14, 36:12, 39:13, 46:10
**independently** [2] - 5:18, 17:23
**Index** [2] - 1:8, 3:3
**indicated** [1] - 59:15
**indicates** [1] - 51:22
**indication** [2] - 9:10, 9:13
**information** [16] - 14:7, 18:1, 29:15, 31:3, 31:5, 31:6, 38:24, 47:11, 47:17, 47:18, 53:6, 53:7, 53:16, 54:5, 55:12, 55:16
**Injunction** [4] - 25:1, 48:2, 53:17, 54:4
**injunction** [10] - 6:7, 6:13, 6:18, 9:18, 10:3, 10:10, 10:11, 17:10, 18:9, 22:7
**injunctive** [13] - 4:23, 6:3, 9:20, 13:11, 16:4, 17:5, 22:5, 23:22, 23:23, 23:24, 25:1, 35:21, 51:23
**INPERSON** [1] - 1:8
**insisted** [1] - 26:14
**instance** [3] - 38:22, 40:9
**instances** [2] - 51:18, 51:19
**instead** [3] - 16:13, 19:3, 25:15
**institute** [1] - 40:5
**instructing** [1] - 16:14
**instruction** [1] - 8:21
**instructions** [1] - 7:17
**insufficient** [4] - 11:10, 38:25, 39:8, 40:17
**intended** [2] - 19:25, 50:2
**intention** [1] - 24:12
**interest** [11] - 6:12, 25:4, 32:8, 35:16, 39:1, 39:2, 39:14, 40:7, 44:12, 44:19, 54:22
**interference** [1] - 27:2
**interpretation** [2] - 25:4, 26:1
**invalid** [2] - 12:10, 37:1
**involved** [1] - 59:8
**irrelevant** [1] - 13:14
**irreparable** [2] - 13:12, 35:6
**issue** [13] - 6:18, 9:17, 14:20, 20:21, 20:25, 49:5, 51:17, 51:22, 52:1, 55:5, 56:11, 58:24, 59:24
**issued** [2] - 13:23, 57:24
**issues** [4] - 14:21, 35:23, 51:14, 57:4
**itself** [4] - 24:18, 35:20, 39:16, 46:15

**J**

**J.P** [1] - 35:11
**January** [2] - 15:4, 58:11
**John** [1] - 3:11
**joined** [1] - 7:20
**JONATHAN** [1] - 1:22
**judgment** [9] - 12:8, 24:20, 25:2, 36:25, 50:8, 52:4, 56:17, 57:10, 59:21
**judicial** [2] - 41:23, 54:2
**July** [5] - 14:3, 14:8, 31:19, 56:12, 56:25
**jumped** [1] - 21:25
**jumping** [1] - 26:4
**June** [8] - 14:1, 14:3, 14:9, 31:19, 55:1, 55:14, 56:10, 59:23
**justice** [1] - 31:10
**Justice** [1] - 1:13
**justification** [1] - 46:10

**K**

**Kang** [4] - 31:25, 34:25, 48:8, 57:9
**Kang's** [1] - 50:13
**keep** [9] - 4:18, 30:14, 42:16, 42:17, 45:15, 48:25, 49:25, 50:2, 51:5
**keeping** [3] - 18:17, 24:19, 48:15
**key** [1] - 50:11
**Kim** [4] - 56:16, 56:19, 57:8, 58:11
**knowledge** [2] - 24:14, 43:11
**knows** [1] - 35:3
**Korea** [5] - 18:14, 24:11, 34:23, 42:16, 56:23
**Korean** [1] - 35:1

**L**

**LA** [1] - 15:2
**lack** [4] - 17:14, 53:22, 55:25, 56:1
**lacked** [1] - 56:19
**language** [3] - 12:23, 32:10, 41:17
**large** [1] - 4:10
**last** [8] - 12:14, 41:22, 42:20, 42:21, 50:4, 51:13, 56:14, 56:20
**late** [1] - 58:5
**LAURA** [1] - 2:4
**Laura** [1] - 3:5
**law** [14] - 6:5, 6:17, 9:16, 10:15, 10:16, 10:18, 34:19, 35:15, 37:5, 39:12, 40:8, 51:13, 51:21
**Law** [1] - 24:24
**lawsuit** [2] - 10:7, 31:12
**leads** [1] - 18:13
**learn** [1] - 59:18
**learned** [1] - 53:4
**least** [5] - 4:13, 32:11, 36:16, 41:6, 41:9
**leave** [1] - 18:22
**lectern** [1] - 4:20
**left** [1] - 56:22
**legal** [11] - 5:7, 5:15, 18:9, 18:15, 38:18, 38:25, 39:9, 39:14, 39:24, 40:9, 42:13
**legally** [4] - 5:1, 37:17, 38:17, 43:10
**lend** [4] - 11:16, 11:17, 11:20, 22:1
**lender** [2] - 11:19, 11:25
**lender's** [2] - 6:8, 6:11
**lenders** [1] - 51:17
**lending** [2] - 28:9, 44:11
**lent** [10] - 9:24, 10:10, 36:7, 37:15, 42:24, 43:3, 43:7, 43:24, 44:3, 44:12

**less** [4] - 5:11, 19:19, 20:5, 20:9
**Letter** [1] - 24:24
**letter** [13] - 5:3, 12:15, 13:23, 14:9, 14:15, 16:14, 28:6, 28:14, 31:18, 31:25, 41:14, 41:16, 48:7
**letters** [6] - 26:25, 28:18, 47:4, 47:5, 47:21, 51:5
**liens** [1] - 38:16
**lifted** [3] - 16:11, 59:7, 59:14
**light** [2] - 47:11, 55:11
**lightly** [1] - 16:25
**likelihood** [11] - 4:7, 10:25, 13:7, 19:6, 20:12, 23:4, 23:15, 31:13, 45:11, 51:6, 51:7
**likely** [1] - 34:7
**limited** [1] - 39:18
**lines** [1] - 42:10
**liquid** [1] - 46:24
**liquidated** [1] - 46:25
**list** [1] - 58:5
**litigation** [12] - 12:20, 18:18, 24:5, 25:22, 26:3, 31:23, 35:18, 35:23, 47:6, 47:23, 51:4, 53:23
**LLP** [3] - 1:16, 1:20, 2:2
**loan** [5] - 32:19, 33:19, 38:11, 38:14, 50:5
**loaned** [3] - 20:2, 20:4, 20:18
**Loans** [1] - 6:6
**location** [1] - 16:23
**look** [7] - 21:22, 31:20, 33:11, 34:10, 37:25, 43:17, 44:25
**looking** [2] - 34:4, 42:16
**looks** [3] - 28:16, 40:25
**lose** [1] - 40:17
**lost** [3] - 17:4, 21:1, 49:19
**lower** [1] - 58:11
**LTD** [1] - 1:6
**Ltd** [2] - 3:3, 3:7

**M**

**Madison** [1] - 1:20
**Management** [1] - 6:9
**mandatory** [2] - 22:7, 23:23
**manifest** [1] - 31:10
**marching** [1] - 56:11
**mark** [2] - 20:5, 44:16
**mark-to-market** [2] - 20:5, 44:16
**market** [5] - 20:1, 20:5, 36:7, 44:16, 46:25
**markup** [1] - 16:10
**Mastoris** [3] - 3:8, 7:20, 36:18
**MASTORIS** [36] - 1:18, 3:8, 4:5, 23:19, 24:22, 26:8, 26:20, 28:4, 28:23, 29:2, 29:6, 29:9, 29:13, 29:20, 30:1, 30:20, 30:23, 31:2, 32:3, 32:18, 32:21, 33:5, 33:10, 33:14, 33:18, 33:24, 34:9, 34:17, 35:25, 44:5, 44:8, 48:6, 48:11, 52:2, 52:7, 57:5
**matter** [2] - 3:22, 54:11
**matters** [2] - 34:13, 54:12
**mean** [1] - 34:21
**meaning** [1] - 41:5
**means** [1] - 46:13
**meant** [1] - 40:20
**Medi** [1] - 6:16
**meet** [2] - 22:6, 50:16
**meeting** [3] - 14:20, 15:1, 50:23
**meets** [1] - 12:6
**memorialized** [1] - 57:8
**ment** [1] - 10:4
**mentioned** [3] - 12:7, 58:11, 58:20
**merely** [2] - 4:25, 20:3
**merits** [7] - 4:7, 10:25, 19:7, 20:13, 23:4, 31:14, 45:11
**met** [1] - 50:24
**mic** [1] - 4:21
**middle** [1] - 35:22
**might** [7] - 24:16, 29:15, 35:2, 37:7, 46:8, 46:21, 57:2
**militates** [1] - 24:18
**million** [18] - 5:11, 5:13, 9:24, 10:1, 11:17, 11:22, 19:22, 20:8, 22:15, 22:20, 22:23, 36:6, 43:9, 44:13, 44:16, 46:19, 49:18, 50:5
**millions** [1] - 5:6
**minds** [1] - 50:23
**minute** [1] - 58:10
**minutes** [5] - 4:3, 4:12, 4:15, 4:18, 52:7
**misconduct** [1] - 10:13
**mislead** [1] - 15:16
**misrepresentation** [1] - 9:1
**misrepresented** [1] - 37:13
**misrepresenting** [1] - 6:1
**missed** [2] - 38:22, 49:12
**missing** [2] - 29:22, 50:11
**misstates** [1] - 10:18
**misunderstanding** [1] - 19:21
**misunderstood** [1] - 37:13
**moment** [2] - 28:13, 41:13
**monetary** [6] - 6:19, 9:18, 32:7, 39:7, 40:17, 46:23
**money** [15] - 24:6, 24:14, 24:23, 24:24, 25:4, 27:4, 27:8, 30:7, 30:18, 33:15, 34:5, 35:3, 35:16, 46:11, 47:1
**monies** [1] - 35:8
**month** [3] - 12:14, 57:24, 58:16
**months** [1] - 56:22
**Morgan** [1] - 35:11
**most** [1] - 22:10
**Motion** [13] - 3:17, 7:10, 19:10, 19:15, 21:1, 21:6, 21:19, 26:24, 36:14, 36:16, 53:2, 53:19, 54:8
**motion** [17] - 3:25, 4:9, 6:22, 10:23, 17:15, 17:16, 18:5, 19:22, 37:7, 42:11, 48:2, 53:13, 54:1, 54:15, 58:20, 59:21
**motions** [4] - 3:21, 53:22, 54:1, 57:11
**move** [5] - 14:19, 18:14, 26:14, 34:5, 56:17
**moved** [4] - 5:7, 26:17, 33:4, 34:7
**moving** [1] - 45:3
**MR** [50] - 3:8, 4:5, 4:14, 18:25, 20:12, 23:19, 24:22, 26:8, 26:20, 26:21, 26:23, 27:5, 27:9, 27:15, 27:20, 27:23, 28:2, 28:4, 28:23, 29:2, 29:6, 29:9, 29:13, 29:20, 30:1, 30:20, 30:23, 31:2, 32:3, 32:18, 32:21, 33:5, 33:10, 33:14, 33:18, 33:19, 33:24, 34:9, 34:17, 35:25, 44:5, 44:8, 48:6, 48:11, 52:2, 52:7, 56:10, 57:5, 59:10, 59:15
**MS** [24] - 3:5, 3:13, 3:24, 4:2, 4:22, 7:5, 7:7, 7:10, 7:13, 8:1, 8:19, 9:16, 36:2, 36:22, 37:4, 37:10, 37:22, 37:25, 38:5, 48:23, 48:25, 49:2, 57:15, 59:1
**muddied** [1] - 37:4
**multiple** [1] - 31:12
**multitude** [1] - 22:14
**must** [2] - 13:20, 43:21

**N**

**name** [4] - 32:17, 37:17, 43:10, 51:17
**nearly** [3] - 6:5, 6:14, 51:14
**necessarily** [1] - 30:7
**necessary** [4] - 6:4, 9:21, 40:6, 57:10
**need** [26] - 3:20, 3:23, 4:2, 4:11, 6:25, 18:12, 19:13, 20:10, 20:24, 23:10, 27:1, 27:13, 29:22, 33:6, 34:18, 42:12, 43:2, 48:16, 50:17, 53:19, 54:1, 56:24, 57:3, 58:2, 58:3
**needed** [4] - 15:13, 18:9, 51:7, 51:8
**needs** [4] - 20:4, 20:6, 38:10, 43:2
**negotiated** [2] - 25:9, 25:10
**negotiation** [1] - 15:3
**net** [2] - 10:5, 43:22
**netting** [2] - 10:9, 43:14
**never** [13] - 9:4, 9:12, 11:21, 12:4, 12:14, 36:16, 36:17, 41:7, 43:19, 43:20, 46:19, 51:2
**new** [14] - 3:10, 12:19, 17:1, 18:18, 19:14, 20:13, 21:24, 27:6, 29:19, 29:25, 53:6, 55:12, 55:16, 56:6
**NEW** [2] - 1:1, 1:1
**New** [11] - 1:9, 1:17, 1:21, 2:3, 6:17, 9:16, 24:24
**next** [2] - 1:24, 52:11
**nine** [1] - 58:6
**nobody** [1] - 36:9
**non** [1] - 10:22
**none** [4] - 41:1, 41:2, 45:1, 45:9
**nonetheless** [1] - 19:4
**normal** [1] - 57:12
**notable** [2] - 17:20, 41:10
**note** [5] - 9:6, 22:4, 23:5, 54:8, 58:18
**noted** [1] - 19:10
**notes** [1] - 60:1
**nothing** [1] - 18:23
**notice** [13] - 12:3, 12:25, 19:12, 41:16, 47:5, 49:8, 49:10, 53:21, 56:20, 58:4, 59:16, 59:24
**noticed** [3] - 57:16, 57:22, 58:15
**notices** [5] - 12:11, 12:18, 56:13, 57:16, 57:21
**noting** [1] - 53:3
**November** [1] - 57:17
**numerous** [3] - 11:12, 14:3, 51:21
**NYSCEF** [1] - 55:18

**O**

**objected** [1] - 14:23
**objection** [1] - 18:17
**objections** [1] - 16:20
**obligations** [1] - 56:3
**observation** [1] - 53:11
**obtain** [1] - 55:18
**obviated** [2] - 15:6, 53:18
**obviously** [7] - 7:1, 18:12, 28:12, 31:2, 50:23, 57:19, 57:20
**occasions** [1] - 14:3
**occur** [1] - 12:6

**occurred** [1] - 5:17
**occurring** [1] - 48:2
**October** [1] - 7:14
**OF** [3] - 1:1, 1:1
**offer** [1] - 50:16
**offered** [2] - 27:15, 31:2
**Official** [2] - 2:21, 60:9
**old** [1] - 23:20
**older** [1] - 19:11
**once** [3] - 7:20, 33:15, 35:3
**one** [20] - 6:24, 16:8, 22:8, 22:16, 30:12, 31:11, 38:2, 38:15, 39:9, 41:11, 42:21, 45:1, 45:3, 45:4, 45:21, 45:22, 52:3, 52:7, 56:15
**ongoing** [1] - 47:6
**open** [2] - 36:8, 46:25
**opening** [2] - 19:21, 20:8
**operating** [2] - 55:25, 56:1
**operations** [1] - 24:11
**opposed** [1] - 35:6
**opposing** [4] - 19:23, 21:8, 21:17, 22:4
**opposition** [11] - 5:5, 10:16, 10:20, 12:19, 16:20, 17:20, 17:25, 18:7, 19:21, 41:1, 54:9
**Opposition** [3] - 5:10, 11:12, 41:11
**oral** [5] - 3:20, 50:22, 53:4, 55:15, 57:7
**order** [8] - 13:19, 18:12, 18:19, 19:10, 28:16, 42:15, 57:25, 58:24
**Order** [11] - 3:16, 4:3, 9:3, 15:1, 17:17, 45:7, 55:3, 55:7, 55:13, 55:15, 59:4
**orders** [2] - 47:7, 51:16
**original** [3] - 25:7, 25:8, 45:20
**ourselves** [2] - 45:20, 52:5
**outcome** [1] - 28:16
**outraged** [1] - 13:13
**outreaches** [1] - 47:21
**outset** [3] - 19:5, 50:10, 53:3
**outside** [1] - 43:5
**outweigh** [1] - 23:14
**outweighed** [1] - 23:8
**overlap** [1] - 3:21
**oversight** [1] - 15:25
**owes** [1] - 26:2
**own** [5] - 13:19, 16:24, 34:6, 41:23, 43:4

**P**

**p.m** [4] - 55:1, 55:14, 58:8, 59:23
**Page** [1] - 5:10
**page** [3] - 1:24, 19:21, 52:11
**paid** [2] - 35:20, 53:25
**papers** [2] - 38:18, 40:9
**Paragraph** [3] - 8:9, 38:11, 38:12
**parallel** [1] - 16:12
**Paribas** [2] - 19:9, 26:24
**Park** [1] - 1:17
**part** [7] - 4:10, 4:12, 28:15, 29:14, 32:12, 34:24
**partial** [4] - 50:7, 52:4, 56:17, 59:20
**particular** [1] - 31:16
**particularly** [1] - 47:11
**parties** [15] - 6:24, 7:2, 10:3, 10:8, 15:5, 15:12, 25:16, 39:16, 39:18, 53:14, 54:14, 55:1, 55:17, 57:17, 57:20
**parties'** [1] - 44:12
**parts** [1] - 22:7
**party** [18] - 9:2, 11:13, 11:15, 12:3, 12:11, 12:13, 17:11, 21:14, 25:8, 38:15, 39:5, 41:11, 45:13, 45:21, 45:22, 49:7, 49:9
**pass** [1] - 38:15
**past** [2] - 5:14, 6:21
**PATEL** [1] - 1:13
**patent** [1] - 27:2
**Pausing** [2] - 33:17, 38:3
**pay** [2] - 32:7, 35:13
**payment** [3] - 8:20, 13:21, 14:22
**payments** [32] - 5:23, 7:14, 8:2, 8:4, 8:8, 8:10, 8:14, 8:15, 8:23, 9:1, 11:2, 12:18, 12:21, 13:25, 14:1, 14:12, 14:13, 15:22, 20:17, 20:24, 21:3, 21:4, 21:5, 21:15, 23:1, 38:23, 39:23, 41:18, 41:21, 49:12, 49:18, 49:19
**PC** [1] - 59:4
**pendency** [3] - 8:11, 18:18, 36:19
**pending** [1] - 55:7
**people** [1] - 58:6
**per** [2] - 12:13, 43:6
**percent** [1] - 24:3
**perfected** [1] - 25:3
**perfecting** [1] - 5:25
**perfectly** [2] - 13:19, 33:10
**perfects** [1] - 39:1
**performance** [2] - 51:1, 51:2
**performed** [2] - 51:2, 51:3
**perhaps** [3] - 6:24, 24:3, 28:13
**period** [3] - 28:25, 45:18, 59:3
**permits** [1] - 10:18
**perpetrated** [1] - 31:11
**person's** [1] - 59:17
**personally** [1] - 13:13
**perspective** [4] - 30:3, 30:4, 30:17, 48:4
**pilfering** [1] - 19:8
**place** [2] - 10:3, 24:16
**plain** [1] - 22:17
**Plaintiff** [4] - 1:4, 1:18, 1:22, 3:9
**Plaintiff's** [2] - 54:9, 56:15
**plaintiffs** [1] - 54:16
**plan** [1] - 52:1
**plausibly** [1] - 21:2
**pled** [2] - 23:7, 32:11
**pledged** [2] - 21:12, 21:13
**plus** [1] - 35:16
**point** [31] - 6:25, 8:3, 8:22, 9:2, 20:3, 23:2, 23:4, 23:15, 25:3, 25:18, 26:10, 26:14, 30:8, 31:22, 33:25, 35:9, 36:13, 37:8, 39:24, 42:20, 48:8, 49:3, 49:13, 49:15, 49:16, 50:9, 51:10, 51:13, 56:15, 57:5
**points** [6] - 14:9, 30:25, 36:4, 42:22, 44:5, 48:23
**position** [4] - 10:4, 47:4, 49:21, 54:4
**possess** [1] - 46:14
**possession** [13] - 5:24, 18:15, 38:21, 38:25, 39:6, 39:14, 39:25, 40:10, 40:15, 40:21, 42:14, 42:18
**possible** [1] - 48:12
**potential** [1] - 46:2
**potentially** [1] - 58:6
**Power** [1] - 20:20
**powers** [1] - 22:22
**practice** [1] - 55:17
**pre** [2] - 17:16
**pre-motion** [2] - 17:16
**precisely** [3] - 6:3, 17:4, 35:23
**preexisting** [1] - 45:25
**prejudice** [2] - 15:19, 16:3
**Preliminary** [4] - 25:1, 48:1, 53:17, 54:4
**premature** [1] - 57:18
**prepared** [3] - 27:5, 27:17, 50:7
**present** [2] - 54:17, 54:19
**presented** [1] - 55:12
**president** [1] - 22:9
**prevail** [1] - 35:20
**previously** [1] - 53:12
**principles** [1] - 14:21
**proceed** [4] - 3:19, 16:12, 18:24, 39:24
**PROCEEDINGS** [1] - 1:8
**proceedings** [2] - 40:5, 60:5
**proceeds** [1] - 39:11
**produce** [6] - 17:18, 54:16, 54:18, 56:21, 56:23, 59:11
**produced** [1] - 54:20
**producing** [1] - 14:23
**production** [2] - 54:25, 55:11
**professed** [1] - 16:16
**profiting** [2] - 9:23, 50:2
**prohibited** [3] - 12:22, 12:25, 13:4
**prohibitive** [1] - 22:8
**property** [2] - 39:9, 42:13
**proposed** [3] - 4:5, 14:20, 18:19
**protect** [3] - 40:6, 44:11, 44:19
**protections** [1] - 34:11
**protract** [1] - 53:23
**prove** [1] - 23:11
**provide** [5] - 27:10, 44:22, 44:23, 46:10, 55:20
**provided** [5] - 11:20, 12:3, 17:7, 23:12, 36:10
**provides** [3] - 6:12, 38:20, 46:9
**providing** [7] - 14:14, 17:16, 29:18, 37:6, 47:16, 48:16
**proving** [1] - 51:7
**provision** [1] - 11:24
**provisions** [3] - 32:12, 33:11, 34:10
**public** [1] - 28:13
**publicly** [1] - 24:12
**punitive** [1] - 43:15
**purport** [1] - 20:19
**purports** [1] - 48:8
**purpose** [1] - 44:9
**purposes** [3] - 30:6, 37:15, 54:12
**pursuant** [3] - 35:12, 38:11, 38:12
**put** [6] - 13:6, 40:3, 44:11, 44:18, 44:22, 54:24
**puts** [1] - 35:20
**putting** [2] - 47:24, 53:20

**Q**

**questioning** [1] - 56:2
**questions** [3] - 18:21, 23:16, 36:10
**quick** [2] - 48:25, 52:3
**quickly** [1] - 50:4
**QUINN** [1] - 1:20
**Quinn** [1] - 3:11
**quit** [1] - 59:18
**quite** [1] - 14:18
**quo** [4] - 10:10, 43:17, 43:23, 49:24
**quote** [1] - 14:10

**R**

**race** [1] - 8:6
**raise** [1] - 56:11
**raised** [4] - 36:13, 36:17, 51:3, 58:10
**raises** [1] - 36:10
**range** [1] - 28:10
**rate** [22] - 5:23, 7:14, 8:1, 8:4, 8:8, 8:10, 8:15, 8:20, 11:2, 12:18, 12:21, 13:21, 15:21, 32:8, 38:22,

39:23, 41:18, 41:20, 49:12, 49:18, 49:19
**rates** [1] - 12:22
**rather** [1] - 44:22
**RATHOD** [1] - 1:13
**reach** [2] - 9:4, 25:19
**reached** [6] - 7:15, 7:16, 7:20, 8:12, 8:19, 15:5
**reaching** [2] - 6:24, 23:24
**read** [1] - 42:10
**reading** [1] - 41:1
**ready** [1] - 56:17
**real** [2] - 18:5, 24:23
**really** [9] - 16:21, 22:10, 23:22, 24:1, 34:13, 34:15, 34:21, 35:17, 46:15
**reason** [8] - 9:11, 20:24, 35:8, 37:6, 38:8, 38:24, 39:15, 57:13
**reasons** [1] - 17:13
**received** [1] - 12:17
**receiving** [2] - 47:19, 47:20
**recent** [2] - 4:24, 13:15
**recently** [1] - 26:11
**recess** [1] - 52:10
**RECO** [7] - 32:23, 33:21, 33:22, 34:1, 37:15
**recognized** [2] - 27:25, 37:11
**recognizes** [1] - 26:24
**recommended** [1] - 53:13
**record** [5] - 19:17, 21:21, 22:13, 53:1, 53:21
**recorded** [1] - 19:14
**recover** [1] - 24:17
**recovery** [1] - 13:5
**refer** [1] - 21:23
**reference** [6] - 9:7, 19:18, 19:22, 19:25, 22:4, 56:16
**referenced** [2] - 19:15, 51:14
**reflect** [1] - 18:19
**refrain** [1] - 28:14
**refused** [3] - 12:5, 12:17, 17:19
**regarding** [3] - 14:17, 58:22, 58:23
**regular** [1] - 54:18
**reissue** [1] - 59:16
**related** [1] - 10:16
**relationship** [1] - 28:19
**relationships** [1] - 42:1
**relax** [1] - 57:12
**release** [1] - 7:3
**relevant** [8] - 14:9, 23:15, 30:7, 30:10, 53:15, 54:11, 54:12, 54:13
**relief** [30] - 4:23, 5:2, 6:4, 9:20, 10:19, 13:11, 15:6, 15:20, 16:4, 17:3, 17:5, 22:7, 23:22, 23:23, 23:24, 25:1, 25:24, 30:12, 31:9, 35:21, 42:22, 44:2, 45:10, 45:17, 46:15, 46:21, 46:23, 47:15, 51:23, 55:10
**relieve** [1] - 17:6
**rely** [3] - 17:2, 51:2, 51:10
**relying** [1] - 50:22
**remain** [1] - 42:18
**remained** [1] - 26:12
**remains** [1] - 18:3
**remedies** [1] - 46:2
**remedy** [5] - 4:24, 22:10, 32:3, 35:15, 51:17
**renew** [1] - 59:13
**repeat** [2] - 26:25, 59:19
**repeated** [4] - 5:20, 12:11, 13:18, 41:12
**repeatedly** [6] - 13:24, 14:5, 16:9, 28:6, 30:11, 41:14
**replied** [1] - 16:5
**reply** [3] - 4:19, 10:21, 15:13
**report** [1] - 9:8
**Reporter** [2] - 2:21, 60:9
**reporting** [2] - 27:17
**reports** [17] - 9:11, 14:17, 15:22, 29:18, 29:22, 29:24, 37:6, 41:4, 41:7, 44:23, 47:16, 53:14, 54:6, 54:13, 54:17, 54:25, 55:11
**representation** [5] - 6:23, 7:16, 17:1, 28:7, 47:18
**representations** [3] - 5:20, 40:22, 50:13
**representative** [2] - 46:1, 50:12
**represented** [4] - 6:25, 8:8, 29:7, 37:23
**representing** [2] - 29:9, 51:5
**reputational** [3] - 28:17, 47:12, 47:25
**request** [1] - 57:23
**requested** [1] - 7:7
**required** [10] - 5:2, 5:9, 18:16, 20:17, 21:4, 22:6, 29:16, 33:3, 43:13, 49:17
**requirement** [1] - 49:9
**requirements** [1] - 38:5
**requires** [3] - 11:8, 43:22, 49:23
**requiring** [1] - 6:7
**reserve** [1] - 55:13
**reserved** [1] - 30:11
**resides** [1] - 54:5
**resolve** [7] - 14:19, 14:21, 21:10, 21:11, 47:24, 51:17, 53:16
**resources** [1] - 54:2
**respect** [10] - 6:15, 16:3, 23:13, 37:14, 37:16, 53:1, 54:8, 54:19, 57:6, 59:20
**respectfully** [3] - 26:4, 27:7, 28:11
**respective** [1] - 55:21
**respond** [1] - 36:3
**responded** [1] - 8:16
**responding** [1] - 18:22
**response** [6] - 7:3, 7:17, 8:13, 8:20, 21:10, 50:16
**rests** [1] - 12:19
**result** [1] - 13:17
**resume** [4] - 27:15, 27:17, 29:18
**resumed** [3] - 8:3, 8:7, 41:4
**retaining** [1] - 5:14
**return** [13] - 9:24, 11:4, 12:6, 25:20, 25:23, 42:24, 43:7, 43:15, 43:21, 44:3, 45:11, 49:23
**returned** [2] - 43:25, 50:14
**returning** [1] - 49:25
**reverse** [4] - 32:23, 33:21, 34:1, 34:21
**revisions** [1] - 50:18
**rewarding** [1] - 10:12
**rewriting** [1] - 13:9
**RFPs** [1] - 14:24
**rhetoric** [1] - 19:1
**RIA** [80] - 1:3, 3:2, 5:3, 5:13, 5:22, 5:23, 7:15, 8:13, 8:17, 9:4, 9:10, 9:23, 10:12, 10:15, 10:20, 10:24, 11:1, 11:4, 11:20, 12:3, 12:8, 12:13, 12:14, 12:24, 13:21, 13:25, 14:1, 14:8, 14:10, 14:12, 14:18, 14:20, 14:23, 15:7, 15:11, 15:13, 15:18, 16:7, 16:10, 16:13, 16:19, 16:25, 17:6, 17:14, 17:18, 20:15, 20:22, 21:2, 21:3, 21:6, 21:12, 21:13, 21:16, 21:20, 22:25, 23:9, 25:9, 25:10, 26:6, 26:14, 27:16, 28:5, 28:8, 28:19, 31:11, 31:20, 32:9, 33:21, 34:25, 35:6, 35:10, 39:4, 40:13, 41:18, 44:15, 44:21, 45:20, 46:3, 47:13, 50:17
**RIA's** [23] - 4:24, 5:16, 5:20, 8:21, 11:8, 11:9, 12:19, 13:6, 13:8, 13:10, 13:14, 13:17, 13:23, 14:9, 15:12, 15:15, 16:9, 16:16, 18:13, 28:7, 37:17, 41:25, 42:18
**rightly** [1] - 7:21
**rights** [17] - 5:25, 10:17, 15:19, 16:3, 17:12, 21:16, 25:13, 31:16, 35:12, 41:15, 42:19, 46:2, 46:4, 46:10, 48:19, 49:6, 54:10
**rise** [1] - 57:6
**risk** [7] - 4:25, 18:5, 32:8, 32:10, 35:13, 35:14, 40:19
**room** [1] - 53:8
**ROTHROCK** [2] - 2:21, 60:8
**route** [1] - 48:17
**RPR** [2] - 2:21, 60:8
**rule** [5] - 9:20, 39:3, 39:7, 40:12
**rules** [1] - 57:12
**ruling** [1] - 54:4

**S**

**Sachs** [1] - 6:15
**Sam** [1] - 56:16
**Savings** [1] - 26:20
**scenes** [1] - 56:4
**schedule** [3] - 56:12, 58:1, 59:17
**scheduling** [3] - 56:11, 57:25, 58:19
**Schreiber** [1] - 6:15
**sealed** [1] - 25:9
**SEBASTIAN** [1] - 1:22
**Sebastian** [1] - 3:11
**second** [9] - 13:10, 14:17, 36:13, 38:2, 39:13, 53:10, 53:18, 54:3, 55:8
**secret** [3] - 19:8, 19:13, 19:16
**section** [1] - 38:1
**Section** [9] - 11:3, 11:6, 11:21, 12:23, 13:5, 38:14, 38:20, 39:15, 41:15
**secured** [10] - 5:25, 6:17, 9:17, 10:13, 17:4, 40:10, 40:14, 40:18, 42:19
**SECURITIES** [1] - 1:6
**securities** [51] - 5:7, 5:13, 5:25, 8:25, 9:24, 10:2, 10:10, 11:5, 11:20, 11:22, 12:7, 12:17, 16:24, 18:10, 18:17, 19:20, 20:1, 20:3, 20:7, 20:9, 20:18, 22:2, 22:16, 25:21, 25:23, 26:7, 31:7, 32:16, 32:18, 32:22, 33:23, 37:15, 38:10, 38:11, 42:24, 42:25, 43:3, 43:8, 43:16, 43:21, 43:23, 43:24, 44:3, 44:12, 44:17, 45:12, 46:17, 46:18, 46:22, 46:24, 55:9
**Securities** [7] - 3:3, 3:7, 5:4, 5:22, 24:10, 24:16, 40:1
**security** [8] - 6:11, 33:19, 36:7, 39:1, 39:2, 39:14, 40:6, 40:11
**see** [11] - 29:22, 29:24, 30:7, 35:7, 38:7, 39:16, 48:1, 54:3, 57:13, 58:7, 59:23
**seek** [10] - 5:2, 10:19,

13:11, 15:20, 16:4, 17:3, 30:12, 49:7, 50:7, 58:6
**seeking** [18] - 4:23, 22:7, 23:25, 24:5, 25:23, 31:9, 42:8, 42:22, 43:6, 43:7, 43:15, 44:2, 45:17, 45:23, 46:21, 55:10, 58:4
**seeks** [1] - 13:3
**seemingly** [2] - 13:18, 15:7
**Self** [2] - 5:4, 43:5
**self** [1] - 16:17
**Self-Help** [2] - 5:4, 43:5
**self-help** [1] - 16:17
**send** [2] - 16:7, 47:5
**sends** [1] - 16:13
**sent** [5] - 15:11, 31:18, 31:25, 48:7, 58:5
**sentence** [1] - 41:22
**separate** [6] - 5:12, 6:12, 9:20, 11:5, 43:8, 58:18
**September** [4] - 36:19, 56:14, 56:20, 57:16
**serious** [5] - 14:25, 15:17, 16:10, 47:10, 56:3
**serve** [1] - 39:13
**served** [3] - 55:22, 56:14, 57:16
**service** [2] - 55:22, 55:23
**serving** [1] - 56:20
**set** [27] - 11:12, 12:21, 12:24, 13:2, 21:3, 21:5, 21:7, 21:9, 21:12, 21:16, 22:22, 22:23, 22:25, 31:16, 31:21, 31:22, 35:11, 36:15, 43:2, 43:22, 46:9, 46:11, 48:19, 49:6, 49:13, 49:22
**setting** [2] - 13:1, 25:14
**settle** [1] - 6:2
**settled** [2] - 10:18, 37:5
**settlement** [5] - 8:5, 15:1, 15:3, 16:10, 30:13
**settling** [1] - 57:17
**several** [2] - 50:20, 57:4
**severe** [1] - 34:20
**severely** [1] - 28:7
**shall** [4] - 31:5, 38:14, 54:16, 55:1
**share** [1] - 14:16
**shared** [1] - 7:8
**shifting** [1] - 19:16
**SHINHAN** [1] - 1:6
**Shinhan** [69] - 3:2, 3:7, 5:4, 5:7, 5:22, 5:24, 6:1, 10:13, 11:8, 11:13, 11:16, 12:2, 12:12, 13:18, 13:22, 14:2, 14:13, 15:3, 15:7, 15:10, 16:9, 16:14, 16:16, 16:18, 17:2, 17:7, 18:13, 18:15, 18:16, 18:18, 20:6, 20:15, 20:22, 21:1, 21:15, 21:18, 21:22, 21:25, 23:5, 24:2, 24:10, 24:16, 25:3, 26:25, 27:3, 28:13, 31:8, 31:12, 31:20, 33:20, 33:22, 34:11, 34:21, 35:1, 35:6, 35:18, 37:16, 39:22, 40:5, 41:12, 41:22, 42:15, 44:21, 44:23, 46:14, 50:12, 56:21
**Shinhan's** [21] - 4:25, 5:6, 5:9, 5:17, 10:1, 13:10, 15:19, 16:3, 16:17, 17:3, 31:17, 32:17, 33:3, 37:17, 37:18, 38:19, 41:22, 44:19, 45:6, 46:1, 47:21
**shocking** [1] - 10:13
**short** [4] - 21:10, 39:17, 51:25, 58:24
**Show** [9] - 3:16, 4:3, 15:1, 17:17, 45:7, 55:3, 55:7, 55:14, 55:15
**showed** [1] - 9:8
**showing** [1] - 50:14
**shown** [3] - 22:13, 25:3, 59:5
**shows** [1] - 43:23
**shut** [1] - 24:12
**shutting** [1] - 24:10
**side** [1] - 3:20
**sign** [1] - 50:13
**signed** [7] - 21:25, 25:8, 25:11, 33:20, 46:1, 46:7, 50:13
**significant** [2] - 22:6, 34:20
**similar** [3] - 28:14, 47:20, 47:21
**simply** [4] - 10:16, 13:6, 15:13, 44:11
**simultaneous** [2] - 38:8, 55:2
**single** [3] - 16:7, 39:23, 59:2
**sit** [2] - 24:10, 44:20
**sitting** [1] - 24:9
**situation** [2] - 6:3, 10:8
**six** [2] - 5:14, 12:15
**skips** [1] - 25:25
**SKLAR** [1] - 2:4
**Sklar** [1] - 3:14
**SLA** [8] - 11:3, 22:16, 23:12, 38:20, 39:15, 39:16, 41:15, 43:1
**SLC** [9] - 22:20, 22:23, 23:11, 31:17, 31:21, 46:6, 46:7, 56:18, 57:6
**slightly** [1] - 46:22
**slower** [1] - 57:1
**small** [1] - 28:20
**solely** [1] - 54:6
**someone** [1] - 56:7
**sometime** [1] - 26:13
**soon** [1] - 59:7
**sorry** [2] - 33:24, 41:23
**sort** [9] - 23:23, 25:1, 25:16, 25:24, 28:9, 29:13, 35:20, 46:5, 57:10
**sought** [5] - 7:23, 12:8, 12:14, 15:6, 51:3
**source** [1] - 19:3
**spades** [1] - 35:14
**specific** [1] - 55:10
**specifically** [5] - 15:21, 39:18, 43:20, 49:22, 55:4
**split** [1] - 4:6
**spread** [1] - 14:12
**Squared** [1] - 3:2
**SQUARED** [1] - 1:3
**stage** [7] - 21:11, 21:20, 24:15, 35:22, 36:16, 49:19
**stake** [2] - 44:13, 45:5
**stale** [1] - 53:5
**standard** [4] - 17:8, 18:9, 22:5, 51:6
**start** [2] - 44:9, 53:3
**started** [1] - 47:2
**starting** [1] - 46:3
**STATE** [1] - 1:1
**state** [1] - 40:13
**statement** [3] - 17:20, 21:23, 22:18
**States** [4] - 24:13, 24:19, 35:4
**status** [12] - 10:10, 10:14, 14:24, 15:10, 16:24, 17:3, 17:21, 40:14, 40:18, 43:17, 43:23, 49:24
**statute** [2] - 50:21
**statutory** [2] - 32:8, 35:16
**stay** [6] - 15:4, 16:11, 24:9, 24:16, 59:7, 59:14
**stayed** [1] - 57:20
**steps** [2] - 25:25, 58:16
**Sterling** [1] - 6:6
**stick** [1] - 23:21
**still** [4] - 9:9, 12:9, 42:24, 48:4
**stock** [1] - 32:19
**stop** [3] - 12:20, 41:13, 48:2
**stopped** [10] - 5:23, 8:12, 9:12, 9:14, 14:18, 15:22, 15:23, 41:5, 41:8, 57:21
**straightforward** [2] - 4:15, 20:14
**STRAWN** [1] - 1:16
**Strawn** [1] - 3:9
**Street** [4] - 1:9, 28:8, 28:20, 47:13
**strongly** [1] - 24:18
**stuff** [1] - 47:22
**subject** [6] - 3:22, 7:10, 9:25, 23:22, 24:25, 34:25
**submit** [2] - 10:21, 18:18
**subpoena** [1] - 59:13
**subsequent** [1] - 51:5
**succeed** [1] - 51:11
**success** [12] - 4:7, 10:25, 13:7, 13:8, 19:7, 20:12, 23:4, 23:15, 31:14, 45:11, 51:7, 51:8
**successor** [1] - 16:15
**suddenly** [1] - 59:18
**sued** [1] - 8:24
**sufficient** [2] - 10:23, 30:5
**suggestion** [2] - 14:11, 58:12
**suggests** [3] - 42:2, 42:4, 42:8
**SULLIVAN** [1] - 1:20
**summary** [4] - 50:8, 56:17, 57:10, 59:21
**supersedes** [1] - 39:17
**supplement** [1] - 55:3
**support** [1] - 45:7
**supposed** [4] - 37:18, 43:18, 43:25, 59:6
**SUPREME** [1] - 1:1
**Supreme** [1] - 1:13
**supremely** [1] - 46:9
**survive** [1] - 36:16
**suspect** [1] - 29:14
**sustained** [1] - 23:8
**sworn** [1] - 17:20

## T

**targeting** [1] - 30:15
**TERM** [1] - 1:1
**term** [1] - 11:15
**terminate** [7] - 12:14, 12:17, 43:2, 43:21, 48:9, 48:19, 49:7
**terminated** [9] - 12:4, 26:12, 33:15, 43:20, 48:5, 48:12, 55:5, 56:8
**terminating** [2] - 27:1, 49:20
**termination** [9] - 11:5, 12:5, 12:6, 12:25, 25:18, 28:18, 28:25, 43:19, 50:3
**terminations** [2] - 12:10, 36:25
**terms** [15] - 3:19, 13:9, 15:11, 20:21, 23:6, 24:22, 26:1, 29:9, 30:6, 43:6, 47:15, 48:18, 48:20, 50:11, 50:24
**terrific** [1] - 4:16
**testimony** [2] - 19:1, 19:2
**THE** [68] - 1:1, 3:1, 3:12, 3:15, 4:1, 4:4, 4:16, 6:21, 7:6, 7:9, 7:12, 7:25, 8:18, 9:15, 18:23, 20:11, 23:18, 24:21, 26:6, 26:19, 26:22, 27:4, 27:8, 27:13, 27:18, 27:21, 28:1, 28:3, 28:21, 29:1, 29:4, 29:7, 29:12, 29:17, 29:21, 30:10, 30:21, 31:1, 32:2, 32:14, 32:20, 32:24, 33:9, 33:13, 34:4, 34:15, 36:1, 36:21, 37:3, 37:9, 37:20, 37:24,

dar

38:2, 38:4, 44:7, 48:3, 48:10, 48:22, 48:24, 49:1, 51:24, 52:6, 52:8, 53:1, 58:24, 59:2, 59:13, 59:20
**themselves** [2] - 24:25, 47:25
**therefore** [3] - 21:13, 55:13, 55:25
**they've** [2] - 32:10, 37:4
**thinking** [1] - 47:14
**third** [3] - 17:6, 37:4, 55:10
**threatened** [2] - 5:3, 6:12
**threatens** [1] - 17:11
**three** [1] - 56:14
**threw** [1] - 8:16
**throughout** [2] - 8:11, 14:3
**timely** [1] - 20:16
**timing** [1] - 41:3
**title** [12] - 5:7, 32:18, 32:19, 32:21, 32:25, 37:14, 37:15, 38:15, 38:17, 38:18
**titled** [2] - 37:17, 43:10
**Toby** [1] - 3:10
**TOBY** [1] - 1:21
**today** [20] - 3:10, 3:12, 3:16, 3:19, 24:10, 26:5, 29:15, 30:5, 31:8, 32:4, 38:18, 46:6, 53:4, 53:9, 54:5, 56:9, 56:16, 58:25, 59:22, 59:24
**today's** [6] - 3:25, 53:7, 54:21, 55:18, 55:20, 58:7
**took** [3] - 5:6, 5:22, 30:22
**top** [1] - 5:12
**tranche** [1] - 50:20
**transactions** [4] - 28:9, 32:23, 33:22, 34:2
**transcript** [3] - 55:18, 55:21, 60:5
**transfer** [15] - 5:1, 5:17, 9:13, 15:24, 18:4, 19:9, 27:2, 32:18, 33:3, 35:8, 35:9, 38:9, 40:3, 42:16, 51:15
**transferred** [20] - 9:5, 16:22, 18:2, 18:10, 26:6, 27:22, 27:23, 28:22, 29:4, 29:24, 32:25, 33:15, 34:23, 37:14, 37:16, 39:10, 43:10, 46:20, 47:19, 51:16
**transferring** [2] - 42:5, 42:6
**transfers** [1] - 32:19
**transparency** [4] - 47:17, 48:16, 55:25, 56:1
**travel** [1] - 34:7
**traveled** [1] - 30:18
**travels** [1] - 35:3
**tread** [1] - 23:20
**tremendously** [1] - 31:21
**triable** [1] - 51:22
**trial** [1] - 23:11
**triggered** [1] - 46:2
**true** [6] - 9:2, 11:10, 18:10, 18:11, 51:18, 60:4
**truly** [1] - 10:12
**trust** [1] - 39:5
**trusted** [2] - 5:21, 16:25
**trusting** [1] - 15:16
**try** [4] - 14:21, 23:20, 23:21, 30:13
**trying** [5] - 15:15, 20:8, 20:23, 42:9, 50:1
**turn** [2] - 8:25, 46:2
**turning** [2] - 20:12, 31:7
**turnover** [1] - 23:16
**two** [7] - 3:10, 14:9, 17:13, 39:6, 48:23, 52:7, 54:20
**type** [1] - 23:22

## U

**U.S** [1] - 18:17
**ultimate** [5] - 25:24, 28:16, 42:22, 46:21, 46:23
**ultimately** [10] - 6:19, 9:19, 10:6, 11:17, 31:9, 32:5, 32:8, 35:7, 46:24, 48:18
**unaware** [1] - 3:25
**under** [28] - 10:8, 11:3, 11:6, 11:10, 11:15, 11:18, 11:19, 11:21, 11:24, 12:1, 12:22, 13:3, 13:5, 18:8, 22:16, 23:4, 25:14, 31:21, 32:6, 37:25, 41:15, 43:1, 46:3, 46:5, 49:8, 49:14, 56:7, 56:12
**undermines** [1] - 13:11
**understood** [4] - 7:21, 52:6, 52:8
**undertaking** [2] - 27:11, 28:12
**undisputed** [1] - 13:6
**unfortunately** [1] - 53:5
**United** [4] - 24:13, 24:19, 35:3, 35:4
**unknown** [1] - 16:23
**unless** [4] - 11:20, 12:3, 38:9, 56:7
**unlikely** [2] - 50:6, 51:11
**unprecedented** [1] - 10:12
**unqualified** [1] - 11:2
**up** [8] - 4:21, 8:6, 8:16, 16:9, 23:11, 44:18, 48:7, 58:14
**upheld** [2] - 6:7, 6:9
**URQUHART** [1] - 1:20

## V

**vaguely** [1] - 5:5
**valid** [5] - 10:22, 32:12, 46:7, 56:18, 57:22
**value** [15] - 5:19, 17:19, 17:23, 19:19, 19:20, 19:24, 20:1, 36:5, 36:7, 36:8, 36:11, 37:11, 44:16, 55:8
**Van** [2] - 53:12, 54:14
**verification** [2] - 17:23, 36:12
**verified** [1] - 5:19
**versus** [4] - 3:2, 6:6, 6:15, 55:9
**victim** [1] - 45:13
**view** [2] - 8:22, 56:15
**violation** [2] - 17:11, 50:22
**visibility** [1] - 16:24
**voluntarily** [1] - 17:18

## W

**wait** [1] - 56:10
**waiver** [1] - 8:2
**Wall** [3] - 28:8, 28:19, 47:13
**wants** [1] - 35:13
**warranting** [1] - 17:5
**ways** [3] - 7:22, 28:20, 49:5
**weeks** [3] - 13:15, 15:12, 54:20
**WHITE** [1] - 2:2
**white** [1] - 22:17
**White** [1] - 3:6
**whole** [3] - 25:25, 33:25, 47:22
**wide** [1] - 25:13
**willing** [5] - 29:18, 32:9, 44:22, 57:11, 58:8
**Wilmington** [3] - 26:20, 27:24, 28:1
**win** [1] - 31:23
**windfall** [1] - 10:12
**WINSTON** [1] - 1:16
**Winston** [1] - 3:9
**Winston's** [1] - 7:16
**wishes** [1] - 48:19
**withdraw** [1] - 7:3
**withdrew** [1] - 57:18
**withheld** [1] - 18:1
**withholding** [4] - 17:15, 39:5, 40:23, 42:4
**worded** [1] - 5:5
**words** [2] - 30:2, 55:2
**world** [2] - 24:11, 28:20
**worries** [1] - 49:1
**worry** [1] - 60:1
**worth** [5] - 5:6, 20:5, 20:7, 20:9, 44:17
**writing** [5] - 25:11, 28:6, 28:14, 41:14, 41:16
**written** [6] - 12:3, 12:11, 12:25, 49:8, 49:10
**wrongly** [1] - 5:13
**wrote** [3] - 13:25, 14:2, 14:9

## Y

**year** [3] - 50:20, 56:14, 56:20
**years** [3] - 5:14, 12:15, 46:19
**yesterday** [10] - 5:16, 17:22, 18:11, 56:19, 56:23, 57:25, 58:5, 58:14, 59:12, 59:19
**YORK** [2] - 1:1, 1:1
**York** [11] - 1:9, 1:17, 1:21, 2:3, 6:17, 9:16, 24:24
**yourself** [1] - 19:10

## Z

**zero** [1] - 10:5

**EXHIBIT 17**

Message

**From:** Klint, Andrew [Andrew.Klint@us.gt.com]
**Sent:** 3/6/2026 5:52:26 PM
**To:** Shida, Sakiko [sakiko.shida@rsquaredia.com]
**CC:** Law, Brandon [brandon.law@us.gt.com]; Kang, David [david.kang@rsquaredia.com]; Ishida, Tetsuya [tetsuya.ishida@rsquaredia.com]
**Subject:** Re: RIA Draft Rep Letter

Hi Sakiko,

Thank you. I had meant to ask for the latest available financial statements and/or reporting pack for 2025 (not related to 12/31/23) — can you let me know what is available?

Andrew

---

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Friday, March 6, 2026 09:31
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

**Attention: EXTERNAL EMAIL**

**Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.**

Report Suspicious

Hi Andrew,

The updated rep letter is attached. As for the reporting pack, we have not made any updates to the attached version provided on December 9th.

Sakiko

On Thu, Mar 5, 2026 at 4:37 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

> Hi Sakiko,
>
> Can you please send across the latest available financial statements and reporting pack?
>
> The rep letter can be dated tomorrow Friday, March 6.
>
> Andrew
>
> ---
>
> **From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
> **Sent:** Tuesday, March 3, 2026 07:19

**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

**Attention: EXTERNAL EMAIL**

**Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.**

Report Suspicious

Hi Andrew,

There have been no updates to any of the subsequent event inquiries listed below. Regarding the Shinhan lawsuit, there have been no developments since our last update. No settlement is imminent.

Please provide the issuance date once it's available so we can finalize the management representation letter. Thank you.

Sakiko

On Mon, Mar 2, 2026 at 8:36 AM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko,

Hope you had a nice weekend. We plan to issue this report this week. Can you confirm via email that there are no updates to the subsequent event inquiries - see list of items below. As well, there are two dates on the management representation letter that will need to be updated to the date we file.

Finally - it looks like per review of the court filings related to the Shinhan case that a settlement may have been reached or is imminent. Can an update to that be provided?

- Modifications or revisions to significant transactions or agreements
- Changes in equity (for example, stock), debt, or working capital
- Changes in the Company's related parties, including any significant new related party transactions
- Significant transactions that are outside the normal course of business or that are otherwise unusual due to their timing, size or nature
- Assets appropriated by government or destroyed
- Developments regarding contingencies
- Unusual journal entries or adjustments
- Events that are relevant to the measurement of estimates or provisions
- Events that are relevant to the recoverability of assets
- Status of items accounted for on the basis of tentative, preliminary, or inconclusive data
- Events or likely events that question the appropriateness of accounting policies
- Changes in the Company's officers, board members, major shareholders, or important advisors
- New commitments, borrowings or guarantees
- Sales or acquisitions of assets outside of the normal course of business

Thanks,
Andrew

---

**From:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Sent:** Monday, February 16, 2026 21:23
**To:** Shida, Sakiko <sakiko.shida@rsquaredia.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

Hi Sakiko,

We will issue early next week - unfortunately we already have several reports going out this week. We will need to update our subsequent event inquiries (email confirming no changes would suffice) and obtain the management representation letter updated to the date we issue our report. I will confirm a day or two before what day we will issue.

Thanks,
Andrew

---

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Wednesday, February 11, 2026 08:20
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

**Attention: EXTERNAL EMAIL**

**Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.**

Report Suspicious

Hi Andrew,

Could you let us know when the expected issuance date is? I believe Winston provided the updated legal letter last week.

Sakiko

On Tue, Jan 20, 2026 at 3:57 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

> Hi Sakiko,
>
> See attached. The GT LLP W9 pertains to audit services provided by Grant Thornton LLP and the GTA LLC W9 pertains to tax services provided by Grant Thornton Advisors LLC.
>
> Thanks
> Andrew

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Tuesday, January 20, 2026 11:55 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

**Attention: EXTERNAL EMAIL**

Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.

Report Suspicious

Hi Andrew,

Thank you for the update. On a separate note, could you provide a copy of GT's W-9 for Form 1099 purposes?

Sakiko

On Fri, Jan 16, 2026 at 3:38 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko,

Thanks for sending this. Unfortunately the legal update we received in late December needs to be updated one last time (it goes stale after 14 days). I will request now, then we will need the rep letter updated to our issuance date.

Andrew

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Wednesday, January 14, 2026 11:18 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: RIA Draft Rep Letter

**Attention: EXTERNAL EMAIL**

Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.

Report Suspicious

Hi Andrew,

We completed our review and have no comments. Please see the signed rep letter attached.

Sakiko

On Tue, Jan 6, 2026 at 9:01 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Ria Team,

Wishing you all a happy new year. Wanted to follow up on your review of the financial statements and rep letter.

Thanks,
Andrew

---

**From:** Klint, Andrew
**Sent:** Tuesday, December 16, 2025 1:58 PM
**To:** Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>; Shida, Sakiko <sakiko.shida@rsquaredia.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>
**Subject:** RE: RIA Draft Rep Letter

Hi Ria Team,

Wanted to follow up on this – thank you.

Andrew

---

**From:** Klint, Andrew
**Sent:** Tuesday, December 9, 2025 8:07 PM
**To:** Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>; Shida, Sakiko <sakiko.shida@rsquaredia.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>
**Subject:** RIA Draft Rep Letter

Hi Ria Team,

Attached is the draft management representation letter and final draft of the financial statements. Please note that we did add to the liquidity disclosure the statement that significant doubt exists as to the company's ability to continue as a going concern, consistent with ASC 205-40-50-13. Our draft opinion, which is consistent with we had previously provided, is also included in this draft.

Please let us know if you have any comments on the management representation letter. We are still waiting on response from George at W&S before we sign off.

Thanks,

Andrew Klint
Managing Director, Audit & Assurance Services

**D** +1 213 688 1759
**M** +1 818 279 3301

GT.COM

444 S. Flower Street, Floor 31
Los Angeles, CA 90071