"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.

Please consider the environment before printing this email.

Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.

Please consider the environment before printing this email.

Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.

Please consider the environment before printing this email.

Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.

Please consider the environment before printing this email.

Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.

Please consider the environment before printing this email.

Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.

Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

**EXHIBIT 18**

WHITE & CASE

April 2, 2026

**VIA NYSCEF**

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

Hon. Anar R. Patel
Supreme Court of the State of New York
Commercial Division, New York County
60 Centre Street, Rm. 428
New York, NY 10007

**Re:** ***RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.* (Index No. 659538/2024)**

Dear Justice Patel:

This firm represents Defendant and Counterclaimant Shinhan Securities Co., Ltd. ("Shinhan") in the above-referenced action. Pursuant to Commercial Division Rule 24 and Section VIII.B of this Court's Practices and Procedures, Shinhan respectfully requests a pre-motion conference in advance of its anticipated motion by order to show cause for a preliminary injunction and temporary restraining order pursuant to CPLR §§ 6301, 6311, and 6313.

As the Court is aware, this action arises out of two securities lending agreements between Plaintiff Ria R Squared, Inc. ("RIA") and Shinhan (together, the "Parties"): the Global Master Securities Lending Agreement dated January 25, 2019 (the "GMSLA") and the Supplemental Lending Agreement dated January 25, 2019 (the "SLA," and together with the GMSLA, the "Agreements"). RIA's numerous breaches of the Agreements, including its failure to return the lent securities, are the subject of separate pending claims before this Court. Under the Agreements, however, RIA is obligated—among other things—to make monthly borrowing rate payments and coupon payments to Shinhan for as long as it retains the lent securities. RIA's failure to make any monthly borrowing rate payments is an event of default and, pursuant to Section 13 of the SLA, Shinhan has an immediate and irrevocable right to take legal possession of the collateral held for its benefit in custodial accounts (the "Accounts") at BNP Paribas ("BNP").

Since May 2025, RIA ceased making all borrowing rate payments. At the same time, RIA also ceased providing daily reports on the value of the collateral held in the Accounts. These daily reports, which were sent every day from the outset of the lending arrangement in January 2019 until April 30, 2025, were verified by BNP, and are necessary to ensure that RIA maintains sufficient collateral at BNP in order to comply with Section 5 of the GMSLA and to protect Shinhan from RIA's wrongful depletion or transfer of its collateral.

Starting in October 2024, and again since RIA ceased borrowing rate payments in May 2025, Shinhan has repeatedly attempted to exercise its contractual right to take immediate legal possession of its collateral but RIA has wrongfully obstructed each such effort. Further, RIA has refused Shinhan's repeated requests for the collateral reports that would confirm the balance of the Accounts, causing grave concerns that the collateral has been dissipated. As such, Shinhan intends

to move by order to show cause for a preliminary injunction and, if necessary, a temporary restraining order enjoining RIA from obstructing or otherwise interfering with Shinhan's contractual right to exercise its irrevocable power of attorney and take legal possession of the collateral securities held in the Accounts.

As will be demonstrated in the forthcoming order to show cause, Shinhan is entitled to such relief because it can show (1) a reasonable probability of success on the merits, (2) a danger of irreparable injury in the absence of injunctive relief, and (3) a balance of equities in its favor.

**Shinhan can demonstrate a reasonable probability of success on the merits** because there is no dispute the borrowing rate payments have not been made and the Agreements unambiguously provide Shinhan with an irrevocable power of attorney in the event of RIA's default to "take legal possession" of the custodial securities. Despite Shinhan's numerous attempts to exercise its power of attorney in compliance with the Agreements, RIA has wrongfully obstructed Shinhan's efforts to take possession of the Accounts and has further blocked Shinhan's insight into the balances of the Accounts.

**Shinhan faces irreparable harm in the absence of injunctive relief** because the securities in the Accounts constitute Shinhan's collateral and, in addition to obstructing Shinhan's control over the Accounts, RIA has refused to provide any reassurances that RIA has not transferred or otherwise depleted the Accounts. RIA has not provided Shinhan with any daily collateral reports since April 30, 2025—despite consistently doing so for over six years previously—and refused to respond to validly served discovery requests regarding the Accounts. Therefore, Shinhan has no means to monitor whether RIA is wrongfully depleting or transferring collateral from the Accounts. This leaves Shinhan exposed to imminent and unquantifiable harm that cannot be adequately remedied by money damages upon resolution of Shinhan's claims. Courts routinely hold that the dissipation or loss of collateral constitutes such irreparable harm. *See, e.g.*, *TS Falcon I, LLC v. Golden Mtn. Fin. Corp.*, No. 655783/2023, 2024 N.Y. Misc. LEXIS 556 (Sup. Ct. N.Y. Cnty. Feb. 1, 2024) (enjoining defendants from further breaching the loan and security agreement and taking any action to dissipate plaintiff's collateral).

**The balance of equities strongly favors Shinhan** because Shinhan has had a legal right to take possession of its property since at least May 2025. The injunctive relief sought would simply preserve the status quo by preventing RIA from continuing to obstruct a legal right to possess the collateral that is already vested. Put simply, the injunctive relief would simply allow Shinhan to take possession of its own property and therefore, RIA would suffer no cognizable harm. Absent injunctive relief, RIA will continue to convert both the lent securities and the collateral and Shinhan would be deprived of its property—twice over.

For the foregoing reasons, Shinhan respectfully requests that the Court schedule a pre-motion conference at its earliest convenience to address Shinhan's anticipated order to show cause. Given the urgency of the circumstances, as precipitated by RIA's ongoing obstruction of Shinhan's power of attorney and the complete cessation of daily collateral reporting since April 30, 2025, Shinhan respectfully requests that the Court schedule the conference on an expedited basis. We thank Your Honor for your time and consideration of this matter.

Respectfully submitted,

*/s/ Laura Garr*
Laura Garr, Esq.

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

cc: All counsel of record via NYSCEF

**EXHIBIT 19**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE PATEL, ANAR R.**

**RIA R Squared, Inc.**

**- v. -**

**Shinhan Securities Co., Ltd.**

**Index #** **659538/2024**

## COURT NOTICE

Pursuant to todays off-the record pre-motion conference, the Court grants leave to Defendant Shinhan Securities Co., Ltd. to file a motion via order to show cause for a temporary restraining order and preliminary injunction to take legal possession of the collateral currently held for its benefit in custodial accounts.

DATED 04/09/2026 FILED By Vanessa VanBrunt

**EXHIBIT 20**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------X

RIA R Squared, Inc.,

Plaintiff(s)

-against-

Shinhan Securities Co., Ltd.

Defendant(s).
---------------------------------------------------------------X

~~PROPOSED~~ **AMENDED**

**Preliminary Conference Order**
**Part 45**

Index No. 659538/2024

RJI Filing Date 01/31/2025

Track:
☐ Expedited
☑ Standard
☐ Complex

**RATHOD PATEL, J.**

Counsel and/or parties having appeared before this Court on April 9, 2026 at a preliminary conference on this matter:

**Appearances** (Attorney Name, Firm Name, Phone, and Email Address)

| Counsel for Plaintiff(s): | Counsel for Defendant(s): |
|---|---|
| George E. Mastoris | Laura Garr |
| Winston & Strawn LLP | White & Case LLP |
| 212-294-6700 | 212-819-8849 |
| gmastoris@winston.com | laura.garr@whitecase.com |
| | |

The Court having conducted a Preliminary Conference in the above-entitled action, it is hereby ORDERED as follows, pursuant to the Rules of the Commercial Division and this Court's Practices and Procedures:

1. **Confidentiality Agreement and Order**

   a. The parties are directed to Commercial Division Rule 11-g and Appendix B thereto for the form Stipulation and Order for the Production and Exchange of Confidential Information. If the parties propose to deviate from the form Stipulation, the parties shall file (1) a copy of the parties' proposed confidentiality order; (2) a redline of the parties' proposed order to the form Stipulation; and (3) a letter to the Court articulating the reasons for such deviations.

*Revised as of 1/24/25*

2. **Document Production and Interrogatories**

   a. Demands for Discovery and Interrogatories shall be served on or before: N/A - Complete.

   b. Responses to Demands for Discovery with objections and Interrogatories shall be served on or before: N/A - Complete.

   c. The parties shall produce all documents on a rolling basis and shall complete all document productions, including the production of privilege logs, on or before: May 15, 2026.

   d. Pursuant to Commercial Division Rule 11-a (a) and (b), the parties are advised that the interrogatories shall be limited both in terms of the topics to be covered and the number of interrogatories permitted (*i.e.*, 25 including subparts). Pursuant to Commercial Division Rule 11-a (d), the Court hereby orders that there shall be no additional interrogatories permitted concerning the claims and contentions of the parties.

3. **Exchange of Electronically Stored Information (ESI)**

   a. The parties shall execute a stipulation reflecting their agreement as to exchanging ESI by N/A - Complete, or if there is no agreement or only partial agreement the parties shall notify the Court.

4. **Deposition of Oral Questions**

   a. All party depositions shall be completed by: July 15, 2026.

   b. Non-party depositions shall be completed by: July 29, 2026.

5. **Expert Discovery**

   a. Parties shall serve expert disclosure on or before: August 12, 2026.

   b. Expert Discovery shall be completed on or before: October 13, 2026.

6. **Impleader** shall be completed on or before: N/A.

7. All discovery shall be completed by October 14, 2026, and any discovery not then completed may be considered waived, precluded, or otherwise as appropriate pursuant to Commercial Division Rule 13(a) and CPLR 3126. The failure to provide a document, or to otherwise provide discovery, may result in preclusion at trial.

** The Court will not permit any further adjournment of discovery deadlines absent good cause shown.

8. **Trial Readiness Conference and Note of Issue**

   a. A Trial Readiness Conference will be held on October 15, 2026 at 9:30 am in person in Courtroom 428. On this date, a Trial Readiness Order (TRO) will be issued directing that Plaintiff serve and file a Note of Issue and within ten (10) days of the date of the TRO.

   b. The Note of Issue/ Certificate of Readiness shall be filed on or before: October 26, 2026.

9. **Discovery Disputes**

   a. Counsel shall comply with this Court's Practices and Procedures and Commercial Division Rule 14. If counsel, after good faith consultation, cannot resolve a discovery dispute, counsel shall promptly notify the Court *via* letter filed on NYSCEF to schedule a virtual conference, otherwise the issue(s) will be waived. No motion relating to discovery shall be made without the permission of the Court. Neither the existence of any discovery dispute nor the making of any discovery motion shall result in, or justify, any change or adjustment in the dates set forth herein.

10. **Motions**

    a. Pre-motion conferences are required before making any application to the Court.

    b. Any dispositive motions shall be served within forty-five (45) days of the filing of the Note of Issue, unless otherwise directed by the Court.

11. The dates set forth herein of the discovery deadline, Trial Readiness Conference, and filing of the Note of Issue may not be adjourned except with the prior approval of the Court. *See* Sections 7 and 8.

12. There is no stay of discovery pending motion practice, settlement proceedings, or alternative dispute resolution, unless specifically ordered by the Court.

13. Additional Directives

    The parties may modify the deadlines set forth in this Order and will engage in good faith negotiations to modify the said deadlines as necessary; provided that all discovery shall be completed by the deadline set forth in paragraph 7; provided, further, that the parties may seek to modify the deadline set forth in paragraph 7 upon further orders from this Court.

Dated: April 15, 2026
New York, New York

**So Ordered.**

A. R. Patel

**Hon. Anar Rathod Patel, A.J.S.C.**

**OPTIONAL STIPULATION**

In order to streamline the discovery process, and to prioritize good faith cooperation over motion practice, the parties hereby stipulate that the prevailing party in any discovery related motion may, subject to the Court's discretion, recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in litigating the motion.

Counsel for Plaintiff(s): ____________________

Counsel for Defendant(s): ____________________

# EXHIBIT 21

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

RIA R SQUARED, INC.,

*Plaintiff,*

v.

SHINHAN SECURITIES CO., LTD.,

*Defendant.*

Index No. 659538/2024

Hon. Anar R. Patel, J.S.C., Part 45

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SHINHAN SECURITIES CO., LTD.'S MOTION TO COMPEL DISCOVERY RESPONSES FROM PLAINTIFF RIA R SQUARED, INC.**

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 3

I. The Agreements and the Custodial Accounts ..... 3

II. Shinhan's Document Requests and RIA's Deficient Responses ..... 4

ARGUMENT ..... 7

I. That Shinhan's Document Requests Relate to Its Counterclaims Does Not Excuse RIA's Deficient Responses ..... 8

II. Shinhan's Document Requests are Directly Relevant to RIA's Claims and Alleged Damages ..... 10

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abedin v. Osorio*,
188 A.D.3d 764 (2nd Dept. 2020) ....7

*Abrams v. Pecile*,
83 A.D.3d 527 (1st Dep't 2011) ....7

*Allen v. Crowell-Collier Publ. Co.*,
21 N.Y.2d 403 (1968) ....7, 8

*CallisonRTKL Inc. v. Envirochrome Interiors, Inc.*,
2022 N.Y. Misc. LEXIS 6718 (Sup. Ct. Nov. 3, 2022) ....11

*Kenford Co. v. Cty. of Erie*,
67 N.Y.2d 257 (1986) ....11

*Madia v. CBS Corp.*,
146 A.D.3d 424 (1st Dep't 2017) ....8

*SNI/SI Networks LLC v. DIRECTV, LLC*,
132 A.D.3d 616 (1st Dep't 2015) ....7

*Vargas v. Lee*,
170 A.D.3d 1073 (2d Dep't 2019) ....7

**STATUTES AND RULES**

CPLR 3101 ....7, 8, 9, 10

CPLR 3124 ....1, 7

Defendant and Counterclaimant, Shinhan Securities Co. Ltd. ("Shinhan"), respectfully submits this Memorandum of Law in Support of its motion, pursuant to CPLR 3124, compelling Ria R Squared, Inc. ("RIA" or "Plaintiff") to produce documents responsive to (i) Shinhan's First Set of Requests for the Production of Documents, dated April 11, 2025 (the "First Set of Document Requests"); and (ii) Shinhan's Second Set of Requests for the Production of Documents, dated July 21, 2025 (the "Second Set of Document Requests" and, together with Shinhan's First Set of Document Requests, the "Document Requests"). Shinhan submits this motion pursuant to the Court's February 25, 2026 Order (NYSCEF Doc. No. 92) and reserves all rights as to any subsequent discovery motions that may become necessary in the course of this litigation.

The subject of this Motion to Compel overlaps with issues articulated in Shinhan's forthcoming motion by order to show cause for a preliminary injunction and temporary restraining order, as previewed in Shinhan's letter request for a pre-motion conference dated April 2, 2026 (NYSCEF Doc No. 94) and discussed during the pre-motion conference held on April 9, 2026. By moving to compel compliance with Plaintiff's discovery obligations, Shinhan supplements, rather than supplants, the injunctive relief it seeks by order to show cause.

## PRELIMINARY STATEMENT

The case arises from a Global Master Securities Lending Agreement ("GMSLA") and a Supplemental Lending Agreement ("SLA," and together with the GMSLA, the "Agreements"), under which Shinhan lent RIA nearly $300 million in securities in 2019. The GMSLA and SLA require RIA to maintain a certain amount of custodial securities in accounts (the "Custodial Accounts") at BNP Paribas ("BNP"), which served as collateral for the loans. Both sides have brought claims for breaches of the Agreements, and Shinhan also asserts a claim for conversion with respect to the lent securities and the collateral in the Custodial Accounts.

In April 2025, Shinhan served its First Set of Document Requests upon RIA, seeking—among other things—documents reflecting the value of the Custodial Accounts and documents and communications concerning the Custodial Accounts and the use, transfer, sale, or other disposition of the collateral. After RIA ceased providing regular collateral reports in May 2025, something it had done daily over the previous six years, Shinhan served a Second Set of Document Requests in July 2025, which included additional requests for the daily collateral reports for the period starting April 30, 2025.

RIA's responses to these requests have been deficient. RIA objected to and refused to produce documents in response to certain of Shinhan's First Set of Document Requests on the grounds that the requests called for information or documents that were relevant to neither the claims, defenses, nor subject matter of the action. As to the Second Set, RIA objected to Shinhan's request for collateral reports on the grounds that, to the extent they were based on Shinhan's then-forthcoming counterclaims, Shinhan had failed to establish a foundation for those requests.

RIA's objections fail, and Shinhan is entitled to full disclosure of all matter that is material and necessary in the prosecution or defense of this action. RIA claims it has suffered hundreds of millions of dollars in damages as a result of the financial and reputational harm it purportedly has sustained, and that its business is directly tied to the Custodial Accounts. Aside from the information sought through these requests being relevant to Shinhan's counterclaims (which were filed in September 2025), Shinhan is entitled to the documents necessary to test RIA's assertions underpinning Plaintiff's own claims and damages. The Court should compel RIA to comply with its discovery obligations and produce documents responsive to these requests without further delay.

## FACTUAL BACKGROUND

Shinhan and RIA (together, the "Parties") entered into a Global Master Securities Lending Agreement and a Supplemental Lending Agreement as of January 25, 2019. On December 9, 2024, RIA filed this action (the "Complaint") alleging, among other things, that Shinhan had breached the terms of these Agreements. *See generally* Compl. (NYSCEF Doc No. 1). After the Court denied Shinhan's Motion to Dismiss (NYSCEF Doc. No. 71), Shinhan filed its Answer and Counterclaim (the "Counterclaim") on September 2, 2025 (NYSCEF Doc. No. 73). The Parties subsequently exchanged document productions on September 26, 2025.

### I. The Agreements and the Custodial Accounts

Between February and October 2019, Shinhan lent RIA approximately $294 million in securities. *See* Countercl. ¶¶ 138, 176 n.1 (NYSCEF Doc. No. 73). Pursuant to the Agreements, at the time of each individual loan, RIA deposited an agreed-upon amount of securities (totaling approximately 110% of the value of the lent securities) into accounts (the "Custodial Accounts") at BNP Paribas ("BNP"), which served as collateral for the loans. Under Sections 4.2(c) and 5 of the GMSLA, and Sections 8 and 10 of the SLA, when RIA deposited those securities, it transferred full legal title and ownership of the Collateral[1] to Shinhan. *See* GMSLA §§ 4.2(c), 5 and SLA §§ 8, 10 (NYSCEF Doc. No. 40).

The terms of the GMSLA require RIA to ensure the Custodial Accounts maintain the "Required Collateral Value," or the minimum aggregate value of Collateral that is required "on any Business Day." GMSLA §§ 5.4, 5.5 (NYSCEF Doc. No. 40). Section 5.3 of the GMSLA further establishes the requirements and limitations for substitutions of collateral by RIA. *Id.* at § 5.3. To demonstrate its compliance with these terms, RIA provided Shinhan with daily collateral

[1] Capitalized terms used but not defined herein shall have the same meaning given to them in the Agreements.

reports, verified by BNP, that reflected the value of the securities held in the Custodial Accounts. These reports confirmed the nature and value of the Collateral held on each Business Day.

## II. Shinhan's Document Requests and RIA's Deficient Responses

On April 11, 2025, Shinhan served its First Set of Document Requests upon RIA. *See* Affirmation of Laura Garr in Support of Shinhan's Motion to Compel filed herewith ("Garr Aff.") ¶ 3. On May 1, 2025, RIA served its Responses and Objections thereto, in which it objected to several of Shinhan's requests on the grounds that they "call[ed] for the production of information or documents that are neither relevant to the claims, defenses, or subject matter of . . . this Action." *See, e.g.*, Garr Aff. Ex. 1 at 22. After several meetings and extensive correspondence between counsel, RIA maintains its objections to the following of Shinhan's requests:

> Request for Production No. 17 ("Request No. 17")
> Documents sufficient to reflect the value of the Custodial Accounts and Custodial Securities from January 1, 2020, to present, including all account statements.
>
> Request for Production No. 20 ("Request No. 20")
> All Documents and Communications concerning the Custodial Account and Custodial Securities, including all account statements, information concerning the use, transfer, sale, or other disposition of the Custodial Securities, information concerning the value of the Custodial Securities, and block letters and un-block letters signed by the Parties.

*See id.* at 21-22, 24.

In May 2025, RIA ceased making the borrowing rate payments required under the Agreements and has not, as of this filing, made any of the requisite payments since, despite assurances to both Shinhan and this Court that RIA would "continue to do so as long as the Current Loan remains outstanding." Compl. ¶ 71 (NYSCEF Doc No. 1). Further, as of May 1, 2025—the same date that RIA served its Responses and Objections to Shinhan's First Set of Document Requests—RIA has refused, without explanation, to provide Shinhan with the collateral reports it previously provided daily, from the commencement of the Parties' transactions in January 2019

through April 30, 2025. Shinhan has repeatedly requested these reports, but RIA has, without justification, continued to deny those requests.

The Parties met and conferred regarding RIA's objections to Shinhan's First Set of Document Requests on May 23, 2025. In that meeting, Shinhan's counsel inquired about the status of the Custodial Accounts and the daily collateral reports, given RIA's objections to Request Nos. 17 and 20, and RIA's failure to provide Shinhan with daily collateral reports as of May 1, 2025, as iterated *supra*. Shinhan's counsel explained that these requests directly related to the allegations in RIA's own Complaint, *see, e.g.* Compl. ¶ 72 (NYSCEF Doc No. 1), in addition to any relevance for Shinhan's then-anticipated counterclaims.[2] Though the Parties agreed that Shinhan's explicit request for the daily collateral reports in this meeting between counsel constituted an official request for production, implicit in its First Set of Document Requests, the Parties were otherwise unable to come to an agreement on Request Nos. 17 and 20.[3]

Despite multiple email exchanges and an additional meeting to discuss RIA's objections to the Document Requests on June 3, 2025, the Parties failed to reach an agreement. On June 18, Shinhan's counsel followed up via email regarding its First Set of Document Requests, and on June 20, RIA's counsel agreed that the Parties would simultaneously engage in discovery concerning Shinhan's forthcoming counterclaims. However, in that communication, RIA also requested that Shinhan first provide a written rationale for each of the requests that related to Shinhan's anticipated counterclaims. On June 24, Shinhan once again explained that the

[2] At the time, Shinhan's Motion to Dismiss was still pending before the Court, and Shinhan's answer and counterclaims were not yet due. Shinhan's Motion to Dismiss was denied on August 1, 2025 (NYSCEF Doc. No. 71), after which Shinhan promptly filed its Answer and Counterclaim on September 2, 2025 (NYSCEF Doc. No. 73).

[3] After RIA later refused to provide a sufficient response as to the collateral reports in the Parties' subsequent email and telephonic communications, Shinhan's counsel formalized the request in its Second Set of Document Requests, served July 21, 2025.

Document Requests did not relate exclusively to its potential counterclaims, but also were relevant to RIA's own claims and alleged damages. On June 27, 2025, counsel for the Parties reconvened. When Shinhan's counsel inquired about the status of the daily collateral reports, opposing counsel represented that RIA's position was that it had no affirmative obligation to provide the reports in the first place—its discovery obligations, apparently, notwithstanding.

In light of this development, as well as RIA's discontinuance of the borrowing rate payments in May 2025, and out of concern that its collateral had been wrongfully dissipated, on July 21, 2025, Shinhan served its Second Set of Document Requests upon RIA, which formalized the requests originally made during the Parties' May 23 meeting. Shinhan's Second Set of Document Requests included only two items:

> Request for Production No. 1
> The daily collateral reports from the Custodial Accounts for the period starting on April 30, 2025, until July 21, 2025.
>
> Request for Production No. 2
> Documents sufficient to show the current financial performance or condition of RIA, including but not limited to income statements, balance sheets, cash flow statements, profit and loss statements, tax returns, audited and unaudited financial statements, accounts payable and receivable records, loan agreements, debt schedules, investor reports, and any related internal and external communications, emails, memoranda, reports, meeting minutes, presentations, and analyses that discuss, assess, or reference the financial standing, profitability, liquidity, solvency, or any financial aspect of RIA.

*See* Garr Aff. Ex. 2 at 9-10.

On August 11, 2025, RIA served its Responses and Objections to Shinhan's Second Set of Document Requests. *See* Garr Aff. Ex. 2. RIA has since agreed to produce documents responsive to Request No. 2. However, RIA maintains its objection to Request No. 1 from Shinhan's Second Set of Document Requests (together, with Request Nos. 17 and 20 from Shinhan's First Set of Document Requests, the "Disputed Requests"), on the basis that Shinhan had failed to establish "any foundation for its Request—and in particular without connecting it to any claim, defense, or

subject matter of this Action." *Id.* at 9. In addition, RIA objected to the request as being "palpably improper, harassing, not proportionate to the needs of this case, and not reasonably calculated to lead to the discovery of admissible evidence." *Id.* RIA further claimed, much to Shinhan's surprise, that "[t]o the extent [Shinhan] grounds its Request in a forthcoming counterclaim, it must first disclose that basis and its relevance to this Action." *Id.* As the parties have reached an impasse, Shinhan moves to compel RIA's production of documents related to the Disputed Requests, pursuant to this Court's February 25, 2026 Order (NYSCEF Doc. No. 92).

## ARGUMENT

Under New York law, Shinhan is entitled to "full disclosure of all matter material and necessary in the prosecution or defense of an action, regardless of the burden of proof." CPLR 3101(a). The phrase "material and necessary" is "to be interpreted liberally to require disclosure, upon request, of any facts bearing on the controversy which will assist preparation for trial by sharpening the issues and reducing delay and prolixity." *Vargas v. Lee*, 170 A.D.3d 1073, 1075 (2d Dep't 2019) (quoting *Allen v. Crowell-Collier Publ'g Co.*, 21 N.Y.2d 403, 406 (1968)). Accordingly, requested discovery must be produced if the "discovery sought will result in the disclosure of relevant evidence or is reasonably calculated to lead to the discovery of information bearing on" the parties' claims or defenses. *SNI/SI Networks LLC v. DIRECTV, LLC*, 132 A.D.3d 616, 617 (1st Dep't 2015) (quoting *Abrams v. Pecile*, 83 A.D.3d 527, 528 (1st Dep't 2011)); *see also, e.g.*, *Abedin v. Osorio*, 188 A.D.3d 764, 766 (2nd Dept. 2020) ("If there is any possibility that the information is sought in good faith for possible use as evidence-in-chief or for cross-examination or in rebuttal, it should be considered matter 'material' in the action."). Where a party fails to comply with written discovery requests, "the party seeking disclosure may move to compel compliance or a response." CPLR 3124.

## I. That Shinhan's Document Requests Relate to Its Counterclaims Does Not Excuse RIA's Deficient Responses

RIA has suggested, in its Responses and Objections to the Document Requests, that because the Disputed Requests related, in part, to Shinhan's counterclaims, they did not require a substantive response until Shinhan filed its Answer and Counterclaim or otherwise articulated "that basis and its relevance to this Action." Garr Aff. Ex. 2 at 9. That assertion is inconsistent with both the basic principles of judicial economy, as contemplated by CPLR 3101, as well as RIA's own prior commitments. It also disregards completely Shinhan's consistent efforts to do exactly that, through both written discovery and the meet-and-confer process.

Basic principles of judicial economy require that discovery proceeds on all claims and defenses in this action simultaneously. This Court has an interest in the efficient resolution of this dispute as a whole. To that end, as noted above, CPLR 3101(a) requires disclosure "of any facts which will assist preparation for trial by sharpening the issues and reducing delay . . . with the test being one of usefulness and reason." *Madia v. CBS Corp.*, 146 A.D.3d 424, 424-25, (1st Dep't 2017) (citing *Crowell-Collier Publ'g Co.*, 21 N.Y.2d at 406) (internal quotations omitted). Requiring Shinhan to re-serve, re-negotiate, and re-litigate requests for the same categories of documents on a claim-by-claim basis would waste the resources of the Court and the Parties alike, and would serve no legitimate purpose.

CPLR 3101 does not contemplate that a plaintiff may withhold documents relevant to a defendant's counterclaims pending some further procedural event. Rather, CPLR 3101(a) provides that "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action." CPLR 3101(a). The phrase "prosecution or defense" is unqualified. It encompasses Shinhan's counterclaims no less than RIA's affirmative claims, and documents material to either are subject to disclosure. *See Crowell-Collier Publ'g Co.*, 21 N.Y.2d at 406

("[I]f there is any possibility that the information is sought in good faith for possible use as evidence-in-chief or in rebuttal or for cross-examination, it should be considered 'evidence material [to] the prosecution or defense.'") (citations omitted).

In any event, RIA also expressly agreed during the Parties' meet-and-confer process to engage in discovery concerning Shinhan's counterclaims concurrently with discovery related to RIA's affirmative claims. In those meetings and the Parties' subsequent correspondence, Shinhan also clarified the purpose of its requests. And to the extent RIA retained any doubt or uncertainty as to the "basis" of the Disputed Requests or their "relevance to this Action," that would have been extinguished when Shinhan filed its Answer and Counterclaim on September 2, 2025 (NYSCEF Doc. No. 73). Yet, RIA still refused to produce documents responsive to the Disputed Requests in its September 26, 2025 production, and continues to refuse to produce such responsive documents. With respect to the daily collateral reports in particular, RIA maintains its objections, as well as its position that it lacks an affirmative obligation to produce the reports, despite having an explicit duty to disclose "all matter material and necessary in the prosecution or defense of an action," pursuant to CPLR 3101.

In its Answer and Counterclaim, Shinhan alleged, in specific and detailed terms, that RIA has wrongfully retained Shinhan's securities, blocked Shinhan's attempts to exercise its contractual rights over the Collateral, has ceased providing daily collateral reports, and has additionally failed to make payments required under the Agreements, all of which constitute events of default. Shinhan's Counterclaim explicitly states claims for conversion and unjust enrichment, including based on RIA's wrongful retention of the Collateral and its obstruction of Shinhan's attempts to exercise its legal right over the Custodial Accounts. *See* Countercl. ¶¶ 237, 241, 254 (NYSCEF Doc. No. 73). As such, the relevance of the Disputed Requests—which include, among other

things, "[d]ocuments sufficient to reflect the value of the Custodial Accounts and Custodial Securities" (Request No. 17) and "information concerning the use, transfer, sale, or other disposition of the Custodial Securities" (Request No. 20)—is apparent on the face of the pleadings. Garr Aff. Ex. 1 at 21, 24.

## II. Shinhan's Document Requests are Directly Relevant to RIA's Claims and Alleged Damages

Even if Shinhan had not raised serious concerns regarding the value of the Custodial Accounts or brought any counterclaims, RIA is obligated to respond to the Disputed Requests because they also relate directly to RIA's own claims and allegations, as articulated in the Complaint. As explained above, Shinhan is entitled to "all matter material and necessary in the . . . defense" of these allegations. CPLR 3101.

For example, in the Complaint, RIA alleges that it has suffered "hundreds of millions of dollars in damages" as a result of the "financial and reputational harm" it has sustained. Compl. ¶ 13 (NYSCEF Doc No. 1). The Complaint also alleges that "RIA's business and reputation" are directly tied to the Custodial Accounts. *See* Compl. ¶ 72 (NYSCEF Doc No. 1) ("Moreover, [Shinhan] was well aware that the securities in that custodial account were the subject of various repurchase transactions entered into by RIA; had BNP complied with [Shinhan's] request [to turn over the Collateral], the impact on RIA's business and reputation would have been catastrophic."). Therefore, documents that (i) "reflect the value of the Custodial Accounts" (Request No. 17), and (ii) "concern[] the use, transfer, sale, or other disposition of the Custodial Securities" (Request No. 20), not to mention the daily collateral reports themselves, are essential to RIA's claims and the alleged facts asserted.

To the extent RIA claims "hundreds of millions of dollars in damages from balance sheet losses; lost opportunity costs from the lost yields on the promised securities; trading liquidity

losses; unrealized market value . . . and lost business opportunities with third parties," the Disputed Requests are essential to understanding that valuation. *See* Compl. ¶ 13 (NYSCEF Doc No. 1). Each of these categories of alleged damages is dependent on the financial condition and performance of RIA's broader portfolio, which rests, at least in part, on the Custodial Accounts and the securities that are the subject of the Disputed Requests. Whether any of RIA's alleged damages—monetary or reputational—were actually caused by Shinhan's alleged breach as opposed to RIA's own trading decisions, for example, or by the performance of the securities RIA chose to hold, or even by broader market movements, depends on what RIA did with the securities and collateral it had in its possession. *See, e.g.*, *Kenford Co. v. Cty. of Erie*, 67 N.Y.2d 257, 261 (1986) (a party's damages for breach of contract "must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes").

"Information regarding a party's damages is unquestionably relevant." *CallisonRTKL Inc. v. Envirochrome Interiors, Inc.*, 2022 N.Y. Misc. LEXIS 6718, at *5 (Sup. Ct. Nov. 3, 2022). The daily collateral reports, other documents that "reflect the value of the Custodial Accounts . . . including account statements," and documents that concern the "use, transfer, sale, or other disposition of the Custodial Securities," all go directly to the validity of RIA's claimed damages. Critically, these documents would also enumerate transactions that may have reduced the value of the Custodial Accounts or otherwise disposed of those assets in ways that contributed to RIA's claimed losses. RIA cannot claim that Shinhan's conduct caused massive downstream losses and simultaneously refuse to produce the documentary record of what RIA did—or did not do—with the Custodial Accounts.

## CONCLUSION

For the foregoing reasons, Shinhan respectfully requests that the Court issue an order compelling RIA to respond to Shinhan's Document Requests, and for further relief as the Court deems just and proper.

Respectfully submitted,

New York, New York
April 13, 2026

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

It is hereby certified pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

The total number of words in this Memorandum of Law, inclusive of point headings and footnotes and exclusive of caption page, table of contents, table of authorities, signature block, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules regulations, etc., is 3,553 words.

New York, New York
April 13, 2026

By: */s/ Laura Garr*

# EXHIBIT 22

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.,<br>*Plaintiff,*<br>v.<br>SHINHAN SECURITIES CO., LTD.,<br>*Defendant.* | Index No. 659538/2024<br>Hon. Anar R. Patel, J.S.C., Part 45 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SHINHAN SECURITIES CO., LTD.'S MOTION FOR AN ORDER TO SHOW CAUSE**

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 3

I. The GMSLA and SLA ........ 3

II. RIA's Non-Payment Triggers Shinhan's Irrevocable Power of Attorney Over the Accounts ........ 4

III. Shinhan Delayed Seeking Injunctive Relief Pending the Parties' Settlement Efforts ........ 7

ARGUMENT ........ 8

I. Shinhan Is Entitled to Injunctive Relief ........ 8

A. Shinhan Has Demonstrated a Likelihood of Success on the Merits ........ 9

B. Shinhan Will be Irreparably Harmed Absent Injunction ........ 11

1. The Irreparable Harm to Shinhan's Security Interest Will Not be Remedied by Monetary Damages ........ 11

2. Injunctive Relief Is Appropriate Given Shinhan's Conversion Claim Regarding the Collateral ........ 14

3. Injunctive Relief Is Necessary to Prevent Irreparable Harm to Shinhan's Contractual Rights ........ 15

C. The Balance of Equities Favors Granting the Requested Relief ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ALP, Inc. v. Moskowitz*,
2021 N.Y. Misc. LEXIS 900 (Sup. Ct. Mar. 4, 2021) ....................13, 14

*Amity Loans, Inc. v. Sterling Nat'l Bank & Tr. Co.*,
177 A.D.2d 277 (1st Dep't 1991) ....................11, 14

*AQ Asset Mgmt. LLC v. Levine*,
111 A.D.3d 245 (1st Dep't 2013) ....................11, 14

*Arena Special Opportunities Fund, L.P. v. Arbor One Escrow, Inc.*,
Index No. 650995/2023 (Sup. Ct. Dec. 8, 2023) ....................11-12, 15-16

*Barbes Rest. Inc. v. ASRR Suzer 218, LLC*,
140 A.D.3d 430 (1st Dep't 2016) ....................9, 17

*Bell & Co., P.C. v. Rosen*,
114 A.D.3d 411 (1st Dep't 2014) ....................9

*Bishop v. Rubin*,
228 A.D.2d 222 (1st Dep't 1996) ....................16

*Crocker Com. Servs. v. Davan Enters.*,
88 A.D.2d 877 (1st Dep't 1982) ....................16

*Demartini v. Chatham Green, Inc.*,
169 A.D.2d 689 (1st Dep't 1991) ....................10

*Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*,
69 A.D.3d 212 (4th Dep't 2009) ....................16, 19

*Deutsch v. Grunwald*,
165 A.D.3d 1035 (2d Dep't 2018) ....................17

*Di Fabio v. Omnipoint Commc'ns, Inc.*,
66 A.D.3d 635 (2nd Dep't 2009) ....................11

*Doe v. Axelrod*,
73 N.Y.2d 748 (Ct. App. 1988) ....................9

*Emigrant Bus. Credit Corp. v. Hanratty*,
2022 N.Y. Misc. LEXIS 7416 (Sup. Ct. Nov. 29, 2022) ....................18

*EmpireMediHoldings, LLC v. Bridge Funding Cap LLC*,
2022 N.Y. Misc. LEXIS 11146 (Sup. Ct. July 5, 2022) ........12

*Goldman Sachs Bank USA v. Schreiber*,
2022 N.Y. Misc. LEXIS 422 (Sup. Ct. Jan. 6, 2022) ........12

*Petry v. Gillon,*
199 A.D.3d 1277 (3d Dep't 2021) ........9

*Plus Enters. LLC v. Samco Elec. Corp.*,
2023 N.Y. Misc. LEXIS 27182 (Sup. Ct. Apr. 3, 2023) ........12

*TS Falcon I, LLC v. Golden Mountain Fin. Corp.*,
2024 N.Y. Misc. LEXIS 556 (Sup. Ct. Feb. 1, 2024) ........11, 12

*W. T. Grant Co. v. Srogi*,
52 N.Y.2d 496 (Ct. App. 1981) ........11

*White Oak Com. Fin., LLC v. EIA Inc.*,
2023 WL 4149527 (Sup. Ct. June 23, 2023) ........9, 12

**RULES**

N.Y. C.P.L.R § 6301 ........1, 9, 19

N.Y. C.P.L.R § 6311 ........1

N.Y. C.P.L.R § 6313 ........1

Defendant and Counterclaimant Shinhan Securities Co. Ltd. ("Shinhan") respectfully submits this Memorandum of Law in Support of Shinhan's Motion for an Order to Show Cause why an order should not be made pursuant to CPLR 6301, 6311, and 6313 enjoining Ria R Squared, Inc. ("RIA") from obstructing or otherwise interfering with Shinhan's contractual right to take possession of the collateral securities held for its benefit at BNP Paribas ("BNP") pursuant to Section 13 of the Supplemental Lending Agreement for Securities Lending dated as of January 25, 2019 (the "SLA"), as supplement to the Global Master Securities Lending Agreement dated as of January 25, 2019 (the "GMSLA" and, together with the SLA, the "Agreements").

## PRELIMINARY STATEMENT

RIA has wrongly retained approximately $228 million of Shinhan's securities for over six years. RIA's numerous breaches of the Agreements and conversion of Shinhan's lent securities are the subject of separate, pending claims before this Court. For as long as RIA retains the securities, however, it is obligated to pay Shinhan monthly borrowing rate payments pursuant to Section 7 of the SLA, and coupon payments pursuant to Section 6.2 of the GMSLA. Failure to timely make any borrowing rate payment constitutes an event of default by which Shinhan has a contractual right to exercise its irrevocable power of attorney and immediately "take legal possession of the custodial account and the custodial securities" in account numbers 180036500002 and 180036500002001 at BNP (together, the "Accounts"), collateral over which Shinhan holds full legal title. After defaulting prior to commencing this action, RIA resumed borrowing rate payments and assured Shinhan and this Court that it would continue to make all borrowing rate and coupon payments during the pendency of this proceeding. Compl. ¶ 71 (NYSCEF Doc. No. 1). However, RIA stopped making borrowing rate payments in May 2025, stopped making quarterly coupon payments in August 2025, and has prevented each of Shinhan's efforts to enforce its power of attorney over the Accounts. At the same time, RIA began blocking

Shinhan from monitoring the value of its collateral in the Accounts by ceasing the daily collateral reports verified by BNP. Shinhan served discovery requests to demand the reports, as well as requests for admission to confirm the status and value of its custodial securities in the Accounts, but RIA refused to respond, raising serious concerns about whether and to what extent RIA is dissipating, transferring, or otherwise depleting Shinhan's legal property. After Shinhan advised RIA it would be filing a motion to compel and seeking immediate injunctive relief, the Parties entered into settlement discussions and agreed to stay these proceedings after reaching an agreement in principle in January 2026. RIA represented to this Court and Shinhan that the Parties had reached a settlement but simply required additional time to review and finalize the agreements—claims that again proved entirely false. The stay expired on March 27, 2026 without any substantive engagement by RIA after it obtained the stay in January 2026. Shinhan immediately sought leave to file the present Order to Show Cause.

On April 7, 2026, after this Court granted a pre-motion conference, RIA sent an alarming letter to Shinhan and BNP (excluding counsel), in which RIA purported to terminate the GMSLA, demanded $2.6 billion based on the same false allegations underlying the action before this Court, instructed BNP (and "any other successor Custodian" bank) to disregard any and all directions from Shinhan, and contended that RIA is entitled to engage in "self-help" to offset the $2.6 billion RIA claims it is owed, seemingly taking Shinhan's collateral in addition to the outstanding $228 million in lent securities already converted. Since then, RIA has not only declined this Court's invitation to voluntarily resume the daily collateral reports to allay Shinhan's concerns about the dissipation of its collateral, RIA also re-asserted its objections to any discovery into the collateral. Shinhan seeks an order from this Court enjoining RIA from obstructing Shinhan's contractual right

to exercise its power of attorney and take legal possession of its collateral being held in the Accounts.

## FACTUAL BACKGROUND

### I. The GMSLA and SLA

Shinhan and RIA entered into the GMSLA and SLA as of January 25, 2019. Affirmation of Laura Garr ("Garr Aff."), Ex. 1 (GMSLA and SLA). In connection with the Agreements, Shinhan lent securities to RIA between February 2019 and October 2019 totaling approximately $228 million. At the time of each individual loan, RIA deposited an agreed amount of custodial securities (totaling approximately 110% of the value of the lent securities) into custodial accounts at BNP to serve as Shinhan's collateral for the loans. Under Sections 4.2(c) and 5 of the GMSLA, and Sections 8 and 10 of the SLA, RIA transferred full legal title and ownership of the Collateral[1] to Shinhan to be held in a custodial account at BNP. The SLA also granted Shinhan—"by way of security" and to "more fully secur[e] the performance" under the agreements—an irrevocable power of attorney over the Collateral by which Shinhan could take immediate legal possession of, and any actions related to, any or all of the custodial securities. *See* Garr Aff. Ex. 1, GMSLA §§ 4.2(c), 5; *id.*, SLA § 13. Notably, the irrevocable power of attorney also authorizes Shinhan to, among other things "make any claims or to ***take any action*** or to institute any proceedings which [Shinhan] considers to be necessary or advisable ***to protect or enforce the security interest created***" in the custodial securities under the SLA. *Id.*, SLA § 13 (emphasis added).

Under Section 7 of the SLA, RIA is obligated to make monthly borrowing rate payments to Shinhan on the 25th of the month. RIA's failure to make a monthly borrowing rate payment within five business days is an event of default under Section 13 of the SLA, triggering Shinhan's

[1] Capitalized terms used but not defined herein shall have the same meaning given to them in the Agreements. *See* Garr Aff. Ex. 1.

right to take immediate legal possession of its Collateral held in the custodial account and custodial securities for its benefit. Specifically, Section 13 of the SLA provides that "[a]n event of default shall occur upon a nonpayment of the ***borrowing rate*** from the ***borrowing party*** to the ***lending party*** within 5 business days of the scheduled payment date. In an event of default, post acknowledgement of such default by BNP, Shinhan Investment Co., Ltd. shall solely have the right to proceed with the following steps to take legal possession of the ***custodial account*** and the ***custodial securities***." Garr Aff. Ex. 1, SLA § 13 (emphasis in original).

Section 5 of the GMSLA details RIA's obligations related to the Collateral, including, among other obligations, the "Required Collateral Value" and minimum aggregate value of the collateral required "on any Business Day." Garr Aff. Ex. 1, GMSLA §§ 5.4, 5.5. Section 5.3 further establishes the requirements and limitations for substitutions of collateral by RIA. From the outset of the Agreements, RIA provided daily collateral reports to Shinhan which were verified by BNP. The bank-verified reports confirmed the nature and value of the Collateral daily to ensure RIA maintained sufficient collateral each Business Day to comply with Section 5 of the GMSLA. The daily reports are necessary to protect Shinhan from RIA's wrongful depletion or transfer of its collateral and allows Shinhan to act quickly if the Collateral values drop, per the terms of the Agreements.

## II. RIA's Non-Payment Triggers Shinhan's Irrevocable Power of Attorney Over the Accounts

RIA failed to make borrowing rate payments in December 2021, June 2022, November 2022, August 2024, September 2024, October 2024, January 2025, and February 2025. Shinhan attempted to take immediate possession of the collateral in October 2024 and RIA similarly blocked Shinhan's efforts with BNP. RIA resumed payments immediately before commencing this action in December 2024, and alleged in its Complaint that "RIA has in fact made all of the

borrowing and coupon payments in question . . . and will continue to do so as long as the Current Loan remains outstanding." *See* Compl. ¶ 71 (NYSCEF Doc. No. 1).

In May 2025, without prior warning, RIA ceased making borrowing rate payments, failing to make the full monthly borrowing rate payment within five days of May 25, 2025. On June 5, 2025, Shinhan sent a Notice of Event of Default by Ria R Squared, Inc. to BNP and RIA, seeking to exercise its power of attorney over the Accounts in accordance with Section 13 of the SLA. *See* Garr Aff. Ex. 2 at 2-3. On June 13, 2025, counsel for RIA wrote to BNP, falsely reporting that there was no event of default for failure to make borrowing rate payments. Garr Aff. Ex. 3 at 3. BNP replied that it "is not authorized to accept [Shinhan's] instructions without direction from" RIA. Garr Aff. Ex. 2 at 10. RIA then failed to make the monthly borrowing rate payments in June and July 2025, and Shinhan sent additional Notices of Event of Default to BNP and RIA. *See* Garr Aff. Ex. 2 at 11-12, 14-15. Both times, BNP responded that it would not accept Shinhan's instructions without direction from RIA. *Id.* at 13, 16.

At the same time the borrowing rate payments ceased, RIA abruptly stopped providing the collateral reports that it had been providing for the past six years. In July 2025, Shinhan validly served requests for the production of the daily collateral reports for the Accounts and requests for admission related to the Collateral. *See* Garr Aff. Ex. 5; Garr Aff. Ex 4. In response, RIA objected to all discovery requests related to the Collateral, contending that because Shinhan had not yet filed counterclaims, the request was "not reasonably calculated to lead to the discovery of admissible evidence."[2] *See* Garr Aff. Ex. 5 at 9. RIA similarly refused to admit or deny whether

[2] Shinhan's Answer and Counterclaims were not yet due, as the Court's decision on Shinhan's Motion to Dismiss the Complaint was still pending. *See* August 1, 2025 Decision and Order on Motion (NYSCEF Doc. No. 71). Shinhan has made clear that it would move to compel such discovery. *See* Court Notice dated February 25, 2026 (NYSCEF Doc. No. 92). Although RIA has since agreed to produce documents responsive to certain discovery requests concerning the

it is dissipating Shinhan's Collateral. *See* Garr Aff. Ex. 4. At the end of August 2025, RIA failed to make both the borrowing rate payment and the quarterly coupon payments. Shinhan sent another notice to BNP in September 2025 concerning RIA's ongoing default, and BNP once again responded that it would not accept Shinhan's instructions without further direction from RIA. *See* Garr Aff. Ex. 2 at 17-19.

When counsel for Shinhan attempted to meet and confer with RIA on the issue, RIA's counsel alleged that there was some confusion on Shinhan's part, as it was counsel's understanding that RIA's payments were current. RIA's counsel sent letters to Shinhan in June 2025 alleging all payments were current but that RIA *could* stop making payments if it so chose because of a purported set-off provision in an alleged "Securities Loan Confirmation" agreement—a draft agreement that was never finalized or agreed to and that RIA never executed. Garr Aff. Ex. 3 at 7-8; *see also* Countercl. ¶¶ 66, 87, 178-81 (NYSCEF Doc. No. 73). RIA made the same baseless claims again in September 2025, implying payments were being made but did not need to be, based on the same unexecuted and incomplete draft agreement. Garr Aff. Ex. 3 at 9-10.

Following confirmation that there was no "misunderstanding" or confusion by Shinhan about RIA's nonpayment, and in light of BNP's continued refusal to act in accordance with the unequivocal terms of the Agreements, Shinhan advised RIA's counsel that it had serious concerns about its Collateral and intended to file this Order to Show Cause, and also that Shinhan would move to compel discovery related to the Accounts. The Parties then commenced settlement

---

Collateral, it continues to maintain its objections to producing the daily collateral reports from the period starting after April 30, 2025, as well as "[d]ocuments sufficient to reflect the value of the Custodial Accounts and Custodial Securities . . . including all account statements." Shinhan accordingly moved to compel production of documents responsive to these requests pursuant to the deadline set by this Court. *See* Mot. to Compel (NYSCEF Doc. No. 122); *see also* Court Notice dated February 25, 2026 (NYSCEF Doc. No. 92).

discussions in October 2025. Feb. 25, 2026 Status Conference Tr. ("Tr.") 2:24-3:1, 8:13-22 (NYSCEF Doc. No. 93).

## III. Shinhan Delayed Seeking Injunctive Relief Pending the Parties' Settlement Efforts

To allow the settlement discussions to move forward and productively advance resolution of this dispute, Shinhan agreed not to seek any injunctive relief with respect to the Collateral in the Accounts at that time, without prejudice to its rights to do so. The Parties reached an agreement in principle in January 2026. The Parties then sought a stay of proceedings to finalize the necessary settlement documentation and related agreements, which the Court granted on January 21, 2026. *See* Stipulation and Order for Stay (NYSCEF Doc. No. 91). Although Shinhan had concerns regarding the possible dissipation of the Collateral, the settlement reached by the Parties would have obviated the need for Court intervention related to the Accounts and Shinhan believed that the Parties were working to formalize the settlement in good faith. Tr. 5:4-15. On February 10, 2026, Shinhan provided RIA with draft agreements in complete accordance with the settlement terms agreed to by the Parties. *Id.* at 3:6-11.

As of the status conference on February 25, 2026, RIA had not provided any comments to the draft agreements and had not taken the steps it had agreed to as part of the settlement. RIA's counsel advised the Court that it simply needed more time but "intend[ed] to look at those drafts . . . as quickly as possible" in order to share RIA's comments with Shinhan. RIA requested an additional thirty days "to try to get this thing done." *Id.* at 3:9-21. At that time, Shinhan expressed to the Court its apprehensions about whether RIA was proceeding in good faith with the settlement. Shinhan also specifically raised its concerns about the status of its Collateral and worried that further extensions of the stay might prejudice Shinhan's rights in seeking the relief at issue here. *Id.* 5:16-18. Shinhan proposed a court appointed mediator to oversee the process, which was considered but not adopted by the Court. Ultimately, the Court granted the parties an additional

thirty days to conclude the settlement agreements and file a stipulation of discontinuance (*id.* at 10:3-8) and confirmed the extension would be without prejudice to Shinhan's right to seek the relief that is subject of this Order to Show Cause. Despite the thirty-day extension and Shinhan's repeated follow-ups, RIA failed to provide *any* comments or responses on the draft agreements, allowing the Court's extended stay to expire.

On April 2, 2026, Shinhan filed a letter seeking leave to file a motion enjoining RIA from obstructing its contractual power of attorney over the Accounts, directing RIA to produce daily collateral reports, and temporarily restraining RIA from using, disposing, or transferring the custodial securities. Following the Court's so-ordering of a pre-motion conference on this Order to Show Cause, RIA's CEO, David Kang, sent a letter and email correspondence—apparently without the involvement of counsel and with the assistance of AI tools—to Shinhan and BNP on the evening of April 7, 2026 (the morning of April 8 in the Republic of Korea). *See* Garr Aff. Ex. 6 (the "April 7 Letter"). In his letter, Kang claimed that RIA is purporting to terminate the GMSLA as of April 2, 2026, and demanded payment of $2,595,188,892 from Shinhan.[3] *See id.* Kang also stated that "BNP Paribas (or any other successor Custodian) is hereby instructed to **disregard any and all directions from Shinhan**." *Id.* (emphasis original). He further asserted he had a right to engage in "self-help" to recover the purported $2.6 billion Kang contends RIA is owed.

## ARGUMENT

### I. Shinhan Is Entitled to Injunctive Relief

Shinhan requests that this Court enter an order, enjoining RIA from continuing to violate the terms of the SLA by obstructing Shinhan's exercise of its irrevocable power of attorney over

[3] In addition, Kang identified purported "continuing Events of Default under [the] GMSLA" by Shinhan (*see* Garr Aff. Ex. 6); as has already been made clear throughout this litigation, Shinhan disputes such assertions. *See, e.g.*, Answer and Countercl. ¶¶ 51, 66, 87-88, 158, 160-76, 178-81 (NYSCEF Doc. No. 73).

the Accounts, and its right to take legal possession of the custodial securities over which it has full legal title.

Shinhan is entitled to such relief because it can show: (1) a reasonable probability of success on the merits; (2) a danger of irreparable injury in the absence of the injunctive relief sought; and (3) a balance of equities in its favor. *See* CPLR 6301; *see also Doe v. Axelrod*, 73 N.Y.2d 748, 750 (Ct. App. 1988).

**A. Shinhan Has Demonstrated a Likelihood of Success on the Merits**

To obtain a preliminary injunction, a party needs to "demonstrate a likelihood of success on the merits on at least one of their claims." *White Oak Com. Fin., LLC v. EIA Inc.*, 2023 WL 4149527 at *10 (Sup. Ct. June 23, 2023) (citing *Petry v. Gillon,* 199 A.D.3d 1277, 1279 (3d Dep't 2021). The evidence required to show such a likelihood of success need not be conclusive and can be found even when certain facts are in dispute. *See Barbes Rest. Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430, 431 (1st Dep't 2016); *White Oak Com. Fin.*, 2023 WL 4149527 at *7 (citing *Bell & Co., P.C. v. Rosen*, 114 A.D.3d 411 (1st Dep't 2014)).

Here, it is undisputed that legal title to the Collateral transferred to Shinhan under the GMSLA, that the Collateral is held in the Accounts at BNP for Shinhan's benefit, and that Shinhan holds an irrevocable power of attorney "in relation to any of the custodial securities" held in the Accounts. Garr Aff. Ex. 1, SLA § 13. The SLA further includes an express and unambiguous provision establishing RIA's obligation to make monthly borrowing rate payments on the 25th of the month (*id.* at § 7)—an obligation RIA assured this Court it would honor "as long as the Current Loan remains outstanding." *See* Compl. ¶ 71 (NYSCEF Doc. No. 1). Failure to make a single borrowing rate payment within five business days entitles Shinhan to immediately "take legal possession of the custodial account and the custodial securities" pursuant to its irrevocable power of attorney. Garr Aff. Ex. 1, SLA § 13.

On the basis of RIA's nonpayment of borrowing rate payments, including failing to make all payments since May 2025, and RIA's documented obstruction of Shinhan's ability to take possession of its Collateral, Shinhan has established a likelihood of success on the merits of its claims. *See Demartini v. Chatham Green, Inc.*, 169 A.D.2d 689, 690 (1st Dep't 1991).

RIA has offered only two defenses to its defaults—neither of which is meritorious. First, RIA alleged to BNP that it has made the borrowing rate payments. This is verifiably false. Second, RIA argues it is not required to make the borrowing rate payments because it is entitled to certain set-off rights under a purported "Security Loan Confirmation." To be clear, RIA is not contending there is any contractual right to set off or any contractual exception under the SLA (or GMSLA) that would allow RIA to obstruct Shinhan from taking possession of its Collateral. Instead, RIA is relying entirely on a provision from a "Discussion Draft" of a "Security Loan Confirmation" document prepared by RIA (the so-called $750M Loan Agreement). *See* Countercl. ¶¶ 66, 87, 178-81 (NYSCEF Doc. No. 73); *see also* Compl. ¶ 66 (NYSCEF Doc. No. 1). As discovery has borne out, RIA's claim of a binding $750M Loan Agreement between the Parties is entirely false. There never was any agreement between the Parties on which RIA can now rely. As previously set forth in both Shinhan's Motion to Dismiss and its Answer and Counterclaim, there was only an incomplete "Discussion Draft" missing key terms. *See* Countercl. ¶¶ 66, 87, 178-81 (NYSCEF Doc. No. 73); *see also* Mem. of Law Supp. Def.'s Mot. to Dismiss ¶¶ 25, 49 (NYSCEF Doc. No. 55). Documentary evidence produced in this action confirms that: (i) the "Discussion Draft" sent to Mr. Kim lacked key substantive terms, (ii) RIA expressly stated that the "Discussion Draft" that Mr. Kim signed[4] was still subject to further changes, (iii) RIA abandoned efforts to amend, finalize,

[4] In addition to it not being a formal offer, as it did not include agreed upon terms, Mr. Kim did not have authority to sign on behalf of Shinhan.

or otherwise proceed with the agreement, (iv) RIA never countersigned and returned to Shinhan any version of the agreement, and (v) RIA never asked for performance or declared an event of default under the agreement when the obligations would have become due years ago. In other words, any such defense is not only unlikely to succeed but is frivolous.

**B. Shinhan Will be Irreparably Harmed Absent Injunction**

Shinhan will be irreparably harmed if RIA is permitted to continue obstructing Shinhan from exercising its bargained-for contractual rights to take legal possession of its Collateral. *See W. T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 517 (Ct. App. 1981); *see also Di Fabio v. Omnipoint Commc'ns, Inc.*, 66 A.D.3d 635, 636-37 (2nd Dep't 2009). Although ordinarily "there can be no irreparable harm from the mere loss of money," *AQ Asset Mgmt. LLC v. Levine*, 111 A.D.3d 245, 259 (1st Dep't 2013), New York courts recognize exceptions to that general rule, finding that: (1) potential loss or dissipation of a secured creditor's collateral constitutes irreparable harm, even if money damages ultimately are available; and (2) where the underlying action concerns conversion of identifiable funds, injunctive relief is appropriate notwithstanding the movant having an adequate remedy at law for monetary damages. *See, e.g.*, *TS Falcon I, LLC v. Golden Mountain Fin. Corp.*, 2024 N.Y. Misc. LEXIS 556, at *10-11 (Sup. Ct. Feb. 1, 2024); *Amity Loans, Inc. v. Sterling Nat'l Bank & Tr. Co.*, 177 A.D.2d 277, 279 (1st Dep't 1991). Both of those exceptions apply here.

**1. The Irreparable Harm to Shinhan's Security Interest Will Not be Remedied by Monetary Damages**

New York courts have routinely held that injunctive relief is proper to prevent irreparable harm caused by the dissipation or loss of collateral even when money damages ultimately are available. *See* Order to Show Cause at 3, *Arena Special Opportunities Fund, L.P. v. Arbor One Escrow, Inc.*, Index No. 650995/2023 (Sup. Ct. Dec. 8, 2023) (NYSCEF Doc. No. 238) (enjoining

defendants "from[] taking any action inconsistent with the terms of any of the [underlying agreements], including but not limited to . . . failing to transfer to [plaintiff] (or hold such amounts in escrow) the proceeds of the collateral pledged under" the applicable agreement); *White Oak Com. Fin.*, 2023 WL 4149527, at *11, *17-18 (explaining that "a secured creditor *does* have a legally recognized interest in preventing dissipation of encumbered property prior to obtaining judgment" and enjoining defendants from using or disposing of any of plaintiff's collateral property, including cash brokerage accounts) (emphasis in original); *Goldman Sachs Bank USA v. Schreiber*, 2022 N.Y. Misc. LEXIS 422, at *7 (Sup. Ct. Jan. 6, 2022) (in action for breach of loan and related agreements, granting preliminary injunction after finding sale of assets in contravention of governing documents irreparably harms Lender by taking away the value of the collateral); *see also TS Falcon I, LLC*, 2024 N.Y. Misc. LEXIS 556, at *10-12, *19-20 (granting preliminary injunction enjoining defendants from further breaching the loan and security agreement and taking any action to dissipate plaintiff's collateral).

When a creditor's collateral is at issue, the form of the collateral is not relevant. Courts have found irreparable harm even where the potentially-dissipated collateral is comprised of cash, deposit accounts, and other bank accounts. *See, e.g.*, *Plus Enters. LLC v. Samco Elec. Corp.*, 2023 N.Y. Misc. LEXIS 27182, at *1 n.1, *10 (Sup. Ct. Apr. 3, 2023) (finding that "without an injunction against dissipation or transfer of the assets, [plaintiff's] rights to the Collateral are at risk of irreparable harm and any future judgment in [plaintiff's] favor might be rendered futile," and enjoining defendants from interfering with collateral comprised of "right, title and interest in all" of defendant's property, including bank accounts and investments); *EmpireMediHoldings, LLC v. Bridge Funding Cap LLC*, 2022 N.Y. Misc. LEXIS 11146, at *2, 9 (Sup. Ct. July 5, 2022) (granting preliminary injunction with respect to collateral that included "accounts receivable, cash, [and]

cash proceeds," where plaintiffs had "a pre-existing interest in the Collateral, including all accounts receivable" and would be irreparably harmed if "Defendants are permitted to seize or dissipate the Collateral," which would render any future judgment "worthless"); *ALP, Inc. v. Moskowitz*, 2021 N.Y. Misc. LEXIS 900, at *19-20, *24-25 (Sup. Ct. Mar. 4, 2021) (granting preliminary injunction with respect to $2 million previously held in escrow account for party seeking relief and requiring that defendant "deposit the sum of $2,000,000.00 into either (i) [plaintiff's] operating account, or (ii) an escrow account designated by [plaintiff's] counsel, at the plaintiff's option").

Here, even if the Court might ultimately award money damages at the conclusion of this litigation, Shinhan nonetheless has a right to injunctive relief now in order to prevent irreparable harm to its security interest, which would be lost if the Collateral is dissipated or otherwise depleted. Shinhan loaned securities to RIA with the assurance that Shinhan could take immediate possession of its Collateral following a single failure by RIA to make a monthly payment, and that Shinhan could "make any claims or [ ] take any action . . . necessary or advisable to protect or enforce the security interest created" in the custodial securities under the SLA. Garr Aff. Ex. 1, SLA § 13. The Collateral serves as a critical security measure to protect Shinhan's interests and mitigate risk of unrecoverable losses. RIA's obstruction undermines this core protection.

RIA's obstruction, unaddressed, further causes operational and reputational harm to Shinhan. Shinhan relies on the ability to promptly enforce its collateral rights to maintain liquidity and operational stability. RIA's obstruction disrupts Shinhan's business operations, affecting its ability to engage in further securities lending. RIA's actions have also caused, and continue to cause, damage to Shinhan's reputation and financial standing in the market. Shinhan's reputation in financial markets is predicated on its ability to secure and manage its assets effectively. The

loss of its rights and security interest under the Agreements could lead to a perception of vulnerability, thereby harming its standing and credibility in the industry. Such reputational damage is inherently difficult to quantify and cannot be remedied solely through monetary damages.

### 2. Injunctive Relief Is Appropriate Given Shinhan's Conversion Claim Regarding the Collateral

Courts routinely award injunctive relief to remedy the conversion of identifiable proceeds or funds sought in the underlying action—another independent exception to the general rule that "there can be no irreparable harm from the mere loss of money." *AQ Asset Mgmt. LLC*, 111 A.D.3d at 259; *see also, e.g.*, *ALP, Inc.*, 2021 N.Y. Misc. LEXIS 900, at *19-20 ("[A]n exception to this rule exists where the monies at issue are identifiable proceeds that should be held for the party seeking injunctive relief but have been otherwise converted."). For example, in *AQ Asset Mgmt. LLC v. Levine*, during litigation of the various underlying contract, fraud, and other tort claims, the moving party sought to enjoin the defendant from disbursing certain funds that were intended for the moving party under the disputed agreement. *See AQ Asset Mgmt. LLC*, 111 A.D.3d at 259-61. The appeals court found that $2 million dollars previously held by the defendant in escrow "are identifiable proceeds that are supposed to be held for the party seeking injunctive relief" and thus "should be restrained pending the resolution of the dispute concerning the proceeds." *Id.* (reversing trial court's denial of preliminary injunction and enjoining "further disburs[ement]" of the disputed funds); *see also Amity Loans, Inc.*, 177 A.D.2d at 279 (in context of counterclaims for breach of contract and conversion, finding that "injunctive relief is appropriate to remedy the conversion of identifiable proceeds" where the moving party sought to enforce an obligation requiring that specific funds were held in trust for the movant's benefit).

That is precisely the case here, as Shinhan has brought a counterclaim against RIA, for converting both the lent securities and the Collateral that belongs to Shinhan and for which Shinhan has an immediate right of legal possession. *See* Countercl. ¶¶ 235-46 (NYSCEF Doc. No. 73). RIA is not only preventing Shinhan from taking possession of its own property, RIA has now affirmatively stated it intends to help itself to both the lent securities and the custodial securities in the Accounts. *See* Garr Aff. Ex. 6. And BNP has indicated that, contrary to the express terms of the Agreements, it is taking instruction from RIA. Garr Aff. Ex. 2 at 10, 13, 16, 19, 22. This Court's immediate intervention is needed to prevent further conversion of Shinhan's assets.

Moreover, RIA's missed borrowing rate payments and refusal to provide Shinhan with daily reports as to the status of the Collateral since May 1, 2025 are indicative of, and raise serious concerns regarding, RIA's financial stability and the improper use or dissipation of Shinhan's Collateral. This is of particular concern given RIA's failure to confirm that it is not improperly transferring or using Shinhan's Collateral. Indeed, Shinhan lacks any insight into what actions RIA has taken with respect to the Collateral, the current value of the converted funds, or whether the funds are subject to transfer or dissipation by RIA. There is a risk that RIA is or will engage in further misconduct as it relates to Shinhan's Collateral; the likelihood of such harm has only been reconfirmed by RIA's April 7 Letter, and makes an injunction that prohibits RIA from doing so all the more essential.

**3. Injunctive Relief Is Necessary to Prevent Irreparable Harm to Shinhan's Contractual Rights**

Injunctive relief is also appropriate to prevent RIA from continuing to obstruct Shinhan's bargained-for contractual rights. *See* Order to Show Cause at 3, *Arena Special Opportunities Fund, L.P. v. Arbor One Escrow, Inc.*, Index No. 650995/2023 (Sup. Ct. Dec. 8, 2023) (NYSCEF Doc. No. 238) (enjoining defendants "from[] taking any action inconsistent with the terms of any of the

[underlying agreements], including" with respect to "the collateral pledged under" the applicable agreement).

As discussed, it is undisputed that legal title to the Collateral transferred to Shinhan under the GMSLA, that Shinhan holds an irrevocable power of attorney under the Agreements, and that Shinhan has the right to take legal possession of the Accounts holding its Collateral. Garr Aff. Ex 1, SLA § 13. The irrevocable power of attorney allows, without limitation, Shinhan to execute any transfer of the custodial securities, exercise all rights and powers of RIA in respect of the custodial securities, and take any other actions to protect or enforce its security interest. *Id.* Shinhan exercised its rights on October 25, 2024, June 5, 2025, July 3, 2025, August 6, 2025, and September 10, 2025. *See* Garr Aff. Ex. 2. Shinhan again exercised its rights on April 7, 2026. *See id.* at 19-20. Each time, RIA has instructed BNP not to comply with the terms of the SLA that were agreed to by Shinhan and RIA. *See* Garr Aff. Ex. 2; *see also* Garr Aff. Ex. 6. BNP has made clear that it will not allow the exercise of the power of attorney "without direction from RIA R Squared, Inc." Garr Aff. Ex. 2 at 10, 13, 16, 19, 22. Despite the repeated and clear Events of Default for nonpayment, RIA continues to violate Shinhan's contractual rights by making false statements to BNP and obstructing Shinhan's legal right to take possession of the Accounts.

RIA's continued interference with Shinhan's contractual rights is the type of irreparable injury warranting injunctive relief. *See, e.g.*, *Bishop v. Rubin*, 228 A.D.2d 222, 224 (1st Dep't 1996) (irreparable injury when plaintiff's attempted exercise of its rights to undertake corporate action was ignored by manager defendant); *Crocker Com. Servs. v. Davan Enters.*, 88 A.D.2d 877, 877 (1st Dep't 1982) (injunction appropriate when defendant flouted plaintiff's right to certain proceeds of secured collateral provided for under financing agreement); *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 223 (4th Dep't 2009) (affirming an

injunctive order in part which sought to "enjoin [the defendant] from refusing" to act in accordance with the parties' agreement and to "comply with the procedural requirements of the [a]greement"). In seeking this order to show cause, Shinhan does not ask the Court to do anything beyond enjoining RIA from its continued interference with Shinhan's contractual rights under the Agreements, thereby preventing the further irreparable harm that will otherwise result.

**C. The Balance of Equities Favors Granting the Requested Relief**

The balance of the equities favors Shinhan. Under the Agreements, Shinhan's right to "take legal possession of the custodial accounts and custodial securities" with BNP was triggered months ago. Garr Aff. Ex. 1, SLA § 13. The terms were agreed to by the Parties, are self-executing, and were properly noticed to be exercised by Shinhan. *See* Garr Aff. Ex. 2. Enjoining RIA from obstructing Shinhan's right to its property is preserving the status quo. *See Barbes*, 140 A.D.3d at 432. Shinhan seeks to take possession of property that legally belongs to Shinhan. RIA, by contrast, is attempting to benefit from its own breach by preventing Shinhan from taking possession of its Collateral. RIA does this, while at the same time refusing to return $228 million in securities that were due back to Shinhan years ago. Failure to grant the injunctive relief will cause greater harm than if the injunction was granted. *See Deutsch v. Grunwald*, 165 A.D.3d 1035, 1037 (2d Dep't 2018) (enjoining a party from undertaking acts that impacted the moving party's property appropriate to maintain the status quo).

That Shinhan seeks this relief now does not shift the balance of equities against it, as RIA has suggested. Shinhan had been clear throughout discovery that it would move to compel the production of daily collateral reports, and that Shinhan would move the Court for the injunctive relief sought here, if necessary. *See supra* Factual Background § III. However, once the Parties began settlement discussions, Shinhan participated in good faith to seek an amicable resolution to the Parties' dispute. That RIA sought additional time during the stay of proceedings and yet

provided no comments or responses during the more than six weeks RIA had to review the draft agreements raises questions as to whether RIA's participation in settlement discussions was done in good faith at all and increases Shinhan's concerns regarding the status of the Collateral, making insight into the Accounts and access to Shinhan's Collateral all the more necessary.

To the extent RIA participated in protracted settlement negotiations merely as a delay tactic to avoid Court intervention with respect to the Collateral, RIA should not be allowed to benefit from such gamesmanship and dismiss "[a]ny purported urgency" in Shinhan's request for injunctive relief.[5] *See* RIA's Response to Shinhan's Request for Pre-Motion Conference at 2 (NYSCEF Doc. No. 96). David Kang's most recent correspondence with BNP and Shinhan, on behalf of RIA, and his statement that "BNP Paribas (or any other successor Custodian) is hereby instructed to **disregard any and all directions from Shinhan,**" makes clear that RIA's continued interference with Shinhan's legal rights in the Collateral remains a live and pressing issue that will cause Shinhan irreparable harm if left unresolved. *See* Garr. Aff. Ex. 6 (emphasis original). In any event, "mere delay . . . does not preclude the grant of an injunction." *Emigrant Bus. Credit Corp. v. Hanratty*, 2022 N.Y. Misc. LEXIS 7416, at *9 n.2, *17 (Sup. Ct. Nov. 29, 2022) (in action to recover amounts loaned to defendant, granting plaintiff's requested preliminary injunction and enjoining defendant from, among other things, "transferring, mortgaging, selling, converting, concealing, dissipating, disbursing, spending, withdrawing, disposing of, assigning, permitting the transfer of any of their assets").

[5] Indeed, at the February 25 status conference, Shinhan's counsel expressly requested—and the Court agreed—that "the additional 30 day[]" stay be granted "without prejudice to [Shinhan's] rights with respect to any injunctive relief [Shinhan would] seek with respect to the collateral." Tr. 10:13-17. (NYSCEF Doc. No. 93).

Granting the preliminary injunction also serves the public interest. *Destiny USA Holdings, LLC* 69 A.D.3d at 223 ("In ruling on a motion for a preliminary injunction, the courts must weigh the interests of the general public as well as the interests of the parties to the litigation.") (internal quotations and citations omitted). Allowing potential dissipation of assets and prohibited transfers of collateral—on top of the conversion of Shinhan's securities—has an unmistakable public-policy dimension. Moreover, granting the injunction upholds the enforceability of legal contracts, reinforces that parties cannot obstruct contractual rights without consequences, and promotes stability in the financial markets by fostering trust and reliability in commercial transactions.

## CONCLUSION

For the foregoing reasons, Shinhan respectfully requests that the Court grant the preliminary injunction to: (1) enjoin RIA from obstructing Shinhan's right to exercise its Power of Attorney, including its right to take immediate legal possession of the collateral securities pursuant to Section 13 of the SLA; (2) direct RIA to immediately cease and desist from any actions that interfere with Shinhan's exercise of its Power of Attorney or the steps set forth in Section 13 of the SLA to take legal possession of the custodial account and custodial securities at BNP; (3) pending the hearing of this motion, (a) direct RIA to produce daily collateral reports and (b) temporarily restrain RIA from using, disposing, transferring the custodial securities, pursuant to CPLR 6301; and (4) any other relief that the Court may deem just and proper.

Respectfully submitted,

New York, New York
April 20, 2026

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

It is hereby certified pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

The total number of words in this Memorandum of Law, inclusive of point headings and footnotes and exclusive of caption page, table of contents, table of authorities, signature block, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules regulations, etc., is 6,048 words.

New York, New York
April 20, 2026

By: */s/ Laura Garr*

**EXHIBIT 23**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.,<br>Plaintiff,<br>v.<br>SHINHAN SECURITIES CO., LTD.,<br>Defendant. | Index No. 659538/2024<br>Hon. Anar R. Patel, J.S.C., Part 45 |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SHINHAN SECURITIES CO., LTD.'S MOTION FOR AN ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

**WINSTON & STRAWN LLP**
George E. Mastoris
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: GMastoris@winston.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sascha N. Rand
Toby Futter
295 5th Avenue
New York, NY 10016
(212) 849-7000
sascharand@quinnemanuel.com
tobyfutter@quinnemanuel.com

*Counsel for Plaintiff RIA R Squared, Inc.*

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The GMSLA and SLA ..... 2
B. SSC's Serial Breaches of the GMSLA, SDA, and SLC ..... 4
C. SSC's Wrongful Interference with RIA's Custodial Relationships ..... 5
D. RIA's Lawful Set-Off Rights ..... 6
E. The Procedural History of SSC's Motion ..... 7

III. LEGAL STANDARD ..... 8

IV. ARGUMENT ..... 9

A. SSC HAS NOT DEMONSTRATED A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ..... 9

1. SSC Is the Admitted Defaulting Party Under the Agreements ..... 9
2. RIA's Cessation of Borrowing-Rate Payments Was a Lawful Exercise of Set-Off Rights ..... 11
3. The Court's Motion to Dismiss Decision Undermines SSC's Claim of Likelihood of Success ..... 12

B. SSC HAS NOT DEMONSTRATED IRREPARABLE HARM ..... 13

1. SSC's Harm Is Purely Economic in Nature ..... 13
2. SSC's Claims of "Operational and Reputational Harm" Are Conclusory and Unsupported ..... 15
3. SSC's Delay Undermines Its Claim of Irreparable Harm ..... 16

C. THE BALANCE OF EQUITIES FAVORS RIA ..... 17

1. Granting the Injunction Would Reward SSC as the Defaulting Party ..... 17
2. An Injunction Would Further Harm RIA and Exceed Any Harm to SSC ..... 18

V. CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barbes Rest. Inc. v. ASRR Suzer 218, LLC*,
140 A.D.3d 430 (1st Dep't 2016) ....................19

*Beal Sav. Bank v. Sommer*,
8 N.Y.3d 318 (2007) ....................10

*Berman v. TRG Waterfront Lender, LLC*,
181 A.D.3d 783 (2d Dep't 2020) ....................8, 14

*Bishop v. Rubin*,
228 A.D.2d 222 (1st Dep't 1996) ....................18

*CGI Tech. & Sols., Inc. v. N.Y. State Off. of Mental Health*,
2019 N.Y. Misc. LEXIS 6870 (Sup. Ct. Albany Cnty. Dec. 31, 2019) ....................13

*Crocker Com. Servs., Inc. v. Davan Enters., Inc.*,
88 A.D.2d 877 (1st Dep't 1982) ....................18

*Demartini v. Chatham Green, Inc.*,
169 A.D.2d 689 (1st Dep't 1991) ....................11

*Deutsch v. Grunwald*,
165 A.D.3d 1035 (2d Dep't 2018) ....................19

*DiFabio v. Omnipoint Commc'ns, Inc.*,
66 A.D.3d 635 (2d Dep't 2009) ....................14

*DS Partners LIC LLC v. CPIF MRA LLC*,
2025 N.Y. Misc. Lexis 9915 (Sup. Ct. N.Y. Cnty. Nov. 20, 2025) ....................8

*Emigrant Bus. Credit Corp. v. Hanratty*,
2022 N.Y. Misc. LEXIS 7416 (Sup. Ct. Nov. 29, 2022) ....................17

*Family-Friendly Media, Inc. v. Recorder Tel. Network*,
74 A.D.3d 738 (2d Dep't 2010) ....................13, 14, 16

*Goldman Sachs Bank USA v. Schreiber*,
2022 N.Y. Misc. LEXIS 422 (Sup. Ct. N.Y. Cnty. Jan. 6, 2022) ....................14

*John Mullins & Sons v. Komnich*,
31 N.Y.S.2d 569 (App. Term, 2d Dep't 1941) ....................15

*Kaloyeros v. Fort Schuyler Mgmt. Corp.*,
55 Misc. 3d 1082 (Sup. Ct. Albany Cnty. Mar. 24, 2017)........................................................8

*Kazantzis v. Cascade Funding RM1 Acquisitions Grantor Tr.*,
217 A.D.3d 410 (1st Dep't 2023) ......................................................................................17

*Lard-PT, LLC v. Seokoh, Inc.*,
132 N.Y.S.3d 276 (Sup. Ct. N.Y. Cnty. Oct. 20, 2020)...........................................................8

*In re Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A.*,
541 B.R. 551 (S.D.N.Y. 2015)...........................................................................................12

*Malik v. Toss 29, Inc.*,
15 Misc. 3d 1112(A) (Civ. Ct., N.Y. Cnty. Mar. 29, 2007).............................................10, 18

*Mangovski v. DiMarco*,
175 A.D.3d 947 (4th Dep't 2019)......................................................................................13

*Matos v. City of New York*,
21 A.D.3d 936 (2d Dep't 2005) ..........................................................................................9

*Mercury Serv. Sys., Inc. v. Schmidt*,
50 A.D.2d 533 (1st Dep't 1975) ........................................................................................17

*Matter of P. & E.T. Found.*,
204 A.D.3d 1460 (4th Dep't 2022).........................................................................8, 13, 15

*Spectrum Stamford, LLC v. 400 Atl. Title, LLC*,
162 A.D.3d 615 (1st Dep't 2018) ....................................................................................8, 19

*TS Falcon I, LLC v. Golden Mtn. Fin. Corp.*,
2024 N.Y. Misc. LEXIS 556 (Sup. Ct. N.Y. Cnty. Feb. 1, 2024) ..........................................14

*White Oak Com. Fin., LLC v. EIA Inc.*,
2023 WL 4149527 (Sup. Ct. N.Y. Cnty. June 23, 2023).......................................................14

*White v. F.F. Thompson Health Sys., Inc.*,
75 A.D.3d 1075 (4th Dep't 2010)......................................................................................13

**Other Authorities**

Yoon Young-sil, *Shinhan Securities to Withdraw from U.S. After Closing Shanghai Office*, BusinessKorea (Oct. 10, 2025),
https://www.businesskorea.co.kr/news/articleView.html? idxno=253820.............................18

## I. PRELIMINARY STATEMENT

SSC's request for interim injunctive relief is not just "extraordinary"; it is audacious. SSC is a publicly traded financial institution and subsidiary of Shinhan Financial Group, one of South Korea's largest banking conglomerates, and a sophisticated participant in global capital markets. SSC negotiated and executed the industry-standard Global Master Securities Lending Agreement ("GMSLA") at issue here, yet it has serially defaulted on its contractual obligations to RIA, *admitted* those defaults in writing, and now taken issue with RIA's exercise of industry-standard and contracted-for remedies. Turning the GMSLA and the protections it affords non-defaulting parties on their head, despite its admitted defaults, SSC now asks this Court to compel RIA to immediately and irreversibly transfer securities nominally valued at roughly $185 million from RIA's U.S.-based custodial accounts to SSC's accounts in Korea, potentially putting them permanently beyond RIA's reach should RIA prevail on the merits in this litigation.

In effect, without even establishing a viable counterclaim, SSC is attempting to skip over the part of this case where it has to actually *prove* its counterclaims and instead obtain the ultimate relief it is seeking *now*, and doing so despite this Court's ruling that RIA has stated a claim that SSC is in default on its 2020 and 2022 agreements to loan RIA some $900M in securities. Far from preserving the status quo, which is the usual reason litigants seek injunctive relief, SSC asks this Court to impose a mandatory injunction that, despite the Court's motion to dismiss decision, would altogether vitiate the industry-standard protections and remedies available to RIA, the non-defaulting party, under the GMSLA, the SLC, and its pending claims. This extraordinary request is unwarranted, unnecessary, and improper as a matter of fact and law.

As set forth below, SSC has not come close to satisfying the demanding standard for a mandatory preliminary injunction. SSC has failed to demonstrate clear or substantial likelihood of success on the merits, a particularly difficult task where it has admitted default under the GMSLA

and SLA and where RIA's cessation of payments to SSC is a lawful exercise of its contractual set-off rights. Nor has SSC shown irreparable harm: its claims of dissipation rest on speculation, not evidence, and the collateral at issue is made up entirely of cash and fungible securities.

The balance of equities also overwhelmingly favors RIA. Granting SSC's injunction would hand SSC the entirety of the relief it seeks before trial in the face of a RIA damages claim that far exceeds the value of the securities that RIA holds in a custodial account and is contractually entitled to retain. Moreover, in what should be a matter of grave concern for this Court, SSC is almost certainly seeking to move the securities in question outside of the Court's jurisdiction (and, for that matter, the jurisdiction of *any* U.S. court). It is a matter of public record that SSC has announced its withdrawal from U.S. and other non-Korean markets and is in the process of shuttering its U.S. operations, meaning that if its application is successful, the securities in question would be transferred to a South Korean bank account beyond the practical reach of this Court. Given the immense sway that SSC's parent company—Shinhan Financial Group—holds in Korea, and the fact that (as alleged in the Complaint) it has already used that influence to blacklist RIA from the Korean financial sector, ordering the relief SSC seeks could well spell the end of RIA's ability to recover even a fraction of the damages it has suffered as a result of SSC's breaches.

This Court should not predetermine the practical outcome of this case through the extraordinary imposition of a preliminary injunction, particularly where, as here, SSC has admitted default on breach claims asserted by RIA that this Court already held can proceed on the very same agreements that SSC now invokes. RIA respectfully requests that the Court deny SSC's Motion.

## II. FACTUAL BACKGROUND

### A. The GMSLA and SLA

On January 25, 2019, Plaintiff RIA R Squared, Inc. ("RIA") and Defendant Shinhan Securities Co., Ltd. ("SSC") entered into a Global Master Securities Lending Agreement

("GMSLA") and an accompanying Supplemental Lending Agreement for Securities Lending ("SLA"). Compl. (Dkt. 1) ¶ 2; *see generally* GMSLA and SLA (Dkt. 40). The GMSLA and SLA established the industry-standard framework for a series of securities-lending transactions: SSC would lend U.S. securities to RIA, RIA would put up certain monetary collateral and pay a fee, and upon the agreed-upon maturity of each loan, RIA would return the borrowed securities. Compl. (Dkt. 1) ¶ 2; GMSLA (Dkt. 40) § 3. If SSC failed to remit sums to RIA in accordance with the GMSLA, it undertook to pay interest that would "accrue daily on a compound basis." GMSLA (Dkt. 40) § 11.7.

The GMSLA also contains broad default provisions. Section 10.1 defines "Events of Default" that may be committed by *either* party—including the "Lender or Borrower failing to pay any sum due" (§ 10.1(c)) and the "Lender or Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations" (§ 10.1(f)). GMSLA (Dkt. 40) § 10.1. Section 11 vests well recognized, industry-standard remedial rights—acceleration, close-out netting, and set-off—exclusively in the Non-Defaulting Party. *Id.* §§ 11.1–11.2, 11.8.

Between February and October 2019, SSC lent RIA approximately $294 million in securities across multiple transactions. SSC's Answer & Countercls. (Dkt. 73) ¶ 138. In connection with each loan, and in compliance with the GMSLA and SLA, RIA deposited an agreed-upon amount of collateral securities—totaling approximately 110% of the value of the lent securities—into custodial accounts maintained at BNP Paribas ("BNP"). SLA (Dkt. 40) §§ 8, 10, 12–13. From the inception of the lending relationship, RIA provided SSC with daily collateral reports verified

by BNP—but solely as a matter of voluntary business practice, not contractual obligation, as neither the GMSLA nor the SLA imposed any affirmative duty on RIA to furnish such reports.[1]

### B. SSC's Serial Breaches of the GMSLA, SDA, and SLC

The parties' lending relationship proceeded without incident until early 2020, when SSC—facing massive liabilities from the Lime Asset Management fraud scandal and the onset of the COVID-19 pandemic—sought to shift its financial burden onto RIA. Compl. (Dkt. 1) ¶¶ 35–39; *see generally* Dkt. 105. In February 2020, SSC pressured RIA to prematurely return $94 million in loaned securities, threatening to blacklist RIA from the South Korean financial market if it refused. Compl. (Dkt. 1) ¶¶ 40–42. Although the early return of securities was not required under the SLA, RIA agreed to negotiate, and in April 2020 the parties executed a Securities Delivery Agreement ("SDA"). *Id.* ¶¶ 47–48. Under the SDA, RIA agreed to deliver $47 million in securities to SSC, and SSC committed to return those securities, lend an additional $100 million, and reduce RIA's spread payments. *Id.* ¶ 48. RIA performed in full; SSC never returned a single dollar and never extended any of the promised additional lending. *Id.* ¶¶ 49–54.

In subsequent correspondence, ***SSC admitted its breach***. On March 11, 2022, the parties executed the Statement of Facts—a jointly signed declaration of settled facts that explicitly intended to "resolve the differences between the Parties regarding obligations under the GMSLA." *See* Compl. (Dkt. 1) ¶¶ 59–61 ("SOF"). That document states:

> Around April 28, 2020, Shinhan requested that RIA early terminate certain securities lent by it under the GMSLA, and as of April 28, 2020, RIA agreed to deliver $47 million of securities in exchange for ***Shinhan's agreement to extend $100 million of additional securities for borrow and to return the $47 million of securities*** or $47 million of US Treasuries by May, 2020.

[1] Subject to an appropriate undertaking by SSC approved by the Court that ensures that SSC will not tortiously interfere in RIA's relationship with its new collateral agent (as SSC did with BNP), RIA would agree to resume providing these or similar collateral reports to SSC.

> ***To date, no additional borrow has been extended and the $47 million of securities have not been lent to RIA.***

SOF at 1–2 (emphasis added). This was an unambiguous admission by SSC that it, as of March 2022, had breached the SDA as entered by the parties in April 2020. In a December 2022 email, SSC's own representative further conceded that SSC "would have liked to fulfil[l] our transactional agreement and obligation of returning the $50MM notional and ramping up an additional $100MM notional" (as required by the SDA) but that ***"our management would not allow us to fulfil our obligations per transaction."*** Compl. (Dkt. 1) ¶ 64 (emphasis added). Later, in October 2023, SSC sought further forbearance by committing to lend $750 million in high-quality liquid securities across three tranches (the "$750M Loan Agreement" or "SLC"). Compl. (Dkt. 1) ¶¶ 65–66; *see generally* SLC (Dkt. 47). SSC never honored that commitment either, constituting yet another breach. Compl. (Dkt. 1) ¶ 88.

Through these breaches of the SDA, the GMSLA, and the SLC, SSC has repeatedly failed to deliver securities to RIA as promised, where each failure constitutes an Event of Default under the GMSLA. Specifically, under GMSLA § 10.1(c), a failure to deliver securities constitutes an Event of Default; under § 10.1(f), a party's admission that it is unable to, or intends not to, perform its obligations constitutes an Event of Default; and under § 10.1(i), a failure to perform any other obligation under the GMSLA and/or in respect of any Loan constitutes an Event of Default. *See* GMSLA (Dkt. 40) § 10.1.

### C. SSC's Wrongful Interference with RIA's Custodial Relationships

Unwilling to fulfill its contractual obligations and failing to recognize the consequences of its own breaches, SSC resorted to a campaign of wrongful interference with RIA's third-party relationships. Beginning in October 2024, SSC sent a series of at least six letters directly to BNP—the custodian for RIA's custodial securities—each time purporting to declare events of default

under the GMSLA and demanding that BNP immediately transfer the securities into SSC's own accounts. Compl. (Dkt. 1) ¶¶ 69–74. BNP rejected SSC's directives each time, advising that it was "not authorized to accept [SSC's] instructions" absent direction from RIA. Affirmation of Laura Garr in Support of SSC's Order to Show Cause ("Garr Aff.") Ex. 2 (Dkt. 128) at 10, 13, 16, 19, 22. Despite this rebuff, and despite RIA's demand that SSC cease its interference, SSC continued sending letters to BNP through at least April 2026, repeating the same demands. *See id.* at 19–20 (April 7, 2026 letter); *id.* at 22 (BNP's April 14, 2026 response reiterating that it was "not authorized to accept [SSC's] instructions").

### D. RIA's Lawful Set-Off Rights

Upon SSC's Events of Default, RIA's rights under the GMSLA's set-off provision were triggered. GMSLA § 11.8 provides that "[a]ny amount payable to one Party (the Payee) by the other Party (the Payer) … may, at the option of the Non-Defaulting Party, be reduced by its set-off against any amount payable … by the Payee to the Payer … under any other agreement between the Payee and the Payer." GMSLA (Dkt. 40) § 11.8 (emphasis omitted). The SLC reiterates and expands on that provision, both because it is "any other agreement" as defined in the GMSLA and because it independently entitles RIA, as the Non-Defaulting Party, "without prior notice to any person," to "set off any sum or obligation … owed by the Defaulting Party … against any sum or obligation … owed by [RIA] to [SSC]"—whether or not arising under the Agreement, whether matured or unmatured, and whether ascertained or unascertained. SLC (Dkt. 47) at 4. In other words, as is standard in capital market securities lending frameworks, the GMSLA and SLC together authorize RIA to recover from the value of SSC's securities any amounts—including yet-to-be-determined losses flowing from SSC's breach, with daily compounding interest—owed to RIA.

RIA's counsel repeatedly detailed RIA's well recognized rights in writing to SSC, including in June and September 2025, when they explained that "the [SLC], 'without prejudice and in addition to the right of set-off in' § 11.2 of the GMSLA, provides for an independent right of set-off directly applicable here" and that "RIA could, if it so chose, simply cease making borrowing and spread payments altogether."[2] Garr Aff. Ex. 3 (Dkt. 129) at 7, 9 (Notices of Election of Set-Off Rights). On April 8, 2026, RIA served a formal Termination Notice and Close-Out Netting Statement under GMSLA §§ 10.1 and 11. Garr Aff. Ex. 6 (Dkt. 132). RIA's initial netting statement calculated a gross close-out amount of $2,595,188,892, reflecting the full scope of SSC's defaults including the SLC (which, if found to be enforceable, superseded the prior SDA). *Id.* at 6. Even if the Court ultimately concludes that only a fraction of RIA's Termination Notice and Close-Out Netting Statement balance is due to RIA from SSC, the outcome will be that SSC owes RIA far more than the value of the securities—not the reverse.

**E. The Procedural History of SSC's Motion**

On December 9, 2024, RIA commenced this action, asserting claims for breach of contract (GMSLA, SLA, SDA, and SLC), fraudulent inducement, and breach of the covenant of good faith and fair dealing. *See generally* Compl. (Dkt. 1). On April 8, 2025, SSC filed a Motion to Dismiss (Dkt. 55), which the Court denied as to Counts I through III—finding that RIA adequately pleaded breach of the GMSLA, the SLA, the SDA, and the SLC, and adequately pleaded fraudulent inducement. Order on SSC's Motion to Dismiss (Dkt. 71). SSC subsequently filed its Answer and Counterclaim on September 2, 2025. SSC's Answer & Countercls. (Dkt. 73).

---

[2] RIA acknowledges that its Complaint, filed in December 2024, represented that RIA would "continue to make all borrowing rate and coupon payments during the pendency of this proceeding." Compl. (Dkt. 1) ¶ 71. And it did just that for six months—until SSC's campaign to interfere with RIA's business relationships bore fruit, fundamentally altering the operational landscape and compelling RIA to pursue the exercise of its contractual set-off rights.

SSC admits that RIA stopped making borrowing-rate payments in May 2025 and stopped providing collateral reports around the same time. SSC's Answer & Countercls. (Dkt. 73) ¶¶ 187, 226. Notwithstanding this fact, SSC did not file the instant Order to Show Cause until April 20, 2026—approximately *eleven months* after RIA's alleged default. SSC attributes this delay to settlement discussions and the parties' agreement to stand down from discovery and motion practice while those were ongoing. Fair enough, but those discussions did not commence until October 2025—*five months after* the conduct that purportedly gave rise to SSC's request for "emergency" relief. Tellingly, at no point during that time period did SSC suggest it was suffering the kind of imminent, irreparable harm that would justify the extraordinary remedy it now seeks.

## III. LEGAL STANDARD

Preliminary injunctive relief is "'a drastic remedy' not routinely granted." *Matter of P. & E.T. Found.*, 204 A.D.3d 1460, 1461 (4th Dep't 2022); *see also Lard-PT, LLC v. Seokoh, Inc.*, 132 N.Y.S.3d 276, at *13 (Sup. Ct. N.Y. Cnty. Oct. 20, 2020). A movant must demonstrate by clear and convincing evidence: (1) a likelihood of ultimate success on the merits; (2) irreparable injury if the preliminary injunction is withheld; and (3) a balance of equities tipping in the moving party's favor. *Matter of P. & E.T. Found.*, 204 A.D.3d at 1461; *DS Partners LIC LLC v. CPIF MRA LLC*, 2025 N.Y. Misc. Lexis 9915, at *2–3 (Sup. Ct. N.Y. Cnty. Nov. 20, 2025); *Kaloyeros v. Fort Schuyler Mgmt. Corp.*, 55 Misc. 3d 1082, 1089–91 (Sup. Ct., Albany Cnty. Mar. 24, 2017). "[A]bsent extraordinary circumstances, a preliminary injunction will not issue where to do so would grant the movant the ultimate relief to which he or she would be entitled in a final judgment." *Berman v. TRG Waterfront Lender, LLC*, 181 A.D.3d 783, 784–85 (2d Dep't 2020). The purpose of a preliminary injunction is to maintain the status quo—not to grant the movant everything it seeks before trial. *Spectrum Stamford, LLC v. 400 Atl. Title, LLC*, 162 A.D.3d 615, 616 (1st Dep't 2018).

Moreover, SSC does not merely seek a prohibitory injunction—it seeks a *mandatory* one. This "is an extraordinary and drastic remedy which is rarely granted and then only under unusual circumstances where such relief is essential to maintain the status quo pending trial of the action." *Matos v. City of New York*, 21 A.D.3d 936, 937 (2d Dep't 2005). The standard for such relief is much higher than for a prohibitory injunction: the movant must demonstrate either a clear or substantial likelihood of success on the merits, or that extreme or very serious damage will result from a denial of the motion. *See Matos,* 21 A.D.3d at 937. SSC falls well short of meeting that exacting standard.

## IV. ARGUMENT

### A. SSC HAS NOT DEMONSTRATED A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

SSC has not demonstrated anywhere near a clear or substantial likelihood of success on the merits. *See Matos*, 21 A.D.3d at 937 (recognizing that a mandatory injunction is "an extraordinary and drastic remedy" subject to a heightened showing). Nor could it, as ***SSC is the admitted defaulting party*** under the relevant agreements and the Court has already credited RIA's claims at the pleading stage. As a result, it beggars belief that SSC could plausibly argue *any* likelihood of success, let alone the heightened likelihood of success required for a mandatory injunction.

#### 1. SSC Is the Admitted Defaulting Party Under the Agreements

SSC's entire motion rests on the premise that RIA's nonpayment of monthly borrowing rates constitutes an Event of Default entitling SSC to exercise its irrevocable power of attorney under SLA § 13. But to even contemplate this premise requires the Court to ignore that SSC ***already admitted to being the defaulting party*** under the GMSLA. SSC thus remarkably asks this Court to ignore its default (which allowed RIA to terminate the parties' agreement), decide there is a high likelihood of a new default by RIA, and then impose final default-triggered remedies

against RIA, the original ***non-defaulting party***, all on the basis of speculative theories of harm. The law does not permit such a result.

First, at the outset, a party in material breach cannot enforce the contract against its counterparty. Counter to RIA's alleged defaults—which RIA disputes constitute defaults under the relevant agreements—SSC's defaults are neither trivial nor disputed. SSC failed to deliver $147 million in securities under the SDA by May 2020 and has never cured that breach—an obligation SSC itself acknowledged in the SOF signed by both parties on March 11, 2022. Compl. (Dkt. 1) ¶¶ 59–61. Moreover, SSC failed to deliver any of the three tranches of securities under the SLC executed on November 13, 2023, each of which constitutes an independent Event of Default under the GMSLA and the SLC. *See* GMSLA (Dkt. 40) §§ 10.1(c), 10.1(f), 10.1(i); SLC (Dkt. 47). Because a party in default cannot invoke default-triggered remedies against its counterparty, were any party to have a high likelihood of success, that party is RIA, not SSC. *Malik v. Toss 29, Inc.*, 15 Misc. 3d 1112(A), at *7 (Civ. Ct., N.Y. Cnty. Mar. 29, 2007) ("[A] breaching party waives its right to enforce a contractual provision in its (his/her) favor when that party is responsible for the breach.").

Second, the GMSLA and SLA form a single integrated transaction. The SLA expressly "supersedes the agreement for the purpose of Securities Lending" and was executed simultaneously with the GMSLA on January 25, 2019. SLA (Dkt. 40) § 1. Events of default under the GMSLA—which SSC has triggered—cannot be ignored when construing the SLA's default provisions. The GMSLA and SLA must be "read as a whole, and every part will be interpreted with reference to the whole." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007). SSC cannot cherry-pick SLA § 13 while ignoring GMSLA §§ 10.1 and 11.

At a minimum, this question of who is the "Defaulting Party" under the GMSLA is highly disputed, with the Court having already credited RIA's allegations that it is SSC that is in default. This defeats any claim of a "clear or substantial" likelihood of success from SSC. SSC cites *Demartini v. Chatham Green, Inc.*, 169 A.D.2d 689 (1st Dep't 1991), for the proposition that it can establish a likelihood of success on the merits (Motion at 10), but the facts of *Demartini* are inapposite, as there was no dispute as to whether the plaintiff was in default, no question of competing contractual obligations, and no contested set-off defense (detailed below). Here, by contrast, the question of who is the "Defaulting Party" is actively contested. Ultimately, SSC's unclean hands—its alleged serial breaches, repeated admissions of default, and fraudulent inducement—are the root cause of this dispute, and SSC should not be permitted to use the Court's equitable powers to profit from its inequitable conduct.

### 2. RIA's Cessation of Borrowing-Rate Payments Was a Lawful Exercise of Set-Off Rights

Even setting aside SSC's earlier default, SSC cannot establish a likelihood of success on the merits, as it cannot show breach where RIA was merely exercising its contractual right of set-off provided by the parties' agreements. GMSLA § 11.8 provides that, upon an Event of Default, any amount payable by one party may be reduced by setoff against any amount payable by the other party "under any other agreement between the Payee and the Payer." GMSLA (Dkt. 40) § 11.8. The SLC reinforces and expands on that provision, entitling the Non-Defaulting Party to set off any sum or obligation owed by the Defaulting Party—"without prior notice to any person," whether matured or unmatured, and whether ascertained or unascertained. SLC (Dkt. 47) at 4. Simply put, RIA is entitled to offset any amounts owed by SSC to RIA, ***including*** amounts flowing from SSC's undisputed breach of the underlying agreements, and to the extent RIA is withholding from SSC payments under an express contractual right—that is not a "nonpayment" that triggers

a remedial default clause. *See, e.g.*, *In re Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A.*, 541 B.R. 551, 570 (S.D.N.Y. 2015) (recognizing that non-defaulting party's exercise of contractual lien and set-off rights was authorized by the parties' agreements, and "a party does not breach an agreement by behaving as the instrument permitted").[3]

Because RIA's damages claims—which include hundreds of millions of dollars arising from SSC's breach of the SDA, its failure to deliver any securities under the SLC, and SSC's fraudulent inducement of RIA into entering the SDA—vastly exceed any borrowing-rate obligations SSC claims RIA has, and, in fact, exceed the amount of collateral entirely, RIA cannot be said to be in breach. In fact, RIA is well within its rights to permanently maintain possession of the collateral, and to recover from it the total amount of damages flowing from SSC's admitted Event of Default. *See* GMSLA (Dkt. 40) § 11.8; SLC (Dkt. 47) at 4.

### 3. The Court's Motion to Dismiss Decision Undermines SSC's Claim of Likelihood of Success

Finally, this Court has already considered the central factual disputes underlying SSC's motion and declined to resolve them in SSC's favor. On July 31, 2025, the Court denied SSC's motion to dismiss Counts I through III, finding that SSC's "documentary evidence did not conclusively resolve" the disputes in its favor. Order on SSC's Motion to Dismiss (Dkt. 71) at 6–12. Those same disputes—whether the SDA was binding, whether SSC breached, whether the SLC was an enforceable commitment, and ultimately who is the Defaulting Party—fundamentally undermine SSC's asserted "present right to possession" of the collateral. To be sure, the motion-

---

[3] SSC may argue that no Event of Default was operative when RIA withheld payment because RIA had not yet served formal written notice under GMSLA § 10.1. But Section 10.1(f) is triggered when a party "admi[ts] to the other that it is unable to, or it intends not to, perform." SSC's December 2022 email—in which it conceded that its management "would not allow [it] to fulfil [its] obligations per transaction"—was precisely such an admission, and it has been operative and continuing since that date. Compl. (Dkt. 1) ¶ 64. RIA's June 2025 counsel letter (Dkt. 129) merely served to memorialize that Event of Default as detailed in Section 10.1.

to-dismiss standard differs from the preliminary-injunction standard. But the denial of SSC's motion to dismiss confirms that the merits remain sharply contested and unresolved. Where the merits are so genuinely disputed, a movant cannot establish a "reasonable probability of success"—let alone the higher "clear or substantial" likelihood that a mandatory injunction requires—on a preliminary record.

## B. SSC HAS NOT DEMONSTRATED IRREPARABLE HARM

Even if SSC could establish likelihood of success on the merits, which it cannot, its motion would still fail because SSC has not satisfied its burden of demonstrating irreparable harm, the cornerstone of the equitable relief analysis. *CGI Tech. & Sols., Inc. v. N.Y. State Off. of Mental Health*, 2019 N.Y. Misc. LEXIS 6870, at *15–22 (Sup. Ct. Albany Cnty. Dec. 31, 2019); *White v. F.F. Thompson Health Sys., Inc.*, 75 A.D.3d 1075, 1076–77 (4th Dep't 2010). Critically, a movant must go beyond merely showing that irreparable harm is possible; instead, it must show that irreparable harm is "likely" and "imminent, not remote or speculative." *Matter of P. & E.T. Found.*, 204 A.D.3d at 1463; *Family-Friendly Media, Inc. v. Recorder Tel. Network*, 74 A.D.3d 738, 739 (2d Dep't 2010). Here, where the assets at issue are entirely fungible and SSC's theories of harm are conclusory and unsupported by the facts, that burden is impossible to meet.

### 1. SSC's Harm Is Purely Economic in Nature

As a threshold matter, SSC's motion is undone entirely by the fact that the assets it is seeking to appropriate—the collateral—consist of completely fungible assets tantamount to money. The underlying claims on both sides are for monetary damages, and SSC seeks in its motion the return of lent securities (with a market value of approximately $185 million). Because damages are calculable and SSC could be made whole by a monetary judgment, it cannot establish irreparable harm. *See, e.g.*, *Mangovski v. DiMarco*, 175 A.D.3d 947, 948–49 (4th Dep't 2019);

*Berman v. TRG Waterfront Lender, LLC*, 181 A.D.3d 783, 784–85 (2d Dep't 2020); *DiFabio v. Omnipoint Commc'ns, Inc.*, 66 A.D.3d 635, 636–37 (2d Dep't 2009).

To avoid this result, SSC attempts to invoke an exception to the general rule that "there can be no irreparable harm from the mere loss of money," arguing that the "potential loss or dissipation of a secured creditor's collateral constitutes irreparable harm." Motion at 11. Each of SSC's cited cases, however, is readily distinguishable, as each involved an undisputed non-defaulting creditor and affirmative evidence of actual dissipation of assets—not mere speculation.[4] Here, SSC is the *admitted defaulting party* and has offered no evidence that RIA has dissipated or depleted any collateral such that it would not be entirely recoverable at a later time.[5] At most, SSC points to a lack of *information* concerning the assets—*i.e.*, the cessation of daily collateral reports and RIA's objections to certain discovery requests—which do not constitute evidence of actual dissipation of the assets or a suggestion that they no longer exist. Moreover, those reports were a *voluntary* business practice, not a contractual obligation—neither the GMSLA nor the SLA imposed any affirmative duty on RIA to furnish them. Because SSC's entire theory of dissipation rests on a factual vacuum that it asks this Court to fill with speculation, the relief it seeks is forbidden by New York law. *Family-Friendly Media*, 74 A.D.3d at 739–40 (denying preliminary

---

[4] *Goldman Sachs Bank USA v. Schreiber*, 2022 N.Y. Misc. LEXIS 422 (Sup. Ct., N.Y. Cnty. Jan. 6, 2022) (defendant actually sold collateral assets in direct contravention of governing documents); *White Oak Com. Fin., LLC v. EIA Inc.*, 2023 WL 4149527 (Sup. Ct., N.Y. Cnty. June 23, 2023) (defendant was actually using and disposing of collateral property); *TS Falcon I, LLC v. Golden Mtn. Fin. Corp.*, 2024 N.Y. Misc. LEXIS 556 (Sup. Ct., N.Y. Cnty. Feb. 1, 2024) (defendants actively taking steps to dissipate collateral through specific, identified transactions).

[5] In fact, if anyone, the party that destabilized the custodial arrangement was *SSC*, as SSC's repeated demands to BNP—each rejected—directly impaired RIA's custodial access and downstream relationships. BNP's November 1, 2024 response was unequivocal: "BNP Paribas is not authorized to accept your instructions." Affirmation of Laura Garr in Support of SSC's Motion to Dismiss Ex. 7 (Dkt. 46). SSC's own extrajudicial conduct caused the disruption, and it should not be permitted to claim irreparable harm from the disruption it created.

injunction where plaintiff "failed to point to any imminent and non-speculative harm"); *see Matter of P. & E.T. Found.*, 204 A.D.3d at 1461 (the prospect of irreparable harm must be "imminent, not remote or speculative").

At bottom, what SSC seeks is a 100% advance on the monetary damages it hopes to recover as part of this litigation, while ignoring the much larger countervailing liability that RIA asserts against it. That would be a massive stretch under the most egregious circumstances. But here, where there isn't *any* allegation—let alone any actual *evidence*—that RIA is insolvent or might be unable to satisfy a judgment, there is no basis whatsoever for SSC's requested relief. Irrespective of whether the custodial securities remain in a custodial account or whether RIA exercises its lawful contractual recovery rights, as discussed *infra* in Parts II.D & IV.A.2, the collateral securities or their cash equivalent will remain within the United States and within the jurisdiction of this Court—fully available to satisfy a judgment in favor of SSC (unlikely as that may be)[6] or part of a judgment in RIA's favor. Simply put, if SSC ultimately prevails at trial, it can recover the securities or their monetary value through a money judgment enforceable against a solvent, U.S.-based counterparty. That is the very definition of an adequate remedy at law.

### 2. SSC's Claims of "Operational and Reputational Harm" Are Conclusory and Unsupported

In a nod to the frailty of its collateral-based irreparable harm argument, SSC's motion also asserts that it can show irreparable harm because "RIA's obstruction disrupts Shinhan's business operations" and causes "damage to Shinhan's reputation and financial standing in the market."

[6] SSC argues that because it asserted a conversion counterclaim regarding the collateral, injunctive relief is independently warranted. Motion at 14–15. But a conversion claim is, by definition, a claim for money damages: the value of the converted property. *John Mullins & Sons v. Komnich*, 31 N.Y.S.2d 569, 570 (App. Term, 2d Dep't 1941) ("The only judgment which can be rendered in a conversion action is for damages based upon the value of the property converted at the time of the conversion."). The mere pendency of a conversion claim does not, without more, establish irreparable harm.

Motion at 13. But this is mere boilerplate. SSC offers no particularized evidence to support these assertions—no affidavit detailing internal disruption at SSC or reputational harm, no evidence of business lost or reputational harm, no market reports. Indeed, SSC offers no proof of harm at all—a glaring (and dispositive) failure given that the conduct allegedly giving rise to that harm arose at the latest in May 2025 (and, given that SSC has been trying to terminate the GMSLA and reclaim its securities since early 2022, perhaps far longer than that).

Courts routinely reject such conclusory assertions as insufficient to establish irreparable harm. *See Family-Friendly Media*, 74 A.D.3d at 739–40 (denying preliminary injunction where plaintiff made "only conclusory allegations and failed to point to any imminent and non-speculative harm"). Moreover, as with the collateral, "[e]conomic loss, which is compensable by money damages, does not constitute irreparable harm." *Id.* at 739. And even if that weren't true, SSC's theory does not make any sense where it is the ***admitted defaulting party***. If anyone has suffered reputational harm in this dispute, it is RIA—as the direct and foreseeable consequence of SSC's admitted breaches and ongoing wrongful interference with BNP and RIA's business in South Korea. It thus comes with particular ill-grace for SSC—who spilled all this milk in the first place—to cry foul over it, as well.

**3. SSC's Delay Undermines Its Claim of Irreparable Harm**

SSC's delay only further underscores the futility of its Motion. SSC admits it knew of RIA's alleged defaults as early as December 2021. Motion at 4. It sought no injunctive relief for more than four and a half years. It voluntarily entered settlement negotiations and agreed to a stay of proceedings in January 2026. *See, e.g.*, Stipulation and Order for Stay (Dkt. 91). It was not until February 2026—***nine months after RIA's cessation of reporting and borrowing-rate payments***—that SSC suddenly discovered an "emergency" that required it to notify the Court. *See* Transcript of February 25, 2026 Court Proceedings (Dkt. 93). This Court has already signaled doubt about

the urgency of SSC's claims by, when signing the Order to Show Cause, striking paragraph 4—the TRO provision—in its entirety. Order to Show Cause (Dkt. 135) at 2. While courts may decline TROs on various grounds, the Court's decision not to impose interim restraints—after reviewing SSC's papers—is at minimum consistent with the conclusion that SSC's claimed harm does not rise to the level of urgency required for extraordinary relief.

SSC misplaces reliance on *Emigrant Bus. Credit Corp. v. Hanratty* for the proposition that "mere delay" does not preclude an injunction. Motion at 20–21. The *Emigrant* court's reference to delay was dictum offered in a footnote, in a case involving affirmative evidence of dissipation, including allegations of insolvency, fraudulent transfers, and misappropriation of collateral. *See* 2022 N.Y. Misc. LEXIS 7416, at *9 n.2 (Sup. Ct. Nov. 29, 2022). SSC has presented no similar evidence. Here, the eleven-month gap between RIA's alleged default and SSC's motion (or even a five-month gap between that default and the commencement of settlement communications) is not a procedural footnote—it is direct evidence that SSC does not face imminent, irreparable harm. *Kazantzis v. Cascade Funding RM1 Acquisitions Grantor Tr.*, 217 A.D.3d 410, 412 (1st Dep't 2023) (affirming the denial of plaintiff's motion for a preliminary injunction "particularly given his delays in seeking injunctive relief"); *Mercury Serv. Sys., Inc. v. Schmidt*, 50 A.D.2d 533, 533 (1st Dep't 1975) (denying the grant of a preliminary injunction because movant's three-and-a-half month delay in seeking relief cut against a finding of irreparable harm).

### C. THE BALANCE OF EQUITIES FAVORS RIA

#### 1. Granting the Injunction Would Reward SSC as the Defaulting Party

The entire well-established architecture of the GMSLA's default provisions—close-out netting, acceleration, set-off—exists to protect the Non-Defaulting Party from precisely the conduct SSC has engaged in: years of non-performance followed by an attempt to seize the counterparty's collateral. Granting SSC possession while its six-year default remains unresolved

would invert this framework and reward the very breach that gave rise to this litigation. "[A] breaching party waives its right to enforce a contractual provision in its (his/her) favor when that party is responsible for the breach." *Malik*, 15 Misc. 3d 1112(A), at *7. Indeed, as explained, *supra* § II.B, SSC has serially defaulted on its contractual obligations and repeatedly admitted those defaults in writing, all while—on two separate occasions—acknowledging RIA's "exemplary track record and performance of all obligations between the parties." Compl. (Dkt. 1) ¶ 55. Moreover, as the netting analysis above confirms, on any reasonable contractual reckoning it is SSC that owes RIA—not the reverse. Granting SSC possession under these circumstances would not preserve the status quo; it would award SSC a windfall to which it is not entitled under the contract.[7]

### 2. An Injunction Would Further Harm RIA and Exceed Any Harm to SSC

Even were SSC not the admitted defaulting party, the equities would still tip in RIA's favor because the relief that SSC seeks is potentially irreversible. SSC is a Korean financial institution that is headquartered in Seoul and that has recently announced that it is withdrawing from the United States.[8] The present motion therefore appears to be SSC's attempt at an asset grab—contrary to the parties' contractual agreements and despite RIA's pending lawsuit against it—

[7] SSC's reliance on *Bishop v. Rubin*, 228 A.D.2d 222 (1st Dep't 1996), and *Crocker Commercial Services, Inc. v. Davan Enterprises, Inc.*, 88 A.D.2d 877 (1st Dep't 1982), is misplaced. In neither case was there any dispute as to which party was at fault, any competing claim of default, or any contractual set-off defense. Here, by contrast, SSC—the admitted defaulting party—seeks equitable relief against a counterparty that holds disputed set-off rights under the very agreements SSC invokes. That posture is fundamentally incompatible with the equitable principles underlying *Bishop* and *Crocker*, and SSC's reliance on them should be rejected.

[8] *See* Yoon Young-sil, *Shinhan Securities to Withdraw from U.S. After Closing Shanghai Office*, BusinessKorea (Oct. 10, 2025), https://www.businesskorea.co.kr/news/articleView.html?idxno=253820 (announcing Shinhan is recalling staff from its Silicon Valley office and reviewing the sale of its New York subsidiary.)

before SSC exits the jurisdiction. Should this Court grant the injunction, the custodial securities would be transferred from RIA's U.S. custodial accounts to SSC's Korean accounts, and RIA's ability to obtain meaningful relief—should it ultimately prevail—will be dramatically constrained.[9]

By contrast, denial of the injunction preserves the status quo: the securities or their cash equivalent will remain in the United States, fully within the jurisdiction of this Court, available to satisfy any judgment in SSC's favor should SSC prevail. Because, as detailed above, there are no credible allegations or claims of impending insolvency or dissipation by RIA, the securities or their cash equivalent would therefore remain available irrespective of who prevails in this lawsuit.

Compounding the asymmetry, the relief SSC seeks is the very relief it would obtain on final judgment. Both SSC's counterclaims *and* its Order to Show Cause seek possession of the collateral. Granting the Order to Show Cause would therefore hand SSC its ultimate remedy midway through the case—an outcome the law of preliminary injunctions forecloses. *See Spectrum Stamford, LLC v. 400 Atl. Title, LLC*, 162 A.D.3d 615, 616 (1st Dep't 2018) ("[T]he ordinary function of a preliminary injunction is not to determine the ultimate rights of the parties, but to maintain the status quo until there can be a full hearing on the merits."). At bottom, SSC is looking to circumvent the legal process by obtaining the relief it seeks and absconding with its alleged winnings halfway through this case. Because the potentially irreversible nature of the relief SSC seeks, combined with the availability of an adequate remedy at law if the injunction is denied,

[9] SSC's citations to *Barbes* and *Deutsch* for the proposition that its requested relief merely "preserves the status quo" are inapposite, as, unlike here, both cases involved injunctions that maintained—rather than altered—the existing state of affairs. *Barbes Rest. Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430, 431–32 (1st Dep't 2016) (granting injunction to *toll* a lease cancellation date, thereby keeping the parties in the position they were in before the dispute arose); *Deutsch v. Grunwald*, 165 A.D.3d 1035, 1037–38 (2d Dep't 2018) (enjoining party from disposing of disputed property to maintain existing state of affairs).

overwhelmingly tips the equities in RIA's favor, this Court should deny SSC's motion and keep the funds where they are today: under RIA's control.

Finally, the public interest weighs decisively against SSC. The GMSLA is the internationally recognized ISLA-form master agreement governing billions of dollars in institutional securities lending transactions. Its default and netting provisions are designed for predictable, self-executing enforcement—a feature that underpins the stability of global securities markets. Granting injunctive relief to an admitted defaulting party that has bypassed those provisions would invert that internationally recognized framework, destabilize market participants who rely on it, and undercut this Court's longstanding commitment to predictable enforcement of standardized commercial agreements in the Commercial Division.

## V. CONCLUSION

For the foregoing reasons, SSC's motion for a preliminary injunction and temporary restraining order should be denied in its entirety.

Dated: May 5, 2026

Respectfully submitted,

*/s/ George E. Mastoris*
George E. Mastoris
**WINSTON & STRAWN, LLP**
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: GMastoris@winston.com

Sascha N. Rand
Toby Futter
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
295 5th Avenue
New York, NY 10016
(212) 849-7000
sascharand@quinnemanuel.com
tobyfutter@quinnemanuel.com

*Counsel for Plaintiff RIA R Squared, Inc.*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

I certify that pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

The total number of words in this Memorandum of Law, inclusive of point headings and footnotes and exclusive of caption page, table of contents, table of authorities, signature block, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 6,733 words.

New York, New York
May 5, 2026

/s/ *George E. Mastoris*

**EXHIBIT 24**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 45

---------------------------------------------------------------X

RIA R Squared, Inc.,

Plaintiff,

- v -

Shinhan Securities Co., Ltd.

Defendant.

---------------------------------------------------------------X

**INDEX NO.** 659538/2024

**MOTION DATE** 04/13/2026

**MOTION SEQ. NO.** 004

**DECISION + ORDER ON MOTION**

**HON. ANAR RATHOD PATEL:**

The following e-filed documents, listed by NYSCEF document number (Motion 004) 118, 119, 120, 121, 122, 136, 137, 138, 139, 140 were read on this motion to COMPEL DISCOVERY.

Upon the foregoing documents, and pursuant to the reasons stated on the record following oral argument held on May 12, 2026, it is hereby

**ORDERED** that Defendant's Shinhan Securities Co., Ltd. Motion to Compel (Motion 004) is GRANTED in its entirety; and it is further

**ORDERED** that Plaintiff RIA R Squared, Inc. shall produce documents responsive to Defendant's April 2025 Requests for Production (Requests 17 and 20); and it is further

**ORDERED** that Plaintiff RIA R Squared, Inc. shall produce documents responsive to Defendant's July 2025 Requests for Production (Request 1); and it is further

**ORDERED** that Plaintiff is directed to produce the aforementioned documents within fourteen (14) days of the electronic filing of this Decision and Order; and it is further

**ORDERED** that the daily collateral reports requested in Defendant's July 2025 Requests for Production (Request 1) shall be produced by Plaintiff to Defendant on an ongoing basis absent further Order of this Court; and it is further

**ORDERED** that, notwithstanding the Court's directives herein, the prevailing party in any discovery-related motion may, subject to the Court's discretion, recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in litigating the motion (*see Etkin v. Sherwood Residential Mgmt. LLC*, 233 A.D.3d 566 (1st Dept. 2024); and it is further

**ORDERED** that movant shall file a obtain and file a copy of today's transcript within thirty (30) days of this Decision and Order.

The foregoing constitutes the Decision and Order of this Court.

**05/12/2026**
**DATE**

A. R. Patel
**ANAR RATHOD PATEL, A.J.S.C.**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **CHECK ONE:** | | **CASE DISPOSED** | | | X | **NON-FINAL DISPOSITION** | | |
| | X | **GRANTED** | | **DENIED** | | **GRANTED IN PART** | | **OTHER** |
| **APPLICATION:** | | **SETTLE ORDER** | | | | **SUBMIT ORDER** | | |
| **CHECK IF APPROPRIATE:** | | **INCLUDES TRANSFER/REASSIGN** | | | | **FIDUCIARY APPOINTMENT** | | **REFERENCE** |

**EXHIBIT 25**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>SHINHAN SECURITIES CO., LTD.,<br><br>*Defendant.* | Index No.<br>659538/2024<br><br>Hon. Anar R. Patel,<br>A.J.S.C., Part 45 |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT**
**SHINHAN SECURITIES CO., LTD.'S MOTION FOR SANCTIONS**

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Trudy Smith
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
trudy.smith@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

RELEVANT FACTUAL BACKGROUND ..... 4

I. THE COLLATERAL WAS SECURITY INTEREST FOR THE LOAN ..... 4

II. RIA MISLED BNP AND SHINHAN AND INVOKED SETTLEMENT TO DELAY COURT INTERVENTION ..... 5

III. RIA'S REPEATED MISREPRESENTATIONS TO THIS COURT AND SHINHAN ..... 7

IV. RIA'S VIOLATION OF THE MAY 12 ORDER CONFIRMS WILLFULNESS ..... 12

ARGUMENT ..... 14

I. SANCTIONS SHOULD BE IMPOSED AGAINST RIA UNDER CPLR § 3126 ..... 15

A. RIA's Non-Compliance Was Willful and Sanctions Are Warranted ..... 15

B. The Court Should Draw Adverse Inferences Against RIA ..... 18

C. RIA Should Be Precluded from Offering Evidence It Has Withheld ..... 20

II. RIA SHOULD BE REQUIRED TO PAY SHINHAN'S ATTORNEY'S FEES AND COSTS ..... 21

CONCLUSION ..... 23

CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17 ..... 1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arpino v. F.J.F. & Sons Elec. Co., Inc.*,
102 A.D.3d 201 (2d Dep't 2012) .......... 19

*Congleton v. United Health Services Hosps.*,
67 A.D.3d 1148 (3d Dep't 2009) .......... 18

*Dagro Assocs. II, LLC v. Chevron U.S.A., Inc.*,
206 A.D.3d 793 (2d Dep't 2022) .......... 20

*Fish & Richardson, P.C. v. Schindler*,
75 A.D.3d 219 (1st Dep't 2010) .......... 15

*Gen. Motors Acceptance Corp. v. N.Y. Cent. Mut. Fire Ins. Co.*,
104 A.D.3d 523 (1st Dep't 2013) .......... 16, 18, 19, 20

*Hicks v. Unitrin Advantage Ins. Co.*,
246 A.D.3d 1489 (4th Dep't 2026) .......... 16, 18

*Himani v. Isani*,
2022 N.Y. Misc. LEXIS 4459 (N.Y. Sup. Ct. June 3, 2022) .......... 19

*Horizon Inc. v. Wolkowicki*,
55 A.D.3d 337 (1st Dep't 2008) .......... 19

*Jackson v. Opencommunications Omnimedia LLC*,
2015 WL 8773024 (Sup. Ct. N.Y. Cty. 2015) .......... 25

*Kihl v. Pfeffer*,
94 N.Y.2d 118 (N.Y. 1999) .......... 15

*Levy v. Carol Mgmt. Corp.*,
260 A.D.2d 27 (1st Dep't 1999) .......... 23

*Lucas v. Stam*,
147 A.D.3d 921 (2d Dep't 2017) .......... 16, 17, 22

*Matter of Carol Mallon Revocable Trust*,
193 A.D.3d 1049 (2d Dep't 2021) .......... 16, 18

*Morgenstern v. Jeffsam Corp.*,
78 A.D.3d 913 (2d Dep't 2010) .......... 15, 25

*Navin v. Mosquera*,
30 A.D.3d 883 (3d Dep't 2006) ....................23

*Oak Beach Inn Corp. v. Babylon Beacon, Inc.*,
62 N.Y.2d 158 (N.Y. 1984) ....................22

*Pegasus Aviation I, Inc. v. Varig Logistica S.A.*,
26 N.Y.3d 543 (2015) ....................20

*T.L. by E.L. v. City of New York*,
2025 N.Y. Slip Op. 50583 (N.Y. Sup. Ct. 2025) ....................21

*Valerio v. N.Y.C. Hous. Auth.*,
2024 N.Y. Misc. LEXIS 6282 (N.Y. Sup. Ct. Mar. 11, 2024) ....................22

Defendant and Counterclaimant, Shinhan Securities Co. Ltd. ("Shinhan"), submits this memorandum of law in support of its motion, pursuant to CPLR § 3126, 22 NYCRR § 130.1.1, and this Court's May 12, 2026 Decision and Order ("May 12 Order"), requesting sanctions against Ria R Squared, Inc. ("RIA" or "Plaintiff") in the form of the following: (1) adverse inferences that the daily collateral reports, account statements, and transfer records involving the Collateral[1] would have shown that (a) since May 1, 2025, RIA did not maintain the Required Collateral Value on each Business Day as required under the GMSLA and the Trade Confirmations, (b) Plaintiff profited from Shinhan's Collateral since at least May 1, 2025, and (c) Plaintiff failed to separately maintain or otherwise commingled Shinhan's Collateral; (2) precluding Plaintiff from offering any evidence or argument at trial or on any dispositive motion based on information it failed to produce in accordance with the Motion to Compel; (3) an award of Shinhan's reasonable attorney's fees and costs incurred in connection with the Settlement, Motion to Compel,[2] Motion for Injunctive Relief,[3] Supplemental Briefing, and this motion; and (4) such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

Shinhan seeks sanctions for RIA's willful failure to comply with this Court's May 12 Order, its deliberate obstruction and pattern of misrepresentations to Shinhan and to this Court, and its bad-faith litigation conduct that has needlessly squandered judicial resources and prevented Shinhan from obtaining relief to which it was entitled.

RIA's misrepresentations and sustained obstruction efforts include:

---

[1] Capitalized terms used but not defined herein have the same meaning as in the Agreements (defined below).

[2] NYSCEF Doc. No. 122 (the "Motion to Compel").

[3] NYSCEF Doc. No. 133 (the "Motion for Injunctive Relief").

- representing it would make all borrowing and coupon rate payments while it retained the lent securities; [4]

- ceasing collateral reports under false pretenses after such reports were subject to valid discovery demands;

- making legally unfounded objections to discovery requests that would reveal the status and value of Shinhan's Collateral;

- falsely claiming to Shinhan and BNP that borrowing rate payments were made to avoid Shinhan's exercise of its power of attorney or motion for injunctive relief;[5]

- feigning agreement on settlement to stay the proceeding and avoid a motion to compel and motion for injunctive relief;

- concealing the transfer and dissipation of Shinhan's Collateral for over a year, including in pleadings filed with this Court;[6]

- making unsupported assertions, together with Ducenta (for which David Kang also serves as CEO), about the current value of the assets held at Wilmington Savings Fund Society ("WSFS") and the status of Shinhan's Collateral over the past year;[7]

- making legally unsupportable arguments based on a draft $750 million agreement that RIA falsely alleged it had executed;[8]

- [redacted]

[redacted] and

- failing (still) to comply with this Court's May 12 Order compelling production of critical information, including any bank account statements from BNP, Wells Fargo ("WF"), or WSFS for the entire period from May 1, 2025, to present.

While the discovery remains incomplete, the financial audit information produced ***after*** the supplemental briefing on the Motion for Injunctive Relief (the "Supplemental Briefing")

---

4 NYSCEF Doc. No. 1 at ¶ 71.
5 *See* Affirmation of Laura Garr ("Garr Aff."), Ex. 11; NYSCEF Doc. No. 133.
6 NYSCEF Doc. No. 145 at 13–14.
7 NYSCEF Doc. No. 156.
8 Garr Aff., Exs. 11, 12, 33, 34.

demonstrates that [redacted] establishes that this litigation (and refusal to recognize valid termination notices) is a stall tactic to avoid [redacted]. Meanwhile, Shinhan's Collateral, that served as Shinhan's security for its loans, has been seemingly sold for RIA's benefit and replaced with illiquid assets. No appraisal was obtained before RIA replaced Shinhan's liquid Collateral valued at over $204 million, or before RIA represented to this Court that the value of the assets currently held at WSFS—[redacted]—totals $198 million.

Shinhan does not seek sanctions lightly. It met and conferred in good faith with RIA. It engaged in months of settlement negotiations RIA never intended to honor. It gave RIA every opportunity to comply with its discovery obligations before and after this Court's May 12 Order and before bringing this motion. Had RIA [redacted] engaged in discovery in good faith, Shinhan could have obtained the judicial relief needed to protect its security interest before it was depleted, causing Shinhan irreparable harm. Had RIA complied with the May 12 Order, this Court would have had the benefit of critical facts necessary to rule on Shinhan's Motion for Injunctive Relief at the June 3 hearing and all follow up meetings that the Court so graciously provided. Shinhan's engagement with RIA in good faith in the face of repeated misrepresentations may ultimately deprive Shinhan from full (or any) recovery in this action.

RIA's willful, contumacious, bad faith, and frivolous conduct warrants sanctions under CPLR § 3126 and 22 N.Y.C.R.R. § 130-1.1.

## RELEVANT FACTUAL BACKGROUND

### I. THE COLLATERAL WAS SECURITY INTEREST FOR THE LOAN

Shinhan and RIA entered into the Global Master Securities Lending Agreement ("GMSLA") and a Supplemental Lending Agreement ("SLA" and, together with the GMSLA, the "Agreements") on January 25, 2019.[9] In connection with the Agreements, Shinhan lent securities to RIA between February 2019 and October 2019 totaling approximately $294 million, with approximately $228 million currently outstanding and payable to Shinhan.[10] At the time of each individual loan, and in accordance with the Agreements and individual Trade Confirmations, RIA deposited an agreed type and amount of custodial securities (totaling 110% of the value of the lent securities) into custodial accounts at BNP Paribas ("BNP") to serve as Shinhan's collateral for the loans.[11] The custodial account with BNP was not set up as a tri-party securities control account agreement because RIA advised Shinhan on January 9, 2019, that "Custodians in the U.S. do not enter into any tri-party agreements."[12] Based on this representation, the parties agreed to incorporate a power of attorney into the SLA, required that the collateral be held solely for Shinhan's benefit, and imposed a "block letter" requirement preventing RIA from transferring the collateral without Shinhan's consent.[13] The SLA granted Shinhan—"by way of security"—an irrevocable power of attorney over the Collateral, which permitted Shinhan to take immediate legal possession of and any actions related to any or all of the custodial securities, including any action to protect or enforce its security interest.[14] Shinhan approved the type of securities serving as Collateral from the outset and was in daily contact with BNP until May 1, 2025.

RIA is obligated to make monthly borrowing rate payments and quarterly coupon payments to Shinhan.[15] Failure to do so is an event of default triggering Shinhan's right to take possession of its Collateral at BNP.[16] The GMSLA details RIA's Collateral obligations, including the "Required Collateral Value" on each Business Day[17] and limitations for substitutions.[18] From the

outset, RIA provided daily collateral reports to Shinhan verified by BNP to ensure compliance with the Agreements and Trade Confirmations.[19] As of April 30, 2025, the last verified report, the Collateral at BNP exceeded $204 million in qualifying liquid securities.[20] RIA ceased providing collateral reports and stopped making payments in May 2025, despite representing to this Court that it would "continue to do so as long as the Current Loan remains outstanding."[21]

## II. RIA MISLED BNP AND SHINHAN AND INVOKED SETTLEMENT TO DELAY COURT INTERVENTION

Shinhan immediately served notices of events of default and sought to take legal possession of its Collateral. RIA's counsel falsely represented to BNP that payments had been made, and no event of default had occurred.[22] After RIA had missed May and June payments, RIA's counsel again insisted RIA had made all payments, although RIA ***could*** elect to invoke a set-off right under the $750 million draft agreement—an agreement that was never finalized, executed, or performed.[23] In April 2025, Shinhan had sought the daily collateral reports and related account records. In May, RIA objected on grounds that the requests were unduly burdensome and not

---

9 *Id.*, Ex. 1.
10 *See* NYSCEF Doc. No. 73 at ¶¶ 138, 176 n.1.
11 Garr Aff., Ex. 1, SLA §§ 8-10, Exs. 2-6 ("Trade Confirmations").
12 *Id.*, Ex., 7 at SSC_000142-43.
13 *See id.* at SSC_000138-39. This is in addition to the protections of GMSLA § 5.3. *See id.*, Ex. 1, GMSLA § 5.3.
14 *Id.* §§ 4.2(c), 5; SLA § 13.
15 *Id.* SLA § 7; GMSLA § 6.2.
16 *Id.* SLA § 13; GMSLA § 10.1.
17 *Id.* GMSLA §§ 5.4, 5.5.
18 *Id.* § 5.3.
19 *Id.*, Ex. 8 at SSC_0000526; Ex. 9.
20 *Id.*, Ex. 9.
21 NYSCEF Doc. No. 1 at ¶ 71.
22 Garr Aff., Ex. 10 at RIA-SIC_00003470.
23 *Id.*, Exs. 11, 12, 33, 34. At no time prior had RIA asserted set-off rights.

relevant.[24] Shinhan engaged in multiple meet and confers on the objections.[25] In July 2025, after the daily collateral reports had ceased, Shinhan served additional requests targeting the value and composition of the Collateral. RIA again objected on the grounds that it was burdensome and not required under the GMSLA—not that RIA ceased the reports and the Collateral had been transferred, sold or replaced.[26] When Shinhan stated it intended to file a motion to compel and seek injunctive relief, RIA initiated a settlement meeting and the parties began a lengthy settlement process culminating in a finalized term sheet in January 2026 sufficient to support a Court-ordered litigation stay.[27] Shinhan circulated draft agreements reflecting the settlement agreement.[28] At the February 25, 2026 status conference, RIA's counsel represented to this Court that RIA "intend[ed] to look at those drafts . . . as quickly as possible" and requested additional time "to try to get this thing done."[29] Shinhan expressed its fear that RIA was not acting in good faith and raised concerns over the status of its Collateral and Shinhan's delay in seeking Court relief.[30] After securing the extension, RIA did not make any effort toward settlement.[31] Compelled discovery reveals that days after asking this Court for an extension of the stay, [redacted][32]

Litigation resumed after RIA succeeded in delaying court intervention for over six months, during which period (without Shinhan's knowledge) [redacted]

---

[24] *Id.*, Ex. 13 at 21-22, 24.
[25] *Id.* at ¶ 38.
[26] *Id.*, Ex. 14 at 9; Ex. 11 at RIA-SIC_00014524; Ex. 15.
[27] *Id.*, Ex. 11; NYSCEF 149 at 15:3-8.
[28] NYSCEF 149 at 15:9-14.
[29] NYSCEF Doc. No. 93 at 3:6-21.
[30] *Id.* at 4:12-18, 5:4-18, 10:3-17.
[31] NYSCEF 149 at 16:6-12.
[32] *See* Garr Aff., Ex. 16 at RIA-SIC 000025928.

[redacted]

After the stay, RIA retained all baseless objections to producing information related to Shinhan's Collateral. Shinhan filed a pre-motion letter related to injunctive relief raising concerns about its security interest.[33] At an April 9, 2026 pre-motion conference before the Court's clerk, the Court encouraged RIA to provide Shinhan with the information to resolve the dispute. RIA represented to Shinhan and the Court that the Collateral was safe and maintained in full and further argued against injunctive relief based on RIA's solvency and sufficiency of a monetary award. RIA then declined the Court's invitation to produce the requested discovery forcing Shinhan to file the motions. RIA's April 2026 opposition to the Motion to Compel asserted legally unfounded arguments. At no time during the meet and confers with counsel, the Court clerk, or in its pleadings to the Court, did RIA disclose that the Collateral had been transferred out of BNP, was no longer comprised of liquid securities, and the value was indeterminable.[34]

## III. RIA'S REPEATED MISREPRESENTATIONS TO THIS COURT AND SHINHAN

Instead of being transparent with Shinhan and this Court, RIA misled this Court and Shinhan as to the status, condition, and value of Shinhan's Collateral, as well as RIA's financial condition overall, and deliberately withheld (and continues to withhold) documents that would provide Shinhan and this Court with the information necessary to rule on injunctive relief and Shinhan's underlying claims.

### A. RIA Misrepresented the Status of the Collateral

Until directly confronted by the Court at a hearing on May 12, 2026, RIA led Shinhan to believe that the Collateral remained intact at BNP and that injunctive relief was entirely

33 NYSCEF Doc. No. 94.
34 Garr Aff. at ¶¶ 36-37.

unnecessary. Its oppositions to Shinhan's motions were deliberately opaque. It was not until this Court asked directly that RIA acknowledged the Collateral had been transferred but could not provide basic details.[35] At no point, before formally opposing Shinhan's motions, had counsel for RIA ever independently verified the location or actual value of the Collateral.[36]

**B. RIA Misrepresented the Nature and Cause of the Transfer**

RIA painted a picture that the Collateral was simply transferred from BNP to a new Custodial Account at WSFS because BNP terminated the relationship.[37] That is not the case. [redacted] the remainder is gone.[38] By RIA's own admission, the current assets purportedly comprising Shinhan's collateral were not at WSFS over the course of the year, but held in various accounts across different locations.[39] RIA's failure to provide bank account statements or trading records make it impossible to determine what was actually transferred to and from RIA, Ducenta, WSFS and WF, and when.

RIA's counsel also characterized the transfer from BNP as a neutral administrative event offering "equivalent protection."[40] It was not. The BNP custodial account was titled [redacted] and BNP knew Shinhan was the sole beneficial owner.[41] The account with WSFS [redacted],[42] [redacted]

---

35 NYSCEF Doc. No. 149 at 16:8-15.
36 Discovery produced reveals that [redacted] *Id.* at 27:21-25; 28:21-29:3; Garr Aff., Exs. 17, 18. [redacted] Garr Aff., Ex. 16 at RIA-SIC_00025930-31.
37 NYSCEF Doc. No. 149 at 19:8-15, 26:8-18, 33:14-16, 34:9-14.
38 Garr Aff., Ex. 15.
39 It is unclear if Ducenta supplied certain of the illiquid assets.
40 NYSCEF Doc. No. 149 at 34:11–17. The Court found this representation to be "really helpful." *See id.*
41 Garr Aff., Ex. 19.
42 *Id.*, Ex. 20.

[redacted][43] WSFS has no knowledge of Shinhan's existence or rights.[44]

RIA also repeatedly blamed Shinhan's "letter writing campaign" as the cause for termination.[45] No communication from BNP supports this assertion. Indeed, by early 2026, RIA's relationship with WF [redacted][46]

### C. RIA Misrepresented that the Collateral Was Not Dissipated

In opposing Shinhan's Motion for Injunctive Relief, RIA represented to this Court that "SSC has offered no evidence that RIA has dissipated or depleted any collateral such that it would not be entirely recoverable at a later time" and that Shinhan's "claims of dissipation rest on speculation, not evidence."[47] RIA went further, asserting "there are ***no*** credible allegations or claims" of dissipation and thus "the securities or their cash equivalent would therefore remain available irrespective of who prevails in this lawsuit."[48] At the May 12, 2026 hearing, RIA argued that the case law Shinhan relied upon is distinguishable on grounds that it involved actual dissipation of assets where, as here, no such dissipation occurred.[49] The discovery that RIA was compelled to produce confirms (1) a vast depletion in the value of the collateral between April 30, 2025 (more than $204 million), (2) the assets that RIA sought to transfer to WSFS in May 2025

---

43 *Id*. Ex. 21 § 15.

44 NYSCEF Doc. No. 149 at 26:8-20, 28:24-29:15. RIA's counsel represented to this Court that the transfer was information he had only recently come to understand: *Id*. at 26:8–21. But counsel was on communications with BNP [redacted] Garr Aff., Ex. 22 at RIA-SIC_00018834.

45 NYSCEF Doc. No. 149 at 28:4-10.

46 Garr Aff., Ex. 23 at RIA-SIC_0002790, Ex.24.

47 NYSCEF Doc. No. 145 at 13–14.

48 *Id*. at 19 (emphasis added).

49 NYSCEF Doc. No. 149 at 19:8-15, 26:6-18, 29:7-11, 44:18-45:7.

([redacted]), and (3) that RIA transferred assets [redacted] without any indication as to whether the Collateral was segregated. In its Supplemental Briefing, RIA stated, without any independent verification, that the current value of the assets at WSFS totals $198 million.[50] [redacted]. RIA has since acknowledged that an independent appraiser is needed to determine the value of the illiquid assets and to confirm whether the assets are marketable at all.

### D. RIA Misrepresented its Solvency to Shinhan and this Court

Most egregiously, RIA depleted Shinhan's Collateral [redacted] RIA repeatedly misrepresented its financial condition to Shinhan and the Court which dissuaded Shinhan from pursuing more aggressive and earlier judicial intervention. RIA's counsel assured Shinhan of its solvency repeatedly before and during settlement, at the time of the stay extension, and prior to the motions. At a pre-motion conference before the Court's clerk related to Shinhan's Motion for Injunctive Relief and Motion to Compel, RIA argued against the need for injunctive relief on the grounds that RIA's solvency rendered monetary damages sufficient. In its formal opposition to Shinhan's Motion for Injunctive Relief, RIA argued that injunctive relief was unwarranted because, unlike the cases Shinhan cited, "there isn't *any* allegation—let alone any actual *evidence*—that RIA is insolvent or might be unable to satisfy a judgment" as "a solvent, U.S.-based counterparty."[51] RIA pursued the same arguments in its Supplemental Memorandum and before the Court at the May 12, 2026 hearing, arguing that

---

50 NYSCEF Doc. No. 156 at 2, 6, 11.
51 *See* NYSCEF Doc. No. 145 at 15.

Shinhan faced no irreparable harm because it retained the ability to obtain a "money judgment" and "statutory interest" against RIA.[52]

Discovery withheld until *after* Supplemental Briefing on injunctive relief confirm that [redacted]

[52] *See* NYSCEF Doc No. 156 at 12; NYSCEF Doc. No. 149 at 35:14–21.
[53] Garr Aff., Ex. 24 at RIA-SIC_00026121; Ex. 25.
[54] *Id*., Ex. 24 at RIA-SIC_00026121.
[55] *Id*., Ex. 25 at RIA-SIC_00025719, RIA-SIC_00025724-25.
[56] *Id*., Ex. 26 at RIA-SIC_00025476.
[57] *Id*., Ex. 25 at RIA-SIC_00025715.

[redacted][60] None of this was disclosed to Shinhan or the Court.

## IV. RIA'S VIOLATION OF THE MAY 12 ORDER CONFIRMS WILLFULNESS

At the May 12, 2026 hearing, following briefing and oral argument, this Court granted Shinhan's Motion to Compel in its entirety and ordered RIA to produce all documents responsive to Shinhan's April 2025 and July 2025 Requests for Production (including collateral reports and bank account statements) within two weeks (by May 26, 2026) and to produce collateral reports on an ongoing basis absent further order of the Court. RIA suggested that the historical reports reflecting the location of the Collateral would not be relevant if there is sufficient collateral today, and the Court said: "it is highly relevant" and that Shinhan "has repeatedly reserved [its] right to seek this relief."[61] The Court made clear it had "no interest" in hearing burden arguments because the discovery "should have already been done" and further noted that "[t]here was no need for a motion to compel to have been filed and consume judicial resources."[62] The Court warned that continued noncompliance would result in an award of attorneys' fees.[63] The Court further noted

---

[58] *Id*. at RIA-SIC_00025714.
[59] *Id*., Ex. 24 at RIA-SIC 00026121.
[60] *Id*.
[61] NYSCEF Doc. No. 149 at 30:3-19.
[62] *Id*. 53:10–54:11.
[63] *Id*.

it could not rule on the motion because "briefing is, unfortunately, stale now, because there's all this new information that the Court was not aware of prior to today's argument, and certain information that the Defendants were not aware of prior to coming into the room today."[64] "The Court has been operating on a lack of transparency . . . [and] ha[s] some very serious concerns about what is going on behind the scenes."[65] The Court ordered that the parties must submit supplemental briefing that addresses, among other things, "any new/additional information contained in the forthcoming production" and "the value of collateral on a daily basis versus the securities."[66]

The Court's directive could not have been plainer. RIA disregarded it.

By May 26, 2026, RIA failed to produce the core materials the Court had ordered that would have revealed the value of collateral on a daily basis: daily collateral reports, bank account statements, or any records reflecting the transfer or sale of Shinhan's Collateral since May 1, 2025.[67] RIA did not produce a single document from July 2025 through the present leaving an eleven month gap as to the status of the Collateral. It further failed to provide any documentation to verify the value of the assets presently held at WSFS—[redacted][68] RIA, again, deliberately deprived Shinhan and this Court of critical information needed for the Supplemental Briefing. The Court and Shinhan were limited to an unverified account by RIA and Ducenta that the collateral held at WSFS had a market value of $198,591,177 as of April 30, 2026. This value was not

---

64 *Id*. 53:3–10, 54:4-6.
65 *Id*. 55:25–56:4.
66 NYSCEF Doc. No. 146.
67 What RIA produced instead were unverified internal reconciliation statements that RIA and Ducenta created. *Infra* n.68.
68 *See* Garr Aff., Ex. 27 at RIA-SIC_00025051-52.

supported by a single appraisal or independent third-party. At the same time, RIA represented to this Court that it was "complying in full with the Court's May 12 Order."[69]

Only after the Supplemental Briefing was complete and upon repeated prompting by Shinhan did RIA produce certain additional discovery, including (1) [redacted][70] (2) [redacted][71] and (3) [redacted].[72]

Despite repeated requests and this Court's May 12 Order RIA continues to refuse to produce any bank statements, trading reports, final audit reports for 2023, 2024, and 2025, and related information (such as all information provided to the auditor), and attachments to correspondence that appear to contain financial information. Indeed, despite the Court order, RIA's counsel confirmed on June 25, 2026, that it had not and did not intend to collect and produce bank account statements, requiring further intervention from this Court or unnecessary third-party subpoenas to the banks. Despite all the deficiencies, RIA wrote that it will not produce anything further.[73]

## ARGUMENT

RIA's misconduct warrants sanctions on two independent grounds. First, under CPLR § 3126, RIA's willful and contumacious refusal to produce court-ordered discovery—sustained across multiple deadlines, accompanied by deficient productions, and capped by false compliance

---

69 NYSCEF Doc. No. 153 at 1, 2.
70 *See* Garr Aff., Exs. 28-30.
71 *Id.*, Ex. 31.
72 Ex. 25 at RIA-SIC_00025724-25.
73 *Id.*, Ex. 32.

representations—justifies adverse inferences on each of the factual issues the withheld documents would have resolved, preclusion of any evidence RIA suppressed during discovery, and an award of attorneys' fees and costs. Second, and independently, RIA's conduct throughout this litigation—including its assertion of meritless discovery objections, its exploitation of settlement negotiations as an instrument of delay while concealing the transfer and dissipation of Shinhan's Collateral, and its repeated misrepresentations to Shinhan and this Court—constitutes frivolous conduct under 22 N.Y.C.R.R. § 130-1.1, warranting award of costs and fees.

## I. SANCTIONS SHOULD BE IMPOSED AGAINST RIA UNDER CPLR § 3126

Section 3126 requires litigants to faithfully adhere to the court's disclosure orders and produce relevant information. *See* N.Y.C.P.L.R. § 3126. If a litigant "willfully fails" to do so, the court may issue an order (1) drawing an adverse inference and resolving the issue against the disobedient party, (2) precluding the disobedient party from contesting the information sought, and/or (3) striking a pleading. *Id*. A court has broad discretion to fashion whichever remedy it deems appropriate and is not limited to those enumerated in section 3126. *Morgenstern v. Jeffsam Corp*., 78 A.D.3d 913, 914 (2d Dep't 2010); *Kihl v. Pfeffer*, 94 N.Y.2d 118, 123 (N.Y. 1999) ( "[A] litigant cannot ignore court orders with impunity."). "[C]ompliance with a disclosure order requires both a timely response and one that evinces a good-faith effort to address the requests meaningfully." *Id*. Where a party's conduct falls short of that standard, willfully and repeatedly, sanctions follow. *Fish & Richardson, P.C. v. Schindler*, 75 A.D.3d 219, 220 (1st Dep't 2010).

### A. RIA's Non-Compliance Was Willful and Sanctions Are Warranted

Willful and contumacious conduct may be inferred from a party's repeated failures, without adequate excuse, to comply with discovery demands and court orders. *Lucas v. Stam*, 147 A.D.3d 921, 925 (2d Dep't 2017). A party's history of noncompliance with prior discovery orders independently supports a finding of willfulness. *Gen. Motors Acceptance Corp. v. N.Y. Cent. Mut.*

*Fire Ins. Co.*, 104 A.D.3d 523, 525–26 (1st Dep't 2013).

RIA's failure to produce the daily collateral reports and other financial records concerning Shinhan's Collateral was a deliberate and sustained strategy that began before this Court issued a single order and continued even after the Court directed compliance.

First, in April and July 2025, Shinhan served document requests seeking the daily collateral reports and account records showing the identity, value, and location of the Collateral and any transfers or dispositions. RIA refused, asserting objections that are untenable under New York's liberal discovery standards.[74] Without the very reports and statements RIA was withholding, Shinhan could not detect the loss of its Collateral.

Second, RIA's bad-faith invocation of settlement negotiations delayed court intervention. RIA's assurances about the safety of the Collateral, repeated claims of RIA's financial solvency, and representations of imminent resolution induced Shinhan to refrain from pursuing motion practice sooner. Had RIA not held out the prospect of settlement while engaging in none of the transparency that genuine negotiations require, Shinhan would have sought Court intervention a year ago and had the opportunity to take meaningful action to prevent the harm that has occurred. Those assurances were not made in good faith.

Third, at the April 9, 2026 pre-motion conference, the Court signaled that RIA should produce the discovery and avoid burdening the Court.[75] RIA declined and opposed Shinhan's motions without revealing that the Collateral was no longer at BNP, RIA had taken Shinhan's liquid securities, and the WSFS account held [redacted]

---

[74] *See* Garr Aff., Ex. 14 at 9; Ex. 11 at RIA-SIC_00014524; Ex. 15; NYSCEF Doc. No. 149 at 54:8-18.

[75] NYSCEF Doc. No. 149 at 53:10-25.

Fourth, on May 12, 2026, the Court granted Shinhan's Motion to Compel in full, ordered production by May 26, and warned that noncompliance would result in an award of attorneys' fees.[76] RIA's counsel represented RIA would comply. Yet, despite demands for the daily collateral reports dating back to May 1, 2025, RIA elected to cease generating the reports, failed to alert Shinhan or the Court that it had done so, and then after being compelled to produce the reports argued, it cannot produce what does not exist.[77] Shifting, after-the-fact excuses of this kind are the basis on which courts infer willfulness and bad faith. *Lucas*, 147 A.D.3d at 925. RIA has also failed to produce bank account statements, trading records, and other financial records for the period when the Collateral was being moved.[78] Courts have held that claiming compliance while leaving material gaps in production supports a finding of willful noncompliance. *See Hicks v. Unitrin Advantage Ins. Co.*, 246 A.D.3d 1489, 1491 (4th Dep't 2026).

Fifth, Shinhan continued to work with RIA through the filing of this motion. But RIA still has not produced critical discovery. In a June 26 email, RIA's counsel admitted that it did not attempt to collect bank account statements, claiming that RIA did not believe that they existed and were burdensome to gather, which this Court already rejected and is contradicted by the three WSFS account statements that were produced.[79] Despite this blatant deficiency, RIA had stated that it "does not intend to produce further documents at this time." Sanctions should be imposed.

---

76 *See supra* at 12-13. Despite filing oppositions, RIA's counsel had not taken any steps to verify the location and value of the Collateral before opposing the relief requested.

77 *See* NYSCEF Doc. No. 153 at 2.

78 Internal reconciliation summaries created by Ducenta, the entity Mr. Kang controls, are no substitute for daily collateral reports or account statements: they are not bank-issued, lack security-level and transaction-level detail, and cannot show where the assets were held or to whom they were transferred.

79 *See* Garr Aff., Ex. 32.

*See Congleton v. United Health Services Hosps.*, 67 A.D.3d 1148, 1150–51 (3d Dep't 2009); *Matter of Carol Mallon Revocable Trust*, 193 A.D.3d 1049, 1050 (2d Dep't 2021).

Each time RIA was asked or ordered to produce highly relevant information, it responded with a misrepresentation. While Shinhan and the Court relied on these representations and attempted in good faith to resolve the issues, Shinhan's Collateral disappeared. And RIA depleted this Collateral knowing (without disclosing it to this Court or Shinhan) that it [redacted] This sustained course of obfuscation and delay is exactly the type of willful and contumacious misconduct that warrants adverse inferences, preclusion, and other sanctions under section 3126, and RIA has offered no reasonable excuse justifying otherwise. *Arpino v. F.J.F. & Sons Elec. Co., Inc.*, 102 A.D.3d 201, 210–11 (2d Dep't 2012).

### B. The Court Should Draw Adverse Inferences Against RIA

Section 3126(1) authorizes this Court to order that the issues to which the withheld information is relevent be deemed resolved in accordance with the moving party's claims. This remedy is not limited to spoliation;[80] it is equally available where a party willfully refuses to produce documents it has been ordered to produce. *Horizon Inc. v. Wolkowicki*, 55 A.D.3d 337, 338 (1st Dep't 2008) (affirming adverse inference where defendants refused to comply with orders to produce financial documents "peculiarly within defendants' custody"); *General Motors*., 104 A.D.3d at 525–26 (affirming an adverse inference where evidence "may have existed, but was not produced by defendant either because it was destroyed or withheld"). An adverse inference is

[80] Here, RIA stopped generating the daily collateral reports altogether, ceasing a business practice it had maintained for six years *after* Shinhan's discovery requests that sought those documents. The practical effect is identical to destruction. *See, generally, Himani v. Isani*, 2022 N.Y. Misc. LEXIS 4459, at *2-3 (N.Y. Sup. Ct. June 3, 2022) (stating that the defendants may seek spoliation sanctions for documents and information that the plaintiff no longer keeps in the ordinary course of business).

warranted where the withheld evidence was within the non-producing party's control and is relevant to the issues in dispute and the non-producing party acted with the requisite culpable state of mind. *Pegasus Aviation I, Inc. v. Varig Logistica S.A.*, 26 N.Y.3d 543, 551 (N.Y. 2015).

Each element is met. First, the daily collateral reports, account statements, trading reports, and other financial records are under RIA's custody and control. Second, this Court has already found that these withheld documents are "highly relevant."[81] And third, RIA's withholding of such documents was deliberate. Although a culpable state of mind for this purpose "includes ordinary negligence," the record here goes beyond that standard. *Dagro Assocs. II, LLC v. Chevron U.S.A., Inc.*, 206 A.D.3d 793, 794–95 (2d Dep't 2022). [redacted][82] Mr. Kang attempted to [redacted], stopped paying Shinhan, ceased generating collateral reports, and objected to turning over documents. The decision to withhold discovery related to the Collateral was not negligent; it was documented, deliberate, and timed so RIA could take the valuable Collateral for its own benefit without intervention.

Accordingly, Shinhan is entitled to the following adverse inferences requested above.[83] Each of those inferences flows from the information RIA has refused to produce. Had daily collateral reports been produced after April 30, 2025, they would have identified every security in the accounts by CUSIP, type, notional value, and market value and confirmed on each business day whether the aggregate market value met the 110% margin requirement under the Agreements. Likewise, the trading activity records would have disclosed every repo transaction executed against the Collateral, revealing the counterparties, terms, and any financial returns generated by

---

81 *Supra* at 12.
82 Garr Aff., Ex. 24 at RIA-SIC_00026121
83 *See supra* at 1.

RIA's use of Shinhan's assets. Bank account statements from BNP, WSFS, WF, and any other financial institution that held the Collateral post-April 30, 2025, would have identified every security held on each statement date, every transfer into and out of those accounts, and whether the accounts were maintained in a segregated structure for Shinhan's exclusive benefit. The absence of this evidence is not neutral. The missing evidence would have been unfavorable to the withholding party on the issues that evidence would have resolved. RIA should not be permitted to exploit at trial the evidentiary void it created. *See T.L. by E.L. v. City of New York*, 2025 N.Y. Slip Op. 50583 at 6 (N.Y. Sup. Ct. 2025).

### C. RIA Should Be Precluded from Offering Evidence It Has Withheld

Section 3126(2) authorizes this Court to preclude a party from offering evidence at trial or on any dispositive motion where that party has willfully failed to produce materials it was ordered to disclose. N.Y.C.P.L.R § 3126(2). The purpose of preclusion is straightforward: to prevent a party that has refused to disclose evidence from "affirmatively exploiting or benefiting from the unavailability of the proof during the pending civil action." *Oak Beach Inn Corp. v. Babylon Beacon, Inc.*, 62 N.Y.2d 158, 166 (N.Y. 1984).

RIA should be precluded in two ways. First, it should be prevented from offering any evidence or argument concerning documents it failed to produce in response to the Motion to Compel at trial or any dispositive motion. Second, it should be precluded from offering any evidence or argument at trial or in any dispositive motion concerning (1) the identity, location, value, and composition of Shinhan's Collateral, (2) whether RIA complied with its obligations under the SLA with respect to the Collateral, (3) whether the Collateral was transferred, dissipated, commingled, or otherwise improperly disposed of, (4) any damages RIA claims to have suffered during the relevant time period, including as a result of BNP's termination of its relationship with RIA. Preclusion extends beyond the specific documents withheld and applies to issues to which

those documents relate. *See Valerio v. N.Y.C. Hous. Auth.*, 2024 N.Y. Misc. LEXIS 6282, *14 (N.Y. Sup. Ct. Mar. 11, 2024).

## II. RIA SHOULD BE REQUIRED TO PAY SHINHAN'S ATTORNEY'S FEES AND COSTS

RIA's misconduct warrants monetary sanctions under both CPLR § 3126 and 22 NYCRR § 130-1.1. Monetary sanctions are warranted under section 3126 where a party's non-compliance with its discovery obligations is willful. *Lucas*, 147 A.D.3d at 925. Section 130-1.1 extends beyond discovery to ***any*** frivolous conduct (including in settlement negotiations) in the course of litigation when such conduct (1) is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification, or reversal of existing law, (2) is undertaken primarily to delay or prolong the resolution of the litigation, or (3) consists of material factual statements that are false. *Levy v. Carol Mgmt. Corp.*, 260 A.D.2d 27, 33–34 (1st Dep't 1999). Both apply.

First, RIA withheld highly relevant documents, including information about [redacted] until after Supplemental Briefing concluded. When pressed on the status of the discovery following the June 3 hearing, it did not produce information until Shinhan advised it would follow through on a motion for sanctions. Even still, over a month after the May 12 Order compelling RIA to produce bank account statements, RIA confirmed it never attempted to obtain any bank records and did not intend to produce any. Thus, monetary sanctions should be awarded under section 3126.

Second, RIA persisted with frivolous objections to producing the documents despite the Court's encouragement to avoid motion practice. The Court compelled production of the requested discovery by May 26, 2026, recognizing that RIA "blatantly conflates contractual rights with discovery applications." RIA's basis for its objections was not a close question, a developing area

of law, or a reasonable argument for modification of existing precedent. As a result, every dollar Shinhan spent on the motion stems from RIA's legally indefensible position.

Third, RIA's conduct was designed to delay resolution of this dispute, not resolve it. Upon the threat of motion practice, RIA wasted Shinhan and this Court's time and resources on a bogus settlement. That is the definition of conduct undertaken primarily to delay. *Navin v. Mosquera*, 30 A.D.3d 883, 884 (3d Dep't 2006).

And fourth, RIA has repeatedly made material misrepresentations to Shinhan and this Court to avoid relief to which Shinhan is entitled, as explained above.[84] Most notably, RIA concealed its financial condition in opposing Shinhan's Motion for Injunctive Relief, arguing that there is no evidence that "RIA is insolvent or might be unable to satisfy a judgment," describing RIA as "a solvent, U.S.-based counterparty" while withholding records confirming RIA cannot continue as a going concern and repay its debt to Shinhan and its creditors.[85] This Court was therefore asked to rule on whether injunctive relief was necessary without access to information disputing RIA's ability to satisfy a judgment.

This Court itself expressed concerns about operating with a lack of transparency, warning that motion practice driven by lack of cooperation will result in attorneys' fees to be paid in connection with those motions. RIA did not heed that warning. *See, e.g., Morgenstern*, 78 A.D.3d at 914. It did not produce the information it was compelled to produce by May 26, 2026, made additional misrepresentations in its Supplemental Briefing, and continues to withhold highly relevant information. The pattern of concealment, misrepresentation, and non-compliance described herein is precisely the conduct that sanctions are designed to address and deter.

[84] *Supra* at 7-12.
[85] NYSCEF Doc. No. 145 at 15.

Therefore, Shinhan is entitled to an award of costs and attorneys' fees related to the Motion to Compel, Motion for Injunctive Relief, the fees in preparing draft settlement agreements, and this present motion.[86]

## CONCLUSION

For the foregoing reasons, Shinhan respectfully requests that the Court issue an order for sanctions pursuant to CPLR § 3126 and 22 NYCRR § 130-1.1, and for further relief as the Court deems just and proper.

---

[86] Shinhan will submit a supporting fee affidavit upon the Court's direction or the granting of this motion. *See Jackson v. Opencommunications Omnimedia LLC*, 2015 WL 8773024, at *4 (Sup. Ct. N.Y. Cty. 2015) (directing defendants to "submit an appropriate bill of costs, affidavit detailing costs incurred and relevant itemized bills from vendors" upon award of monetary sanctions). Shinhan's fees continue to accrue in connection with this motion.

Respectfully submitted,

New York, New York
July 1, 2026

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Hannelore Sklar
Trudy Smith
Zoe Mitrofanis
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
hannelore.sklar@whitecase.com
trudy.smith@whitecase.com
zoe.mitrofanis@whitecase.com

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

It is hereby certified pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

The total number of words in this memorandum of law, inclusive of point headings and footnotes and exclusive of caption page, table of contents, table of authorities, signature block, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules regulations, etc., is 6,974 words.

New York, New York
July 1, 2026

By: *<u>/s/ Laura Garr</u>*
Laura Garr

**EXHIBIT 26**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| RIA R SQUARED, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>SHINHAN SECURITIES CO., LTD.<br><br>Defendant. | Index No.: 659538/2024<br><br>Hon. Anar R. Patel, A.J.S.C.<br><br>Motion Seq. No. 03 |

**PLAINTIFF RIA R SQUARED, INC.'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S ORDER TO SHOW CAUSE**

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Sascha N. Rand
Toby E. Futter
J. Sebastian Becker
295 5th Avenue
New York, New York 10016
Tel: (212) 849-7000
sascharand@quinnemanuel.com
tobyfutter@quinnemanuel.com
sebastianbecker@quinnemanuel.com

*Counsel for Plaintiff RIA R Squared, Inc.*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ....... 1

**SUPPLEMENTAL FACTUAL BACKGROUND** ....... 3

**A. Shinhan Never Had Title To The Collateral** ....... 3

**B. RIA Transferred The Collateral Only Because Forced By Shinhan** ....... 5

**C. The Collateral Is Secure, Sufficient, and Subject to Reporting** ....... 5

**ARGUMENT** ....... 7

**A. SHINHAN CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS** ....... 7

**1. RIA's Non-Payments Are a Lawful Set-Off, Not a Default** ....... 7

**2. RIA Has Not Terminated The GMSLA** ....... 9

**3. Shinhan Cannot Show A Substantial Likelihood of Success** ....... 9

**B. SHINHAN HAS NOT DEMONSTRATED IRREPARABLE HARM** ....... 11

**1. The Collateral Is Secure and Sufficient** ....... 11

**2. Shinhan's Alleged Harms Are Economic or Conclusory** ....... 12

**C. THE BALANCE OF EQUITIES FAVORS RIA** ....... 12

**CONCLUSION** ....... 13

**PRELIMINARY STATEMENT**

Recognizing that Shinhan lacked factual support for its strident assertions that RIA had "admitted [to] conversion" by a "dissipation and transfer" of the collateral while it was "legally titled in Shinhan's name, not RIA's" (Dkt. 149 (OTSC Hr'g Tr.) at 4, 18, 37) the Court prudently reserved decision on Shinhan's order to show cause. The Court then directed RIA to produce various materials to determine the location and current value of the collateral. Dkt. 147. RIA has now done so and—as set forth in the affirmations attached hereto—has (i) committed to curing Shinhan's alleged borrowing fee payment defaults by placing the contested amounts into segregated accounts, (ii) agreed to provide ongoing reporting on those payment accounts, and (iii) resumed ongoing reporting on the collateral.

RIA's document productions, and its agreement to both resume collateral reporting and borrowing payments (with arrears), establish that Shinhan's motion is both meritless and mooted. As explained below, the parties' agreements and course of dealing expressly *did not* grant Shinhan title over the collateral. Nor did Shinhan limit RIA's use of the collateral. These and other facts require dismissal of Shinhan's motion.

*First,* Shinhan cannot show a substantial likelihood of success on its claim to title over the collateral because Shinhan does not hold such title—and never has. The SLA expressly provides that *"[n]o delivery of collateral shall take place between the parties*." Dkt. 40 (SLA) at §8 (emphasis added). The parties further agreed that collateral title would transfer to Shinhan *if and only if* RIA defaulted, *and* the custodian acknowledged default, *and* various other conditions were met. *Id*. at §13. Yet Shinhan—not RIA—defaulted under the agreements, and none of these conditions were met. RIA therefore remained entitled to hold the collateral in a "custodial account" and retain full title and control of it. Dkt. 40 (SLA) at §8. Indeed, in August 2024 RIA reminded Shinhan that "*the [custodial] account at BNP belongs to RiaR*." Ex. 1 (RIA-

SIC_00022477) (emphasis added).[1] Any Shinhan claim based on the false assertion that it already has title over the collateral is meritless.

*Second,* Shinhan also cannot establish a likelihood of success on its claim that it should be permitted to gain title through a purported exercise of a power of attorney. While Shinhan has the right to exercise a power of attorney in certain circumstances, Dkt. 40 (SLA) at §13, it can invoke such right only upon RIA's default. Yet it is *Shinhan*, not RIA, that first defaulted by coercing RIA—through improper means—into returning $47 million of lent securities (and then never re-returning them) and thereby caused RIA substantial economic damages and reputational harm. While RIA had agreed to continue making coupon payments on the lent securities following this breach, it ceased doing so—and sought to exercise its setoff rights against the collateral—when it became clear that Shinhan did not intend to cure its breaches. Moreover, while RIA was withholding borrowing payments pursuant to its lawful set-off rights under the GMSLA (§11.8) and the SLC (§ "Set-Off"), it now fully understands that the Court will not countenance any self-help until the Parties' rights and remedies are fully adjudicated by this Court. RIA has therefore agreed to resume all borrowing payments (with arrears) into a custodial account pending the Court's decision following trial this Fall. *See* Affidavit of David Kang, dated June 1, 2026 ("Kang Aff"), ¶62.

*Third,* Shinhan cannot show irreparable harm. Contrary to Shinhan's hyperbolic conjecture, the collateral has not been dissipated or transferred to a non-custodian. The documents produced by RIA confirm that the collateral resides with Wilmington Savings Fund Society ("WSFS")—a well-recognized custodian—to which it was transferred after Shinhan's aggressive

[1] All references to "Ex." are to the exhibits attached to the Affirmation of Toby Futter in Support of RIA's Supplemental Opposition to Defendant's Order to Show Cause dated June 1, 2026 and filed herewith.

and extrajudicial self-help attempts caused BNP Paribas ("BNP") to terminate RIA's custodial relationship. As per the materials produced pursuant to the Court's orders, the collateral is presently worth approximately $198 million, exceeding the value of the loaned securities ($185 million) and satisfying the agreed requirements. Moreover, RIA has committed to leaving it at WSFS pending trial of this matter and resumed collateral reporting. Shinhan therefore has and will suffer no harm during the pendency of this matter through trial, and it is RIA that would be irreparably harmed should Shinhan—the defaulting party—be permitted to remove the collateral from the United States or otherwise dissipate it. The balance of equities clearly favors RIA.

In short, the answers to the four questions posed by the Court underscore that Shinhan's motion should be denied: (1) the GMSLA has not been terminated; (2) the collateral is secure and sufficient; (3) there has been no impermissible transfer or dissipation; and accordingly (4) Shinhan cannot meet the demanding standard for the mandatory injunction it seeks. The Court should deny the motion and maintain the status quo so that the parties can complete discovery and bring this matter to trial this Fall.

## SUPPLEMENTAL FACTUAL BACKGROUND

### A. Shinhan Never Had Title To The Collateral

Shinhan's briefing is replete with the false assertion that it took title to the collateral.[2] It did not. The parties entered the GMSLA and SLA on January 25, 2019. Dkt. 40 (GMSLA, SLA) at 40. The SLA "supersedes the [GMSLA] agreement for the purpose of Securities Lending," *id.* (SLA) at §1, and prevails where the agreements conflict. The SLA makes clear that the collateral would remain RIA's property in a custodial account that RIA would establish and control.

[2] *See*, for example, OTSC at 9 and 16 (asserting that it "is undisputed that legal title to the Collateral transferred to Shinhan under the GMSLA"); 5 (describing collateral as property "over which Shinhan holds full legal title"); May 12 Hr'g Transcript at 5, 38.

At the outset, the SLA expressly provides that "[t]he collateral for this loan agreement shall be the custodial securities held in the custodial account with the agent" but that "*[n]o delivery of collateral shall take place between the parties*." SLA § 8 (emphasis added). RIA was not "deliver[ing]" the collateral to Shinhan[3] and never transferred collateral title to Shinhan.

*Second*, the SLA did provide a title transfer process—but it was both contingent and convoluted. It required: (i) default by RIA; (ii) acknowledgement of default by BNP; (iii) a new custody agreement and AML/KYC vetting of Shinhan; (iv) BNP's review of those documents; and (v) BNP's approval of transfer. SLA § 13(1)-(4). These were Shinhan's "sole" rights upon an RIA default (SLA § 13)—notwithstanding its ability to exercise a power of attorney subject to these conditions—and it was only upon completion of this process (which never occurred[4]) that "ownership transfer of the collateral shall be immediate." SLA § 13(4).

*Third*, the SLA establishes that RIA, not Shinhan, would control the collateral account. The parties agreed RIA would ensure "[n]o other counterparty's collateral, besides Shinhan … shall be placed into the custodial account" (SLA § 10), because RIA controlled the assets flowing in and out of it.[5]

---

[3] Shinhan's motion attached no evidence—*i.e.*, title certificates, title transfer forms, or similar records—showing Shinhan ever held title over the collateral since 2019. The collateral reports that Shinhan received for years list both RIA and Shinhan's names jointly. *See, e.g.*, Ex. 2 (SSC_0003541); Ex. 3 (RIA-SIC_00010326) (07/2020 and 04/2025 reports)

[4] Shinhan repeatedly attempted to have BNP acknowledge RIA's default, but BNP refused, Ex. 4 (RIA-SIC_00020405); Ex. 5 (RIA-SIC_00002880) (11/2024, 06/2025 BNP Ltrs.), given Shinhan *itself* was in default and subject to a setoff claim by RIA given Shinhan's prior breach of the SDA.

[5] The SLA specifies some types of collateral that RIA *could* include, *see* SLA, §12, but Shinhan released even these minimal requirements in April 2020 when it issued an "unblock letter" to allow RIA to sell whatever collateral necessary to comply with Shinhan's demand that RIA prematurely return $47M of Shinhan's loaned securities. Ex. 6 (RIA-SIC_00025422).

**B. RIA Transferred The Collateral Only Because Forced By Shinhan**

Shinhan casts the collateral transfer as a "conversion," Dkt. 149 (OTSC Hr'g Tr.) at 4, 5, 9, but the record reveals the self-serving nature of that assertion. The transfer occurred only because Shinhan's repeated attempts to coerce BNP into acknowledging that RIA was in default—while Shinhan was itself facing setoff claims for its own default—caused BNP to terminate RIA's custodial account. Ex. 7 (RIA-SIC_00004386); Ex. 8 (RIA-SIC_00000340) (10/2024 and 06/2025 Shinhan Ltrs); Dkt. 1 (Compl.) ¶¶72-73. The transfer was therefore no secret to Shinhan—it was Shinhan that forced it.[6] For its part, RIA: (1) maintained the custodial account as long as BNP would allow given Shinhan's aggressive self-help attempts, Ex. 13 (RIA-SIC_00019598) at '599 (BNP: "Legal and Compliance … will not grant any further extensions"), then (2) transferred the collateral to WSFS, a suitable replacement custodian, once forced.[7]

**C. The Collateral Is Secure, Sufficient, and Subject to Reporting**

Shinhan's motion relies heavily on unfounded accusations of dissipation. *See, e.g.,* Dkt. 149 (OTSC Hr'g Tr.) at 5, 18. These too are baseless.

*First*, and foremost, the collateral is secure. Position reconciliation and fixed income statements from RIA's asset manager, Ducenta, confirm WSFS holds the collateral in a custodial account pursuant to a custodial services agreement.[8] *See*, *e.g.*, Ex. 14 (RIA-SIC_00024480) (2020-

---

[6] *See* Ex. 9 (RIA-SIC_00016683) (12/2024 BNP Termination); Ex. 10 (RIA-SIC_00015354) (02/2025 Extension); Ex. 11 (RIA-SIC_00016050) (03/2025 Extension); Ex. 12 (RIA-SIC_00018918) (04/2025 Final Extension).

[7] RIA's reluctance to disclose the new custodian to Shinhan arose solely because it would be catastrophic to RIA's business if Shinhan's repeated self-help attempts caused RIA to lose another custodial relationship. *See* Kang Aff. ¶63; Ex. 19 ( RIA-SIC_00016078**)** **(**RIA seeking "assurances" from BNP that "all information" about the new custodian "CONFIDENTIAL" because "[w]e don't want to repeat what happened with Shinhan and BNP").

[8] Ducenta has been continuously registered as an investment advisor with the U.S. Securities and Exchange Commission for over 40 years and acts as investment manager for RIA. *See* Affidavit of Tim Torline ("Torline Aff."), dated June 1, 2026, ¶4.

2024 Position Reconciliation Report); Ex. 15 (RIA-SIC_00024856) (same for 2025-2026); Ex. 16 (RIA-SIC_00024796) (04/30/2026 Ducenta Position Statement). These records provide detailed collateral information from 2020 through present—and on a monthly basis from May 2025 through present—including data on collateral investment type, description, CUSIP, and custodian. RIA has also produced a screenshot from Ducenta's WSFS client portal (current May 25, 2026) and email verification from WSFS (dated May 26, 2026), confirming WSFS holds the collateral listed in RIA's produced records. Ex. 17 (RIA-SIC_00025312) (WSFS Client Portal Snapshot); Ex. 18 (RIA-SIC_00023679) (05/26/2026 WSFS Confirmation).[9] RIA has also committed—effective immediately and pending further Court order—to report any collateral trading activity to Shinhan within two business days, and to refrain from removing or encumbering the collateral except for ordinary course portfolio management. Kang Aff, ¶45.

*Second,* the collateral is sufficient. RIA's produced records show the collateral has a market value of $198,591,177 as of April 30, 2026. *See* Exs. 15, 16. The methodology underlying that valuation is detailed in the Torline Affirmation and consistent with the GMSLA and SLA requirements. These records establish that the collateral meets the parties' agreed collateral amount.

*Third*, the collateral is subject to ongoing reporting.[10] RIA has resumed ongoing collateral reporting, including best-efforts daily or weekly NAV updates where market pricing is available,

---

[9] The affirmations of David Kang and Tim Torline further confirm that the collateral recorded in the produced reconciliations and portal screenshots (i) are in fact held at WSFS; (ii) have not been dissipated, transferred, or commingled with any other party's assets; (iii) remain in an identifiable custodial account at a regulated U.S. financial institution, and (iv) are managed by Ducenta as an SEC-registered investment adviser. *See* Kang Aff, ¶33-45; Torline Aff., ¶10-14-20.

[10] As above, *supra* n. 4, RIA ceased custodial reporting when BNP terminated its relationship with RIA solely because it would be catastrophic to RIA's business if Shinhan's repeated self-help attempts caused RIA to lose another custodial. *See* Kang Aff., ¶25, 63.

monthly Ducenta reconciliations, and Bloomberg AIM/PORT portal access, with WSFS confirmation where available. Kang Aff., ¶26, 45; Torline Aff., ¶21.

## ARGUMENT

### A. SHINHAN CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS

### 1. RIA's Non-Payments Are a Lawful Set-Off, Not a Default

Shinhan's entire motion assumes RIA defaulted by withholding borrowing payments. But that claim is meritless because (1) RIA alleges Shinhan previously defaulted under the GMSLA, SLA, SDA and SLC, and the Court has already concluded that these allegations state claims for breach and damages, and (2) the GMSLA and SLC allow RIA to set off any such damages against payments due from RIA. These issues will be resolved through discovery and trial, but the existing record substantially undermines Shinhan's position.

*First*, the SLA makes clear that RIA retained collateral title despite taking title to the Shinhan loaned securities. Dkt. 40 (SLA) at §8 ("[n]o delivery of collateral shall take place between the parties"). It also grants RIA broad set-off rights if Shinhan defaults on any agreement between the parties. GMSLA Section 11.8. (any amount payable by RIA to Shinhan under paragraph 11.2(b) "may, at the option of [RIA] … be reduced by its set-off against any amount payable … by [Shinhan] to [RIA] … under any other agreement between" them). (party substitutions added).

*Second,* RIA obtained even further, broader, set-off rights under the SLC. Dkt 21 (SLC) at "Set-off" ("upon the occurrence of any Event of Default, [RIA] may, without prior notice … set off any sum or obligation … owed by [Shinhan] to [RIA] … against any sum or obligation … owed by [RIA] … to [Shinhan]") (party substitutions added). These are setoff rights that RIA—subject to the Court's adjudication on a full factual record—negotiated for and secured.

*Third*, this Court has ruled that RIA has adequately stated cognizable claims for breach and damages under the GMSLA, SLA, SDA and the SLC. Shinhan's breach under the GMSLA and SDA was coercing the premature return of $47 million in loan securities. Shinhan's breach under the SDA was its failure "to extend [to RIA] $100 million of additional securities for borrow and to return the $47 million of securities or $47 million of US Treasuries by May, 2020," Ex. 22 (RIA-SIC_00002955) at -056 (SOF ¶1); Dkt. 103 (MTD) at 8. Shinhan's breach of the SLC was its failure to make three tranches of loans totaling over $750 million. Dkt. 103 (MTD) at 8-9.

*Fourth*, RIA has satisfied the procedural steps required to exercise set-off for its damages. It gave Shinhan written notice of default under the SDA, and of RIA's set off rights, in June and September 2025. *See* Dkt. 138, 139. It thereby satisfied any notice requirements. GMSLA, Dkt. 40, at Section 10.1. Notably, the SLC's set-off provision do not require any RIA notice at all.

*Fifth*, Shinhan does not allege RIA owes it any amount that would fall outside RIA's set off rights. Shinhan alleges RIA breached by ceasing borrowing payment in May and August 2025, Counterclaims at 5, and these alleged breaches are the sole basis for its motion and purported right to title. *See* OTSC at 4-5. Yet these alleged breaches by RIA in 2025 occurred *years* after Shinhan's various breaches of the GMSLA, SLA, SDA, and SLC. And while RIA's claims and damages are subject to further factual development, following trial it will be entitled to set-off any proven losses against any post-breach GMSLA payments. GMSLA, §11.8; SLC, "Set Off".

In sum, while Shinhan may contest that it breached the SDA and SLC, or that RIA suffered harm, the Court has credited RIA's claims of breach and damages from years earlier than any wrongdoing alleged by Shinhan. RIA is entitled to conduct itself commercially as if it will be entitled to enforce its set-off.

**2. RIA Has Not Terminated The GMSLA**

RIA's continued possession of the loaned securities is not a default because the GMSLA remains in effect. While RIA did send an April 7, 2026, communication purporting to exercise RIA's setoff rights, and therein to terminate the GMSLA to effect that setoff, that communication was sent out of personal frustration over Shinhan's interference with BNP and RIA now understands it cannot exercise any set off rights until this Court adjudicates the parties' claims through trial. Kang Aff., ¶48-50. In such circumstances, and given RIA is no longer seeking to effect a post-termination close-out, the letter should not be treated as consummating the termination of a bespoke, complicated, securities-lending relationship. RIA will continue to maintain the same agreed ratio of collateral in a custodial account at WSFS, has resumed both collateral reporting, and will place all borrowing payments required under the parties' agreements into dedicated accounts, the amounts of which will also regularly be reported to Shinhan. *Supra* Facts, § C.

**3. Shinhan Cannot Show A Substantial Likelihood of Success**

Shinhan also cannot come close to showing a substantial likelihood of success on its claim that it holds title over the collateral, nor that it should hold such title, for three reasons. *First*, as explained above, Shinhan has never held title and has always known this: the SLA provides that "no delivery of collateral shall take place between the parties," SLA § 8 (emphasis added), with title transferring only upon RIA's default and BNP's acknowledgement of it—neither of which occurred. Shinhan's repeated assertion that "the legal title to collateral is Shinhan's" (*see*, *e.g.*, May 12 Hr'ing Tr. at 5, 38; OTSC at 5) is mistaken, and any claims based on it are meritless.

*Second,* Shinhan cannot show a likelihood of success on its claim to title through an exercise of its power of attorney and the title-transfer process set out in SLA Section 13. That process requires both that RIA be in default (which it is not) and that BNP acknowledge the default

(which, based on Shinhan's status as defaulting party as alleged in RIA's complaint, BNP refused to do). To prevail, Shinhan would need to show that (1) RIA is substantially *unlikely* to succeed on *either* of its GMSLA, SLA, SDA or SLC breach of contract claims, or alternatively, that (2) RIA is substantially *unlikely* to establish that it has set off rights under *either* the GMSLA or the SLC. Even the record to date establishes Shinhan has no genuine likelihood of success: it concedes the GMSLA is binding, Ex. 20 (RFA Responses) at 6 (Response 1); which contains a broad set-off provision (§ 11.2(b)), and it has no credible answer to its admissions that the SDA was agreed and breached, Ex. 22 at -056 (SOF ¶1). Moreover, Shinhan's only defense to the SLC's validity would be testimony from Mr. Sam Kim—who signed it—yet RIA has recently learned that Mr. Kim no longer works at Shinhan and Shinhan cannot or will not make him available for deposition. Ex. 21 (06/2026 Garr Email). Nor, shockingly, does Shinhan continue to employ or have any control over multiple other percipient employee witnesses, *id.*, meaning they too are unlikely to be available to provide testimony in this matter—a fact from which the Court will be able to draw various adverse inferences.

*Third*, even if the GMSLA had been terminated, it does not follow that Shinhan is entitled to a return of the securities or to take title over the collateral. A default-based termination triggers the close-out mechanism of GMSLA §11, under which the parties' obligations are accelerated and "the sums due from one Party shall be set off against the sums due from the other and only the balance … shall be payable." GMSLA § 11.2(b). That net balance may then be further set off against amounts owed "under any other agreement between" the parties—here, the SDA and SLC. GMSLA §11.8. A close-out would thus collapse all debts between the parties into a single net payment, not an in-kind redelivery of the collateral or the lent securities. Because RIA's claims may well exceed the value of the lent securities, the balance would run to RIA.

**B. SHINHAN HAS NOT DEMONSTRATED IRREPARABLE HARM**

**1. The Collateral Is Secure and Sufficient**

Shinhan's irreparable-harm theory rested entirely on an absence of information—*i.e.*, it argued that RIA "has not disclosed where the funds are" and "has not independently verified the value" of the collateral, and that the value was "over 20 million less than it should be." May 12, Hr'g Tr. at 5. Any such hypothesized irreparable harm has since been fully addressed.

*First*, the collateral's location and value (both present and historic) has been confirmed. As detailed above, the collateral now resides at WSFS. Exs. 17, 18; *see also* Ex. 15-16 (Position Statements). WSFS has confirmed by email that it holds the collateral as of May 26, 2026, and RIA has produced WSFS client-portal screenshots confirming the same as of May 25, 2026. Exs. 17-18. The value has also been verified: the sworn affirmations of Mr. Kang and Mr. Torline establish a current market value of $198,591,177. Kang Aff. ¶38; Torline Aff. ¶19. Mr. Torline, Ducenta's President of Investments, has explained the valuation methodology used to reach it. Torline Aff. ¶17-20.

*Second,* the collateral is sufficient, and Shinhan's claim that "the collateral is over 20 million less than it should be" (Dkt. 149 at 5) is incorrect. Neither the GMSLA nor the SLA fixes a concrete collateral percentage. The GMSLA defines "Required Collateral Value" as the "Market Value" of securities equivalent to the loaned securities plus the applicable "Margin" (GMSLA § 5.4(a)), and the SLA requires only that the ratio of collateral market value to "the market value of lent assets" not fall below the "OC Ratio" (SLA § 9)—but neither the Margin nor the OC Ratio is assigned a numerical value in the agreements. Shinhan asserts that the required figure is "approximately 110%". OTSC at 3. Even taking that as correct, the benchmark is 110% of the *current* market value of the loaned securities. (GMSLA, definition of "Market Value"; SLA § 9). Because the loaned securities have a current market value of approximately $185 million, (Torline

Aff. ¶20), the required collateral is approximately $203.5 million. The collateral's current value of $198,591,177 comes within 2.5% of that amount, and any modest variance against the margin is not evidence of dissipation; as Mr. Kang affirms, it reflects mark-to-market movement and will be rebalanced as necessary.

**2. Shinhan's Alleged Harms Are Economic or Conclusory**

What Shinhan appears to be seeking is the pre-judgment delivery of value it can recover, if it prevails, through a money judgment against a solvent, U.S.-based counterparty. This does not constitute irreparable harm. Shinhan's attempt to shoehorn its motion into the narrow exceptions for collateral-dissipation and conversion fall flat. Those exceptions require actual dissipation, which has not occurred, and the conversion exception is unavailable because, as explained, Shinhan holds no title to the collateral. Nor are Shinhan's assertions of operational and reputational harm supported by any affidavit, documents, or market evidence. *Ipse dixit* conclusory allegations of harm cannot sustain the extraordinary relief Shinhan seeks.

**C. THE BALANCE OF EQUITIES FAVORS RIA**

Nor does anything in the produced documents supports Shinhan's facially implausible argument that its motion seeks to "preserve the status quo." OTSC at 17. To the contrary, because Shinhan never had title, the status quo is RIA's continued possession and control of the collateral in a custodial account, with reporting to Shinhan, all subject to the Court's determination of RIA's damages and the extent to which it can set off those damages against the collateral and RIA's post-breach borrowing payments.

Indeed, the equities firmly favor RIA. At present the collateral is in the U.S. with a U.S. custodian and U.S. investment manager, fully available to satisfy any judgment. Kang Aff. ¶33-43; Torline Aff ¶10-14. By contrast, Shinhan has publicly announced its withdrawal from the U.S. market, meaning that if the collateral were transferred to it, those assets could be removed

beyond this Court's practical reach before the merits are decided. Denying the motion would thus preserve both parties' ability to recover; while granting it would expose RIA to potentially irreparable loss in respect of the amounts it can realistically recover on its SDA and SLC breach claims.

## CONCLUSION

The Court should deny Shinhan's Order to Show Cause in its entirety. Should the Court conclude that any interim measure is warranted, RIA respectfully submits that the appropriate relief is to maintain the status quo on the commitments RIA has volunteered—*i.e.*: (i) all past and ongoing borrowing payments as due will be placed in a custodial account, (ii) the collateral will remain in its custodial account at WSFS in the United States, and (iii) RIA will provide regular borrowing payment and collateral reporting—and also direct that Shinhan not further disrupt the WSFS custodial relationship pending judicial resolution of the parties' allegations.

Dated: New York, New York

June 1, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Sascha N. Rand*

Sascha N. Rand
Toby E. Futter
J. Sebastian Becker
295 5th Avenue, New York, NY 10016
(212) 849-7000
sascharand@quinnemanuel.com
tobyfutter@quinnemanuel.com
sebastianbecker@quinnemanuel.com
*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

Pursuant to Rule 17 of the Rules of the Commercial Division, I certify that this Supplemental Memorandum of Law, inclusive of point headings and footnotes and exclusive of the caption, signature block, and this certificate, contains 4,146 words and complies with the Court's 4,200-word limit. This certificate relies on the word count of the word-processing system used to prepare this memorandum.

/s/ *Sascha N. Rand*
Sascha N. Rand

**EXHIBIT 27**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| RIA R SQUARED, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>SHINHAN SECURITIES CO., LTD.<br><br>Defendant. | Index No.: 659538/2024<br><br>Hon. Anar R. Patel, A.J.S.C. |

**AFFIRMATION OF TIMOTHY TORLINE**

I, Timothy Torline, hereby affirm, under penalty of perjury pursuant to CPLR 2106, as follows:

1. I am the President of Investments of Ducenta Squared Asset Management ("Ducenta"), an investment adviser registered with the U.S. Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended (the "

2. Advisers Act"). I hold the Chartered Financial Analyst (CFA) designation and previously held NASD Series 3, 7, and 63 licenses.

3. I have over 25 years of experience in the investment management industry, including portfolio management, credit analysis, and institutional fixed income strategy. I submit this Affirmation in connection with the above-captioned action based upon my personal knowledge and my review of records maintained by Ducenta in the ordinary course of its business in accordance with the books-and-records requirements applicable to SEC-registered investment advisers under Rule 204-2 promulgated under the Advisers Act.

**A. Ducenta's Identity, SEC Registration, and Independence**

4. Ducenta is an investment adviser registered with the SEC pursuant to Section 203 of the Advisers Act and is subject to the full regulatory regime applicable to SEC-registered

investment advisers, including the antifraud provisions of Section 206, the books-and-records requirements of Rule 204-2, the compliance program requirements of Rule 206(4)-7, the marketing requirements of Rule 206(4)-1, and the custody-related requirements of Rule 206(4)-2 (the "Custody Rule"), where applicable. Ducenta has been continuously registered as an investment adviser for over 40 years, with its legacy originating from Bradford & Marzec, LLC, which was founded in 1984.

5. In accordance with Rule 206(4)-7 under the Advisers Act, Ducenta has adopted and implemented written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder, has designated a Chief Compliance Officer responsible for administering those policies and procedures, and reviews the adequacy of its compliance program no less frequently than annually. Ducenta also makes the public disclosures required of SEC-registered advisers on Form ADV, including Parts 1, 2A, and 2B.

6. Ducenta operates in compliance with the Global Investment Performance Standards ("GIPS"), the globally recognized standard for investment performance measurement and reporting, and presents performance information in a manner consistent with the requirements of Rule 206(4)-1 under the Advisers Act (the "Marketing Rule").

7. Ducenta has been independently verified by ACA Group for the periods from July 20, 2020, through December 31, 2024. ACA Group has confirmed that Ducenta's policies and procedures for complying with the GIPS standards related to composite and pooled fund maintenance, as well as the calculation, presentation, and distribution of performance, have been designed in compliance with the GIPS standards and implemented on a firm-wide basis.

8. Ducenta currently manages approximately $3.4 billion in assets across institutional strategies including Core, Core Plus, High Yield, Corporate Credit, Intermediate, Low Duration,

Securitized, and Bank Loan strategies, serving public funds, Taft-Hartley plans, private wealth, foundations, endowments, corporate clients, and Native American accounts.

9. Ducenta is a separate legal entity from RIA R Squared, Inc. ("RIA"). While Mr. David Kang is the Chairman and CEO of Ducenta, the company operates under its own regulatory framework as an SEC-registered investment adviser, maintains its own compliance infrastructure under Rule 206(4)-7, has an executive team that includes myself as President of Investments, a Chief Compliance Officer, and a Head of Portfolio Management, among others. As an SEC-registered investment adviser, Ducenta is subject to fiduciary duties of care and loyalty owed independently to each of its advisory clients, including RIA, under Section 206 of the Advisers Act and SEC interpretive guidance (see Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA-5248 (June 5, 2019)). Ducenta maintains separate auditors and accountants for tax reporting purposes, and its corporate structure, regulatory registration, and tax treatment are entirely independent from RIA.

**B. Ducenta and the Collateral and Custodial Account**

10. Ducenta manages certain assets for RIA as collateral (the "Collateral") pursuant to RIA's security lending relationship with Shinhan Securities Co., Ltd. ("SSC"). The Collateral is held in an account (the "Custodial Account") at WSFS Bank ("WSFS"), held through SEI Private Trust Company, pursuant to an Investment Management Agreement between Ducenta and RIA. WSFS is a "qualified custodian" within the meaning of Rule 206(4)-2(d)(6) under the Advisers Act, and the custody arrangement is structured consistent with the framework contemplated by the Custody Rule.

11. The Custodial Account is titled "RIA R SQUARED SEC CUST Ducenta 80-20," account number ending in 404-1. It is a sub-account to the master account titled "RIA R SQUARED Sec Custody," which has an account number ending in 404-0.

12. I hereby affirm that the assets described in the Position Reconciliation spreadsheets (that I understand that RIA produced to SSC on or about May 26, 2026), and reflected in the WSFS portal screenshot (that I understand were also produced to SSC on or about May 26, 2026), are in fact held at WSFS, through SEI Private Trust Company, and that Ducenta has confirmed this through its own books and records, which are maintained in accordance with Rule 204-2 under the Advisers Act.

**C. Duties of an Asset Manager (like Ducenta) vs Duties of a Custodian (like WSFS)**

13. In the institutional asset management industry, there is a well-established separation of duties between the qualified custodian and the investment adviser. This separation is reflected in, and reinforced by, the SEC's regulatory framework for investment advisers—most notably Rule 206(4)-2 under the Advisers Act, which generally requires that client funds and securities be maintained with a "qualified custodian" rather than with the adviser itself, and the SEC's longstanding guidance regarding adviser custody arrangements (*see, e.g.*, Custody of Funds or Securities of Clients by Investment Advisers, Release No. IA-2968 (Dec. 30, 2009)).

14. The qualified custodian—here, WSFS through SEI Private Trust Company—provides ledgering services: it holds the assets, records transactions, and maintains the books and records of the account, and is the entity responsible under the Custody Rule for delivering periodic account statements directly to the client. The investment adviser—here, Ducenta—provides portfolio management, valuation, and investment performance services: it determines the market value of the holdings, manages the portfolio, and reports investment performance in accordance with the adviser's written valuation policy (adopted pursuant to Rule 206(4)-7) and the Marketing Rule.

15. This separation of duties is the standard industry arrangement contemplated by the SEC's regulatory framework, and it mirrors the arrangement that existed when BNP Paribas ("BNP") served as the custodian agent under the operative agreements. Indeed, under the prior arrangement, BNP served as the custodian and provided ledgering, while Ducenta and RIA generated the daily Default Market Value reports. The current arrangement at WSFS operates on the same principle.

16. Consistent with this framework, it is standard custodial practice for WSFS—or any institutional qualified custodian—not to provide independent market valuations of the assets it holds. WSFS provides ledgering: it records what assets are in the account, in what quantities, and processes transactions. Ducenta, in its capacity as the SEC-registered investment adviser, provides the valuation. RIA engaged WSFS for qualified-custodian ledgering services and Ducenta for portfolio management, valuation, and investment performance—an allocation of functions consistent with industry practice and with the regulatory framework applicable to SEC-registered advisers and qualified custodians.

**D. The Custodial Securities and Collateral Valuation Methodology and Valuation**

17. Ducenta has valued the securities that were loaned by SSC to RIA (the "Loaned Securities") and the Collateral assets held in the Custodial Account using the methodology set forth below, consistent with Ducenta's written Valuation Policy, which has been adopted as part of Ducenta's Rule 206(4)-7 compliance program and is applied uniformly across similarly situated client accounts. The methodology is designed to produce fair value determinations consistent with the fair value framework generally accepted in the institutional asset management industry (including the inputs hierarchy reflected in ASC Topic 820):

a. CUSIP Securities: Securities with CUSIP identifiers—including corporate bonds and structured products—are valued daily using Bloomberg BVAL, an institutional pricing source widely recognized and relied upon in the fixed income markets. BVAL provides evaluated pricing based on market data inputs including dealer quotes, trade data, and comparable securities analysis. This is confirmed per Ducenta's Valuation Policy.

b. Bespoke Investments: The Custodial Account also contains investments for which no daily public market price is available, including commercial real estate interests, loans associated with commercial real estate, and private debt. For these instruments, Ducenta values them using the most recent third-party appraisal valuations obtained from independent appraisers. This approach is consistent with the fair-value approach contemplated by the mark-to-market framework set forth in the SLA and with Ducenta's written Valuation Policy. Ducenta would recommend updated appraisal valuations as applicable; however, costs associated with obtaining such appraisals are a factor that must be taken into consideration in a manner consistent with Ducenta's fiduciary obligations to its client.

c. Cash Balances: Cash balances are valued at face value.

18. Ducenta has also created a series of position reconciliation reports in Excel format that provide valuations for the Collateral held with WSFS, which I understand were provided to SSC on or about May 26, 2026. These reports are produced consistent with Ducenta's written policies and procedures and are maintained as part of Ducenta's books and records under Rule 204-2.

19. As of April 30, 2026, Ducenta's current valuation of the Collateral held in the Custodial Account with WSFS is $198,591,177. The CUSIP securities within the Collateral were valued at their Bloomberg BVAL mid-prices as of April 30, 2026. Any bespoke investments in the Collateral were valued at their most recent third-party appraisal values, based on independent appraisals and comparable market data.

20. As of April 30, 2026, Ducenta's current valuation of the Loaned Securities is $185,517,963.75. As with the Collateral valuation, the Loaned Securities were valued at their

Bloomberg BVAL mid-prices as of April 30, 2026, consistent with Ducenta's written Valuation Policy.

**E. Ducenta Collateral Reporting on Behalf of RIA**

21. Consistent with its fiduciary obligations under Section 206 of the Advisers Act and its written compliance and recordkeeping policies, Ducenta is able and prepared to provide the following reporting on behalf of RIA in respect of the Collateral, commencing June 1, 2026:

a. Daily Reporting: Daily reporting of the Collateral assets held in the Custodial Account;

b. Monthly Position Reconciliation: monthly reconciliation reports reflecting all holdings, quantities, and valuations in the Custodial Account, consistent with Ducenta's position reconciliation practices and its Rule 204-2 books-and-records obligations;

c. Regular Valuation Updates: daily or weekly DMV updates for CUSIP securities, to the extent Bloomberg BVAL pricing is available, and quarterly bespoke valuation updates to the extent new third-party appraisal valuations become available, in each case consistent with Ducenta's written Valuation Policy; and

d. Portal Access: portal access to SSC through Bloomberg AIM/PORT, if SSC maintains Bloomberg terminal access, to permit real-time position visibility, subject to Ducenta's information-security and access-control policies.

I affirm this 1st day of June, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

[signature]

Timothy Torline

**EXHIBIT 28**

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

| | |
|---|---|
| RIA R SQUARED, INC.,<br>Plaintiff,<br>-against-<br>SHINHAN SECURITIES CO., LTD.,<br>Defendant. | Index No.: 659538/2024<br>Hon. Anar R. Patel, A.J.S.C. |

**AFFIRMATION OF DAVID KANG**

I, David Kang, hereby affirm, under penalty of perjury pursuant to CPLR 2106, as follows:

1. I am the President and Chief Executive Officer of RIA R Squared, Inc. ("RIA"), and make this Affirmation based upon my personal knowledge and my review of business records maintained by RIA in the ordinary course of its business.

2. I am fully familiar with the facts and circumstances of the securities-lending relationship between RIA and Shinhan Securities Co., Ltd. ("SSC"), and the allegations that RIA has made as Plaintiff in the complaint filed against SSC as Defendant in the above-captioned action, and I submit this affirmation in connection with that action.

**A. The GMSLA and The Custodial Account**

3. On January 25, 2019, RIA and SSC entered into a Global Master Securities Lending Agreement ("GMSLA") and a contemporaneous Supplemental Lending Agreement for Securities Lending ("SLA"). These agreements created an arrangement where SSC would loan securities to RIA (the "Loaned Securities") and in exchange RIA would pay a borrowing fee and provide collateral for such loans (the "Collateral").

4. Due to certain regulatory and structural issues raised by the cross border nature of the arrangement (i.e., US and South Korea), and to accommodate Shinhan's desire for higher than usual borrowing fees, the parties did not agree to a traditional three-party collateral account arrangement whereby the Collateral would be held in a secured account with title passing to SSC.

5. Instead, under the GMSLA and SLA, the Collateral was held in a custodial account maintained at a designated agent (the "Custodial Account") with title remaining with RIA. The required amount of the Collateral is defined by the market value of the Loaned Securities, and RIA and Shinhan agreed that the Collateral would—generally, and subject to market fluctuations—be 110% of the current market value of the Loaned Securities.

6. The SLA authorizes RIA, as the Borrower (Party B), to actively manage the Loaned Securities—including by engaging in REPO and Reverse REPO transactions—and to reinvest the proceeds thereof.

7. Because title to the Collateral did not pass to SSC, RIA was also permitted to actively manage and generate income from it (subject only to the parties' agreement regarding the amount of Collateral required).

8. RIA's retention of title and active management authority over the Collateral was a central feature of the parties' business arrangement as it allowed RIA to generate additional returns from the Collateral during the term of any loan of the Loaned Securities.

9. Accordingly, the Collateral was not maintained in a secured account and Shinhan did not take title to it.

10. The Collateral was initially held in an RIA securities account at BNP Paribas ("BNP") (the "Custodial Account"), and at times specific Collateral was subject to "Block Letters." Block Letters are written instructions issued by RIA, and consented to by SSC as witness, directing BNP to block the sale of specified Collateral securities so that they could not be sold or removed while serving as security collateral for the Loaned Securities.

11. However, following Shinhan's demand that RIA prematurely return $47 million of Loan Securities, an "Unblock" letter was agreed to by the parties on April 5, 2020, after which there were no blocks on any of assets held as Collateral.

12. At all times the title to the Collateral remained with RIA throughout the parties' relationship. It has never passed to Shinhan.

### B. Ducenta's Role As RIA's Investment Advisor

13. RIA's investment advisor is Ducenta Squared Asset Management ("Ducenta"). Ducenta is an SEC-registered investment advisor, with a legacy performance record spanning more than forty years that it holds through acquisition.

14. Ducenta currently provides investment management service to RIA, and is responsible for the day-to-day management of the assets held in the Custodial Account. Ducenta manages those assets in accordance with the investment parameters directed by RIA as set forth in the SLA, including the REPO and Reverse REPO authority described above, and consistent with its obligations and adherence as an SEC-registered advisor.

15. While I hold the role of Chairman and CEO at Ducenta, it is a separate entity that maintains an entirely separate corporate structure and a separate existence for purposes of federal regulatory registration and self-reporting, tax treatment, and audit compliance.

### C. BNP's Role As RIA's Custodian For The Collateral

16. As I noted, BNP Paribas ("BNP") initially served as the designated Administrator for the Custodial Account under the SLA.

17. As part of the maintenance framework for the Collateral, RIA provided SSC with daily reports reflecting the Collateral Market Value and the Loaned Securities Market Value (the "Collateral Reports").

18. The Collateral Reports were generated by RIA and submitted to BNP on a daily basis. BNP, in turn, confirmed the reports on a daily basis, stating: "We confirm bonds listed under collateral assets have settled or are to be settled." The Collateral Reports were then sent by RIA to SSC for final confirmation and/or Market Value reconciliation.

19. BNP's role in respect of the Collateral Reports was twofold: (1) to confirm that the securities identified in the applicable Block Letters remained subject to the block; and (2) to confirm that the bonds listed as Collateral had settled or were to be settled. BNP did not create the Collateral Reports, and it did not provide or confirm any valuations set forth in the reports. Its role was limited to the two confirmations described above.

20. Beginning in October 2024, SSC sent a series of letters directly to BNP—at least six in total—each time purporting to declare that RIA had defaulted under the GMSLA and demanding that BNP immediately transfer title to the Collateral to SSC.

21. BNP declined to acknowledge that RIA had defaulted and rejected SSC's directives each time including because, as I understand it, it was aware that RIA had alleged that it was Shinhan, rather than RIA, that was in default.

22. Despite BNP's repeated refusals, and despite RIA's demands that SSC cease attempting to interfere with RIA's relationship with BNP, SSC continued sending letters to BNP through at least April 2026.

23. As a direct result of SSC's letters to BNP, in December 2024 BNP served RIA with a 90-day notice of termination for its Middle Office Services and Local Custody and demanded that RIA move the Collateral out of RIA's custodial account at BNP.

24. Despite RIA's best efforts, BNP was not willing to reconsider this decision, and a final termination date was set for April 30, 2025. It is my belief that SSC's repeated correspondence to BNP was the direct cause of BNP's decision to terminate its custodial relationship with RIA—a relationship that had been in place for more than a decade.

### D. RIA's Collateral Reporting

25. Following BNP's termination of its custodial relationship with RIA, RIA's access to BNP's custodial reporting was limited and discontinued. As a result, currently it is no longer possible for RIA to access BNP's system nor to obtain any data or information from BNP reflecting the assets as they were held during the BNP custodial period. Historical position data from the BNP period during 2024 and 2025 has been migrated to the Bloomberg AIM/PORT infrastructure.

26. To the extent SSC maintains Bloomberg terminal access, I understand that Ducenta is prepared—subject to compliance and certain other confirmations—to provide SSC with access to this historical position data through the Bloomberg platform.

27. Following BNP's forced termination of RIA's custodial relationship, RIA was forced to transition the Collateral to a new custodian, Wells Fargo Securities, LLC ("Wells Fargo").

28. Wells Fargo served as a prime brokerage custodian for certain of the Collateral during this transition period. Other assets were also transferred to WSFS Bank ("WSFS").

29. During this interim period, which lasted from May 2025 to February 2026, the Collateral was held at both Wells Fargo and WSFS, as reflected in RIA's position reconciliation statements from that time.

30. In September 22, 2025, Wells Fargo issued a notice of termination of the Prime Brokerage Customer Agreement and Futures and Clearing Swaps. I understand that this termination was a direct result of an inquiry made by their Credit Department related to the Shinhan Litigation.

31. As a result of Wells Fargo's termination, RIA fully transitioned the Collateral to WSFS, where it is held through SEI Private Trust Company.

32. SEI Private Trust Company, through which the Collateral is held, is a DTC Clearing participant with Participant Number 2663. WSFS is a regulated financial institution: a trust company, custodian, and bank. It is my understanding that it is subject to applicable federal and state banking and fiduciary regulations.

## E. The Current Custodial Account

33. At present, all Collateral is held in the Custodial Account with WSFS.

34. The Custodial Account is titled "RIA R SQUARED SEC CUST Ducenta 80-20" and has an account number ending in 404-1.

35. This account is a sub-account within the master account titled "RIA R SQUARED Sec Custody," which has an account number ending in 404-0.

36. The Collateral presently consists of two broad categories:

    a. The first category is CUSIP securities, including corporate bonds and structured products with publicly available market prices. These securities are priced using Bloomberg BVAL, an institutional pricing source.

    b. The second category is bespoke investments, including commercial real estate interests, loans associated with commercial real estate, and private debt. These bespoke investment valuations are based on the most recent third-party appraisal valuations.

37. The SLA placed some non-limiting specifications on the types of assets that RIA could use as Collateral. *See* SLA, §12 (providing that the Collateral "shall include but not be limited to" six types of securities and seventeen types of hedges). As described above however, Shinhan released any collateral requirements in April 2020 when it issued an "unblock

letter" to allow RIA to sell whatever part of the Collateral was necessary to comply with Shinhan's demand that RIA prematurely return $47M of Shinhan's loaned securities

38. Ducenta's current and most updated valuation of the Collateral—determined on an accrual accounting basis and consistent with recognized institutional valuation methodologies—as held in the Custodial Account at WSFS is $198,591,177.

39. I understand the underlying valuation methodology, pricing sources, and data infrastructure are set forth in detail in the accompanying Affirmation from Mr. Tim Torline dated June 1, 2026.

40. It is my understanding that this valuation approach is consistent with the GMSLA's Default "Market Value" definition and the SLA's mark-to-market requirements, and is the valuation approach required by the GMSLA and SLA.

41. I confirm that the Collateral described in the Position Reconciliation spreadsheets (which I understand were produced to SSC on or around May 26, 2026), and as reflected in the WSFS portal screenshot (which I understand was also produced to SSC on that date), are in fact held at WSFS, through SEI Private Trust Company, and will continue to be held there pending the resolution of this litigation.

42. I further confirm that the Collateral are all RIA's assets, held as collateral for Shinhan pursuant to the GMSLA and SLA, and have not been commingled with any other party's assets.

43. RIA, through Ducenta, has maintained the Collateral in a Custodial Account and none of the assets have not been dissipated or transferred to non-custodial third parties.

**F. RIA's Undertakings Concerning the Collateral and the Custodial Account**

44. I have carefully reviewed the transcript of the Court's May 12, 2026 conference and the orders issued thereafter.

45. Based on that review, and consultation with recently engaged counsel from Quinn Emanuel, RIA hereby makes the following commitments effective immediately and continuing pending further order of this Court:

    a. Daily Reporting: RIA commits to providing SSC with daily reporting regarding the Collateral held in the Custodial Account;

    b. Monthly Position Reconciliation: RIA commits to providing SSC with monthly position reconciliation reports for the Collateral, reflecting all holdings, quantities, and valuations;

    c. Portal Access: RIA commits to providing SSC portal access through Bloomberg AIM/PORT for the Collateral, if SSC maintains Bloomberg terminal access, to permit real-time position visibility;

d. Trade Transparency: RIA commits to reporting to SSC and its counsel, in writing, any trading activity—whether a purchase or sale—of the Collateral as necessary for ongoing collateral management and balancing, within two (2) calendar days;

e. SLA-Consistent Management: RIA commits to ensure that Ducenta, as RIA's SEC-registered investment advisor, will continue to manage the Collateral in the Custodial Account consistent with the investment parameters in the parties' agreements;

f. No Dissipation: RIA will not transfer, further encumber, or remove the Collateral from the Custodial Account pending further order of this Court (except in the ordinary course of portfolio management consistent with the SLA and subject to the two-day notice commitment set forth above). Any expenditures from the account will be limited to normal operating expenses and activities in line with the management of the Collateral and Custodial Account; and

g. Income Generation and Preservation: Ducenta will continue to manage the Collateral in the Custodial Account to generate income and/or appreciation of the assets, consistent with the economic purpose of the GMSLA and SLA.

46. I understand that it may be important for the Court to be aware that the Collateral currently include assets or positions that, if RIA was forced to close and transfer them on short notice, would result in realization values significantly below their fair market values and significantly reduce the value of the Collateral. I believe this would be to the detriment of both parties and contrary to the economic design of the agreements, and respectfully request that the Court take this consideration into account as necessary and appropriate.

**G. The Status of the GMSLA**

47. I understand that the Court has asked for confirmation regarding whether the GMSLA has been terminated in light of my April 7, 2026 email correspondence to SSC, and wish to clarify the intent and context of that communication.

48. My April 7, 2026 was sent at a time of extreme personal frustration given what I believed to be a history of repeated defaults, threats, and coercion by SSC in breach of their contractual relationships, resulting in significant harm to RIA's business, business relationships, and future business prospects.

49. The email was intended as a notice to SSC of its defaults, an enumeration of the damages I believe SSC is liable for its default and improper interfere with RIA's business, a reservation of RIA's rights and remedies, and a notice of setoff in relation to the collateral in regard to those damages which as a matter of industry practice I strongly believe RIA was entitled to effect.

50. Upon reflection and after obtaining further legal advice, I understand that the Court will not permit any such setoff until after it has adjudicated the Parties' rights under the agreements following a trial of this matter.

51. While I wished to effect the setoff rights that I believe RIA holds against the collateral as described in my April 7, 2026 email, that email was not a formal termination of the GMSLA and was not intended as an irrevocable election to terminate the GMSLA.

52. Consequently, RIA has not treated the GMSLA as terminated in practice. It has continued to maintain the Collateral, continued to manage the Collateral consistent with the SLA's investment parameters, and has committed to resuming daily collateral reporting.

59. To the extent any ambiguity exists, on behalf of RIA I hereby confirm that it does not consider the GMSLA to have been terminated and that the operative agreements—including the custodial framework and custodial maintenance obligations set forth in the SLA—remain in effect pending judicial determination of the parties' respective rights.

## H. The Status of Coupon Payments and Borrowing Rate Payments

60. I understand that the status of RIA's regular payments under Section 7 of the SLA and coupon pass-through obligations under Section 6.2 of the GMSLA (together, the "Borrowing Payments") are in question.

61. RIA acknowledges that it ceased making the Borrowing Payments in May 2025. I believed this was justified under the governing contracts and as a matter of industry practice and the agreements between the parties given Shinhan's repeated defaults and harmful conduct.

62. Based on my review of the May 12, 2026 transcript and after consultation with counsel at Quinn Emanuel however—and while reserving all set off and damages rights and allegations—RIA undertakes and affirms the following:

a. RIA has begun and undertakes to complete payment into a dedicated custodial account with WSFS all past and presently due Spread Coupon liabilities as per the SLA and SDA (the "Custodial Spread Payments Account"), with those and any ongoing Spread Coupon payments to be held in that account pending the Courts' resolution of this litigation. RIA currently expects to be able to confirm the Custodial Spread Payments Account details, and to confirm the account balance, by Wednesday June 3, 2026.

b. RIA has begun and undertakes to complete payment into a dedicated escrow account all past and presently due Passthrough Coupon liabilities as per GMSLA (the "Escrow Coupon Payments Account"), with those and any ongoing Passthrough Coupon payments to be held in that account pending the Court's resolution of this litigation. RIA currently expects to be able to confirm the Escrow Coupon Payments Account details, and to confirm the account balance, by Friday June 12, 2026.[1]

63. RIA respectfully urges the Court to direct SSC not to make further attempts to access or obtain control over (i) the Custodial Account, or (ii) the Custodial Spread Payments Account or the Escrow Coupon Payments Account, absent permission of the Court, given SSC's prior correspondence with BNP directly caused BNP to terminate its 10-year

[1] In April 2025, BNP double paid $123,495.41 to SSC and RIA's incipient payments will account for this overpayment.

custodial relationship with RIA, and it would be a catastrophic loss to RIA if WSFS were to similarly terminate its current custodial account due to similar self-help attempts by SSC in respect of the claims and allegations currently before the Court.

I affirm this 1st day of June, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

David Kang

# EXHIBIT 29

**From:** Toby Futter <TobyFutter@quinnemanuel.com>
**Sent:** Tuesday, June 16, 2026 11:17 AM
**To:** Garr, Laura; Sascha Rand
**Cc:** Sebastian Becker; Hannah Barbosa Cesnik; Sklar, Hannelore; Hille, David; W&C Shinhan Core Team
**Subject:** [EXT] RE: RIA v Shinhan --Stipulation Follow Up
**Attachments:** Ria Ltr to WSFS re Notice (6-15 DRAFT).docx

Laura – RIA's responses to your questions are set out in red:

1. We continue to believe that payment directly to Shinhan is consistent with the "status quo" at the timing the litigation was filed and should resume. Please confirm whether RIA can agree on this point or if it would require a court order. Alternatively, our client has confirmed that they would be willing to open a U.S. account into which RIA would make the borrowing rate and coupon payments for the duration of the litigation. RIA will agree to (1) transfer the current $1.8M balance of the WSFS custodial account to a Shinhan escrow account and continue to pay all spread payments as due to that Shinhan escrow account, provided Shinhan undertakes to RIA and the Court that it will not withdraw funds from that escrow account during the pendency of this litigation, and (2) transfer the current $4.8M balance of the WSFS escrow account to a Court account and continue to make coupon payments as due to that Court account during the pendency of this litigation.

2. Can you please confirm that Shinhan can be provided daily (read only) access to the custodial account so the amount and status of collateral can be verified on a daily basis. RIA will inquire with WSFS whether this is possible and has no objection to providing such access if WSFS will agree to do so.

3. As requested by email last Tuesday (June 9), and discussed during the status conference with Ms. Van Brunt on Friday, can you please provide the third-party appraisal(s) of the collateral referenced in paras. 17(b) and 19 of the June 1, 2026 Affirmation of Timothy Torline today? RIA has included these documents with its document production made earlier today.

4. We have advised Shinhan that RIA has proposed using Houlihan Lokey to provide both ongoing valuations of the illiquid collateral assets and to develop a path forward for converting those illiquid assets into liquid securities. We hope to have an answer from Shinhan regarding RIA's proposed retention of Houlihan Lokey by tomorrow, subject to agreement on the other terms. Given the time sensitivity, RIA has now engaged Houlihan Lokey.

   Can RIA please confirm what percentage of the illiquid assets RIA is able to swap <u>at the present time</u> so that we can get approval from our client on a preliminary substitution together with an agreement on a schedule for the remainder in coordination with Houlihan Lokey. RIA is unable to provide that confirmation at this time, as it requires that Houlihan Lokey value those assets and then assess their marketability. RIA will agree to provide an update on this process as and when Houlihan Lokey is able to provide one.

5. At Friday's status conference, you were not certain whether RIA had already advised WSFS that the collateral is held exclusively for Shinhan's benefit and provided the bank with the underlying agreements including Shinhan's power of attorney. Can you please confirm whether that communication has occurred, and provide us with copies of all information RIA has provided to WSFS? RIA proposes providing WSFS with the attached letter, which it will send subject to Shinhan's agreement to do so. Relatedly, our client is concerned that the securities are serving as collateral for other counterparties or creditors of RIA. Can you please provide confirmation that there is no title, liens, or rights by any other party to the current collateral. Following consultation with RIA, we confirm.

We are available to discuss any of the above ahead of Wednesday's hearing with the Court with the goal of reaching a resolution on all of the above points. RIA had understood that the purpose of entering a stipulation would be to avoid further argument on the OTSC. Please confirm that, if the parties can reach a stipulation, Shinhan will withdraw its motion. If a stipulation is possible, RIA proposes that the parties also consider a stay of any pending motion practice and discovery to reduce the parties' legal costs while the Houlihan Lokey valuation and marketability process is conducted.

Separately, we are in receipt of your communications regarding the amounts for the previously outstanding borrowing rate and coupon payments, and have been discussing RIA's calculations with our client. Can you please clarify two points regarding the coupon payments: We will inquire with RIA and expect to be able to provide these clarifications shortly.

1. Can you please confirm the time period RIA was using for calculation of the coupon payments?

2. Your June 13 email refers to a "historic overpayment of $444,769.27" that RIA identified—please advise on the date(s) of this "historic overpayment." Our client is separately investigating this point on their end as well.

---

**From:** Garr, Laura <laura.garr@whitecase.com>
**Sent:** Monday, June 15, 2026 1:18 PM
**To:** Toby Futter <TobyFutter@quinnemanuel.com>; Sascha Rand <sascharand@quinnemanuel.com>
**Cc:** Sebastian Becker <sebastianbecker@quinnemanuel.com>; Hannah Barbosa Cesnik <hannahbarbosacesnik@quinnemanuel.com>; Sklar, Hannelore <hannelore.sklar@whitecase.com>; Hille, David <dhille@whitecase.com>; W&C Shinhan Core Team <wcshinhancoreteam@whitecase.com>
**Subject:** RIA v Shinhan --Stipulation Follow Up

**[EXTERNAL EMAIL from laura.garr@whitecase.com]**

---

Toby, Sascha,

I am writing to follow up on the potential stipulation that we discussed last week and during Friday's status conference to see if the parties can reach a resolution before Wednesday:

1. We continue to believe that payment directly to Shinhan is consistent with the "status quo" at the timing the litigation was filed and should resume. Please confirm whether RIA can agree on this point or if it would require a court order. Alternatively, our client has confirmed that they would be willing to open a U.S. account into which RIA would make the borrowing rate and coupon payments for the duration of the litigation.

2. Can you please confirm that Shinhan can be provided daily (read only) access to the custodial account so the amount and status of collateral can be verified on a daily basis.

3. As requested by email last Tuesday (June 9), and discussed during the status conference with Ms. Van Brunt on Friday, can you please provide the third-party appraisal(s) of the collateral referenced in paras. 17(b) and 19 of the June 1, 2026 Affirmation of Timothy Torline today?

4. We have advised Shinhan that RIA has proposed using Houlihan Lokey to provide both ongoing valuations of the illiquid collateral assets and to develop a path forward for converting those illiquid assets into liquid securities. We hope to have an answer from Shinhan regarding RIA's proposed retention of Houlihan Lokey by tomorrow, subject to agreement on the other terms.

   Can RIA please confirm what percentage of the illiquid assets RIA is able to swap at the present time so that we can get approval from our client on a preliminary substitution together with an agreement on a schedule for the remainder in coordination with Houlihan Lokey.

5. At Friday's status conference, you were not certain whether RIA had already advised WSFS that the collateral is held exclusively for Shinhan's benefit and provided the bank with the underlying agreements including Shinhan's power of attorney. Can you please confirm whether that communication has occurred, and provide us with copies of all information RIA has provided to WSFS? Relatedly, our client is concerned that the securities are serving as collateral for other counterparties or creditors of RIA. Can you please provide confirmation that there is no title, liens, or rights by any other party to the current collateral.

We are available to discuss any of the above ahead of Wednesday's hearing with the Court with the goal of reaching a resolution on all of the above points.

Separately, we are in receipt of your communications regarding the amounts for the previously outstanding borrowing rate and coupon payments, and have been discussing RIA's calculations with our client. Can you please clarify two points regarding the coupon payments:

1. Can you please confirm the time period RIA was using for calculation of the coupon payments?

2. Your June 13 email refers to a "historic overpayment of $444,769.27" that RIA identified—please advise on the date(s) of this "historic overpayment." Our client is separately investigating this point on their end as well.

Best,

Laura

**Laura Garr** | Partner
**T** +1 212 819 8849 **M** +1 917 968 0236 **E** laura.garr@whitecase.com
White & Case LLP | 1221 Avenue of the Americas | New York, NY 10020-1095

==============================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

==============================================================================

# EXHIBIT 30

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 45
------------------------------------------X
RIA R. SQUARED, INC.,

Plaintiff,

INDEX NO: 659538/2024

-against-

SHINHAN SECURITIES CO., LTD.,

Defendants.
------------------------------------------X

New York Supreme Courthouse
60 Centre Street
New York, New York 10007
JUNE 3, 2026

B E F O R E:

THE HONORABLE ANAR R. PATEL,
J U S T I C E

A P P E A R A N C E S:

WINSTON & TAYLOR
Attorney for the Plaintiff
200 Park Avenue
New York, New York 10166
BY: GEORGE MASTORIS, ESQ.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorney for the Plaintiff
51 Madison Avenue, 22nd Floor
New York, New York 10010
BY: TOBY E. FUTTER, ESQ.
JONATHAN SEBASTIAN BECKER, ESQ.
SASCHA N. RAND, ESQ.

WHITE & CASE
Attorney for the Defendant
1221 Avenue of the Americas
New York, New York 10020
BY: LAURA GARR, ESQ.
DAVID G. HILLE, ESQ.

Karen Mangano, CSR
Senior Court Reporter

KM

THE COURT: Good afternoon. We are here on RIA R. Squared Inc. against Shinhan Securities Co Limited, Index 659538 of 2024.

Counsel, your appearances, please.

MR. RAND: Good afternoon, your Honor. Sascha Rand, Quinn Emanuel for plaintiff. Nice to meet you.

MR. MASTORIS: George Mastoris, Winston Taylor, I think as of yesterday on behalf of Ria R. Squared.

MR. FUTTER: Toby Futter also Quinn Emanuel.

MR. BECKER: Sebastian Becker.

MS. GARR: Good afternoon, your Honor. Laura Garr, White and Case on behalf of the defendants and counter claimants Shinhan Investment CORP.

MR. HILLE: David Hille, White and Case on behalf of Shinhan.

THE COURT: Okay, folks. We are here today on a continued preliminary injunction hearing with respect to motion sequence number three.

Now what I was going to propose for today, but it requires some buy-in from everyone is the following:

As we reviewed the supplemental briefs and looked at the underlying documentation with an eye towards what has historically been done between the parties in the past vis-à-vis the daily collateral reports and kind of what was business then and how we're looking to progress the case

forward and looking at plaintiff's offer in terms of how to get defendants the assurances they are seeking regarding the collateral, we would propose that maybe we take some time, go off the record and work out a stipulation to resolve this motion.

Alternative two is I'm ready to go if you want to proceed with respect to a preliminary injunction hearing. I'm happy to hear argument. I have a sense of what I think would make sense which would still adopt some of the offers plaintiff has made, but we are open to how you want to proceed.

MR. RAND: Your Honor, for plaintiff RIA, we think that makes very good sense.

In fact, one of the things that we've offered to Shinhan is the opportunity to confer in connection with certain reconciliations they may have in regard to the information we're providing. And just to provide the Court with an assurance from counsel, it is our intent to recreate exactly they were previously receiving --

THE COURT: Okay.

MR. RAND: And give them the assurances they were previously receiving.

Having said that, I'm not -- there may be differences about what they think they were previously receiving, but we're trying to recreate that, so I think a

stipulation makes good sense, your Honor, so we can have an expeditious trial.

THE COURT: That's helpful. Thank you, Mr. Rand.

MS. GARR: Thank you very much, your Honor. I do appreciate the offer, and I am open to having a discussion off record about a potential stipulation. I do want to note for your Honor some information that has come in since and that is relevant, and I don't think it has been made apparent in the papers.

On June 1, so yesterday, Shinhan received from RIA in the first daily report, and it is a report generated by Ducenta, and I do have a copy for your Honor if I may approach.

THE COURT: Thank you.

MS. GARR: This is what was sent, and it's a report generated by Ducenta sent from RIA to Shinhan without any bank verification. And if you compare it to the prior daily collateral reports with BNP and Shinhan which are Shinhan Exhibit 5 at Docket 192. You'll note it makes no mention of collateral, and it makes no mention of Shinhan. It's a position daily report for the client RIA R. Squared, but what this report does have that nothing else had previously that had been produced as part of the May 26 production is the valuation here.

THE COURT: Right.

MS. GARR: And what you'll see is that the -- what's notable is the drastic change in composition of both the value and the current securities that are being held at Wilmington and compared to the collateral assets that were verified for the BNP for the past six years.

Only two of the positions that formed Shinhan's collateral as of April 30, 2025 remain, and there's only around 60 million of liquid securities with any market value. The rest is bespoke portfolio of completely illiquid assets. The value attributed to them is listed from being third-party appraisal, an appraisal that was not in the production that was produced, and in any event, is worthless. These are not permitted custodial securities under the agreements, and the value that we attribute to them is illusory.

David Kang's confirmation -- affirmation makes this very clear. If you look at Paragraph 46 of his affirmation which is at Docket 181, he states, "It may be important for the Court to be aware that the collateral currently includes assets or positions that if RIA was forced to close and transfer them on short notice would result in realization values significantly below their fair market values and significantly reduce the value of the collateral." That isn't the case with liquid securities of the type required to be held as collateral.

We don't have the discovery that we requested and that you ordered be produced. But from what we do know as of May 2 just two days after the last collateral report, what RIA indicated it would transfer to this alleged new custodial account had a reported market value of only 92 million, less than half of the value of Shinhan's collateral and 40 million of that was illiquid assets.

What was to be transferred was only six assets from Shinhan's collateral totalling only 28 million. So as of yesterday all that currently remains are two Freddie Mac assets valued at around 1.5 million. So -- and notably, none of this is held in a custodial account for Shinhan's benefit over which it has any rights. RIA and Ducenta took complete control of this account. It was previously a Shinhan Investment Corp. custodial account. It is currently a RIA Ducenta account. So all the reporting that they are offering to make and what their offer suggests is reporting of assets that they own and control over which we have no rights, no way to enforce their security interest and it's providing a reporting of completely illiquid assets that is well below the required collateral value as required under 5.4 of the GMSLA.

So while I'm certainly open to going off record and having a discussion of how to move forward, nothing that's proposed and how this is set up can -- unless the securities

are transferred into the liquid assets as a starting point can not replicate what was done, and this is not 198 million of collateral sitting in an account for Shinhan's benefit.

Thank you, your Honor.

MR. RAND: May I be heard, your Honor? May I use the podium?

THE COURT: Yes.

MR. RAND: Thank you very much.

So there are a couple of important points that I think have been raised by counsel for Shinhan, and I appreciate the opportunity to address your Honor on it. It was a subject of our June 1st filing. And first, just by way of the record, the exhibit that was handed up to your Honor, the collateral report, my understanding was that was provided on May 26. It was not just yesterday, and it's important because your Honor did enter orders, and we have taken every effort we can to comply obviously with any order your Honor enters, and these orders in particular given the prior conference.

But some important points, and I don't think that these points are really factually in dispute. I think they show up clearly in the documents, and I think your Honor is aware of them, but I think it's important to cover them. This was not what is typically called a tri-party agreement where you had a collateral agent and Shinhan had a security

interest in the collateral; and therefore, had a lien that was available to be pulled upon as of right.

This was a very different kind of arrangement. It was called collateral, small C, effectively in a custodial account that belonged to RIA, and I think the correspondence that's been presented to the Court with BNP bears that out. Right. There was no security interest. There was no right that Shinhan had to grab that. It had a power of a security -- Power of Attorney that could be exercised if BNP had agreed there had been a default and obviously given the course of events over the years and the complaint in front of your Honor that began that case and the motion to dismiss, that BNP was in no position and frankly withdrew frankly because without an order of the Court, it didn't know what it was supposed to do. So I think that's one important to bear in mind in terms of the assertions made.

The second important point to bear in mind, your Honor, is that the SLA, and I have copies of it to hand up unless your Honor has it readily available. I'm going to the SLA, and if you go to -- I think it's -- if you go to the section about the -- bear with me for one moment. I'm looking at a different copy. Thank you very much. I appreciate that.

Yes. If you go to Paragraph 8, collateral which is on the second page there, "The collateral for this loan

agreement shall be the custodial securities held in the custodial account with the agent." This is the key language. "No delivery of collateral shall take place between the parties."

And if you compare that to a standard GMSLA, and in fact, the GMSLA that was a standard that this SLA modifies and supercedes, it uses the delivery language that has been quoted to your Honor in briefing from Shinhan and argument to your Honor, but that is not the applicable clause at issue. The clause at issue is this clause, and it's clear as daylight. No delivery of collateral. And I think that's a very, very, very important clear point that I don't think there should be any dispute on.

The second point which in regard to the collateral which is very important is to recognize that the ways in which the collateral can be utilized under Paragraph 12 on the same page, and I'm reading again, your Honor. "The custodial security shall include but not be limited to," and it goes on again at the bottom again. It includes that same open-ended language. "Shall include but not be limited to."

Now, the only limitation historically, and I don't think this is disputed either, but I am sensitive that your Honor hasn't yet had an evidentiary hearing in this case and trial is forthcoming, so I believe it's undisputed, but it's a fact that hasn't began tested by cross-examination yet,

but there was a blocking letter in place for certain of the collateral, and it's in the exhibits that was presented to your Honor by the parties in the June 1st filings. That letter was unblocked by an unblocking letter which is Exhibit 6 to Mr. Kang's declaration, his affirmation. And so effectively, there was a limitation that certain of the collateral couldn't be liquidated and utilized for other purposes. That was unblocked by Shinhan -- by Shinhan's authorized, you know, individual who had apparent authority to do so, and that's Exhibit 6 to the Kang declaration affirmation. It makes clear there was an unblocking.

So the reality is the arrangement reached was that there was going to be no security interest. The collateral could be used as RIA sought fit, and that's what they've done.

Now, what did Shinhan get in exchange for that? They got very -- higher yields than would be traditionally given as a borrowing fee, and those are in fact the yields and the borrowing fee that we have reinstated and we're putting into custodial account or escrow subject to additional order of the Court because we recognize that they want to know that those higher fees were there given that that was the deal that was struck and that was very important to us.

So look, I'm happy to go further on, but those are

very, very important points, and I think that we have undertaken to give the Court confidence and to give Shinhan confidence that there is status quo that is going to be enforced until there's an order of this Court based upon rights and remedies under the four agreements at issue, right, following trial, and we have made that -- I think it comes through in the papers crystal clear to our client that's what's happening, and we submit to the Court to insure the Court's comfortable with that, and we look forward to trying the case and getting to the bottom of all this.

And so with that, I'm happy to go off the record and discuss a stipulation, but I think it's important that be on the record.

Thank you, your Honor.

THE COURT: So briefly.

MS. GARR: I'm so sorry, your Honor. May I just respond to some of the points before we go off the record, and if I could just use the podium as well. I just want to respond to his particular points.

First of all, it's inaccurate that the June 1st correspondence was sent prior to May 26. The Exhibit 9 is what was sent on May 26, and that is at Docket 200, and you'll see from that that that is completely different, and it does not have the valuation.

Second, there's reference to the fact that this was not set up with a tri-party agreement. That is correct. It was not set up with a tri-party agreement. And I was hoping to have a Korean translation for you today to be able to submit. I'm happy to submit it separately, but that's because RIA advised Shinhan that U.S. banks don't do tri-party agreements.

And so what the parties agreed to instead was the security language that was there both in Section 13 which allows them to take legal possession but separately an entire Power of Attorney that is included in the SLA that establishes the security interest, and establishes RIA's -- Shinhan's rights to take all actions that Shinhan -- that RIA could otherwise take with respect to that collateral including bringing any actions and seeking to enforce any rights with respect to its security interest. This was designed to have a security interest.

Third, they say this a lot, and it was referenced again now that this collateral was not titled in our -- there was no legal title that we have, and this is somehow not our collateral or that we don't have a security interest in this. They say that because of that, that there is no conversion; although, again, not required for purposes of dissipating collateral as they do here. But for this, they ask the Court to ignore the terms of the GMSLA 42C and 14C

based on what we just heard Section 8 of the SLA which simply notes that there won't be delivery of the collateral between the parties.

Instead, the collateral will be held in a custodial account with a designated agent. This does not address the question of legal title. It does not supercede the GMSLA, but importantly, RIA also ignores the irrevocable Power of Attorney in the SLA which grants Shinhan the right to take all acts related to the collateral including any action to enforce its security interest, and Shinhan exercised that Power of Attorney to enforce its legal title back in October of 2024 well before the transfer that occurred here a year -- in May of 2025.

And so while RIA acknowledges that the SLA provides a title transfer process in its papers, it argues that it required BNP's acknowledgment of the default first. That is not true.

Under Section 13, the acknowledgement of BNP is only required to take legal possession of the collateral. Not title. The possession must be preceded by an event of default by RIA which occurred many times over prior to Shinhan seeking to enforce its right to perfect its security interest.

RIA obstructed that right to take possession, and an obstruction of our contractual right under the Power of

Attorney is the injunction -- the acts that we are seeking to enjoin, and that's Goldman Sachs v Schreiber finding that the agreement reflected a bargain that the borrower should have sufficient collateral to support the loan and that the sale of the assets in contravention of the agreement irreparably harmed the lender by taking away the value of the collateral and also EmpireMediHoldings which finds that where a creditor properly exercises its right in the event of default under a security agreement, injunctive relief is appropriate.

It's also worth noting that RIA is entirely misrepresenting the relationship with BNP. Every day for six years Shinhan received an email confirmation directly from BNP about the status of its collateral. At the commencement of the process, there was a specific collateral identified in the trade confirmations and a block letter in place that was supposed to prevent RIA from making any change or transfer to the collateral without Shinhan's signed consent.

RIA and Shinhan both -- I'm sorry. RIA and BNP both referred to the account as Shinhan's account and named it Shinhan Investment Corp.

I have with me documents produced by RIA which establishes this. BNP also had a copy of Shinhan's Power of Attorney which entitled it to take any action necessary over

the collateral. And as you can see, what RIA produced at Exhibit 4 to their submission which is at Document 161, when Shinhan exercised its Power of Attorney in October 2024, RIA falsely claimed to BNP that the Power of Attorney and agreements were no longer valid.

And when we exercised the right again starting in May 2025, it falsely claimed then to BNP that all payments were current and there was no event of default, and that's at Shinhan Exhibit 20 at Docket 2022.

Now, the last thing is referenced here to this unblock letter. The -- it's argued -- it was argued just now by counsel, and it was argued in Footnote 5 of their believe that the unblock letter issued in April 2020 released any information that the collateral complied with the SLA and GMSLA.

The unblock letter from 2020 did not allow RIA to take or sell our collateral and replace it with illiquid investments.

The unblock letter that they reference was for a subset of collateral in the account, not all of the collateral, and it related to the specific requests to recall the 94 million, not 47 million in securities which RIA did not do. It was not permission to steal the collateral five years later, what happened here only because they stopped the daily collateral reports.

If they had that freedom to do that, you wouldn't have had the following five and a half years of the daily reports and the requirements that any substitution of collateral under 5.3 of the GMSLA be approved by Shinhan.

What they did was they stopped providing the daily collateral reports, hold it from the bank and engaged in conduct that they were not permitted to do.

I have more to say, but I understand your Honor wants to move forward. And again, I'm happy to discuss a stipulation, but what is left of this collateral is insufficient to be able to move forward.

THE COURT: Okay. Thank you, Ms. Garr.

So folks, before we go off the record, part of the issue and part of how we're approaching this. It's a PI, and we have been in this case long enough to know that this is a classic -- well, classic/not so classic case of everybody's defaulted, right, and multiple defaults. And so when we think about the element of likelihood of success on the merits, it's frankly impossible in a case like this. So that's kind of how we're thinking about this case, big picture, which is why we think it makes more sense to spend time on a stip to at least get us through this stage. But again, Ms. Garr, like I said, we are ready to roll on a bench ruling if that's what we need to do. I'm just looking for a creative solution that makes everyone happy as opposed

to a grant or deny.

Okay. So folks, it's 2:22. Let's go off the record. Ms. Van Brunt is going to conference with you all on a stip. I don't want to lose track of time or waste time, so let's plan to kind of spend the -- how is like an hour max. Let's kind of give it until 3:30. Let's see if we are making progress. If we are not, then let's jump back into a hearing mode.

Does that work for everybody?

MR. RAND: Yes.

MS. GARR: Yes.

THE COURT: Let's go off the record. I leave you in excellent hands. If you will just reach out to me as you need me.

Thank you.

(Whereupon, at this time there was a recess taken.)

THE COURT: Okay. We are back on the record in RIA versus Shinhan Securities.

While the Court was off the record, counsel held an off-the-record conference with court attorney Mrs. Van Brunt to review and discuss a potential stipulation that may resolve the pending motion for preliminary injunction.

Based on those off-the-record discussions, parties have agreed to the following:

The parties will appear for a remote off-the-record

status conference with Ms. Van Brunt on June 12 at 10 a.m. to report back on the status of those negotiations and securing a stipulation.

To the extent that the parties have not reached a stipulation, the Court will hold a continued preliminary injunction hearing on June 17 at two p.m. in person.

In the event that the parties seek an additional conference with the Court prior to June 1, please do reach out, and as I indicated to counsel off the record, the goal here is not to kick the can down the road and keep adjourning a PI hearing, but it's to secure a negotiated resolution.

Counsel, anything else we can help with today?

MR. RAND: No, your Honor. Thank you so much.

MS. GARR: No. Thank you very much your Honor.

THE COURT: Terrific. Last but not least, if you would obtain a copy of today's transcript, file it on NYSCEF within 30 days. We'll chat next week. Thank you.

MR. RAND: Thank you, your Honor.

MS. GARR: Thank you, your Honor.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

Karen Mangano

KAREN MANGANO, CSR
Senior Court Reporter
KM

**EXHIBIT 31**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE PATEL, ANAR R.**

| | |
|---|---|
| **RIA R Squared, Inc.**<br><br>**- v. -**<br><br>**Shinhan Securities Co., Ltd.** | **Index #** **659538/2024** |

## COURT NOTICE

Pursuant to today's conference:

- Parties shall appear remotely for an off-the-record conference on June 12, 2026, at 10:00 a.m. Microsoft TEAMS information shall be provided.
- Parties shall appear for a continuation of the preliminary injunction hearing (Mot. Seq. 003) on June 17, 2026, at 2 p.m.
- Parties shall obtain today's transcript and file it on NYSCEF within thirty (30) days.

DATED 06/03/2026 FILED By Vanessa VanBrunt

**EXHIBIT 32**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE PATEL, ANAR R.**

| | |
|---|---|
| **RIA R Squared, Inc.**<br><br>**- v. -**<br><br>**Shinhan Securities Co., Ltd.** | **Index #** **659538/2024** |

**COURT NOTICE**

Parties are directed to speak with their respective clients, then meet and confer to determine if parties can agree on resolutions to any outstanding issues discussed during the conference.

Moving Defendant has leave to file an amended proposed order (Mot. Seq. 004) prior to the June 17, 2026 appearance at 2 p.m. in Courtroom 428.

The Court will address Defendant Shinhan Securities Co., Ltd.'s request for a pre-motion conference (NYSCEF Doc. No. 152) during the June 17, 2026 appearance.

DATED 06/12/2026 FILED By Vanessa VanBrunt

**EXHIBIT 33**

WHITE & CASE

May 28, 2026

**VIA NYSCEF**

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

Hon. Anar R. Patel
Supreme Court of the State of New York
Commercial Division, New York County
60 Centre Street, Rm. 428
New York, NY 10007

**Re: *RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.* (Index No. 659538/2024)**

Dear Justice Patel:

This firm represents Defendant and Counterclaimant Shinhan Securities Co., Ltd. ("Shinhan") in the above-referenced action. Pursuant to Section IX.B of this Court's Practices and Procedures and Commercial Division Rule 14, Shinhan respectfully writes to advise the Court of Plaintiff RIA R Squared, Inc.'s ("RIA") deficient compliance with the Court's May 12, 2026 Decision and Order on Motion 004 (NYSCEF Doc. No. 147) ("Order") and to respectfully request a pre-motion conference in advance of its anticipated motion for sanctions, fees, adverse inference, and other related relief, to be held concurrently with the hearing scheduled for June 3, 2026.

As the Court is aware, the Order granted Shinhan's Motion to Compel in full and directed RIA to produce documents responsive to Shinhan's April 2025 Requests for Production (Requests 17 and 20) and July 2025 Request for Production (Request 1). These Requests sought, among other information, (i) bank verified daily collateral reports, (ii) documents sufficient to reflect the value of the Custodial Accounts and Custodial Securities from January 2020 to present, including all account statements, and (iii) all Documents and Communications concerning the Custodial Account and Custodial Securities, including information concerning use, transfer, sale or other disposition of Shinhan's collateral. During the May 12, 2026 oral argument, RIA confirmed for the first time that RIA had transferred Shinhan's collateral out of the custodial account at BNP to a new custodian, which led this Court to reserve decision on the Order to Show Cause and to compel production within fourteen (14) days, i.e., by May 26, 2026. The Order also required that RIA resume producing the daily collateral reports to Shinhan on an ongoing basis, absent further order of the Court.

Shortly before midnight on May 26, 2026, RIA served two formal productions and one informal production on Shinhan, purportedly in compliance with the Order's deadline. However, the productions failed to provide any information about the location or value of the collateral for the past eleven months.

The two formal productions, made in accordance with the parties' governing discovery protocols, consist of approximately 3,362 emails and their attachments. Of these, only 350 documents are dated after April 30, 2025, and the last date of any document within this production

is July 18, 2025. There are no communications for the nearly 11-month period after the collateral was removed from BNP's custodial account.

RIA also made an informal production of approximately 1,582 native files comprised mainly of the daily collateral reports from ***prior*** to May 1, 2025—in other words, reports Shinhan had already received. There are ***no*** bank verified collateral reports since May 1, 2025. RIA included a single email from May 26, 2026 requesting that Wilmington Savings Fund Society Bank ("WSFS") confirm the securities position as of that date, without any legible statement attached. RIA failed to produce a single bank account statement or any independently verified record of the location or value of the collateral since May 1, 2025. The informal production includes only monthly "Securities Position Reconciliation statements" created by Ducenta and Ria that are not verified by any bank and do not disclose where the collateral was held.

In short, RIA did not produce the missing daily collateral reports from May 1, 2025 onwards (Request 1). Nor did it produce documents that "sufficient[ly] reflect the value" (Request 17) or provide "information concerning the use, transfer, sale, or other disposition" (Request 20) of Shinhan's collateral since May 1, 2025. Moreover, to date, RIA has not resumed providing the verified daily collateral reports despite the Court's clear directive.

RIA's ongoing obstruction and failure to comply with the Order conflicts with the Court's May 12, 2026 Court Notice (NYSCEF Doc. No. 146) directing the parties to file supplemental simultaneous briefs by June 1, 2026, addressing, among other things, "any new/additional information contained in the forthcoming production as directed by the Court in granting Motion 004." Without compliance with the Order, Shinhan is unable to meaningfully fulfill that directive.

Because RIA's willful noncompliance deprives both Shinhan and the Court of the information necessary to resolve the Order to Show Cause on a complete record, and because it reflects a continuing pattern of obstruction and waste of judicial resources, Shinhan respectfully requests leave to file a motion for sanctions under CPLR § 3126—including, without limitation, preclusion, adverse inference, and an award of reasonable attorneys' fees and costs (as contemplated by the Order), and any other relief the Court deems appropriate. *See* Tr. May 12, 2026 Hearing (NYSCEF Doc. No. 149) at 53:21–54:2. The production deficiency is directly connected to the subject matter of the June 3 hearing and, with the Court's permission, can be addressed at that time. We thank Your Honor for your time and consideration of this matter.

Respectfully submitted,

*/s/ Laura Garr*
Laura Garr, Esq.

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

cc: All counsel of record via NYSCEF

**EXHIBIT 34**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**JUDGE PATEL, ANAR R.**

| | |
|---|---|
| **RIA R Squared, Inc.**<br><br>**- v. -**<br><br>**Shinhan Securities Co., Ltd.** | **Index #** **659538/2024** |

**COURT NOTICE**

Pursuant to the Court's directives at today's held continued Preliminary Injunction hearing and pre-motion conference, the parties are directed as follows:

- Defendant has leave to file its anticipated motion as outlined in its May 28, 2026 letter (NYSCEF #152) on or before July 1, 2026 subject to a meet and confer with Plaintiff as per the Court's direction
- Plaintiff has leave to file its anticipated motion as outlined in its June 15, 2026 letter (NYSCEF #223) on or before July 1, 2026 subject to a meet and confer with Defendant as per the Court's direction
- The parties shall file today's transcript on NYSCEF within thirty (30) days of today's date

DATED 06/17/2026 FILED By Anar R. Patel

**EXHIBIT 35**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 26-19251-CLC
Chapter 11

In Re:

RIA R SQUARED, INC.,

Debtor.
_________________________________/

ECF # 38, 69, 20, 41
44, 63, 70
August 28, 2026

The above-entitled cause came on for a hearing before the Honorable CORALI LOPEZ-CASTRO, Judge in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, on Friday, August 28, 2026, commencing at or about 10:01 a.m., and the following proceedings were had:

Transcribed from a digital recording by:
Helayne Wills, Court Reporter

APPEARANCES:

EDELBOIM LIEBERMAN PLLC, by
BRETT D. LIEBERMAN, ESQ.,
ALEXANDER LEWITT, ESQ.,
and
MARKO & MAGOLNICK, LLP, by
JOEL S. MAGOLNICK, ESQ., (Special Litigation Counsel)
on behalf of the Debtor

WHITE & CASE LLP, by
LAURA GARR, ESQ.,
ANDREW ZATZ, ESQ.,
HANNELORE SKLAR, ESQ.,
on behalf of Shinhan Securities Co Ltd.

OFFICE OF THE UNITED STATES TRUSTEE, by
STEVEN D. SCHNEIDERMAN, ESQ.,
on behalf of the U.S. Trustee

KOZYAK TROPIN & THROCKMORTON, LLP, by
DAVID A. SAMOLE, ESQ.,
and
KLEINBERG KAPLAN WOLFF & COHEN, by
DOV KLEINER, ESQ.,
DAVID LEVY, ESQ.,
on behalf of Kleinberg Kaplan Wolf & Cohen

ALSO PRESENT:
ECRO: Electronic Court Reporting Operator
LISTEN ONLY:
NILA VORA
JEFFREY ATTEBERRY
DAVID LEVY
GREGORY PLOTKO
JEREMY KING
DAVID KANG
EMILIO GONZALEZ

ECRO: All rise.

THE COURT: Have a seat. Okay.

Before we get started, Ms. Garr, I changed my whole setup so you didn't have to look like this and like this, and you've missed it completely.

MS. GARR: I'm so sorry, Your Honor.

THE COURT: We did a whole change. It reminds me, for those Miami lawyers, when we tried cases across the street I was sent -- well, my first case was a one-week jury trial. I was sent early to get the right table. That's what you had to do in order to make sure that you were not blocked from the jury.

I didn't want you to think you had to get here early to get the right seat. I think it's important. I think good lawyers always want to see what the Judge is thinking and how they're reacting. If you're just looking at your papers, you're not looking at the Judge, then you're actually missing a lot.

Anyway, let's go ahead and get started. This is our fifth day of hearings in a row, so it's been quite the week. I'm going to call Ria R Squared, Inc., 26-19251.

Let me get appearances in the courtroom

first.

MR. LIEBERMAN: Very good, Your Honor. Good morning, Your Honor. Brett Lieberman, L-I-E-B-E-R-M-A-N, for the debtor, Ria R Squared, Inc. Joining me in the courtroom today is my colleague, Alex Lewitt, L-E-W-I-T-T, and my corporate representative, David Kang, K-A-N-G, and Emilio Gonzalez, G-O-N-Z-A-L-E-Z.

THE COURT: Okay. Welcome, gentlemen.

MR. MAGOLNICK: Good morning, Your Honor. Joel Magolnick, M-A-G-O-L-N-I-C-K, subject to an application for special counsel.

THE COURT: Okay. Let's go and turn to Zoom. Let's go ahead and start with Ms. Garr.

MS. GARR: Thank you, Your Honor. Laura Garr from White & Case, on behalf of creditor Shinhan Securities Co. Ltd. With me today is Andrew Zatz and Hannelore Sklar, also from White & Case.

THE COURT: Okay, welcome.

Mr. Samole.

MR. SAMOLE: Good morning, Your Honor. David Samole of Kozyak Tropin & Throckmorton on behalf of creditor Kleinberg Kaplan Wolff & Cohen PC. With me today from the KKWC law firm is Dov Kleiner and David Levy.

THE COURT: Okay. Mr. Schneiderman.

MR. SCHNEIDERMAN: Steven Schneiderman for the U.S. Trustee.

THE COURT: Okay. Does anyone else that has joined us by Zoom want to make an appearance?

Okay. So let's go ahead and take first the motion for maintenance of existing bank accounts by the debtor. I want to make sure that I understand, and definitely want to hear your thoughts, Mr. Schneiderman, as I know this is what you pay attention to. Well, you pay attention to everything, but this is something that the U.S. Trustee cares a lot about.

So the three accounts at Wilmington, you're asking they would stay there, right?

MR. LIEBERMAN: Just keep them there.

THE COURT: You're saying it would be very disruptive if you close those accounts, and then you opened up debtor-in-possession accounts, right?

MR. LIEBERMAN: I am saying that that would cause some disruption, but it was more in the nature of advising the Court that to the extent that that New York court imposed certain limitations on bank accounts, that we would be willing to continue with whatever those limitations were.

So if these accounts were funded with the anticipation that they'd be an account that would be available, then we would be willing to continue to maintain those bank accounts as they were intended. So we filed this motion with that request that these bank accounts just be maintained in the way that they had been intended.

THE COURT: Subject to the limitations?

MR. LIEBERMAN: That's right.

THE COURT: Okay. So did you have an opportunity -- I assume you did -- to speak to Mr. Schneiderman about the Wilmington accounts? I'm just dealing with those.

MR. LIEBERMAN: Only briefly. Mr. Schneiderman just asked that I file a motion and that it be before the Court. I don't believe the U.S. Trustee has a specific objection to the relief that we're seeking.

And this is a little bit different from a normal maintenance of bank accounts, where we're saying it would just cause so much disruption to the operations of the debtor that we need to do this. This is more to try to comply with other orders that have said, "Hey, this money should sit here until otherwise ordered." So we are just trying to comply

with that.

Those moneys, as the motion represents, are not necessary for the continued operations, and they would just remain in place where they were pre-petition.

THE COURT: Okay. I'm going to first hear from Mr. Schneiderman on that, and then I'll hear from Ms. Garr.

Go ahead, Mr. Schneiderman.

MR. SCHNEIDERMAN: Your Honor, I do have concerns, and I apologize. Like you said it's been a crazy week. This is the last hearing, and I had to file an objection yesterday in this other case in front of you.

The amounts in those accounts are in the millions. To the extent they're not protected by FDIC insurance limits, there's a concern. If Your Honor is willing to grant the motion with that information, but the whole idea of putting these in debtor-in-possession accounts is to protect those accounts in the event of, you know, a bank failure or otherwise.

Those amounts are not protected above the FDIC insurance limits. There is concern. I had no objection to perhaps another continuance of this

motion pending the outcome of the other matters, so that we can see what can be done, but leaving millions of dollars in an account that are not necessary for the debtor's operation is troubling.

MR. LIEBERMAN: Your Honor, we're happy to move them into DIP accounts. There's no argument really.

THE COURT: Ms. Garr, do you want to be heard with respect to the -- thank you, Mr. Schneiderman -- with respect to the Wilmington Savings accounts?

MS. GARR: Yes, Your Honor. I'll address this point, but then I'm going to turn it over to my colleague, Andrew Zatz to speak to the motion in general, if that's okay.

THE COURT: Sure.

MS. GARR: So, Your Honor, with respect to the WSFS accounts, to the extent they are subject to the freeze order that Your Honor entered, which we are still waiting for agreements from debtor's counsel on a written order, and have been pushing for that. Otherwise, we would resubmit the proposed order that was submitted on that front.

To the extent those accounts, including the subaccounts that are subject to the freeze

order, we don't have an objection to them being submitted to a DIP account, or the maintenance in the current pre-petition account. Although we would just --

THE COURT: Ms. Garr, just so I understand, you have no objection to either, they get moved to a DIP account, they stay in this account, and they're subject to the orders, right?

MS. GARR: Yes, Your Honor.

THE COURT: Okay. So, I guess, one of two things. This is just something that I remember from managing my firm.

Isn't there a way where you can actually -- the bank distributes the money, so you never exceed the FDIC limit?

Mr. Schneiderman, do you know what I'm talking about?

To avoid that issue, there's a way that you can ask your bank to kind of -- I don't know if they distributed to different accounts. There's a way of doing it so you don't have this problem.

Do you know what I'm talking about?

MR. SCHNEIDERMAN: I think what you're suggesting is that they open multiple accounts not to exceed the FDIC limit, and spread the amounts

out. We'd have, you know, a dozen or two dozen accounts, Your Honor.

THE COURT: That's not it. It's something you can make an arrangement with your bank where you mitigate this problem.

I guess what you're saying is -- what seems to me is that perhaps moving them to DIP accounts is what makes sense?

MR. LIEBERMAN: That's perfectly acceptable to the debtor.

THE COURT: Mr. Schneiderman?

MR. SCHNEIDERMAN: Yes, Your Honor. Those DIP accounts will still be subject to the freeze order that Ms. Garr referenced. I'm sure that they'll include those accounts.

That would satisfy the U.S. Trustee's concern over those accounts. And we still have the Citibank account, and what's going to happen with that account. If the debtor is also suggesting they're going to open up a DIP account for the moneys in the Citibank account, that would address that issue.

MR. LIEBERMAN: Let me respond, because I don't want to get too far ahead of ourselves.

The freeze order was intended to be

temporary, basically between the last hearing and today's hearing, and we're hoping that the Court removes that freeze order. These accounts were funded for the purpose of satisfying an obligation that the debtor committed to in New York to fund these accounts, which they did.

And then there was a promise that those funds would stay in those accounts until a court ordered otherwise.

THE COURT: What court order -- and that's important, because when you -- I reread the pleadings in preparation of today's hearing.

It's almost, you know, the story in the complaint filed by -- is it Ria?

MR. LIEBERMAN: Ria.

THE COURT: -- is completely different from the story that Shinhan --

MR. LIEBERMAN: Fundamentally.

THE COURT: It's almost like -- I've never -- I have seen that before, but this is really to another level.

MR. LIEBERMAN: Yes.

THE COURT: So what -- I know you were not state court counsel at that time. I guess I'm trying to determine like how far -- and we talked a

little bit about this, about discovery and so forth.

How far did the Court get to resolving the factual dispute?

MR. LIEBERMAN: I don't think they're anywhere near resolving the factual dispute. They haven't even finished discovery.

I don't believe that they've taken depositions of the debtor. My understanding is that the deposition the debtor sought to take of the people with knowledge of Shinhan were not going to be made available for deposition, my understanding is, under a set of circumstances.

I have been told that some of those people are incarcerated. The balance of the people that have knowledge are no longer with the company, not under Shinhan's control. So I don't know what depositions remain for Shinhan. I also don't know what witnesses Shinhan would produce.

But as far as making factual determinations, I don't believe the New York court is close.

THE COURT: Ms. Garr, I'm going to get your view.

I guess what I'm trying to get the sense of is, you have these two different stories.

Everyone agrees that they're completely different stories. Ria thinks that Shinhan got into trouble, asked them to do early termination, give back these securities, and with this promise of doing something else, never did it.

You claim they were fraudulently induced to give back those securities. I get that. Shinhan says something completely different, completely different.

So what I wanted to get a sense of is, with these two different stories, these two different narratives, how did the -- did the freeze order come about because everybody just --

MR. LIEBERMAN: No. That's what I was trying to describe to the Court.

Without being too flippant, this was a wild goose chase having to do with discovery, and an injunction about what they were calling collateral at the time, because the contract uses that language that in Bankruptcy Court --

THE COURT: It absolutely uses the language.

MR. LIEBERMAN: Right. The contract uses that language.

The term "collateral" is lower case C, and

what we in Bankruptcy Court would recognize as collateral as being improperly perfected security interest, we don't believe exists.

So the discussion in New York was to avoid --

THE COURT: I mean, in the second agreement or the supplement, the collateral for this loan agreement shall be the custodial securities held in custodial account with the agent, right?

MR. LIEBERMAN: Right.

THE COURT: That's what you're saying is a little C, not a capital C?

MR. LIEBERMAN: Yes.

THE COURT: Because this is not a control agreement, right?

MR. LIEBERMAN: This is not a control agreement, and there's no properly filed UCC.

THE COURT: Okay. So if I have to find that there's -- this is not a control agreement, right? I don't have to find control and UCC, do I?

MR. LIEBERMAN: No. Well -- no, you don't. Because in order for them to have a properly perfected security interest in this kind of act, that they would have to have a control agreement. The control agreement would have to be a tri-party

agreement. This isn't one, and none exists.

THE COURT: Okay. Ms. Garr, let me get your view.

My question was this: I just want to understand, with respect to the state court, how far -- anything that the Court determined as to whose narrative was more likely to be factually correct?

MS. GARR: Thank you. I'm going to assume Mr. Lieberman's response is because he was not involved in the case. What he said is not accurate.

The Court -- we were -- July 15th was the date that the Court ordered all depositions to be concluded.

THE COURT: You said that last time.

In your view, this thing was much more advanced than what Mr. Lieberman just said?

MS. GARR: That's correct.

All document discovery has been completed. Ria had requested an extension for depositions. The Court rejected that request for an extension. All depositions were required to be completed by July 15th, depositions for both sides, including for Shinhan employees, were noticed in effect.

The depositions were set for Ria, and parties, both public reps and Mr. Kang himself. His

deposition was to take place the day before they filed the petition.

And then in terms of the factual dispute, what was described as -- I think he used the term wild good chase. What had happened was, the daily collateral reports that Your Honor -- not to go too far into the merits on this -- but when Ria filed the complaint, they stated to the Court that their position was, the agreement remains in effect, despite the repeated terminations by Shinhan. And that they would continue making borrowing and coupon rate payments during the pendency of the litigation.

They stopped making -- submitting the daily collateral reports in May of 2025, and they stopped borrowing rate and coupon rate payments. That set off alarm bells in saying, we're concerned about the status of this collateral.

They made assurances there was nothing to be concerned about, everything was there. It was just burdensome for them to keep doing the daily collateral reports. They weren't contractually required, despite the requirement under Section 5 of the (unintelligible) on a daily basis to maintain 110 percent.

These are facts that they state in their

declaration, that they state in their pleadings, that that collateral is required to be maintained at 110 percent on a daily basis.

After feigning settlement discussions and saying that they had an agreement in principle to stay the proceeding, which was set to move forward, that was going to be a motion for injunctive relief for the immediate turnover of the collateral.

They used the guise of settlement to stay those proceedings. In that interim they transferred -- they sold and transferred without alerting from the designated account from BNP without alerting the Court or Shinhan that all those securities were being transferred, and they didn't transfer what was 204 million in securities over to the WSFS account.

What they did was, they sold off 140 something million worth of securities for their own benefit. There's only --

THE COURT: I want to get back to my question, which was --

MS. GARR: On the factual dispute.

THE COURT: Yes.

MS. GARR: So, Your Honor, when -- I'm sorry. I lost my video.

THE COURT: It's okay.

MS. GARR: On the facts of where the Court was making a determination, once that injunctive relief was filed, a part of that was specifically a requirement for likelihood of success on the merits.

THE COURT: Right.

MS. GARR: So for that -- and this is why, you know, as mentioned in the court order, what they had represented was that what was happening at BNT, and the status of the collateral had not changed. The value hadn't changed. There had been no dissipation of assets. There had been no depletion of collateral. And that WSFS just replaced BNP as the custodial account.

So what the Court granted, with the understanding that those securities were still there, the value was still there, there hadn't been a depletion, and to maintain, one ordered two of the accounts that are listed in the WSFS accounts that are subject to the freeze order right now, those were accounts that they funded the coupon rate payments and the borrowing rate payments that the Court ordered be turned over. That was ordered to be turned over to Shinhan. Those are two of the accounts that are subject to the freeze order right

now, that are sitting in the WSFS account.

The rest are the securities that are what remain, and then the bespoke collateral, which is essentially the DW litigation, the valueless litigation claims of participation rights that had been extinguished years prior; apparently, a lien on what appears to be Mr. Kang's home, or a promissory note of what appears to be Mr. Kang's personal ledger. These are now the bespoke collateral that are supposed to be sitting there.

So with respect to the factual dispute, the Court was absolutely -- we had a trial readiness conference set for October. We had depositions that were required to be completed. The Court even, once notified of this bankruptcy proceeding, said that she would dismiss the claims if there was not counsel, because of the delay tactics that had been happening there.

All of this required factual determinations of the Court, including the fact that under the contract, it's a breach to miss borrowing rate payments, it's a breach to miss the coupon rate payments. It's a breach for not having 110 percent of the collateral.

That's why they scrambled and made

representations to the Court to say that what's in those accounts valued at 110 percent, so they weren't in breach there.

THE COURT: Right, but in their narrative they said you breached first.

MS. GARR: I do understand that, Your Honor. And I will say -- and again, not to delve too deep into the merits here, but the problem with that is, if it were a breach back in 2020, which is what they're alleging, their remedy for a breach is to terminate the agreements, offset the collateral.

First of all, it's not a breach, because there's nothing in the contract, there's nothing in the contract, that even if they're right, this is an oral agreement that we dispute happened, and certainly, the credibility of Mr. Kang here is questionable.

He's saying it's an oral agreement between someone who had no authority at the company to relend securities. And then, if you look at the contract itself, there's nothing that constitutes an event of default for saying, "I will relend securities if Ria didn't supply collateral," that's the only time there could be an event of default.

If they put up collateral for the

147 million that they allege was supposed to be relent, and that wasn't relent, that's the only time it's an event of default. They never did. There was no collateral put up. There is no event of default.

But even if there were an event of default their remedy was to terminate, and then there would be an offset rate then and there. There is nothing that permits them in the contract to seize for six years collateral and use that as a remedy. There's nothing that permits that.

THE COURT: So the trial court in state court was going to decide whether your version, meaning Shinhan, Mr. Kim, I believe, had no authority to make that oral agreement, right?

MS. GARR: Yes.

THE COURT: An event of default did not happen because it's only triggered if they put up the 110 percent and so forth.

That was going to be what the trial was about, right?

MS. GARR: Well, summary judgment. So we had a trial readiness conference, and all the fact discovery was completed. Once those depositions were completed we were moving immediately for

summary judgment.

THE COURT: So you --

MS. GARR: But there is also a finding -- sorry, Your Honor.

THE COURT: No, no. You were going to move for summary judgment, but that seems strange, only because if Mr. Kang's credibility is at issue, then isn't that an issue of fact?

MS. GARR: So, the credibility point, to the extent that it comes in at a later point, that's not what was relied upon for summary judgment.

THE COURT: Okay.

MS. GARR: The summary judgment, under the terms of the contract itself, there's no breach, even assuming his facts as true.

There's no contractual provision that permits that, nor, again, the issue of whether or not an oral phone call from Mr. Kim, who had no authority at the company, and was not in a position to bind the company. That's all a matter of law.

So that would be the basis for that, together with the fact that the other claim they had of the 750 million was through a contract that he never signed, and that they said it was subject to revisions. So this was a matter of law that could

be decided easily, from our perspective.

THE COURT: Okay.

MS. GARR: But prior to summary judgment there was also before the Court this outstanding injunctive relief.

The resolution that the Court had come up with was based on what turned out to be complete misrepresentations of fact. It was that realization that the company is insolvent, that they had represented that they were a solvent U.S. company that could satisfy any judgment when it becomes due. That is a complete misrepresentation. That the value of the collateral was at 110 percent, there was nothing to worry about, there had been no depletion.

These were the predicates for the injunctive relief that we were seeking. It was when we discovered that the sworn submissions to the Court were false, and we put that before the Court, that they came to this Court and filed for Chapter 11.

THE COURT: Okay. Let's go to the Citibank account, okay?

I just want -- I know there's two narratives. I get that.

MR. LIEBERMAN: But your question was where is the New York Judge, and I think that the New York Judge told you where she was during the June 17th hearing.

And when Ms. Garr referred to the finding of the merits is an important statement that the Court said, and the Court said on its face it appears to the Court at this juncture that the (unintelligible) may allow for illiquid securities that do not have a daily mark, and therefore, cannot be valued on a daily basis. Therefore, the Court is faced with competing claims of default, contract validity and current rights to collateral compounded by the informality of lending and the collateral arrangement between the parties.

The Court was telling everybody that at that moment in time she had made no factual findings whatsoever. At that hearing, where Ria had agreed to do those things, the Court did not make a finding that Ria must do these things. This has been offered by Ria, and essentially accepted by the Court that those are appropriate remedies at the time.

THE COURT: Based on misrepresentation.

MR. LIEBERMAN: And that's the point

that's not true. Excuse me. That's the point that the Court never said.

What the Court did at the hearing on the injunction is denied their injunction. They were trying to get the collateral, lower case C, turned over. New York had said, "No. I'm not doing that right now."

Shinhan was asking to send a letter to WSFS saying, "Oh, Shinhan has all these rights," and the Court said -- the Court essentially said, "I have real concerns about blessing a letter that does that at this stage."

So this idea that there was some factual development by the Court in New York, I think overstates the record.

And another thing. I told this Court the depositions of Shinhan representatives were not had, for a variety of reasons. I think that's true. Now, Ms. Garr explained to the Court that discovery was being cut off and that fact discovery was being cut off. The depositions had to be taken.

I didn't explain that one way or the other. My point was, if you're talking about the factual discovery in the case, there were no depositions of Shinhan that I'm aware of. I don't

believe they took depositions of Ria. And the fact in a court --

THE COURT: I think she said they were noticed.

MR. LIEBERMAN: They were noticed. They didn't occur.

THE COURT: This takes place the day before you filed bankruptcy?

MR. LIEBERMAN: Well --

THE COURT: They were noticed for that date?

MR. LIEBERMAN: Right, but Ria counsel withdrew two weeks earlier, and told them that they wouldn't be able to attend those dates. So to say that they were scheduled the day before the bankruptcy and it involved --

THE COURT: Well, did you have a discovery cutoff of July 15th?

MR. LIEBERMAN: I believe so.

THE COURT: Okay. Those depositions, I don't know what would happen in state court. If you have a cutoff and the depositions don't happen, I don't know what will happen.

MR. LIEBERMAN: I don't know.

THE COURT: Quinn Emanuel was the law

firm, right?

MR. LIEBERMAN: Yes.

THE COURT: And they withdrew two weeks before the cutoff, or two weeks before bankruptcy filing? I forget.

MR. LIEBERMAN: I think they withdrew two weeks before the cutoff, and advised Shinhan's counsel that they wouldn't be representing -- the depositions wouldn't be going forward, for whatever that's worth.

THE COURT: Let's go back to the Citibank account. Let's deal with what we're dealing with here, okay?

MR. LIEBERMAN: Yes.

THE COURT: Citibank, your proposal is that you use it, right, for -- you use it for operating expenses, and when we were preparing for this, the idea would be Ms. Garr's client says no until we know what the source of the 704,000 or so is, right?

MR. LIEBERMAN: Well, not really. Our motion doesn't say let us use the Citibank account because --

THE COURT: Corporate checking account.

MR. LIEBERMAN: Yeah. Our motion asks for

permission for an exception to the U.S. Trustee Guidelines as to the three other accounts.

THE COURT: Okay.

MR. LIEBERMAN: It explains that the Citibank account is not subject to a control agreement, and isn't subject to other security, and therefore, we have already moved it into a DIP account, and that's the DIP account that we're going to be using to operate.

The motion doesn't specifically ask for permission to do that. And their objection is mislabeled. I think their objection is a motion for an injunction, which doesn't go through any of the injunctive factors. It loosely refers to 362(c)(3) as cash collateral, but it is not their cash collateral.

Then it loosely argues that they have a security interest in the securities held by Ducenta, and those proceeds, but they don't have a properly perfected security interest in those securities either.

They certainly wouldn't have a post-petition interest in proceeds of collateral unless their security interest -- their security instrument calls for it. And their security

instrument does not exist, so it could not call for it.

So like all of the arguments in their objection are, number one, not an objection to our motion. Our motion was to have particular accounts excused from moving into DIP accounts. Number one, I assume this Court is not inclined to do that, and would ask the debtor to put them into DIP accounts. And this Court might impose restrictions on those DIP accounts.

But with respect to the Citibank account, those are just funds that were sitting in accounts that are now in the DIP account, that have --

THE COURT: Well, I think Ms. Garr is saying accounts that are subject to their control agreement were moved, and there could be -- at least right now there's no transparency with respect to the source of the funds.

Another statement that Ms. Garr has made on behalf of her client is that your client doesn't -- and I have made no factual findings, because I haven't heard from anyone -- that the only customer, or the only business you did, you did it with Shinhan, and everything else is a farce.

These are lawyer arguments. Therefore,

any money you have in any of these accounts are really kind of -- it's part of this part and parcel of this dispute, and really belong to Shinhan.

MR. LIEBERMAN: I think that even Ms. Garr would acknowledge that historically Ria had other lenders, and at a point in time had $800 million of securities that it was responsible for, and that those other securities were subject to other contract counterparties and (unintelligible) those transactions.

Over the course of time it paid back those other lenders, and in fact, when Ria had to pay back the $47 million in securities, which we believe was a default and an early breach, it took on additional debt to do that. And it's through its business operations, and generations of income and profit it was able to pay back that debt. It was able to pay back other lenders.

The company had infusions of capital. The company has had other loans. So this is a bigger business than Shinhan wants to explain to the Court.

Now, is Shinhan's point now that there are no remaining large counterparties to Ria? I think that's fair. But is it true to say that whatever Ria's assets are today can all be traced back to a

loan that Shinhan made at a point in time? No.

Ria has been operating for many years. These loans originated in 2019, and at that point in time that they originated, Ria had a lot of other assets under management, and a lot of other debt obligations. It created profits and it created income. All of those assets were used in its ordinary course of business. There were millions of dollars that were funded by equity that came into this company at various points in time.

So to say that every dollar that exists in the estate can somehow conceivably be traced back to Shinhan, one, it isn't factually accurate, and two, it's kind of largely irrelevant, because every business that borrows money as a start up at a point in time, if you were to say, "Well today's assets couldn't be logically traced back to the original loan that assisted the business in being started up, and therefore, every asset that could ever be created under this business is traceable to that loan, would be a fallacy.

THE COURT: Well, I think Ms. Garr's point, and I'll let her expand upon it, is really more like, this was getting litigated in New York. This really is about your claim against them, their

claim against you. This has to be resolved, right?

Why is this court the Court to resolve this dispute, if essentially Ria, maybe in the past, has had other counterparties and was doing other business, but why is this court the court to resolve this?

MR. LIEBERMAN: I think we're talking about two different things. One is dismissal.

THE COURT: And that's not set for today. I disagree with you. I know that -- I read your response.

Let's stay focused here.

MR. LIEBERMAN: Okay.

THE COURT: So with the Citibank account, I saw, Ms. Garr, your objection more one of objections to the use of cash collateral than really getting moved into a DIP account.

MS. GARR: Thank you, Your Honor. On this point I'm going to turn it over to my colleague, Mr. Zatz, if that's okay with Your Honor.

THE COURT: Sure. Mr. Zatz.

MR. ZATZ: Good morning, Your Honor. Can you hear me okay?

THE COURT: I can hear you perfectly. Can you hear me?

MR. ZATZ: I can.

THE COURT: Okay.

MR. ZATZ: Andrew Zatz, White & Case, on behalf of Shinhan.

So, if this were simply a motion to freeze the WSFS accounts, and to move the Citi account cash into a new DIP account, preserving everybody's rights and interest in that cash, we would have no issue here. But I disagree with the notion that that is all the motion is attempting to do.

What this motion is also attempting to do is effectively get the Court's blessing, a comfort order, if you will, that they're free to use the cash that's currently in the Citi account to fund what they call day-to-day operations. That's what we take issue with.

I can expanded on that, but I just want to make sure I'm framing our issue correctly.

THE COURT: I understand that the use of the day-to-day operations is really the -- I mean, Mr. Zatz, with respect to debtors-in-possession that come in here and, you know, seek to, you know -- in fact, maybe they didn't even have to file the motion with respect to Citibank.

You know, it's an account. They're going

to turn it into a DIP account, if they had a problem, turning it into a DIP account. But think about it like a regular case. Let's not say that this is -- let's not call this a different type of case.

Isn't this what debtors do when they file for bankruptcy? You're saying that by getting an order from me, getting an order from the Court, that they can use it for day-to-day operations, they're getting that comfort order which says, "I am blessing your use of that money, although there's obviously a very big dispute as to where that money came from."

Is that what it is?

MR. ZATZ: That's part of it, Your Honor. Let me be very clear. We just don't want this money to be wasted.

There is a history and a pattern here of dissipation of assets that's very concerning. If the debtor can explain to this Court what the cash is to be used for, and it truly is a necessary expense to preserve assets and to protect the status quo, then we can be convinced. The motion makes no attempt to explain what the cash is to be used for.

Using the phrase "day-to-day operations,"

simply doesn't work for us in this context, given the history here, and the fact that the debtor seems unable to explain even what its core business is, in a way that's understandable to a normal person.

THE COURT: Let me --

MR. ZATZ: So we think that cash should be -- sorry. Go ahead, Your Honor.

THE COURT: No, it's okay. I want to talk to Mr. Schneiderman for a second.

Mr. Schneiderman, there was a question about this in a different context before Judge Mark, right, as to what is a DIP allowed to use their cash for, right? My question is, does Ria have to -- we're going to see the first -- we're going to see the first -- what do you call it -- the first MOR, right?

And what Mr. Zatz is saying, he doesn't want to see that first MOR and see, you know, 500,000 left that account for expenses that are not reasonable, and then we're chasing all those expenses.

I mean, Mr. Schneiderman, what are your thoughts on that?

MR. SCHNEIDERMAN: Your Honor, it's an interesting issue, because Mr. Ti Chang (phonetic)

basically testified there are no -- and I'm very loosely saying this -- no real operational expenses.

There's a pending motion for payroll, where the debtor is coming in, which has not been set for hearing yet, to authorize the payment of payroll to the three officers, who are the only three employees of the debtor, which would be coming out of this account.

Really, I think what Shinhan's counsel has filed is an objection to that motion, probably before it was filed. These issues should be probably continued until that payroll motion is heard.

I do have a case in front of Judge Mark where it's an individual, but an individual who at one time was a very prominent, successful hedge fund operator, and had hundreds of millions of dollars in assets, and there's judgment creditors who have asked to put that debtor on a budget. It's not a cash collateral issue, it's a budget issue. Perhaps that's what's needed here.

Mr. Lieberman can say, "These are our monthly expenses, supplement the motion for payroll, here are our monthly expenses. Here's what we need to pay on an ongoing basis from the Citibank

account."

And maybe we can address all of these issues on that day when the motion to consider the motion to approve payroll of the three officers at $77,000 a month can be addressed. I'll withhold any comment about the salary at this time.

THE COURT: Thank you, Mr. Schneiderman.

Let's put this in a box a second. I want to deal with the main event, the main event, which is what I think is the emergency motion to dismiss the case or for stay relief.

I agree with Shinhan with respect to, I need an evidentiary hearing. I can't decide whether Shinhan's claims are valid or whether Ria's claims are valid. I need to hear from people.

This is something that -- it's kind of obvious to me. I want to apologize, because when emergency motions are filed in Bankruptcy Court we check them quickly, but we use the notice of hearing, you know, that has the standard language. And I think, notwithstanding that you come here for the ten minute non-evidentiary hearing, you can see, you can be here for a couple of hours, because I want to get this right.

So my question with respect to the

emergency motion to dismiss -- and I know I've been jumping around a little bit -- and also the motion to convert the non-evidentiary hearing to an evidentiary hearing, who would I hear from on the Ria side?

MR. LIEBERMAN: On the Ria side you'd here from Mr. Kang.

Your Honor, we have no objection to having the Court hear evidence. Mr. Kang is here today, and able, willing, capable and competent of presenting evidence today in testimony if the Court has questions that it would like to ask, and to ferret up facts and have factual statements.

So if the Court requires there to be evidence, Mr. Kang is here, present --

THE COURT: I appreciate that.

MR. LIEBERMAN: -- and prepared.

THE COURT: I advised the parties that I was not going to take evidence and I was going to hear this. That's why Ms. Garr is via Zoom.

MR. LIEBERMAN: I understand.

THE COURT: And I appreciate that. I think, Mr. Lieberman, you would want the same courtesy if you were on the other side, right?

MR. LIEBERMAN: I would.

THE COURT: So my question is, Mr. Kang -- I'm going to hear from Mr. Kang.

Will I hear from Mr. Gonzalez?

MR. LIEBERMAN: No, Your Honor.

THE COURT: Okay. Ms. Garr, who am I going to hear from from your side?

MS. GARR: Your Honor, to the extent testimony -- you said you wanted to speak about the underlying claims. I don't know that that's relevant for purposes of the motion to dismiss, but to the extent Your Honor wants to hear that, we will absolutely make a representative of Shinhan available and address that issue for Your Honor.

THE COURT: Okay. And then the second question I have is, we're talking about two witnesses?

MR. LIEBERMAN: Yes.

THE COURT: Ms. Garr is going to want to take Mr. Kang's deposition, or no?

MS. GARR: Yes, Your Honor.

THE COURT: Mr. Lieberman, will you want to take the representative's deposition?

MR. LIEBERMAN: Yes, Your Honor.

THE COURT: Okay. Can we do that -- and I know it's August. Kids are back and all that. I

want to be sensitive. I'm an empty nester, so I'm in a different place, finally.

Do we think we can get that done within two weeks?

MR. LIEBERMAN: I don't think so, Your Honor. My calendar has been unbelievably busy. I was in court three out of the last four days, on probably six separate hearings. I'm getting close to confirmation in one Chapter 11 case, and I have active litigation in another.

I think 30 days would be a more reasonable timeline.

THE COURT: Ms. Garr -- Susan, let's pick the date. We're only going to give one day to this. Let's pick the date first, and then that way we can make this happen.

Mr. Schneiderman, I don't know if you have any thoughts on the motion to dismiss, and with respect to anything -- I mean, you're a very important participant in these proceeds, so I want to make sure that I give you a chance to be heard.

MR. SCHNEIDERMAN: Thank you, Your Honor.

Both sides are very well represented. Anything I add at this point would just be redundant of what's being said.

THE COURT: Okay.

MR. SCHNEIDERMAN: I know that the 341 Meeting, for Your Honor's benefit, the 341 Meeting was held and concluded, I think it was on Monday. I imagine that transcript will be available to Your Honor by one of the parties in whatever they file, and you'll consider the testimony from that 341 Meeting.

I don't think I have anything to add to the equation after that.

THE COURT: Okay. If someone could file that transcript that would be wonderful, okay?

Susan, I can't recognize something you wrote here.

(Discussion off the record.)

THE COURT: I'm going to throw out two dates, the 25th of September and October 2nd. For those observing, we've avoided the Jewish holidays to make sure that that doesn't interfere.

MR. LIEBERMAN: You tried, but October 2nd is Simchat Torah.

THE COURT: Okay. Which holiday?

MR. LIEBERMAN: The day after Sukkot.

THE COURT: Okay.

MR. LIEBERMAN: But the 25th is a good day

for me.

THE COURT: The 25th, Ms. Garr, works, and Mr. Zatz? Which is a Friday.

MR. ZATZ: I'm sorry. This is September 25th, Your Honor?

THE COURT: Yes. I'm sorry.

MR. ZATZ: If it works for Ms. Garr it works for me.

MS. GARR: I have a deposition that day, but I can get somebody else to cover it, so that can work for me.

THE COURT: So we'll use that date. So that will be the date.

MR. LIEBERMAN: 10:00 a.m., Your Honor?

THE COURT: 10:00 a.m.

Ms. Garr, would you be flying in the day before?

MS. GARR: I would, Your Honor.

THE COURT: Do you want to start at 9:30, just to make sure, or is 10 o'clock okay?

MR. LIEBERMAN: It's challenging to get down here. 10 o'clock is easier.

THE COURT: We'll keep it at 10:00, and we'll just keep any lunch break, if we need it, very short.

MR. LIEBERMAN: That makes sense.
THE COURT: So the 25th -- Mr. Lieberman, you're drafting the order, okay?
MR. LIEBERMAN: Do you want me to put like discovery --
THE COURT: That's where we're going now.
So this will be -- actually, Ms. Garr, you'll draft it, since I'm granting your motion to convert the non-evidentiary hearing to -- but work with Mr. Lieberman, okay?
MR. LIEBERMAN: That means circulate a proposed form of order before you submit it.
THE COURT: Let's talk about deadlines. I think within one week of today's hearing -- we already know Mr. Kang will be one witness.
You'll disclose who your corporate representative will be, Ms. Garr, okay, within one week?
MS. GARR: Yes.
THE COURT: That's in the order.
The second deadline will be depositions of those two will be concluded by September 18th, okay? And then with respect to any exhibits you intend to use, that disclosure will be done by September 8th, okay?

So September 8th, witness -- I mean, exhibit -- exchange exhibit list. Depositions by the 18th, which gives you a week to get the transcript, et cetera, and gives you almost a full month to conduct them. And then September 8 -- I said September 8th, September 18th, and I think that's it.

Go ahead.

MS. GARR: I'm sorry, Your Honor. Just so I'm clear on this, we were intending to focus these depositions and the testimony before Your Honor to the elements for granting a motion to dismiss, the timing of the filing, the misrepresentations to the Court, the business itself, and whether or not there are assets or a business to reorganize, those issues.

I want to ensure we are addressing what Your Honor would like for purposes of the hearing. So are you looking for an evidentiary hearing, as well, on the underlying issues with respect to the breach of contract between the parties?

THE COURT: Yes.

MS. GARR: Okay.

THE COURT: I want to get a sense -- and Ms. Garr, thank you for trying to clarify.

I'm not going to decide the issue on the motion to dismiss, but I want to get a sense, the narratives are so like -- I've got to get a sense of -- I mean --

MS. GARR: Understood, Your Honor.

THE COURT: And I want to make it clear. I see a complaint drafted by Winston & Strawn, a very reputable firm, that has, you know, chapter and verse about what happened, right? And I see the response, which is a very, very different response.

So, for example, if I sense, or I get a sense of what this dispute is about, and where it may end up, but I feel like I have to hear from people before I can decide that motion to dismiss. It's just -- it's really so different, and I want to get a sense.

MS. GARR: I understand, Your Honor. I will also note Winston & Strawn withdrew as counsel.

THE COURT: Yes.

MS. GARR: I understood, Your Honor.

Given the time frame, there are two other issues. There was, as mentioned, the creditors' meeting, where there was an audio recording and some testimony given under oath. That time was limited, but it would be very useful to have that, the audio.

I don't know the timing of that. I don't know if that can be worked into --

THE COURT: There's a way to request that so you can get a transcript.

MS. GARR: I believe we have put in the request already, Your Honor. Since we don't know the timing of when we'll receive it, we'll follow up on that.

And then --

THE COURT: Hold on. Before we leave that, Mr. Schneiderman, do you know how long it takes for that to be turned around, by any chance?

MR. SCHNEIDERMAN: Your Honor, since they're asking for a transcript, the court reporter will have to make a direct request for that. We do not send a recording to counsel and let counsel transcribe that.

I have just provided -- Ms. Garr's assistant just e-mailed me. I sent her the information with the court reporter. The court reporter will send that request in. We could probably have the recording to them by Tuesday at the latest, to the court reporter, if they make the request.

So they need to contact the court reporter

first, and the court reporter will submit the request for the transcript -- for the audio recording. Like any normal --

THE COURT: Okay. Because didn't we -- Mr. Schneiderman, didn't we have a case where they got that transcript on file pretty quickly this week? They're all running together, but --

MR. SCHNEIDERMAN: Yes, Your Honor. If it's an expedited overnight, it will be done within a day or two.

THE COURT: Okay.

MR. SCHNEIDERMAN: That's up to Ms. Garr and her client, if they want a two-day turnaround or a seven-day turnaround. That's up to the court reporter and Ms. Garr.

THE COURT: Okay. And, Ms. Garr, just to put a finer point on it, you're right. The factors that I will have to consider with respect to the motion to dismiss are different than the merits of the claim, but I believe -- I need to know a little bit about the merits of the claim to give me context to deciding the motion to dismiss.

MS. GARR: Understood, Your Honor. We're happy to expand the scope of the deposition and get clarity on that, as well.

THE COURT: Okay. So let me -- just so I can start dealing with what I'm doing here, the motion to convert, non-evidentiary is granted. You're going to prepare an order scheduling the evidentiary hearing.

And then with respect to -- so, Mr. Schneiderman, we have not set -- you have a payroll motion, Mr. Lieberman, the debtor does?

MR. LIEBERMAN: I do.

THE COURT: We haven't set that yet?

MR. LIEBERMAN: I don't believe so.

THE COURT: Okay. Maybe we can set that for hearing and then continue this motion.

MR. LIEBERMAN: Your Honor, I think I also have a motion or an application to employ special counsel.

THE COURT: Okay.

MR. LIEBERMAN: Given the nature of this dispute, if we could set that sooner than later, that would be great.

THE COURT: Okay. Let's see.

MR. SCHNEIDERMAN: Just to clarify, Your Honor, it's not a payroll motion in the true sense, where they're looking to pay pre-petition payroll. They're asking for authority to pay the officers

going forward from the Citibank account.

THE COURT: I understood what you were saying, Mr. Schneiderman.

MR. SCHNEIDERMAN: I apologize, Your Honor.

THE COURT: No need to apologize.

MR. SCHNEIDERMAN: This is also the third motion to waive insurance issues with respect to the property in Korea, which can be set at the same time.

THE COURT: Okay. So, Mr. Lieberman, is there -- are you going to be before me any time soon?

MR. LIEBERMAN: Not in this case, that I'm aware of.

THE COURT: No, no, I'm saying, with respect to other cases, that we can schedule at the same time.

MR. LIEBERMAN: I don't think so, Your Honor.

THE COURT: Okay.

MR. SCHNEIDERMAN: Your Honor, are we scheduled in this case on September 2nd for the employment motion?

THE COURT: That's too soon. If it is,

Mr. Lieberman, I'll move that, okay?

So what I can give you is, we could do it on September -- if we did it September 9th, we'd have to do it by Zoom, right, because they're going to do construction in my courtroom. So would you want to do it on September 9th, all via Zoom, with respect to the continuance of the motion to maintain, the motion to pay the officers?

MR. LIEBERMAN: Yes. I can do it September 9th in the morning. I have a hearing at 1:30 in Palm Beach.

THE COURT: Okay. So you would prefer 10:00 a.m., right?

MR. LIEBERMAN: If it is available for the Court.

THE COURT: We can do 10:30, right, since we have -- let's do 10:30.

Ms. Garr, you could appear by Zoom, or Mr. Zatz?

MS. GARR: Yes, Your Honor. Although I would ask, given that a lot of these expenses presume the existence of a Chapter 11 hearing, if it would make sense to have this dealt with after the hearing on the -- continued until after the hearing on the motion to dismiss.

THE COURT: I just think it's going to take too long. I understand why you want that, but I think it's going to take too long.

MS. GARR: September 9th is fine, Your Honor.

THE COURT: Okay. At 10:30. And via Zoom, because I won't have a courtroom.

Mr. Lieberman, that should make your life easier, right?

MR. LIEBERMAN: It does.

I mean, also pointing out that to the extent that Mr. Zatz referred to this motion as a comfort order, the wages motion seeks a comfort order. Because the debtor paying its payroll in the ordinary course of business doesn't require court authority.

THE COURT: This is a weird issue. In fact, some of the judges, we talked about this. This is a strange --

MR. LIEBERMAN: I had a conversation with Mr. Schneiderman where there was a result of a conversation that the motion was filed in order to provide additional transparency to the Court.

THE COURT: Okay. I think that was smart.

Susan, we're checking on this. Should I

do -- can you do a re-notice for the motion for maintenance or should we do an order -- let's do this, Mr. Lieberman.

You prepare an order setting for hearing on September 9th via Zoom, a continued hearing on the motion for maintenance of existing bank accounts. And you can put your payroll -- no, your employment motion. If it's set on September 2nd, please reset it for that date, the motion to employ special counsel, and what we're calling the payroll wages motion, okay?

MR. LIEBERMAN: We have communicated with Mr. Mukamal to help us in preparing reports and general advice and guidance. I anticipated to file that today, after today's hearing.

THE COURT: Okay.

MR. LIEBERMAN: Is it too much for me to ask that be set on September 9th, also?

THE COURT: I think you could probably do it. If Shinhan wants --

MR. LIEBERMAN: I just want to have Mr. Mukamal in the case as quickly as possible to start helping.

THE COURT: Hold on a second. Let me just -- I want to look at something a second.

Okay. If you file it today I'll set it for the 9th.

MR. LIEBERMAN: Thank you, Your Honor.

THE COURT: And by the way, I don't want anybody to get excited, because if motions are being filed, that doesn't mean that -- I'm not going to consider the motion to dismiss, and then at the motion to dismiss hearing I'm going to say, "Well, so much has happened, why are we going to dismiss it now?"

So we're taking into account your calendar. You said you're very booked, and you needed 30 days for these deposition. But I want to make sure that everyone understands, I'm trying to accommodate people's schedules, but that doesn't mean that on the day of the motion to dismiss, and Ms. Garr and her colleagues have met their burden --

MR. LIEBERMAN: I appreciate the Court is setting it --

THE COURT: I'm not going to take into account, "Well, you know what, we've already done this, this, this, and this."

I think it's too late. Because they filed it on the first day.

MR. LIEBERMAN: I understand. And the

Court's concern for prejudice to parties by the delay.

And I don't know if the Court is going to address this next, but the Court's oral ruling on August 13th imposed a freeze that we think imposes an impairment to the debtor. I'd like to address that, now that the Court is going to continue this hearing.

Our position is that the debtor's rights to use its assets ought to be allowed in the ordinary course, prior to the Court's August 13th freeze order, which we think is an impediment to the debtor's operations, and devalues its assets.

THE COURT: So, Mr. Schneiderman just represented that Mr. Kang stated under oath that there's really no operations.

MR. LIEBERMAN: I think that we're getting myopic, because this debtor does not make widgets and this debtor does not paint cars.

What this debtor does is it invests in assets. It is an investment company. I think at the earlier hearing the Court asked, what's a parallel? What's another company that does something like this? And I think that the closest that comes to this is the Shark Tank show, where

each one of the people there are --

THE COURT: I actually understand it much better now, now that I had an opportunity to --

MR. LIEBERMAN: This is an investment company that actively trades securities, and when things happen in the market that negatively impact its asset, it must take action, either to create hedges or to sell off securities in order to buy different securities.

This is an actively managed portfolio of assets. And by having restrictions on what it would do in the ordinary course of business, it creates impediments.

THE COURT: Right, but in my freeze order, if, for example -- and I think I -- I'm not looking at my notes from the prior hearing, but you wrote to Ms. Garr and you said, "Look, we need to liquidate this for X, Y and Z reason," a market reason.

Then she goes to her client and says, "Okay, that makes sense."

If we're talking -- these are things that happen in this market. This is a market that operates. This is not -- this arrangement is not a silo. It happens --

MR. LIEBERMAN: It's fluid.

THE COURT: But when you want -- you want to use the securities, right, or you want to have the option of the securities, liquidate, hedging, whatever reason you want to do.

Then, if it's a market reason and you write to Ms. Garr and say, "We need to do this for this reason," and if she says, "No, we dispute it," then I'm going to give you a hearing very quickly for you to explain, "Okay, we're doing this for this reason. We have this opportunity. We have this."

It's hard for me to reconcile, Mr. Lieberman, when Mr. Schneiderman says there's really no operations, right, there's no operations, you know, Ria, from the complaint that was filed in state court was not a nothing player, at least as stated in your complaint, right.

MR. LIEBERMAN: Right.

THE COURT: So how could --

MR. LIEBERMAN: When you -- I'm sorry. Did you say nothing player?

THE COURT: Like it was a real player.

MR. LIEBERMAN: Yeah.

THE COURT: So how do I reconcile that with what -- and maybe, Mr. Schneiderman, can you give me more flavor on the testimony at the 341 so I

can judge this request by Mr. Lieberman?

MR. SCHNEIDERMAN: Your Honor, I'll just say it appeared -- I'll defer to Ms. Garr on this point -- that everything in that account was related to Shinhan.

And if I remember correctly, it wasn't like daily trading. They were basically monitoring. But I think Ms. Garr, when she cross-examined Mr. Kang, established a little bit more record as to what actually was happening with those accounts and Ducenta, which is also controlled by Mr. Kang, through a Ducenta entity that manages the Ducenta account.

And the debtor is, I believe, the 100 percent owner of the investments in the Ducenta accounts, or at least the main account with the $65 million in it. I'll defer to Ms. Garr. I think she had a better understanding of the testimony and the mechanics of how that worked.

But that's what was developed at the 341 Meeting, is that this is really trading of the Ducenta account, which is Ria owned investments, and the only investment in that account, which is also managed by Mr. Kang.

MS. GARR: If I may, Your Honor, and I

think this goes to the heart of what our motion to dismiss is, and for what's relevant, and why we're objecting to the use of the cash in the Citibank account for day-to-day operations.

What Ria has been -- the testimony of Mr. Kang under oath is that since 2020, so for the past six years, the only source of funds that they've had for investments has been Shinhan. That's been since 2020. Shinhan lent them over 250 million in securities back in 2019. They've had no other counterparty other than Shinhan since 2020.

And those investments, this business, all it is is an investment for the benefit of the three individuals, Mr. Kang, Mr. Gonzalez and Mr. Leung. That's it.

So this is a business where they are taking Shinhan's collateral and (unintelligible) [11:08] collateral, lent securities that they sold off that were a one-year lending transaction that they have held hostage for the past six years, and their business is just profiting off of the trading of the securities that were lent by Shinhan, and that are the subject of litigation for conversion and for breach of contract.

THE COURT: Okay.

MR. LIEBERMAN: Your Honor has seen our complaint, where Shinhan is a lender, and Ria is an operating, active investment company, that actively manages the portfolio.

Shinhan's claims are entirely unsecured, and they haven't demonstrated even the facial arguments that they have, a control agreement or a UCC. Ria, as a debtor-in-possession, insider, really outside of Bankruptcy Court, ought to be permitted to continue to operate its business in the ordinary course of business.

THE COURT: That's the key. What is the business?

MR. LIEBERMAN: It's an investment company that regularly manages and maintains its portfolio of assets, which continue to do the things which it has already done.

I know that the Court has set this evidentiary hearing on a motion to dismiss, but if we're talking about this issue, this freeze order issue, which is not the subject of a motion or for an injunction, but rather the Court's concern to be careful at the beginning of a case on an emergency hearing.

Mr. Kang could testify --

THE COURT: I'm concerned, you know, Mr. Lieberman, because -- let's assume -- I wanted the characterization from Mr. Schneiderman as opposed to Ms. -- I asked -- not because I don't think Ms. Garr is candid with the Court, but I wanted something that was more, you know -- what I wanted to get a sense of, is there anybody else's money that's here besides what came from Shinhan?

MR. LIEBERMAN: Over the course of Ria's business it has received capital contributions from its owners, millions of dollars, somewhere between five and $10 million.

Over the course of Ria's business it has had hundreds of millions of dollars of other securities lent and other creditors.

THE COURT: Since 2020, since this started with Shinhan, since 2020, with respect to the testimony at the 341, did Mr. Kang testify that he had other lending relationships, or other securities came in from other parties other than Shinhan?

MR. LIEBERMAN: If I may have a moment.

THE COURT: Yeah, I see it. Hold on one second before you speak.

Mr. Schneiderman.

MR. SCHNEIDERMAN: Your Honor, my

recollection, because you said you wanted to hear from me, is consistent with what Ms. Garr said.

My friendly suggestion to the Court, if you would like some input, would be that Your Honor read the transcript, direct Ms. Garr's client to file it within a certain number of days, and continue this part of the hearing until the 9th, if Mr. Lieberman was concerned about the 30 days, and perhaps come back on the 9th, on the freeze matter.

But my recollection is consistent with what Ms. Garr stated with respect to the source of those moneys in that account, and the fact that since 2020 it's been Shinhan.

MS. GARR: If I may also, Your Honor, I asked specifically if there had been any private money that had been invested, and was also answered under oath that there has been nothing since 2020.

THE COURT: Okay. So, Mr. Lieberman, this is what I'm going to do, because I do want to read the transcript. We'll continue this discussion on the freeze orders to September 9th. We're not that far away.

If someone, whoever gets the transcript first, if you could e-mail it to chambers, that would be great, clcchambers. As opposed to just

filing it, because we're not going to be -- I want to look at it as soon as it's filed with the Court.

MR. LIEBERMAN: Your Honor, my concern is that the questions that the Court wants to have answered are not going to be found in the 341 transcript.

THE COURT: Well, it will give me some information, right?

MR. LIEBERMAN: Yeah, but, for example, the discussion about whether it's operating, my notes, which are clearly not a transcript, there was a question about Hajjar Medical Office, which the debtor explained is currently in litigation.

Then the question was, "Continuing to operate?"

And the answer was, "Um, no."

And then Mr. Schneiderman said, "Not operating?"

And then the debtor said, "Generally, of course it's operating."

So I don't know how helpful that dialogue is going to be to the Court's analysis of whether or not --

THE COURT: Let me just look at it and I'll make that decision.

MR. LIEBERMAN: The Court asked me a question and I have an answer and I want to give it. My understanding is that as recent as October of 2025, Wells Fargo was a lender to Ria of somewhere between 50 and $60 million, previous to '25, and that its obligation was satisfied in late 2025.

So this is not a company that has been stagnant for six years. It has been actively managing, actively marketing, actively overseeing its investment portfolio.

One more cause for consideration, if because of this freeze order the assets are devalued and the debtor prevails, who would be responsible for those damages? Would it be Ms. Garr's client as the moving party asking for an injunction?

THE COURT: Perhaps. But I think to avoid the devaluation, the question was -- the suggestion was, "We need to liquidate, we need to do this for this reason."

And Ms. Garr goes back to her client and says, "Look, they need to do this."

I'm trying to think --

MR. LIEBERMAN: That's not a normal market process. The normal market process is that investment companies manage their own folio without

seeking permission. In fact, the --

THE COURT: But I read something in this case that this was going to be the case in state court, and then if there was a reason to liquidate, to do something, you were going to talk to counsel for Shinhan.

Am I making that up?

MR. LIEBERMAN: No, but I think that what you're remembering is that if there were trades made, that we would advise Shinhan within two days of that happening. It was notice, it wasn't permission.

This Court's freeze order went far further than the New York Court, which, by the way, was largely consistent with Ria's proposal for how it could operate while they're trying to get to the merit determination. This court's freeze order is --

THE COURT: So your issue is that you should be able to trade, and then let them know within two days, right?

MR. LIEBERMAN: That, I believe, would be acceptable. We should be able to operate in the ordinary course, and we can advise them within two days.

THE COURT: When Mr. Schneiderman says -- I'm going to look at the transcript, and you said it may not solve it, but I want to review the transcript, because that gets to the heart of what we're talking about here.

Go ahead and liquidate, right? Liquidate. The money would stay in the account, right?

MR. LIEBERMAN: Right, and get reinvested, like this company does.

THE COURT: But right now Ms. Garr's client is, we started here, we're already down to here, we don't want to go any further, right?

In some ways, the motion to dismiss is exactly what you want, right?

MR. LIEBERMAN: I don't know what you mean by that, Your Honor.

THE COURT: Meaning an evidentiary hearing where I hear about the merits, a little bit of the merits.

MR. LIEBERMAN: Absolutely. I want this Court to be advised of the merits.

THE COURT: You want me to know.

MR. LIEBERMAN: Yes, that is true.

THE COURT: I'm going to leave it as is. I'll look at the 341 transcript, and we'll revisit

this on the 9th, okay?

MR. LIEBERMAN: Understood, Your Honor. Thank you.

MS. GARR: I'm so sorry, Your Honor. I just want to, on the freeze order point, there was the oral order.

Part of the reason for the evidentiary hearing that we raised was the concern that the debtor here has not -- we are still waiting for a written order to be entered.

THE COURT: I vacated an order, right? There was a joint motion to vacate, right?

MR. LIEBERMAN: Yes.

MS. GARR: Yes. So, Your Honor, there was -- at the last hearing it was instructed that we submit a proposed order on the -- that Shinhan submit a proposed order on the freeze order.

After it was submitted to the Court and entered, the debtor reached out and said, "We oppose the language in that order." So we will work cooperatively with you for other language but we want that particular order to be vacated while we work with you on other language.

What was raised at the time, which was concerning, is, he said the only source of liquid

available assets at this moment, the 58 million that are the subject of the freeze order that's listed in those daily reports, every single one of those securities, those were transferred to a subaccount in WSFS that's held under the Ducenta 8020 Fund L.P.

It is not directly owned or controlled, according to them, and this is what they testified to, not directly under control by debtor. So what Mr. Lieberman has said over the course of this, the only asset here that's subject to the freeze order that remains of our collateral, he said the Court doesn't have jurisdiction to have frozen the account, and he doesn't want the parties who have it, Ducenta 8020, who are the same individuals sitting in the courtroom -- but that entity itself is separate, and the bank who has the assets, he don't want that written order to be known to the bank.

So we have very serious concerns of the only asset here. And this is why the safe harbor proposed orders that we have before Your Honor, this is exactly why, upon the filing of Chapter 11, Shinhan is supposed to be able to take immediate possession of these collateral.

Because we are in a position now where I

have a counterparty, the debtor, who is not getting back to us on a written order, was insistent that the order that was entered be vacated, on grounds that the parties who are actually holding the liquid assets right now not be subject to the order.

THE COURT: I'm looking at the order, Mr. Lieberman.

MR. LIEBERMAN: Yes.

THE COURT: Can you pull it up?

MR. LIEBERMAN: I can.

THE COURT: Ms. Garr, can you pull it up, the order that was vacated?

MS. GARR: Yes, Your Honor.

MR. LIEBERMAN: I have it, Your Honor.

THE COURT: So what is the language that is objectionable?

MR. LIEBERMAN: Let's start with story telling. I have real criticisms of the way that Ms. Garr sews together kernels of truth to make an argument that I believe misleads the Court.

The debtor's concern with the proposed order was that it was submitted without circulating a proposed form of order, and included language that the debtor was concerned with.

The debtor was going to seek an emergency

motion to vacate, but through that process of communication, we were able to negotiate a form of order that both vacated that order, and reduced to writing what we believe to be the oral ruling.

So the order that exists today both vacates the prior order that was submitted to this Court without circulating it, which is both local practice, and this Court specifically told Ms. Garr to communicate with counsel for the debtor before submitting it. And it explained in further detail what that ruling was.

And do we have concerns about delivering a form of an order to banks that we don't agree with, that we don't think was accurate? I mean, one of the things that the first order does is it says that the debtor is not permitted to use any of these.

Well, what does that mean, to not be able to use it? Clearly it's sitting in accounts. These securities are getting interest. (Unintelligible). So just their existence violates your court order, which we were concerned with.

And sending an order that has confusing information to banks and counterparties wasn't acceptable to the debtor. We had concerns about sending confusing letters to banks, in general. So

that was the reason why we were upset that they submit an order to the Court that included language that they never previewed with us, and we never had an opportunity to negotiate.

But this order incorporates this Court's oral ruling. And to the extent that the Court has or doesn't have jurisdiction over non-debtor parties, we didn't quibble with that in this order that preserves the Court's ruling. We deemed this as the Court's ruling.

And we served the original order on the counterparties, notwithstanding the fact that, A, Shinhan included a requirement that that order be served on one business day, which we would have opposed. We still complied with it, because it's a court order. So to the extent that Ms. Garr has concerns that this -- counterparties aren't informed of it, A, they got the first order, and B, they got the second order.

So if the Court believes that there's a third order that needs to be emanated from the Court, then certainly we can submit proposed orders. I suspect that Ms. Garr's third proposed order will look a lot like her first proposed order, and my proposed order will look like this.

THE COURT: So the order vacating provides notwithstanding that the order is vacated, Ria R Squared and its officers, directors, agents, employees, representatives, are prohibited from withdrawing, transferring, dissipating, pledging, encumbering or otherwise impairing, or instructing another person to do so," okay?

MR. LIEBERMAN: Yes.

THE COURT: "Any of the following funds; securities or other assets held in the following accounts, investments, assets. The Wilmington account, the three, Ducenta 2020-40, Ducenta 80-20, Ducenta Villa Torres, DW 80 South, DW Marcy, and all securities identified on the daily report dated August 13th, attached here as August 18 -- I mean, attached as Exhibit 8."

My first question is this: Is the list accurate, Ms. Garr?

MS. GARR: The list of the entities is accurate, Your Honor.

THE COURT: So A through I, we don't have to include anyone else, right?

And it says it first has to get prior written consent from Shinhan, and it remains -- this is the order.

So, Mr. Lieberman, today you said, "Look, this is creating a problem," right?

MR. LIEBERMAN: Yes.

THE COURT: I don't need to enter another order, you're saying, because this order is fine, right?

MR. LIEBERMAN: And so was the Court's August --

THE COURT: Well, you don't like the order. Your client doesn't like the order, wants relief from the order, right?

MR. LIEBERMAN: But the Court entered it, and we think that it accurately reflects what the Court's oral ruling was.

THE COURT: Okay. But, Ms. Garr, you think you need additional language in a proposed order; is that correct?

MS. GARR: Yes, Your Honor. I think -- and you'll see it as the motion to vacate. It was stated by Mr. Lieberman, and I --

MR. LIEBERMAN: Your Honor, this whole stated by counsel, not counsel, these are at best settlement communications.

If she wants to make argument, she should make argument, but this out of court dialogue that

she brings into court is very unusual. If Ms. Garr wants to make argument she should make argument.

MS. GARR: Thank you.

As you'll see by the motion to vacate, it lists specifically in the motion to vacate that it will be vacated subject to either competing orders or a joint written order.

On the same day that that motion to vacate was filed, it was submitted with a proposed written order. We have been waiting for comments to, which we've been assured are coming, to a follow-up written order. What the motion to vacate is, which was immediately served upon those Ducenta parties and the banks, the motion to vacate, which I think also causes confusion, that was served on the same parties. And their position has been that the freeze order applies only to Ria, and the liquid assets here are Ducenta 8020 Fund L.P.

And those were transferred from a list -- from a Ria account, that was the BNT account, to a master account also from Ria, but then transferred down to a subaccount held by Ducenta 80 Fund L.P., who's a non-debtor.

What they've listed on their schedules is that Ria holds nothing more than a partnership,

99 percent partnership interest on that, meaning -- and they testified at the 341 creditor meeting that Ducenta 80 Funds L.P. is who owns and controls the account, with the only liquid available assets that are serving, according to the records, as Shinhan's collateral.

So we have very serious concern with both the push to vacate the motion that gave notice to Ducenta 8020 and the bank, and then for there to be no follow-up order. What was submitted was never intended to be the final order, nor was it ever agreed by us to be a final order.

If it's going to be we have opposing orders, then we can do that, but we have been trying to work cooperatively since that time for a written order that would give comfort.

THE COURT: What I want to happen is, Ms. Garr, you're going to recirculate the order. You're going to copy Mr. Schneiderman on this. I want Mr. Schneiderman to perhaps be involved in this. And then if by next Thursday there's no agreement to this, then you can do competing orders.

I just want to get a sense of what the issue is here. I understand your issues. This money was here. Then it went to a subaccount. It

went to Ducenta. I understand the movement, but Mr. Lieberman's point is, "Well, this is a non-debtor and it shouldn't be part of this."

But is it really completely separate? I get the issues. Let's just get to the right place, so we can at least do no harm, okay?

And that's the problem. Mr. Lieberman said it's doing harm. If it's truly doing harm on an economic basis that everyone can understand -- these are liquid assets, right?

I was going to say AT&T stock, right? AT&T stock. You need to sell that stock, right?

MR. LIEBERMAN: They're not so liquid as stock, and they have -- certain of them have inherent obligations to be sold or repurchased at certain dates in the future. So it's not exactly like a portfolio of stock.

A lot of the securities have obligations to sell and rebuy, and there are obligations to buy securities to satisfy obligations to sell securities. These are ongoing obligations that --

THE COURT: By Ducenta?

MR. LIEBERMAN: By Ducenta.

THE COURT: Not by Ria?

MR. LIEBERMAN: We have advised Ducenta of

the Court's freeze order, and Ducenta is abiding by it.

THE COURT: And when you advised Ducenta, who do you advise?

MR. LIEBERMAN: Mr. Kang.

THE COURT: Okay. So Mr. Kang is both Ducenta and Ria, right?

MR. LIEBERMAN: And just to be clear and in full transparency, Mr. Kang is CEO of the debtor. He is -- I don't know what his title is, but a principal of Ducenta Trust 8020. And he is a principal of Ducenta Management Co.

So Mr. Kang is a principal and involved in the universe of the Ria and Ducenta entities. So when Mr. Kang is made aware of the Court's freeze order, that information is distributed to the layers that it needs to be distributed to.

THE COURT: Okay. By when -- what did I say?

MR. LIEBERMAN: Thursday.

THE COURT: By Thursday you're going to give comments?

MR. LIEBERMAN: Certainly.

THE COURT: You're going to copy Mr. Schneiderman, and let's see if we can get to the

right place. Okay?

MR. LIEBERMAN: Very good.

THE COURT: Okay. Thank you all.

(Thereupon, the hearing was concluded.)

# CERTIFICATION

STATE OF FLORIDA:
COUNTY OF DADE:

I, HELAYNE F. WILLS, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were taken by electronic recording at the date and place as stated in the caption hereto on Page 1; that the foregoing computer-aided transcription is a true record of my stenographic notes taken from said electronic recording.

WITNESS my hand this 31st day of August, 2026.

______________________________
HELAYNE F. WILLS - Court Reporter

**EXHIBIT 36**

Grant Thornton

# 2023 Annual Audit Presentation

**Ria R Squared, Inc.**
March 2026

PRESENTATION TO THOSE CHARGED WITH GOVERNANCE

This communication is intended solely for the information and use of management and those charged with governance of Ria R Squared, Inc. and is not intended to be and should not be used by anyone other than these specified parties.

© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Agenda

01 Audit scope and results
02 Required communications
03 Appendix





© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Significant risks

## The following provides an overview of significant risks based on our risk assessments

| Significant risk area | Results |
| --- | --- |
| Management override of controls<br>Based on the presumed fraud risk in professional standards, the risk of management override includes the following:<br>• Manipulating the assumptions, methodologies and amounts used in estimations used for accounting for transactions, or significant unusual transactions to engage in fraudulent financial reporting or conceal misappropriation of assets.<br>• Omitting, obscuring, or otherwise misstating disclosures by manipulating the financial reporting process. | • Please see results and procedures below with regard to the valuation of investments.<br>• We obtained a listing of journal entries prepared by the third-party administrator to ensure completeness and reconciled all material accounts from the trial balance to supporting subledgers which were subject to testing.<br>• Ensured any top-sided entries were supported and represented a valid business purpose. |
| Fair Valuation of Investments<br>Private investments in companies are classified as Level 3 which has been identified as a significant risk due to the complexity, subjectivity, and high estimation uncertainty involved in the measurement of fair value. These financial models of the Fair Value of Investments require management's judgment to create. Management may create financial models using inaccurate assumptions to inflate their total value of investments. | GT reviewed the inputs used in the valuation model and performed recalculation to verify accuracy. Given the valuation as of December 31, 2023 was based on a recent valuation round of the company, we obtained evidence of that transaction to support the valuation assumption. No exceptions were noted. |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd


HIGHLY CONFIDENTIAL - ATTORNEY' EYES ONLY RIA-SIC_00026116

# Areas of audit focus

The following provides an overview of the areas of significant audit focus based on our risk assessments.

| Areas of focus | Results |
|---|---|
| Investments<br>- Investments in Securities at Fair Value<br><br>Payable for reverse repurchase agreements | • Gained a business process understanding of the controls related to valuation of investments and purchases and sales transactions.<br>• Sent confirmation requests to custodians and brokers to verify the balances of investments, including the repurchase agreements.<br>• Tested the cost basis of investments<br>• Used our New York Pricing Group to establish independent estimates of the valuation of the investment securities portfolio. |
| Loan Payable – securities at fair value | • Obtained an understanding of the securities lending transaction.<br>• Confirmed ending securities borrowed with the custodian.<br>• Tested short sales and covers from the inception of the lending transaction through December 31, 2023<br>• Used our New York Pricing Group to establish independent estimates of the valuation of the loan payable on the basis of the securities owed. |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Summary of misstatements

| | Increase (Decrease) to: | | | |
|---|---|---|---|---|
| **Description** | **Assets** | **Liabilities** | **Equity** | **Net Income** |
| **Material, corrected misstatements** | | | | |
| Land | $ 1,500,000 | | | |
| Notes payable | | $ 1,500,000 | | |
| Interest payable | | $ 789,667 | | |
| Retained earnings | | | ($789,667) | |
| | | | | |
| *To record related party note payable* | | | | |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Required communications




- Going concern matters
- Fraud and noncompliance with laws and regulations
- Significant deficiencies and material weaknesses in internal control over financial reporting
- Use of other auditors
- Use of internal audit
- Related parties and related party transactions
- Significant unusual transactions
- Disagreements with management
- Management's consultations with other accountants
- Significant issues discussed with management
- Significant difficulties encountered during the audit
- Difficult or contentious matters for which we consulted outside the engagement team and that are, in our professional judgment, significant and relevant to you and your oversight responsibilities
- Other significant findings or issues that are relevant to you and your oversight responsibilities
- Modifications to the auditor's report
- Other information in documents containing audited financial statements


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd


HIGHLY CONFIDENTIAL - ATTORNEY' EYES ONLY

# Quality of accounting practices

| Topic | Discussion |
|---|---|
| **Accounting policies** | The accounting policies adopted by the Company are consistently applied and appropriate. We noted no unusual or alternative policies. The significant policies are detailed in the notes to the financial statements. |
| **Accounting estimates** | Significant accounting estimate include the valuation assumptions and methodologies used. We will evaluate management's significant judgments and estimates noted. |
| **Disclosures** | The audit team will evaluate the Company's financial statement presentation and disclosures to ensure completeness and conformity with the applicable financial reporting framework. |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd


HIGHLY CONFIDENTIAL - ATTORNEY' EYES ONLY

# Going concern

## Conditions and events, when considered in the aggregate, that indicate substantial doubt

As of December 31, 2023, the Company's total liabilities exceeded its total assets by $91 million. The net asset deficit is primarily due to the $189 million loan payable to Shinhan Investment Corp. The trading resources of the Company come from securities borrowed from a lending counterparty. The Company intends to continue trading pending the outcome of current litigation.

The risks to the Company are adverse market conditions and the Court reversing its current legal standing and obligating the Company to return the securities to Lending counterparty, which would prompt the liquidation of the assets of the Company. The current maturity of the securities lending arrangement obligates the Company to return the securities to the lending counterparty subject to the Court's direction and final judgement. Given the dependency on the outcome from litigation, management has determined there is substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financial statements are issued.

## Effects on the financial statements and adequacy of related disclosures

The notes to the financial statements discuss the circumstances which give rise to there being substantial doubt about the Company's ability to continue as a going concern. Please see Note 2.

## Effect on the auditor's report

Our report includes an emphasis of matter relating to these circumstances.


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Auditor independence

Our firm maintains a robust quality control system supported by comprehensive policies and procedures that meets or exceeds regulatory requirements. Our system enables us to evaluate and maintain our independence and serve audit clients with requisite integrity, objectivity, and independence. As you exercise your oversight responsibilities, you should understand the more significant aspects of this system:

- Accumulating and communicating relevant information, including a restricted-entity list and use of a tracking system to monitor the financial interests of our worldwide personnel
- Obtaining annual written confirmations of compliance from personnel and member firms
- Monitoring individual compliance, including periodic audits and disciplinary mechanisms
- Conducting a domestic or international relationship check through a robust Relationship Checking System
- Evaluating relationships and circumstances that create threats to independence, including relationships identified through a domestic or international check

**Monitoring independence for new opportunities**

Only permitted non audit services or business relationships are cleared, and such services or relationships are monitored for scope creep. As necessary, our firm applies appropriate safeguards to eliminate or mitigate independence threat(s) to an acceptable level. As necessary, or as required by a regulator, the engagement partner will discuss with management and/or those charged with governance any potential independence threats or where additional input is needed in relation to our firm's independence evaluation.


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Internal control matters



## Responsibility

We are responsible for obtaining reasonable assurance about whether the financial statements are free of material misstatement. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. Control deficiencies that are of a lesser magnitude than a significant deficiency will be communicated to management.


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Use of the work of others

| Other individuals or entities | | Description of the use of others and relevant area(s) of audit |
|---|---|---|
| Specialists and those with specialized skill and knowledge | ✓ | • GT's New York Pricing Group provided independent prices for investment securities. |
| Internal audit | | |
| Other company personnel | | |
| Third parties working at the direction of the company | | |
| Other GTUS offices or locations | ✓ | • Technology and resources of our shared services center located in India. |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Related parties and related party transactions

## Nature of related party relationships

- Management provided us with a listing of related parties, which include Ducenta Squared Asset Management.
- Management has entered into a promissory note with two shareholders and used the proceeds of the note to purchase real estate.

## Significant findings or issues with related parties

There were no material related party transactions that occurred during the year that were not disclosed in the financial statements.


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Additional information on relevant required communications

| Topic | | Description of matter(s) |
|---|---|---|
| Difficult or contentious matters for which we consulted | | |
| Management's consultation with other accountants | | |
| Disagreements with management | | |
| Difficulties encountered during the audit | | |
| Circumstances that affect the form and content of the auditor's report | | |
| Other findings or issues | | |
| Written representations requested from management | ✓ | Management representation letter will include a schedule of unrecorded misstatements and omitted disclosures, if any. |


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# New Mountain Capital (NMC) investment and APS independence considerations

## ALTERNATIVE PRACTICE STRUCTURE (APS)

Grant Thornton LLP

- Licensed CPA firm that will continue to provide audit and attest services

Grant Thornton Advisors LLC

- Advisory and non-attest entity, which is receiving NMC's investment

Independence considerations

- The APS does not change independence or ethical requirements for either firm or their professionals
- Grant Thornton LLP has established ongoing monitoring procedures to protect independence of audit clients under the new structure

## COORDINATION

Relationships with NMC or GT Advisors LLC

- Identify and evaluate existing or potential business or financial relationships that the Company or its affiliates may have with NMC (e.g., a lending relationship from a NMC credit fund) to allow for timely independence evaluations and discussions
- Identify and evaluate other types of relationships that the Company or its affiliates may have with GT Advisors LLC (e.g., an investment or participation in the debt of GT Advisors LLC) to allow for timely independence evaluations and discussions

## AUDIT PROCEDURES GOING FORWARD

The engagement team will:

- Inquire of management regarding any business or financial relationships with NMC or investments in or participation in the debt of GT Advisors LLC
- Evaluate relationships for independence purposes and discuss with national office or subject matter experts, as appropriate
- Obtain new written representations from management that, to the best of their knowledge, they have disclosed any relationships with NMC or GT Advisors LLC that may exist or are being considered
- Follow applicable communication requirements for relationships that may bear on the firm's independence


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

# Commitment to promote ethical and professional excellence

**We are committed to promoting ethical and professional excellence. To advance this commitment, we have put in place a phone and internet-based hotline system.**

**The Ethics Hotline**
(1.866.739.4134) provides individuals a means to call and report ethical concerns.

**The EthicsPoint URL**
link can be accessed from our external website or through this link:
https://secure.ethicspoint.com/domain/en/report_custom.asp?clientid=15191

**Disclaimer:** EthicsPoint is not intended to act as a substitute for a company's "whistleblower" obligations.


© 2025 Grant Thornton LLP | All rights reserved | U.S. member firm of Grant Thornton International Ltd

Grant Thornton

# EXHIBIT 37

Message

**From**: Klint, Andrew [Andrew.Klint@us.gt.com]
**Sent**: 10/24/2025 2:49:44 AM
**To**: Shida, Sakiko [sakiko.shida@rsquaredia.com]
**CC**: Law, Brandon [brandon.law@us.gt.com]; Kang, David [david.kang@rsquaredia.com]; Ishida, Tetsuya [tetsuya.ishida@rsquaredia.com]; Tim Torline [tim.torline@rsquaredia.com]
**Subject**: RE: Audit Requests

Hi Sakiko,

Wanted to confirm (as I'm sure you saw) that we did receive the statements from BNP.

To follow up on a few items:

- Can you confirm whether the tax accruals for penalties/interest/payable were recorded?
- Have the prior year delinquent tax returns been filed?
  - If not, any reason for the delay?
  - Would need to disclose this in the notes to the financial statements.
- Please let us know timing of payment of the tax invoices that James Hughes shared yesterday, since those are past due.

Finally, below are our standard subsequent event inquiries – which would cover the period from 12/31/23 through today's date, to be updated through issuance. Please let us know if you the larger RIA team has knowledge of any of the below. We can also run through these on a phone call.

- Modifications or revisions to significant transactions or agreements
- Changes in equity (for example, stock), debt, or working capital
- Changes in the Company's related parties, including any significant new related party transactions
- Significant transactions that are outside the normal course of business or that are otherwise unusual due to their timing, size or nature
- Assets appropriated by government or destroyed
- Developments regarding contingencies
- Unusual journal entries or adjustments
- Events that are relevant to the measurement of estimates or provisions
- Events that are relevant to the recoverability of assets
- Status of items accounted for on the basis of tentative, preliminary, or inconclusive data

- Events or likely events that question the appropriateness of accounting policies
- Changes in the Company's officers, board members, major shareholders, or important advisors
- New commitments, borrowings or guarantees
- Sales or acquisitions of assets outside of the normal course of business

Thank you,
Anderw

---

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Monday, October 20, 2025 9:15 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Ishida, Tetsuya <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

**Beware of phishing attempts: Use caution with links and attachments. Do not open attachments unless you recognize the sender.**

Report Suspicious

Hi Andrew,

We are available 9-11am tomorrow (10/21). Please let us know if that works.

Sakiko

On Sun, Oct 19, 2025 at 5:48 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko,

We wanted follow up on this request. As well, please let us know when you are available for a call early this week. We are in the final steps of our audit and would like to issue as soon as possible, both to meet the needs of your stakeholders and also so that we can start and complete the 2024 audit. We will want to see recent financial statements and complete our subsequent event procedures, and can set a short timeline for issuance on our call.

Thank you,

Andrew

**From:** Klint, Andrew
**Sent:** Monday, October 13, 2025 2:17 PM
**To:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** RE: Audit Requests

Hi Sakiko,

Thank you so much – we have gone through the support. The last piece as I noted in my email on 9/15 is to confirm the activity with the custodian (BNP). Ideally, if you have a client contact at BNP that can just send us statements, I can reach out to them directly and ask for the below.

- 2/28/2019
- 10/31/2019
- 2/29/2020
- 4/30/2020
- 9/30/2021
- 10/31/2021
- 3/31/2022
- 8/31/2022

Thanks,

Andrew

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Monday, October 6, 2025 11:36 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Beware of phishing attempts: Use caution with the links and attachments. Report Suspicious

Hi Andrew,

The support requested has been uploaded to this folder.

Best,
Sakiko

On Thu, Sep 25, 2025 at 5:51 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

HI Sakiko,

Below is a link to our sample of transactions for testing. If there are multiple trades for one selection (the rollforward was summarized by year), we can go back and pick individual trades.

RIA Loan Payable Sample.xlsx

For each selection, we are asking for the below support:

1. Trade confirmation
2. Proof of cash paid/received
3. Custodian statement showing transaction

Please let me know if you want to discuss. I can also come by next week if it's easier to run through these in person.

Thanks,

Andrew

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Monday, September 22, 2025 12:16 PM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

Attention: EXTERNAL EMAIL

Hi Andrew,

Please see the loan payables rollforward attached along with the most up to date draft FS.

Sakiko

On Mon, Sep 22, 2025 at 9:16 AM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi David and Team,

We wanted to follow up on the rollforward schedule.

Thanks,

Andrew

**From:** Klint, Andrew
**Sent:** Monday, September 15, 2025 10:43 AM
**To:** 'David Kang' <david.kang@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; 'Tetsuya Ishida' <tetsuya.ishida@rsquaredia.com>; 'Tim Torline' <tim.torline@rsquaredia.com>
**Subject:** RE: Audit Requests

Hi David,

Hope you had a nice weekend. Wanted to follow up on the rollforward information we had requested relating to the loan payable. We have further discussed with our national office and will test the activity from inception of the SLA (which is the current loan balance, not the GMSLA), including vouching trades to confirmation/cash/delivery, and confirming with BNP as custodian as an alternative to Shinhan.

As I had mentioned, I believe that the loan rollforward information listed on the cost roll tabs prepared by Integrated is a starting point, if that can be complied going back to inception ($0 balance) of the SLA.

Thanks,

Andrew

**From:** Klint, Andrew
**Sent:** Monday, September 8, 2025 1:03 PM
**To:** David Kang <david.kang@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** RE: Audit Requests

Hi David,

Was just sending you an email as this one came across. Will discuss internally and let you know next steps.

Andrew

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Monday, September 8, 2025 1:00 PM
**To:** Law, Brandon <brandon.law@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Klint, Andrew <Andrew.Klint@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Brandon/Andrew.. .

Spoke with legal as well as my partners. Requesting confirmation from Shinhan on the current trade/transactional would/could create litigation risk from an overall negotiation that is current underway. As of last week, Shinhan's counsel have requested negotiations on potential settlement. And therefore, any request to Shinhan would be a no go.... :(

For reference, the last confirmation that we received from Shinhan in 2020, let us know if this could be of any help... Or please let us know if your alternative option would suffice...

Thanks

DK

On Thu, Aug 28, 2025 at 10:05 PM Law, Brandon <brandon.law@us.gt.com> wrote:

Hi David,

Thanks for the update. Let us know. For clarity, we would not be attempting to confirm anything related to the litigation, only the factual terms of the outstanding balance as of 12/31/2023. As noted below, we will work concurrently on the alternative procedures.

Regards,

Brandon Law
Partner, Audit Services, Grant Thornton LLP
Principal, Grant Thornton Advisors LLC

**D** +1 949 608 5373
**M** +1 312 231 1090

GT.COM

---

4695 MacArthur Court, Suite 1600
Newport Beach, CA 92660

---

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Thursday, August 28, 2025 1:30 PM
**To:** Law, Brandon <brandon.law@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Klint, Andrew <Andrew.Klint@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Brandon...

Lets just any and all other outstanding points per audit done. And I will discuss internally with my legal counsel at Winston and see how to navigate without any negative impact on the lawsuit. Although the audit is a part of our overall business, but if the audit negatively impacts our lawsuit, then there will be no need for an audit. make sense?

Will let you know...

DK

On Wed, Aug 27, 2025 at 11:43 AM Law, Brandon <brandon.law@us.gt.com> wrote:

Hi Sakiko,

Thank you for the response. Andrew can provide the details on alternative procedures however I did want to highlight that we still need to attempt to confirm with SIC. This is our first audit so given the materiality of this balance, and its connection to the going concern, we are required to attempt to confirm directly with SIC. We can and will perform alternative procedures concurrent with this, but the alternative procedures cannot replace the attempt to confirm. In future periods, assuming no response back from SIC, we will have the prior experience to document the ineffectiveness of confirmation procedures and would allow us to proceed directly with alternative procedures, but we cannot do that in the first audit. We are happy to get on a call to discuss this or any of the items below if it would be helpful.

Regards,

Brandon Law
Partner, Audit Services, Grant Thornton LLP
Principal, Grant Thornton Advisors LLC

**D** +1 949 608 5373
**M** +1 312 231 1090

GT.COM

4695 MacArthur Court, Suite 1600
Newport Beach, CA 92660

---

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Wednesday, August 27, 2025 9:53 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

Attention: EXTERNAL EMAIL

Hi Andrew,

Since it is unlikely that we will receive a response from SIC as you noted in your email, we request that you proceed with the alternative procedure. We would like to move forward with this audit without further delay. Could you let us know exactly what information BNP and Integrated need to provide?

Best,

Sakiko

On Tue, Aug 26, 2025 at 6:02 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi David,

Thank you for sharing your concerns.

Attached is the current draft of our audit report which reflects the going concern language we had previously shared. This opinion language assumes that we obtain the audit evidence below.

As it pertains to the balance sheet audit as of 12/31/23, we wanted to provide some additional details as to why we have been making these requests. While the legal documents provide a lot of key information relating to the fact pattern and legal analysis of the Shinhan matter, we are also trying to audit the factual account balances as of the balance sheet date.

For the securities borrowed from SIC as of 12/31/23, we have a liability of $189mm on the balance sheet and we need to obtain evidence as to its completeness. Typically, that means having the counterparty confirm the balance, and our professional standards require that we try to send that confirmation. We have provided proposed language for that confirm, and if legal counsel has edits to that, we can potentially incorporate.

If, as expected, Shinhan does not respond, the alternative procedure would be to understand and obtain evidence for the transactions underlying the amount borrowed, including obtaining the detail of the trades from the inception of the arrangement to arrive at the balance today – this is the reason why we were asking for the journal entries. This is factual support that should be in the records kept by BNP and Integrated. We can connect with them directly to try to compile the information if that's the most efficient approach.

For the repo liability, the lender reported a difference between what their records show as being financed and what the custodian shows as being financed of $144mm. Sakiko has made multiple attempts to obtain clarification from JPM but they have not provided a reply or explanation. As of today, they are still investigating. If there is an explanation for this, we can perform additional alternative procedures however as it stands there is a material difference between what the counterparty is confirming and what the custodian is reporting, and we need to reconcile this difference to sign off on the audit.

I apologize if the nature of our asks have been unclear.

Upon reviewing this evidence in totality, we will be able to finalize the going concern consultation, disclosure language, and issue our opinion. Timing is about a week to process this once received.

We are happy to set up a call and discuss and/or coordinate with BNP/Integrated.

Best,

Andrew

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Tuesday, August 26, 2025 9:08 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Andrew...

Lets recap.

1. This is a Balance Sheet Audit.

2. With exection to the 3 points above. I am going to assume that the a Draft Audit is available.

As such, I spoke with my attorney, and any requests during an active litigation to the Defendant/Shinhan is NOT prudent... as it will have a legal strategy implications. "Therefore... Per GAAP, please advice/revise as applicable and please finalize. Would appreciate timing of delivery of the Draft.

Thanks

DK

On Mon, Aug 25, 2025 at 6:01 PM David Kang <david.kang@rsquaredia.com> wrote:

Andrew...

I really don't understand. Since engagement I was completely transparent per the Shinhan transaction and litigation. We have gone through multiple versions of the same "ask" for the past 7-8 months. If this is above GT's ability to conduct an audit, I think it would have been great to have known this since engagement. I am really confused on how many legal docs I need to provide to qualify the current litigation with Shinhan. And you have been provided a Court decision on the Shinhan's Motion to Dismiss. Which was in our favor.

I'm trying to better understand if the delays are due to resources at GT per our discussion, or due to other drivers?? Like I said, I expect my auditor to be unbiased in its factual qualitative language and to providing color. I honestly must insist we just wrap up the audit ASAP. We have 3 points... What I would appreciate if you can provide the "final draft" of the Audit report with Notes per these last three items before we progress. This continued back and forth is tiresome/unproductive for both GT and RiaR. I would appreciate you understand that I have a business to run and continued audits to do. LMK ASAP.

Thanks

DK

On Mon, Aug 25, 2025 at 4:45 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko,

Thanks for reaching out. These are the items that we need to get audit closed out:

- Confirmation request to Shinhan – we discussed with our national office and do need to try sending this out. We acknowledge the circumstances and low likelihood of a reply, but if you can please help us get this sent that would be great.
- Representative journal entries for Shinhan transaction – we saw the support that Tim had provided with regard to magnitude of losses from the default. Can you help us understand exactly how the transactions flowed from the initial borrowing to their return and resulting realized losses, that would help.
- Repo confirmation for JPM – I know your client contact and the confirm department at the bank are working on this, but the initial response from the bank on our first follow up states that their original response was complete. Is it possible that this is an error on BNP's side? I know your team has made a lot of effort to get a response from JPM.

We are available to get on a quick call if it's easier.

Best,

Andrew

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Friday, August 22, 2025 9:47 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Hi Andrew,

Could you give us a status update? Thank you.

Sakiko

On Thu, Aug 14, 2025 at 1:25 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Thanks you – we will review.

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Thursday, August 14, 2025 11:12 AM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>; Tim Torline <tim.torline@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

See Memo in Spreadsheet. 3 worksheets that will provide overall rationale of losses/deficit. Principle drivers of losses 1) MTM on securities and 2) Increase Repo Borrowing Costs.

I will have Tim Torline provide additional color on the trades.

Thank you

DK

On Wed, Aug 13, 2025 at 10:44 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi David,

Completely understand on the futility of the confirm attempt – our professional standards do ask us to at least try in cases like this.

For the valuation, here is the price from a BWIC that we have access to. They also got a price from Markit at $79. Happy to look at any other data that you have specific to this bond.

| | SECTOR | BOND | ORIG FACE | CURR FACE | WAL | MD | SP | FI | DB | KR | OT | SPREAD | SPEED | C/E | PRICE | DEALER | AGING | DATE ADDED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [illegible] | WESTF 2021-A B | 380,000 | 349,350 | 5.10 | - | - | - | - | - | - | P+74 | - | - | 74-00 | BAM | 3 | Sep 08, 2023 |

Andrew

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Wednesday, August 13, 2025 8:14 PM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Andew, thanks for the update.

Memo: Ok will get you some quantitative drivers.

Shinhan: Read over the confirm needed or requested from Shinhan. To be honest, I don't think they will even respond. To be honest, if you were getting sued for performance related, where 1) The Court issued certain decision to support our claim and 2) the amounts are in the 100's of millions. and 3) there is a fraudulent inducement tied to financial and reputational damages, would you provide the plaintiff support? given there are legal implications? No attorney would allow their client to provide this. The lawsuit specifically list our full complaint and also confirms the GMSLA agreement.

Security valuation: 1/1/2024: Can you send over the doc referencing this?

Thanks

DK

On Wed, Aug 13, 2025 at 8:01 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi David,

Thank you – we are reviewing this. A few updates below --

- We had also discussed receiving a memo to further address the series of transactions that resulted in the current net deficit, including sample journal entries – is that available?
- We also need to attempt to confirm the current securities lending arrangement with Shinhan. I have a attached a sample confirmation for review. While we do not expect a response, it is a procedure our national office is asking that we attempt in accordance with our professional standards. Aside from reviewing the letter, we would need a contact a SIC who would be authorized to respond.
- Finally, we do have one proposed adjustment to the securities valuation as of 1/1/2024 relating to one security (WESTF 2021-A B) that was marked at 91.558 but had an observed dealer quote in Sep 2023 for $74 and pricing from one of our approved pricing vendors showed $79 at 12/31/23. This would extrapolate to a difference of $1.09mm which is below our materiality, so would not need to be corrected in the financial statements but would be communicated as a passed audit adjustment.

Thanks,

Andrew

**From:** David Kang <david.kang@rsquaredia.com>
**Sent:** Thursday, August 7, 2025 1:17 PM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>
**Cc:** Shida, Sakiko <sakiko.shida@rsquaredia.com>; Law, Brandon <brandon.law@us.gt.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: Audit Requests

**Attention: EXTERNAL EMAIL**

Hi Andrew,

Please see the Liquidity Memo revision as discussed that accurately notes current status given our most recent Court decision. LMK if this would be satisfactory to you as it works for us.. As you can see, it varies sole on specifics given updated Court decision...

**Liquidity:**

As of December 31, 2023, the Company's total liabilities exceeded its total assets by $91 million. The net asset deficit is primarily due to the $189 million loan payable to Shinhan Investment Corp (the "Lender") as further described in Note 8. The trading resources of the Company come from securities borrowed from a lending counterparty. The Company intends to continue trading pending the outcome of current litigation where the Court will need to assess damages to the Company via legal discovery and summary judgement; Count 1: $147 million obligation, Count 2: $750 million obligation, Count 3: fraudulent inducement claims and the reputational and financial damages.. Until such time that one of those events occurs, there are funds to continue trading activities. The counterparties of the Company's reverse repurchase agreements can make margin calls, however, the Lending counterparty of the securities cannot. The risks to the Company are adverse market conditions and the Court reversing its current legal standing and obligates the Company to return the securities to Lending counterparty, which would prompt the liquidation of the assets of the Company. The current maturity of the securities lending arrangement obligates the Company to return the securities to the lending counterparty subject to the Court's direction and final judgement. Given the dependency on the outcome from litigation, management has determined uncertainties do exist as to the Company's ability to continue as a going concern.

In a standard liquidation scenario, the Company will liquidate all unencumbered securities first, using the proceeds to pay off reverse repurchase agreement obligations. The Company will then liquidate the remaining securities. With those net proceeds, the Company will deliver the borrowed securities to the Lender either in whole or in deficit. If delivered in deficit, the Lending counterparty is responsible for the loss

Thanks

DK

On Tue, Jul 15, 2025 at 7:54 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko,

Thank you – we will let you know if we have any questions and will review the memo when received.

Is there a contact at Shinhan that we could attempt to confirm with? We appreciate this is a sensitive topic with them and we would only want to confirm details pertaining to the current securities borrowed.

Separately, attached is the current draft of our audit opinion which includes the proposed language for going concern. We also attached comments to the draft financial statements – let us know if you would like to discuss. Finally, below are some suggested edits to the liquidity footnote to align with our draft opinion, which can also be updated in the draft. We shared this with David earlier today and understand that the language will want to be run by legal counsel

**Liquidity**

As of December 31, 2023, the Company's total liabilities exceeded its total assets by $91 million. The net asset deficit is primarily due to the $189 million loan payable to Shinhan Investment Corp (the "Lender") as further described in Note 8. The trading resources of the Company come from securities borrowed from a Lender. The Company intends to continue trading until those securities are called in whole by the Lender or are replaced with other securities by the Lender or by a new counterparty. Until such time that one of those events occurs, there are funds to continue trading activities. The counterparties of the Company's reverse repurchase agreements can make margin calls, however, the Lender of the securities cannot. The risks to the Company are adverse market conditions and the risk of the Lender terminating the securities lending arrangement without finding a suitable replacement with a new counterparty, which would prompt the liquidation of the assets of the Company. The current maturity of the securities lending arrangement obligates the Company to return the securities to the lender in August of 2025, unless the Lender continues to roll the maturity of the lending transaction. As a result of this uncertainty, management has determined that substantial doubt exists as to the Company's ability to continue as a going concern.

In a liquidation scenario, the Company will liquidate all unencumbered securities first, using the proceeds to pay off reverse repurchase agreement obligations. The Company will then liquidate the remaining securities. With those net proceeds, the Company will deliver the borrowed securities to the Lender either in whole or in deficit. If delivered in deficit, the Lender is responsible for the loss.

Thanks,

Andrew

---

**From:** Sakiko Shida <sakiko.shida@rsquaredia.com>
**Sent:** Tuesday, July 15, 2025 1:41 PM
**To:** Klint, Andrew <Andrew.Klint@us.gt.com>

**Cc:** Law, Brandon <brandon.law@us.gt.com>; Kang, David <david.kang@rsquaredia.com>; Tetsuya Ishida <tetsuya.ishida@rsquaredia.com>
**Subject:** Re: Audit Requests

Attention: EXTERNAL EMAIL

Hi Andrew,

Please refer to the separate email thread for JPM's repo confirmation and the attached for SIC's bond substitution confirmations. The summary memo will follow separately.

Best,

Sakiko

On Mon, Jul 14, 2025 at 5:30 PM Klint, Andrew <Andrew.Klint@us.gt.com> wrote:

Hi Sakiko and Tetsuya,

Thanks for connecting earlier today. Below are a few requests we discussed to help close out the audit.

**Repo Confirms**

- JPM Confirm – below is the snippet from the confirmation they provided, which only showed $46mm of principal balance versus $189mm on the balance sheet. Would you be able to help us resolve this and obtain an updated confirmation directly from JPM?

| Customer Account | Security Name | Amount | Price | Rate | Principal | Fin Type | Finance Date Number | As Of Date | Open Date | Return Date | CUSIP Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21338351 | ABS EART 12.36 091830 | 1.75 | 80.1142857 | 8.84587 | 1,402,000.00 | RV | 120423 75553 | 120423 | 120523 | 010524 | 30168BAG5 |
| 21338351 | ABS CRVNA 1.82 090827 | 2.835 | 76.1142857 | 6.54587 | 1,988,000.00 | RV | 120423 75554 | 120423 | 120523 | 010524 | 14687AAS7 |
| 21338351 | ABS FCRT 7.58 081529 | 2.55 | 84.5088039 | 8.49587 | 2,155,000.00 | RV | 120423 75555 | 120423 | 120523 | 010524 | 35104AAE8 |
| 21338351 | ABS PART 2023-1A E | 1.5 | 75.4666667 | 8.84587 | 1,132,000.00 | RV | 120423 75556 | 120423 | 120523 | 010524 | 74113GAN3 |
| 21338351 | ABS TAST 8.7 071527 | 2.78 | 85.3763441 | 8.54587 | 2,382,000.00 | RV | 120423 75557 | 120423 | 120523 | 010524 | 89616KAD6 |
| 21338351 | ABS TAST 7.13 081726 | 2.5 | 89.6885808 | 8.34587 | 1,121,000.00 | RV | 120423 75578 | 120423 | 120523 | 010524 | 89616KAA2 |
| 21338351 | CMO GNR 2016-033 UF | 35 | 90.1844172 | 5.85 | 6,381,000.00 | RV | 120423 123340 | 120423 | 120523 | 010324 | 38378VU28 |
| 21338351 | CMO GNR 10-44 FM | 18.257547 | 89.8856741 | 5.86 | 5,374,000.00 | RV | 120423 123341 | 120423 | 120523 | 010324 | 38381TRK3 |
| 21338351 | CMO GNR 221827 FA | 26.31808 | 82.5018085 | 5.86 | 3,748,000.00 | RV | 120423 123342 | 120423 | 120523 | 010324 | 38381RHA0 |
| 21338351 | GNR 2019-43 FB | 40 | 85.1827387 | 5.85 | 6,161,000.00 | RV | 120423 123343 | 120423 | 120523 | 010324 | 38381TR98 |
| 21338351 | CMO GNR MV | 29.333334 | 88.871493 | 5.85 | 3,748,000.00 | RV | 120423 123389 | 120423 | 120523 | 010324 | 38381TRW7 |
| 21338351 | C MRG MRG 12/31/99 | 1.84966307 | 100 | 5.33 | 1,848,863.07 | MI | 120823 100850 | 120123 | 120123 | 010224 | MRG008001 |
| 21338351 | ABS 6.63 071526 | 4.45 | 81.4703559 | 8.10739 | 1,822,000.00 | RV | 120823 82807 | 120823 | 121123 | 011024 | 05386DAA5 |
| 21338351 | ABS SBCLN 8.071 061533 | 0.75 | 84.9537008 | 8.45739 | 478,000.00 | RV | 120823 82808 | 120823 | 121123 | 011024 | 80293DBW3 |
| 21338351 | CMO FREMF 2010-KF6 B | 3.8155 | 74.0373731 | 7.00739 | 744,000.00 | RV | 120823 82845 | 120823 | 121123 | 011024 | 30306HAG3 |
| 21338351 | CMO FREMF BC | 4 | 28.3729882 | 7.00738 | 768,000.00 | RV | 120823 82858 | 120823 | 121123 | 011024 | 30307GAC3 |
| 21338351 | ABS EART 6.44 061527 | 3.5 | 78.6255714 | 6.50739 | 2,753,000.00 | RV | 120823 82859 | 120823 | 121123 | 011024 | 30168NAL0 |
| 21338351 | FREMF 2019-KF69 B | 3 | 72.8368425 | 7.00739 | 480,000.00 | RV | 120823 82860 | 120823 | 121123 | 011024 | 30313LAG7 |

**SIC Matter**

- Summary memo of transactions
- SLA, trade confirmation, and notice of delivery covering all securities borrowed as of 12/31/23
    - The notice of delivery previously provided only covered two CUSIPs
    - We would like to attempt to confirm the details of the securities lent as of 12/31/23, based on review of the above

Thanks,

**Andrew Klint**
Senior Manager, Audit & Assurance Services

**D** +1 213 688 1759
**M** +1 818 279 3301

**GT.COM**

444 S. Flower Street, Floor 31
Los Angeles, CA 90071

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

david.kang@rsquaredia.com

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms: GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms, GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings

opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

--

***David Kang***

*President and CEO*

*Partner*

***Ria R Squared Inc.***

NY: 405 Lexington Ave., 26th Floor

New York, NY 10174

FL: 801 Brickell Ave. 8th Floor

Miami, FL 33131

*Cell: 213-364-2848*

*Office: 212-652-9668*

*david.kang@rsquaredia.com*

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership.

Services are delivered by the member firms. GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership.
Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

"Grant Thornton" is the brand name under which Grant Thornton LLP and Grant Thornton Advisors LLC and its subsidiary entities provide professional services. Grant Thornton LLP and Grant Thornton Advisors LLC (and their respective subsidiary entities) practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Grant Thornton LLP is a licensed independent CPA firm that provides attest services to its clients, and Grant Thornton Advisors LLC and its subsidiary entities provide tax and business consulting services to their clients. Grant Thornton Advisors LLC and its subsidiary entities are not licensed CPA firms.
Grant Thornton International Limited (GTIL) and the member firms, including Grant Thornton LLP and Grant Thornton Advisors LLC, are separate legal entities. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms; GTIL does not provide services to clients. In the U.S., visit Grant Thornton at https://www.grantthornton.com. For information about how we may process your personal information, please see our privacy statement.
Please consider the environment before printing this email.
Any tax advice included in, attached to, or otherwise transmitted with this e-mail is limited to the matters specifically addressed herein and is based on the completeness and accuracy of the stated facts, representations, or assumptions, and is not intended as advice on the potential application of any penalties that may be imposed. Preliminary tax advice based on incomplete or inaccurate facts or incomplete analysis of all relevant tax issues should not be relied upon. Nothing herein should be viewed as a representation, warranty, or guarantee that any tax benefits or tax consequences will be realized or all tax savings opportunities identified.
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

**EXHIBIT 38**

WHITE & CASE

July 2, 2026

**VIA NYSCEF**

Hon. Anar R. Patel
Supreme Court of the State of New York
Commercial Division, New York County
60 Centre Street, Rm. 428
New York, NY 10007

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

**Re:** ***RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.*** **(Index No. 659538/2024)**

Dear Justice Patel:

Defendant and Counterclaimant Shinhan Securities Co., Ltd. ("Shinhan") writes in response to the surprising motions to withdraw filed by both sets of counsel for Plaintiff RIA R Squared, Inc. on June 30, 2026 (the "Motions to Withdraw"). *See* NYSCEF Doc. Nos. 246, 247, 249, 250. Although Shinhan takes no position on the merits of those Motions to Withdraw, Shinhan respectfully requests the Court's input and guidance on how to proceed in view of upcoming interim discovery deadlines and the Court-ordered stipulation related to Shinhan's Motion for a Preliminary Injunction. *See* Amended Preliminary Conference Order, NYSCEF Doc. No. 123; Decision and Order on Motion, NYSCEF Doc. No. 244.

As the Court is aware, the parties were instructed to confer on the outstanding issues related to Shinhan's Motion for a Preliminary Injunction, which the Court granted in part and directed the parties to file a stipulation by July 8, 2026. *See* NYSCEF Doc. No. 244. Likewise, the parties have noticed depositions for the coming weeks in accordance with the Court-ordered schedule, and had scheduled meet and confers regarding the final scheduling of those depositions (among other matters); those meet and confers were postponed prior to the Motions to Withdraw, then cancelled. Following the Motions to Withdraw, on June 30, 2026, counsel for Shinhan wrote to counsel at both Quinn Emanuel and Winston Taylor requesting that they advise as to how RIA intends to address the upcoming case deadlines. On July 1, 2026, counsel at Winston Taylor responded noting that they have not been actively involved in this litigation for quite some time, and are unable to advise as to RIA's position. Winston Taylor similarly advised the Court that they "reduced [their] involvement in the litigation" and only "remained counsel of record at Plaintiff's request in order to assist with various time-sensitive matters and ensure a smooth transition of the representation." *See* Mastoris Aff. ¶ 3, NYSCEF Doc. No. 250. Quinn Emanuel, for its part, stated in their July 1, 2026 letter to the Court (NYSCEF Doc. No. 254), that they were "directed by RIA to withdraw as counsel on the evening of June 29th," and that "Quinn Emanuel will take no further action in this matter" absent further instruction from the Court. In its Motion to Withdraw, Quinn Emanuel sought a stay of the discovery and case deadlines.

At this point, Shinhan effectively has no counterparty with which to discuss the remaining issues relevant to the stipulation due on July 8 and progress the proceedings in this case.

WHITE & CASE

July 2, 2026

With respect to depositions in particular, our client agreed to, and has been prepared to, travel from South Korea to attend depositions in New York. However, we cannot reasonably advise them to incur the logistical and financial burdens attendant to such travel where RIA has not confirmed the depositions.

Accordingly, Shinhan respectfully requests the Court's guidance on next steps, in view of the upcoming deadlines and present procedural posture of this action.

The Court is in receipt of Defense counsels' Motions to Withdraw (NYSCEF Doc. Nos. 249, 318). The Court hereby adjourns the stipulation, as ordered by the Court in the Decision and Order issued on June 18, 2026 (NYSCEF Doc. No. 244), *sine die*. The Court will address additional deadlines in the Decision and Order on the motions herein.

So Ordered.

A. R. Patel

Hon. Anar Rathod Patel, A.J.S.C.
New York, New York
July 7, 2026

Respectfully submitted,

*/s/ Laura Garr*
Laura Garr, Esq.

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

cc: All counsel of record via NYSCEF

**EXHIBIT 39**

WHITE & CASE

July 10, 2026

**VIA NYSCEF**

Hon. Anar R. Patel
Supreme Court of the State of New York
Commercial Division, New York County
60 Centre Street, Rm. 428
New York, NY 10007

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

**Re:** ***RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.* (Index No. 659538/2024)**

Dear Justice Patel:

Defendant and Counterclaimant Shinhan Securities Co., Ltd. ("Shinhan") writes to advise the Court of certain very concerning developments with respect to the collateral in the custodial accounts at Wilmington Savings Fund Society ("WSFS") that are the subject of this Court's June 18, 2026 Decision and Order that granted in part Shinhan's Motion for Preliminary Injunction (the "June 18 Order"). NYSCEF Doc. No. 244; *see also* NYSCEF Doc. No. 320 (June 17, 2026 Hr'g Tr.).

As the Court is aware, all counsel of record for Plaintiff RIA R Squared, Inc. filed motions to withdraw as counsel on June 30, 2026 (the "Motions to Withdraw"). *See* NYSCEF Nos. 247, 249-50, 318. One (of several) consequences of those Motions to Withdraw was that Shinhan effectively was left no counterparty with which to negotiate the Court-ordered stipulation that was originally due on July 8, 2026 and would have resolved the remaining outstanding issues concerning Shinhan's collateral in accordance with the Court's June 18 Order. Consequently, the Court adjourned the July 8 stipulation deadline *sine die*. *See* NYSCEF Doc. No. 319.

Shinhan nonetheless brings the following developments regarding the collateral in the custodial accounts to the Court's attention:

- Despite the Court's instructions in the June 18 Order (which were not subject to the pending stipulation), RIA has not "provide[d] screen shots to determine the daily positions on the [WSFS] accounts to Shinhan." *See* June 17, 2026 Hr'g Tr. 36:17-22. Instead, to date, RIA continues to provide only purported daily collateral reports generated by Ducenta. *See* Ex. 1 ("Ducenta Squared"-Generated Daily Reports for July 1 to July 9, 2026).

- The July 1, 2026 Daily Report showed more than $332,000 in cash that was still held by BNP (not WSFS), and which no longer appears in the subsequent reports. *See* Ex. 1.

- Between July 2 and July 8, 2026, RIA also appears to have removed more than $898,000 in cash from the WSFS account; the Daily Reports do not indicate that any other bonds or assets were purchased with this cash. *See id.* Nor has RIA provided Shinhan with notice of any trading activity that used this cash, despite the Court's clear direction that "RIA shall report any [trading] activity, whether a purchase or sale of the collateral as necessary for ongoing collateral management and balancing within two calendar days of the trade." June 17, 2026 Hr'g Tr. 37:14-18.

Shinhan does not wish to over-burden the Court with excessive submissions and correspondence, is mindful that it has the opportunity to respond to the Motions to Withdraw, and will do so by the deadline set by the Court. *See* NYSCEF Doc. No. 318. However, given the time-sensitivities and seriousness of Shinhan's concerns that RIA has been dissipating collateral from the WSFS custodial accounts, Shinhan thought it appropriate to apprise the Court of these latest developments and to renew its request for Court oversight and control of the collateral in WSFS custodial accounts.

Respectfully submitted,

*/s/ Laura Garr*
Laura Garr, Esq.

*Counsel for Defendant-Counterclaimant*
*Shinhan Securities Co., Ltd.*

cc: All counsel of record via NYSCEF

**EXHIBIT 40**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.,<br>*Plaintiff,*<br>v.<br>SHINHAN SECURITIES CO., LTD.,<br>*Defendant.* | Index No. 659538/2024<br>Hon. Anar R. Patel, A.J.S.C., Part 45<br>Mot. Seq. Nos. 006 & 007 |

**DEFENDANT SHINHAN SECURITIES COMPANY, LTD.'S PARTIAL OPPOSITION TO PLAINTIFF'S COUNSELS' MOTIONS TO WITHDRAW AS COUNSEL**

**WHITE & CASE LLP**
Laura Garr
David G. Hille
Hannelore Sklar
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
dhille@whitecase.com
hannelore.sklar@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 2

CONCLUSION .......... 5

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ctr. for Judicial Accountability, Inc. v. Cuomo*,
167 A.D.3d 1406 (3d Dep't 2018) ....................5

*Haskell v. Haskell*,
185 A.D.2d 333 (2d Dep't 1992) ....................2

*Megan Holding LLC v. Conason*,
2013 NYLJ LEXIS 7396 (Civ. Ct. Nov. 15, 2013) ....................5

*Oberon Sec., LLC v. Captivision Korea, Inc.*,
2026 N.Y. Misc. LEXIS 3345 (Sup. Ct. April 14, 2026) ....................5

*Torres v. Torres,*
169 A.D.2d 829 (2d Dep't 1991) ....................2

## INTRODUCTION

Defendant-Counterclaimant Shinhan Securities Co., Ltd. ("Shinhan") respectfully submits this opposition to the motions by counsel for Plaintiff RIA R. Squared, Inc. ("RIA") to withdraw as counsel in this matter (the "Motions to Withdraw"). *See* NYSCEF Nos. 247, 249-50, 321.

Over the course of one day, two respected, international law firms moved to withdraw as counsel for RIA. The withdrawal motions came on the eve of fact depositions and after months of RIA's delay tactics and brazen misrepresentations. Whether this is a situation of lawyers trying to separate from a client who cannot be trusted, or a client firing counsel to obtain a tactical advantage, Shinhan should not be further prejudiced by RIA's gamesmanship. Shinhan requests that there be no period of time in this case when RIA does not have counsel of record responsible for the case, and that any replacement counsel make their appearance within thirty (30) days given that RIA has confirmed it will not appear for scheduled depositions by the Court-imposed deadlines. If RIA does not appoint replacement counsel in thirty (30) days, its claims should be dismissed.

Shinhan further requests that the Court impose additional constraints on RIA to protect Shinhan's interests. RIA has not only failed to advance or adhere to the terms of this Court's June 18, 2026 Order granting in part Shinhan's Motion for Preliminary Injunction (the "June 18 Order," NYSCEF Doc. No. 244), RIA appears to have withdrawn around $1.2 million in cash from Shinhan's collateral in the custodial accounts since the Motions to Withdraw were filed. The Court should grant interim relief compelling RIA to immediately transfer all remaining collateral to a court account or, at minimum, order interim relief consistent with the intended stipulation from the June 18 Order.

## ARGUMENT

Granting the Motions to Withdraw without any limitations or other protections will cause substantial prejudice to Shinhan. After obtaining a stay of these proceedings under false pretenses, RIA should not be permitted to dismiss its counsel to further delay this case and to avoid complying with the injunctive relief this Court already granted to Shinhan. *See, e.g.*, *Torres v. Torres*, 169 A.D.2d 829, 829 (2d Dep't 1991) (denying withdrawal that "would allow the defendant to manipulate the pace of the litigation to his liking"); *Haskell v. Haskell*, 185 A.D.2d 333, 333 (2d Dep't 1992) (affirming denial of motion to withdraw where "substitution of counsel at this late date would have only further delayed the resolution of the matter"). RIA has already been without functioning counsel for more than two weeks. *See* July 1, 2026 Letter from Quinn Emanuel to the Court (NYSCEF Doc. No. 254) (stating they were "directed by RIA to withdraw as counsel on the evening of June 29th," and that that "Quinn Emanuel will take no further action in this matter" absent further instruction from the Court); Garr Aff. Ex. 3 (stating that "Winston hasn't been actively involved in this litigation for quite some time" and is "unable to advise as to RIA's position on any" impacts to the existing case schedule). Quinn Emanuel also requested that the Court "stay[] all proceedings in this action, including discovery and motion deadlines, for thirty (30) days to permit Plaintiff to retain substitute counsel." *See* Order to Show Cause (NYSCEF Doc. No. 321).

As a consequence, depositions that have been noticed for more than a month in accordance with the Amended Preliminary Conference Order's July 15, 2026 deadline (*see* NYSCEF Doc. No. 123) were postponed and the timeline for the completion of party and non-party depositions negatively impacted. Moreover, the July 8, 2026 deadline for the Court-ordered stipulation concerning Shinhan's collateral, has been adjourned *sine die*. *See* So-Ordered Letter Correspondence (NYSCEF Doc. No. 319). Shinhan cannot be left without a functioning

counterparty in a complex, multi-year litigation that RIA itself commenced. With two current law firms as counsel of record, RIA cannot be unrepresented and unsupervised while significant obligations and deadlines run. To the extent RIA is given additional time to retain new counsel, any further delay should be extremely limited, and RIA should not be permitted to reset or substantially extend the deadlines this Court has already entered regarding the overall completion of discovery, the October 15, 2026 Trial Readiness Conference, or deadline to file the Note of Issue. *See* Am. Prelim. Conference Order (NYSCEF Doc. No. 123).

With respect to Shinhan's collateral, the delay is particularly concerning. Despite this Court's June 18 Order and Shinhan's repeated efforts to meet and confer with RIA, as instructed (*see* Garr Aff. ¶¶ 3-4), RIA has not engaged in any efforts to resolve the open items of the stipulation. RIA has also failed to comply with aspects of the Court's June 18 Order that were ***not*** subject to the pending stipulation. *See* June 17, 2026 Hr'g Tr. 36:17-22 (NYSCEF Doc. No. 320) ("[W]ith respect to daily reporting, the Court directs daily reporting at the collateral assets held at WSFS -- held in the WSFS custodial account on a going forward basis. At a minimum, RIA should provide screen shots to determine the daily positions on the accounts to Shinhan."). To date, RIA continues to provide only purported daily collateral reports generated by Ducenta (for which RIA's CEO, David Kang, also serves as Chairman and CEO). *See* Garr Aff. ¶ 9 & Ex. 4. Disturbingly, in the week following the withdrawal motions, the daily reports generated by Ducenta reveal that RIA withdrew more than $900,000 from the WSFS account entirely.[1] *See* Garr Aff. Ex. 4. The daily report dated July 1, 2026 also includes an entry for more than $332,000 in cash that was

[1] Despite these withdrawals of cash, the daily reports generated by Ducenta indicate that there has been a 0.00% change in the cash holdings, further casting doubts on the credibility of RIA (and Ducenta's) self-reporting. *See* Garr Aff. Ex. 4 at 3, 4, 6, 9.

apparently held by BNP (not WSFS), and which appears nowhere in the July 2, 2026 Daily Report or any subsequent report. *See* Garr Aff. Ex. 4. RIA's continued depletion of Shinhan's collateral while RIA is seemingly insolvent is causing irreparable harm to Shinhan. *See, e.g.*, Mot. for Sanctions at 2-3, 10-12 (NYSCEF Doc. No. 256).

Given RIA's misconduct to date, its lack of transparency with this Court, and its recently disclosed financial condition, Shinhan has serious, legitimate concerns about allowing RIA to operate in a posture where it is unrepresented by counsel and subject to no additional court oversight. Shinhan therefore respectfully requests an order from the Court directing RIA to immediately transfer all remaining collateral from the custodial accounts at WSFS into a court account, or, at minimum, blocking RIA from withdrawing or transferring any cash, cash equivalents, or liquid assets, and directing RIA's compliance with the following four issues that should have been addressed in the parties' stipulation:

1. RIA should "provide screen shots to determine the daily positions on the [custodial] accounts" at WSFS to Shinhan on a daily basis (*see* June 17, 2026 Hr'g Tr. 36:21-25), and make read-only access to the accounts available to Shinhan within seven (7) days, or otherwise advise the Court as to why it is unable to do so;

2. RIA should provide to Shinhan, within seven (7) days, written confirmation that Houlihan Lokey and a second appraiser for the real estate assets identified within the custodial accounts have been retained and are conducting a valuation of the assets within the custodial accounts and "an analysis to determine when and how these [assets] can be transitioned into a liquid form" (*id.* at 37:2-13). In such confirmation, RIA also should provide the engagement letters for the appraisers conducting these valuations (*see id.* at 20:12-16) and an estimated timeline for completion of the valuation and conversion of the illiquid assets into liquid ones;

3. RIA should provide to WSFS, within seven (7) days, the joint letter to WSFS, incorporating the revisions Shinhan previously provided to RIA's counsel on June 29, 2026. *See* Garr Aff. Ex. 1; June 17, 2026 Hr'g Tr. 37:19-38:9. In doing so, counsel for Shinhan should be included on that communication.

4. RIA should commence making the borrowing rate and coupon payments to Shinhan directly, in a Shinhan-held U.S. bank account. *See* June 17, 2026 Hr'g Tr. 38:10-23.

Though Shinhan takes no position as to whether Quinn Emanuel and Winston Taylor should ultimately be permitted to withdraw as counsel, RIA should not be permitted to evade or delay satisfaction of the injunctive relief this Court already granted to Shinhan. *See* June 17, 2026 Hr'g Tr. 36:9-39:6; *see also* June 18 Order. To the extent RIA is unable or unwilling to obtain new counsel immediately and abide by the Court-ordered schedule, the claims against Shinhan should be dismissed. *See Ctr. for Judicial Accountability, Inc. v. Cuomo*, 167 A.D.3d 1406, 1409 (3d Dep't 2018) ("Corporations are required to appear by attorney to prosecute or defend a civil action . . . Causes of action asserted by a corporation are properly dismissed when the corporation does not appear by attorney."); *Oberon Sec., LLC v. Captivision Korea, Inc.*, 2026 N.Y. Misc. LEXIS 3345, at *3-7 (Sup. Ct. April 14, 2026) (Patel, J.) (granting motion for default judgment where "the corporate defendant fail[ed] to appear by an attorney as directed" following the withdrawal of multiple sets of former counsel); *Megan Holding LLC v. Conason*, 2013 NYLJ LEXIS 7396, at *2 n.1 (Civ. Ct. Nov. 15, 2013) (explaining that "[a]fter withdrawal of the fourth attorney based on ethical concerns, the Court granted petitioner a seven-week adjournment to seek new counsel . . . after petitioner failed to appear with new counsel, the Court closed the proceedings").

## CONCLUSION

For the foregoing reasons, Shinhan respectfully requests that: (1) the portion of Quinn Emanuel's motion seeking a stay of proceedings be denied; (2) RIA be required to maintain counsel of record in this case until replacement counsel is retained and that any replacement counsel appear within thirty (30) days; (3) the Court so-order RIA's compliance with the collateral-related issues enumerated above; and (4) any such other and further relief as this Court may deem just and proper.

Respectfully submitted,

New York, New York
July 14, 2026

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
David G. Hille
Hannelore Sklar
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
dhille@whitecase.com
hannelore.sklar@whitecase.com

*Counsel for Defendant-Counterclaimant Shinhan Securities Co., Ltd.*

**CERTIFICATE OF COMPLIANCE WITH COMMERCIAL DIVISION RULE 17**

It is hereby certified pursuant to Rule 17 of the Rules of the Commercial Division, effective October 1, 2018, as follows:

The total number of words in this Memorandum of Law, inclusive of point headings and footnotes and exclusive of caption page, table of contents, table of authorities, signature block, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules regulations, etc., is 1,684 words.

New York, New York
July 14, 2026

By: */s/ Laura Garr*

**EXHIBIT 41**

**From:** Joshua S. Bauchner <jbauchner@mblawfirm.com>
**Sent:** Friday, July 10, 2026 8:19 AM
**To:** Sklar, Hannelore; Garr, Laura; Hille, David
**Cc:** Sascha Rand; Toby Futter; Christopher T. Zona
**Subject:** [EXT] RE: RIA R Squared, Inc. v. Shinhan Securities Co., Ltd., Index No. 659538/2024

Good morning,

As a professional courtesy, please be advised that RIA is withdrawing its deposition notices and does not intend to produce witnesses until such time as it has retained new counsel.

Regards,
Josh

**Joshua S. Bauchner | Partner**
(646) 369-0250
Mandelbaum Barrett PC
570 Lexington Avenue, 21st Floor
New York, NY 10022

3 Becker Farm Road
Roseland, NJ 07068
Bio | V-Card | Website

This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.

---

**From:** Sklar, Hannelore <hannelore.sklar@whitecase.com>
**Sent:** Thursday, 09 July 2026 21:17:51
**To:** Mastoris, George <george.mastoris@winstontaylor.com>; Toby Futter <TobyFutter@quinnemanuel.com>; Sebastian Becker <sebastianbecker@quinnemanuel.com>; Hannah Barbosa Cesnik <hannahbarbosacesnik@quinnemanuel.com>; Sascha Rand <sascharand@quinnemanuel.com>
**Cc:** Garr, Laura <laura.garr@whitecase.com>; Hille, David <dhille@whitecase.com>
**Subject:** RE: RIA R Squared, Inc. v. Shinhan Securities Co., Ltd., Index No. 659538/2024

**[EXTERNAL EMAIL from hannelore.sklar@whitecase.com]**

---

Counsel,

Following up regarding the below, and in view of Plaintiff's postponement and cancellation of discussion among the parties regarding adjustments to the deposition schedule, the pending motions to withdraw as counsel, and the Court's anticipated instructions regarding case deadlines (*see* Dkt. No. 319), we ask that you please confirm that RIA is withdrawing the noticed depositions of Shinhan witnesses.

Shinhan is still prepared to proceed with the depositions of Mr. Kang and RIA next week as scheduled. Please advise if RIA plans to appear.

Regards,
Hannelore

**Hannelore Sklar** | Associate
**T** +1 212 819 2646 **M** +1 202 499 0864 **E** hannelore.sklar@whitecase.com
White & Case LLP | 1221 Avenue of the Americas | New York, NY 10020-1095

---

**From:** Mastoris, George <george.mastoris@winstontaylor.com>
**Sent:** Wednesday, July 1, 2026 8:17 AM
**To:** Sklar, Hannelore <hannelore.sklar@whitecase.com>; Toby Futter <TobyFutter@quinnemanuel.com>; Sebastian Becker <sebastianbecker@quinnemanuel.com>; Hannah Barbosa Cesnik <hannahbarbosacesnik@quinnemanuel.com>; Sascha Rand <sascharand@quinnemanuel.com>
**Cc:** Garr, Laura <laura.garr@whitecase.com>; Hille, David <dhille@whitecase.com>
**Subject:** [EXT] RE: RIA R Squared, Inc. v. Shinhan Securities Co., Ltd., Index No. 659538/2024

Thanks, Hannelore, and good morning. Winston hasn't been actively involved in this litigation for quite some time, has taken no part in the discussion of deposition scheduling (or other upcoming case deadlines) with you or the Court, and has had no conversations on that topic with RIA, either. Accordingly, we are unable to advise as to RIA's position on any of the below.

---

**From:** Sklar, Hannelore <hannelore.sklar@whitecase.com>
**Sent:** Tuesday, June 30, 2026 10:39 PM
**To:** Toby Futter <TobyFutter@quinnemanuel.com>; Sebastian Becker <sebastianbecker@quinnemanuel.com>; Hannah Barbosa Cesnik <hannahbarbosacesnik@quinnemanuel.com>; Sascha Rand <sascharand@quinnemanuel.com>; Mastoris, George <GMastoris@winston.com>
**Cc:** Garr, Laura <laura.garr@whitecase.com>; Hille, David <dhille@whitecase.com>
**Subject:** RIA R Squared, Inc. v. Shinhan Securities Co., Ltd., Index No. 659538/2024

Counsel,

In view of your respective motions to withdraw as counsel of record filed today in the above-captioned matter, we are writing to confirm your client's position with respect to the upcoming case deadlines, in particular the Court-ordered stipulation due July 8 and upcoming noticed depositions.

As you are aware, the parties originally noticed depositions for the following dates:

- David Kang – July 14
- RIA Rule 11-f Witness – July 13
- Michael Leung – July 21
- Min Young Jeong – July 1
- Shinhan Rule 11-f Witness – July 15

Shinhan likewise served notice of third-party deposition subpoenas for R Squared BM LLC d/b/a Ducenta Squared Asset Management (July 27) and Tim Tourline (July 28). Shinhan had been requesting to meet and confer regarding—among other things—the stipulation due July 8 and adjustments to the deposition schedule since June 19; as you are aware, the parties were scheduled to discuss these and other issues today.

Given the pending withdrawal, we would appreciate your advising us as to how your client intends to address these deadlines. On the depositions in particular, our client has been prepared to attend (subject to the parties' agreement on scheduling), but given the logistics required, we are not going to recommend that they make arrangements to travel from South Korea to the United States if there is no plan to take those depositions in the coming month. Please advise how your client intends to proceed with the existing schedule, particularly the existing deadlines for depositions, and whether RIA plans to withdraw these deposition notices.

Shinhan reserves all rights in the event that any deadline is missed and for any deposition that does not occur on the scheduled date or is not otherwise rescheduled. We remain available to confer should you wish to discuss any of the above.

Regards,
Hannelore

**Hannelore Sklar** | Associate
**T** +1 212 819 2646 **M** +1 202 499 0864 **E** hannelore.sklar@whitecase.com
White & Case LLP | 1221 Avenue of the Americas | New York, NY 10020-1095
WHITE & CASE

==============================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

==============================================================================

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

==============================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

==============================================================================

Links contained in this email have been replaced for YOUR security. If you click on a link in the email above, the link will be analyzed for known threats.

# EXHIBIT 42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 45

---------------------------------------------------------------------X

| | | | |
|---|---|---|---|
| RIA R SQUARED, INC. | | **INDEX NO.** | 659538/2024 |
| | Plaintiff, | **MOTION DATES** | 07/08/2026, 07/15/2026 |
| - v - | | | |
| SHINHAN SECURITIES CO., LTD., | | **MOTION SEQ. NOS.** | 006 007 |
| | Defendant. | | |

**DECISION + ORDER ON MOTIONS**

---------------------------------------------------------------------X

**HON. ANAR RATHOD PATEL:**

The following e-filed documents, listed by NYSCEF document number (Motion 006) 246–248, 254, 318, 321, 324–330 and (Motion 007) 249, 250, 251, 325–330 were read on these motions to/for ATTORNEY – DISQUALIFY / RELIEVE / SUBSTITUTE / WITHDRAW.

On June 30, 2026, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"), co-counsel for Plaintiff RIA R Squared, Inc. ("RIA"), moved by order to show cause for an order seeking to be relieved as counsel under CPLR § 321(b)(2) and Rule 1.16(c) of the New York Rules of Professional Conduct and staying all proceedings for thirty (30) days (Motion 006). Quinn Emanuel submits the Affirmation of Sascha N. Rand, *Esq*. stating that RIA has agreed that Quinn Emanuel will terminate its representation. NYSCEF Doc. No. 247 (Rand Aff.) at ¶ 4. Also on June 30, 2026, Winston Taylor LLP ("Winston"), co-counsel for RIA filed a motion for leave to withdraw as counsel of record under CPLR § 321(b)(2) and Rule 1.16(c) of the New York Rules of Professional Conduct (Motion 007). Winston submits the Affirmation of George Mastoris, *Esq*. stating that RIA has agreed that Winston will terminate its representation. NYSCEF Doc. No. 250 (Mastoris Aff.) at ¶ 4. Subsequently, in a July 1, 2026 letter to the Court, Quinn Emanuel stated that, "Quinn Emanuel has not received payment for services rendered to RIA in this matter, was directed by RIA to withdraw as counsel on the evening of June 29th, and has terminated its engagement with RIA." NYSCEF Doc. No. 254.

Defendant Shinhan Securities Co., Ltd., ("Shinhan") filed a partial opposition to the motions on July 14, 2026. Shinhan opposes the stay of the proceedings and seeks the imposition of additional protections and limitations in light of the substantial prejudice to Shinhan that would arise as a result of the requested stay and that Shinhan has already experienced due to RIA having no counsel to effectuate the terms of the Court's prior Orders. NYSCEF Doc. No. 325.

On July 16, 2026, Shinhan submitted a further letter to the Court stating that it was informed on July 16 by a partner at Mandelbaum Barrett PC that RIA filed a voluntary petition for

relief under Chapter 11 of the United States Bankruptcy Code on July 15, 2026, in the United States Bankruptcy Court for the Southern District of Florida, Miami Division ("Chapter 11 Case"). NYSCEF Doc. No. 331. The Court observes that while Quinn Emanuel and Winston have sought to withdraw as counsel for RIA, they remain as counsel of record and have not filed any notice of bankruptcy as relates to RIA on the docket in this action.

Based upon the unusual posture and circumstances presented—*e.g.*, the apparent transition of representation of RIA from Winston to Quinn Emanuel, *see* Mastoris Aff. at ¶ 3; RIA's directive to Quinn Emanuel to withdraw as counsel on June 29, 2026, *see* NYSCEF Doc. No. 254; and the fact that no party has technically filed any notice of bankruptcy in this action, the Court determines that it is appropriate to grant the applications of Quinn Emanuel and Winston to withdraw as counsel subject to certain conditions as set forth herein. The Court reserves its decision as to the stay of the proceedings subject to compliance with the directives set forth herein as this action may be subject to the automatic stay under 11 U.S.C. § 362(a).

Accordingly, it is hereby

**ORDERED** that the motions by Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") and Winston Taylor LLP ("Winston") to withdraw as counsel for Plaintiff RIA R Squared, Inc. ("RIA") are GRANTED on condition that, on or before July 22, 2026, (1) Quinn Emanuel e-files proof that it has served RIA with a copy of this Order and notice of entry, and a letter directing RIA to retain replacement counsel, and which shall explain the ramifications of noncompliance; and (2) Quinn Emanuel e-files the ECF docket for the Chapter 11 case; and it is further

**ORDERED** that the Court reserves its decision regarding Quinn Emanuel's request for a stay of the proceedings; and it is further

**ORDERED** that unless RIA has retained replacement counsel, and said replacement counsel has filed a notice of appearance, on or before October 15, 2026, RIA will be considered *pro se* and because corporations may not proceed *pro se*, *see Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 767 F. Supp. 2d 480, 486 (S.D.N.Y. 2011), RIA will be in default and its claims may be deemed abandoned and therefore dismissed pursuant to CPLR § 3216.

The foregoing constitutes the Decision and Order of this Court.

7/17/2026
DATE

ANAR R. PATEL, A.J.S.C.

| | | | | | |
|---|---|---|---|---|---|
| CHECK ONE: | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | | |
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER | |
| APPLICATION: | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE | |

# EXHIBIT 43

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 45

---------------------------------------------------------------X

| | |
|---|---|
| RIA R SQUARED, INC., | **INDEX NO.** 659538/2024 |
| Plaintiff, | **MOTION DATES** 04/13/2026, 07/01/2026 |
| - v - | **MOTION SEQ. NOS.** 005 008 |
| SHINHAN SECURITIES CO., LTD., | **DECISION + ORDER ON MOTIONS** |
| Defendant. | **ORDER - STAY** |

---------------------------------------------------------------X

**HON. ANAR RATHOD PATEL:**

The following e-filed documents, listed by NYSCEF document number (Motion 005) 102–115, 117, 148, 229–231 were read on this motion to DISMISS.

The following e-filed documents, listed by NYSCEF document number (Motion 008) 255–316 were read on this motion for SANCTIONS.

**WHEREAS,** on April 13, 2026, Plaintiff RIA R Squared, Inc. ("RIA"), through its counsel Winston Taylor LLP ("Winston Taylor"), moved to dismiss counterclaims made by Defendant Shinhan Securities Co., Ltd. ("Shinhan") (NYSCEF Doc. No. 102); and

**WHEREAS,** on July 1, 2026, Shinhan moved for sanctions against RIA (NYSCEF Doc. No. 255); and

**WHEREAS,** on July 17, 2026, the Court granted motions (Mot. Seq. 006, 007) made by RIA's co-counsel at Winston Taylor and Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") to withdraw as counsel, subject to certain conditions as set forth in the Court's Decision and Order (NYSCEF Doc. No. 335); and

**WHEREAS,** the aforementioned conditions set by this Court were satisfied, and Quinn Emanuel provided proof of same (NYSCEF Doc. Nos. 336–340); and

**WHEREAS,** on July 21, 2026, Quinn Emanuel provided this Court a copy of a chapter 11 voluntary bankruptcy filing by RIA in the United States Bankruptcy Court for the Southern District of Florida (Bankruptcy Petition 26-19251-CLC) (NYSCEF Doc. No. 340); and

**WHEREAS** this action is therefore automatically stayed under 11 U.S.C. § 362.

Accordingly, it is hereby

**ORDERED** that Motion Sequences 005 and 006 are hereby denied without prejudice to refile pending either leave of the bankruptcy court or resolution of the bankruptcy action; and it is further

**ORDERED** that this action is stayed pending the resolution of the bankruptcy action except for an application to vacate or modify said stay; and it is further

**ORDERED** that either party may make an application by Order to Show Cause to vacate or modify this stay upon the final determination of the bankruptcy action, or leave of the bankruptcy court; and it is further

**ORDERED** that the parties shall file a letter on NYSCEF on or before **January 11, 2027**, providing the Court with the status of the bankruptcy action; and it is further

**ORDERED** that the Clerk of the Court shall mark this action as stayed.

The foregoing is the Decision and Order of the Court.

20260722133506ARPATEL67F08833F5384A86B839F2EEFA5FDAF0

**July 22, 2026**
**DATE**

**ANAR RATHOD PATEL, A.J.S.C.**

| | | | | | | |
|---|---|---|---|---|---|---|
| **CHECK ONE:** | ☐ | **CASE DISPOSED** | | ☒ | **NON-FINAL DISPOSITION** | |
| | ☐ | **GRANTED** | ☒ **DENIED** | ☐ | **GRANTED IN PART** | ☐ **OTHER** |
| **APPLICATION:** | ☐ | **SETTLE ORDER** | | ☐ | **SUBMIT ORDER** | |
| **CHECK IF APPROPRIATE:** | ☐ | **INCLUDES TRANSFER/REASSIGN** | | ☐ | **FIDUCIARY APPOINTMENT** | ☐ **REFERENCE** |

**EXHIBIT 44**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RIA R SQUARED, INC.,**

**Plaintiff,**

**v.**

**SHINHAN SECURITIES CO., LTD.,**

**Defendant.**

**________________________________________/**

**Case No. 26-cv-6748**

**NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1452(a) AND FED. R. BANKR. P. 9027**

## NOTICE OF REMOVAL PURSUANT TO <u>28 U.S.C. § 1452(A) AND FED. R. BANKR. P. 9027</u>

RIA R Squared, Inc., as debtor and debtor in possession in the Chapter 11 ("**RIA**") case identified below, removes the remaining claims and causes of action in the above-captioned action under 28 U.S.C. § 1452(a) and Federal Rule of Bankruptcy Procedure 9027.

1. This action was commenced on December 9, 2024, in the Supreme Court of the State of New York, New York County, and is pending under Index No. 659538/2024. RIA is the plaintiff and Shinhan Securities Co., Ltd. ("**Shinhan**") is the defendant.

2. RIA's complaint arose from a securities lending relationship and alleged five causes of action. By Decision and Order dated July 31, 2025, the state court denied dismissal of Count I (breach of the GMSLA, SLA, and alleged Securities Delivery Agreement), Count II (breach of an alleged $750 million loan agreement), and Count III (fraudulent inducement), and dismissed Counts IV and V. *See RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.*, 2025 N.Y. Slip Op. 33055(U).

3. On July 15, 2026, RIA filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Florida, Miami Division. The case is *In re RIA R Squared, Inc.*, Case No. 26-19251-CLC (the "**Chapter 11 Case**"). A copy of the petition is attached as **<u>Exhibit A</u>**.

4. RIA is a debtor in possession under 11 U.S.C. §§ 1101(1) and 1107(a). The causes of action asserted in this case are property of the bankruptcy estate under 11 U.S.C. § 541(a) and may materially affect creditor recoveries, plan formulation, liquidity, and the administration of the estate.

5. The petition materials identify Shinhan as holding or asserting a disputed, contingent, and unliquidated claim in the approximate amount of $185 million. Accordingly, the adjudication of the parties' respective contract, damages, default, recoupment, and setoff positions may directly affect both estate assets and the allowance or treatment of claims against the estate.

6. This Court has original but nonexclusive jurisdiction under 28 U.S.C. § 1334(b) because the action is at least "related to" the Chapter 11 Case. The outcome could alter the estate's assets, liabilities, creditor distributions, and ability to reorganize. *See In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).

7. Removal is authorized by 28 U.S.C. § 1452(a), which permits a party to remove any claim or cause of action over which the district court has bankruptcy jurisdiction. Removal is timely under Bankruptcy Rule 9027(a)(2) because this action was pending when the Chapter 11 Case commenced and this notice is being filed within the applicable period measured from the July 15, 2026 order for relief.

8. Venue of the removed proceeding initially lies in this District because the state action is pending in New York County. Fed. R. Bankr. P. 9027(a)(1). RIA is contemporaneously seeking transfer to the Southern District of Florida, Miami Division, under 28 U.S.C. § 1412 or, alternatively, § 1404(a), and referral to the bankruptcy court administering the Chapter 11 Case.

9. RIA consents to the bankruptcy court's entry of final orders and judgment to the fullest extent permitted by the Constitution and 28 U.S.C. § 157, without waiving any right to a jury trial, withdrawal of the reference, or de novo review where applicable.

10. This notice removes the remaining claims in the action, including all defenses, compulsory counterclaims, recoupment and setoff issues, and other matters inseparable from the adjudication of those claims. To the extent any affirmative claim against Ria has been or is asserted, its prosecution remains subject to 11 U.S.C. § 362.

11. Copies of the process and pleadings presently known to Ria are attached in the state court record appendix. RIA reserves the right to supplement the appendix if the docket review identifies additional process, pleadings, orders, or other records required by Rule 9027.

12. Promptly after filing this notice, RIA will serve all parties and file a copy with the clerk of the state court as required by Bankruptcy Rule 9027(b). Removal becomes effective upon the state court filing under Bankruptcy Rule 9027(c).

**WHEREFORE**, RIA that the Court entry an order: (i) accepting removal of the remaining claims and causes of action; (ii) directing that the proceeding be administered consistently with the Chapter 11 Case; and (iii) grant such other relief as is just and proper.

**Dated: August 7, 2026**

**MANDELBAUM BARRETT PC**
*Counsel for Ria R. Squared Inc.*
570 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (646) 369-0250
Email: jbauchner@mblawfirm.com

______________________________.
Joshua S. Bauchner, Esq.
(NY Bar No. 4016168)

# EXHIBIT A

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

Case number *(if known)* ______________ Chapter 11

☐ Check if this is an amended filing

# Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

**1. Debtor's name**

Ria R Squared, Inc.

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names and *doing business as* names

**3. Debtor's federal Employer Identification Number** (EIN)

66-0858686

**4. Debtor's address**

**Principal place of business**

3001 SW 3rd Avenue
Miami, FL 33129
Number, Street, City, State & ZIP Code

Miami-Dade
County

**Mailing address, if different from principal place of business**

801 Brickell Ave 8th Floor
Miami, FL 33131
P.O. Box, Number, Street, City, State & ZIP Code

**Location of principal assets, if different from principal place of business**

Number, Street, City, State & ZIP Code

**5. Debtor's website** (URL)

**6. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: ______________

Debtor Ria R Squared, Inc. Case number (*if known*) ______
Name

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. § 101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
☒ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)
☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)
☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

____

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7
☐ Chapter 9
☒ Chapter 11. *Check **all** that apply*:

- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
- ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
- ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☒ No.
☐ Yes.

District ______ When ______ Case number ______
District ______ When ______ Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☒ No
☐ Yes.

List all cases. If more than 1, attach a separate list

Debtor ______ Relationship ______
District ______ When ______ Case number, if known ______

Debtor Ria R Squared, Inc. Case number (*if known*)
Name

**11. Why is the case filed in *this district?***

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ______

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ______

**Where is the property?** ______

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ______

Contact name ______

Phone ______

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☒ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☒ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☒ $100,000,001 - $500 million | ☐ More than $50 billion |

Debtor Ria R Squared, Inc.
Name

Case number (*if known*)

**Request for Relief, Declaration, and Signatures**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/15/2026
MM / DD / YYYY

X
Signature of authorized representative of debtor

M.K. David Kang
Printed name

Title President and CEO

**18. Signature of attorney**

X
Signature of attorney for debtor

Date 7/15/2026
MM / DD / YYYY

Brett Lieberman
Printed name

Edelboim Lieberman PLLC
Firm name

2875 NE 191st Street, Penthouse One
Miami, FL 33180

Number, Street, City, State & ZIP Code

Contact phone 305-768-9909 Email address brett@elrolaw.com

FL 69583
Bar number and State

| Fill in this information to identify the case: |
|---|
| Debtor name Ria R Squared, Inc. |
| United States Bankruptcy Court for the: SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION |
| Case number (if known) |

☐ Check if this is an amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☒ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* ________
- ☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration ________

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/15/2026 X ________
Signature of individual signing on behalf of debtor

M.K. David Kang
Printed name

President and CEO
Position or relationship to debtor



Software Copyright (c) 1996-2026 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | Ria R Squared, Inc. |
| United States Bankruptcy Court for the: | SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION |
| Case number (if known): | |

☐ Check if this is an amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| American Express<br>4315 South 2700 West<br>Salt Lake City, UT 84184 | | Business Operations | | | | $10,141.04 |
| Emilio Tomas Gonzalez<br>228 SW 30th Road<br>Miami, FL 33129 | | Salary | | | | $240,000.00 |
| Epiq eDiscovery Solutions, Inc.<br>777 3rd Avenue, 12th Floor<br>New York, NY 10017 | | Services | | | | $106,226.35 |
| Integrated Solutions<br>7000 W Palmetto Park Rd., Suite 503<br>Boca Raton, FL 33433 | | Services | | | | $60,000.00 |
| Internal Revenue Service<br>POB 21126<br>Philadelphia, PA 19114 | | | | | | $2,803,727.13 |
| JP Morgan Chase Bank, N.A<br>POB 14231111<br>Polaris Parkway<br>Columbus, OH 43240 | | Business Operations | | | | $19,658.29 |
| Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071 | | Services | | | | $27,048.00 |



Software Copyright (c) 1996-2026 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor Ria R Squared, Inc. Case number *(if known)*
Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| M.K. David Kang<br>5757 Valley Oak Dr<br>Los Angeles, CA<br>90068 | M.K. David Kang | Salary | | | | $2,460,000.00 |
| Michael Leung<br>228 SW 30th Rd<br>Miami, FL 33129 | Michael Leung | | | $5,000,000.00 | $0.00 | $5,000,000.00 |
| New York Dept of<br>Taxation and Finance<br>Bankruptcy Section<br>P.O. Box 5300<br>Albany, NY 12205 | | | | | | $339,779.93 |
| NYC Department of<br>Finance<br>Correspondence Unit<br>66 John Street, 13th<br>Floor<br><br>New York, NY 10038 | | | | | | $253,085.82 |
| Sakiko Shida<br>3701 Overland Ave<br>C-230<br>Los Angeles, CA<br>90034 | | Services | Unliquidated | | | $250,000.00 |
| Shinhan Securities<br>Co., Ltd.<br>70 Yeouidae-ro,<br>Yeongdeungpo-gu<br>Seoul 07325, South<br>Korea) | | Contract<br>Termination | Contingent<br>Unliquidated<br>Disputed | | | $185,000,000.00 |
| Tim Torline<br>Tim Torline (1500<br>10th St<br>Manhattan Beach, CA<br>90266 | | Services | Unliquidated | | | $500,000.00 |
| Winston & Strawn<br>LLP<br>300 N. LaSalle Dr.,<br>Suite 4400,<br>Chicago, IL 60654 | | Services | | | | $598,288.50 |



Software Copyright (c) 1996-2026 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name: Ria R Squared, Inc.

United States Bankruptcy Court for the: SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

Case number (if known): ______________

☐ Check if this is an amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

12/15

**Part 1: Summary of Assets**

1. ***Schedule A/B: Assets-Real and Personal Property*** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*.......... $ 1,500,000.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*.......... $ 677,858,613.58

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*.......... $ 679,358,613.58

**Part 2: Summary of Liabilities**

2. ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D*.......... $ 6,468,117.00

3. ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.......... $ 3,396,592.88

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*.......... +$ 189,271,362.18

4. **Total liabilities**..........
   Lines 2 + 3a + 3b .......... $ 199,136,072.06



Software Copyright (c) 1996-2026 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

**United States Bankruptcy Court**
**Southern District of Florida, Miami Division**

In re Ria R Squared, Inc. Debtor(s)

Case No. ____________
Chapter 11

# VERIFICATION OF CREDITOR MATRIX

I, the President and CEO of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date: 07/15/2026

M.K. David Kang/ President and CEO
Signer/Title

Software Copyright (c) 1996-2026 Best Case, LLC - www.bestcase.com 

American Express
4315 South 2700 West
Salt Lake City, UT 84184

Ducenta Squared Asset Management
2240 E Maple Ave,
El Segundo, CA 90245

Emilio Tomas Gonzalez
228 SW 30th Road
Miami, FL 33129

Epiq eDiscovery Solutions, Inc.
777 3rd Avenue, 12th Floor
New York, NY 10017

Integrated Solutions
7000 W Palmetto Park Rd., Suite 503
Boca Raton, FL 33433

Internal Revenue Service
POB 21126
Philadelphia, PA 19114

JP Morgan Chase Bank, N.A
POB 14231111 Polaris Parkway
Columbus, OH 43240

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071

M.K. David Kang
5757 Valley Oak Dr
Los Angeles, CA 90068

Michael Leung
228 SW 30th Rd
Miami, FL 33129

New York Dept of Taxation and Finance
Bankruptcy Section
P.O. Box 5300
Albany, NY 12205

NPI Advisors
228 SW 30th Road
Miami, FL 33129

NYC Department of Finance
Correspondence Unit
66 John Street, 13th Floor
New York, NY 10038

R Squared ML LLC, Korea

Sakiko Shida
3701 Overland Ave C-230
Los Angeles, CA 90034

Shinhan Securities Co., Ltd.
70 Yeouidae-ro, Yeongdeungpo-gu
Seoul 07325, South Korea)

Tetsuya Ishida
4823 Alminar Ave
La Canada Flintridge, CA 91011

Tim Torline
1500 10th St
Manhattan Beach, CA 90266

Winston & Strawn LLP
300 N. LaSalle Dr., Suite 4400,
Chicago, IL 60654

**RESOLUTIONS OF THE BOARD OF DIRECTORS**
**BY WRITTEN CONSENT OF RIA R SQUARED INC.**

The undersigned, being all the members of the Board of Directors (the "Board") of Ria R Squared, Inc., a Delaware corporation (the "Company"), in accordance with the Delaware General Corporation Law, and Article 3.1 of the Company's Bylaws dated March 3, 2025 (the "Bylaws"), hereby consent to the adoption of the following resolutions following a meeting of the Board, effective as of July 15, 2026 (the "Effective Date"):

**RELIEF UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE**

**RESOLVED**, that, in the judgment of the Board, after considering, among other things, the financial condition, liabilities, operations, business prospects, and available alternatives of the Company, and after consultation with the Company's legal and financial advisors, it is advisable and in the best interests of the Company, its creditors, and other parties in interest for the Company to commence a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), by filing a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "**Chapter 11 Case**"), and the commencement of the Chapter 11 Case is hereby authorized and approved; and it is

**FURTHER RESOLVED**, that M.K. David Kang, the Company's President and CEO and each other officer of the Company designated by the Board or by an officer authorized under these resolutions (each, an "**Authorized Officer**" and collectively, the "**Authorized Officers**"), acting individually, be, and each hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to execute, verify, acknowledge, deliver, and file the voluntary petition, schedules of assets and liabilities, statements of financial affairs, lists, declarations, affidavits, applications, motions, pleadings, notices, reports, certificates, and all other documents necessary or appropriate to commence and administer the Chapter 11 Case; and it is

**FURTHER RESOLVED**, that each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed to take any and all actions that such Authorized Officer determines to be necessary, advisable, or appropriate to obtain relief under the Bankruptcy Code and to continue the operation of the Company's business during the Chapter 11 Case, including, without limitation, taking actions concerning the payment of employees, taxes, insurance, utilities, vendors, and other obligations; the use of cash collateral; the maintenance of bank accounts and cash-management systems; the procurement of debtor-in-possession financing; and the negotiation, execution, and performance of any related agreements, subject to any approval required from the Bankruptcy Court.

**RETENTION OF PROFESSIONALS**

**RESOLVED**, that each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed to employ and retain Edelboim Lieberman, PLLC as bankruptcy counsel to represent and assist the Company in connection with the Chapter 11 Case and related matters; and, in connection therewith, to negotiate, execute, and deliver an engagement agreement; pay such retainers, fees, costs, and expenses as may be required or appropriate; and cause an application to be filed with the Bankruptcy Court seeking authority to retain such firm, as applicable; and it is

**FURTHER RESOLVED**, that the Company is authorized to pay Edelboim Lieberman, PLLC a retainer in the amount of $250,000.00, or such other amount as may be set forth in an engagement agreement approved by an Authorized Officer, subject to the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, and any order of the Bankruptcy Court; and it is

**FURTHER RESOLVED**, that each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed to employ and retain such other attorneys, accountants, financial advisors, investment bankers, claims and noticing agents, consultants, appraisers, brokers, and other professionals as such Authorized Officer determines to be necessary, advisable, or appropriate to assist the Company in connection with the Chapter 11 Case; and, in connection therewith, to negotiate, execute, and deliver appropriate engagement agreements; pay appropriate retainers, fees, costs, and expenses; and cause any necessary retention applications or other papers to be filed with the Bankruptcy Court.

**BANKRUPTCY RELATED TRANSACTIONS AND DOCUMENTS**

**RESOLVED**, that each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed to negotiate, execute, deliver, and perform any agreement, instrument, certificate, consent, notice, or other document, and to take any action, that such Authorized Officer determines to be necessary, advisable, or appropriate in connection with the Chapter 11 Case, including any agreement or document relating to:

1. The use of cash collateral or the granting of adequate protection;
2. Debtor-in-possession financing or other postpetition financing;
3. The continuation or modification of the Company's cash-management system and bank accounts;
4. The payment of prepetition or postpetition claims;
5. The assumption, assumption and assignment, or rejection of executory contracts or unexpired leases;
6. The sale, lease, or other disposition of assets;
7. The settlement, compromise, prosecution, or defense of claims and causes of action;
8. The filing and prosecution of a plan of reorganization or liquidation and related disclosure statement; and
9. Any other transaction contemplated by or undertaken in connection with the Chapter 11 Case, in each case subject to any approval required from the Bankruptcy Court; and it is

**FURTHER RESOLVED**, that each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed to open, close, maintain, or modify bank accounts; designate authorized signatories; execute banking and cash-management documents; and take any related action necessary or appropriate for the operation of the Company during the

Chapter 11 Case, subject to any requirements of the Bankruptcy Court or the Office of the United States Trustee.

**FURTHER ACTIONS AND RATIFICATION OF PRIOR ACTIONS**

**RESOLVED**, that, in addition to the specific authorizations conferred by the foregoing resolutions, each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to take or cause to be taken any and all further actions; to negotiate, execute, acknowledge, deliver, and file any and all agreements, certificates, instruments, pleadings, notices, and other documents; and to pay all fees, costs, and expenses, including filing fees, that such Authorized Officer determines to be necessary, advisable, or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions; and it is

**FURTHER RESOLVED**, that the omission from these resolutions of any agreement, instrument, document, filing, action, or transaction relating to the matters contemplated herein shall not limit the authority of any Authorized Officer to take such action or execute such document if such Authorized Officer determines that the action or document is necessary, advisable, or appropriate to carry out the intent and purposes of these resolutions; and it is

**FURTHER RESOLVED**, that all actions previously taken, and all agreements, instruments, documents, payments, and transactions previously executed, delivered, made, or performed, by any director, officer, employee, agent, attorney, or representative of the Company in connection with the matters contemplated by the foregoing resolutions be, and hereby are, adopted, approved, confirmed, and ratified in all respects as the acts and deeds of the Company; and it is

**FURTHER RESOLVED**, that the Secretary or any Assistant Secretary of the Company be, and hereby is, authorized, empowered, and directed to certify the adoption and continuing effectiveness of the foregoing resolutions and to deliver certified copies thereof to any person or entity as may be requested.

**DIRECTORS**:

______________________________
M.K. David Kang, Director and 50% Shareholder

______________________________
Michael Leung, Director and 50% Shareholder

## FURTHER ACTIONS AND RATIFICATION OF PRIOR ACTIONS

**RESOLVED**, that, in addition to the specific authorizations conferred by the foregoing resolutions, each Authorized Officer, acting individually, be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to take or cause to be taken any and all further actions; to negotiate, execute, acknowledge, deliver, and file any and all agreements, certificates, instruments, pleadings, notices, and other documents; and to pay all fees, costs, and expenses, including filing fees, that such Authorized Officer determines to be necessary, advisable, or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions; and it is

**FURTHER RESOLVED**, that the omission from these resolutions of any agreement, instrument, document, filing, action, or transaction relating to the matters contemplated herein shall not limit the authority of any Authorized Officer to take such action or execute such document if such Authorized Officer determines that the action or document is necessary, advisable, or appropriate to carry out the intent and purposes of these resolutions; and it is

**FURTHER RESOLVED**, that all actions previously taken, and all agreements, instruments, documents, payments, and transactions previously executed, delivered, made, or performed, by any director, officer, employee, agent, attorney, or representative of the Company in connection with the matters contemplated by the foregoing resolutions be, and hereby are, adopted, approved, confirmed, and ratified in all respects as the acts and deeds of the Company; and it is

**FURTHER RESOLVED**, that the Secretary or any Assistant Secretary of the Company be, and hereby is, authorized, empowered, and directed to certify the adoption and continuing effectiveness of the foregoing resolutions and to deliver certified copies thereof to any person or entity as may be requested.

**<u>DIRECTORS</u>**:

____________________________
M.K. David Kang, Director and 50% Shareholder

____________________________
Michael Leung, Director and 50% Shareholder

**SECRETARY'S CERTIFICATE**

The undersigned, being the duly elected, qualified, and acting Secretary of the Company hereby certifies that the foregoing resolutions were duly adopted by the Board of Directors of the Company by written consent effective as of July 15, 2026, in accordance with the Company's governing documents and applicable law, and that such resolutions have not been amended, rescinded, or revoked and remain in full force and effect as of the date set forth below.

**Dated: 7/15/2026**

**RIA R SQUARED INC.**

By: ______________________

Name: M.K. David Kang,
Title: Secretary

**EXHIBIT 45**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RIA R SQUARED, INC.,** **Case No. 26-cv-6748**

**Plaintiff,**

**v.**

**SHINHAN SECURITIES CO., LTD.,**

**Defendant.**

______________________________________/

**NOTICE OF MOTION TO TRANSFER VENUE**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law, the Notice of Removal and the record in this action, RIA R Squared, Inc. ("**RIA**" or the "**Debtor**"), as debtor and debtor in possession in *In re RIA R Squared, Inc.*, Case No. 26-19251-CLC (Bankr. S.D. Fla.) (the "**Chapter 11 Case**"), will move this Court for an Order pursuant to 28 U.S.C. § 1412 or, in the alternative and independently, 28 U.S.C. § 1404(a), transferring this action to the United States District Court for the Southern District of Florida, Miami Division.

Transfer will place this removed bankruptcy related adversary proceeding in the district administering RIA's Chapter 11 case, where it will be subject to the Southern District of Florida's standing Order of Reference, Administrative Order 2024 84, and may be coordinated, as appropriate, with *RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.*, Adv. Pro. No. 26-01268-CLC (Bankr. S.D. Fla.) (the "**Florida Adversary Proceeding**"). The Florida adversary proceeding concerns the ownership, validity, priority, perfection, and extent of Shinhan's asserted interests in assets RIA identifies as property of the bankruptcy estate, while Shinhan's counterclaims in this action assert rights of possession and recovery concerning alleged collateral under the same securities lending agreements. RIA therefore seeks transfer so that those overlapping disputes can

be administered in a single bankruptcy forum and the risk of duplicative proceedings and inconsistent rulings can be minimized.

RIA requests such other and further relief as the Court deems just and proper.

Dated: August 11, 2026

**MANDELBAUM BARRETT PC**
*Counsel for Ria R. Squared Inc.*
570 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (646) 369-0250
Email: jbauchner@mblawfirm.com

______________________________.
Joshua S. Bauchner, Esq.
(NY Bar No. 4016168)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RIA R SQUARED, INC.,** **Case No. 26-cv-6748**

**Plaintiff,**

**v.**

**SHINHAN SECURITIES CO., LTD.,**

**Defendant.**

______________________________________/

**[PROPOSED] ORDER GRANTING MOTION TO TRANSFER VENUE**

Upon consideration of Plaintiff RIA R Squared, Inc.'s *Motion to Transfer Venue*, the supporting memorandum, the Notice of Removal and the record, and for good cause shown, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** pursuant to 28 U.S.C. § 1412 to the extent applicable and independently pursuant to 28 U.S.C. § 1404(a).

2. The Clerk of Court shall transfer this action to the United States District Court for the Southern District of Florida, Miami Division, in accordance with this Court's Local Civil Rules and ordinary inter district transfer procedures.

3. Nothing in this Order determines whether any claim is core or non core, whether the bankruptcy court may enter final judgment on any claim, whether any party has or has waived a jury trial right, or whether any claims should be consolidated, coordinated, stayed, or separately tried after transfer.

4. After transfer, the proceeding shall be subject to the *Southern District of Florida's Administrative Order 2024-84* and any further order of the transferee court or the United States Bankruptcy Court for the Southern District of Florida, including any application concerning

coordination with *RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.*, Adv. Pro. No. 26 01268 CLC.

5. The Clerk shall close this case on this Court's docket upon completion of the transfer.

**SO ORDERED.**

Dated: ____________________, 2026
New York, New York

______________________________
UNITED STATES DISTRICT JUDGE

**EXHIBIT 46**

Case 26-01036 Doc 2-1 Filed 08/21/26 Page 1 of 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RIA R SQUARED, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SHINHAN SECURITIES CO., LTD.,<br><br>Defendant. | Case No. 26-cv-06748-DLC |

**SHINHAN SECURITIES CO., LTD.'S STATEMENT**
**PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9027(E)(3)**

PLEASE TAKE NOTICE that, pursuant to Rule 9027(e)(3) of the Federal Rules of Bankruptcy Procedure, Shinhan Securities Co., Ltd. ("**Shinhan**") denies Plaintiff RIA R Squared, Inc.'s allegations in the Notice of Removal that this Court has jurisdiction under 28 U.S.C. § 1334(b); and

PLEASE TAKE FURTHER NOTICE that Shinhan does not consent to the entry of final orders or judgment by the bankruptcy judge; and

PLEASE TAKE FURTHER NOTICE that Shinhan reserves all rights and remedies with respect to the Notice of Removal, including without limitation, the other allegations contained therein.

*[Remainder of this page intentionally left blank]*

Dated: August 21, 2026
New York, New York

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Andrew Zatz
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
azatz@whitecase.com

*Counsel for Shinhan Securities Co., Ltd.*

**EXHIBIT 47**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RIA R SQUARED, INC., Case No. 26-cv-06748-DLC

*Plaintiff*,

v.

SHINHAN SECURITIES CO., LTD.,

*Defendant*.

____________________________________/

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO TRANSFER VENUE**

Defendant, Shinhan Securities Co., Ltd. ("**Defendant**"), respectfully files this *Defendant's Response to Plaintiff's Motion to Transfer Venue* (the "**Response**") regarding RIA R Squared, Inc.'s ("**Plaintiff**") *Notice of Motion to Transfer Venue* [Docket No. 3] (the "**Motion**") and *Memorandum of Law in Support of RIA R Squared, Inc.'s Motion to Transfer Venue* [Docket No. 4] (collectively, with the Motion, the "**Motion to Transfer Venue**") and states as follows:

1. By its *Notice of Removal Pursuant to 28 U.S.C. § 1452(A) and Fed. R. Bankr. P. 9027* [Docket No. 1] (the "**Notice of Removal**") of the state court breach of contract and tort action Plaintiff commenced in New York Supreme Court, Commercial Division in 2024 (the "**State Court Action**") and its Motion to Transfer Venue from this Court to the United States Bankruptcy Court for the Southern District of Florida (the "**Florida Bankruptcy Court**"), Plaintiff now seeks to have the Florida Bankruptcy Court hear and adjudicate the State Court Action.

2. Shinhan takes no position with respect to the pending Motion to Transfer Venue. However, Shinhan expressly reserves, and does not waive, any and all rights, claims, defenses, and arguments, including without limitation, its rights and arguments with respect to: (a) remand; (b) subject-matter jurisdiction; (c) the constitutional authority of any bankruptcy court to hear,

determine, or enter final orders or judgment with respect to any or all of the claims, causes of action, or proceedings at issue; (d) venue; (e) transfer of venue; (f) the right to adjudication of any and all claims by a court established under Article III of the United States Constitution, which right is not waived; (g) the right to a jury trial on any and all claims so triable, which right is not waived; and (h) consent to the jurisdiction or constitutional authority of any bankruptcy court to enter final orders or judgment, which consent is not given. As a general matter, by taking no position on the Motion to Transfer Venue, Defendant does not concede there is any basis to the jurisdiction of the Florida Bankruptcy Court or any federal court to adjudicate this matter.

Dated: August 27, 2026
New York, New York

By: */s/ Laura Garr*

**WHITE & CASE LLP**
Laura Garr
Andrew Zatz
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200
Facsimile: 212-354-8113
Email: laura.garr@whitecase.com
andrew.zatz@whitecase.com

*Counsel for Shinhan Securities Co., Ltd.*

**EXHIBIT 48**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RIA R SQUARED, INC.,** **Case No. 26-cv-6748**

**Plaintiff,**

**v.**

**SHINHAN SECURITIES CO., LTD.,**

**Defendant.**

______________________________________/

# ~~[PROPOSED]~~ ORDER GRANTING MOTION TO TRANSFER VENUE

Upon consideration of Plaintiff RIA R Squared, Inc.'s *Motion to Transfer Venue*, the supporting memorandum, the Notice of Removal and the record, and for good cause shown, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** pursuant to 28 U.S.C. § 1412 to the extent applicable and independently pursuant to 28 U.S.C. § 1404(a).

2. The Clerk of Court shall transfer this action to the United States District Court for the Southern District of Florida, Miami Division, in accordance with this Court's Local Civil Rules and ordinary inter district transfer procedures.

3. Nothing in this Order determines whether any claim is core or non core, whether the bankruptcy court may enter final judgment on any claim, whether any party has or has waived a jury trial right, or whether any claims should be consolidated, coordinated, stayed, or separately tried after transfer.

4. After transfer, the proceeding shall be subject to the *Southern District of Florida's Administrative Order 2024-84* and any further order of the transferee court or the United States Bankruptcy Court for the Southern District of Florida, including any application concerning

Case 1:26-cv-06748-DLC Document 2-1 Filed 08/28/26 Page 2 of 2

coordination with *RIA R Squared, Inc. v. Shinhan Securities Co., Ltd.*, Adv. Pro. No. 26 01268 CLC.

5. The Clerk shall close this case on this Court's docket upon completion of the transfer.

**SO ORDERED.**

Dated: August 27, 2026
New York, New York

[signature]
UNITED STATES DISTRICT JUDGE

**EXHIBIT 49**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: CASE NO. 26-19251-CLC

RIA R SQUARED, INC.,

Debtor.
________________________________/

341 MEETING OF CREDITORS

August 24, 2026

The above-entitled cause came on for a Section 341 Meeting of Creditors before Steven Schneiderman, Trial Attorney, Office of the U.S. Trustee, Department of Justice, in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, via telephone, on August 24, 2026, commencing at or about 12:00 p.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES VIA TELEPHONE:

STEVEN SCHNEIDERMAN, Trial Attorney
Office of the U.S. Trustee
Department of Justice

EDELBOIM LIEBERMAN, by
BRETT D. LIEBERMAN, Esquire
On behalf of the Debtor

WHITE & CASE, by
LAURA GARR, Esquire
HANNELORE SKLAR, Esquire
On behalf of Shinhan Securities

JEFFREY ATTEBERRY, Esquire
On behalf of Andrew Gu

MARK TORLINE, Esquire
On behalf of Ducenta

JOEL MCGOLNICK, Esquire
And
JOSHUA BAUCHNER, Esquire
Proposed special counsel for the debtor

KLEINBERG KAPLAN WOLFF & COHEN, by
DOV KLEINER, Esquire
On behalf of the Kleinberg Kaplan Wolff & Cohen

**CONTINUED APPEARANCES**

**ALSO PRESENT**

**Tetsuya Ishida**

**ECRO - Electronic Court Reporting Operator**

**- - - - - - -**

WITNESS


| David Kang | Page |
|---|---|
| Examination by Mr. Schneiderman | 7,46 |
| Examination by Ms. Garr | 27,47 |

MR. SCHNEIDERMAN: Good afternoon. My name is Steven Schneiderman. I'm a trial attorney with the U.S. Trustee's Office in Miami, Florida. Today is August 24th, 2026 at 12:00 noon. This is the 341 Meeting of Creditors in the Chapter 11 case of Ria R Squared, Inc., R-I-A, capital R, Squared, Inc., Case Number 26-19251-CLC. On the phone I have debtor's attorney, Brett Lieberman, debtor's representative, David Kang, K-A-N-G; For Shinhan Securities, I have Laura Garr, G-A-R-R, and Hannelore Sklar, S-K-L-A-R -- H-A-N-N-E-L-O-R-E; Jeffrey Atteberry, A-T-T-E-B-E-R-R-Y, on behalf of Andrew Gu; Mark Torline, T-O-R-L-I-N-E, on behalf of Ducenta; Joel McGolnick, proposed special counsel for the debtor; Joshua Bauchner, B-A-U-C-H-N-E-R, another proposed special counsel for the debtor.

Are there any other appearances?

(No verbal response.)

MR. SCHNEIDERMAN: Any other callers on the line?

MR. KLEINER: (Inaudible.)

MR. SCHNEIDERMAN: Okay. Say that again slowly, please.

MR. DELLA TORRE: Yes, sir.

(Two people speaking.)

MR. DELLA TORRE: Franco Della Torre, I'm

here with Brett, bankruptcy counsel.

MR. SCHNEIDERMAN: Okay. I've got --

MR. DELLA TORRE: D-E-L-L-A T-O-R-R-E, is the last name.

MR. SCHNEIDERMAN: -- two people speaking. Who -- say that again.

MR. DELLA TORRE: Should I repeat myself first?

MR. SCHNEIDERMAN: Go ahead.

MR. DELLA TORRE: Franco Della Torre on behalf of Ria R Squared, I'm here with Brett. Della Torre is D-E-L-L-A, space, T-O-R-R-E.

MR. SCHNEIDERMAN: Okay. Was there somebody else who was trying to make an appearance?

MR. KLEINER: Yes.

MR. SCHNEIDERMAN: Go ahead.

MR. KLEINER: Hi, this is Dov Kleiner, from Kleinberg Kaplan Wolff & Cohen in New York.

MR. SCHNEIDERMAN: Bill, last name?

MR. KLEINER: No, that's Dov, D-O-V, that's the first name. The last name is Kleiner, K-L-E-I-N-E-R.

MR. SCHNEIDERMAN: Dov Kleiner, and who do you represent?

MR. KLEINER: Kleinberg Kaplan Wolff & Cohen.

MR. SCHNEIDERMAN: Okay. Either you have to pick up the headset, or -- I mean, the handheld set, take off the headset, and please take me off of speaker. Say the name of your client again.

MR. KLEINER: This is Kleinberg Kaplan Wolff & Cohen, we are one of the parties in litigation in New York.

MR. SCHNEIDERMAN: Okay. The law firm itself is --

MR. KLEINER: Yes.

MR. SCHNEIDERMAN: Okay, and there was one other person trying to make an appearance.

MR. ISHIDA: Yes, Tetsuya Ishida.

MR. SCHNEIDERMAN: Say that again, and spell it, please.

MR. ISHIDA: T-E-T-S-U-Y-A, last name is Ishida, I-S-H-I-D-A.

MR. SCHNEIDERMAN: Okay. Mr. Kang, will you raise your right hand?

Do you swear and affirm --

MR. KANG: Yes, sir.

MR. SCHNEIDERMAN: Do you swear and affirm to tell the truth, the whole truth, and nothing but the truth, under penalty of perjury?

MR. KANG: Yes, I do.

Thereupon,

DAVID KANG,

having been first duly sworn, was examined and testified as follows:

MR. SCHNEIDERMAN: Mr. Lieberman, you confirmed Mr. Kang's identity, and he is the authorized representative here on behalf of the debtor today?

MR. LIEBERMAN: Confirmed.

EXAMINATION

BY MR. SCHNEIDERMAN:

Q. What is your position with the debtor, Mr. Kang?

A. I am the corporate representative.

Q. Do you have an official title?

A. I am the president and CEO of Ria R Squared, Inc.

Q. And you're also the president of Ducenta, is that correct?

A. No.

Q. What is your position with Ducenta?

A. I am the CEO of Ducenta.

MR. LIEBERMAN: Mr. Schneiderman, this is Mr. Lieberman. There's several Ducenta entities. If I could ask Mr. Kang to be more specific.

BY MR. SCHNEIDERMAN:

Q. Mr. Kang, which Ducenta entity are you the CEO of?

A. I am the CEO of Ducenta Squared Asset Management.

MR. SCHNEIDERMAN: Mr. Lieberman, before you got on the line, I told Ms. Garr I have another meeting at 1 o'clock, and I have emergency hearings at 1:30, so we're pressed for time.

Do you have an opening statement, or is it not necessary based on that?

MR. LIEBERMAN: No, given the time restriction, I would permit the U.S. Trustee's Office to have as much time to ask questions as is available.

MR. SCHNEIDERMAN: And everything in the case management summary, at Docket Entry 13 is still the same, which is an explanation of the debtor's business, and what got us here today. Do you adopt that as your opening statement?

MR. LIEBERMAN: I do.

MR. SCHNEIDERMAN: Okay.

BY MR. SCHNEIDERMAN:

Q. And, Mr. Kang, do you adopt the case management summary as well?

A. I do.

Q. Mr. Kang, did you receive the U.S. Trustee

guidelines?

A. Yes.

Q. Do you understand those guidelines?

A. Yes.

Q. Do you have any questions regarding the guidelines?

A. Unfortunately, I do not have a copy of those guidelines in front of me.

Q. But do you have any questions?

A. Not at this point.

Q. And if you do, you can reach out to Mr. Lieberman. He should be able to help you with that.

You understand that the --

A. Thank you.

Q. -- debtor must file operating reports monthly?

A. Yes.

Q. Who will be preparing those reports?

MR. LIEBERMAN: So, Mr. Schneiderman, this is Lieberman. We have discussed engaging a bankruptcy-specific accountant to assist in the reports, and we are interviewing potential accountants to help with that effort.

BY MR. SCHNEIDERMAN:

Q. And you also understand you need to file,

and I think I saw a motion to extend the time, Rule 2015.3 reports, entities in which the debtor has a significant interest, I believe, of more than 20 percent ownership, is that correct, and you'll be --

MR. LIEBERMAN: Yes, Mr. Schneiderman, this is --

MR. SCHNEIDERMAN: Go ahead.

MR. LIEBERMAN: Sorry, I didn't mean to interrupt but, yes, the obligation is understood, and part and parcel to our desire to engage a specialized accountant that has bankruptcy knowledge would be one of the -- the 2015 tax series is one of the reasons why we think that's appropriate here.

MR. SCHNEIDERMAN: And who is that speaking?

MR. LIEBERMAN: Lieberman.

MR. SCHNEIDERMAN: Okay.

BY MR. SCHNEIDERMAN:

Q. Mr. Kang, you agree with that statement?

A. Yes, sir.

Q. And you understand that the debtor must pay U.S. Trustee fees?

A. Yes.

Q. And the failure to pay those fees or file those reports timely could lead to the dismissal of the case, conversion of the case, or the possible appointment

of a Chapter 11 trustee?
A. Yes, sir.
Q. Now, I understand, I think we received general liability insurance. Is that correct?
A. Yes, that is correct.
Q. Right. Have you -- do you have insurance on the -- the only real estate holdings the debtor has is the real estate in South Korea, is that correct?
A. That is correct, that is correct.
Q. And is that property insured? Do they have property insurance in South Korea?
A. I'm not sure about that, sir.
MR. SCHNEIDERMAN: I mean, it kind of sounded funny coming out of -- as I was saying it, but it was a legitimate question. I don't know the answer.
To the extent that you have insurance, we need to have a copy of that, and we also need to make sure you have liability -- even if there's no property insurance, liability insurance on that property in Korea or a waiver.
If you intend to seek a waiver, I'd like to see that motion on file before the end of this week, Mr. Lieberman. I had hoped to have it -- I had hoped that you would have had it on file already, but I understand there's been a lot of pressure to do other things. But if

you could have that on file before Friday's hearing, it would be appreciated.

MR. LIEBERMAN: We will endeavor to do that.

BY MR. SCHNEIDERMAN:

Q. Is the debtor opening up a debtor-in-possession bank account, Mr. Kang?

A. Yes, sir, a debtor-in-possession account has been established at City National Bank of Florida.

Q. One account?

A. Correct.

Q. And you're -- you still have the prepetition accounts open, and you're going to -- I believe there were three different accounts. You're going to maintain those for now, or you're going to sweep those into the debtor-in-possession account?

A. The Citibank account has been closed. I believe my assistant sent that over to the folks at EL.

Q. Okay. What about the other -- what about those other accounts?

A. If you could give me one second, let me identify which accounts they are so that I can be as accurate as possible.

Yes, the escrow account, the reserve account, and the custodian account, I'm not sure what to do with those.

MR. SCHNEIDERMAN: Mr. Lieberman, were those accounts going to be maintained, or transitioned to debtor-in-possession accounts?

MR. LIEBERMAN: Those are the accounts that have claims of interest by Shinhan and possibly others, and those are the subjects of the motion to permit the existing bank accounts, that would ultimately be frozen, for lack of a better word, until the court rules otherwise, and that's the subject of Docket Entry 38 --

MR. SCHNEIDERMAN: And is that --

MR. LIEBERMAN: -- the motion to maintain the prepetition bank accounts.

MR. SCHNEIDERMAN: Right, I was looking for it while you were speaking.

Is that also up on Friday?

MR. LIEBERMAN: Yes. It was moved from Thursday to Friday.

MR. SCHNEIDERMAN: Correct.

BY MR. SCHNEIDERMAN:

Q. Okay. Schedules have been filed. Mr. Kang, have any -- and I think I saw an amendment, and you filed -- you signed the bankruptcy petition, correct, sir?

A. Yes, sir.

Q. You signed the bankruptcy schedules and the Statement of Financial Affairs?

A. Yes, sir.
Q. You assisted in the preparation of those documents, reviewed them before you signed them?
A. Yes, sir.
Q. And are the schedules and Statement of Financial Affairs true and correct?
A. To the best of my knowledge, yes, sir.
Q. And are there any assets that you know of that have been omitted?
A. Not that I'm aware of. If so, I'll communicate to Mr. Lieberman.
Q. Are there any errors or omissions in the bankruptcy schedules and the Statement of Financial Affairs?
A. Not that I know of.
Q. Other than Mr. Lieberman, I think there's Mr. McGolnick on the line?
MR. McGOLNICK: Yes, sir.
BY MR. SCHNEIDERMAN:
Q. And Mr. -- hold on one second, I wrote it down, Mr. Bauchner, are you intending to hire any other attorneys?
A. Not at this time, sir.
Q. Okay, and you're looking for a bankruptcy accountant to help with the operating reports?

A. That is correct.
Q. Okay. Other than -- in order to retain a professional or pay a professional, the debtor must first get an order of court. Even if they're not charging the debtor, if they're representing the debtor, they need to be approved by the court so we know who's out there making statements and representing the debtor's interest in whatever matter is pending.
So you need to get a court order authorizing the employment, and a subsequent order authorizing any future compensation. No payments can be made without a court order. You understand?
A. I understand, sir.
Q. Can you give me a -- I know it's in the case management summary, but can you give me a very short summary of the nature of the debtor's business?
And before you do that, Mr. Kang, how long have you been affiliated with Ria R Squared as president and CEO?
A. Since 2016.
Q. Okay. So you've been there for quite a -- a considerable amount of time.
A. Yes, sir.
Q. Okay. Go ahead and answer that previous question, if you could, please.

A. Ria R Squared is an investment company that engages with investments in fixed income securities, a.k.a. bonds, whether U.S. Treasuries, mortgage-backed securities, corporate bonds, and auto ABS securities, as well as other investment opportunities dealing with other corporations, and providing ample capital investment, and all with -- in-line with participation -- our participation in the U.S. capital markets industries.

Q. And what caused the filing of the bankruptcy?

A. It's simple here, it's lack of funds and inability to deal with the DW litigation, inability to deal with the Shinhan Securities litigation, the inability to deal with all the different litigations that -- where the legal expenses were beyond extraordinary, where the capital resources were diminished.

Q. I heard you say earlier you're also the CEO of Ducenta Squared Asset Management. What is the relationship of that entity with Ducenta 8020 Unconstrained Fund LP?

A. Ducenta Squared Asset Management is the investment manager of 8020 Unconstrained Fund.

Q. Does Ducenta 8020 have any other investors other than Ria R Squared?

A. No.

Q. Are all of the Ducenta investments purely Ria R Squared investments?
A. At this time, yes, as a limited partner.
Q. And the general partner, is it a limited partnership?
A. That is correct.
Q. And who is the general partner?
A. I believe the general partner is another entity called RSMD 8020 GP.
Q. And is that also controlled by you or others at Ducenta or Ria R Squared?
A. I am one of the participants in that GP, along with, I believe, three or four other individuals not involved with Ria R Squared.
Q. But Ria R Squared is, in essence, the entirety of the investment?
A. It's the sole majority limited partner, yes.
Q. And this property in Korea is in what name?
A. I'm not sure.
Q. And what's the size? Is it vacant land? Is it improved real estate? Is it a condominium building, an office building, acreage?
A. It's vacant beachfront property.
Q. And how many acres is that?
A. I'm not sure. I'll get you that

information.

Q. I see in the bankruptcy schedules, which I hope you do have in front of you, Schedule B, Item 55 -- 55.1, it lists several addresses all in South Korea, and I'm not going to try to pronounce these names, but there are numbers, 446, 447, 451, 451-2, 451-3, and 453. Are those empty lots, beachfront property?

A. That is correct.

Q. But you don't know if they are single unit family home sites, or are they dozens or hundreds of acres?

A. It's not that large.

Q. You have a value here --

A. (Inaudible.)

Q. Go ahead.

A. Those are different parcels.

Q. You have an aggregate --

A. (Inaudible.)

Q. You have an aggregate value of $1.5 million. How did you arrive at that?

A. That was the purchase price.

Q. When was the property purchased, approximately?

A. I would say approximately 2018.

Q. And what was -- was that a typical

investment on behalf of Ria R Squared, or what was the reasoning behind purchasing some vacant beachfront property in South Korea?

A. To develop.

Q. Has --

A. And it is in line with Ria's normal course of investment and business.

Q. Has Ria R Squared developed any other property?

A. No, but we invested in projects where the goal was to develop property.

Q. And did any of those projects get developed with Ria R Squared's involvement?

A. Yes, one did get developed almost to completion. That would be DW Marcy.

Q. And was this property purchased from an insider, or a third party, unrelated third party?

A. Unrelated third party.

Q. What was the name of the DW entity you just mentioned?

A. DW Marcy.

Q. So the debtor is a 50 percent owner of that entity. Is that a completed real estate development?

A. I don't believe it was 100 percent completed. However, we are currently in litigation for

that matter.

Q. And can you briefly describe that project? Is it 100 single family homes, a 40-story high rise, a single family home?

A. It is a condominium complex in Manhattan.

Q. And this is the entirety, the entire building, or ownership of particular units?

A. It was the participation in the entire development of that project.

Q. What is the address of the development?

A. I'm not 100 percent sure. I can definitely get that over to you.

Q. And you said the value is unknown. Do you have a ballpark range of the value of that development in its current state?

A. If my memory serves me right, I believe that property valuation was between $30 and $45 million.

Q. Is that similar for DW 80 South, is that also a real estate development project?

A. It was, yes, sir, a real estate dev -- a project to be developed.

Q. Does that project own vacant land in New York City or elsewhere?

A. Excuse me?

Q. Does it own vacant land?

A. It is land with an empty building.
Q. Like a shell?
A. Correct.
Q. Where?
A. 80 South, right next to the Brooklyn Bridge.
Q. And was Hajjar Medical Office building in Flushing?
A. Correct.
Q. And the debtor owns that property?
A. (No verbal response.)
Q. The debtor owns the --
A. (Inaudible) --
Q. The debtor owns the entity that owns that property?
A. Again, we're currently in litigation.
Q. You're continuing to operate though, correct?
A. No.
Q. The debtor is not operating, you're not -- I'm not talking about that particular property. I'm talking about generally.
A. Oh, yes, generally, of course it's operating.
Q. And how do you expect to get out of the Chapter 11? What do you expect to happen here?

A. Given the debtor's overall relationship, being able to continue in the normal course of business, for example, repurchase agreements and reverse repurchase agreements, and to be able to reach out to previous capital counterparties.

Q. Do you anticipate selling any of the assets that are held by other entities, in the name of other entities?

A. If the opportunity does arise where there's a fair evaluation, that is one option.

Q. And how many -- strike that.

Is the debtor current on its payroll taxes and other tax obligations?

A. The debtor is current on his payroll taxes. The debtor is delinquent on some federal, as well as New York State.

Q. You understand that those will need to be brought current in order to exit the bankruptcy?

A. Yes, sir.

Q. How many shareholders are there?

A. There's currently three. Actually two with an option to purchase.

Q. Are you one of them?

A. Yes, I am.

Q. Who's the other?

A. Michael Leung, L-E-U-N-G, and Dr. Emilio Gonzalez.
Q. Are you currently taking a salary from the debtor?
A. Yes.
Q. How much is that again?
A. Approximately $420,000 per year.
Q. Is Mr. Leung taking a similar salary?
A. No.
Q. Is he getting any salary?
A. Yes, he's getting a salary, but I believe his salary is approximately $240,000 a year.
Q. And what is he doing for the debtor?
A. He manages risk. He assesses market volatility. He assesses and participates in executive committee meetings. He further assists in terms of understanding deep capital markets experience, as well as managing repurchase agreements and counterparties, along with reverse repurchase counterparties.
Q. Does the debtor, other than -- I'll strike that.
Are there any related entities, other than the Ducenta entities, and these other various partnerships that you listed, are there any other related entities to Ria R Squared?

A. (No verbal response.)

Q. Do you or Mr. Leung, or Dr. Gonzalez own any other businesses that do business with the debtor or these related entities?

A. I believe the individual relationships only stem from the Ducenta entities, and that's that.

Q. Has the debtor transferred any monies, other than salary, to you, or Mr. Leung, or Dr. Gonzalez?

A. Besides salary, no, not to the best of my knowledge.

Q. I forgot the amount, let's just call it a ballpark figure of 185 million, that is asserted in the Shinhan Securities papers. Did you receive any of those monies outside of your ordinary salary of $420,000?

A. No.

Q. Did anyone related to you or any entity in which you have an ownership interest, or that of Mr. Leung or Dr. Gonzalez, receive any monies from those transfers?

A. Not that I know of.

Q. Do you have any other businesses, I may have asked this already, that transact business with Ria R Squared?

A. No.

Q. Does the debtor own any vehicles, boats, planes, aircraft, watercraft of any type?

A. No.
Q. Does the debtor own any machinery, equipment or furnishings of any type?
A. Besides computers, no.
Q. Other than the litigation claim that you've scheduled here, I believe against Shinhan Securities, does anybody owe the debtor any monies?
A. Yes.
Q. Be more specific, please.
A. Excuse me?
Q. Can you be a little more specific?
A. DW.
Q. I'm looking at Schedule B.
A. Schedule B.
Q. Item 71, you have a bunch of -- several notes receivable, litigation with Shinhan Securities, notes secured by real estate in Los Angeles for 5.5 million. Are you doing anything to collect on that money?
A. Besides litigation, no.
Q. Anything with -- this revolving credit keyman insurance, 2.9 million, is that a note receivable that's currently being paid, or just the value of the insurance if something were to happen?
A. Yeah, it has been paid, approximately two

payments of $500,000 were paid, so that needs to be adjusted.

Q. Okay. So you're still collecting on that money?

A. Correct.

Q. And you have other bonds, mortgage trusts where you're collecting money?

A. Trying to, sir.

Q. Are there any accounts receivable?

A. Outside of litigation, and outside of interest coupons to be paid, and specifically with Medalist Partners, no.

Q. Are you or any of the other officers and directors personally liable on any of these debts?

A. No.

Q. Are you personally liable on the claim by Shinhan Securities?

A. No.

Q. Are there any bank debts, conventional loans?

A. Nothing to the best of my knowledge, sir.

Q. Are there any related bankruptcy cases by you or any of the other entities, or any of the other parties related to the debtor?

A. Not that -- none -- not that I know of any.

Q. Any prior bankruptcies?
A. None.
MR. SCHNEIDERMAN: Ms. Garr, did you have any questions you'd like to ask today at the 341 Meeting?
MS. GARR: I do. Thank you so much.
MR. SCHNEIDERMAN: Go ahead.

EXAMINATION

BY MS. GARR:
Q. Good afternoon, Mr. Kang.
So, you -- it's correct that you and Mr. Leung are 50/50 shareholders of Ria, is that right?
A. Correct.
Q. And you mentioned Mr. Gonzalez. Beyond you -- what is Mr. Gonzalez' role with Ria?
A. His title is partner and executive committee member. He's part of the executive committee for Ria R Squared.
Q. Beyond you and Mr. Leung, does any other person or entity hold an equity, profit sharing, or other beneficial interest in Ria?
A. Not that I know of.
Q. You said that Ria has an actual operating business today that is providing financial planning, portfolio management, and investment advisory service. For whom does it provide those services?

A. I don't think I said that.
Q. Okay.
A. I said Ria is an investment company that engages in portfolio management and participates in the capital market.
Q. Okay, and for whom is it providing those services?
A. I'm sorry, I don't know how to answer that question.
Q. Where does the money come from that Ria uses to make investments?
A. Yeah, again, I don't know how to answer that question.
MR. SCHNEIDERMAN: Mr. Kang, it's a simple question. There's money invested. Who is Ria Squared investing the money and providing the financial services for?
THE WITNESS: No, Ria doesn't get investors. Ria has capital transaction parties where both counterparties are participants in capital markets in the U.S., with the function of investing in other investments, whether securities and/or (inaudible) investments, and/or real estates developments, et cetera.
BY MS. GARR:
Q. So there are two separate questions that I

still am not sure I have an answer to.

Where does the money come from that Ria uses to make its investments?

A. A combination of capital counterparties, a combination of repurchase and reverse repurchase, a combination of certain capital warehouse -- capital line, unsecured debt.

Q. Okay. So who benefits? Who's the beneficiary of your services?

A. Again, Ria is an investment company, with the mindset goals of generating alpha and/or returns with the capital, whether credit facilities, whether reverse repurchase agreements, whether it's with other, you know, security transactions.

Q. Okay. Mr. Kang, other than you, Mr. Leung, and Mr. Gonzalez, does anyone receive a benefit from the revenue generated by your services?

A. Yes.

Q. Okay. Who?

A. Money center banks, capital counterparties, investment managers, the issuers of mortgage bonds, corporate bonds.

Q. Okay. So other than the securities that were loaned by Shinhan as part of the 2019 lending transaction, does Ria manage any other third party's

client's money?

A. Shinhan Securities is not a client, it's a counterparty.

Q. Okay. Does Ria R Squared have any other counterparty that lent its securities? I understand there's reverse repo transactions that were done using those securities. Is there any other lending counterparty with Ria R Squared other than Shinhan?

A. No.

Q. Who has the authority -- was there, in -- has that been the case for the past, since the 2019 lending transaction?

A. No.

Q. When is the last time there was a counterparty other than Shinhan?

A. The last time, I believe, was approximately in 2020.

Q. Okay, and does any private -- does Mr. Leung, or you, or Mr. Gonzalez invest your own money at all?

A. Yes.

Q. And what percentage of the assets are your own money?

A. In 2019, '20, I would estimate anywhere between 3 and 5 percent of the capital balance sheet.

Q. And then what about after 2020?
A. I'm not sure, but there are still outstanding amounts. Currently, I believe, combined we have approximately anywhere between 5 and 7 percent.
Q. Of insider assets?
A. Correct, insider capital.
Q. Whose capital?
A. Mine and -- as well as Mr. Leung.
Q. Who has the authority to make decisions on behalf of Ria regarding investments?
A. The executive committee has the authority to make investment decisions.
Q. Who is on the executive committee of Ria?
A. David Kang, Michael Leung, and Dr. Emilio Gonzalez.
Q. And what is the financial arrangement between Ducenta Squared Asset Management -- you said that you're the CEO of Ducenta Squared Asset Management, correct?
A. Correct.
Q. What's the financial arrangement between Ducenta and Ria?
A. Ducenta is an SEC registered investment manager that charges a fee for -- a standard fee, based on the type of strategy and/or investment.

Q. Okay. So you answered earlier that Ducenta has no other -- it's solely investing for Ria R Squared, is that correct?

A. Excuse me?

Q. Ria R Squared is Ducenta's only client?

A. I never said that.

Q. Okay. So --

A. Ducenta has -- combined, I believe, Ducenta has approximately, I'm going to estimate 300 clients.

Q. Okay. So, and Ducenta has $4 billion of assets under management, is that right?

A. That is correct, approximately.

Q. Okay. So, what -- does Ducenta get paid a flat fee, or a percentage of assets under management for its investments (inaudible) Ria?

A. Traditionally, Ducenta charges a percentage to all its clients based on the default market value of the investments that Ducenta manages.

Q. So does Ducenta get paid regardless of whether the investments are profitable?

A. Yes, the fees are charged based on the market value of the investment.

Q. Okay, and the market value of the investment -- well, I'll come back to that.

So who has the authority to make decisions

on behalf of Ria regarding company expenditures?
A. The executive committee.
Q. The same three people that you identified --
A. Right.
Q. -- earlier?
Who has the authority to make decisions on behalf of Ria regarding litigation?
A. Excuse me, can you repeat that one more time?
Q. Who has the authority to make decisions on behalf of Ria regarding litigation?
A. The executive committee.
Q. Who has the authority to make decisions on behalf of Ria regarding the filing of the Chapter 11 petition?
A. The executive committee.
Q. When did Ria first retain restructuring counsel to advise on a potential bankruptcy filing?
A. When?
Q. Yes.
A. I want to say the first Chapter 11 bankruptcy attorney that was introduced was approximately the end of May 2026.
Q. Was there any other party involved in making the decision to file for Chapter 11 other than the

executive committee of Ria?

A. No.

Q. Is Ria insolvent?

MR. LIEBERMAN: Objection, calls for a legal conclusion.

BY MS. GARR:

Q. Did Ria ever obtain an outside accountant to conduct annual audits?

A. Yes.

Q. Ria lists its total scheduled assets of roughly 677 million against liabilities of roughly 199 million, is that correct?

A. Can you highlight -- let me be accurate on this.

Q. Sure. In your summary, Part 12, you list roughly 677 million of liabilities -- I'm sorry, 677 million of assets against liabilities of roughly 199 million, is that right?

A. Can you give me an exact page number on which schedule?

Q. Sure, the summary on Part --

MR. SCHNEIDERMAN: Mr. Kang, do you have the set of schedules with the docket number printed across the top, where it says --

THE WITNESS: Yes.

MR. SCHNEIDERMAN: -- the case number, Docket 6?

THE WITNESS: I have Official Form 202. Yes, I have Docket 6, correct.

MR. SCHNEIDERMAN: Okay. Page 8 of 29. Do you have the pages printed across the top where it says page number blank?

THE WITNESS: Yes, sir, I found it.

MR. SCHNEIDERMAN: Okay. Ms. Garr, go ahead and ask your question again.

MS. GARR: Thank you.

BY MS. GARR:

Q. So you list a total of scheduled assets of roughly 677 million, do you see that?

A. Yes, I do.

Q. Okay, and that's against liabilities that are listed of roughly 199. So I guess my question -- and I don't want to waste additional time here.

Of this, if you look at the page before that, there's 606 million reported in Part 11, all other assets, it's Schedule A/B, Line 78, the page before, Page 6?

A. Correct.

Q. How much of that is flexible, liquid, or reasonably capable of being reduced to cash in the near

term, of this 606, as opposed to just litigation claims?
A. With the exception to litigation claims, give or take $50 to $60 million.
Q. Of the 606?
A. Correct.
Q. Or of the 699?
A. Correct.
Q. And you said roughly -- I'm sorry, you said roughly how much?
A. 50 to $60 million.
Q. And are those the securities in the Ducenta 8020 and some trade funds that you're speaking of?
A. That is correct, those are the only liquid assets.
Q. Okay. So, in 20 -- and the rest are contingent litigation claims, correct?
A. Correct.
Q. In 2025, Grant Thornton served as auditor to Ria for the year ending December 31st, 2023, is that right?
A. I believe so.
Q. And they conducted a going concern analysis, right?
A. A going concern, yes.
Q. In March 2026, Grant Thornton found that as

of December 31st, 2023, the company's total liabilities exceeded its assets by $91 million, primarily due to the loan payable to Shinhan Investment Corp, and that management had substantial doubt about the company's ability to continue as a going concern.

This is filed in the Court, and this is a (alarm going off) -- presentation adopted in 2026.

Grant Thornton also stated that if Ria returned the securities to Shinhan, it would cause the liquidation of the assets of the company, correct?

A. I (inaudible, two people speaking) --

UNIDENTIFIED: Sorry.

BY MS. GARR:

Q. Could Ria return the securities loaned by Shinhan and continue as a going concern as of December 31st, 2023?

A. Again, I'm not sure which document you're referencing.

Q. Okay. So, separately from a document, could Ria return the securities loaned by Shinhan and continue as a going concern in 2023?

MR. LIEBERMAN: Objection, no predicate.

BY MS. GARR:

Q. You can answer.

A. If Ria could reengage all its credit

facility lenders without any disruption, there definitely could be a feasibility.

Q. Okay. Absent obtaining additional lent securities from another lender, or from Shinhan, could Ria return the lent securities due at the end of the lending arrangement and continue as a going concern as of December 31st, 2023?

MR. LIEBERMAN: Same objection.

THE WITNESS: I think my track record kind of proves, I think, there's a feasibility. I need to be able to reengage all my capital counterparties without interruption.

BY MS. GARR:

Q. Okay. I don't, I don't -- that's not a response to my question.

Grant Thornton found as of December 31st, 2023, that if Ria returned the securities to Shinhan, it would prompt the liquidation of the assets of the company. Do you recall that?

A. I don't recall those exact words because I don't have those files in front of me.

Q. Okay. It's at Docket 2026, but we'll move on.

So, did Ria's financial condition change as of 2024?

A. Can you clarify that question?
Q. Did Ria's financial condition improve as compared to December 31st, 2023 in 2024?
A. From 2023 to 2024, approximating -- I believe the financial condition got worse.
Q. What about from 2024 to today?
A. Worse.
Q. In a filing with the New York court on May 5th, 2025, Ria stated that there's no actual evidence Ria's insolvent, or might be unable to satisfy a judgment, quote. Stated again, quote, the collateral securities or their cash equivalent will be fully available to satisfy a judgment in favor of Shinhan. Quote, and if, quote, Shinhan prevails at trial, it can recover the securities for their monetary value through a money judgment enforceable against a solvent U.S.-based counterparty, end quote.
Who from Ria reviewed and approved this filing?
MR. LIEBERMAN: I'm sorry, Ms. Garr, what are you quoting?
MS. GARR: I'm quoting from the opposition to the motion for injunctive relief that was filed by Ria on May 5th, 2026, and it's filed on the docket at 20-17 in this bankruptcy.

BY MS. GARR:

Q. So, who from Ria reviewed and approved the filing with the New York court on May 5th, 2026?

A. Yeah, I'm not sure how to comment on that because I don't have the forms in front of me.

Q. You said decisions being made for litigation were made by the executive committee. Did the executive committee approve filings that were made to the New York court?

A. I don't recall.

Q. Did you personally review filings that were made to the New York court?

A. I'm sure I have.

Q. You also, together with Tim Torline, submitted sworn affidavits to the New York Supreme Court Commercial Division. Who reviewed and approved the filing of those affidavits?

A. I reviewed the affirmation. Those are my affirmations as a representative of Ria R Squared.

Q. Okay, and --

MR. SCHNEIDERMAN: Ms. Garr --

BY MS. GARR:

Q. -- did anyone else have to approve it before it got submitted to the court for Ria?

A. For my personal affirmation, I don't believe

so.

Q. In your affidavit to the New York court, you described a transfer of collateral that was previously held at the BNP custodial account. That was an account that was titled Shinhan Investment Corp RR-SAC (phonetic), and the number is ending in 0002.

You stated that following the termination of the BNP relationship, Wells Fargo and WSFS Bank served as custodians of the collateral and then, quote, at present, all collateral is held at the custodial account with WSFS.

Who made and approved the decision to transfer the collateral out of BNP?

A. I believe it's not a collateral --

Q. You think -- I'm sorry, who made the decision to transfer the --

MR. LIEBERMAN: Ms. Garr, if you could finish that sentence so that I can raise my objection?

MS. GARR: Yes.

BY MS. GARR:

Q. Who made and approved the decision to transfer the collateral out of BNP?

MR. LIEBERMAN: Objection, calls for a legal conclusion, the term collateral.

MS. GARR: I'm using the term that he used in his sworn affidavit to the New York court.

BY MS. GARR:
Q. So, who made the decision to transfer that?
MR. LIEBERMAN: The same objection.
BY MS. GARR:
Q. You can answer.
A. I'm not sure if it was a decision. It was more of a forced termination by BNP.
Q. Okay, and who made the decision to transfer it to Wells Fargo and to WSFS?
A. It was a --
MR. SCHNEIDERMAN: Ms. --
THE WITNESS: It was discussed by the executive committee, and everyone was in line with being able to transfer assets given -- transferred assets to both Wells Fargo, Prime Brokerage, as well as WSFS.
MR. SCHNEIDERMAN: Ms. Garr, could you -- Ms. Garr, could you spell out that acronym, please?
MS. GARR: WSFS?
MR. SCHNEIDERMAN: Yes, please.
MS. GARR: It's W-S-F-S --
MR. SCHNEIDERMAN: Thank you.
MS. GARR: -- Bank.
MR. SCHNEIDERMAN: Ms. Garr, how much longer? I have this -- Mr. McKenzie, are you on the line yet?

MR. MCKENZIE: Yes.
MR. SCHNEIDERMAN: Okay. Just hold on two minutes, sir.
Ms. Garr, if you could wrap it up, please?
MS. GARR: Okay.
BY MS. GARR:
Q. Who, who -- I'm sorry.
The Ducenta 8020 account is a sub-account under the master account of WSFS ending in 4040, is that right?
A. I believe so.
Q. Who owns and controls the master account?
A. I'm not sure. I'll try to provide that information.
Q. Who owns and controls the Ducenta 8020 Unconstrained Funds LP?
A. Yeah, if it's controlling the investments, I believe Ducenta -- I mean, Ducenta Squared is a manager that manages the portfolio, if that's what you mean by control.
Q. Who owns the Ducenta 8020 Unconstrained Funds LP?
A. To the best of my knowledge, the LP is Ria Squared, the GP is RSMD 8020 GP, and the investment manager is Ducenta Squared Asset Management.

Q. Does the Ducenta 8020 Funds hold any assets other than the securities held in the Ria companies through Ducenta 8020 sub-account?

A. Can you clarify that question?

Q. Sure.

We talked about the securities -- the only liquid securities you've identified are the ones held in that account, correct?

A. Correct.

Q. Does the Ducenta 8020 Unconstrained Funds LP hold any assets other than those held in that account?

A. Not at this time, no.

Q. And when was the Ducenta 8020 Unconstrained Funds formed, created?

A. I'm not exactly sure of the exact date.

MR. SCHNEIDERMAN: Ms. Garr, I'm going to have to ask you to wrap it up here.

I apologize, Mr. Della Torre -- actually, no, you're counsel for the debtor.

Mr. Kleiner and the other attorney, Mr. Atteberry, I apologize, did you have any questions that weren't already asked? Mr. Atteberry?

(No verbal response.)

MR. SCHNEIDERMAN: Okay, I guess Mr. Atteberry is no longer there.

Mr. Kleiner, did you have any additional -- other questions that haven't already been asked?

MR. KLEINER: None at this time. Thank you.

MR. SCHNEIDERMAN: And the other attorney, was it Mr. Isida.

MR. ISHIDA: No.

MR. SCHNEIDERMAN: No? And can you spell your last name again, sir?

MR. ISHIDA: I-S-H-I-D-A.

MR. SCHNEIDERMAN: Okay, Ishida.

Okay. Ms. Garr, I think we've gone enough through the 341 Meeting.

Did you have any other questions that had to be asked today?

MS. GARR: I did, but I'm appreciative of your time. I only have a few minutes more of questions. Is there a possibility to continue this just for a few -- you know, 15 minutes, 10 minutes more?

MR. SCHNEIDERMAN: No, I have another meeting at -- they're already on the line, and I have a 1:30 emergency first day hearing in a new case.

MS. GARR: No, I understand. I meant another day, could we continue this --

MR. SCHNEIDERMAN: No, you can --

MS. GARR: -- just for another day?

MR. SCHNEIDERMAN: No, you can set a 2004 Exam, which I think is where you're probably going to end up going anyway --

MS. GARR: Yes.

MR. SCHNEIDERMAN: -- as opposed to a continued 341 Meeting.

I think for purposes of today --

MS. GARR: Okay.

MR. SCHNEIDERMAN: -- we've exhausted the 341 Meeting, and I'm going to go ahead and conclude the meeting.

I appreciate everybody's time.

CONTINUED EXAMINATION

BY MR. SCHNEIDERMAN:

Q. Mr. Kang, I'm just going to go through a couple last minute issues here.

Did the debtor pay down any old debt, not in the ordinary course of business in the last year?

A. No, not that I know of.

Q. Did the debtor pay off any creditors in the last three months prior to filing?

A. Yes.

Q. Other than what's shown on Statement of Financial Affair Number 3, are there any other transfers, other than those that are disclosed in the bankruptcy

schedules and Statement of Financial Affairs?

A. Not to the best of my knowledge.

Q. Did the debtor give away any assets in the last 12 months?

A. No, sir.

Q. Did the debtor sell any assets for less than market value in the last 12 months?

A. Not that I'm aware of.

Q. Did the debtor transfer any assets to any insiders, you, any of the other governing board members, any of the entities owned or controlled by you, or any other related entity in the last two years?

A. No, not that I know of.

MR. SCHNEIDERMAN: Okay. I want to remind you to file your reports timely, pay the U.S. Trustee fees timely. We need that motion to waive insurance or extend the time to get insurance on the real property and the other issues, Mr. Lieberman. We also need those 2015.3 reports to show the financial activity of these other entities, which clearly fall under the definition of the entities covered by Rule 2015.3, okay?

MS. GARR: May I ask just two questions very quickly?

MR. SCHNEIDERMAN: Go ahead, Ms. Garr.

CONTINUED EXAMINATION

BY MS. GARR:

Q. There was over $204 million in liquid marketable securities at BNP as of April 30th, 2025. At least 2 remain in the WSFS account.

Who at Ria made the decision to sell or liquidate the liquid (inaudible) securities?

A. Yeah, I need a reference on what this is referring to. I mean --

Q. You're unfamiliar with the $204 million in marketable securities? It's in your affidavit to the court. It's listed in daily collateral reports that were submitted.

The collateral that was held at BNP was sold, the majority of it was sold.

A. I (inaudible) recall in my affirmation a number of $244 million.

Q. Okay. Who sold the assets that were the securities that were in the BNP account? Who made the decision to sell those assets?

A. And, again, I'm not sure which assets you're referring to.

Q. The liquid marketable securities that were held in the BNP account, who made the decision, and who received the benefit of the sale of those proceeds?

A. And, again, unless I can review which

securities and the ledger, I cannot opine on something that is specific to identified securities. So --
Q. Okay.
A. -- I'd be more than willing to --
Q. We'll have a deposition, that's fine.
But last question, who has the authority to direct trade transfers or withdrawals of the securities that are currently held in the Ducenta 8020 account at WSFS?
A. Who has the authority to withdraw?
Q. To direct trade, transfer or make any withdrawals of those securities held in the WSFS account.
A. Ducenta Squared, as a registered SEC manager, buys and sells and manages the portfolio based on a certain strategy. So, they don't -- they're the ones that actually do the trading.
Q. Would they do that without Ria's direction or instruction?
A. Of course.
Q. And they're aware of the freeze order that was issued by the Court over those assets?
A. Yes, and, hence, given the freeze, they haven't traded.
MS. GARR: Okay. Thank you.
MR. SCHNEIDERMAN: All right. Thank you all

for attending today.

That will conclude the meeting in the Ria R Squared case. Those parties on the line for the next case, I ask you to hold on.

Mr. Kang, Mr. Lieberman, I'd just ask you to file your monthly reports timely. Mr. Kang, please get the information Mr. Lieberman needs, and is requested of you, to avoid any unnecessary issues with our office, and to delay any administration in this case.

That will conclude that meeting. Thank you all for attending.

UNIDENTIFIED: Thank you, sir.

MR. LIEBERMAN: Thank you.

(Thereupon, the 341 Meeting of Creditors was concluded.)

## CERTIFICATION

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing Section 341 Meeting of Creditors was transcribed by me from a digital recording made on the date and at the place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record to the best of my ability of said proceedings.

WITNESS my hand this 29th day of August, 2026.

______________________________

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 715336
December 27, 2029